Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Apr 17 4:49 PM-18CV003229

0E112 - N79

## IN THE FRANKLIN COUNTY COURT OF COMMON PLEAS
### GENERAL DIVISION

| | | |
|---|---|---|
| **KARL SHAW** | ) | **Case No.** _____ |
| **120 Marconi Blvd.** | ) | |
| **Columbus, OH 43215** | ) | **Judge** _____ |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **CITY OF COLUMBUS, OHIO,** | ) | |
| **COLUMBUS DIVISION OF POLICE,** | ) | |
| **120 Marconi Blvd.** | ) | |
| **Columbus, OH 43215,** and | ) | |
| | ) | |
| | ) | |
| **KIMBERLEY JACOBS, CHIEF,** | ) | |
| **Columbus Division of Police,** | ) | |
| **120 Marconi Blvd.** | ) | |
| **Columbus, OH 43215** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT WITH JURY DEMAND ENDORSED HEREON

### I.    INTRODUCTION

1.    This is an action for damages and declaratory and injunctive relief pursuant to

Ohio Revised Code Section 4112.02(A) and (J) and Title VII of the Civil Rights Act of 1964, 42

U.S. Code Section 2000e, arising from race discrimination and retaliation against the Plaintiff,

Karl Shaw, an African-American police officer, by Defendants City of Columbus, the Columbus

Division of Police, and Chief Kimberley Jacobs.  Officer Shaw was repeatedly subjected to

hostile and discriminatory conduct, including the denial of open assignments, due to his race and

in retaliation for participating in an investigation of violent racial threats by a white officer.

Officer Shaw's experiences are symptomatic of a pattern, practice, and policy of discriminatory

treatment of minority officers under the administration of Chief Jacobs.

1

## II.     PARTIES AND VENUE

2.     Plaintiff Karl Shaw is an African-American male resident of Ohio.

3.     Defendant City of Columbus, Ohio (hereinafter "the City"), is a municipal corporation and a political subdivision of the State of Ohio, responsible for governing Columbus, Ohio, which is located in Franklin County.  The City's agencies include Defendant Columbus Division of Police ("CPD"), its primary law enforcement agency.  The City has over 10,000 employees, of whom approximately 2,100 work at the CPD.

4.     Defendant Kimberley Jacobs is the Chief of the CPD, and the chief law enforcement officer for Columbus, Ohio.  She is an "employer" and a "person" for purposes of Chapter 4112 of the Ohio Revised Code.

5.     Defendant Jacobs' actions fall outside the scope of Ohio political subdivision immunity based on the exceptions in Divisions (A)(6)(b) and (c) of Section 2744.03 of the Revised Code, because Defendant Jacobs committed the acts described below with malicious purpose, in bad faith, or in a wanton or reckless manner, and because Defendant Jacobs is expressly liable for her discriminatory acts under Section 4112.02(J) of the Revised Code.

6.     Venue is appropriate in this Court as the Defendants are located in Franklin County, Ohio, and committed the discriminatory acts alleged below in Franklin County.

## III.    FACTS

### A.     Officer Shaw's History of Distinguished Service Despite Hostility from White Command Officers

7.     Plaintiff Karl Shaw has been employed by the Columbus Division of Police as a sworn police officer since November 1992.

8.     During his over twenty-five years with the CPD, Officer Shaw has served with distinction, and has performed well in a variety of roles.  Perhaps most notably, between 2013

2

Case: 2:18-cv-00483-JLG-CMV Doc #: 2 Filed: 05/17/18 Page: 3 of 15 PAGEID #: 40
Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Apr 17 4:49 PM-18CV003229
0E112 - N81

and 2014, while serving in the CPD's Strategic Response Bureau (SRB), Officer Shaw initiated a high-profile investigation of Columbus hotels connected with prostitution, human trafficking, and drug activity. Thanks in part to his work, the CPD and the Columbus city attorney's office were able to shut down a number of hotels that were facilitating illegal conduct. Prior to that investigation, Officer Shaw served in Narcotics, a particularly challenging and sometimes dangerous assignment.

9. Officer Shaw's work was openly praised by the city prosecutors who partnered with the CPD in the hotel investigation—but not by his chain of command with the CPD. Instead, white command officers were dismissive of his investigative activity and gave credit and recognition for his work to white officers who played smaller roles in the investigation.

10. Officer Shaw also experienced hostility from white command officers in other ways. For instance, he was turned down for opportunities to join the CPD's dive team (a prestigious assignment) on three separate occasions, despite achieving record times in the CPD's internal swimming competition. In addition, he experienced undue animosity and criticism of his performance from a white supervisor (Commander Gary Cameron, whose actions are discussed below) while serving in the CPD's Narcotics unit despite achieving results similar to or exceeding those of his peers.

**B.    Sergeant Eric Moore Is Heard Making Racist Death Threats; Officer Shaw Participates in the Investigation.**

11. During Officer Shaw's time in the SRB, the most critical white command officer was Sergeant Eric Moore. Moore not only refused to recognize Officer Shaw's achievements; he actively worked to shut down the hotel investigation and remove Officer Shaw from it.

12. Officer Shaw reasonably believed Moore's hostility toward him and his work was based on race. Moore did not treat white officers with similar hostility, and he was well known

3

Case: 2:18-cv-00483-JLG-CMV Doc #: 2 Filed: 05/17/18 Page: 4 of 15  PAGEID #: 41
Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Apr 17 4:49 PM-18CV003229
0E112 - N82

inside and outside his unit for making disparaging comments about black officers and using racial slurs. One of Moore's roles was to oversee the use of police surveillance equipment, and black officers (including Officer Shaw) noticed a pattern of Moore refusing permission for them to use needed equipment.

13.  In April 2014, Moore became involved in a dispute with two African-American officers, Sergeant Doug Williams and Officer Eric Cornett. In a discussion with a white subordinate, Officer Wes Sorrell, Moore called Williams and Cornett "niggers" and stated he needed to "take their monkey asses out back and kill them."

14.  Sorrell, a close confidante of Moore, waited several months, but ultimately reported Moore's racist death threat to Sergeant Williams in September 2014. Williams reported it through his chain of command. The CPD opened an Internal Affairs investigation of Moore.

15.  In addition to beginning to investigate Moore, the CPD opened another, more intense investigation of Sorrell, the officer who reported the racist death threat, based on statements Sorrell had made about his and Moore's abuse of their access to CPD equipment, as well as Sorrell's failure to report Moore's comment more promptly.

16.  Sorrell, who reported the alleged death threat, was immediately relieved of duty and deprived of his gun and badge pending the investigation. Despite being accused of far more serious misconduct, including making death threats against African-American officers he was working with, Moore was allowed to remain on duty in a command role for more than a year after the allegations were reported. Moore remained on duty, with gun and badge. The only restriction on Moore was to refrain from contact with Officer Cornett and several other officers involved in the allegations against him.

4

Case: 2:18-cv-00483-JLG-CMV Doc #: 2 Filed: 05/17/18 Page: 5 of 15 PAGEID #: 42
Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Apr 17 4:49 PM-18CV003229
0E112 - N83

17.    Moore continued to hold his position even after additional, disturbing misconduct surfaced, including a report that he had drawn his weapon on a minority officer, a confirmed report from an outside agency that he had ordered an illegal device capable of converting a semi-automatic weapon into an automatic weapon, and his own admission that he had violated his no-contact order by contacting one of the officers he had been instructed to stay away from.

18.    The Moore and Sorrell investigations lasted for over a year and a half.  Sorrell was punished with a significant suspension.  As discussed below in more detail, the CPD and Chief Jacobs never effectively held Moore accountable for any of the race-related allegations against him, nor did it seriously attempt to do so.  Although Moore was terminated, it was for unrelated conduct, and he was reinstated due to the CPD's failure to charge him effectively.

19.    Officer Shaw was not in Moore's chain of command and did not witness the threats Moore made.  But he became a participant in the investigation when he was asked to provide an interview regarding Moore's broader conduct toward African-American officers.  In his Internal Affairs interview and thereafter, Officer Shaw truthfully reported comments he had heard reported by others (including Moore's use of the word "nigger"), his impression of Moore's hostile attitude toward black officers with respect to the use of equipment, and his understanding that Moore was actively trying to shut down his hotel investigation.  Moore was informed of all of the allegations against him, including Officer Shaw's.

### C.    The CPD Permits Moore to Push Officer Shaw Out of an Open Narcotics Assignment for Admitted Illegal Reasons.

20.    While the investigation continued, in the fall of 2014, Officer Shaw's unit, the SRB, was disbanded, and the officers in it, including Officer Shaw, were required to find alternate assignments.  Officer Shaw was removed from the hotel investigation he had initiated.

Case: 2:18-cv-00483-JLG-CMV Doc #: 2 Filed: 05/17/18 Page: 6 of 15  PAGEID #: 43
Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Apr 17 4:49 PM-18CV003229
0E112 - N84

21.     When the SRB unit was disbanded, despite the investigation pending against him, Moore was assigned as a Narcotics sergeant and given authority to fill two openings for Narcotics officers through a competitive bid process.

22.     The Narcotics positions posted in late 2014 were the best assignments available to Officer Shaw (and among the only assignments available), in terms of duties, likely hours and days of service, and overtime compensation eligibility.  Officer Shaw applied for the positions.

23.     Moore, having been permitted to fill the openings despite the active investigation of his misconduct, continued to abuse his authority in doing so.  In filling the first opening, he decided to select a junior white officer, well down the seniority list for the position.  He did this by persuading more senior white officers to pass on the position.  He then claimed, falsely, that more senior black officers, including Shaw, had also passed, when in fact, they had not.

24.     Meanwhile, Shaw and another black Narcotics applicant, Whitney Lancaster (who had also participated in the Moore/Sorrell investigation), were "interviewed" in person for the Narcotics opening by two senior command officers in Narcotics, Commander Gary Cameron and the unit lieutenant.  Only these two black officers were interviewed in person for the openings.  Consistent with normal practice, no interview process at all occurred for any other applicants, since the job was supposed to be filled based on candidates' written applications and their placement on the seniority list.

25.     In his "interview" with Cameron and the unit lieutenant, Cameron told Officer Shaw he was concerned about his ability to do the Narcotics job based on his past performance record, and raised unfounded concerns about Officer Shaw's integrity through a reference to the Rampart scandal involving corrupt narcotics officers in California.  The unit lieutenant later told Officer Shaw he felt Cameron had bullied him, and he had no explanation for why this occurred.

6

Case: 2:18-cv-00483-JLG-CMV Doc #: 2 Filed: 05/17/18 Page: 7 of 15 PAGEID #: 44
Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Apr 17 4:49 PM-18CV003229
0E112 - N85

26.     In the midst of this hiring process, Moore openly sought to intimidate Officers Shaw and Lancaster so they would not take the Narcotics positions. Despite a direct order not to contact Officer Lancaster due to his role in the investigation, Moore confronted him in person and told him he would assign him to unfavorable hours and duties if he took the position.

27.     Moore also sent threatening text messages to another officer, which the officer relayed to Officers Shaw and Lancaster, warning they had "better not" take the Narcotics jobs.

28.     Officer Shaw and Officer Lancaster reported Moore's new threats to Internal Affairs. The CPD took no effective action in response. Moore remained on duty in his command position despite having violated a direct no-contact order and made written threats against two black officers while already under investigation for racist threats and slurs.

29.     Moore's selection of the junior white officer for the first Narcotics position was eventually overturned after a number of reports of Moore's irregular hiring process. The hiring process was restarted with the unit lieutenant and Cameron taking over the process—but Moore was allowed to retain his post and would supervise both open positions.

30.     The unit lieutenant subsequently spoke to Officer Shaw about the positions. Officer Shaw asked him if he would be protected if he took a position under Moore. The unit lieutenant said he would do his best, but could not guarantee anything because he would not be there every minute. During the conversation, the lieutenant was told of Moore's racist threats against Officers Shaw and Lancaster to deter them from seeking or accepting the narcotics positions. The lieutenant took no action against Moore following his conversation with Officer Shaw. Nor did Defendant Jacobs take any action against Cameron or the lieutenant related to the discriminatory and threatening in-person interviews of Officers Shaw and Lancaster.

Case: 2:18-cv-00483-JLG-CMV Doc #: 2 Filed: 05/17/18 Page: 8 of 15 PAGEID #: 45
Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Apr 17 4:49 PM-18CV003229
0E112 - N86

31.     Officer Shaw reasonably concluded that he could not take a position in Narcotics under Moore after his threats. A threat that an officer had "better not" take a Narcotics job carries particular weight. Narcotics officers have frequent contacts with drugs and other contraband confiscated from suspects, and are thus especially exposed if their fellow officers or supervisors are inclined to manufacture false allegations against them. Officer Shaw therefore informed the unit lieutenant that he was withdrawing from consideration.

32.     Moore subsequently admitted in his Internal Affairs investigation that he threatened Officers Shaw and Lancaster because he felt they had labeled him as a racist in the investigation of his threats against Officer Cornett and Sergeant Williams. This admission, as well as Officer Shaw's conversation with the unit lieutenant and the threatening and discriminatory interviews conducted by Cameron, were made known to the chain of command, including Defendant Jacobs, through the Internal Affairs investigative packet concerning Moore.

33.     One of the Narcotics positions was ultimately filled by a less senior white officer. The other was given to a more senior officer who had not applied until after the position was withdrawn and reposted due to Moore's misconduct in filling the position. Upon information and belief, the more senior officer was solicited to apply for the position to exclude less senior black officers, including Officer Shaw, who might otherwise have taken the position.

### D.     The CPD Continues to Subject Officer Shaw to Disparate Treatment Even After His Retaliatory Deprivation of the Narcotics Assignment.

34.     Following the Narcotics incident, Officer Shaw applied for an assignment to freeway patrol. This assignment was less favorable than the Narcotics position, but he was running out of time to find a position after his former unit disbanded. However, he was denied this position because he was about to go on leave due to an injury. White officers had previously

8

had positions held for them pending such leave, or were permitted to fill positions for periods as short as one day before taking medical leave. Officer Shaw received no such accommodation.

35.     Officer Shaw was forced to pursue a union grievance about the freeway position. The union accepted a compromise through which he was re-assigned temporarily. Following his rehabilitation, he took an assignment as a school resource officer—a position with less overtime eligibility and fewer advancement opportunities than the Narcotics and freeway patrol positions.

36.     Officer Shaw has since sought and been turned down for additional, favorable assignments for which he was very well qualified in favor of less qualified white applicants.

**E.     The CPD and Chief Jacobs Fail to Hold Moore Accountable, Consistent with Their Pattern and Practice of Ignoring, Condoning, and Participating in Race Discrimination and Retaliation.**

37.     Moore was permitted to remain on active duty until the completion of the Internal Affairs investigation in October 2015. The investigation focused almost entirely on his abuse of overtime and equipment privileges and treated the race-based allegations as an afterthought. Despite concluding that Moore had been untruthful about a number of issues, that several officers had witnessed him using racial slurs, and that he had personally admitted retaliating against Officers Shaw and Lancaster in the filling of the Narcotics positions, the investigator claimed he was unable to reach a finding as to whether Moore made death threats against Officer Cornett and Sergeant Williams, and made no other findings regarding Moore's pattern of race-based and retaliatory conduct except that he had used inappropriate language. Moore's purchase of illegal weapons equipment was not even investigated.

38.     When Chief Jacobs was presented with the charges against Moore, she terminated him, but did so based solely on the non-race-based conduct alleged against him. Moore received only a minor reprimand for his open use of racial slurs while on duty and no discipline for his

threats against Officer Cornett and Sergeant Williams, his retaliation against Officer Shaw and Officer Lancaster, his false statements as to other black officers withdrawing their applications for the Narcotics position, or his deliberate disregard of the order not to contact Officer Lancaster. Nor was there any recommendation, charge, or action concerning the discriminatory, threatening interviews of Officers Shaw and Lancaster by Commander Cameron. Similarly, the Defendants ignored the unit lieutenant's failure to take action as to Moore's threats against Officer Shaw that forced him to withdraw from consideration for the open Narcotics position.

39.    As a result of Chief Jacobs' refusal to charge Moore with the most serious conduct against him, his termination was subsequently overturned by an arbitrator and he was reinstated to his command position with no loss of pay.

40.    The failure of Chief Jacobs to charge Moore with all of his misconduct was in stark contrast to her treatment of black officers, and was consistent with her pattern and practice of treating alleged misconduct by black officers more harshly than that of white officers. In recent years, with the knowledge and evident approval of Chief Jacobs, African-American officers and officers raising concerns of discrimination and harassment have routinely been disciplined more harshly, investigated without cause, denied protection from discriminatory treatment by supervisors and co-workers, and, in several cases, driven out of the CPD by a pattern of race discrimination and retaliation.

41.    For example, at least two minority officers reported incidents in which white officers drew or threatened to draw their service weapons on them. Both officers were pressured not to make disciplinary allegations regarding the incidents, and one of the officers, who did make such an allegation, was then subjected to a baseless investigation for alleged dishonesty. No discipline was issued regarding either threatening incident.

10

Case: 2:18-cv-00483-JLG-CMV Doc #: 2 Filed: 05/17/18 Page: 11 of 15 PAGEID #: 48
Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Apr 17 4:49 PM-18CV003229
0E112 - N89

42.     In another case, an African-American officer was terminated by the CPD upon
allegations of misreporting the hours he worked, and then denied the ability to arbitrate his union
grievance because he filed a charge of race discrimination with the Ohio Civil Rights
Commission and the EEOC.  In the same time frame, multiple white officers who faced nearly
identical or more serious allegations were punished much less severely and are still employed.

43.     The pattern of conduct within the CPD command staff, including that of the
Chief, is part of their policy of refusing to protect minority officers from discrimination.  The
priority for the CPD under Chief Jacobs's administration is to avoid any charges or findings of
discrimination by white officers at all costs, even when the Internal Affairs Bureau has identified
discrimination or an officer has admitted engaging in harassing or discriminatory conduct.

44.     The actions described in the above paragraphs were because of race and in
retaliation for the Plaintiff's participation in an investigation of race discrimination.

45.     The actions described in the above paragraphs caused the Plaintiff great expense,
loss of income, damage to reputation, embarrassment, and mental anguish.

46.     The Defendants' actions described above, and the actions of their agents and
employees, which were within the scope of their employment, were at all relevant times
undertaken with malice and knowing disregard for the Plaintiff's rights and the rights of others
similarly situated to the Plaintiff.

**F.     EXHAUSTION OF ADMINISTRATIVE REMEDIES**

47.     Following the conduct alleged, on or about July 30, 2015, the Plaintiff dually filed
a timely charge of race discrimination and retaliation against Defendant CPD with the Ohio Civil
Rights Commission and the federal Equal Employment Opportunity Commission.

11

0E112 - N90

48.     The Ohio Civil Rights Commission investigated the Plaintiff's charge and found probable cause that he was subjected to race discrimination and retaliation.

49.     On or about January 30, 2018, the Plaintiff received from the U.S. Department of Justice a Notice of Right to Sue permitting the Plaintiff to file a lawsuit in court within ninety (90) days of his receipt of the notice.  The notice is attached as Exhibit 1.

50.     As to his claims of race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, the Plaintiff has satisfied and exhausted all administrative procedures and complied with all deadlines in filing this action and his charge, including filing this action within ninety days of his receipt of the Notice of Right to Sue.

## IV.     CLAIMS FOR RELIEF

### Discrimination and Retaliation in Violation of Sections 4112.02(A) and (I) of the Ohio Revised Code

51.     The Plaintiff incorporates the above paragraphs as if fully rewritten herein.

52.     By subjecting the Plaintiff to discrimination and retaliation in the terms and conditions of his employment, Defendant City of Columbus, Columbus Division of Police, violated Sections 4112.02(A) and (I) of the Ohio Revised Code, which prohibit unlawful race discrimination and retaliation in employment.  Such discrimination is actionable under Section 4112.99 of the Revised Code.

### Discrimination in Violation of Ohio Revised Code Section 4112.02(J)

53.     The Plaintiff incorporates the above paragraphs as if fully rewritten herein.

54.     By aiding, abetting, compelling, and/or coercing the unlawful race discrimination and retaliation against the Plaintiff, Defendant Jacobs violated Section 4112.02(J) of the Ohio Revised Code, which makes any person liable for such unlawful discriminatory conduct.  Chief Jacobs' individual acts of discrimination are actionable under Revised Code Section 4112.99.

12

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Apr 17 4:49 PM-18CV003229
0E112 - N91

*Discrimination in Violation of Title VII of the Civil Rights Act of 1964*

55.    The Plaintiff incorporates the above paragraphs as if fully rewritten herein.

56.    By discriminating and retaliating against the Plaintiff in the terms and conditions

of his employment because of his race, Defendant CPD violated Title VII of the Civil Rights Act

of 1964, Section 2000e of Title 42 of the United States Code, which prohibits employment

discrimination and retaliation based on race.

## V.    PRAYER FOR RELIEF

57.    WHEREFORE, the Plaintiff requests the following relief:  (1) monetary damages,

including back pay, compensatory, and punitive damages, in excess of twenty-five thousand

dollars ($25,000.00); (2) a declaration that the Defendants have committed a pattern and practice

of race discrimination affecting the Plaintiff and other similarly situated Columbus police

officers; (3)  prospective injunctive relief protecting the Plaintiff and other similarly situated

officers from future race discrimination and retaliation; (4) the costs of this action, including

attorneys' fees; and (5) such other relief as the Court deems appropriate.

Respectfully Submitted,

/s/Frederick M. Gittes
Frederick M. Gittes (0031444)
fgittes@gitteslaw.com
Jeffrey P. Vardaro (0081819)
jvardaro@gitteslaw.com
The Gittes Law Group
723 Oak St.
Columbus, OH 43205
(614) 222-4735/Fax: (614) 221-9655

Attorneys for Plaintiff Karl Shaw

/s/Sean L. Walton, Jr.
(per telephone authority)
Sean L. Walton, Jr. (0088401)
swalton@waltonbrownlaw.com
Chanda L. Brown ()
cbrown@waltonbrownlaw.com
Walton + Brown, LLP
395 E. Broad Street, Suite 200
Columbus, Ohio 43215
(614) 636-3476/Fax: (614) 636-3453

Case: 2:18-cv-00483-JLG-CMV Doc #: 2 Filed: 05/17/18 Page: 14 of 15 PAGEID #: 51
Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Apr 17 4:49 PM-18CV003229
0E112 - N92

## JURY DEMAND

The Plaintiff hereby demands a jury of eight (8) to determine all issues triable by jury in this matter.

/s/Frederick M. Gittes
Frederick M. Gittes (0031444)

Franklin County Ohio Clerk of Courts of the Common Pleas- 2018 Apr 17 4:49 PM-18CV003229

0E112 - N93

## In the Court of Common Pleas, Franklin County, Ohio, General Division

Karl Shaw
_____,
Plaintiff/Appellant,

vs.                                      Case No._____

City of Columbus, et al.
_____,
Defendant/Appellee,

### Civil Case Filing Information Summary

#### Type of Action/Case Classification:

**Professional Tort (Type A)**
($225.00 Security Deposit Required)

**Product Liability (Type B)**
($225.00 Security Deposit Required)

**Other Torts (Type C)**
($225.00 Security Deposit Required)

**Workers Compensation (Type D)**
($225.00 Security Deposit Required)

**Foreclosure (Type E)**
($350.00 Security Deposit Required)

**Administrative Appeal (Type F)**
($100.00 Security Deposit Required)

✔ **All Other Civil Cases (Type H)**
($225.00 Security Deposit Required)

**Cognovit Confession of Judgment (H)**
($100.00 Security Deposit Required)

**JURY DEMAND?**  Yes
($300.00 Additional Security Deposit Required)  (Yes or No)

**Total Security Deposit $** 525.00

Is a **TEMPORARY RESTRAINING ORDER** being requested at this time? No
(Yes or No)

Is this a case in which **ALL** the issues presented are a result of the
defendant(s) having signed and defaulted on a **COGNOVIT NOTE?**  No
(Yes or No)

Is this a **FORCIBLE ENTRY AND DETAINER** case?  No
(Yes or No)

Does this case include allegations of **CONSUMER SALES PRACTICES**
**ACT** violations under Chapter 1345 or any other statutory consumer
protection provision of the Ohio Revised Code?  No
(Yes or No)

#### Refiling Information:

If this is a **REFILING** of a previously dismissed case, please complete the following:

Previous Case No. _____

Original Judge _____

/s/Frederick M. Gittes
Attorney/Party Signature

0031444
Attorney Ohio Sup. Ct. Registration No.

Frederick M. Gittes
Attorney/Party Name (Type or Print)

(614) 222-4735
Telephone Number

The Gittes Law Group, 723 Oak Street
Mailing Address

(614) 221-9655
Facsimile Number

Columbus                    OH   43205
City                            State   Zip Code