1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Karl Shaw,                           :

     Plaintiff,                   :
                            Case No. 2:18-cv-483
     vs.                          : Judge Graham
                            Magistrate Judge Vascura
City of Columbus,                    :
et al.,
                        :
     Defendants.                  :

- - - - -

VIDEOTAPED DEPOSITION OF KIMBERLEY K. JACOBS

- - - - -

Taken at Spectrum Reporting LLC
400 S. Fifth Street, Ste. 201
Columbus, OH 43215
May 20, 2019, 9:34 a.m.

- - - - -

Spectrum Reporting LLC
400 S. Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

2

1                    A P P E A R A N C E S

2

   ON BEHALF OF PLAINTIFF:
3

       The Gittes Law Group
4      723 Oak Street
       Columbus, OH 43205-1011
5      By Frederick M. Gittes, Esq. and
           Jeffrey P. Vardaro, Esq.
6
       and
7
       Walton & Brown, LLP
8      395 East Broad Street, Ste. 200
       Columbus, OH 43215
9      By Sean L. Walton, Esq.

10
   ON BEHALF OF DEFENDANTS:
11
       Columbus City Attorney's Office
12     77 North Front Street, 4th Floor
       Columbus, OH 43215
13     By Richard N. Coglianese, Esq.

14
   ALSO PRESENT:
15
       Michael Lane - Videographer
16     Karl Shaw

17

18

19

20

21

22

23

24

3

1                    Monday Morning Session

2                    May 20, 2019, 9:34 a.m.

3                    - - - - -

4                S T I P U L A T I O N S

5                    - - - - -

6        It is stipulated by counsel in attendance that

7    the deposition of Kimberley K. Jacobs, a Defendant

8    herein, called by the Plaintiff for

9    cross-examination, may be taken at this time by

10   the notary pursuant to notice and subsequent

11   agreement of counsel that said deposition may be

12   reduced to writing in stenotypy by the notary,

13   whose notes may thereafter be transcribed out of

14   the presence of the witness; that proof of the

15   official character and qualification of the notary

16   is waived.

17                    - - - - -

18

19

20

21

22

23

24

4

1                           I N D E X

2      Examination By                                    Page

3      Mr. Gittes - Cross                                   5

4
       Plaintiff's Exhibits                               Page
5
       Exhibit 5  - Memorandum to Jacobs from            110
6                   Williams, 9/5/14

7      Exhibit 6  - Routing Sheet for Correspondence,    116
                    9/10/14
8
       Exhibit 19 - Memo to Jacobs from Moore,           167
9                   1/23/15

10     Exhibit 20 - Routing Sheet for Correspondence,    170
                    1/23/15
11
       Exhibit 35 - Informational Summary #68            220
12
       Exhibit 38 - Memo to Knight from Decker,          219
13                  9/28/15

14     Exhibit 41 - Routing Sheet for Correspondence,    159
                    10/14/15
15
       Exhibit 54 - Routing Sheet for Correspondence,    235
16                  3/9/17

17     Exhibit 55 - Memo to Bodker from Weaver,          235
                    2/9/18
18
       Exhibit 57 - McFadden Charges, 5/17/18            256
19
       Exhibit 58 - Columbus Dispatch Article, 5/4/18   234
20

21

22     (Original exhibits returned to Mr. Gittes.)

23

24

5

```
 1              THE VIDEOGRAPHER:  The following
 2   deposition of Kimberley Jacobs is being taken on
 3   May 20th, 2019 at 400 South Fifth Street, Suite
 4   201, Columbus, Ohio, in the case of Karl Shaw
 5   verse City of Columbus, et al., in the United
 6   States District Court, Southern District of Ohio,
 7   Eastern Division, case No. 2:18-cv-483.  The court
 8   reporter is Mary Bradley and the videographer is
 9   Michael Lane.  This deposition is being recorded
10   by Spectrum Reporting LLC.
11              We're on the record at 9:34.  Will
12   counsel please announce their presence.
13              MR. GITTES:  This is Fred Gittes
14   representing the plaintiff.
15              MR. VARDARO:  Jeff Vardaro for the
16   plaintiff.
17              MR. WALTON:  Sean Walton for the
18   plaintiff.
19              MR. COGLIANESE:  Rich Coglianese on
20   behalf of defendants City of Columbus and Chief
21   Jacobs.
22              MR. GITTES:  And for the record,
23   Officer Shaw is present.
24                          - - - - -
```

6

```
 1                    KIMBERLEY K. JACOBS

 2    being first duly sworn, testifies and says as

 3    follows:

 4                    CROSS-EXAMINATION

 5    BY MR. GITTES:

 6    Q.         Would you tell us your name, please.

 7    A.         Kimberley K. Jacobs.

 8    Q.         And given what this case is about, is

 9    it all right if I refer to you as Chief?

10    A.         Certainly.  Retired.

11    Q.         Chief, I imagine, but I want -- don't

12    want to rely on my imagination, you've been in

13    depositions before?

14    A.         I have.

15    Q.         About how many times would you say?

16    A.         Someplace between 10 and 20, I would

17    assume.

18    Q.         Were any of those in cases involving

19    you personally?

20    A.         Yes.

21    Q.         How many of them?

22    A.         I have no idea.

23    Q.         Were all of them related to your work

24    as a police officer?
```

7

1    A.          Yes.

2    Q.          All right.  Did any of them involve any

3    form of claim related to discrimination or

4    retaliation?

5    A.          Possibly.  I don't -- I don't recall.

6    I mean, the allegations are about my role as

7    chief, and so sometimes that might have been part

8    of the allegations, but I don't recall

9    specifically.

10   Q.          Well, I hate to take the time, but it

11   would be helpful if, as best you can remember, you

12   let us know the earliest or oldest case that you

13   can recall involving you.

14   A.          I don't know.  I mean, I was in law

15   enforcement for 39 years.  And I'm not sure.  Are

16   you talking when I've been personally sued, or are

17   you talking about when I've been personally

18   accused of some particular action?

19   Q.          Let's just take it personally sued

20   first, keep it simple.  First time you can

21   remember.  I'm asking you for whatever you can

22   remember.

23   A.          I don't know.  I was chief for seven

24   years.  Before that, I might have been deposed for

8

1  some other reason, but I would assume it was in

2  the last seven years, but I can't remember a

3  particular case.

4  Q.        Okay.  Were -- and that's very helpful.

5            Have you -- do you -- sitting here

6  today, as best you can remember, were you ever

7  sued before you became the chief?  You?

8  A.        Named in a lawsuit?

9  Q.        Named in a lawsuit, correct.

10  A.        The potential is there.  I can't recall

11  a particular case that I would have been named in

12  prior to being chief.

13  Q.        Okay.  Were you -- did you do law

14  enforcement work outside of Columbus?

15  A.        No.

16  Q.        Okay.  Do you recall -- and I'll break

17  it down timewise -- any case that involved

18  allegations based on your conduct as a police

19  officer in Columbus?  I'm focusing before you were

20  chief.  Any case before you were chief that was

21  based in part or whole on your conduct or alleged

22  conduct as a police officer?

23  A.        I don't recall any such case.

24  Q.        Okay.  Prior to your being chief, did

9

1    you ever have a judgment against you in any case?

2    A.          I'm not aware of any.

3    Q.          Okay.  Prior to becoming chief, was any

4    case settled by the city that involved in whole or

5    part allegations related to your conduct as an

6    officer?

7    A.          None that I am 2aware of.

8    Q.          Fair enough.  Now, let's focus on the

9    years after you became chief.  You became chief in

10   '79; is that right?

11   A.          No.  2012.

12   Q.          2012, yeah.

13              You became a police officer sometime in

14   the '70s?

15   A.          October of 1979 I joined the division.

16   Q.          Okay.  Since you were the chief in

17   2012, can you remember any case in which claims

18   were made against you personally, excluding this

19   lawsuit --

20   A.          I know --

21   Q.          -- from your behavior as chief or your

22   authority as chief?

23   A.          I know that I have been named in

24   lawsuits personally and professionally, but as far

10

```
 1    as my own behavior, no.  Most of the time it's for

 2    behavior that somebody else has done under my

 3    tenure as chief.

 4    Q.          Okay.  How would you classify this

 5    case?  Is it personal or is it what you just

 6    described?

 7                MR. COGLIANESE:  Objection.  Go ahead

 8    and answer.

 9    A.          I don't recall that there's a specific

10    allegation against me for a certain behavior of

11    mine, other than the failure to take a particular

12    action, I believe.  But I don't -- I don't recall

13    any specific behavior that I have been accused of

14    in this particular lawsuit.

15    Q.          Okay.  That's -- I'm just trying to get

16    an understanding of what you meant when you

17    described.  So this is -- this case, your view of

18    it is it's not a suit against you because of your

19    conduct, it's more related to your status as the

20    chief and your responsibility --

21    A.          That's --

22    Q.          -- for others?

23    A.          That is the way that I understand it.

24    Q.          Okay.  That's fair enough.
```

1   A.          I haven't reviewed any of the paperwork

2   lately, so I --

3   Q.          Okay.  When you -- so you don't recall

4   any of the specific cases since you became chief

5   in which you were sued either in your official

6   capacity or personally?

7   A.          Well, I -- are you talking about suit

8   or depositions?

9   Q.          Suit.

10  A.          I know that there's a number of

11  lawsuits with my name on them.  I can't name them

12  all.  I know that there's some pending ones and

13  then there's some others that I believe had gone

14  to court.  What -- what --

15  Q.          I mean, do you remember any of them?

16  A.          Federal?  State?

17  Q.          Any.

18  A.          I know that I was sued -- well, by

19  Officers Zimmerman and Lazar --

20  Q.          Okay.

21  A.          -- that is still pending.  I know that

22  there's a lawsuit that's been filed by Lieutenant

23  McFadden --

24  Q.          Okay.

12

1    A.          -- in state court.  I'm not sure how

2    far it went, but Representative Kent, I think

3    filed a suit against me.  I've been named in a

4    number of -- of suits involving the use of deadly

5    force.  The family of Henry Green.  The family of

6    Tyree King.  The family of the man who was shot on

7    the east side in 2012.  So there's probably a

8    number of those cases.  My name is almost always

9    on the lawsuits involving the use of deadly force.

10   So there might be a multitude of those.  I just

11   don't know all of them.

12   Q.          Have any of the cases you've described,

13   and I'm not trying to cut you off, but involved

14   claims of discrimination?

15   A.          Yeah, the one from Lieutenant

16   McFadden --

17   Q.          Okay.

18   A.          -- I believe includes a claim of

19   discrimination.  Some of the deadly force ones

20   might, but --

21   Q.          Yeah, I'll put those aside.

22   A.          Okay.

23   Q.          I understand that.

24               You mentioned two other officers who

13

1    had a case pending?

2    A.          Zimmerman and Lazar.

3    Q.          What's that about?

4    A.          Good question.  They were accused of

5    misconduct while on duty and they felt that

6    internal affairs had mishandled the evidence.  And

7    in that particular case, I made a decision not to

8    include the evidence that was under question.  And

9    so I think that -- I don't know that it involves

10   discrimination.  I think it's more of an evidence

11   kind of a thing.  But I don't know if there was a

12   gender thing involved in that particular one or

13   not.  I don't -- I don't think so.

14   Q.          Any others that you can recall sitting

15   here today where you were -- you were named while

16   you were chief?  Let's exclude use of force cases.

17   Mainly interested in employment cases.

18   A.          There might be others, I don't know.

19   I've disciplined a lot of officers and they might

20   have filed a suit.  You know, a lot of times the

21   lawsuits are handled by the city attorney's office

22   and I may or may not have much of a role in them.

23   Some of them are settled right away, so...

24   Q.          Do you recall any specific suit -- any

```
 1    suits that you were specifically named in either
 2    personally or as chief that either went to trial
 3    and resulted in a judgment against the city or
 4    you?  Let's do that first.
 5    A.         I --
 6    Q.         While you were chief?
 7    A.         I don't know the time period, but I
 8    know that some officers in the campus area were
 9    accused of excessive force.  There may or may not
10    have been an allegation of discrimination.  And it
11    did go to court.  And this is the Hines case.  It
12    did go to court.  And the ruling was that one of
13    the officers used excessive force and there was a
14    finding against him.  The other officers were not
15    found to be guilty of excessive force.  I believe
16    there was a ruling that the city owed $30,000 or
17    something in court costs or lawyer's costs, I'm
18    not sure which.  I think the city tried to fight
19    back on that ruling and lost, I think.
20               I think there was another settlement
21    case with an officer that punched somebody in the
22    face, broke his jaw, and so that was a settlement.
23    It wasn't a court decision.
24    Q.         Okay.
```

1    A.        But as far as I know, that is the only

2    one that went to court and had a ruling against

3    the city.  I was not personally involved in that

4    particular case other than being chief.

5    Q.        Now, let's ask the same question about

6    settlements.

7    A.        I'm not even -- okay.

8    Q.        Any settlements of cases while you were

9    the chief which either involved just the city or

10   other command staff or you?

11   A.        There were a number of settlements.

12   Q.        Do you remember any where you were

13   involved?  You had been named?

14   A.        Not specifically.  Sometimes I'm named

15   and sometimes I'm not.

16   Q.        No, I understand.

17   A.        I -- I sometimes was involved in the

18   discussions about settlement, not always, but

19   sometimes just because it impacted whether or not

20   policies were violated or not, and I had an

21   opinion about that.  But I don't know which ones

22   of those I was named in.

23   Q.        Well, even if you don't know, can you

24   recall specific cases that got settled?  Again,

16

```
 1    I'm focusing, if I -- to make it clear, on

 2    employment cases, not use of force cases.

 3    A.        Oh.  As far as lawsuits, no, I don't

 4    recall any specific one, because there's a -- you

 5    know, in addition to the lawsuits, there's the

 6    arbitrations that I go to, and so I can't recall

 7    which ones were arbitrations and which ones were

 8    lawsuits specifically.  If you had a list, I might

 9    be able to --

10    Q.        Yeah, I was hoping --

11    A.        I'm sure it's public record --

12    Q.        -- you might have one in your head.

13    A.        -- somewhere, right?

14    Q.        It should be public record as far as I

15    know.

16              Now, something that's not necessarily

17    public record, have you had charges of

18    discrimination filed with the Ohio Civil Rights

19    Commission or the EEOC based on your allegations

20    of your conduct?

21    A.        Yes.

22    Q.        Okay.  Tell me what you can remember of

23    those.

24    A.        Well, the first one that I recall was
```

17

1    back in the 1990s.  I was a commander at the

2    communications bureau, and there was a charge

3    filed against me by -- wow, I -- I think it was

4    based on my age, because they said who was under

5    40, and I really wasn't under 40, but I took it as

6    a compliment that they thought I was under 40.

7    But it was an age-based charge that I made a

8    decision about I think my recommendations for

9    promotion.

10   Q.        Okay.  Was that resolved or dismissed

11   or what happened with that?

12   A.        I think there was a finding of no

13   probable cause.

14   Q.        Okay.  Any others?

15   A.        Yeah, I know that there's been others.

16   I don't know any specifics.

17   Q.        Okay.  Do you remember any other

18   charges involving the Columbus Police Department

19   during a time you were chief where -- again,

20   employment related, in which probable cause was

21   found?  Putting -- excluding --

22   A.        This is --

23   Q.        -- Officer Shaw's.

24   A.        -- the only one that I'm aware of.

18

1    Q.         Okay.  So I've talked to you about

2    trials.  Let's talk about depositions.  You've

3    mentioned you have testified in depositions.

4    Could you give me a guesstimate of how many times

5    you've been deposed?

6    A.         I said previously I think it's

7    somewhere between 10 and 20.

8    Q.         Oh, okay.  I missed that.

9              I thought you said something about a

10   hundred times.  Is that trials?  Have you

11   testified in a trial?

12             MR. COGLIANESE:  Objection.

13   A.         I didn't say anything about a hundred.

14   Q.         Okay.  How many times would you say

15   you've testified in a trial, criminal or civil?

16   A.         Oh, very, very rarely.  I was in a

17   civil trial as a police officer about a traffic

18   accident.

19   Q.         You don't have to list what they were

20   about, I'm just curious --

21   A.         Okay.

22   Q.         -- how many times.  And I know it's an

23   estimate.

24   A.         In a trial, a criminal trial or civil

1    trial?

2    Q.        Both.

3    A.        Very few.

4    Q.        So 10 times maybe, guesstimate?

5    A.        Yeah, I would say less than that.

6    Q.        Okay.  Well, let's -- before I keep

7    going, because I've already been throwing

8    questions at you, I would just kind of like to go

9    over some procedures during the deposition for the

10   rest of the day.

11            I know you've been through them, but I

12   just want to make sure -- I don't know when the

13   last time you were deposed was.

14            First of all, I will probably

15   necessarily be asking you most, if not all, the

16   questions today.

17   A.        Okay.

18   Q.        Do you understand that if I ask you a

19   question and you don't understand it for any

20   reason, that you can tell me you don't understand

21   it and I will try to clarify the question or

22   rephrase it until you're -- you feel you can

23   answer it?

24   A.        I do.

1    Q.         And will you try to do that for us

2    today?

3    A.         (Indicates affirmatively.)

4    Q.         And it's better if you speak.

5    A.         Correct.

6    Q.         Okay.  If I -- if you do answer a

7    question that I've asked you and you don't

8    indicate that you're confused or don't follow the

9    question, I'm going to assume that you've

10   understood it unless you tell me otherwise.  Fair

11   enough?

12   A.         I agree.

13   Q.         Okay.  This is not a memory contest.  I

14   know many, many people who have better memories

15   than me, so I know what it's like to try to

16   remember things covering years.  So do you

17   understand that as we go through today, if you

18   realize you made a mistake an hour later or any

19   time later, you forgot something or you got

20   something wrong, that you can interrupt me, even

21   in the middle of a question, to let me know you

22   realized you omitted something or you've

23   remembered something?

24   A.         I understand.

21

1   Q.       And will you do that for us as we go

2   through?

3   A.       I will.

4   Q.       This is going to be a full, long day.

5   It's not my intention to torture anybody,

6   including myself, so feel free to take a break or

7   let me know.  I just ask that you don't do it in

8   the middle of a question.

9   A.       I agree.

10   Q.       All right.  Are you on any medications

11   or other drugs that would affect your ability to

12   testify truthfully and accurately today?

13   A.       No.

14   Q.       Do you have any health problems that

15   would affect your ability to testify truthfully

16   and accurately today?

17   A.       No.

18   Q.       Do you know of any reason, personal or

19   otherwise, that you would not be able to testify

20   truthfully and accurately today?

21   A.       No.

22   Q.       Have you had a chance to meet with your

23   counsel, either your own personal counsel or the

24   city attorney's office about this case?

22

```
 1    A.         I have met with the city attorney's

 2    office.

 3    Q.         And about how many times have you met

 4    with them since it got filed?  Again, a

 5    guesstimate.

 6    A.         On this particular case?

 7    Q.         This particular case.

 8    A.         I would say less than a handful.

 9    Q.         Okay.  And when was the last time you

10    met with them?

11    A.         I believe it was before I retired, so

12    sometime before February.

13    Q.         Okay.  Did you review any records

14    before coming today?

15    A.         I have reviewed a summary, but that's

16    been probably two or three months ago.

17    Q.         Okay.  When you say, "a summary," what

18    are you referring to?

19    A.         Of the investigation of Eric Moore.

20    Q.         Okay.

21    A.         The summary.

22    Q.         So you looked at a portion of the IAB

23    file called the summary?  Is that what's it's

24    called?
```

23

1    A.        Well, the investigation is quite

2    extensive, and I just reviewed the summary pages.

3    Q.        Right.  I mean, the file has a section

4    called --

5    A.        Yeah.

6    Q.        -- summary?

7    A.        Summary of investigation, yes.

8    Q.        Right.  Had you read the IAB packet

9    when you were at the police department as chief?

10   A.        I don't believe that I've ever read the

11   entire investigation.

12   Q.        Okay.  So, in general, when you get IAB

13   investigations, you don't read them in their

14   entirety?

15   A.        Not at all.  That's not what I

16   testified to.

17   Q.        Okay.

18   A.        This was an extensive investigation

19   that filled boxes, or a box.  Generally I did

20   review most investigations from beginning to end,

21   but this one was quite lengthy.  And what I

22   decided upon was departmental charges, not lesser

23   discipline, so, you know, I reviewed the parts

24   that I thought were pertinent to the charges that

24

1    were brought.

2    Q.          So does the length of the IAB packet

3    determine whether you read the entire packet?

4    A.          No, it's not the length.

5    Q.          Okay.  So what -- what -- during your,

6    was it 12 years or 13 --

7    A.          As chief?

8    Q.          As chief.

9    A.          No, it was seven.

10   Q.          Seven years.  Okay.  During your seven

11   years as chief, did you have -- how did you decide

12   which ones to read through and which ones not to?

13   A.          I read through most of them entirely --

14   Q.          Okay.

15   A.          -- if it resulted in departmental

16   charges.  I mean, many, many internal affairs

17   investigations never reach me.  The ones that are

18   recommended for departmental charges are the ones

19   that are brought to me.  And in general, I read

20   all of them.  But based on my schedule and what I

21   felt I needed to know about a particular thing, I

22   would make a decision if I had to read something

23   cover to cover.  And to the best of my

24   recollection, I don't recall reading this

1    particular investigation cover to cover.

2    Q.        Okay.  So if I'm understanding you

3    correctly, and please tell me if I'm not, most IAB

4    files that came to you, you did read them?  Not

5    all of them, but most you actually did?

6    A.        That is -- that is what I believe I can

7    accurately testify to, correct.

8    Q.        And you particularly would make a

9    point, if I understood correctly, of reading those

10   where formal charges were recommended?

11   A.        I generally didn't see internal affairs

12   investigations unless formal departmental charges

13   were recommended.

14   Q.        Okay.  I didn't follow that.

15            Maybe we should -- let me just kind of

16   have you explain for all of us, and anybody who

17   sees this depo, the way this works.  I know there

18   are things called chain of command investigations?

19   A.        Uh-huh.

20   Q.        And I know there are internal affairs

21   bureau investigations.  What determines -- can you

22   explain the difference and what the process is?

23   A.        Sure.  Internal affairs investigates

24   all citizen complaints.  So if somebody calls in

1    and says an officer was rude or an officer took a

2    bribe, it goes to internal affairs, it's

3    investigated by internal affairs.  That is a

4    citizen complaint if it comes from somebody

5    outside the division or even our citizen -- or

6    civilian employees by definition.

7            Internal affairs also investigates

8    allegations of serious misconduct that might be

9    leveled by internal members of the division of

10   police.  So if a sergeant believes that an officer

11   was not turning in all of the property that was

12   required of them to do, serious, it would be sent

13   to internal affairs for investigation.

14           However, if an officer does something

15   more minor like fails to wear their hat, comes to

16   work late, that would be described as a chain of

17   command investigation, still an internal

18   investigation, but it's being conducted by the

19   chain of command.  And so that would be conducted

20   generally by the immediate supervisor and then be

21   sent up.

22           In addition to that, if an officer uses

23   force, like a TASER, that's investigated by the

24   chain of command and sent up through the chain.

27

1    Depending on what the allegation is is somewhat

2    determinant of where that investigation's going to

3    be decided upon.  So if a use of force is say

4    handcuffing and maybe with a minor injury, a

5    sergeant can sign off on a particular use of force

6    level.

7           However, a TASER needs a higher level

8    of chain of command review.  And then most

9    investigations that would be of some type of

10   misconduct would be reviewed up through the deputy

11   chief of the particular officer involved.  The

12   deputy chief, if they believe that the officer was

13   rude to somebody, they can approve a reprimand and

14   that would be the end of the investigation.  I

15   would never see that particular investigation.  It

16   would be sent to internal affairs, the discipline

17   would be issued and it would move on.

18          However, if the deputy chief reviewed

19   that and felt that the officer had say used

20   excessive force or had committed some type of

21   misconduct that rose to the level of serious

22   misconduct, critical misconduct according to the

23   contract, then the deputy chief would recommend to

24   me whether or not the officer should receive a

1    written reprimand or departmental charges.

2            And if it's a written reprimand, then I

3    can approve that.  A piece of paper is issued,

4    goes in their file.  If it's departmental charges,

5    then that gets sent to the professional standards

6    bureau lieutenants for review and -- just cause

7    review, and then they would tell me what they

8    think and then I could decide if I believe

9    departmental charges were appropriate.

10           And if so, then I would schedule a

11    hearing and bring the officer in and see what the

12    defense is basically.  And then I would make a

13    recommendation of discipline that the officer

14    could either accept if it was a leave forfeiture

15    or I could recommend a suspension, which would

16    then be heard by the Director of Public Safety.

17    Q.       Okay.  Please bear with me, because I'm

18    not sure I quite fully understand all of that.

19    A.       Okay.

20    Q.       First of all, is there something called

21    an administrative investigation, or is that the

22    same as chain of command?

23    A.       There's -- there's administrative and

24    criminal investigations.

1    Q.          Okay.

2    A.          So everything that's being conducted by

3    internal affairs --

4    Q.          Chain of command?

5    A.          -- chain of command that -- that is

6    something that we don't anticipate a criminal

7    charge for --

8    Q.          Okay.

9    A.          -- would be called an administrative

10   investigation.

11          But sometimes an allegation would come

12   in saying, I believe that this officer stole my

13   necklace or something along those lines, or raped

14   me.  And depending on the situation, the evidence,

15   we might be able to pull body camera video and

16   immediately find out what happened and not conduct

17   a criminal investigation.  But there are times

18   when we have to conduct a criminal investigation

19   of the allegation.  And so that would be put into

20   the hands of either a detective or a supervisor.

21   And occasionally internal affairs has been charged

22   to do a criminal investigation as well.

23          So that's the difference.  Criminal and

24   administrative are whether or not we anticipate

1    this particular investigation being looked at by

2    our legal advisers and/or the prosecutor's office.

3    Q.          Prosecutor's office?  Okay.

4                So if I -- please help me make sure I

5    have this right.  Depending on whether something

6    is viewed as critical misconduct, serious --

7    A.          Uh-huh.

8    Q.          -- a sergeant or a lieutenant or one of

9    the other commanders in a chain of command can

10   investigate it, decide what to do about it or

11   make -- decide what to recommend to you should be

12   done about it, up to and including a written

13   reprimand or even charges?

14   A.          Departmental charges?

15   Q.          Huh?

16   A.          You mean departmental charges?

17   Q.          Departmental charges, yeah.

18   A.          I would say that those decisions aren't

19   made in a vacuum.  Generally if it's conduct of a

20   critical nature, there are discussions that are

21   being held as to, you know, to make sure that they

22   don't just issue a disciplinary action and not

23   look at it in a more serious light.  Most of those

24   that would be considered for critical misconduct

1  would be sent to internal affairs for

2  investigation.

3  Q.        Okay.  But at the initial stage, this

4  is what I'm trying to understand, something's

5  happened, it's something more than not wearing

6  your hat, but it's, you know, the officer didn't

7  beat anybody up or -- as far as is alleged didn't

8  steal money from somebody, but there's an issue.

9  The initial judgment about whether it's a chain of

10  command matter is made by the sergeant or the

11  lieutenants involved?

12  A.        Or commanders.

13  Q.        Or commanders?

14  A.        Yeah.

15  Q.        Okay.

16  A.        That's often the case, yes.

17  Q.        And if they -- they feel that it isn't

18  what's -- I'll ask you more about the term, but

19  isn't critical misconduct or something serious,

20  the normal practice is they look into it, which

21  might involve some follow up by the sergeant or

22  somebody else in the chain and come up with a

23  recommendation?

24  A.        Yeah.  Unless it's one of those things

1    that internal -- you know, we have directives and

2    the directives say which things should be

3    investigated by internal affairs.  So if it

4    doesn't fall into that particular one, then the

5    chains of command have some discretion over what

6    they investigate before it would be sent to

7    internal affairs.

8    Q.        So other than those that are listed, do

9    you remember what that directive is or what it's

10   called?

11   A.        I used to know the number.  We changed

12   the numbers.

13   Q.        All right.

14   A.        It used to be 310, now it is in I

15   believe chapter 8 or 9, but it's --

16   Q.        It's like a laundry list of --

17   A.        Yeah.

18   Q.        -- these go to IAB?

19   A.        Correct.  Correct.

20   Q.        So if it's not in that list and it's

21   not what's viewed as critical misconduct, it goes

22   up.  And then ultimately, if they're going to do a

23   serious -- what I use as serious, what level do

24   they have to get your approval if it's a chain of

33

1    command investigation, before they actually take

2    the action?

3    A.          A deputy chief can decide that it's

4    going to go to internal affairs.  They don't have

5    to get my approval.

6    Q.          No, what I mean, at what level can they

7    actually issue the punishment?  If it's short of

8    departmental charges, but they feel something

9    needs to be done, let's say like a written

10   reprimand?

11   A.          So nobody can issue anything higher

12   than a DCC, which is the first formal level of

13   discipline, without getting my approval.

14   Q.          Oh, okay.

15   A.          So if it's a written reprimand or

16   departmental charges, they have to seek the

17   chief's approval.

18   Q.          And then if it's something --

19   A.          Unless it was based on progressive

20   discipline.

21   Q.          So they don't have to get your approval

22   if there's been a prior discipline at a lower

23   level?

24   A.          Correct.  If they had received a DCC

1  and that was still able to be viewed within its

2  time period, we're allowed to progress a DCC

3  within nine months.  They could progress it to a

4  written reprimand without seeking my approval.

5  Q.        So there's a lookback --

6  A.        Yes.

7  Q.        -- of nine months and that --

8  A.        Administrative use.

9  Q.        An administrative use?  Okay.

10         Now, if it's determined by the people

11  in the chain involved that this is a critical

12  misconduct, they just forward it over to IAB or do

13  they have to go through you for that?

14  A.        It can go through the deputy chief or

15  it can come through me.  There's -- a deputy chief

16  can approve it being sent to internal affairs

17  without my approval, so...

18  Q.        So something could be investigated at

19  IAB and you wouldn't even know it's going on?

20         MR. COGLIANESE:  Objection.

21  A.        That is absolutely the case, because

22  I'm not aware of all the citizen complaints that

23  they receive.  And, yes, there could be something

24  being investigated by internal affairs that was

1    sent there by the chain of command that I wouldn't

2    be aware of.

3    Q.          Okay.  And in your experience during

4    your seven years, would that include officer

5    complaints about serious misconduct of other

6    officers?

7    A.          I would say that if it didn't ever rise

8    to the level that somebody chose to tell me, then,

9    yes, there's a possibility that an investigation

10   could have ensued and maybe no evidence was found

11   to support that, and I might not have ever been

12   advised of that.  I did allow deputy chiefs who

13   were acting while I was gone to make some

14   decisions, so they could have, you know, been

15   investigated without any knowledge on my part,

16   yes.

17   Q.          You mean initiated?

18   A.          They could have been initiated,

19   investigated and/or closed without my knowledge.

20   Q.          If you weren't there?

21   A.          If I wasn't there or if it never got to

22   the level of discipline.  If they investigated it

23   and nobody told me about it, then it could have

24   gone into the record books without my knowledge.

1   Q.          Can you explain to us what critical

2   misconduct is?

3   A.          Well, this is the subject of lots of

4   arbitrations.  But it is conduct for which we

5   believe that a documented constructive counseling

6   level of discipline is not appropriate for.  So

7   it's egregious behavior.  It's something that

8   could damage our ability to trust the officer.

9   It's -- it's, you know, oftentimes it's, you know,

10  people say right away, like insubordination, you

11  know, is critical misconduct because you failed to

12  follow on order or something along those lines.

13          It's -- it's more this body of evidence

14  that we have over the years of what has been given

15  a DCC or counseling or written reprimands or more.

16  For many years there was a standing policy that an

17  accidental discharge was going to be a written

18  reprimand.  So that's critical misconduct.  You

19  know, firearm goes off even accidentally, we

20  consider that to be critical misconduct because of

21  the dangers that are associated with that.

22          But the division has -- has called some

23  things critical misconduct -- for some time,

24  police pursuits that went, you know, like 90 miles

1    per hour, 100 miles per hour were called critical

2    misconduct.  That went to an arbitration and they

3    said no, it's not.  So there's always been some

4    debate about what critical misconduct equates to,

5    and there is no bright line.

6              It's a feeling of what the chief at the

7    time believes is egregious enough to not reprimand

8    that person and only have that reprimand be on

9    their record for nine more months basically.

10   Something that we think should hold that officer

11   accountable to, you know, not repeating that type

12   of behavior for at least three years, if not more.

13   Q.        So you mentioned insubordination.  What

14   about lying during the course of an investigation

15   or -- to a superior officer?

16   A.        What's the question?

17   Q.        Is that critical misconduct?

18   A.        Absolutely.

19   Q.        Okay.  Is -- what about discrimination?

20   A.        I would -- I would consider most cases

21   of discrimination to be critical misconduct, yes.

22   Q.        Do you -- and what about threats of

23   violence?

24              MR. COGLIANESE:  Objection.  Go ahead.

1    A.        I would say that depends on the

2    circumstances.

3    Q.        Okay.  Why -- when would a threat of

4    violence not be critical misconduct in your mind?

5    A.        What was the environment in which it

6    was spoken?  Who was it spoken to?  Was it being

7    told as a joke?  Was it being told very seriously?

8    Was it with a weapon in hand?  Was it -- you know,

9    did the opportunity, means and everything else

10   lead somebody to believe that it was actually

11   going to happen?  Or was it imminent?  You know,

12   officers hear threats against them every single

13   day and --

14   Q.        From other officers?

15   A.        No.  From -- from the public.

16   Q.        What about do you consider critical

17   misconduct for one officer to threaten another

18   officer with violent act?

19   A.        I -- as I described, yeah, I believe it

20   all depends on the context.

21   Q.        Okay.  So I gather that if an officer

22   claims that they were just joking, under those

23   circumstances, it's okay to threaten another

24   officer with a violent act?

```
 1              MR. COGLIANESE:  Objection.
 2    A.        That's not what I testified to.
 3    Q.        No, I'm asking you.
 4    A.        Oh.  No, it's not good enough to just
 5    say I was joking.  You know, we -- you would have
 6    to understand what the circumstances were and --
 7    Q.        Well, you said if they have the
 8    means --
 9              MR. COGLIANESE:  Chief, were you done
10    answering that question?
11    Q.        I'm sorry.  I didn't mean to interrupt
12    you.  Go ahead.
13    A.        There's a lot of context involved in --
14    in whether or not somebody says I was joking and
15    whether or not we believe that.  So, no, I'm not
16    going to say that if they claim I was joking,
17    that's the end of it.  It certainly depends on
18    evidence and context, what witnesses have to say,
19    whether there were witnesses and various other
20    things.
21    Q.        And let me make it clear to you, I
22    don't mean to interrupt you, and if you're not
23    finished, just let me know.  It's fine for Rich to
24    say it --
```

1    A.        I understand.

2    Q.        -- but I would rather have you just

3    tell me I wasn't done --

4    A.        I understand.

5    Q.        -- so I know you have more to say.

6              Also, I want to make sure you

7    understand that I, again, don't expect memories to

8    be perfect.  So if you don't know something or you

9    don't remember, you can just tell me.

10   A.        I understand.

11   Q.        I don't -- I won't take it that you're

12   doing anything but telling me you can't remember,

13   all right?

14   A.        I understand.

15   Q.        Okay.  You mentioned that one of the

16   factors you would look at -- you mentioned joking,

17   that's why I came back to it.  You also said

18   whether they have the means.  Now, when it comes

19   to officers, don't they -- unless they're

20   suspended, don't they always have the means to do

21   harm to somebody?

22   A.        Well, when I said that, I meant are

23   they with the person that they are threatening?

24   You know, do they -- if they say I'm going to, you

1    know, do something and that isn't physically

2    within the realm of doing in the next minutes or

3    so, but it would take some, you know, time,

4    distance and thought to make it happen, that's

5    what I was referring to.  But it doesn't make or

6    break the decision.  It's just part of the

7    decision-making process.

8              And I don't consider officers to be

9    anybody -- any different.  Everybody has access to

10   weapons.  And whether we've suspended somebody or

11   not doesn't mean that they don't have access to a

12   weapon.  So I don't ever consider somebody that's

13   suspended to be less of a threat, per se, than

14   somebody that hasn't been suspended.

15   Q.        In criminal cases that you've been

16   involved with or that you know about, the fact

17   that somebody doesn't tell their intended victim

18   that they're going to, you know, beat them up or

19   kill them, but tells somebody else, is still

20   considered evidence of intent, isn't it?

21             MR. COGLIANESE:  Objection.  Go ahead.

22   A.        If somebody made a threat towards

23   somebody, they could be criminally charged with

24   menacing, correct, whether they're there or not.

42

1    Q.          Whether the target is there or not?

2    A.          Correct.

3    Q.          What were the -- what were the -- you

4    mentioned -- I asked you about discrimination

5    being critical misconduct.  Do you -- you said

6    most forms.  Can you exempt -- give me an example

7    of a form of discrimination that would not be

8    critical conduct?

9    A.          I would say that -- speaking from

10   personal experience that there were a lot of

11   sexist comments made towards me in my career, and

12   whether or not they were brought to the attention

13   of management, they weren't always viewed as a

14   disciplinary action.  So that's a form of

15   discrimination.  And depending on the person who

16   heard that particular comment or whatever else, if

17   they chose to ignore it or not report it, then it

18   might not rise to that particular level of

19   discipline.

20            Some people say, I don't want anything

21   to happen.  They report it, but they don't want

22   anything to happen.  And so I would say that there

23   are times when -- when some things of a

24   discriminatory nature have occurred that don't

1    reach the point of critical misconduct for a

2    number of reasons.  So it depends on, again, the

3    circumstances and, you know, the information that

4    we know.

5    Q.         So is it -- was it your policy while

6    you were chief that if people didn't report sexist

7    or racist or other forms of discriminatory

8    comments, it would not be viewed as critical

9    misconduct?

10   A.         Are you saying did I enact a policy of

11   that nature?

12   Q.         No.  I mean, is that -- is that what

13   you're telling me, that based on your own

14   experience and while you were the chief, if a

15   person like you experienced didn't report the

16   sexist comments or didn't report racist comments,

17   then later awareness of the comments by you or

18   some other managing officer, it would not be

19   critical misconduct?

20             MR. COGLIANESE:  Objection.  Go ahead.

21   A.         Again, it would still matter on what

22   the particular situation is.  I'm not -- is that

23   my phone?

24   Q.         Yeah, I just couldn't figure out what

1    it was.  I don't care now that I know what it is.

2    A.         Okay.

3    Q.         I'm sorry.  I'm sorry, you were saying?

4    A.         I can't make a blanket statement and

5    say that, you know, some discriminatory comment or

6    action wouldn't be critical misconduct.  It all

7    depends on the circumstances.  And, you know, I

8    certainly didn't have a policy that we were going

9    to ignore any of that.

10              I taught EEO and sexual harassment

11   classes to recruits for years and told them that

12   they need to make complaints of that.  That they

13   don't ever need to suffer any type of

14   discriminatory behavior.  I insisted that it be

15   taught in the first week of recruit class, because

16   I didn't want what had happened to me to happen to

17   them.  So I feel very strongly about reporting

18   discriminatory behavior, and encouraged people to

19   report it.  And also described how they can, you

20   know, address it.

21              So I wouldn't say there was any type of

22   policy during my tenure as chief that said, it's

23   not critical misconduct.  But I will say that, you

24   know, each situation is judged on its own merits,

1   and that applies to practically everything, you

2   know, excessive force, you know, could be anywhere

3   from shooting and killing someone to putting

4   handcuffs on too tight.  They're not going to

5   receive the same level of punishment.

6   Q.        So if I -- are you done?

7   A.        Yes.

8   Q.        So if I understood what you said, a

9   failure of someone to report sexist, racist,

10  ageist or other kinds of conduct from other

11  officers, at least was a factor, as far as you're

12  concerned, in whether or not the racist, sexist or

13  ageist comment would be considered critical

14  misconduct?

15  A.        How would I know about it if it wasn't

16  reported?

17  Q.        Because someone said something to

18  somebody else, but the person to whom the comments

19  were directed or about whom it were made never

20  complained about it.

21            MR. COGLIANESE:  Objection.

22  A.        No, that is not what I testified to.

23  Q.        Okay.  Then explain to me what the

24  failure or decision of someone who is the target

1    of racist, sexist or ageist comments, how does it

2    matter whether they report it or fail to report it

3    themselves?

4    A.          It's just information.  It depends on

5    what the circumstances are.

6    Q.          So can you give me an example of where

7    someone didn't report a racist -- you know, let's

8    say a racist slur and you factored in the fact

9    that they hadn't reported it in deciding whether

10   it was critical misconduct?

11   A.          I can't give you an example of that.

12   Q.          Okay.  Now, just briefly in light of

13   your reference to the training.  Tell me about

14   your -- your -- actually, I'm going to just kind

15   of switch totally, just to get it out of the way

16   real quickly.

17              Are you employed now since your

18   retirement?

19   A.          I'm not employed by the City of

20   Columbus now.

21   Q.          No.  I mean employed at all?

22   A.          I do not have any income besides the

23   pension that I receive.

24   Q.          Okay.  Are you doing any volunteer work

1   for any organization?

2   A.          I -- I consider myself to be doing some

3   volunteer work for the Columbus Police Foundation.

4   Q.          Okay.  And what's the Columbus Police

5   Foundation?

6   A.          It's a charitable group that supports

7   programs from the division of police.  They have

8   been the supporters of buying tourniquets for

9   division members, of -- of providing the funds to

10  allow us to take five charter bus fulls of

11  division personnel to Washington, D.C. for a

12  three-day trip to visit the Holocaust Museum and

13  the African-American -- or the National African

14  American Museum of History and Culture for

15  learning experiences and how to prevent

16  discrimination.

17          They have also supported some of the

18  meals for some of our recruiting events and some

19  of our community dialogue events.  What else have

20  they bought?  They're also helping to raise funds

21  for us to maybe put together some type of an

22  engagement center maybe on wheels where we can

23  have better interaction with our community

24  members.  So at this point in time, I've just done

48

```
 1    a little bit of fundraising for them and continue
 2    to stay in touch with our donors.
 3    Q.        And are you on the board?
 4    A.        No, I'm not.
 5    Q.        Okay.  Any other organizational work
 6    you're doing?
 7    A.        No.
 8    Q.        Do you have any plans or are you
 9    involved in any discussions about becoming a
10    consultant related to police investigation?
11    A.        I have already had discussions about
12    becoming a consultant, but I turned that
13    opportunity down.
14    Q.        Okay.  So at the present moment, you
15    have no specific plans regarding other kinds of
16    work, whether it's as a consultant, independent
17    contractor or employee?
18    A.        I didn't say that.
19    Q.        Oh.
20    A.        I have been discussing with the
21    foundation whether or not they want to hire me
22    part-time as an executive director.
23    Q.        Oh, okay.
24              Any other leads in the offering that
```

```
1    you're considering discussing?

2    A.        Board membership.

3    Q.        I'm talking about paid gigs at this

4    point.

5    A.        Oh, no.  No, paid gigs.

6    Q.        Okay.

7    A.        Other than that foundation executive

8    director possibility, but that's still --

9    Q.        Okay.

10   A.        -- being discussed and is --

11   Q.        Do you have any family members who are

12   in law enforcement?

13   A.        I do.

14   Q.        And who are they?

15   A.        My son Peter.

16   Q.        And where does he do his work?

17   A.        He's employed by the division of

18   police, Columbus Division of --

19   Q.        Columbus Division of Police?

20   A.        Uh-huh.

21   Q.        Okay.  And how long has he been a

22   police officer?

23   A.        Since January of 2013.

24   Q.        Okay.  And what -- anybody else in the
```

1    extended family that's in law enforcement?

2    A.        No.

3    Q.        Okay.  And what -- is your son on

4    patrol?

5    A.        Yes.

6    Q.        Okay.  When you came on the department,

7    I believe we said earlier '79, I don't want to

8    assume anything, did you go to patrol after going

9    through the academy?

10   A.        I did.

11   Q.        And how long did you do patrol?

12   A.        Until -- well, I -- as a patrol

13   officer, I was on the street until 1987.

14   Q.        Okay.

15   A.        And then I got promoted to sergeant,

16   and I was a patrol sergeant on the street for most

17   of '88, I believe.  But then I got a job

18   inside still assigned to patrol, but in the

19   administrative office.  And that was until late

20   November -- or I believe November of 1991 when I

21   became a lieutenant and I went back to patrol.

22   Q.        What were you doing in the

23   administrative office for patrol?

24   A.        Scheduling officers to fill the holes

```
 1    for the vacancies that we had due to sickness or

 2    vacation or training or whatever it might be.  I

 3    answered the complaint line for almost four years.

 4    Q.          Citizen complaint line?

 5    A.          The citizen complaint line, eight hours

 6    a day, five days a week.  I scheduled officers for

 7    training purposes.  I scheduled them for big

 8    events, made sure that we had enough people

 9    scheduled to go wherever we needed them to.  I did

10    that for almost four years.

11    Q.          And where were you assigned as a

12    lieutenant as patrol?

13    A.          Initially on patrol, zone three.  I had

14    a rotating shift.  I had two nights on third

15    shift, Thursday and Friday, Saturday was

16    unassigned, and then Sunday and Monday was on

17    second shift.  And I did that until early 2000 --

18    or early 1993 when I got a job on first shift for

19    the first time working for Deputy Chief Lanata as

20    his administrative lieutenant in charge of the

21    patrol office, and I was assigned to him.  It was

22    still technically patrol, but it was in an office,

23    until late 1995.

24    Q.          And then what happened?
```

52

```
 1   A.          And then I got promoted to commander,

 2   and I went to the communications bureau.  And I

 3   was there until early 2001.  And in early 2001, I

 4   was assigned to internal affairs and stayed there

 5   until I think April or May, maybe, of 2005.  So I

 6   was there for about four years.

 7   Q.          So you were the commander of IAB?

 8   A.          Internal affairs.

 9   Q.          For four or five years?

10   A.          Yeah.  And that was when we made the

11   whole reorganizational change from just

12   investigating serious misconduct allegations to

13   investigating all citizen complaints as well.

14   Q.          Okay.

15   A.          I implemented that change.

16   Q.          And then what happened?

17   A.          In 2005, I was assigned to patrol zone

18   four and -- as the commander.  And that was

19   downtown, Short North, campus, Clintonville and

20   everything northwest Columbus.  I was there until

21   mid 2006 when I was assigned to the training

22   bureau as their commander.  And I was there for

23   three years till late 2009 when I was promoted to

24   deputy chief and I went back to patrol.
```

53

```
1    Q.        So 2009 you're back on patrol as the --

2    A.        Not on patrol, but in patrol.

3    Q.        No, I mean assigned to patrol?

4    A.        Yes.  Yes.  I was assigned to the

5    patrol east subdivision initially.  And then when

6    we reorganized that, it was the patrol south

7    subdivision, until I think early 2011.

8    Q.        When you became --

9    A.        No.

10   Q.        No.  Where were you when you --

11   A.        I became the administrative deputy

12   chief in 2011 and I was the administrative deputy

13   chief for about a year before I became the chief

14   of police.

15   Q.        Okay.  Now, let's talk a little bit

16   since you've mentioned the academy.  Tell me about

17   your own training -- well, let me -- let me switch

18   it up.  I'm sorry.

19             You were on the department when the POE

20   case went to trial, do you --

21   A.        POER?

22   Q.        Yeah.  Right, POER.  Police Officers

23   for Equal Rights?

24   A.        I don't know what year that was.
```

54

```
 1    Q.          Okay.  Do you remember the case?
 2    A.          I don't remember specifics.  I remember
 3    that POER was an employment group within the
 4    division of police, Police Officers for Equal
 5    Rights.  I don't remember what -- what the case
 6    was, you know.  I was, I believe, maybe an officer
 7    at that time.
 8    Q.          So just sitting here today, you don't
 9    remember reading about it or hearing about it on
10    the department?
11    A.          Oh, I can't say that, no.  I --
12    Q.          I'm just asking what you remember.
13    A.          I believe it was allegations of
14    discrimination from --
15    Q.          Right.
16    A.          -- you know, against the division of
17    police.  I know that -- and I don't know which
18    ones are which, because I know that
19    African-Americans sued the city for hiring
20    purposes and won that.  I know that women sued the
21    city for discrimination in hiring and won that.  I
22    coached a woman that got out of the academy and
23    immediately had seniority over me, because of the
24    back seniority that she had gotten, because she
```

1    had tried to be hired and was turned down.

2            And then I know that there were rules

3    in place -- in fact, before I got hired, we were

4    taking the entry test and there was a white list

5    and a black list, and we had to have enough

6    African-Americans on the list prior to starting a

7    class.

8            And then I know -- and I don't -- I

9    don't know if this was the POER case or not, but I

10   know that there were allegations about

11   discrimination in promotions, and that was I know

12   in the mid '80s, I believe, that that was

13   resolved.  There were promotions that took place

14   prior to me becoming promoted to sergeant from the

15   list that were, I believe, a result of either a

16   settlement or win in a case.  I just don't know if

17   that was the POER case, so -- but I know that we

18   promoted like 30 African-Americans, I believe, in

19   July of '87, I believe as a result of a lawsuit.

20   I just don't know if it was a settlement or if it

21   was some type of a decision from the court.

22   Q.      Do you -- do you -- again, I'm just

23   asking you what you remember.

24   A.      Uh-huh.

56

1   Q.          Do you recall that the -- and I'll fess

2   up, I was involved in those --

3   A.          I know.

4   Q.          -- cases, so I remember them a little

5   better than most people.  Do you recall that the

6   POE -- POER case also involved allegations of a

7   hostile work environment based on race?  Did you

8   ever know that?  Besides promotions?

9   A.          It -- it might have been something that

10  I knew at the time.

11  Q.          Okay.

12  A.          I -- as I said, I don't remember the

13  specifics.  You know, I remember the hiring and

14  promotion part being big factors.  The hostile

15  work environment part I might have had some

16  knowledge of because I believe Officer

17  Stubblefield was involved in the lawsuit.  And

18  while I was in the academy, I went on a ride-along

19  and apparently while I was at the substation,

20  somebody made some type of a threat against him or

21  is alleged to have made a threat against him, and

22  I got called into internal affairs, I believe

23  while I was still in the academy, to see if I had

24  heard anything about that.

1          So I would -- I would certainly

2     consider that investigation of hostile work

3     environment.  I just don't know if it was related

4     to the lawsuit or not.

5     Q.          Okay.  And were you aware at any time

6     during the pendency of that case that another

7     issue that was litigated was about assignments?

8     Allegations that black officers were excluded from

9     certain units like SWAT and the detective bureau?

10    A.          I don't recall having that recollection

11    as an officer.  You know, you're kind of isolated

12    at times from what's going on.  But I -- I do know

13    that a job description manual was created in the

14    late '80s because of inequities, if you will,

15    about how people got assignments.  I don't know if

16    they were based on race or not.

17          I was asked if I wanted a job on first

18    shift, and I was like, I don't have the seniority

19    to get a job on first shift.  And they're like,

20    yeah, but we want women on first shift.  I'm like,

21    well, I'm going to wait until I have the

22    seniority.

23          So, you know, I know that -- that

24    people felt that there were inequities with regard

1   to assignments, and I believe that that was one of

2   the reasons why the job description manual became

3   a thing I think in 1989.

4   Q.        Do you recall that as a result of that

5   lawsuit, the judge -- Judge Duncan at the time --

6   A.        Yes.

7   Q.        -- does that sound familiar?  Issued a

8   number of orders, including the promotion that

9   you've mentioned, but also issued orders about not

10  Judge Duncan, actually Judge Graham later took

11  over the case, issued orders about creating an EEO

12  office and a whole new set of rules related to

13  assignments and other things.  Do you recall that?

14  A.        I don't recall that that was a result

15  of --

16  Q.        Okay.

17  A.        -- anything.  I remember that it seemed

18  like all of a sudden we had an EEO office,

19  Mr. Apple was --

20  Q.        Yep.

21  A.        -- in charge of EEO, and I think

22  Mr. Wheeler.  But I -- like I said, I don't recall

23  that it was specifically as a result of the

24  lawsuit or whether or not it was a settlement or

1    whether it was an agreement.

2    Q.         Did you hear during these years I'm

3    talking about, that lawsuit was pending for quite

4    awhile if you remember?

5    A.         I don't remember when it was filed --

6    Q.         Okay.

7    A.         -- or when it was settled, no.

8    Q.         But did you hear police officers that

9    you were working with or around making negative

10   comments about the case or about the people who

11   filed the case?

12              MR. COGLIANESE:  Objection.  Go ahead.

13   A.         Nothing specific, no.

14   Q.         Okay.  Did you hear people grumbling --

15   you know, when I say, "people," I'm talking about

16   officers being -- expressing, criticizing that

17   some individuals got promoted over them even with

18   less seniority as you experienced because of the

19   case?

20              MR. COGLIANESE:  Objection.

21   A.         Do I remember people express --

22   criticizing others for being promoted over them?

23   Q.         Just expressing they were upset that

24   that was happening?

1    A.        Again, I can't remember anything

2    specific.  I -- I believe that, yeah, there

3    were -- you know, there was some resentment of

4    either POER as a group or some of the decisions

5    that were being made just because of people's

6    strong feelings about seniority.

7    Q.        Okay.  None of them were -- none of the

8    comments were about race; that blacks were using

9    the race card or taking advantage of their race to

10   get advantage?

11   A.        I cannot remember anything specific

12   along those lines.

13   Q.        One way or the other?  Or are you

14   telling me you never heard anything like that?

15   A.        I would say that I don't recall any --

16   anything specific at all.  You know, people talked

17   about a lot of stuff in roll calls or whatever,

18   but I would say that -- and this is -- this is one

19   of the things that I have talked about for years

20   is that, you know, you surround yourself with good

21   people and you don't hear stuff like that.  You

22   know, people didn't use profanity around me very

23   much because they knew that I didn't like it.  And

24   so I wasn't privy to a lot of conversations.  I

1    didn't get invited to the poker games that my

2    fellow officers attended.  I didn't get invited to

3    a lot of social activities, because I was a woman

4    and they didn't want me hanging around, or I was a

5    goody two shoes and they didn't want me hanging

6    around or whatever.  But I don't remember a lot of

7    discussion about resentment towards particular

8    individuals as much as just that feeling of -- of,

9    you know, seniority not being as big a factor.

10            I believe that there was a lot of -- of

11   discussion among the city and others about whether

12   or not seniority points were even going to be used

13   in the sergeant's test that I took, and that

14   delayed the final list, because they had said it

15   wasn't going to count, then they added it back in.

16   And I think that might have been related to the

17   lawsuits because those other promotions happened

18   in 1987 as well.

19   Q.        Did you -- why did you decide not to --

20   I think you indicated you had a chance to get to

21   the first shift and you chose not to take it?

22   A.        I did not believe that I had earned

23   enough seniority to get there.  It was important

24   to me that -- that people didn't view me as a

1    female police officer, you know?  I should be an

2    officer that does their job and does it well, and

3    I didn't want any special privileges coming to me

4    because I was a woman.  And that was the reason

5    why the position was offered to me.

6    Q.        And so I take it that you were

7    concerned that other women who might have chosen

8    otherwise might face that attitude from male

9    officers?

10   A.        I wouldn't say that that was

11   necessarily part of my decision-making.  It was

12   just it wasn't right for me.

13   Q.        Okay.  Well, I thought I understood you

14   to say that you didn't want officers to view you

15   as a woman police officer, and taking a position

16   because of a court order which contravened

17   seniority was one of the concerns you have is that

18   you would be viewed differently?

19   A.        I don't remember testifying anything at

20   all related to a court order.  I just decided that

21   I didn't want to get that assignment because I was

22   a woman.

23   Q.        Okay.

24   A.        It didn't have anything to do with

63

1    court orders or anything else.

2    Q.        I gotcha.

3    A.        Okay.

4    Q.        But you didn't want to get -- you

5    didn't want to be viewed as someone who was --

6    A.        Using my gender.

7    Q.        -- getting -- of using your gender?

8    Yeah.

9              During the years from '79 into the

10   '90s, did you ever observe or hear racial epithets

11   at the Columbus Police Department?

12             MR. COGLIANESE:  Objection.  Go ahead.

13   A.        By other division personnel or --

14   Q.        Yes.

15   A.        -- by -- I don't know.  Potentially.

16   And, again, that would -- that would be -- was it

17   somebody repeating something that they had heard

18   or been told?

19   Q.        It could be either in your presence or

20   someone repeating what they had been told, or

21   graffiti in the bathrooms or racist graffiti or

22   racist graffiti in the training academy, any kind

23   of things like that?

24             MR. COGLIANESE:  Objection.

1    A.        I don't recall anything specifically

2    like that.

3    Q.        Okay.  Do you recall anything not

4    specific at a -- that related to race and that was

5    negative about black personnel?

6    A.        I can't say that I haven't, I just

7    don't remember that there were instances where

8    people were referring to African-Americans in

9    racially derogatory terms about other division

10    personnel.  It could have happened in my presence,

11    but I don't -- I don't ever recall, you know, that

12    being something that happened.

13             It -- it seemed to me that -- I don't

14    know if it was because I wasn't included in some

15    things that they, you know, thought that maybe I

16    would tell on them if they used those kinds of

17    terms around me, because I had stood up for

18    myself.  And maybe they thought that maybe they

19    shouldn't use those kinds of terms, but I can't

20    say that I -- I never heard those terms and

21    certainly might have investigated, not personally,

22    but might have investigated as, you know, the

23    commander of internal affairs other allegations to

24    that effect, but I just don't recall anything

1    specific.

2    Q.          And when you mentioned that your

3    sergeant's promotion was delayed because of the

4    court -- you know, of the black officers ordered

5    to be -- you know, lists being created for

6    promotion of black sergeants --

7    A.          I don't think that's what I testified

8    to.

9              MR. COGLIANESE:  Objection.

10   Q.          Oh, you didn't?

11   A.          I think I testified to there was a

12   debate on whether or not they were going to add

13   seniority points to my list or not.  And they put

14   out a list that had the rankings without seniority

15   points, and I was higher on that list.  But they

16   decided then to put seniority points back in and I

17   sank a little bit down.  I still got promoted in

18   the first group, but I don't know that that was

19   related to the lawsuit or not.

20   Q.          So your promotion was not delayed?

21   A.          I didn't say that.

22   Q.          Okay.

23   A.          I believe it was delayed, because I

24   think that there was debate and a slowness in

66

1    preparing the final list because of that question
2    of whether or not there were going to be seniority
3    points added to the list or not.  And then
4    ultimately they were added.  And there was a list
5    that existed prior to, so you would think that
6    that might have been the reason for the delay.
7              I just don't know if the delay was
8    caused by the lawsuit or the fact that 30 people
9    got promoted, I believe it was 30, you know,
10   months prior to the promotion ceremony.  But like
11   I said, I just don't know what was going on behind
12   the scenes on all of that.
13   Q.        But in terms of where you ranked in
14   scoring or when you were promoted didn't affect
15   you?  I mean, it might have happened some weeks
16   later than expected, but you still --
17   A.        The first time they promoted from the
18   list, I got promoted.
19   Q.        Okay.
20   A.        It was a very large group from people
21   that were on the list as well.
22   Q.        During your years in patrol, did you --
23   did you hear white officers using racial epithets
24   at any time when they were making arrests or

67

1    talking to suspects?

2                    MR. COGLIANESE:  Objection.  Go ahead.

3    A.              I suppose the potential is there for

4    that.

5    Q.              But sitting here today, you can't tell

6    me one way or the other whether you actually had

7    occasions when you heard that kind of language?

8                    MR. COGLIANESE:  Objection.  Go ahead.

9    A.              You're talking about almost 40 years

10   ago, and, no, I don't remember any particular

11   incidents where that occurred.

12   Q.              And I take it you never reported such

13   an incident if you did hear it?

14                   MR. COGLIANESE:  Objection.  Go ahead.

15   A.              I don't recall ever reporting hearing

16   that kind of language being used towards a

17   suspect.

18   Q.              Prior to being in IAB, but while you

19   were on patrol and an officer, did you ever report

20   another officer for misconduct?  Not once you were

21   a sergeant, but before you were a sergeant?

22   A.              I know that I reported a use of force

23   that I don't believe that the officer reported to

24   my sergeant.  I was a witness.  A guy -- this is

68

1     when we didn't have screens between the front seat

2     and backseat, so partners were required to ride in

3     the backseat.  And the suspect in this particular

4     case went for my partner's gun, even though he was

5     handcuffed, and so my partner's struggling to

6     maintain control of his weapon.  I got out, I'm

7     struggling to make sure that we get him under

8     control.  We put out a 10-3, officer in trouble.

9     And another officer showed up.

10            And as we were dragging the guy out of

11    the backseat, this officer came up and kicked the

12    suspect in the face, and it was a big hubbub, you

13    know, because of the potential for my partner to

14    have been killed or myself.  And I don't know if

15    the officer that kicked this guy in the face

16    reported it to his sergeant, but I reported it to

17    the sergeant and made sure that I gave my

18    statement to that effect.  I don't know what

19    happened to that.  It might have been determined

20    that it was within policy for all I know, because

21    the guy was definitely a threat, even though he

22    was handcuffed.

23    Q.        I take it -- anything else that you

24    reported?

1  A.          Not that I recall.

2  Q.          And I take it you've explained why

3  you -- I -- at least I believe I recall you

4  testified that you had heard sexist comments

5  during your years on the department?

6  A.          Yes.

7  Q.          Did you ever report any of them?

8  A.          Not officially, no.

9            And I have told the story many times in

10 my speeches and when I teach a class on sexual

11 harassment that when I was at the substation in

12 front of my entire crew basically at a table like

13 this, I was standing and one of my co-workers

14 walked up and pinched me on my butt and hey, Kim,

15 you losing weight?

16           And I was offended by him touching me

17 in such a private place.  And I told him not to

18 ever touch me again.  And oh, oh, I didn't mean

19 anything.  And I said, just don't touch me again.

20 My sergeant was there, he witnessed it, or at

21 least could have, but he didn't ever say anything

22 to me about it, and I never made an official

23 complaint about it.

24 Q.          Did you have other incidents of

70

1     inappropriate comments or touching?

2     A.          Sexist comments, yes.  There were other

3     sexist comments, including some that were made by

4     higher ranking people than me.

5     Q.          Did you --

6     A.          And I was discriminated against, in my

7     opinion, by higher ranking people.

8     Q.          And did you report it?

9     A.          I did.

10    Q.          When?

11    A.          To my boss.

12    Q.          Who was?

13    A.          At the time it happened, my boss was

14    Deputy Chief Tony Lanata.

15    Q.          So this was later in your career?

16    A.          This was in the '90s.

17    Q.          Okay.

18    A.          Yeah.

19    Q.          Did anything happen?

20    A.          No.  The offending person was the chief

21    of police.

22    Q.          Is that Joseph back then?

23    A.          No, Jackson.

24    Q.          Jackson?  Okay.

```
 1              Any -- any others after that?
 2   A.         I -- I believe that there have been
 3   comments made about me being gay by some division
 4   personnel.  I was told by the FOP president that
 5   there might be a vote of no confidence because I
 6   was gay after I got promoted to chief.  Apparently
 7   that didn't happen, but I was told that somebody
 8   was strongly opposed to the fact that I was gay
 9   and promoted.  So I know that comments about
10   gender and sexual orientation have been said about
11   me, but I -- I don't know how many.  I don't know
12   when all -- you know, all of them occurred.  But,
13   yes, I've been the recipient either directly or
14   indirectly of such comments.
15   Q.         And in most of those instances, it
16   sounds like you did not make formal complaints
17   about them?
18   A.         Correct.
19   Q.         Okay.  I gather as somebody who's done
20   EEO training, you've talked with people about why
21   they might not want to file complaints?
22   A.         Can you explain what you mean?
23   Q.         Black officers and women, why they
24   might be hesitant to file complaints about other
```

1    officers' racial or sexual comments?

2    A.        The question is whether or not I have

3    discussed why they might be hesitant?

4    Q.        Yes.

5    A.        I wouldn't say that the training delved

6    too deeply into that.  The training was mostly

7    that you shouldn't put up with discriminatory

8    behavior and that you should report it, here's the

9    different ways that you can report it.  We

10   probably touched on, you know, whether or not you

11   decide to not report it and then the consequences

12   of that, but the consequences weren't ever

13   described as being more pro don't -- don't report

14   it.

15   Q.        No, I -- and I'm sorry if I'm not being

16   clear.  I'm not asking whether you ever

17   discouraged people.

18   A.        Okay.

19   Q.        I'm asking you:  Do you as a woman and

20   a gay person understand why some gay people and

21   some women and some blacks would be very hesitant

22   about making a formal complaint about slurs,

23   comments, racist jokes, sexist jokes when they're

24   working with other officers on patrol or in other

73

```
 1    dangerous assignments?
 2              MR. COGLIANESE:  Objection.
 3    A.        I understand why some people are
 4    hesitant to report, yes.  That's a variety of
 5    reasons.
 6    Q.        Yeah.  And they include concern about
 7    retaliation, right?
 8              MR. COGLIANESE:  Objection.
 9    A.        I am sure that that is some of the
10    considerations that some people give to reporting
11    or not.
12    Q.        Isn't another thing that you -- you
13    understand about some people in these situations
14    and the thought about yourself is you don't want
15    to be viewed as a black person or a woman, you
16    want to, as much as you can, just be seen as a
17    police officer?
18              MR. COGLIANESE:  Objection.
19    A.        I don't know that -- I mean, I -- I
20    guess you don't want people to think that you
21    complain about every little thing that happens to
22    you.  But when it boils right down to it, what are
23    you going to stand up for?  And the two things
24    that I thought were the most egregious that
```

1    happened to me, I dealt with very strongly in my

2    opinion.  I didn't let it go unnoticed.  I

3    addressed it.

4            The one that happened later on in my

5    career as a lieutenant and coming from the chief

6    of police, I demanded that what was being

7    determined be changed or else I would file

8    something more official, and it was changed.

9    They -- they gave me an order not to ride around

10    with the only other female lieutenant because it

11    looked strange, but all of the other male

12    supervisors were allowed to ride around together.

13    But it was just me and Lieutenant Kerins that

14    weren't going to be allowed to right around

15    together.

16            And I said, if you only order the two

17    of us not to ride in the same vehicle together,

18    you are individually singling us out because we're

19    women, and, you know, that needs to be changed.

20    Within 24 hours, the order went out that no

21    supervisors were allowed to ride around together.

22    So I didn't have to make any formal complaint

23    because the order was changed.

24    Q.        Okay.  My question is:  What are some

1     of the reasons you understand that women or black

2     officers or officers with other differences might

3     not file a complaint?

4               MR. COGLIANESE:  Objection.

5     A.        There are -- there are a variety of

6     reasons why they might not.  Retaliation is one of

7     them.  Wanting to fit in is one of them.  Wanting

8     to handle it themselves is one of them.  You know,

9     not thinking it's a big deal is one of them or

10    whatever.  But, yes, there's certainly a variety

11    of reasons why some people wouldn't make a formal

12    complaint.

13    Q.        Now, when you have -- what training

14    have you had on EEO?  As opposed to doing

15    training, what training have you had?

16    A.        Whatever the city has required.  I

17    instituted that we were going to do EEO training

18    on a regular basis when I was the chief, but we've

19    been accredited by the commission on accreditation

20    for law enforcement agencies since 1999.  And part

21    of the practices, the standards that we meet are,

22    I believe it was either biennial or triennial

23    training required on EEO.  So since 1996ish, I've

24    attended all of those trainings that were required

1    by the city.  And then as chief, I required it to

2    be done more frequently.

3              And then -- that's within the division.

4    And then the city also instituted EEO training

5    that they required, I think mid managers or

6    commanders on up to attend as well, so what the

7    city's offered.  Back in the day when Mr. Apple

8    was doing training, I went to all of that.

9    Q.        So let's -- let's kind of focus on the

10   '90s.  So you would have been what rank

11   starting --

12   A.        I was --

13   Q.        -- in 1990?

14   A.        I was a sergeant in 1990.  I got

15   promoted to lieutenant in November of '91.

16   Q.        Okay.  Let's start at '91.  In '91, how

17   many times would you have had EEO training?

18   A.        Whatever Mr. Apple might have done.  I

19   do remember going to a class that was required of

20   all, I think mid managers, maybe on up, I'm not

21   sure which, that the city paid an outside trainer

22   to do.  And it was the most insulting training

23   that I've ever taken part of.

24              The instructor did not control the

1    class.  There were both fire and police

2    supervisors there.  I was a lieutenant at the

3    time, so this is probably '92, '93, something like

4    that.  And it was -- I believe it was either one

5    day or two days.

6              But the instructor had different

7    exercises, one of them was a long list of

8    leadership traits.  And it said, is this a male

9    trait, female trait or both sexes?  And had

10   everybody answer that.  And then he asked people

11   to shout out which ones were male and which ones

12   were female.  And the comments that were being

13   tossed out were amazingly sexist.

14             One said that, can you imagine a woman

15   having PMS in the war room making decisions about,

16   you know, what war plan we're going to have?  Or

17   tramping through the jungle and needing to put a

18   tampon in?  And another one was a chart that

19   talked about derogatory terms for ethnicity,

20   gender, race, religion.  You know, it said, you

21   know, list these derogatory terms that have been

22   given for all these different things, and people

23   were just shouting out these terms.

24             And, you know, they said like Italian

78

1    and somebody would yell Wop.  You know, and they

2    would say, Irish, and they would say, you know,

3    drunk, you know.  And it was like this free for

4    all, just say what you're thinking.  And the

5    instructor was encouraging some of this behavior

6    basically.

7            But they got to female and the way that

8    this was shouted out was, in particular, I believe

9    like said with some emphasis, not just Wop, but

10   cunt.  And I took great offense to that particular

11   thing.

12           A number of the fire guys during the

13   break apologized for the other firefighters'

14   transgression, if you will.  Some of the police

15   guys that, you know, weren't too sure that they

16   liked, you know, me being a lieutenant I think

17   even were like defending me, you know.  So that

18   was EEO training, if you will, cultural

19   sensitivity training that had the actual opposite

20   effect.  I left there feeling like the fire

21   department was a bunch of sexists.

22   Q.        Did you complain about it?

23   A.        I didn't make an official complaint to

24   anybody.  I let people know how terrible I thought

1    it was.  But it was mandated by either the chief

2    of police or maybe even above the chief of police.

3    It might have been something that Mr. Apple had

4    suggested and had the city hire for.  I don't

5    know.

6    Q.        Okay.  Did subsequent trainings, it

7    sounds like you had them every year in the '90s

8    and going into the 2000s?

9    A.        No, I wouldn't say that in the '90s.

10   Q.        No?  Okay.

11   A.        I said as chief, after 2012 I asked our

12   training bureau to do EEO training every year.

13   Q.        Okay.  But I'm trying to find out:  As

14   of the time you became the chief, you had been

15   through a few EEO trainings --

16   A.        Oh, sure.

17   Q.        -- a lot of EEO trainings, I mean, give

18   me --

19   A.        Yeah, I mean --

20   Q.        -- once a year or twice a year?

21   A.        I -- I would have to go back and look

22   what the standard was at the time, but the

23   division became accredited for the first time in

24   1999, but it was a three-year lookback.  And so,

1    you know, 1996, '97 we would have had to have EEO

2    training at least once every three years, if not

3    every other year.

4    Q.          Okay.  And those trainings were all day

5    or half a day or --

6    A.          No, it could have been an hour or two.

7    Q.          Okay.

8    A.          It didn't mandate how long, it just

9    said you have to have EEO training.  In addition

10   to that, I went to, you know, outside training

11   like in the late '90s for the police executive

12   leadership college.  And I don't remember

13   specifically, but I'm sure that some of the

14   outside training courses that I attended also

15   talked about EEO issues.

16   Q.          Okay.  Did you save the materials from

17   any of those courses or does the department have

18   them that you know?

19   A.          I might still have some.  I know that

20   when we reorganized internal affairs, we had paid

21   for instructors from -- there were like

22   contractors for IACP that came in and did 40 hours

23   of training.  And I believe that they might have

24   conducted some training on how to conduct EEO

1   investigations so, you know, at least on a

2   periphery there was discussion about EEO stuff and

3   maybe sexual harassment at that time, too.

4   Q.        Could you look and see what you have

5   and let Rich know --

6   A.        Sure.

7   Q.        -- what you have?  Okay.

8             MR. COGLIANESE:  Hey, Fred, can we take

9   a break at some point?

10            MR. GITTES:  Oh, no, we're not allowed

11  to take breaks.

12            MR. COGLIANESE:  We've been going for

13  about an hour and 45.

14            MR. GITTES:  At what point?

15            MR. COGLIANESE:  Within the next 15 or

16  so.

17            MR. GITTES:  Let's just take it now.

18            THE WITNESS:  Yeah, that's fine.

19            THE VIDEOGRAPHER:  We are off the

20  record.  The time is 11:13.

21            (A recess is taken.)

22            THE VIDEOGRAPHER:  This marks the

23  beginning of media number two.  We're back on the

24  record.  The time is 11:22.

1    Q.        Chief, I think we were just talking

2    about EEO training.  And my impression is that it

3    doesn't happen every year; every other year maybe,

4    sometimes every three years depending on what time

5    period we're talking about historically?

6              MR. COGLIANESE:  Objection.

7    A.        Yeah, I don't have the documents in

8    front of me to show what has been offered within

9    the division.  But, yes, there are times when

10   we've done it every year for the last number of

11   years and then there are times where it wasn't

12   happening as frequently.

13   Q.        And in more recent years has the

14   training been multiple days, a day or hour-,

15   two-hour programs?

16   A.        I would say it comes in less than a

17   full day of -- of the segment.  I believe the city

18   offered two hours.  I think the division has been

19   either one or two hours out of it.

20   Q.        Do you go -- oh, I'm sorry.  I didn't

21   mean to interrupt.

22   A.        What's the question?

23   Q.        Do you go still?

24   A.        Absolutely.

1    Q.          Okay.

2    A.          I attended all the training that was

3    mandatory.

4    Q.          So you've had training in retaliation,

5    what that means legally?

6                MR. COGLIANESE:  Objection.  Go ahead.

7    A.          I'm sure it was discussed in at least

8    some of those offerings.

9    Q.          And you've heard of the phrase tangible

10   -- a tangible employment action?  Have you ever

11   heard that phrase before?

12   A.          Potentially.

13   Q.          Can you tell me what it means to you?

14                MR. COGLIANESE:  Objection.

15   A.          In legal terms I don't know --

16   Q.          No, I mean just --

17   A.          -- the words.  But tangible would be

18   something that is, you know, you can see what

19   happened.  You know, it's not how somebody felt,

20   it's somebody -- somebody didn't get promoted or

21   something like that.

22   Q.          Okay.  And independent of federal and

23   state law prohibiting discrimination and

24   retaliation, CPD has its own policies prohibiting

84

```
 1    discrimination, does it not?

 2    A.        Yes.

 3    Q.        Okay.  And do you expect your officers

 4    to abide by all three, policy, state law, federal

 5    law?

 6    A.        Yes.

 7    Q.        And I'm gathering from how you've

 8    described your own experience, you take those

 9    policies and laws seriously?

10    A.        I do.

11    Q.        And you expect your officers to do the

12    same?

13    A.        I do.

14    Q.        And are -- while you were chief, did

15    you expect your commanders, sergeants, lieutenants

16    to enforce policies and laws concerning

17    discrimination and retaliation?

18    A.        Yes.  Well, as -- within their power

19    to.

20    Q.        Yes.  Sure.

21    A.        I mean, they -- they didn't get to make

22    a lot of decisions about what enforcing means, you

23    know, but as far as reporting it or investigating

24    it --
```

1   Q.        Right.

2   A.        -- yes.

3   Q.        Well, nothing gets enforced unless

4   somebody reports it or somehow else it's

5   discovered, right?

6   A.        Correct.  Correct.

7   Q.        So it is a priority for your officers

8   if they're aware of discrimination to report it?

9   A.        Yes.

10  Q.        And if individuals become aware, let's

11  say a lieutenant feels a commander is

12  discriminating against somebody else, not the

13  lieutenant, they're obligated to report it, aren't

14  they?

15  A.        If they believe that a rule violation

16  has occurred, correct, their required to report

17  it.

18  Q.        Well, and besides a rule violation,

19  violation of federal and state discrimination

20  laws --

21            MR. COGLIANESE:  Objection.  Go ahead.

22  Q.        -- should be reported if they're aware

23  of it?

24            MR. COGLIANESE:  Objection.

1    A.          Yes.  So our policies closely match the

2    laws and, you know, it's to follow policy and the

3    law, so -- as they understand the law.

4    Q.          Okay.  Well, they get training on the

5    law --

6    A.          Correct.

7    Q.          -- not just the policy, right?

8    A.          Yes.

9    Q.          Would -- I don't want to go back to our

10   earlier discussion about your practices as

11   regarding IAB investigations except that I do want

12   to understand one thing.  Do all IAB

13   investigations have summaries?

14               MR. COGLIANESE:  Objection.

15   Q.          I mean while you were chief anyway?

16   A.          I can't think of an actual

17   investigation that wouldn't have a summary.  And

18   it would depend on what you call an investigation.

19   There are complaints that get called in that

20   aren't an actual allegation of misconduct.  It

21   gets written up and it's --

22   Q.          I'm going to interrupt you --

23               MR. COGLIANESE:  Hold on.

24   Q.          -- if it's okay.  I don't want us to

1    get sidetracked, because I want to focus now as

2    much as I can on this case.

3    A.        Okay.

4    Q.        I'm only --

5              MR. COGLIANESE:  But if you need to

6    finish your answer, by all means.

7    A.        An actual investigation generally would

8    have a summary.

9    Q.        Okay.  And was it your practice during

10   your years as chief to at least read the summaries

11   if the case was coming to you for some kind of

12   decision or action?

13   A.        Yes.

14   Q.        Okay.  And then sometimes you would

15   read more?

16   A.        Yes.

17   Q.        Were there cases where you would read

18   the summary and based on reading the summary, you

19   might spot check a particular exhibit or a

20   particular interview?

21   A.        Yes.

22   Q.        Was the Moore case one of those?  Eric

23   Moore?

24   A.        What's the question?

1  Q.          Where you read the summary and spot

2  checked individual parts of the investigation?

3  A.          In that particular case, I don't even

4  know if I read the entire summary prior to that.

5  I -- when I reviewed it more recently, because

6  this case was brought to me years ago, I saw

7  things in the summary more recently that I don't

8  recall having seen before.  But I don't know if

9  there were things in that particular summary that

10 I then referenced an actual transcript or

11 something like that.  I have no idea if I did that

12 or not.  I -- this was years ago.

13 Q.          Again, it's okay to just say you don't

14 remember.

15             Have you read the actual complaint,

16 lawsuit in this case?

17 A.          I don't know.

18 Q.          Don't remember one way or the other?

19 A.          I don't remember one way or the other.

20 Q.          Okay.  You -- we talked about this

21 earlier, there was a probable cause finding by the

22 Ohio Civil Rights Commission.  You do remember

23 that, right?

24             MR. COGLIANESE:  Objection.  Go ahead.

89

1    A.          I remember that there was an initial

2    finding of no probable cause.

3    Q.          Right.

4    A.          And then there was a reconsideration.

5    And then it came back with a finding of probable

6    cause.  And that we then had an attempt at

7    mediation, I believe mediation or settlement, I'm

8    not sure which.

9    Q.          You mean -- never mind, go ahead.

10   A.          And then a lawsuit was filed.

11   Q.          Okay.  Okay.

12   A.          I think that's the order.

13   Q.          Did you attend the mediation you're

14   talking about?

15   A.          I went to the office in the state

16   office tower of the Ohio Civil Rights Commission

17   and there was a mediator there, Pam Gordon was the

18   city attorney, and I'm not sure who else was

19   present, but --

20   Q.          Okay.  Have you -- did you read the

21   reconsideration decision by -- that was issued by

22   the commission?

23   A.          I don't recall.

24   Q.          Okay.  Have you ever -- during the time

1    you were chief, did you ever order a review or

2    analysis to determine if there were disparities in

3    the discipline issued to black or -- based on race

4    in chain of command and IAB investigations?

5              MR. COGLIANESE:  Objection.  Go ahead.

6    A.        Not that I recall.

7    Q.        Have you ever -- have you heard during

8    your years as the chief, any complaints from

9    officers, particularly black officers, that I --

10   that -- about disparate discipline?  When I refer

11   to "disparate discipline," do you understand what

12   I'm referring to?

13   A.        I do.

14   Q.        Okay.  Did you hear from any office --

15   black officers during your years as chief any

16   complaints about disparate discipline?

17   A.        Yes.

18   Q.        Okay.  I am as -- one last thing I am a

19   little unclear on is:  Does the internal affairs

20   bureau as part of its responsibilities for

21   investigating employment complaints within the

22   division, does it investigate EEO employment

23   complaints?

24   A.        It is charged with investigating those.

1    We have -- we have now in the last number of years

2    asked for our human resources personnel to assist

3    with some of those investigations, and at times

4    have consulted with the human resources department

5    and/or their personnel and/or the Director of

6    Public Safety's offices, HR manager -- officer --

7    HR officer about some EEO investigations.

8    Q.      Do you know Ms. Van Pelt?

9    A.      I do.

10    Q.      And how long have you known her?

11    A.      Probably since she's been employed.

12    Don't know if I knew her before that.  She used to

13    attend the church that I attend, and so there's a

14    possibility that she -- that I met her at church

15    rather than at work, but I know at least since

16    she's been employed there.

17    Q.      Were you -- were you involved in her

18    hiring?

19    A.      Not personally.

20    Q.      Okay.  And do you consider her a

21    friend?

22    A.      Yeah.

23    Q.      Okay.  Do you socialize at times

24    outside of work?

92

1  A.        She lives in my neighborhood, so, you

2  know, there are times when I stop while I'm

3  walking the dogs and say, hi, how are you doing?

4  Q.        Okay.

5  A.        Have a conversation.  She doesn't

6  attend my church anymore.

7  Q.        Okay.  How about Ms. Guyton?

8  A.        What's the question?

9  Q.        Do you know that person?

10  A.        Absolutely.

11  Q.        How long?

12  A.        Since probably 1995 or '96.  She was

13  the union representative for the dispatchers when

14  I became the commander at the communications

15  bureau.  And so whenever I started dealing with

16  the union matters back then is when I would have

17  met her.

18  Q.        And what's -- what was -- what's her

19  status now?

20  A.        She is the HR officer for the

21  department of building and zoning services.

22  Q.        What was her last position in the

23  department?

24  A.        HR manager over the human resources

1    bureau.

2    Q.        So was she over Van Pelt?

3    A.        Yes.

4    Q.        How many other people are in HR at CPD,

5    at least while you were chief?

6    A.        There was the HR manager and then two

7    HR analysts, I believe, and then several others

8    that work in employee benefits.  And just the

9    personnel office, I don't know, maybe like eight

10   or nine, and then the industrial hygienist.  So

11   maybe 10ish at the most.

12   Q.        Okay.

13   A.        Because I don't know if you -- payroll

14   is actually under the business office.

15   Q.        Okay.  So Ms. Guyton is -- were you

16   friends?

17   A.        Yes.

18   Q.        Socialize outside of work sometimes?

19   A.        Yes.

20   Q.        Okay.  When you say that HR would get

21   involved with IAB investigations of EEO matters,

22   did they actually sit in on interviews, conduct

23   interviews for or with the IAB sergeants or you --

24   A.        For --

1    Q.          How did they get involved?

2    A.          -- investigations of officers --

3    Q.          Yes, officers.

4    A.          -- or investigations of civilian

5    employees?

6    Q.          Officers.

7    A.          I don't think that they participated in

8    the interviews.

9    Q.          So they would just be consulted about

10   questions?

11   A.          Asked to review information, asked to

12   determine whether or not they felt like the

13   complainant and the -- you know, the person

14   accused should be separated, you know, to follow

15   what the recommendations are from U.S. EEOC with

16   regard to leaving people in the same area.

17   Q.          The internal affairs bureau, you

18   indicated you made changes to it.  Can you very

19   briefly tell me what changes you made?

20   A.          Well, I was implementing the changes to

21   internal affairs, if that's what you mean.

22   Q.          Implementing what changes?

23   A.          Are you talking about back in the 19 --

24   or 2001 time period?

95

```
 1    Q.           No, I thought -- maybe my confusion.  I
 2    thought you were talking about as chief?
 3    A.           No, I don't think so.  When I
 4    referenced reorganizing internal affairs, that was
 5    back in 2001 --
 6    Q.           Oh.
 7    A.           -- when the city made a lot of changes
 8    based on the lawsuit that had been filed --
 9    Q.           Yeah.
10    A.           -- and the Department of Justice
11    investigation.
12    Q.           Okay.  Thank you.
13                 When did you first meet -- or did you
14    ever personally meet Eric Moore?
15    A.           I've run into him throughout my career.
16    Q.           Okay.  Did you ever --
17    A.           I don't know when the first time was.
18    Q.           Did you ever work with him?
19    A.           I don't recall any assignment where we
20    would have been in the same unit, no.
21    Q.           You were never his direct supervisor?
22    A.           No.
23    Q.           And as far as you recall, he was never
24    your direct supervisor?
```

96

1    A.        No.

2    Q.        Okay.  How about Lieutenant Brust?

3    A.        What's the question?

4    Q.        Do you know him?

5    A.        Oh, yeah.

6    Q.        Have -- do you socialize with him

7  outside?

8    A.        No.

9    Q.        Okay.  How -- when -- as best you can

10  recall, when would you have first had met or had

11  dealings with Lieutenant Brust?

12    A.        Whenever our paths would have crossed

13  with regard to assignments.  He works a lot of

14  special duty, so I might have run into him at a

15  football game or something like that first.  I

16  don't know when the first time was, but I don't

17  remember ever working in the same unit or maybe

18  even bureau.  Maybe -- well, no, he might have

19  been in the training -- no, I don't think so.  So

20  I don't --

21    Q.        Okay.

22    A.        He might have been in my subdivision at

23  some point in time, but I don't --

24    Q.        Never directly supervised or

97

1    supervisee --

2    A.          Not to my knowledge.

3    Q.          -- or coordinating together?

4    A.          Correct.

5    Q.          Same thing about Sergeant Williams, do

6    you know him?  How do you know him?  Did you

7    work --

8    A.          Sergeant Doug Williams?

9    Q.          Doug Williams, yes.

10   A.          Yes, I know him.  I don't believe that

11   I've ever worked with him in the same unit peer to

12   peer or as supervisor.

13   Q.          Okay.  You don't consider him a

14   personal friend outside of work?

15   A.          No.

16   Q.          Okay.  Did you ever have occasion to

17   discipline him?

18   A.          Yes.

19   Q.          And did he raise any disagreements with

20   you about the discipline?

21   A.          Yes.

22   Q.          Okay.

23   A.          He took at least one of the decisions

24   that I had to arbitration.

1  Q.         Okay.  How about Gary Cameron, how long

2  have you known him?

3  A.         Well, I know that he worked at the

4  training academy when I was there.  That might

5  have been our first time working together.  That

6  would have been in 2006?  Yeah, 2006.

7  Q.         Was he your supervisor there?

8  A.         No.  I was his.

9  Q.         Okay.  And other than your supervising

10 him at the training academy, any other connection

11 work wise beyond being in the same department or

12 division?

13 A.         No.

14 Q.         Okay.  Socialize with him outside of

15 work?

16 A.         No.

17 Q.         And how about now Chief Quinlan, when

18 did you -- when did you first meet him?  Have you

19 worked with him?  Do you consider him a friend?

20 Those same questions.

21 A.         I might have met him prior to, but I do

22 know that when I went to being the patrol

23 commander zone four, so this would have been '05,

24 I believe, but he was the third shift lieutenant

1    on zone four, and so I was his direct supervisor

2    at that time.  And then subsequent to that, I've

3    pretty much known him ever since.  And, yeah, I

4    would consider him to be a friend.

5    Q.        You ever socialize outside of work?

6    A.        We've attended social events at the

7    same time, same place, but I haven't like gone out

8    with just specifically him or his wife.

9    Q.        Or your families, right?

10   A.        Correct.  Correct.  Mostly those were

11   law enforcement --

12   Q.        Related?

13   A.        -- events.

14   Q.        Yes, I understand.

15   A.        Yes.

16   Q.        And Lieutenant Echenrode?

17   A.        I've never worked with him in the same

18   unit.  I don't believe that I've ever directly

19   supervised him, but I've known him for a long

20   time.

21   Q.        In the department context?

22   A.        Correct.  Correct.

23   Q.        Not a personal friend?

24   A.        No.  Correct.

1    Q.        And how about Jennifer Knight, same

2    questions?

3    A.        Don't know when I first ran into her.

4    It's -- I don't know when.  I haven't been her

5    supervisor --

6    Q.        Oh, you haven't?

7    A.        -- directly that I recall.

8    Q.        Okay.

9    A.        I've never worked with her in the same

10   unit.  I'm trying to figure out when our paths

11   would have crossed for the first time.  But she's

12   the sister-in-law of one of my deputy chiefs that

13   I've known for a long time.

14   Q.        Which one is that?

15   A.        Tim Becker.

16   Q.        Have you ever disciplined Jennifer

17   Knight or been involved with discipline related to

18   her work in the internal affairs bureau?

19   A.        Oh, I oversaw her, yeah.  I was her

20   direct supervisor when she was in internal

21   affairs.  I had -- I don't think that I've

22   officially disciplined her.

23   Q.        Okay.  And Ken Decker, what's your

24   knowledge about him, interactions --

1 A.   Yeah.

2 Q.   -- relationship?

3 A.   All work related.  I've never worked in

4 the same unit or supervised him directly, but I

5 have seen him on a number of incidents, because as

6 an investigator, when I have hearings, the

7 investigator comes into the hearings, so I've seen

8 him on any number of occasions.  He's also part of

9 the pipes and drums band, so seen him that context

10 as well.

11 Q.   Are you?

12 A.   No.

13 Q.   Okay.  Is there -- I don't know what to

14 call it, but can you unofficially discipline

15 somebody, I guess, coach them or criticize them

16 say, don't do that again?

17 A.   Can you?

18 Q.   Yeah.

19 A.   Absolutely.

20 Q.   Did you ever do that with Jennifer

21 Knight?

22 A.   Yes.

23 Q.   Okay.  And what was it about?  If it

24 happened on more than one occasion, tell me that,

```
 1   but --
 2   A.          One that I specifically remember was
 3   that I believe that something that she directed
 4   was a violation of the contract.  And that was not
 5   providing a record of an interview that the FOP
 6   had asked for and she decided to not list it as an
 7   interview.  She said it was spontaneous, it wasn't
 8   long, and it didn't amount to anything.  So I --
 9   she said, I don't call it a record.  And I looked
10   into it more and I called it a record.  And I
11   said, you should have provided that.  And told her
12   that I thought that was a violation of the
13   contract.
14   Q.          Wasn't she removed from internal
15   affairs?
16   A.          She was reassigned.
17   Q.          But wasn't it -- was it as a result of
18   some alleged misconduct?
19   A.          Are you asking me why I reassigned her?
20   Q.          Yes.
21   A.          Because I'm the one that reassigns
22   people.  That is not exactly the reasoning that I
23   would describe as to why.  I want to have complete
24   trust in my internal affairs commander.  And if
```

1    you are going to, in my opinion, violate the

2    contract and then basically argue that I was wrong

3    about that, then you don't have enough -- I don't

4    have enough trust in you to do that.

5            I have said for as many years as I

6    remember that I never knowingly violated the

7    contract.  And because internal affairs deals with

8    contractual issues on a regular basis and the FOP,

9    I needed to know that my internal affairs

10   commander would follow the rules of the contract.

11   And she didn't see or agree with me on that

12   particular issue.  And so that was the biggest

13   determining factor as to why she was reassigned.

14   Q.         Isn't one of your priorities to -- I

15   mean, that you make clear to everybody who works

16   for you that you will not tolerate being

17   untruthful to you?

18   A.         Absolutely.

19   Q.         Okay.  Wasn't she -- and if -- again,

20   I'm just asking for your best memory.  Wasn't she

21   involved in a situation where she was overheard by

22   witnesses making dismissive comments about a

23   complaint from an employee, I don't believe it was

24   a uniformed employee, who was making a complaint

1    that IAB was supposed to look into and before it

2    was even looked into, she was making dismissive

3    comments about it?  Does that ring a bell with

4    you?

5              MR. COGLIANESE:  Objection.  Go ahead.

6    A.         You would have to be more specific for

7    me to be able to respond appropriately.

8    Q.         Do you know an officer named Falacia

9    Dragin?

10   A.         I do.

11   Q.         Okay.  Do you recall any kind of a

12   complaint or events involving Knight related to

13   her?

14   A.         I know that Falacia filed a grievance,

15   I believe it was against a sergeant, I think

16   alleging discrimination.  He had told her to do a

17   certain task.  She refused to do it.  I believe

18   she was disciplined, and then she filed a

19   grievance about the discipline.  And there were --

20   there were complaints, I believe, that Commander

21   Knight had talked about that case as if it didn't

22   have merit or something like that.  I asked some

23   questions about what was heard, seen, told, all of

24   that, and did not feel that there was enough

1    information to take formal disciplinary action on

2    that particular thing.

3    Q.          Did you counsel her about what you

4    found out?

5    A.          I told her how imperative it was that

6    the IA commander appears to be impartial to all

7    investigations, and that she shouldn't be talking

8    about any cases.  The way that it was explained

9    was that it wasn't about, you know, what was

10   alleged.  And I didn't have proof to sustain real

11   misconduct, but, yes, I counseled her about the

12   importance of the internal affairs commander

13   being -- you know, treating things confidentially,

14   not talking about cases and then appearing to be

15   impartial.

16   Q.          What was the interview that Officer

17   Knight, I guess was she a lieutenant then?

18   Captain?

19   A.          Commander.

20   Q.          Commander.  What was the interview that

21   Commander Knight claimed was not an interview?

22   A.          That was out of an investigation of an

23   officer that -- let me make sure that I've got

24   this one right.  An officer was accused of and he

```
 1    was charged three different times, so this is why

 2    I'm -- the first time he was accused of harassing

 3    recruits when he was an instructor.  The second

 4    time I think that he was accused of not following

 5    orders.  And then the third time he was accused

 6    of -- of harassing a fellow worker and saying

 7    inappropriate things.

 8              And so I think Commander Knight

 9    decided, and I might have been involved in that

10    decision to do simultaneous interviews of the

11    officer and his girlfriend.  In one of these

12    cases, I think the second or the third case, we

13    believe that he had made up a false call.

14              He had been ordered to not see this

15    particular girlfriend while he was on duty.  And I

16    believe that he made up a false call or had his

17    girlfriend make up a false call so that they could

18    see each other while he was on duty.  Because he

19    was married and he was seeing her while he was at

20    work rather than, you know, during his time off.

21              And so I believe the decision was that

22    they were going to do simultaneous interviews of

23    him and the girlfriend.  And when they knocked on

24    the girlfriend's door, they talked to her briefly,
```

1    but she declined to come in for an interview, I

2    believe, and shut the door.  But it was a long

3    enough discussion and they recorded it, that it

4    was a record in my opinion.

5    Q.        Okay.  Thank you.

6              Can you tell me -- first of all, when

7    did -- when did you first and how did you first

8    become aware of the overtime allegations -- you

9    know, faking overtime from Officer Sorrell

10   concerning Eric Moore?

11   A.        Officer Sorrell made allegations, I

12   believe, to his chain of command that Sergeant

13   Moore had given him permission to take a city

14   phone or something along those lines, and Sorrell

15   admitted to his own behavior with regard to that.

16   He admitted to this behavior.

17             And so we started an investigation.

18   And at some point, I think Officer Sorrell then

19   added more allegations against Sergeant Moore.

20   And it just kept multiplying the number of

21   allegations that Officer Sorrell did.

22             And then as it was being investigated,

23   I think just more information came out.  There

24   were a lot of interviews, obviously.  And at some

1    point in time, they told me that there might have

2    been overtime abuse as well, but I don't believe

3    that that was part of the initial allegations, so

4    sometime after that first --

5    Q.        So I will represent to you that in

6    August of '14, some overtime allegations were

7    brought up by Officer Sorrell based on documents

8    we've gotten from the city and the IAB file.

9    A.        To the chain of command?

10   Q.        Yeah.

11   A.        Okay.

12   Q.        Do you -- do you know or can you tell

13   me whether you were made aware of those in August

14   or September of 2014?

15   A.        Probably.

16   Q.        Probably?

17   A.        Yes.

18   Q.        Okay.  Can you remember who it was who

19   told you about them?

20   A.        I would assume it would have been

21   either the deputy chief over that subdivision

22   or --

23   Q.        Was that Gray at the time, 2014, late

24   2014?

1    A.        Maybe.

2    Q.        Who else might it have been?

3    A.        Well, I can't remember where they were

4    assigned at the time.  If they were in SRB.  So it

5    could have been, I think maybe Deputy Chief

6    Quinlan might have been over --

7    Q.        Okay.

8    A.        -- that subdivision --

9    Q.        All right.

10   A.        -- at the time.  So I don't know if it

11   came from that subdivision or --

12   Q.        Okay.  Then do you -- at some point

13   later, do you remember being made aware of race --

14   a racist threat by Eric Moore?

15             MR. COGLIANESE:  Objection.

16   Q.        Allegations of a racist threat?

17   A.        I remember being told that there was a

18   possibility of a racist -- or a threat against

19   another officer, yes.

20   Q.        And how did you become aware of that?

21   A.        I'm sure by some verbal means.

22   Q.        Do you remember who?

23   A.        No.

24   Q.        Okay.  Do you remember getting a letter

1   from Sergeant Williams about it?

2   A.         I don't know that I received a letter

3   directly from Sergeant Williams about it.

4   Q.         Can we look at Exhibit 5?

5                   - - - - -

6          Thereupon, Plaintiff's Exhibit 5 is marked

7   for purposes of identification.

8                   - - - - -

9   Q.         For the record, Chief, you've been

10  handed what's been marked for identification as

11  Plaintiff's Exhibit 5.  Would you take a moment

12  and look at that document and tell me if you

13  recognize it?

14  A.         What was the question?

15  Q.         Do you recognize that document?

16  A.         I believe I've seen it before, yes.

17  Q.         Okay.  Now, prior -- based on the

18  content of the letter, does this bring to mind to

19  you that you had already heard from some other

20  source about the overtime issue regarding Moore?

21  A.         Yeah, I would say that's a good

22  possibility.

23  Q.         Okay.  Did you -- what is -- where was

24  the AV tech unit?

1    A.        It was more than anything else located

2    in the SRB bureau, fairly unofficial, but had been

3    fairly longstanding.  They were the ones that

4    helped out with surveillance equipment.

5    Q.        Okay.  And at this point in time, if

6    you -- best you can remember, was Quinlan the

7    deputy chief for SRB?

8    A.        I believe so.

9    Q.        Okay.  And at this point in time, was

10   Eric Moore, had he already left SRB and gone to

11   narcotics?

12   A.        That's a good possibility.  I don't

13   know.

14   Q.        Okay.

15   A.        And I'm not even sure about Quinlan

16   being the deputy chief.  I can't remember when he

17   got promoted --

18   Q.        Okay.

19   A.        -- to deputy chief, so...

20   Q.        What was your reaction when you saw

21   this letter from Sergeant Williams?

22   A.        That it needed to be investigated.

23   Q.        Okay.  Did you -- from the statement

24   attributed to Moore, did you think it was a -- did

1  it sound like a joke?

2  A.        I wouldn't interpret it that way.

3  Q.        And would it be acceptable under the

4  policies of the department to reference -- use

5  references like niggers and monkey?

6  A.        No.

7  Q.        What steps did you take after you got

8  that letter, if any?

9  A.        I just know that it needed to be

10  investigated by internal affairs and making sure

11  that this was included in the file.

12  Q.        I mean, did you -- did you communicate

13  with internal affairs?  Did you communicate with

14  Quinlan or whoever it was the deputy chief?

15  Exactly what do you do when you get a letter like

16  this?

17  A.        Send it to internal affairs.

18  Q.        Okay.  And at the time, who would have

19  been in charge of internal affairs in early

20  September 2014?

21  A.        I don't know.

22  Q.        Okay.  But whoever that person was,

23  that's what you would have done with this letter?

24  A.        Correct.

1    Q.        All right.

2    A.        I -- I don't know if I had possession

3    of it or if it was on a routing sheet.  My

4    secretary logged all of my correspondence in and

5    out, but oftentimes deputy chiefs would bring a

6    letter in, show it to me, I would give them some

7    kind of verbal direction --

8    Q.        Okay.

9    A.        -- and they would then forward it on

10   out.

11   Q.        But at the time, is it reasonable to

12   believe that you knew there was already an IAB

13   investigation concerning Moore's -- the

14   allegations about Moore's false reporting work,

15   not showing up for work, overtime, that kind of

16   stuff?

17   A.        I believe it's reasonable to believe

18   that, yes, there was already an investigation

19   underway.  I don't know all of the allegations

20   that were currently under investigation at that

21   time.  But as I said before, I remember that what

22   Officer Sorrell first told us wasn't everything

23   that we later found out were, you know, potential

24   allegations.

1   Q.        Okay.  Do you recall that within, oh,

2   about -- I'm sorry.

3          You -- were you involved in relieving

4   Officer Sorrell of his duties in early

5   September 2014?

6   A.        By "involved," what do you mean?

7   Q.        Did you authorize it?

8   A.        I don't recall specifically.  If I was

9   asked if I approved, I probably would have said

10   yes.

11   Q.        Okay.  Do you sometimes initiate

12   officers being relieved of duty?

13   A.        I have.

14   Q.        Okay.  And what determines whether you

15   do it or not?

16   A.        Depends on what knowledge I have of the

17   circumstances.  If it occurred in my presence or

18   something else, then -- or if it was brought

19   directly to me, then I could order it.  But the

20   chains of command also have the authority to

21   relieve somebody of duty without my approval.  And

22   I just don't recall if this was one that I was

23   consulted on prior to the actual relief of duty.

24   I might very well have.  I do recall that when he

1    came forward, he was making allegations of things

2    that had happened months and years prior to.

3    Q.        Okay.  And how was that pertinent?

4    A.        There's a statute of limitations on

5    some things, and, you know, we decide whether or

6    not we're going to investigate based on timeliness

7    for some allegations.  There's a directive that

8    actually addresses, you know, that if you're going

9    to make an internal allegation, that it should be

10   done within a more prompt period of time.

11   Q.        Is there a time limit for a threat like

12   as reported here to take action on?

13   A.        It's not specific to threats.  It's --

14   Q.        Well, discrimination claim like --

15   A.        Well, discrimination has its own EEO

16   laws, but the directive, I believe, is more

17   general just saying that internal investigations

18   should be made -- or allegations should be made

19   within a certain period of time.  I don't recall

20   what it is.  And that there will be a decision

21   made on whether or not it's going to be

22   investigated.  You know, if somebody said, three

23   years ago I didn't wear a hat, we wouldn't

24   investigate that.

116

1    Q.          Sure.  Did you consider ordering

2    Sergeant Moore relieved of duty when you learned

3    about this accusation?

4    A.          I don't recall a specific conversation

5    about it, but --

6    Q.          Well, just on your own did you think

7    about it when you got the letter?

8    A.          Not that I recall a specific -- I

9    don't -- I don't even know what the state of that

10   was at that point in time.

11                    - - - - -

12          Thereupon, Plaintiff's Exhibit 6 is marked

13   for purposes of identification.

14                    - - - - -

15   Q.          Okay.  For the record, Chief, you've

16   been handed what's been marked as Plaintiff's

17   Exhibit 6.  And my first question is:  Can you --

18   do you recognize that document?

19   A.          There's no indication that it came to

20   me directly.  It was very potentially part of the

21   investigation of Eric Moore and/or of Wes Sorrell,

22   but I don't --

23   Q.          On the second page of the document,

24   there appears to be something sent to you?

1    A.        All correspondence within the division

2    of police is addressed to the chief of police.

3    Q.        Okay.

4    A.        That never means that it was received

5    by me.  My correspondence log kept by my secretary

6    would be the best indicator whether or not it was

7    sent to my office directly.

8    Q.        Okay.  So in order to know whether this

9    document that's from Echenrode to you on

10   September 10th actually got to you, we would need

11   to look at your log?

12   A.        Correct.

13   Q.        Okay.  It's just called the log?

14   A.        Correspondence log or mail log.

15   Q.        Okay.

16   A.        Yes.

17   Q.        Is it maintained or is it destroyed?

18   A.        It's maintained in accordance with

19   public record law.

20   Q.        Do you know what the requirement is for

21   your logs?

22   A.        I would say it's probably at least

23   three years.

24   Q.        Okay.  All right.  Thank you.

1    A.        Sure.

2    Q.        I mean, if you didn't see it, that's

3    all I need to know.

4    A.        I don't know if I --

5    Q.        You just don't remember?

6    A.        Correct.

7    Q.        Okay.  I will represent to you that

8    Sergeant Williams was later interviewed in October

9    of 2014 as part of an internal affairs

10   investigation of Eric Moore.  Did you ever read

11   that interview or the interview summary as best

12   you recall?

13   A.        I don't want to make an assumption.  I

14   would -- I would assume that I did, but I --

15   that's an assumption.

16   Q.        Okay.

17   A.        I can't say with certainty whether I

18   did or not.

19   Q.        Well, maybe this will help.  Do you

20   recall during the interview, Sergeant Williams

21   talking about over his career, he's experienced,

22   you know, racial slurs and racist comments being

23   made at the division, and that he wouldn't always

24   report them, you know, you just kind of get used

1    to it?

2    A.          I do remember that.

3    Q.          Okay.  What was your reaction when you

4    read that he said that?

5    A.          I was disappointed that he had

6    experienced some of the same things, differently,

7    that I had, you know, that -- that feeling of

8    being excluded, the feeling of being treated

9    differently based on his race, rather than my

10   gender.  I don't -- I don't think a lot of people

11   understand what that feels like.  And so when I

12   hear that other people have experienced it, it

13   makes me disappointed and sad that they've had

14   that occur to them.

15          I know that -- I believe that things

16   have gotten better with regard to at least

17   explicit messages like that.  I know it did for

18   me.  I just don't know if it was because I got

19   promoted and people wouldn't say those kinds of

20   things around me.  But it's just discouraging to

21   know that other people have been the subject of

22   derogatory comments based on, as you said before,

23   their difference, you know, whether it's race,

24   gender, sexual orientation, religion, anything.

1    It just has no place in the workplace in my

2    opinion.

3    Q.         I noticed you said you think it's

4    getting better.  I mean, have you got -- have you

5    done any study yourself or had somebody do it to

6    see whether it's really better, and how would you

7    do -- how would you determine that?

8    A.         I listen to people.  I have meetings

9    with a lot of people, and I had a lot of meetings

10   with a lot of employees.  And I specifically had a

11   meeting with a significant sized group of

12   African-Americans, probably in 2015, and asked

13   what their experience was.  James Fuqua was

14   somebody that helped organize the meeting for me.

15   It was after I prepared a training program that I

16   thought was relevant to what was going on with

17   police-involved shootings at the time.  And I

18   wanted to hear what that focus group thought of

19   the training, whether it was far enough.

20            I also sought feedback after we did

21   implicit bias training from African-Americans and

22   said, you know, did we -- how did we do?  Because

23   we did the implicit bias training.  I thought it

24   was decent training, but I didn't know if it had

```
1    actually, you know, accomplished everything that I
2    wanted it to.  So any number of times I sought
3    feedback from employees within the division of
4    police on how their experience was and how they
5    felt they were being treated.  And so based on the
6    feedback that I got, based on, you know, the types
7    of complaints that we have received, I believe
8    that explicit signs of racism or discrimination
9    had at least dropped during my career as compared
10   to where it was when I began.
11   Q.        Did you go talk to Sergeant Williams
12   after you got that letter?
13   A.        I don't believe that I did, no.
14   Q.        How about after you read his interview
15   where he was talking about how he stopped
16   complaining about it or didn't report it?
17   A.        I don't believe that I had a
18   conversation with him about it, no.
19   Q.        Okay.  Did you -- and I -- I think you
20   sort of said this, but I want to focus on it.  You
21   don't -- you don't honestly expect that line
22   officers are going to feel totally open to talk to
23   the chief of police about every aspect of their
24   work, would you?
```

1  A.          I believe that some will tell me what

2  they're thinking and some won't.

3  Q.          Okay.  And some people don't want to

4  bring up discrimination and some are willing to,

5  right?

6          MR. COGLIANESE:  Objection.

7  A.          Their perception of allegation -- of

8  discrimination, some will and some won't probably,

9  yes.

10 Q.          When -- did you -- were you concerned

11 at all -- well, I guess I don't -- did you learn

12 at some point that Sorrell had been relieved of

13 duty?

14 A.          Oh, I -- yeah, I was aware of that.

15 Q.          Okay.  And you approved it?

16 A.          Like I said, I don't know if I, you

17 know, weighed in on approving it or not, but I was

18 not opposed to it at all, that's for sure.  I

19 don't know if I said you have my approval or I

20 agree or what, but it was -- based on what he had

21 admitted to, I believe it was the appropriate

22 thing, because we, at that point in time, thought

23 it was criminal behavior.

24 Q.          Okay.  I just was going to ask you was

1    it based on him admitting --

2    A.        Yes.

3    Q.        -- that he kept the phone --

4    A.        Correct.

5    Q.        -- or whatever it was he did?

6    A.        And --

7    Q.        Okay.  All right.  Now, did you -- you

8    were being informed, were you not, about the

9    progress of the Moore investigation from time to

10   time after October, you know, into November, et

11   cetera, because it went on for a long time, right?

12   A.        Yes.  I was being informed and I was

13   also asking about, you know, the investigation.

14   Q.        So would it be -- wasn't it the case

15   that by December of 2014, this is, you know, going

16   on three months after the initial reports, you had

17   been informed that Sergeant Moore's racist

18   comments and the racist threat had been confirmed

19   during interviews by Sergeant Decker?

20   A.        What's the question?

21             MR. COGLIANESE:  Objection.

22             MR. GITTES:  Want to read that back,

23   please?

24             (The record is read as requested.)

124

1    A.          I would have to answer no to that,

2    because, to my knowledge, the threats have never

3    been confirmed.  And the other part of that is is

4    I don't know the timing of which I found out that

5    there was a likelihood that the derogatory comment

6    was going to be sustained.

7    Q.          Well, don't you know as you sit here

8    today that besides Officer Sorrell, another

9    officer confirmed that Moore made a threat of

10   violence against Eric Moore and Sergeant Williams?

11              MR. COGLIANESE:  Objection.

12   Q.          I'm sorry, Eric Cornett, yeah, sorry.

13              MR. COGLIANESE:  Objection.  Fred, why

14   don't you repeat the question --

15              MR. GITTES:  I'll repeat the question.

16              MR. COGLIANESE:  -- because we've got a

17   bunch of names.

18   Q.          Sitting here today, don't you know that

19   Sergeant Decker interviewed Sergeant Watkins that

20   confirmed that Sergeant Moore had made a threat of

21   violence toward Sergeant Williams and Eric

22   Cornett?

23              MR. COGLIANESE:  Objection.

24   A.          I don't recall the names of people or

```
 1   what you say is confirmed, but I believe that that
 2   allegation was not sustained.
 3   Q.          I understand it wasn't sustained,
 4   that's why we're talking to you about it.
 5   A.          Okay.
 6   Q.          Did you look at the evidence when you
 7   accepted a report that said it wasn't sustained?
 8               MR. COGLIANESE:  Objection.
 9   A.          You mean this particular one?
10   Q.          This particular one.
11   A.          I would say that I probably did.
12   Q.          Okay.  So then my question to you is:
13   On what basis would you not sustain that Sergeant
14   Moore didn't make or there was a lack of evidence
15   that Moore made the threat to take the two
16   monkeys -- basically a threat against two black
17   officers and do some violence to them out back?
18               MR. COGLIANESE:  Objection.
19   Q.          When you had -- you had an Officer
20   Sorrell confirm such a statement and then you had
21   a second officer, Watkins, who confirmed a -- not
22   exactly the identical words, but confirmed the
23   threat to do violence to Cornett.  Why is that not
24   enough evidence to sustain it?
```

```
 1              MR. COGLIANESE:  Objection.

 2   A.              Without being able to point to the

 3   actual testimony and review that, I can't respond

 4   to that.  As you pointed out, it wasn't the same

 5   exact confirmation that Officer Watkins provided.

 6   And I don't recall what all of the other reviewers

 7   had to say about their reasoning for not

 8   sustaining that particular allegation.  Very

 9   rarely is it left to me to decide whether or not

10   something is sustained or not.  Most of the time,

11   it is for me to decide whether or not something

12   that is sustained is going to result in a written

13   reprimand or a departmental charges.  So that's

14   the focus of my review most of the time.

15              Certainly in this one, you know,

16   threats against officers are, in my opinion, very

17   serious, and we have to, you know, decide whether

18   or not we think that they are something that is

19   criminal, administrative, whether it requires

20   protection or whether it's not sustained.  And so

21   without the evidence before me, I can't explain to

22   you what my reasoning is, because I don't recall

23   all the specific interviews and justifications.

24   Q.              If Officer Watkins confirmed that
```

1    Sergeant Moore had made violent -- a violent

2    threat towards Eric Cornett using racist language,

3    along with Sorrell's report, which you do remember

4    that, don't you?  It's reflected in the letter you

5    just read.

6              MR. COGLIANESE:  Objection.

7    A.          I remember reading about it, hearing

8    about it.

9    Q.          Okay.

10   A.          Yes.

11   Q.          Do you remember also that there was

12   confirmation from several other officers that

13   Moore routinely made racial slurs, used the N word

14   and talked about taking people out back and

15   fighting with them?

16             MR. COGLIANESE:  Objection.

17   Q.          Do you remember that?

18   A.          I believe that there were other

19   interviews that alluded to behavior of Sergeant

20   Moore's that was derogatory.  And then there were

21   others that said they never heard such a thing,

22   so -- and that included some African-Americans

23   that testified that he had always treated them

24   well or, you know, that they hadn't heard such

128

 1   things.

 2              So, yes, I remember that there were

 3   other statements that didn't necessarily

 4   corroborate this particular threat, but other --

 5   other people that said that Sergeant Moore had

 6   some things, but I don't believe that they were

 7   specific enough, dates, times, places for us to be

 8   able to pin him down.

 9   Q.         So let me make sure I understand.

10   You -- you did have the authority to issue more

11   severe punishment, right?

12   A.         Than what?

13   Q.         Than -- well, first of all, you could

14   reverse the not sustained and sustained it?

15   A.         I could have.

16   Q.         Okay.  And you knew there were both

17   white and black officers who told Decker that they

18   had heard him use racist terms, told Decker that

19   he -- they believed he had racist attitudes based

20   on his comments.  One of them said with respect to

21   the threat, he didn't deny it when he asked Moore

22   about it.  You also had several officers, again,

23   black and white, who confirmed specific examples

24   of him threatening to take people out and fight

1    them or beat them up?

2              MR. COGLIANESE:  Objection.

3    Q.        And you're telling -- and I want to

4    make sure I understand.  You did not feel that was

5    enough evidence to corroborate either that Moore

6    made either version of the direct threat to

7    Cornett or Williams together -- despite Sorrell

8    and Watkins both supporting that as well?

9              MR. COGLIANESE:  Objection.

10   A.        The decision of that particular

11   allegation was not sustained, and so I have to say

12   that, yes, I wasn't convinced by the evidence,

13   whatever that is, and you're giving testimony as

14   to what some of that evidence was that I may or

15   may not recall parts of all or not.  But it was --

16   it was not my decision to override the

17   recommendation of not sustained, correct.

18   Q.        And if I understood your answer was

19   that you -- part of the reason you didn't take --

20   or you accepted the not sustained charge is that

21   some other officers, white and black, according to

22   your recollection, said they hadn't personally

23   heard Moore make such racist statements or

24   threats; is that right?

1           MR. COGLIANESE:  Objection.  Go ahead.

2    A.          I don't believe that I testified that

3    that was relevant to the decision to over -- to

4    not override the not sustained.  Sounds like a

5    double negative.  The allegation of making a

6    derogatory comment was sustained.  The allegation

7    of making that particular threat was not

8    sustained.  And it was a particular threat of a

9    particular nature at a particular time.

10          So the fact that other people might

11   have heard derogatory comments is significant, but

12   it's not necessarily overriding whether or not

13   this particular comment was made as described in

14   the allegation.  And that's the -- that's the

15   situation that we're in where we have a specific

16   allegation about a specific comment at a specific

17   time.  And you might believe that, you know,

18   there's circumstantial evidence, but you might not

19   be able to prove that there was enough evidence to

20   sustain an allegation.

21   Q.          So just to make sure I understand.

22   Because two witnesses reported about the same

23   threat occurring at the same time, had slightly

24   different versions of the wording, and Sergeant

 1    Moore denied making that threat, you felt

 2    obligated to accept the denial?

 3              MR. COGLIANESE:  Objection.  Go ahead.

 4    A.        I didn't say it that way.  I said that

 5    based on all of --

 6    Q.        I'm saying it that way.  Isn't that

 7    true?

 8              MR. COGLIANESE:  Fred, let her finish.

 9              MR. GITTES:  I want to make sure she

10    understands my question.

11              THE WITNESS:  I said --

12              MR. GITTES:  Want to read it back to

13    her?

14              MR. COGLIANESE:  Chief, finish your

15    answer.

16              MR. GITTES:  She can finish it when she

17    hears the question again.

18              MR. COGLIANESE:  It depends on which

19    question you're asking her, because you cut her

20    off twice on questions here.

21              MR. GITTES:  I hadn't finished my

22    question.  She can't answer a question until it's

23    finished.  So I'm giving her a chance to hear the

24    question I asked.

132

1          MR. COGLIANESE:  And, Chief, by all

2    means, give a full answer.

3          (The record is read as requested.)

4          MR. COGLIANESE:  Feel free to respond.

5    Q.      Do you not understand the question?

6          MR. COGLIANESE:  Feel free to respond.

7    Q.      Do you understand what I'm asking you?

8    A.      You -- you suggested that I did not

9    feel obligated.  That is not the terms that I

10   would use.  I said, based on the information that

11   I reviewed at that time, the evidence that had

12   been submitted, that I did not override the

13   decision.

14   Q.      Okay.

15   A.      And part of that is that the two

16   officers that said something happened and part of

17   it is all of the other information.  So it's based

18   on all of the evidence, not just a particular

19   subset.

20   Q.      Okay.  What other information did you

21   have regarding that specific threat, other than

22   the two officers and Sergeant Moore's statements

23   about it?

24   A.      Without re-reading the entire

```
1    investigation and trying to remember what I was

2    making a decision on four or five years ago, I

3    can't tell you.

4    Q.        Well, I'll represent to you that no

5    other witness claimed to have heard the threat.

6    That the only people who specifically represented

7    they had heard it were Sorrell and Watkins,

8    although their wording was slightly different, and

9    Sergeant Moore denied it.  I'm unaware, I will

10   represent to you, and we have extensively reviewed

11   the IA packet, there's no documentation of a

12   threat, unlike other things that occurred later

13   that we're going to talk about.  It's just those

14   three who claimed one way or another to have

15   knowledge about whether it was or wasn't said.

16             So if you have some thought of any kind

17   of other evidence that maybe we're not aware of, I

18   would sure like to hear it.

19             MR. COGLIANESE:  Objection.

20   A.        I've testified that it's based on the

21   information that I had before me and --

22   Q.        Okay.

23   A.        So --

24   Q.        I'm representing to you had that before
```

134

1    you.

2    A.          I already told you that I also had

3    people within the chain of command that had

4    weighed in on that particular allegation as well.

5    Q.          Did someone in the chain of command

6    claim to be there when the statement was allegedly

7    made?

8                MR. COGLIANESE:  Objection.

9    A.          Not to my knowledge.

10   Q.          They would have been relying on the

11   same IAB investigation you were, wouldn't they?

12   A.          Yes.

13   Q.          You also knew, independent of that

14   specific threat, that there was a sustainable

15   conclusion that Sergeant Moore made racist

16   comments on multiple occasions, not just that

17   single occasion, right?

18   A.          Not sustainable, no.

19   Q.          No.  They found it was sustainable?

20   A.          There was one allegation of a racist

21   comment, a derogatory comment.  There were other

22   people that had been interviewed that alleged

23   that, but they didn't allege it with dates, times,

24   places, you know, participants, all of those

```
 1    things.  So I wouldn't describe those as

 2    sustainable.  The one sustainable allegation we

 3    had was in that investigation.

 4    Q.        So, in other words, you disregarded the

 5    interviews by Sergeant Decker where a number of

 6    other officers, black and white, confirmed that

 7    they had heard Sergeant Moore saying things --

 8    using the N word, talking about blacks being --

 9    referring to them as monkeys, referring to blacks

10    as being lazy and also talking about taking

11    officers out and fighting them.  You just

12    disregarded that, because those people hadn't made

13    a specific complaint to the chain of command or to

14    IAB; is that right?

15            MR. COGLIANESE:  Objection.

16    A.        You're characterizing it as me

17    disregarding that information, and I would not.

18    Q.        That's right, I am.

19    A.        I would not.

20            MR. COGLIANESE:  Let her finish.

21    Q.        Well, how did you weigh that evidence?

22            MR. COGLIANESE:  Fred, please let her

23    finish.

24            MR. GITTES:  She was finished.
```

 1          MR. COGLIANESE:  No, you cut her off

 2    and she was finishing.

 3    Q.          Chief, let me make it clear so I don't

 4    have to have continued interruptions by counsel

 5    trying to direct your testimony.  If you feel I'm

 6    cutting you off, just say it, okay?  He doesn't

 7    have to say it.  You're answering the question.

 8    Please tell me if you -- if you remember something

 9    that you don't, interrupt me.  If you feel I'm

10    interrupting you, please tell me.  I don't mean to

11    interrupt you.  I really don't.  I really want to

12    hear what you have to say.

13          MR. COGLIANESE:  And, Mr. Gittes, when

14    you talk over her, I'm going to tell you you're

15    interrupting her, and I'm going to tell her to

16    finish, which is what you keep doing.  So, Chief,

17    please finish.

18    Q.          Are we clear that you can tell me if

19    you feel I'm interrupting you?

20    A.          Sure.

21    Q.          And will you do that?

22    A.          I will.

23    Q.          Okay.  Now, you --

24          MR. COGLIANESE:  And, Chief, if you

1    haven't finished your previous answer, please

2    finish it.

3    Q.         Were you finished?

4    A.         No.

5    Q.         Okay.  What else did you want to say?

6    A.         You -- you characterized my review as

7    disregarding information, and I regarded all of

8    the information.

9    Q.         Okay.  How did you weigh with respect

10   to the accusation about the violent threat

11   confirmed by Watkins and Sorrell, how did you

12   weigh the other testimony about racist comments,

13   comments about fighting, stupidity of black

14   officers, use of the N word, et cetera, how did

15   you weigh that with respect to whether or not the

16   charge about the specific threat to Cornett and

17   Williams should be sustained?  Explain your

18   thinking.

19             MR. COGLIANESE:  Objection.  Go ahead.

20   A.         Well, first of all, that was years ago,

21   and I can't recall specific balancing of

22   percentages or anything, you're talking about

23   weighing and all that.  I can't remember what I

24   did years ago in that regard.  It boils down to I

1    wasn't convinced that I could prove that charge.

2    Q.        Okay.  Now, you also said that with

3    respect to the other charge about using the

4    inappropriate racist language, you only had one

5    incident, is that what I understood you to say a

6    little bit ago?

7              MR. COGLIANESE:  Objection.  Go ahead.

8    A.        There was an allegation made in this

9    particular investigation that was investigated and

10   prepared about this remark being made.  That was

11   sustained.  Other people's testimony in their

12   interviews were not written up as other

13   allegations.

14   Q.        And is it -- was it your policy while

15   you're the chief that when new incidents of

16   misconduct, including racist misconduct, racist

17   language that clearly violates the department's

18   policies and the law come up, that you are not

19   allowed to consider them and IAB is not allowed to

20   follow up on them?

21             MR. COGLIANESE:  Objection.

22   Q.        Is that your testimony?

23   A.        That is not my policy.

24   Q.        Okay.  Well, then explain to me why the

1    other officers who were reporting experiences with

2    Moore, both to them directly, but also him

3    discussing this kind of stuff with them regarding

4    black officers wasn't part of the charge that was

5    made?

6    A.        That wasn't my decision.  That was the

7    decision made by the IAB investigator and that

8    chain of command to decide what the allegations

9    are.

10   Q.        Okay.

11   A.        And if they felt that it was an

12   allegation that needed to be further investigated,

13   they should have.

14   Q.        You had the -- you're the chief at the

15   time, right?

16   A.        Yes.

17   Q.        Have you ever opened -- ordered them to

18   reopen or expand an investigation?

19   A.        I don't know about reopening an

20   investigation, but I've certainly given them some

21   direction on what I thought were appropriate

22   allegations.

23   Q.        Well, in cases where they were added to

24   the investigation?

1    A.          Yeah.

2    Q.          Okay.  You didn't do that in this case?

3    A.          No.  I -- I think that I did with

4    regard to some of the comments that were brought

5    up.  I believe that I talked to them about, you

6    know, Sorrell.  And to my recollection, he made

7    this allegation about the phone, and then he

8    didn't feel like he was getting enough attention

9    and so he made more allegations and he made more

10   allegations.  And the allegations kept coming in.

11   And so I believe that I did at least approve, if

12   not direct, adding other allegations.

13   Q.          So, Chief, just to save time for the

14   rest of the afternoon, I'm only interested in the

15   discrimination allegations.  I have no -- I may

16   touch on them, but the focus of this case, you

17   know, is about your handling and the department's

18   handling of the discrimination issues related to

19   Sergeant Shaw, okay?

20   A.          Okay.

21   Q.          You did not order any expansion of the

22   investigation or follow up regarding these other

23   officers who reported other racist comments by

24   Sergeant Moore, did you?

1    A.          Not to my recollection, no.

2    Q.          But you did order further follow up on

3    things about whether cell phones were taken and

4    whether overtime was done, but not on the racist

5    comments, right?

6    A.          I don't recall the exact, you know,

7    process and chronology, but I might very well have

8    made sure that that allegation was investigated.

9    Q.          I'm not -- okay.  I'm sorry, let's -- I

10   don't want to have a terminology problem here.

11   I'm not talking about that allegation.  I'm

12   talking about follow-up allegations, additional

13   specific allegations about these other comments,

14   racist comments that other officers were reporting

15   about Moore during Decker's investigation of the

16   particular racist comment that started this.  You

17   did not instruct IAB to follow up on them and

18   prepare new specifications or charges, did you?

19              MR. COGLIANESE:  Objection.

20   A.          The lack -- the lack thereof certainly

21   indicates that I did not give such an order.

22   Q.          In contrast with -- regarding the money

23   issues, what I call the money issues, theft of

24   time, theft of property and so forth, you did make

142

1    instructions to expand certain things, correct?

2    A.        I don't know what my role was in

3    initiating the allegations.  I just know that

4    Moore came in and we decided that there was going

5    to be more to investigate.

6    Q.        Okay.  "We" includes you?  When you use

7    the word "we"?

8    A.        I don't investigate things, I order

9    people to do it or --

10   Q.        So "we" --

11   A.        -- approve of that.

12   Q.        -- including you approving of it?

13             MR. COGLIANESE:  Okay.  You cut her off

14   again.  Please finish your answer, Chief.

15   Q.        Did you get her answer?  Okay.  Thanks.

16             Do you want to add anything else?

17   A.        No.

18   Q.        Now, at some point during the

19   investigation, do you recall becoming aware of

20   information about Sergeant Moore ordering a

21   lightning link?

22   A.        I -- I don't recall that until actually

23   the OCRC thing when -- and Pam Gordon started

24   talking about it.  It might have been something

143

1    that I reviewed when I reviewed the investigation

2    or the summary.  But it did not -- it did not -- I

3    don't recall any such attention that I had prior

4    to it becoming an issue in the OCRC thing.  And

5    that was well after the investigation was closed.

6    Q.        Well, let me see if I can -- let me

7    just ask you questions about it.  Do you recall

8    becoming aware during the course of this

9    investigation that -- that Officer Shaw had a

10   second interview with Decker?  He was interviewed

11   twice.  Do you remember that?

12   A.        Not specifically.

13   Q.        Okay.  Do you remember learning during

14   the investigation that from the -- from Sergeant

15   Decker or from reading the material, that someone

16   had made Karl Shaw aware of the fact that the --

17   what is it?  What's the agency?  Yeah, ATF had

18   been investigating or checking Sergeant Moore

19   because it was discovered he'd ordered a lightning

20   link.  Does that ring a bell with you?

21   A.        Well, I'm aware of that now.

22   Q.        No, I'm trying to put --

23   A.        I don't know when I first became aware

24   of it.

1    Q.        Okay.  Do you recall that Sergeant

2    Decker, in the report, didn't -- determined, I

3    believe with the advice of Jennifer Knight, that

4    there would be no further inquiries about the

5    lightning link because ATF had not filed charges?

6              MR. COGLIANESE:  And I'm just going to

7    object because you said didn't determine, and I

8    just wanted to make sure that you both are

9    answering the question that he asked.

10             MR. GITTES:  Okay.  Thank you.

11             MR. COGLIANESE:  So...

12             MR. GITTES:  Let me -- let me make sure

13   I ask the question correctly.

14   Q.        Do you recall becoming aware that

15   Jennifer Knight, in consultation with Sergeant

16   Decker, decided not to look into the lightning

17   link matter further, because ATF had not filed

18   criminal charges?

19   A.        I am aware of that.  I don't know when

20   I became aware of that.

21   Q.        Okay.

22   A.        It might very well have been at the

23   conclusion of the investigation and when it was

24   sent to me for review, or it could have been even

1    later when it was brought up at OCRC.

2    Q.         Is it -- was it your policy, I should

3    ask, while you were the chief that if another law

4    enforcement agency did not prosecute a potentially

5    criminal matter regarding one of your officers,

6    that IAB could not look into it further?

7    A.         Could you state the question again?

8    Q.         Sure.  Was it a policy while you were

9    the chief that if another law enforcement agency,

10   federal or state, decided not to prosecute one of

11   your officers about a potential criminal issue,

12   that meant IAB should not look into it further?

13   A.         I had no such policy.

14   Q.         Okay.  And I believe there have been

15   occasions during your tenure as chief when some

16   other law enforcement agency, for whatever reason,

17   decided not to do a prosecution, but the CPD and

18   the county prosecutors ended up doing one.  Hasn't

19   that happened?

20   A.         The second part of that question, I'm

21   not sure I'm going to be able to answer.

22             There are cases in both regards where

23   other agencies have criminally investigated our

24   personnel where internal affairs has been ordered

```
 1    or does follow up with an administrative

 2    investigation.  And there have been cases where a

 3    criminal investigation has ensued from another

 4    agency and we don't investigate.  There have been

 5    both --

 6    Q.        Directions?

 7    A.        -- scenarios.

 8    Q.        But there's no automatic rule that you

 9    don't touch something --

10    A.        Correct.

11    Q.        -- if another --

12    A.        Correct.

13    Q.        -- law enforcement agency doesn't

14    pursue it?

15    A.        Correct.

16              MR. GITTES:  Can we -- doesn't have to

17    be long, but I need to eat lunch.

18              THE WITNESS:  Okay.

19              MR. COGLIANESE:  That's fine.

20              MR. GITTES:  Unless we can -- I can't

21    remember, is there food real close?

22              MR. COGLIANESE:  Why don't we go off

23    the record.

24              MR. GITTES:  Yeah.  Yeah.  Sure.  Sure.
```

147

1              THE VIDEOGRAPHER:  We're off the

2     record.  The time is 12:47.

3                        - - - - -

4              Thereupon, a luncheon recess is taken

5              at 12:47 p.m.

6                        - - - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

148

1                      Monday Afternoon Session

2                      May 20, 2019, 1:27 p.m.

3                      - - - - -

4                THE VIDEOGRAPHER:  This marks the

5      beginning of media number three.  We're back on

6      the record.  The time is 1:27.

7      Q.        Chief, let's start where I think I left

8      off sort of.  I was asking about a lightning link

9      and, you know, other law informant agencies.  But

10     I forgot to ask you:  Can you tell us for the

11     record what a lightning link is?

12     A.        I don't know for sure.  I've been told

13     that it has something to do with like a bump

14     stock, I believe, making a weapon fire faster.

15     Q.        Okay.  And are you aware or have you

16     been aware that it's illegal?

17     A.        Through this investigation.  That's the

18     only place I've ever heard of it.

19     Q.        Okay.  Switching totally now.

20     A.        Okay.

21     Q.        I want to talk to you about SRB.  And I

22     just -- just -- I want to make it clear to you,

23     we're going to be going back and forth.  I'm going

24     to come back to some things we've touched on, but

1   in light of subsequent things I'm going to ask you

2   about to see how that might affect or change what

3   you remember, okay?

4   A.        Sure.

5   Q.        Because I realize I said in the

6   beginning, and I guess I didn't make this clear, I

7   know no one's memory's perfect, so you understand

8   you can interrupt me at any time, I don't remember

9   if I said this or not in the beginning.  If you

10  remember something you forgot, interrupt me and

11  say, oh, by the way.

12  A.        I do.

13  Q.        Okay.  At some point, I believe it was

14  in the fall of 2014, but I -- it's not clear to us

15  exactly when, there started to be some discussion

16  about either reorganizing or disbanding portions

17  of SRB.  Do you recall at some point making a

18  decision about modifying or reorganizing SRB?

19  A.        I do.

20  Q.        Can you tell me about when that started

21  being discussed?

22  A.        I think it's always been on the

23  discussion table.  SRB was created in 1999 as its

24  own basically community policing bureau.  And

1    there have been a lot of people that have

2    discussed over the years whether it needed to be

3    its own entity or not.  And so previous chiefs and

4    a lot of other command staff personnel have talked

5    about the necessity of having that bureau.  And if

6    there is going to be such a bureau, what should be

7    in it.

8          I made adjustments to the entire

9    organizational chart after I became chief and

10    created some bureaus and moved entities within

11    bureaus around.  And that occurred for my whole

12    seven years as chief, making changes to the

13    organizational chart.

14          And then in addition to that, I had set

15    up a procedure for us to -- for me to make

16    decisions three times a year on staffing requests.

17    I told everybody if they wanted to have new

18    assignments created, that they should send in

19    requests only three times a year.  Previous chiefs

20    had allowed people to walk into the office and

21    say, hey, I need a couple more officers here, and

22    the chief would consider it then.  But in my

23    opinion, I needed to have the big picture, look at

24    it on a more infrequent basis and then look at the

1    whole and decide.

2            So I would get requests to create

3    positions or expand units throughout my tenure as

4    chief.  And I had to make decisions about whether

5    or not to approve such requests.  Typically I had

6    told them I would make them in February, June and

7    October.  And so I would like collect these

8    requests and then I would review them and we would

9    discuss them at executive staff, if not command

10   staff, and decide what to do about those.

11           I believe it was during 2014 that I had

12   gotten a lot of requests to create a number of

13   assignments and positions that either didn't exist

14   or to expand them, and the number was quite high.

15   And I wanted to do a lot of those, but the

16   division was not hiring to add at that point in

17   time, we were just maintaining, if not sinking

18   lower in our total sworn ranks.  And so there

19   weren't any new people, you know, or new numbers

20   of people, it was just moving some here to fill

21   this hole over here, but you're basically just

22   taking -- you know, robbing Peter to pay Paul

23   basically.

24           And so I wanted to create some of those

152

1    new requests or approve those, and I knew that I

2    had to find someplace else that I could take away

3    from.  So that was part of my consideration with

4    regard to looking at the organization and

5    determining where I could fill some holes and do

6    without.

7              Because there had been advocates to

8    disband either all of SRB or parts of SRB, I

9    started looking at whether or not those were still

10   vital.  SRB enforcement section was one of those

11   areas that the original idea was to supplement the

12   community policing idea of some uniformed

13   officers, community liaison officers, and do some

14   of the detective work, if you will, that needed to

15   be done and street level work that needed to be

16   done, but it had morphed even prior to me becoming

17   a chief.

18             There were a lot of successes that were

19   related to SRB enforcement, but there were also a

20   lot concerns related to SRB enforcement.  And some

21   of those concerns involved the use of overtime.

22   We did surveillance on a fairly regular basis, and

23   sometimes we would use SRB enforcement to do that

24   and sometimes we would use SWAT or others to do

1    it.  And somehow the other units managed to do it

2    without a lot of overtime, but SRB enforcement's

3    overtime was always quite significant.  And I made

4    a pledge basically to Mayor Coleman when I got

5    promoted that I was going to maintain our overtime

6    budget, and I did up until the very last year when

7    the circumstances didn't allow that.  But I was on

8    budget with overtime.  And to do that, you have to

9    make some hard decisions.

10          And so for a lot of different reasons,

11   I decided that abolishing the SRB enforcement

12   section was going to be the way that I would be

13   able to create some of those other positions and

14   to address some of the concerns that had been

15   raised about overtime and just the mission of SRB

16   enforcement.

17   Q.        So what -- do you recall whether that

18   happened late 2014, early 2015?

19   A.        I think both.

20   Q.        Okay.  Did you know Karl Shaw before

21   this lawsuit was filed?

22   A.        I'm sure that we had, you know, some

23   knowledge of each other at some point in time, but

24   I don't think that I've ever worked with him or

1  supervised him directly.

2  Q.        You -- did you know -- at the time you

3  eliminated SRB, did you know he was there?

4  A.        I believe that he was in a meeting that

5  I had with SRB enforcement section.  You know, I

6  know a lot of people, and I know a lot of names

7  and I know a lot of faces, sometimes they match

8  and sometimes they don't.  But I believe that Karl

9  might have been at that meeting, and so I would

10  have been aware at that point in time that he was

11  in SRB enforcement.

12  Q.        Was that an informational meeting or a

13  meeting to announce that you were going to change

14  SRB?

15  A.        Both.

16  Q.        Both?  Okay.

17  A.        Yeah.  I know that -- I know that there

18  was an awful lot of rumors flying, but I wanted to

19  be involved in the discussion so that I could

20  answer questions.

21  Q.        If you remember, at the point in time

22  you had that meeting, was Sergeant Moore

23  already -- had he already moved out of SRB and was

24  in narcotics?

1    A.        I have no idea.

2    Q.        Okay.  Were you aware at the time you

3    met with Shaw, and not just him, but others at

4    SRB, were you aware of any accolades or awards

5    that Karl had received for work he had been doing

6    on hotels that were centers of drug trafficking

7    and other illegal activity?

8    A.        I would say that I was just generally

9    aware of a lot of the recognitions that had been

10   given to many of our employees.

11   Q.        Okay.

12   A.        You know, I mean, we have award

13   ceremonies twice a year.  I read the newspaper, I

14   read Facebook, you know, the accolades about our

15   division employees.  So I certainly would think

16   that I was aware, but not in particular, but, you

17   know.

18   Q.        Okay.

19   A.        Not singling that particular thing out.

20   Q.        So I want to talk a little bit about

21   Officer Shaw's efforts to find another job after

22   learning that SRB -- the unit, part of SRB he was

23   in was going to be disbanded.

24   A.        Okay.

1    Q.        There's a time limit, right?  On how

2    long officers have to apply for open positions

3    before they can just be reassigned?

4    A.        The contract describes in great detail

5    what the rules are as far as giving abolishment

6    notices and all that.  I specifically discussed

7    the process with the union and gave them far --

8    basically twice the amount of time that the

9    contract requires to start looking for other jobs

10   and the number of postings that would be available

11   to them.

12   Q.        Okay.  I'm just trying to make sure

13   it's clear on the record that he did have some

14   time constraints, it wasn't that he could just

15   take forever, he was given the right to pick, if

16   available, open assignments based on his

17   qualifications, seniority for a period of time.

18   And then if he couldn't get a job after that, then

19   he was subject to being assigned through the chain

20   of command, is that --

21   A.        Ultimately if an abolishment notice was

22   officially provided then, yes, there would be a

23   limited amount of time.

24   Q.        Okay.  So going back to the

1    investigation and the charges.  When you

2    reviewed -- you understood at some point that

3    Officer Shaw felt he had been retaliated against

4    and discriminated against in his efforts to go to

5    narcotics?

6              MR. COGLIANESE:  Objection.  Go ahead.

7    A.        Are you saying that I learned that from

8    the investigation?

9    Q.        Yes.  I'm asking whether you became

10   aware that one of the issues that Karl Shaw had

11   was -- that he discussed and reported about,

12   whether or not it became a charge is a separate

13   question, did you become aware at any point during

14   the investigation that he had complaints about the

15   process related to him seeking a narcotics

16   assignment?

17   A.        Well, I know very -- very -- I know

18   that I knew about complaints about his attempt to

19   get into narcotics.  I just don't know if I

20   learned about it as a result of the investigation

21   of Sergeant Moore.  I don't know if that was a

22   separate thing that was brought to my attention

23   and that I dealt with or if I learned about it

24   from there and then we dealt with it.  But I do

1    know that I'm aware that he had complained about

2    the process of being selected in narcotics.

3    Q.        Hang on one second.  I want the chain

4    of command stuff on Moore.

5              MR. VARDARO:  It's 41.  It's either 39

6    or 41, depends on what version you want.

7              MR. GITTES:  Hang on, I'm looking.  I

8    think we want -- I'm sorry, give me a second here.

9    Okay.  I'm going to use -- let's use 41.

10             MR. VARDARO:  I know, I'm just

11   wondering whether we already used it.

12             MR. GITTES:  Oh, do you have a list?

13             MR. VARDARO:  No, I have the list.  We

14   didn't already use it, but just --

15             MR. GITTES:  I see it right here, 41.

16             MR. VARDARO:  Oh, it is?  Oh, okay.

17   Then it's in this.

18             MR. GITTES:  Okay.

19             MR. VARDARO:  They're in numerical

20   order.

21             MR. COGLIANESE:  Before you do, let me

22   just double check it against what I got.  Thank

23   you.

24             THE WITNESS:  Uh-huh.

1    Q.          For the record, Chief, you've been

2    handed an exhibit that was previously identified

3    in this case as Plaintiff's Exhibit 41.  And the

4    part of it that I want to draw your attention to,

5    but obviously you can look at other parts as you

6    feel necessary, is -- it is paginated 014417 at

7    the bottom dated December 29th, 2015.  And it's

8    from Lieutenant Brust addressed to you.  I've now

9    learned today that everything is addressed to you,

10   so -- but I would like to know if you recall

11   seeing this?  Jeff's pointing out the next page

12   after that is also related.

13               MR. COGLIANESE:  So you're talking

14   14419 also?

15               MR. GITTES:  Yes.

16               MR. COGLIANESE:  So let me just make

17   sure that you've got two sided.

18               THE WITNESS:  There's 19.

19               MR. COGLIANESE:  Yeah.  So they're

20   talking about this page, that page and that page

21   and I assume 20 also?  That's the last page.

22   Q.          Yeah.  They all concern.  I'm just

23   asking you to look at them and see if you remember

24   to try to remind you of an issue related to job

1    openings in narcotics.

2    A.         If this was part of the package of the

3    investigation, which it should have been because

4    it's listed in the allegations package, then there

5    is a possibility that I've seen them before.

6    Q.         Okay.  Sitting here today, you don't

7    have a specific recollection of looking at them?

8    A.         I don't specifically recall that, no.

9    The --

10   Q.         When --

11   A.         The outcome of those two allegations

12   was a DCC.  So in my review of the investigation,

13   I'm looking for evidence in support of those that

14   have been sustained and recommended for charges or

15   written reprimands.  So I could have seen them and

16   decided that they weren't relevant, or I could

17   have just reviewed them and not taken any further

18   action on reading that.  But I do know that I was

19   involved in decision-making on how to handle a

20   posting in narcotics.

21   Q.         Okay.  Well, let me -- let me just try

22   to go over some pieces of information that I will

23   represent to you come out of the IAB investigative

24   report --

161

1    A.        Okay.

2    Q.        -- and see if they bring to mind

3    anything.

4              Did you -- do you recall that it came

5    to your attention that Sergeant Moore, with

6    Commander Cameron's consent, had a preferred

7    candidate for an initial opening in narcotics?

8              MR. COGLIANESE:  Objection.

9    Q.        His name -- his name was Ehrenborg?

10             MR. COGLIANESE:  Objection.  Go ahead.

11   A.        I believe that I know that at this

12   point in time, yes.

13   Q.        Okay.  You don't remember whether you

14   knew it back then?

15   A.        I'm going to say that I believe I did.

16   I just don't know when I got knowledge of that.

17   Q.        Do you recall that Sergeant Moore

18   conducted -- sent an invitation to bid to a

19   certain list of officers to let them know about

20   the opening?

21             MR. COGLIANESE:  Objection.

22   A.        I would say I don't remember

23   specific -- that particular part of this.

24   Q.        Is that something that's customarily

1    done when there's an opening?

2    A.        I can't say what's customarily done,

3    because I'm not aware of what the 200-plus

4    supervisors --

5    Q.        Okay.

6    A.        -- do --

7    Q.        Okay.

8    A.        -- with regard to advertising their own

9    openings.

10   Q.        All right.  Were you aware that at the

11   time that Sergeant Moore was pursuing the opening,

12   you know, for candidates and preparing to make a

13   recommendation for selection, he was already under

14   investigation?  In other words, the complaints

15   about him had been made and an IAB file had been

16   opened, investigation had been opened?

17   A.        I'm not sure I understand the question

18   as far as the chronology that you're asking.

19   Q.        I'm asking you if you were aware that

20   Sergeant Moore was permitted to conduct the

21   process of considering candidates for the initial

22   opening in vice while he was being investigated by

23   IAB?

24   A.        Oh, I'm certainly aware of that now.

1    That would -- unless you're relieved of duty, you

2    do the responsibilities of the job, so there was

3    no particular notice that I would have taken of

4    any supervisor trying to fill an assignment unless

5    I was somehow asked to be involved in the posting

6    of it or something else, which, you know, for some

7    jobs, they had to ask for my permission to post,

8    but others they didn't.

9    Q.        Do you now remember that Sergeant Moore

10   was engaging in this inter -- selection process --

11   hang on one second.

12            Do you recall that during the process

13   where Moore was doing -- you know, overseeing and

14   conducting the selection process, initial phase of

15   it, complaints had already been made about him

16   making racist comments and threats?

17   A.        Well, I was aware that Sergeant Moore

18   was under investigation until the investigation

19   was over.  And that's -- that's it.  I mean, I

20   don't recall that there was any connection between

21   the two until it became an issue that there was an

22   allegation that he had probably not done it under

23   the most desirable circumstances.

24   Q.        Well, you knew -- you had already

1   received Sergeant Williams' letter, had you not?

2   By the time that this vice squad hiring process

3   had started or selection process?

4             MR. COGLIANESE:  Objection.  Go ahead.

5   A.        Like I said before, I believe.  I don't

6   know when I got that letter --

7   Q.        Okay.

8   A.        -- but --

9   Q.        What date is this?

10  A.        -- I know it was earlier than this.

11  And I don't know when that selection process was,

12  so that's --

13  Q.        All right.

14  A.        -- my -- I -- if -- I'm not sure what

15  you're asking.  I knew that he was under

16  investigation and I knew that at some point in

17  time there was a question about the manner in

18  which he sought candidates or disregarded

19  candidates for that particular opening in

20  narcotics.

21  Q.        I'm just trying to see whether you will

22  agree with me that you knew he was under

23  investigation not just for theft of time and other

24  things, but for alleged racism?

1   A.          Yeah, I knew what he was under

2   investigation for.

3   Q.          Okay.  So --

4   A.          To some degree.

5   Q.          And during -- at a certain point in the

6   narcotics job selection process, you became aware

7   there were issues about it because you ordered

8   them to redo the selection process, right?

9   A.          That is correct.

10  Q.          And the reason that you ordered them to

11  redo the selection process is that you found out

12  that Officer Ehrenborg had been given the

13  assignment that Sergeant Moore, with Commander

14  Cameron's permission, had made him the -- started

15  the process with him as a preferred candidate,

16  right?

17              MR. COGLIANESE:  Objection.

18  A.          I -- I know that what I was told was

19  that he wanted Ehrenborg and that he had found a

20  way to get to Ehrenborg.  And when it was

21  described how he got there and I understood it,

22  that I did not agree with that method.

23  Q.          Okay.  Now, the how he got there -- and

24  so after he recommended Ehrenborg, and I don't

1    know if you remember the details, it came to your

2    attention, you considered it and you said redo it?

3    A.        Right.

4    Q.        Rebid it?

5    A.        Yes.

6    Q.        Okay.  Now, the process by which

7    Sergeant Moore did this came to your attention,

8    did it not?

9    A.        Yeah.  I mean, at least some parts of

10   the process came to my attention or else I

11   wouldn't have made the change.

12   Q.        And he wrote a letter to you about it?

13   A.        Sergeant Moore?

14   Q.        Yeah.

15   A.        He could have.

16   Q.        Okay.  Let me find --

17   A.        Was that prior to him posting the job?

18   Q.        No.  No, it wasn't.  Let me get you the

19   letter.  I'm just trying to --

20             MR. VARDARO:  It's 18.

21             MR. GITTES:  Has that been marked?

22             MR. VARDARO:  It's previously marked.

23             MR. VARDARO:  19.

24   Q.        May I?

1    A.        You want to touch it?

2    Q.        So for the record, Chief, you've been

3    handed what was previously identified as

4    Exhibit 19.

5    A.        Okay.

6    Q.        So do you recall getting that -- or

7    seeing it?

8    A.        Not specifically, no.

9    Q.        Okay.  In hindsight, do you now recall

10   that Sergeant Moore lied to you in this document?

11             MR. COGLIANESE:  Objection.  Go ahead.

12   A.        Where are you talking about?

13   Q.        Well, he says in this letter addressed

14   to you at least, "Without exception, all the

15   candidates passed with the agreement that they

16   would be considered if a less senior candidate

17   would accept the position."

18             See that sentence?

19   A.        Uh-huh.

20   Q.        You know now from the investigation

21   that that's simply not true, don't you?

22             MR. COGLIANESE:  Objection.

23   A.        I believe that the information that I

24   received indicated that some people had not

1    actually passed or agreed to that particular

2    statement, yes.

3    Q.        And other people verified that he had

4    misled them about a Spanish speaking requirement.

5    Do you recall that also came out of Decker's

6    interviews?

7    A.        Something to that effect, yes.

8    Q.        But he was never charged with lying,

9    was he?  Not about this?

10   A.        Correct.  Correct.

11   Q.        And he -- in addition, a number of the

12   individuals who he had falsely claimed had passed

13   were black officers, you also learned that, didn't

14   you?

15             MR. COGLIANESE:  Objection.  Go ahead.

16   A.        I don't recall the race or ethnicity or

17   gender of all of the people that he might have

18   passed, but I do know that there were some of --

19   Q.        And as far as I can tell from the

20   records -- and as far as I can determine, and

21   please tell me if you have reason to believe I'm

22   wrong, you did not make any specific inquiries

23   about that to Sergeant Decker?

24   A.        About what?

169

1   Q.        About the race -- racial make-up of the

2   people he misled or falsely claimed they had

3   passed?

4   A.        To Sergeant Decker?

5   Q.        Or to anybody.

6             MR. COGLIANESE:  Objection.

7   A.        I can't say that I did or did not.

8   Q.        Okay.  Was it the practice when you

9   were supervisor of IAB that if an investigating

10  sergeant were contacted, asked questions or asked

11  to do something, they put it in their notes?  I

12  think there's a part of the file that lists all of

13  the investigator's contacts and communications?

14  A.        You mean for internal affairs?

15  Q.        Yeah.

16  A.        There is a notes -- like a chronology

17  of -- of what the investigators are doing.

18  Q.        And that would include when they're

19  given instructions or contacted by their

20  supervisors?

21  A.        In general it should, yes.

22  Q.        Now, as I understand it -- and this is

23  in exhibit previously marked -- I'm just going to

24  give it to her unless it's a --

170

1          MR. COGLIANESE:  What's the number?

2          MR. GITTES:  20, sorry.

3          MR. COGLIANESE:  That's okay.

4    Q.        There -- I've handed you what's been

5    previously identified by a different witness

6    Exhibit 20.

7    A.        Uh-huh.

8    Q.        Can you take a moment to look at it?

9    Have you seen that before?

10   A.        This is a routing sheet that doesn't

11   have my name on it.

12   Q.        Well, doesn't it refer to an

13   instruction from you?

14   A.        It does.

15   Q.        Okay.  Do you remember giving that

16   instruction?

17   A.        Absolutely.

18   Q.        Does that suggest to you when your

19   decision about rebidding the job or your order

20   about it occurred?

21   A.        It appears that that decision was --

22   would have been made in January of '15.

23   Q.        Okay.  Now, let's talk a little bit

24   about after -- so at the point you gave that

1    order, let me see if I understand -- or let me ask

2    you to confirm what you did or didn't know.  You

3    knew there was a preferred white candidate that

4    Sergeant Moore, with Commander Cameron's

5    permission, was the preferred candidate they were

6    trying to get to, right?

7    A.        That Sergeant Moore was trying to get

8    to and/or Commander Cameron was trying to get to?

9    Q.        Well, Sergeant Moore with Cameron's

10   consent.

11   A.        Yes.

12   Q.        That there were some black officers who

13   were candidates for the job who had more seniority

14   than Ehrenborg?

15   A.        Everyone above Officer Ehrenborg had

16   more seniority.

17   Q.        Okay.  Many -- some of them were black?

18   A.        I believe so, yes.

19   Q.        And some of the most senior people, in

20   fact, at this time, were a couple of black

21   officers, including Whitney Lancaster and Karl

22   Shaw?

23   A.        I would have to see the list to be able

24   to affirm that, but everybody above Ehrenborg was

1    more senior to him.  So it doesn't matter if

2    they're one day more senior or lots more senior.

3    Q.        Do you know Whitney Lancaster?

4    A.        I know of him and I know who he is,

5    yes.

6    Q.        You've met him?

7    A.        Yes.

8    Q.        Okay.  But never supervised him or did

9    you?

10   A.        Never directly supervised him.

11   Q.        I mean, you -- did you have more

12   familiarity or the same as you had with Karl Shaw,

13   just in passing or did you actually have more

14   knowledge of him?

15   A.        I think Officer Lancaster's more well

16   known to me because his name has come up in more

17   circumstances that would come to my attention.

18   Q.        Okay.  Some of them more recent?

19   A.        Oh, absolutely.

20   Q.        Yeah.  Okay.  I don't want to get

21   involved with things that I'm not involved with.

22            MR. COGLIANESE:  Yeah, and I would

23   instruct you not to talk about --

24            THE WITNESS:  I'm not going to.

1          MR. COGLIANESE:  Thank you.

2     Q.          So when you -- you also -- and I take

3     it at the point you had the job rebid, someone,

4     and I don't know whether it was at your request or

5     not, asked Sergeant Moore to explain what he had

6     done and why.  I'm referring to 19, I'm trying to

7     understand --

8     A.          Why that letter was written?

9     Q.          -- why that letter was written?

10    A.          Someone might have asked him for it or

11    he might have volunteered to do it to try to

12    justify his position.  I know that sometimes when

13    they hear that I'm going to make a decision, they

14    try to override my decision by more justification.

15    So I don't know if it was specifically requested

16    or directed, so I can't answer what originated

17    this particular letter.

18    Q.          Well, let me ask you this:  Would you

19    have seen the letter or at least have been told of

20    its contents before you made the decision?

21          MR. COGLIANESE:  Which letter are we

22    talking about?  Exhibit --

23          MR. GITTES:  19.

24          MR. COGLIANESE:  -- 19?  Okay.

1    A.          I would need more information before I

2    could answer that.

3    Q.          Well --

4    A.          Because I don't know when the job was

5    posted and I don't know when it was reposted.

6    This letter was written on the 23rd.  Cameron's

7    routing sheet indicates that I made a decision by

8    the 28th, but I don't know if I had made the

9    decision even prior to the 23rd and he responded

10   to that.  So I -- I cannot give you a timeline.  I

11   don't know when the job got posted the first time

12   and when it got posted -- reposted again

13   subsequent to that.  We sometimes have a schedule

14   for when postings occur, and so I don't know the

15   timeline without more information.  This isn't

16   enough for me to be able to give you an answer --

17   Q.          Well, I mean --

18   A.          -- to how this originated.

19   Q.          -- Plaintiff's 20 was forwarded to you

20   and it has an attachment which refers to the

21   issues.  Wasn't this letter part of what's being

22   forwarded to you about all of this?

23              MR. COGLIANESE:  Objection.

24   A.          This does not indicate it was forwarded

1    to me.

2    Q.          Okay.

3    A.          As I said before, all correspondence is

4    addressed to me.

5    Q.          Okay.

6    A.          And this is -- there's no indication

7    that this letter was forwarded to me.  It might

8    have been shown to me, but this routing sheet does

9    not indicate that at all.

10   Q.          After -- so after -- after you had

11   rebid, were you made aware of the process that was

12   to be followed?

13   A.          I'm not sure what you're referring to.

14   The process to be followed is follow the contract.

15   Q.          Okay.  Did you become aware that

16   Sergeant Moore was ordered not to interview

17   certain individuals for the position because of

18   the pending complaints against him?

19          MR. COGLIANESE:  Objection.  Go ahead.

20   A.          I don't recall specifically.  That

21   might very well have happened, I just don't recall

22   the discussion.

23   Q.          Okay.  And when I say, "complaint," I'm

24   talking about the IAB investigation that was

1    ongoing.

2    A.          I understand.

3    Q.          Okay.  Were -- did you become aware of

4    who would -- did you know that Commander Cameron

5    and Lieutenant Brust decided to interview the two

6    most senior candidates who were black officers,

7    Whitney Lancaster and Karl Shaw, in person?

8                MR. COGLIANESE:  Objection.  Go ahead.

9    A.          Are you asking me if I'm aware that

10   that occurred?

11   Q.          I'm asking if you were aware of it at

12   the time?

13   A.          I don't believe that I was aware of

14   that at the time.

15   Q.          Hang on one second.

16               So is it -- in your experience in the

17   department, normal for a commander and a

18   lieutenant to interview in person a couple of --

19   from -- two officers from among other officers who

20   are seeking an assignment?

21               MR. COGLIANESE:  Objection.

22   A.          Well, I would say again that I don't

23   know the practices of all the commanders with

24   regard to filling assignments.  There may be some

1    that do it with regularity.  Certainly if it's a

2    commander interviewing a lieutenant for a

3    position, that would happen with regularity.  If

4    you mean specifically a commander interviewing an

5    officer rank for a position, I would think that

6    that doesn't occur very often, but I can't say

7    with any knowledge how often that may or may not

8    occur.

9    Q.          Okay.  Have you -- were you ever

10   interviewed as an officer by a commander for a bid

11   on an assignment?

12   A.          The job description manual and the

13   assignment process did not occur in the same way

14   when I was an officer.  It was, who do you know.

15   Q.          Okay.

16   A.          And I was offered that first shift job

17   by a captain at the time, so an officer was

18   asked --

19   Q.          Okay.

20   A.          -- by the captain at the time if I

21   wanted that job on first shift.  But that's not

22   the process that was in place when I was an

23   officer on the street or of the officer rank.

24   Q.          Okay.  After -- so you don't know just

```
1    how unusual -- I'm gathering from what you told me

2    it is -- you -- at least as far as you knew, it's

3    unusual for a commander and a lieutenant to pick

4    two applicants for an opening out of a list of

5    many other applicants to interview them in person?

6    A.         What I think I testified to is that

7    I -- I don't know how frequently it happens.  I

8    don't know if there's some commanders that do it

9    all the time for, you know, particular

10   assignments.  I know when I was the internal

11   affairs commander and I was bringing in 15 more

12   sergeants, I personally interviewed all of those

13   15 positions, and the 40 or 50 plus sergeants that

14   applied.  So even though there wasn't a direct

15   report to me, my rank, I did interviews.  So for

16   me in internal affairs, it was very common for the

17   commander to be involved in interviews.

18             But I can't say for other commanders

19   what their practice is.  You know, for patrol, I

20   wouldn't think that it happens very often, because

21   it's seniority based, it has nothing to do with,

22   you know, exceptional skills.  But a commander

23   over SWAT or something else might very well sit

24   down with you and want to know more about your
```

1    skills and, you know, thought process on why you

2    want to be a SWAT officer or a K-9 officer or

3    something like that.

4    Q.        Yeah.

5    A.        So I just can't answer that for

6    everyone else.

7    Q.        Did you ever -- did you become aware at

8    some point before this lawsuit was filed, before

9    charges were filed, that Officer Shaw had reported

10   to Sergeant Decker and had complained about the

11   manner in which he was interviewed by the -- by

12   Commander Cameron and Lieutenant Brust?

13   A.        Well, I am aware of that because it's

14   part of this, but I don't have any recollection of

15   knowing it before the investigation took place.

16   Q.        Okay.  Do you -- I'm not asking you

17   about before an investigation took place.

18   A.        I thought you did.

19   Q.        I'm talking about while the

20   investigation was going on.  At some point, did

21   you become aware that Cameron and Brust had done a

22   personal interview with Lancaster -- separate

23   personal interviews with Lancaster and Shaw?

24   A.        I might very well have.  I don't

1    recall.  The investigation of Moore was quite

2    lengthy.  And somebody might have brought that to

3    my attention as a bit of information, but I think

4    you're saying that that occurred after I had

5    ordered it to be reposted.

6    Q.        No, actually it didn't.  It occurred

7    before.  That was my mistake.  I misinformed you.

8    A.        Okay.

9    Q.        It -- just to make it clear, before you

10   re -- ordered the rebid after Sergeant Moore

11   recommended Ehrenborg, I will represent to you,

12   and your counsel can confirm it, but that Sergeant

13   Moore had been prohibited or ordered not to make

14   contact with certain people and Cameron and Brust

15   conducted the personal interviews with Lancaster

16   and Shaw.

17   A.        Okay.

18   Q.        Do you remember whether you learned

19   that either before you vacated the -- you know,

20   the selection or immediately after or --

21   A.        I was probably told that with the

22   entire -- you know, here's what happened and what

23   should we do about it.  And then I ordered the

24   rebid.

1    Q.        Okay.  So here's one question that we

2    hope you can answer for us.

3    A.        Okay.

4    Q.        And there's -- just put it in question

5    form:  Did you know that Officer Shaw recorded his

6    interview with Brust and Cameron?  And that he

7    submitted -- he told Sergeant Decker that he had

8    and the information related to the interview were

9    provided to Decker?

10   A.        I don't recall that specific

11   information.

12   Q.        So sitting here today, this is the

13   first you've heard of it?

14   A.        I can't say that --

15   Q.        Okay.

16   A.        -- with any certainty.

17   Q.        Okay.  I will represent to you that on

18   that recording, which we've been through with

19   Lieutenant Brust, among others, on the record,

20   Officer Shaw made it clear to both Cameron and

21   Brust that he would take the narcotics position

22   even though Moore was the sergeant?

23             MR. COGLIANESE:  Objection.

24   Q.        And if -- and then after the interview,

1    Ehrenborg was recommended for the position, not

2    Officer Shaw, and in no documents we've seen, nor

3    in any testimony we've gotten, is there any

4    indication that Officer Shaw ever withdrew or ever

5    changed his mind before Ehrenborg was announced as

6    the preferred -- as the recommended candidate.

7              My question to you is:  When you

8    ordered the rebid, was there some reason you

9    didn't order that the position go to Karl Shaw,

10   who is the most senior person who was considered

11   and had indicated he would take the job?

12             MR. COGLIANESE:  Objection.  Go ahead.

13   A.        I don't recall what the -- what I knew

14   at that time.  I don't recall if I felt that he

15   was entitled to it based on his statement of

16   wanting that job, if I knew that everybody more

17   senior than him had turned it down.  I just knew

18   that it did not sound like it had been done

19   appropriately and that it should be redone.

20             I have no idea what all I knew about

21   that.  I don't know if anybody even suggested that

22   we just take Officer Shaw.

23   Q.        Okay.  So at least as far as you can

24   recall sitting here today, Commander -- neither

1    Commander Cameron or Lieutenant Brust indicated to

2    you that they had interviewed Karl Shaw and he had

3    indicated he was interested in the position?

4    A.        I can't say with any certainty if they

5    -- if I was aware of that at that time or not.  I

6    don't believe that the information that I received

7    was directly from them.

8    Q.        Okay.

9    A.        I believe it came from their deputy

10   chief.

11   Q.        That was Gray at the time?

12   A.        That doesn't sound right to me.

13   Q.        Okay.

14   A.        I -- I don't know.

15   Q.        Quinlan?

16   A.        It was narcotics, that would have been

17   in Homeland Security, so, yes, it probably would

18   have been Gray.

19   Q.        Now, I want to ask a few questions, but

20   I don't want to -- I'm trying to be as efficient

21   as I can here.

22   A.        Okay.

23   Q.        And we don't know that I want to use up

24   your time or ours playing recordings of things

1    that you've never heard before or read before.

2            There were a number of issues brought

3    up during the investigation about the kinds of

4    questions and statements that Commander Cameron

5    made during his interviews of both Lancaster and

6    Shaw.  Have you -- have you read the transcript of

7    that interview?

8    A.        Which particular interview?  Of

9    Commander Cameron?

10   Q.        Cameron's interview of Shaw and

11   Cameron's -- let's just say Shaw.  Cameron's

12   interview of Shaw for the narcotics position?

13   A.        I don't recall reading a transcript of

14   that particular interview.

15   Q.        Let me mention a few things to see if

16   it brings something to mind.  Do you recall

17   reading or hearing an interview involving

18   Commander Cameron in which he brought up the

19   Ramparts controversy in LA and talked to the

20   candidate, in this case Shaw, about productivity

21   and being worried about ethics?

22   A.        Those words sound familiar to me.  I

23   don't know if they're part of the summary that I

24   read, but I don't think I read a transcript.  But

185

1    I do believe I've heard something along those

2    lines being mentioned.

3    Q.          Do you recall reading or hearing there

4    was conversation of -- from Cameron with Karl Shaw

5    in the interview about how he hadn't done any work

6    in 2011 and 2012?  Of course this interview was

7    happening in 2015.  Does that ring a bell?

8               MR. COGLIANESE:  Objection.

9    A.          If it's included in the summary, then

10   that might be where I have seen it.

11   Q.          And do you recall hearing Officer Shaw

12   say, that's not true, I've made a lot -- I was

13   very productive at the time, and there's some

14   disagreement about it.  Does that sound familiar?

15   A.          It sounds a little familiar, yes.

16   Q.          Do you recall learning, either from the

17   summary or other sources, that similarly, when

18   Lancaster was interviewed, again, both by Cameron

19   and Brust, that he -- the Ramparts thing was

20   brought up with him, there were questions about

21   him not being -- I haven't memorized it, we have

22   the transcript if you really want to see it, but

23   words to the effect, you know, this is -- I don't

24   remember whether they actually used the word, but

1    implying he was lazy and didn't do enough work.

2    Do you recall something like that?

3              MR. COGLIANESE:  Objection.  Go ahead.

4    A.        If that was included in the summary,

5    then that would have been probably where I read it

6    or --

7    Q.        Would it -- to your knowledge, isn't it

8    the case that none of the other candidates at the

9    time that these interviews were being conducted

10   had been told anything about Ramparts or asked

11   about their ethics, anything remotely like that?

12   A.        If that's what was submitted --

13             MR. COGLIANESE:  Objection.

14   A.        -- into the investigation, then, you

15   know, I would trust the investigation to explain

16   if that -- if similar comments were made.  But I

17   don't even know if they were asked, so I --

18   Q.        Do you -- do you remember -- would it

19   concern you as chief if only two black senior

20   officers were interviewed in person off a list of

21   potential candidates for an opening while all

22   other candidates, many, if not -- well, most of

23   whom are white, were simply called and contacted

24   by a sergeant?

```
 1              MR. COGLIANESE:  Objection.
 2    A.        Well, it would concern me if it was
 3    done for discriminatory reasons.  It would not
 4    concern me if it was done based on separating
 5    people from, you know, people that are making
 6    allegations against each other or one side or vice
 7    versa.  If it was a decision that was made in the
 8    best interest of the division of police, the
 9    interview should -- should take place in that way
10    to protect, you know, any conflict of interest,
11    not necessarily asking some questions of some
12    people and not questions of other people.  If it
13    was done for discriminatory reasons, then
14    absolutely, it would -- it would concern me.
15    Q.        Well, why wouldn't the commander make
16    sure that Sergeant Moore asked the same kind of
17    questions and bring up the same kinds of issues
18    with people he talked to?
19              MR. COGLIANESE:  Objection.
20    A.        You would have to ask Commander Moore.
21    Q.        Did you ask him?
22    A.        I don't think that I knew enough about
23    that particular aspect of things to have that
24    conversation.  And it's not my job to supervise
```

1    Commander Cameron as much as it is the deputy

2    chief that oversees that person who would have

3    been the one telling me about the circumstance in

4    the first place, but --

5            (Mr. Vardaro left the room.)

6    Q.        Well, let me just put it this way:

7    Whatever you read in the summary and other

8    documents that came to your attention that led you

9    to have it rebid, you didn't make any inquiries of

10   the Commander or Lieutenant Brust about what they

11   asked Shaw and Lancaster, why they asked it,

12   whether they had made sure that the other people

13   being contacted were submitted to the same kinds

14   of questions?

15           MR. COGLIANESE:  Objection.

16   A.        You asked if I made any inquiries into

17   that?  Not to my knowledge, no.  Other than

18   telling Deputy Chief Gray, because the more that

19   we talk about it, the more I remember, I think it

20   was him that told me about this and feeling that

21   he had a grasp of what was going on and would

22   address it.

23   Q.        You -- you also, as I understand it,

24   became aware of the fact that Commander -- either

1    Lieutenant Brust or Commander Cameron, I'm not

2    sure which, it may have been both of them, ordered

3    Moore not to talk to Whitney Lancaster.  Do you

4    recall that?

5            MR. COGLIANESE:  Objection.

6    A.       I know that I'm aware of it now.

7    Q.       You don't believe you knew that there

8    was an instruction -- is it -- in the

9    specifications, there is an issue that came

10   through a routing sheet about insubordination as

11   to the order given to Moore not to communicate

12   with Lancaster.  Do you recall that?

13   A.       Right.  He got a DCC for it.

14   Q.       Yeah, got a DCC for it.

15            And were you aware that from the

16   documents in this case, Moore not only spoke to

17   Lancaster right after he was interviewed by the

18   Commander and Brust, but he e-mailed him to come

19   into his office before he made any decision about

20   whether to take the job, did you --

21   A.       What was the question?

22   Q.       Were you aware of that?

23            MR. COGLIANESE:  Objection.  Go ahead.

24   A.       Well, I might have been aware of that

1    at some point in time, but I don't know when.

2    Q.          Okay.  And do you believe you were

3    aware of the fact that not only did Moore e-mail

4    Lancaster in violation of his order not to have

5    contact with him, then had him come to his office

6    and spoke with him about the position, and that

7    afterwards, I don't recall, it may have been the

8    same day or the day after, Lancaster said -- sent

9    a letter to the Commander and Brust saying he

10   decided not to take the position, this is like

11   shortly after this conversation with Moore?

12              (Mr. Vardaro entered the room.)

13              MR. COGLIANESE:  Objection.

14   Q.          Do you recall becoming aware of that?

15   A.          Perhaps as part of reading this summary

16   or the investigation, but no -- no idea of when I

17   became aware of it.

18   Q.          Okay.  Do you recall that in his

19   interviews, or in the interview -- in the

20   investigation summary, Lancaster described his

21   meeting with Moore in ways which indicated that

22   he -- he felt -- not only Moore, but also

23   Commander Cameron was trying to push him not to

24   take the position?  Does that ring a bell?

```
 1              MR. COGLIANESE:  Objection.

 2    A.             Overall, the recollection that I have

 3    is is that they wanted Officer Ehrenborg and that

 4    was their goal.  And so alternatively, they would

 5    not want somebody else to take the job and they

 6    would use whatever means, you know, to do that

 7    that they could accomplish it hopefully within the

 8    rules.  But -- so that's my take on it was that

 9    they wanted Ehrenborg and they made efforts to get

10    to Ehrenborg.

11    Q.             And that's the reason you think -- you

12    would agree with me that Sergeant Moore was

13    flagrantly insubordinate as I've described it?

14              MR. COGLIANESE:  Objection.

15    A.             Well, he was -- he was charged with

16    misconduct and got a DCC for failing to follow an

17    order.  I think it's in here somewhere, but you're

18    describing it as insubordination, and it was found

19    to be, I believe, failure to follow an order.

20    Q.             So -- okay.

21    A.             Well, the contract addresses that.  You

22    can read the FOP contract.

23    Q.             Okay.

24    A.             It says, insubordination should be
```

192

```
 1    reserved for the most egregious cases and lower --
 2    lower charges should be used prior to the charge
 3    of insubordination.
 4    Q.          Okay.  So when he was told not to
 5    contact -- contact or communicate with Lancaster,
 6    a person who has made a -- there's an issue about
 7    whether he's discriminating against him, it's
 8    pending investigation, he not only e-mails him, he
 9    talks to him, and that talk is part of an effort
10    to prevent him from coming to the bureau where
11    that sergeant, who's accused of racism, worked.
12    And you think that's not critical misconduct?
13               MR. COGLIANESE:  Objection.
14    A.          I didn't say that.
15    Q.          I'm asking you.  Isn't that critical
16    misconduct?
17               MR. COGLIANESE:  Objection.
18    A.          That he -- that he spoke to Officer
19    Lancaster?
20    Q.          That he did all of those things.  He
21    e-mailed him, he spoke to him, he actively
22    discouraged him from coming to the bureau where he
23    works, he -- and by the way, Moore admitted he had
24    a very angry conversation with Lancaster in his
```

```
1    interview.
2                    MR. COGLIANESE:  Objection.
3    Q.          But as far as you're -- I'm sorry.
4    Were you going to say something?
5    A.          It might have been.  I -- I don't have
6    all of the information in front of me to be able
7    to properly assess all of that.  And you're
8    telling me stuff that may or may not be written
9    down, and I'm not sure if I reviewed it all in
10   that light or if it was even addressed as an
11   allegation for insubordination, other than just
12   failing to follow an order.
13   Q.          Well, in the investigation, do you
14   recall that Sergeant Moore admitted to Sergeant
15   Decker -- well, let me back this up.
16                You do recall, do you not, that
17   Sergeant Moore had sent a text message to Officer
18   John Ever -- Evans saying that Lancaster and Shaw
19   better not take the job in vice or I'm going to
20   get them?  Do you remember that?
21   A.          I didn't have any recollection of it
22   before you just mentioned that, but I think that
23   might have been part of the investigation.
24   Q.          Well, if you had become aware of that
```

194

1    in the investigation, isn't that quite striking

2    that he would send a text message threatening two

3    people who are trying to get an assignment where

4    he's the sergeant and he's selecting -- he's

5    involved in the selection process?

6    A.        Well, you are saying threatening them,

7    but you said that the actual terms were get them

8    and --

9    Q.        You don't consider that a threat from a

10   sergeant about if somebody takes a job?

11            MR. COGLIANESE:  Objection.  Finish

12   your thought if you wanted to.

13   A.        I would -- I would just say that that's

14   unspecific.

15   Q.        I see.

16   A.        "Get them" can be interpreted a lot of

17   different ways.  I don't know what his intent was.

18   Q.        Which way do you interpret it?

19   A.        I'm not going to --

20            MR. COGLIANESE:  Finish your thought.

21   A.        I'm not going to interpret it without

22   more information.

23   Q.        Okay.  Well, you knew that -- you knew,

24   if you read the summary, which I believe you had

1    indicated you think you did, you knew that there

2    were multiple witnesses who confirmed that

3    Sergeant Moore was making racist statements using

4    the N word, calling black officers monkeys,

5    threatening to take people out and fight them or

6    beat them, and in two officer's cases, indicated

7    that he actually threatened to take two individual

8    black officers out and kill them.  So you had that

9    background, right?

10              MR. COGLIANESE:  Objection.

11   A.        You're indicating that I knew all of

12   that.

13   Q.        Well, did --

14   A.        I --

15   Q.        If you read --

16   A.        I will say that there was information

17   in the investigation.  I don't have any personal

18   knowledge of Sergeant Moore doing that.  And just

19   because somebody says something happened doesn't

20   mean that it did.  Some of it got investigated

21   allegations and some of it didn't as we previously

22   discussed.

23              You know, if -- if you said that

24   somebody made a racist comment five years ago and

1    you can't say who was there, all that kind of

2    stuff, it's not going to get investigated without

3    more information in general, so...

4    Q.        But you didn't order it to be

5    investigated more, did you?

6    A.        I -- you'll have to be more clear about

7    what I didn't do.  You're -- what are you talking

8    about?  Because I just gave a hypothetical.

9    Q.        Just -- you -- if you read the summary

10   and you read the routing sheet, you knew that

11   there were multiple officers, it wasn't one, it

12   wasn't two, it was three, it was more who

13   testified to having heard Moore make

14   discriminatory, racist comments?

15             MR. COGLIANESE:  Objection.

16   Q.        You did not -- if you had concerns that

17   you wanted more specifics, you did not direct

18   Sergeant Decker or anybody else to get the more

19   specifics, did you?  About those statements?

20   A.        Correct.

21             MR. COGLIANESE:  Objection.

22   Q.        Okay.  In addition, you had information

23   from the summary that Moore -- in addition to that

24   information, that Moore sent a text message

1    indicating that he would get Karl Shaw and Whitney

2    Lancaster if they took the position in narcotics?

3    A.        If it was included in the

4    investigation, then, yes, I had that information.

5    Q.        Okay.  And your reaction was oh, well,

6    who knows what he means; is that --

7              MR. COGLIANESE:  Objection.

8    A.        I did not say that.

9    Q.        That was your testimony a moment ago,

10   but if you want to change your testimony, go right

11   ahead.

12             MR. COGLIANESE:  Objection.  You're

13   mischaracterizing.

14   A.        That is correct.

15   Q.        Okay.  Well, then how did you --

16   A.        I did not say, oh, well, we're just

17   going to leave it alone.

18   Q.        Okay.  Well, then what did you do?

19   A.        I took the investigation that we had

20   and I made rulings upon that.  I had a

21   disciplinary hearing with Sergeant Moore, and I

22   made a recommendation to the Director of Public

23   Safety.

24   Q.        With respect to the discrimination

1    claim that Officer Shaw was unable to take a

2    position in narcotics because of Sergeant Moore's

3    behavior and his text threat, what did you rule?

4              MR. COGLIANESE:  Objection.

5    Q.        Did you recommend his termination?

6    A.        You're talking about a lawsuit.

7    Q.        No.  I'm talking about the IAB

8    investigation.  You keep referring to the portion

9    of the investigation regarding overtime and other

10   financial issues.  I told you I would like to

11   focus today on the discrimination, race issues.

12             With respect to this information I just

13   reviewed with you that you indicate that if it was

14   in the report, you would have been aware of it,

15   I'm asking you:  Did you recommend charges against

16   Sergeant Moore?

17             MR. COGLIANESE:  Objection.

18   A.        For what?

19   Q.        For sending a text that threatened to

20   get two officers if they took a job where he was

21   working in narcotics?  For him making racial slurs

22   not to one, not to two, but more officers using

23   the N word, calling back officers monkeys,

24   threatening to take them out back and fight them,

1    for lying to you about whether or not he had

2    actually interviewed and gotten agreements from

3    officers to pass on the job when, in fact, he

4    hadn't.  Did you ever consider charges for any of

5    those?

6            MR. COGLIANESE:  Objection.

7    A.        Those were never presented to me as

8    potential charges to my knowledge.  And, no, I did

9    not initiate any departmental charges for things

10   that he wasn't charged with.

11   Q.        Okay.  You also became -- I think we

12   mentioned earlier that he had ordered a lightning

13   link.  Do you recall that?

14            MR. COGLIANESE:  Objection.

15   A.        What was the question?

16   Q.        As I recall, you became aware at some

17   point during the investigation, that Sergeant

18   Moore had ordered a lightning link?

19   A.        I became aware of it at some point in

20   the investigation or far after the investigation.

21   I'm not sure which.

22   Q.        Okay.  Well, if -- as the chief,

23   putting yourself in Karl Shaw's shoes as an

24   officer, if you've become aware that the sergeant

1    where you're trying to get a job is texting people

2    that he's going to get you if you take it, he has

3    ordered an illegal device to make a weapon

4    automatic despite the law, he has made numerous

5    racist comments about black officers, including,

6    according to two people, a threat to violently

7    hurt or kill two particular black officers.

8    Wouldn't you feel a little uncomfortable about

9    taking a job where he's your boss?

10             MR. COGLIANESE:  Objection.

11   A.        You're asking me to think like Officer

12   Karl Shaw does?

13   Q.        Yes.

14   A.        And I'm not sure that I'm able to do

15   that, because I haven't had the same experiences

16   that he has.

17   Q.        Okay.

18   A.        But if he were to be uncomfortable

19   about that, certainly those things would be

20   something that could cause that.

21   Q.        And based on your training in EEO, is

22   it your claim that sending on e-mail like that and

23   engaging in that kind of behavior would not deter

24   people for having raised concerns about a

```
 1    sergeant's racism or discriminatory behavior?
 2              MR. COGLIANESE:  Objection.
 3    A.        I'm trying to make sure I understand
 4    the question.  Do I understand how an e-mail or
 5    text message could deter somebody from --
 6    Q.        Well, let's take that first.
 7    A.        Okay.  What's the question?
 8    Q.        Can you -- do you agree that an e-mail
 9    from somebody who will be your boss in a
10    prospective position saying, if you take it, I
11    will get you, would deter many people, many
12    reasonable people from taking the job?
13              MR. COGLIANESE:  Objection.
14    A.        It could.
15    Q.        Okay.  In your -- in your training of
16    EEO, is it your understanding that a sergeant who
17    says, I sent the text because I was upset that
18    they claimed I was a racist or discriminating,
19    that that's not retaliation?
20              MR. COGLIANESE:  Objection.
21    A.        So he -- you're telling me that he sent
22    that message retaliating against them because they
23    had called him a racist?
24    Q.        I'm telling -- I'm saying to you that
```

1    in his interview with Sergeant Decker, which was

2    summarized, he admitted that he sent the text

3    because Shaw had -- not just Shaw, but Shaw was

4    included, had accused him of being a racist?

5              MR. COGLIANESE:  Objection.

6    Q.         Is -- according to you as chief, is

7    that a retaliatory act under your policies or the

8    law?

9              MR. COGLIANESE:  Objection.

10   A.         We certainly think it's worth

11   investigating, you know.  If we have information

12   of that sort, then I would certainly be interested

13   in a better understanding, you know, that.

14   Q.         Would you have expected your chain of

15   command, if they knew the sequence of events about

16   the text message, as well as the other information

17   in the interviews about people saying he made

18   racist comments and all the other stuff we've been

19   through, should have asked for further

20   investigation as you just suggested?

21             MR. COGLIANESE:  Objection.

22   A.         I will -- I will address that in the

23   sense that there are points in time in a number of

24   lengthy or very complicated investigations where

1    you have to decide how much longer you want to

2    make the investigation.  In the past we've very

3    rarely bifurcated investigations and taken little

4    bits out of it at a time and so at some point in

5    time when allegations continued to stream in or

6    things keep arising, it is often best to say,

7    let's -- let's move forward with what we have and

8    then see if we need to go back and do more.

9         And sometimes the allegations don't --

10   don't stop, because sometimes once they start

11   happening, they steamroll.  And so there are times

12   when you have to say, let's move forward with what

13   we have and wrap that up, because this

14   investigation is taking too long as it is.  And so

15   when you think that you have a terminable case,

16   sometimes you say, we have a termination case,

17   let's move forward with that.  And there might be

18   a lot of other miscellaneous things that get set

19   aside thinking that we don't need that at that

20   point in time to make our case and to make a

21   recommendation of termination.

22        When you have allegations of

23   untruthfulness, you often think that that person's

24   not going to be an employee very long.  And so we

```
 1    have, on any number of occasions, set aside some

 2    serious allegations as, you know, pending,

 3    thinking that we have enough to move forward and

 4    not necessarily ever gone back, because that

 5    person was separated from employment or whatever

 6    else.

 7             Sometimes the chain of command is aware

 8    of those decisions, sometimes they're not.

 9    Sometimes I'm aware of those decisions, sometimes

10    I'm not.  So it's a complicated process,

11    especially when we have very lengthy

12    investigations.  And what things we think are the

13    strongest evidence that we can make a case for are

14    decisions that are taken into consideration.

15             When we think that we have a

16    termination case, sometimes it's best to move

17    forward on the termination and get that done.  And

18    so some things don't continue to make it lengthier

19    and lengthier and lengthier.

20    Q.        And more could there need -- what more

21    would you need to understand whether or not

22    Sergeant Moore sending out a text saying, Karl

23    Shaw better not take this job and Sergeant Moore

24    telling IAB that he did that because Shaw accused
```

1    him of being a racist?  What more would you need

2    to understand what was happening?

3             MR. COGLIANESE:  Objection.

4    Q.       His purpose?

5    A.       A formal investigation.

6    Q.       Okay.

7    A.       You know, a -- a -- it being added as

8    an allegation.

9    Q.       This had been an issue for six months

10   already, the whole issue about whether he was

11   discriminating.  So why wouldn't it be appropriate

12   to include it since they're already investigating

13   whether he threatened black officers and they had

14   already learned during the course of the

15   investigation that he -- witnesses were reporting,

16   both white and black, that he was making racist

17   comments?

18   A.       I don't have any knowledge --

19            MR. COGLIANESE:  Objection.

20   A.       -- that I was aware of making a

21   decision not to include it.

22   Q.       I'm sorry, what?

23   A.       I'm not aware of me making a decision

24   not to include that as an allegation.

1   Q.        Well, it wasn't included, was it?

2   A.        Correct.  That doesn't mean that I made

3   a decision not to.

4   Q.        Well, you had the authority -- the

5   routing sheets that came up to you concluded that

6   the selection process for the narcotics position

7   wasn't fair.  Do you remember that?

8             MR. COGLIANESE:  Objection.

9   A.        I believe that I've established that I

10  was told about the selection process not being the

11  way that it should have been and that I ordered it

12  to be redone.

13  Q.        Okay.

14  A.        That doesn't mean that I was aware of

15  all of that information that was even in this

16  letter, let alone what we've been discussing as

17  far as the interviews and the text messages and

18  all of that.  There was nothing stopping me, other

19  than I can't think of everything all the time.

20  And if it's brought to my attention and given to

21  me in the form of an investigation with an

22  allegation that I can review, then I address it.

23            Very rarely have I initiated

24  investigation of more information upon reading a

1   completed investigation.

2   Q.        Okay.

3   A.        Do you understand what I mean?

4   Q.        I understand what you're saying.  My --

5   my confusion, Chief, is:  I believe, if not every

6   single detail, most of what I've gone over with

7   you today is in the investigative report.  But let

8   me move on, okay?

9           Did you -- did you become -- did you

10   become aware that Karl Shaw was very upset and

11   fearful about what he was learning about Moore's

12   threats, one was the text, because Officer Evans

13   came to him and gave it to him.  I don't think

14   there's any dispute about that in this case, it's

15   in the interviews.  He also became aware of the

16   lightning link.

17           He also became aware of a prior

18   instance of Sergeant Moore threatening another

19   black officer by reaching down toward his gun as

20   he passed him in the hall, only within a few weeks

21   of this, okay?  He brought it all up with Sergeant

22   Decker and -- because he was still debating, can I

23   take this position with Moore being there, and he

24   asked for a meeting with Lieutenant Brust to

```
 1    discuss it.  They discussed it.  The conversation
 2    is recorded.  Are you aware of anything I just
 3    described to you?
 4              MR. COGLIANESE:  Objection.
 5    A.        Well, obviously parts of it.
 6    Q.        Okay.
 7    A.        We've been talking about it most of the
 8    day.
 9    Q.        I'm not asking about -- I'm not -- I
10    don't --
11    A.        I --
12    Q.        -- want to ask you whether you know
13    about it because we've talked about it today.
14    Before today, were you aware that Officer Shaw
15    talked to Decker and went over those three issues
16    I just mentioned, the lightning link, the Elias
17    incident that he'd become aware of since the last
18    conversation he had with him and the text message?
19    A.        Well, I'm aware --
20              MR. COGLIANESE:  Objection.
21    A.        I'm aware of those things, but I don't
22    know when I became aware of them --
23    Q.        Okay.
24    A.        -- or his -- when he became --
```

209

1   Q.          Okay.

2   A.          -- aware of them.

3   Q.          Well, we know that he became aware of

4   them before his second interview, because he

5   brings them up, okay?

6   A.          Sure.

7               MR. COGLIANESE:  Objection.

8   Q.          All right.  So I understand you don't

9   remember when you may have first learned of those

10  things or if you ever did before -- before you

11  made the decision on the package, is that what

12  you're telling me?  You don't -- you don't --

13  that's what I'm trying to understand.  Before you

14  made the decision on whether to charge Eric Moore

15  related to the discrimination complaints, the

16  hiring process, the racist commentary, the racist

17  threat, were you aware of what I just talked

18  about?

19              MR. COGLIANESE:  Objection.

20  A.          I was aware of the gist of the summary

21  of the investigation, so the contents of that I

22  had a level of awareness of.

23  Q.          Okay.  What -- I'm just, if you don't

24  remember, it's okay, you can tell me.  Sitting

1    here today, do you believe at some point when you

2    read the summary and anything else you looked at,

3    you were aware, for example, that the lightning

4    link issue had come up?

5              MR. COGLIANESE:  Objection.

6    A.         Like I said, that didn't really reach

7    any level of consciousness until the OCRC

8    complaint.

9    Q.         Okay.  How about the text message that

10   Moore sent to John Evans and that later came to

11   Decker's attention?

12   A.         I don't know how much attention I gave

13   to it at the time of reading the investigation.

14   Q.         All right.  Now I'm going to -- now I

15   want to talk a little -- a minute about Lieutenant

16   Brust's meeting with Karl Shaw.

17   A.         Okay.

18   Q.         During this meeting -- it's recorded,

19   your counsel has the transcript of the

20   recording -- Officer Shaw tells Lieutenant Brust

21   that he's struggling about the issue of whether to

22   take the narcotics job.  He tells him, I'm running

23   out of time because of that time limit.  My family

24   and other people, friends, are saying, don't do

```
 1    it, don't do it, because he's shared with them

 2    some of the information about Moore we're talking

 3    about today.  He asks Lieutenant Brust and he

 4    tells Lieutenant Brust about the text.  He tells

 5    him that Moore said in a text to John Evans that

 6    he's going to do something, I think -- I think he

 7    -- he didn't actually mention text, but he told

 8    him, I'm being told that Moore is saying he's

 9    going to do something to me if I take the job.

10    We -- separately, Decker actually has the text.

11    A.         Okay.

12    Q.         Lieutenant Brust doesn't ask him any

13    questions about, well, what did you hear and what

14    do you mean?  You know, what did you mean?  And

15    how do you know that?  He asks nothing about it.

16    And he indicates to him, look, I'm not going to

17    let him do something to you, but, you know, I'm

18    not there all the time.  After which -- and by the

19    way, Lieutenant Brust doesn't go to Decker,

20    doesn't bring this up with Decker, he doesn't

21    report it to Cameron, doesn't report it to you.

22    And after that conversation, Karl Shaw decides he

23    better not take the position given all of these

24    circumstances and what Lieutenant Brust says.
```

1          Now, as chief, would you -- would you

2     expect Lieutenant Brust to do some follow up after

3     being told about this by Karl Shaw?

4          MR. COGLIANESE:  Objection.

5     A.          Not having listened to the exact nature

6     of the discussion, but based on what you have told

7     me, and I don't know that the timing of

8     everything, certainly I would think that if

9     Officer Shaw expressed concerns about his own

10    safety, that that information should have been

11    shared.

12          If it was about whether he was going to

13    be retaliated against in some way for taking the

14    job, then I would express that that would be

15    something that Lieutenant Brust should have

16    shared, at least with Commander Cameron, to make

17    sure that they were watching for adverse, you

18    know, evaluations or adverse assignments, or, you

19    know, some type of other action, employment action

20    that the sergeant could or would take against

21    Officer Shaw for taking that.

22          If it was related to the investigation

23    and he provided new information that the

24    lieutenant felt was relevant to the ongoing

213

```
 1    investigation of Sergeant Moore, then, yes, he

 2    should have contacted internal affairs.  So there

 3    are a number of things that I think could have

 4    been done differently if all he said was, I can't

 5    help you.

 6    Q.        Well, when he said, I'm not there all

 7    the time, what kind -- what message do you think

 8    he's sending to Karl Shaw when he's asking for --

 9              MR. COGLIANESE:  Objection.

10    A.        You would have to ask him directly.

11    Q.        I'm asking how you would take that

12    response --

13              MR. COGLIANESE:  Objection.

14    Q.        -- as his chief?

15    A.        I understand that you said that

16    Lieutenant Brust said, I'll do what I can when I

17    am able to, but acknowledging that he's not able

18    to, you know, guard his house or guard his person

19    when he's off duty or something along that line.

20              So it does not sound very reassuring to

21    me, but it sounds realistic in the sense that,

22    hey, I'm not going to be around all the time, you

23    know, that's -- that's true of everyone.  So --

24    Q.        Well --
```

214

1    A.         -- that certainly could be taken in a

2    number of different ways, but I don't know what

3    way Lieutenant Brust took it or intended.

4    Q.         Well, one of -- but he could have said

5    that I'm going to look into this and if necessary,

6    we will consider ordering that Sergeant Moore be

7    relieved of his duty, as has been done for other

8    people and as was already done for Officer

9    Sorrell, right?

10             MR. COGLIANESE:  Objection.

11   A.         He could have said a hundred different

12   things.

13   Q.         Okay.  Yeah, well, that was certainly

14   one of them, right?

15             MR. COGLIANESE:  Well, objection.  I

16   mean, can we move on?

17   A.         What's the question?

18   Q.         That's one of the things he could have

19   said to Karl Shaw?

20   A.         If he felt that there was a --

21   something that was said that needed to be relieved

22   of duty, then I would expect him to say, I would

23   relieve him of duty.  But, I mean, he could have

24   said a whole bunch of different things.

```
 1   Q.        Right.  But he didn't?

 2             MR. COGLIANESE:  Objection.

 3   A.        I don't know.  I haven't seen or read

 4   that transcript --

 5   Q.        Okay.

 6   A.        -- so I --

 7   Q.        I encourage you to read it.  I believe

 8   I've accurately described it to you.

 9   A.        Okay.

10   Q.        Assuming --

11             MR. COGLIANESE.  Form.

12   Q.        -- I've accurately described it, he did

13   nothing to reassure Karl Shaw when he -- by adding

14   to his statement, I'm not around all the time, and

15   leaving it at that?

16             MR. COGLIANESE:  Objection.  Asked and

17   answered.  Can we please --

18             MR. GITTES:  That's not an objection

19   and this is cross-examination.

20             MR. COGLIANESE:  This is the fifth time

21   you've asked this question, move on.

22             MR. GITTES:  Rich, if you want to

23   instruct her not to answer this question, you

24   feel -- you do so.
```

1           MR. COGLIANESE:  I have told --

2           MR. GITTES:  And we can act

3    accordingly.  I believe I'm conducting this

4    deposition appropriately.

5           MR. COGLIANESE:  And I doubt it very

6    much.

7           MR. GITTES:  You've made your

8    objection.

9           MR. COGLIANESE:  Let's take a break.

10          MR. GITTES:  I'm not ready to take a

11   break.

12          MR. COGLIANESE:  Let's take a break.

13   We're off the record.

14          MR. GITTES:  Do you need a break?

15          THE WITNESS:  I'm ready.

16          MR. GITTES:  Okay.

17          THE VIDEOGRAPHER:  We're off the

18   record.  The time is 3:02.

19          (A recess is taken.)

20          THE VIDEOGRAPHER:  This marks the

21   beginning of media number four.  We're back on the

22   record.  The time is 3:15.

23   Q.       Ready?

24   A.       Yep.

1    Q.        Okay.  I wasn't quite finished asking

2    you about the meeting between Lieutenant Brust and

3    Karl Shaw.  One of the other aspects of their

4    conversation is that Officer Shaw, who I think we

5    discussed earlier, had complained about the manner

6    of that interview by Cameron where Brust was

7    there, too?

8    A.        Yes.

9    Q.        Did you know or have you learned that

10    during this recorded conversation with Officer

11    Shaw, Lieutenant Brust told Shaw that Cameron was

12    a bully in reference to that interview?

13               MR. COGLIANESE:  Objection.

14    A.        That doesn't sound familiar to me.

15    Q.        Okay.  Would you agree that if

16    Lieutenant Brust felt Cameron was bullying Shaw or

17    trying to bully him not to take the job, and in

18    combination with being told that Moore had been

19    issuing warnings against taking the job, that

20    Lieutenant Brust should have followed up on it

21    either with the commander or IAB?

22               MR. COGLIANESE:  Objection.

23    A.        I'm not sure I'm clear on the actual

24    question.  Are you saying, Lieutenant Brust should

1    have followed up with IAB if he alleged Commander

2    Cameron is a bully or what?

3    Q.        If he felt that Commander Cameron was

4    bullying Karl Shaw with respect to that interview

5    that was conducted, and it was in the context of

6    whether he should take that position, and in light

7    of Shaw's being upset about the interview,

8    shouldn't he have reported it, or at least talked

9    to Cameron about it?

10   A.        I think he --

11             MR. COGLIANESE:  Objection.

12   A.        -- could have talked to Officer Shaw

13   about what he wanted to see happen.  You know, if

14   he wanted to make an allegation against Commander

15   Cameron or Lieutenant Brust and explain the

16   process if he was unaware.  If he felt that there

17   was enough information there that needed to be

18   investigated, he certainly could have made a

19   decision to either go to internal affairs or go to

20   Commander Cameron's deputy chief to, you know,

21   share his concerns.

22   Q.        Now, let's take a look -- let's do

23   those two exhibits here right now.

24             MR. VARDARO:  38, it's too big to

1    staple, so we need to be careful to keep that

2    together as best we can.

3                    - - - - -

4            Thereupon, Plaintiff's Exhibit 38 is

5    marked for purposes of identification.

6                    - - - - -

7    Q.        First, for the record, you've been

8    handed what's been marked as Plaintiff's Exhibit

9    38.  And I would ask you if you can flip through

10   that and see if that is the investigative summary

11   regarding Eric Moore's investigation?

12   A.        It certainly appears to be.

13   Q.        Okay.  And did you read some or all of

14   this investigative report?

15   A.        I believe so.

16   Q.        And then if you would go to page 147 of

17   the report.  It's up here in the left-hand corner,

18   the page numbers.  You can take the clip off as

19   long as you're careful.  I think it is actually

20   easier, at least it was for me.  There's also page

21   numbers at the bottom and the Bates stamp number

22   is --

23   A.        I got it.

24   Q.        You got it?  Okay.

```
 1              So I will represent to you, as it

 2     should be obvious when you flip through, this is

 3     the portion of the investigation, a much smaller

 4     portion, regarding allegations involving Moore's

 5     alleged racism and other misconduct of that

 6     nature.

 7              Did you read all or a portion of this

 8     section of the investigation?

 9     A.         I believe so.

10                        - - - - -

11          Thereupon, Plaintiff's Exhibit 35 is

12     marked for purposes of identification.

13                        - - - - -

14     Q.         Okay.  Then I would also like to hand

15     you what's been identified as Exhibit 35.  And I

16     will represent to you that this is the actual

17     interview summary of the interview of Sergeant

18     Moore by Sergeant Decker.  And I would like to

19     know whether you read that interview?

20     A.         Without reading it again, I would have

21     to guess.  I don't -- I don't -- I don't know for

22     sure, but --

23     Q.         Well, would -- take your time and look

24     at it.  I need to know whether you read it.
```

1  A.        I would have to say that some of this

2  content looks familiar to me, but whether I read

3  it word for word, I can't tell you.

4  Q.        Chief, let me ask you:  Would it --

5  would there be some reason when you are in a case

6  involving charges that you wouldn't read the

7  officer's interviews who was being charged?

8  A.        No, I would say it was very typical of

9  me to do that.

10  Q.        Okay.  Now, I would like to ask a -- or

11  share with you some information to see if you knew

12  about it at any time before today.

13  A.        Okay.

14  Q.        There -- did you -- were you made aware

15  at any time that Officer Dick Elias had made a

16  complaint to Lieutenant Brust about Officer Moore

17  passing him in the hall and putting his hand on

18  his weapon as if to draw it out and Officer Elias

19  complaining about it to Lieutenant Brust?

20          MR. COGLIANESE:  Objection.

21  A.        I'm aware of -- of some incident

22  involving Officer Elias and Sergeant Moore

23  occurring.

24  Q.        Okay.  And were you aware that Sergeant

1    Moore acknowledged to Brust, according to Brust,

2    that he had done it and it was poor judgment?

3            MR. COGLIANESE:  Objection.

4    A.        I might be.

5    Q.        Okay.  Given what lieutenant -- what

6    Karl Shaw was telling Brust in that meeting I --

7    we discussed earlier before the break?

8    A.        (Indicates affirmatively.)

9    Q.        Do you think it was appropriate -- and

10   I'll represent to you this is what Lieutenant

11   Brust told us -- that he did not follow up

12   regarding the Elias situation or make Sergeant

13   Decker aware of it after Karl Shaw shared with him

14   his concerns about threats being made by Moore?

15           MR. COGLIANESE:  Objection.

16   A.        I don't know what reasoning Lieutenant

17   Brust would have had for the decision-making that

18   he used.  I don't know what he knew about Officer

19   Elias's situation involving that.  So it's hard

20   for me to say what rationale Lieutenant Brust used

21   for his decision-making and whether or not that

22   was appropriate.

23   Q.        Okay.  Well, I guess I'm asking you as

24   a supervisor, as an experienced command officer,

1    if you have a black officer come to you and report

2    that a white officer made a gesture of grabbing,

3    reaching for a gun and -- as if to pull it out as

4    passing you in the hall, and that officer was

5    upset enough that they came to you and said this

6    happened and reported it, and you checked with the

7    person involved, the white officer involved who

8    confirmed it but said and acknowledged it was poor

9    judgment.  And then later, a couple of weeks later

10   you find out that at least allegedly that that

11   same person, and it's a ranking officer, a

12   sergeant, is now being accused of and involved

13   with other racist discriminatory remarks and

14   threats.  Wouldn't what happened with Officer

15   Elias at least be appropriate for the investigator

16   to know about?

17              MR. COGLIANESE:  Objection.

18   A.        I certainly think that it could have

19   been shared and appropriately been shared.

20   Q.        Now -- I'm now moving on to another

21   completely different event.

22              Are you familiar with an Officer

23   Christopher Smith-Hughes?

24   A.        I am.  Sergeant.

```
1    Q.          Sergeant.  No, I'm going to put this

2    off to save time, because it doesn't -- I'm

3    worried about time, so I'm just going to drop that

4    for the moment.

5              The narcotics bureau -- part of your

6    job as chief, as you mentioned earlier, you keep

7    track of overtime, or that's an important

8    financial issue?

9    A.          Well, I -- I ask many other people

10   within the division of police --

11   Q.          Right.

12   A.          -- to help me stay within the overtime

13   budget.  It's their job to keep track of it.

14   Q.          Right.  I didn't mean that you had to

15   do the accounting.

16              Based on your own experience as chief

17   and just general awareness as a commanding

18   officer, the narcotics bureau is among the

19   highest, if not the highest unit with need for

20   officers to work overtime; is that not true?

21   A.          It's one of them.

22   Q.          When -- there obviously was a

23   progression during the course of this

24   investigation which occurred over a year --
```

225

1    ongoing over a year.  In hindsight, I'm asking you

2    in hindsight, would you agree that there were

3    several points in time when a decision to relieve

4    Sergeant Moore of his duties would have been

5    appropriate?

6              MR. COGLIANESE:  Objection.

7    A.        A decision to relieve him of duty was

8    enacted.

9    Q.        Yeah, but it was like almost a year

10   after the investigation, wasn't it?

11   A.        So what's the question?

12   Q.        Well, I'm asking you, you have a

13   sergeant who is involved in ongoing work at a unit

14   where individuals who have reported he engaged in

15   black -- black individuals who have reported he

16   has made racist statements, sent a threatening

17   text message, corroborated, to some extent, by

18   other officers and not just one or two, but more

19   than that, and these officers are interested in

20   the narcotics bureau, given all of those

21   circumstances -- and he's admitted it, the

22   sergeant has admitted to the text message.  Why

23   would he remain on duty?

24             MR. COGLIANESE:  Objection.

1   A.          Somebody would need to advise the chain

2   of command or me that they have information that

3   leads us to believe that there's a charge perhaps

4   that could reach termination level, that is likely

5   to be sustained or of the nature that we can't

6   trust that individual to perform their duties

7   without the potential of causing harm or, you

8   know, making a decision that could impact either

9   employees or the public.

10          So depending on the information that we

11  know during the investigation, or think that we

12  can prove and is -- is then discussed to the point

13  where there's a conversation about relief of duty,

14  is usually the factors that determine that.  Going

15  into an investigation, allegations that come in,

16  sometimes they sound egregious, like I mentioned

17  before, you know, people have accused officers of

18  rape, but based on the information that we have,

19  we're like, there's no evidence to indicate such

20  and we wouldn't relieve them.

21          But in another case, based on the

22  evidence that we have initially, we might very

23  well relieve them of duty.  So it all depends on

24  the amount of evidence that we have, whether the

1   case might result in sustained departmental

2   charges for a terminational -- terminational, you

3   know, type of a recommendation.  Or whether or not

4   we feel that we can trust that person to do their

5   job in the way that we expect it to be done.

6   Q.      Well, let's see if we can put timing on

7   it.  By the time of Sergeant Moore's interview, at

8   least the April 14th interview of 2015, he

9   admitted sending the text message, and the reason

10   he sent it, shouldn't he have been relieved at

11   that point?

12   A.      That -- I would -- I would say that --

13   I can't say that "should have" is necessarily part

14   of the equation.  I don't think that we've ever

15   fired anybody for such a text message before.  The

16   retaliation issue is probably the strongest,

17   because despite what the words are, "get them,"

18   it's still unclear if he meant I'll get them

19   through my evaluation of them --

20   Q.      No, I don't want to be misled.  And I'm

21   sorry to interrupt you.  I think I used "get

22   them," but the other phrase I used, which is

23   actually the actual words, is "better not."

24   Better not take the job, okay?

1  A.        So the part that you said earlier that

2  says, "or I'll get them" is not there?

3  Q.        That's not the words that were in the

4  text.

5  A.        Oh, well, then do we go back and relive

6  my former testimony based on my understanding of

7  what that was?

8          MR. COGLIANESE:  Yeah, and by all

9  means -- go ahead.  "Get them" was not in the

10 text.

11 A.        Well, then what I've responded to

12 earlier needs to be taken into consideration that

13 I was misled as to what that text message said.

14 Q.        Okay.  Well, let's go over the text

15 message.

16 A.        Okay.

17 Q.        He's sending an e-mail saying that

18 Lancaster and Shaw better not take the job.

19 A.        Period?

20 Q.        Yeah.  Well, there's -- but that's the

21 essence of the -- of the message.  You do not

22 consider that a threat?

23          MR. COGLIANESE:  Objection.

24 A.        I've already testified that I didn't

1    consider that to be a direct threat of violence.

2    Q.          Okay.  I didn't ask if you if it was a

3    threat of violence.

4    A.          I just responded to you.  I didn't

5    consider it to be a threat of violence.

6    Q.          Okay.  Do you consider it to be a

7    job-related threat?

8                MR. COGLIANESE:  Objection.

9    A.          It certainly could be taken that way.

10   I don't know what his intentions were, so that's,

11   again, something that you have to find out what he

12   means by that particular thing.

13   Q.          Would sending a message like that

14   reasonably be viewed as deterring or trying to

15   deter -- deter someone from taking a job when the

16   person who sent it admits he did it because they

17   called him a racist?

18               MR. COGLIANESE:  Objection.

19   A.          I believe that that certainly could be

20   taken as a deterrent.

21   Q.          Okay.  And would you not agree it would

22   be an attempt to prevent them from taking it

23   because of their assertion about him?

24               MR. COGLIANESE:  Objection.

230

1    A.         Well, I think that the testimony has

2    already indicated that he wanted to get to

3    somebody else, so certainly preventing somebody

4    from taking it would have been part of getting to

5    somebody else.

6    Q.         Chief, in his interview, he didn't say

7    he sent it because he wanted to get to Ehrenborg.

8    He said he sent it because they called him a

9    racist.  Why would he say it if his only reason

10   was to get to Ehrenborg?

11             MR. COGLIANESE:  Objection.

12   A.         I didn't say that that was his only

13   reason.

14   Q.         Maybe I'm misunderstanding you, and

15   tell me if I'm misreading you.  You seem to be

16   trying to come up with explanations for Sergeant

17   Moore's conduct here, and I'm a little confused

18   why you're doing that.

19             MR. COGLIANESE:  Objection.

20   A.         I am not.  I'm trying not to guess at

21   anybody's intentions.  You've asked me in a number

22   of times to put myself in other people's shoes or

23   to explain why somebody did or did not do

24   something.  So I'm not trying to explain why

1    Sergeant Moore did something.  I am trying to

2    explain, when I can, what I think of a particular

3    thing.  You asked me why he wasn't relieved about

4    a text message that I now find out isn't exactly

5    what you had said was -- it was earlier.

6              So in clarifying why he wasn't relieved

7    after finding out about a particular message that

8    was sent, I think that's how we got back into this

9    discussion, but I'm not trying to read anyone's

10   mind.

11             We've discussed the fact that Sergeant

12   Moore wanted to get to sergeant -- or Officer

13   Ehrenborg.  So the means in which he accomplished

14   that is -- sounds like a variety of things,

15   preventing people, deterring people, talking to

16   people, passing people, you know, not waiting for

17   an answer, whatever it might have been, all seem

18   to have been at play.

19   Q.        Okay.  So in your analysis when

20   Sergeant Moore told Sergeant Decker that he sent

21   the e-mail warning them they better not take the

22   job, and that he did it because they called him a

23   racist, you can't tell why he did it?

24             MR. COGLIANESE:  Objection.

1    A.        I didn't say that.

2    Q.        Okay.  Well, fine.

3          So you -- you -- do you think it's

4    reasonable for Sergeant Decker and others who read

5    that portion of the interview to take Sergeant

6    Moore at his word when he says he did it because

7    they called him a racist?

8          MR. COGLIANESE:  Objection.

9    A.        If somebody explains their

10   justification for that, then generally we're going

11   to believe that that is their justification.

12   Q.        And in terms of considering what the

13   officers who were cautioned not to take the job,

14   isn't it part of your responsibility as a chief or

15   as a command officer who is to enforce the

16   retaliation prohibitions to consider whether that

17   text under those circumstances would deter people

18   from making complaints, raising issues of racism?

19   Isn't that part of what you have to do to evaluate

20   a retaliation claim?

21         MR. COGLIANESE:  Objection.

22   A.        You're asking if I as the chief need to

23   decide if that message was going to deter people

24   from taking the job?

1    Q.        Could deter people?

2              MR. COGLIANESE:  Objection.

3    A.        I think I established that I felt

4    strongly enough about the methods used that I

5    asked and ordered it to be reposted.  So I think

6    it's definitely shown that I did not approve of

7    the way that that posting was handled.

8              And as far as retaliatory behavior,

9    certainly that is something that concerns me, and

10   its impact upon our personnel is another concern.

11   So I'm not sure what parts of that question I

12   didn't respond to.

13   Q.        Okay.  I'm just trying to find out

14   whether you, considering all the facts that you're

15   aware of, concluded that Sergeant Moore's text

16   message, along with his other behavior, would

17   deter a reasonable person from raising

18   discrimination complaints?

19             MR. COGLIANESE:  Objection.

20   Q.        If that was -- that's a risk of his

21   behavior?

22             MR. COGLIANESE:  Objection.

23   A.        I can't speak for what other people use

24   as their rationale, but certainly retaliation is

1    something that could deter people from reporting

2    something and/or taking an assignment.

3    Q.        I want to switch gears here for a few

4    minutes.  And I would like you to take a look

5    at --

6              MR. VARDARO:  58.

7              MR. GITTES:  Yeah, was it 58?  I had it

8    marked.

9              MR. COGLIANESE:  Chief, just make sure

10   you put the clip on that.

11             THE WITNESS:  Yeah, I am.

12             MR. COGLIANESE:  Thanks.

13                   - - - - -

14         Thereupon, Plaintiff's Exhibit 58 is

15   marked for purposes of identification.

16                   - - - - -

17   Q.        What I've -- what you've been handed,

18   Chief, is a print of a newspaper article in which

19   you're quoted, Plaintiff's Exhibit 58.  And I

20   would like you to take a moment and read the

21   article, because I just want to confirm whether

22   you made the statements attributed to you in the

23   article.

24   A.        Okay.

235

1    Q.        Okay.  Were there any statements

2    attributed to you in this article that you believe

3    are inaccurate or that you didn't say?

4              MR. COGLIANESE:  Objection.

5    A.        I can't say that word for word the

6    quotes are exactly what I said, but I don't

7    dispute that I might have said words to these

8    effect.

9    Q.        Okay.  Okay.  Now, I would like to give

10   you -- I want 54 and 55.

11             MR. VARDARO:  Here's 54.

12   Q.        I'm going to give you two exhibits,

13   Chief.

14   A.        Okay.

15                     - - - - -

16        Thereupon, Plaintiff's Exhibits 54 and 55

17   are marked for purposes of identification.

18                     - - - - -

19   Q.        For the record, Chief, you've been

20   handed what have been marked as Plaintiff's

21   Exhibit 54 and 55.  And first of all, do you

22   recognize these documents?

23   A.        I don't know that I've seen the routing

24   sheet before, which is 54.

1    Q.          Okay.  And what about 55?

2    A.          Are you asking if I've seen it before?

3    Q.          Yes, if you recognize it?

4    A.          Yes.

5    Q.          Okay.  And what is it?

6    A.          This is a summary of an investigation

7    that was conducted by internal affairs.  It's not

8    everything that was investigated, but it's part of

9    an investigation that was conducted by internal

10   affairs of Lieutenant Melissa McFadden.

11   Q.          Okay.  And the investigative report is

12   dated February 9th, 2018, correct?

13   A.          Yes.

14   Q.          Didn't you order Lieutenant McFadden

15   relieved of duty in March of '17?  Actually,

16   March 10th of 2017?

17   A.          I don't believe that that is what

18   happened.  I see that the routing sheet says to be

19   relieved of her assignment, but she was

20   reassigned.  But I don't believe she was relieved

21   of duty at that time.

22   Q.          Okay.  So, I mean, this is -- first of

23   all, did you talk to Deputy Chief -- do you

24   pronounce his name Kuebler, is that --

237

```
 1    A.        Kuebler.

 2    Q.        Like the cookies?

 3    A.        Yeah.

 4    Q.        Okay.

 5    A.        But it's spelled differently.

 6    Q.        Did you discuss McFadden with him?

 7              MR. COGLIANESE:  Objection.

 8    A.        I am sure that I have.

 9    Q.        Okay.  As best you recall, what -- what

10    did you order about her?

11              MR. COGLIANESE:  Objection.

12    A.        I don't know if I ordered, approved or

13    what, but based on the information that we

14    received, an investigation was to ensue and she

15    was to be reassigned during the pendency of that

16    investigation, because she was the accused in an

17    EEO allegation.  And per the recommendations of

18    federal EEO law, you remove the accused rather

19    than the accuser if they are going to remain in

20    contact.

21              And so that was the decision or part of

22    the decision-making with regard to not letting her

23    continue to act as the lieutenant in the patrol

24    zone that she was.
```

238

```
 1    Q.         Because -- so you -- as I recall, you

 2    reassigned her -- when I say you --

 3    A.         She was.

 4    Q.         -- with your consent, she was

 5    reassigned to a non-supervisory position -- no?

 6    A.         I wouldn't say that at all.

 7    Q.         Okay.  Where was she reassigned?

 8    A.         No authority was taken away from her

 9    with regard to her supervisory rank.  She was

10    assigned to a place that didn't have the same

11    direct reports or responsibilities, but I didn't

12    take away any of her supervisory authority.

13    Q.         She was assigned to the property room,

14    right?

15    A.         Yes.

16    Q.         Who -- who was there that she was

17    supervising?

18    A.         I don't believe that she was put in

19    charge of anybody to supervise.

20    Q.         Okay.

21    A.         They already have a chain of command

22    there.

23    Q.         Had she admitted to -- had she --

24    according to the charges against her, had she made
```

1    any threats of violence to anybody?

2    A.          Not that I'm aware of.

3    Q.          Had she sent any -- verbally or in

4    writing, communicated any messages warning someone

5    not to seek a position under her authority related

6    to a complaint about her?

7    A.          I don't believe that we had that type

8    of information.

9    Q.          Okay.  You, as I recall, according to

10   the records, you ordered her put into the property

11   room one day after, is it Commander Grizzell, I

12   believe, sent you a letter about her concerns

13   about Lieutenant McFadden; isn't that correct?

14              MR. COGLIANESE:  Objection.

15   A.          I don't recall the exact timing.

16   Q.          Okay.  You wouldn't dispute that she

17   sent the letter to you on the 9th and you

18   confirmed that she should be put into the --

19   reassigned to the property room, that is McFadden,

20   on the 10th?

21              MR. COGLIANESE:  Objection.

22   A.          What you characterize is after I had

23   discussed concerns I believe.  I don't know that

24   there weren't discussions prior to the actual

1    letter being sent up, so --

2    Q.        Okay.

3    A.        -- I --

4    Q.        Well, can we agree that one day after

5    the letter was sent up, regardless of whether

6    there were prior discussions, you moved McFadden,

7    reassigned her to the property room?

8              MR. COGLIANESE:  Objection.

9    A.        Well, that information's not before me.

10   This is dated -- discussed with me on the 10th of

11   March.  It's forwarded on the 13th of March.

12   Q.        Okay.

13   A.        And I don't know -- well -- it says it

14   was originated on the 9th, so -- but there's no

15   letter here, so I --

16   Q.        Okay.  Do you need me to show you the

17   letter?  Do you dispute that it happened very

18   quickly?

19             MR. COGLIANESE:  Objection.

20   A.        No.

21   Q.        Okay.  So with respect to McFadden, she

22   hadn't admitted anything, which is something you

23   stress with Sorrell earlier today, she was charged

24   with EEO violations, as was Sergeant Moore, but at

```
1    no time did you or anybody under your command seek

2    to relieve Sergeant Moore, though it became clear

3    early on that he was going to be involved as an

4    officer in a bureau where black officers who had

5    expressed complaints, along with others, about his

6    discriminatory racist conduct.  Why wasn't he

7    relieved?

8                 MR. COGLIANESE:  Objection.

9    A.            You're equating, I think, what happened

10   to Lieutenant McFadden with what didn't happen to

11   Sergeant Moore.

12   Q.            Absolutely.  That's exactly what I'm

13   doing.

14   A.            And they are not the same.

15   Q.            Tell me how they're not the same.

16   A.            Lieutenant McFadden was given a new

17   place to report to work because she still had

18   people within her chain of command that were, I

19   believe, accusers of hers, and we wanted to make

20   sure that separation happened.  She wasn't

21   relieved of duty.  Her gun wasn't taken away.  Her

22   badge wasn't taken away.  She still had police

23   powers.  Relieving somebody of duty is taking away

24   their badge and gun and saying, don't perform
```

1    police powers.

2              In Sergeant Moore's case, he, at some

3    point in time, had already received a new

4    assignment, wasn't working with the people that

5    had accused him of the racist remarks, to my

6    knowledge.

7    Q.          So the fact that he actually ordered,

8    using his powers as sergeant, Whitney Lancaster to

9    come and talk to him when he was prohibited to do

10   so, and Officer Lancaster later was interviewed

11   and said he felt it was discriminatory the way

12   both the commander and -- and Moore talked to him

13   and pushed him out of the job, that didn't matter?

14             MR. COGLIANESE:  Objection.

15   A.          I didn't say that at all.  I'm just

16   saying, you asked why he wasn't relieved of duty.

17   Q.          Okay.  Why wasn't he relieved of duty

18   at the point in time he disobeyed the order not to

19   talk to people who were witnesses in an ongoing

20   discrimination investigation?

21             MR. COGLIANESE:  Objection.

22   A.          I don't know that anybody made that

23   recommendation.

24   Q.          Why didn't you make that

243

```
 1    recommendation?
 2    A.          I don't know how much information I had
 3    at that time to be able to make that decision.
 4    Q.          Okay.  Why didn't -- you understood at
 5    a certain point, didn't you, that he had ordered
 6    an illegal weapon?
 7              MR. COGLIANESE:  Objection.
 8    Q.          Moore, I'm talking about Eric Moore.
 9              MR. COGLIANESE:  Yeah, objection.
10    A.          As I stated before, I have no idea when
11    I first became aware of that.  The fact that the
12    ATF, who would be the investigating agency on
13    that, declined to prosecute is an indication that
14    there's not enough evidence or it's not
15    prosecutable.  If it's not prosecutable, it is
16    probably not going to result in a termination
17    case.  And that is one of the leading reasons why
18    you would relieve somebody of duty upon learning
19    of -- of criminal behavior.
20    Q.          Chief, is it your representation here
21    that the FBI, ATF, even the Columbus -- I'm sorry,
22    the Columbus and county prosecutors don't decide
23    not to prosecute for reasons other than the merits
24    of a case?
```

```
 1                    MR. COGLIANESE:  Objection.
 2      A.           I didn't say anything like that.
 3      Q.           Sometimes they do it because it's not a
 4      priority case, right?
 5                    MR. COGLIANESE:  Objection.
 6      A.           They have a variety of reasons for not
 7      charging people.
 8      Q.           I mean, no law enforcement agency that
 9      you know of prosecutes every single criminal case
10      of any kind; isn't that true?
11      A.           I have no knowledge --
12                    MR. COGLIANESE:  Objection.
13      A.           -- of everybody -- of what you said,
14      yeah.
15      Q.           Okay.  I mean, there's limits on
16      resources, among other things?
17                    MR. COGLIANESE:  Objection.
18      A.           Correct.
19      Q.           Okay.  I mean, you recently in this
20      depo were talking about resource problems because
21      at one point you were running short of people and
22      you used SRB -- a reorganization that may have
23      been perfectly necessary, but it happened to help
24      out because you needed people at another -- other
```

1    assignments.

2              MR. COGLIANESE:  Objection.

3    A.         If that was a question, yes.

4    Q.         Yeah, it was a question.

5    A.         Okay.

6    Q.         Sorry.

7              I mean, it's -- I mean, it's a problem

8    for all law enforcement, I think everybody here in

9    this room understands that.

10   A.         Resources are.

11   Q.         Okay.  But that's not a reason to think

12   that the fact that they have -- they've indicated

13   to Sergeant Decker, not just to Karl Shaw, that

14   they had proof he ordered a lightning link,

15   doesn't mean it's pertinent to the Columbus Police

16   Department, does it?

17             MR. COGLIANESE:  Objection.

18   A.         I'm not understanding what the question

19   is.

20   Q.         Because the ATF didn't prosecute

21   doesn't mean they didn't have evidence to verify

22   that the sergeant ordered an illegal device?

23   A.         Correct.

24             MR. COGLIANESE:  Objection.

1    Q.        But Sergeant -- Sergeant Decker was

2    told not to pursue that, wasn't he?

3    A.        I believe you testified to that.

4    Q.        No, I'm asking you.  Wasn't he?

5             MR. COGLIANESE:  Objection.

6    A.        I -- Sergeant Moore was not --

7    Q.        Sergeant Decker -- oh, I'm sorry, maybe

8    you meant Sergeant Moore.

9    A.        Sergeant Moore was not investigated by

10   internal affairs for that attempt to purchase.

11   Q.        And didn't Sergeant Decker, in his

12   report, say that he wasn't investigating him about

13   the lightning link because ATF didn't prosecute

14   him?

15            MR. COGLIANESE:  Objection.

16   A.        You're asking me to recall details

17   about the investigation that I would have to read,

18   but I believe that you earlier testified that --

19   or stated that Commander Moore gave him that

20   direction.

21   Q.        Okay.  I haven't testified and I'm not

22   under oath.

23   A.        You've stated.

24   Q.        I've stated it's in the report.  And we

1    have it here if you want -- you and your counsel

2    can correct me when I'm wrong, and I've already

3    corrected myself on one occasion when I made

4    one --

5    A.          Correct.

6    Q.          -- misstatement.

7    A.          Correct.

8                MR. COGLIANESE:  There's been more than

9    one, but that's fine.

10               MR. GITTES:  Okay.  You can put them

11   all on the record.

12               MR. COGLIANESE:  I've been objecting to

13   lots of them.

14               MR. GITTES:  Okay.

15   Q.          You -- my question was:  Do you recall

16   that in his report, he indicated that he -- he,

17   Decker, didn't pursue it because ATF hadn't

18   charged him or pursued the case?

19   A.          I believe that I read that in the

20   summary of the report.

21   Q.          Okay.  And my understanding that by

22   itself is not a reason to look into a situation

23   like that.  The mere fact that another law

24   enforcement agency hasn't prosecuted a Columbus

1    police officer isn't -- it's not a policy of the

2    department that that means it's not to be

3    investigated?

4              MR. COGLIANESE:  Objection.

5    A.        I've already testified to that.

6    Q.        So it's not a policy?

7              MR. COGLIANESE:  Asked and answered.

8    A.        We don't have a policy.

9    Q.        Okay.  Did you -- did you or did

10   yourself ask Sergeant Decker why he didn't look

11   into it further?

12             MR. COGLIANESE:  Objection.  Can you

13   read that question back?  I just want to make sure

14   I heard it.

15             (The record is read as requested.)

16             MR. COGLIANESE:  Objection.  Go ahead.

17   Q.        Let me clarify the question in case --

18   since Rich doesn't understand it.

19             Did you ask Sergeant Decker why he

20   didn't investigate it further?

21   A.        I don't recall.

22   Q.        Okay.  Did you instruct anybody else to

23   talk to Sergeant Decker about investigating the

24   lightning link?

1    A.          Not that I recall.

2    Q.          Okay.  At the time that you became

3    aware that there were multiple witnesses

4    confirming racist statements or slurs by Sergeant

5    Moore, why wasn't he relieved at that point?

6                MR. COGLIANESE:  Objection.

7    Q.          Or -- or reassigned to a position where

8    you would have no -- he would not be with people

9    who might be seeking or working with him?

10               MR. COGLIANESE:  Objection.

11   A.          Well, again, I don't recall anybody

12   making that suggestion based on the information

13   that we had at that point in time, making racist,

14   derogatory comments.  We -- we don't have a

15   precedent for termination for such comments within

16   the division of police, so it wouldn't jump out as

17   this is a termination case, we have to relieve him

18   of duty that it would necessarily be brought to my

19   attention for consideration.  And that doesn't

20   stop anybody else from making that decision.

21               And I don't know if Sergeant Decker

22   brought it to somebody's attention, recommended

23   that he be relieved of duty, if that was

24   discussed.  I don't know how many times we

1    discussed when would be an appropriate time to

2    relieve him of duty.  It certainly wasn't any

3    desire to protect Sergeant Moore, and it certainly

4    wasn't any desire to upset any of our employees.

5    It's just a decision that isn't taken lightly.

6              I have been accused by the FOP and

7    talked to by the FOP and pleaded to by the FOP to

8    be very careful about our relief of duty

9    situations.  And I made changes to the policy and

10   then discussed with our command staff when

11   relieving of duty might be appropriate and when

12   it's not and then how long that should last.  And

13   I've made it clear to them, as I've tried to make

14   it clear here, that if we don't trust you to do

15   the job the way that it's supposed to be done and

16   can't trust you around other employees or

17   public -- or the public, you should be relieved

18   until we know more.  And if I think I have enough

19   evidence of an allegation that would result in

20   termination, that would be another reason to

21   recommend relief of duty.

22   Q.        Well, first of all, let me make it

23   clear.  I'm not just asking about relief of duty

24   in light of your absolutely appropriate point that

251

```
 1    the McFadden case, she was reassigned.  Why didn't
 2    you reassign the sergeant?
 3    A.        I'm not aware of a situation where he
 4    was directly supervising the accusers.
 5    Q.        You were aware that individuals were --
 6    wanted to work in the bureau in which he would be
 7    supervising him and were being deterred because of
 8    comments witnesses were saying he made and
 9    statements he texted; isn't that correct?
10              MR. COGLIANESE:  Objection.
11    A.        It's a lot easier for me to leave him
12    in an assignment where he's not directly
13    supervising those accused than to move him
14    someplace where he might come into contact with
15    people that are the accusers.  So if there's
16    multiple accusers, that would be -- make it even
17    more difficult for me to find a place to reassign
18    him.
19              And like I said, I'm just not aware of
20    a situation where he was supervising those people
21    that had accused him of discriminatory behavior.
22    Q.        So did you actually make a decision
23    that it was better that someone like Officer Shaw
24    be prevented from seeking to work in narcotics
```

1    than it would be to have Sergeant Moore reassigned

2    somewhere?

3                MR. COGLIANESE:  Objection.

4    A.          Not at all.

5    Q.          Did you actually even consider

6    reassigning him?

7                MR. COGLIANESE:  Objection.

8    A.          I would say that at various points in

9    time, there was discussion of either relieving him

10   of duty or -- or reassigning him.  And I can't

11   tell you when those discussions occurred, whether

12   they were repeated or whether they were only at

13   the beginning or what, but I know that there was

14   certainly thought about whether or not he should

15   be relieved of duty.  I just can't tell you how

16   often that was discussed or who it was discussed

17   with or where it stood with regard to the evidence

18   that we had.

19   Q.          Were those -- did those discussions

20   occur with Commander Cameron?

21   A.          I generally wouldn't be doing that kind

22   of conversation with the commanders.

23   Q.          So it would have been -- would have

24   been with Quinlan and/or Gray?

1    A.          And/or all of the executive staff, yes.

2    Q.          Okay.

3    A.          And it might have been internal affairs

4    as well.

5    Q.          And when you use the phrase "executive

6    staff," who are you including?

7    A.          The six deputy chiefs and the commander

8    from the professional standards bureau are the

9    members of the executive staff.  And the chief.

10   Q.          Are those -- have the deputy chiefs --

11   how many of those deputy chiefs are still in the

12   department to the best of your knowledge, of the

13   ones that would have been involved in the

14   discussions about Moore?

15   A.          Well, Gray --

16               MR. COGLIANESE:  Objection.

17   A.          -- has retired and Gary Dunlap has

18   retired just in the last month.

19   Q.          Okay.  And who are the other four?

20   A.          Currently there's Tom Quinlan who's --

21   Q.          Right.

22   A.          -- acting -- acting chief.  Richard

23   Bash, Tim Becker, Ken Kuebler and Michael Woods.

24   Q.          Okay.

1    A.        And then like I said, Gary Dunlap just

2    retired, so they're in the process of selecting

3    somebody for his position.  And Knight is the

4    acting deputy chief for Quinlan's position.

5    Q.        So if I understand it, when you

6    fired -- or recommended the termination of Melissa

7    McFadden, that's the first time, to your

8    knowledge, anyone has been fired for making racist

9    comments?

10             MR. COGLIANESE:  Objection.

11   Q.        Alleged racist comments?

12             MR. COGLIANESE:  Objection.

13   A.        Well, Melissa McFadden wasn't fired.

14   Q.        Recommended termination.  I'm sorry,

15   you demote -- you recommended demotion, you're

16   right, I'm sorry.

17             MR. COGLIANESE:  Objection.

18   A.        So what's -- what's the question?

19   Q.        Okay.  Did you recommend termination

20   for her?

21   A.        I did.

22   Q.        Okay.

23   A.        But not for that.

24   Q.        What did you recommend termination for?

1   A.          Untruthfulness.

2   Q.          Okay.  And what was --

3   A.          And -- and possibly discriminatory

4   actions.

5   Q.          Okay.

6   A.          I would have to review the charges

7   again.

8   Q.          Do you remember what she was allegedly

9   untruthful about?

10  A.          Her testimony in my hearing, I felt

11  that she was untruthful to me --

12  Q.          Okay.

13  A.          -- and untruthful in her statements to

14  internal affairs, but --

15              MR. GITTES:  Can we have a short break?

16  I think I'm almost done.

17              THE VIDEOGRAPHER:  We're off the

18  record.  The time is 4:18.

19              (A recess is taken.)

20              THE VIDEOGRAPHER:  We are back on the

21  record.  The time is 4:27.

22  Q.          Okay?

23  A.          Uh-huh.

24  Q.          Chief, I would like you to look at

1    Exhibit -- Exhibit 57 again.

2            MR. VARDARO:  No, you haven't given it

3    to her yet.

4            MR. GITTES:  Oh, that's right.

5                    - - - - -

6            Thereupon, Plaintiff's Exhibit 57 is

7    marked for purposes of identification.

8                    - - - - -

9    Q.        And after you've had a chance to look

10   at the exhibit, can you tell me what it is?

11   A.        First page is my recommendation of the

12   charges to Lieutenant McFadden, and the next one

13   is my recommendation, the finding and discipline

14   to the Director of Public Safety.  The one labeled

15   000006 is a routing sheet that I signed off on at

16   the conclusion of the investigation and prior to

17   the departmental charge hearing.  And the one that

18   ends with 07 is Deputy Chief Bash's comments with

19   regard to the investigation, and there are also

20   e-mails here.  And the last one are the charges

21   that were filed against her prior to the hearing.

22   Q.        Okay.  Let me make sure I understand.

23   So going from reverse direction, the last two

24   pages were the charges you had decided to file?

257

1    A.          There's one, two, three --

2    Q.          Three pages, yeah?

3    A.          -- so 11, 12 and 13 are the charges

4    that I signed off on charging her departmentally

5    with violations of our rules.

6    Q.          And that's dated the 18th and that's

7    your signature above your name?

8    A.          Correct.

9    Q.          And in this specific -- in the charges,

10   I don't see anything about lying.  Am I missing

11   something?

12   A.          No, you're right.  I -- I was thinking

13   of something else.

14   Q.          So it's all EEO-related charges?

15   A.          Correct.

16   Q.          And as I think you indicated, this

17   document at the end came before the hearing, the

18   charges come out --

19   A.          This is her notice that she's being

20   departmentally charged with those violations,

21   correct.

22   Q.          And she signs it, because I think

23   that's her signature?

24   A.          This is, yes, her receipt --

```
 1    Q.        Okay.

 2    A.             -- to say that she understands that she

 3    needs to appear.

 4    Q.        Okay.  And then I guess now I

 5    understand my confusion about termination,

 6    demotion.  In this letter, the first page, there

 7    were different penalties assigned to different

 8    specifications, is that why there's three

 9    different things?  It says level of discipline,

10    240 hours suspension/termination/demotion?

11    A.             I -- I grouped them all together, and

12    that was my recommendation for that combination of

13    charges.

14    Q.        Okay.

15    A.             I did not separate out what the

16    different --

17    Q.        Well, how does that work?  I mean, in

18    practice, if you've done three different levels of

19    discipline, how does it -- how is that handled?

20    Obviously if you're terminated, you're not -- you

21    can't be demoted.  I mean, so how does it work?

22    A.             How does that work if that was to be

23    upheld by the Director of Public Safety?

24    Q.        So you're -- you're recommending three
```

259

1    different levels of punishment for the purpose of

2    giving the director choices?  I'm just trying to

3    understand how the system works.

4    A.          This is a very different kind of a

5    case, because she was a supervisor, and all of the

6    aspects involved in that.  But it's the Director

7    of Public Safety's decision on the recommendation

8    that gets to him.  And it gets to him if I'm

9    recommending something that involves a suspension

10   or worse.

11          There are some discipline cases where I

12   can offer the officer a leave forfeiture.  And if

13   they accept that, it doesn't go to the Director of

14   Public Safety.  Otherwise if I recommend

15   suspension, then it always goes to the Director of

16   Public Safety to make the final decision.

17          In this particular case, I made that

18   recommendation thinking that if termination isn't

19   the decision, that it's worthy of a six-week

20   suspension and a demotion, because I thought that

21   the supervisory issues were very relevant to the

22   situation and the charges.  You know, if it was --

23   it could have been, you know, just a termination

24   case and sometimes that's all I recommend.

1    Q.          Okay.  That's what I was trying to

2    understand.

3    A.          Yeah.

4    Q.          Okay.

5    A.          This is an unusual recommendation for

6    me, but I have seen it done before in my previous

7    years as a supervisor.  I've been a supervisor

8    since 1987, so in my years in internal affairs and

9    just documents that I've reviewed, I've seen this

10   type of a recommendation before.  It's very rare.

11   Q.          Okay.  Now, just one other area, I

12   believe, not promising, but I believe just one

13   other area.

14               In a situation where you have one

15   officer saying another officer made a threat and

16   the accused officer says, no, I didn't, what do

17   you do?  You just write it off?  Do you

18   investigate further?  What is the -- what is the

19   process?

20               MR. COGLIANESE:  Objection.  Go ahead.

21   A.          Well, first of all, you're asking what

22   I do.

23   Q.          Well, I'm -- as chief, I mean, you've

24   investigated cases before, right?

```
 1              MR. COGLIANESE:  Objection.
 2    A.             I have never investigated as an
 3    internal affairs investigator.  As a sergeant, I
 4    did do some chain of command investigations, but
 5    they were generally like a use of force
 6    investigation.  You know, did you use force and
 7    how did you use it?  I know that I investigated
 8    some citizen complaints, a few when I was a
 9    sergeant, but this is in the 1980s and early '90,
10    maybe.  No, probably not.
11    Q.             I thought you supervised IAB for a
12    while?
13    A.             Well, I was the commander.  I didn't
14    conduct the investigations.
15    Q.             But you were consulted about ongoing
16    investigations?
17    A.             Absolutely.
18    Q.             And you supervised their investigations
19    as needed, right?
20    A.             Correct.
21    Q.             Okay.  Well, based on your experience
22    as an IAB commander, when you have, you know, a he
23    said/he said kind of situation, do you just not
24    pursue it?  Or do you -- do you do polygraphs?  Do
```

1    you do some other -- take other steps to see if

2    you can cooperate?

3    A.          There are --

4                MR. COGLIANESE:  Objection.

5    A.          There are a variety of -- of directions

6    that you can go with an allegation that involves

7    he said/he said.  Most often if they are committed

8    to a complaint, it's going to go for an

9    investigation.  Sometimes that's chain of command,

10   sometimes that's going to be internal affairs.  I

11   wouldn't say that writing it off is ever like a

12   given or even a policy.

13              It depends on the he said/he said

14   content, you know, whatever that might be.  A lot

15   of those situations, you know, going into it you

16   think, well, it might be not sustained, but we

17   have the gamut from sustained to unfounded when

18   it's he said/he said or she said/he said or

19   whatever.  And that depends on the evidence that

20   we're able to uncover.

21              You know, a video makes a huge

22   difference obviously.  An admission makes a huge

23   difference, obviously.  So it just all depends on

24   what the situation is, but --

```
 1   Q.          What about polygraphs?

 2   A.          Polygraphs are written into the

 3   contract with regard to when they can be

 4   undertaken.  So -- and that's with regard to sworn

 5   personnel.  And I've kind of been talking about

 6   sworn personnel.  Civilian investigations are --

 7   have different rules.  But with regard to the FOP

 8   contract, the contract comes right out and says

 9   when you can do a polygraph.  And that's if

10   there's a criminal aspect to the allegations, and

11   whether or not the accuser or the person making

12   the complaint is willing to take a polygraph and

13   passes, I believe, before we would then make a

14   decision on ordering the involved officer to take

15   a polygraph.

16   Q.          In this case, did Sorrell take -- I

17   mean, accusations -- some of the accusations that

18   Sorrell was making were of a criminal nature,

19   right?  Theft of money essentially?

20   A.          Certainly some of the allegations

21   involved, theft of time or overtime.  I can't

22   recall whether we had a discussion about ordering

23   a polygraph for Sorrell or not.  Some people see

24   value in that.
```

1              My -- my history with polygraphs and

2    how it's used and all that is that I often don't

3    find that it's going to create a lot of value to

4    the investigation, and the FOP sometimes turns

5    that around and says, well, you're relying on

6    that, and if you're relying on that, then we have

7    to throw the whole thing out, so...

8    Q.        So the rule -- the contract rule is

9    it's got to be criminal and the accuser has to --

10   A.        Of a criminal nature, I believe it

11   says.

12   Q.        Criminal nature?

13   A.        Yeah.

14   Q.        I'm sorry.  Has to be of a criminal

15   nature or at least potentially --

16   A.        Correct.

17   Q.        -- a criminal act?

18             And the accuser has to agree to it --

19   to take it?

20   A.        I'm pretty sure it says accuser or, you

21   know, the person making the complaint.

22   Q.        Complainant or something --

23   A.        Yeah.  Exactly.

24   Q.        -- like that?

265

```
 1   A.          I mean, it's in the contract.  It would
 2   be better to just go word for word than --
 3   Q.          The reason I'm asking you this --
 4   A.          Yeah.
 5   Q.          -- is there's a document that I've seen
 6   where it looks like Sergeant Decker suggested or
 7   requested polygraphs, but we can't figure out
 8   whether they actually ever happened.  Do you know?
 9   A.          If they happened --
10   Q.          Yeah, in this case?
11   A.          -- the records should be in the record.
12   Q.          Okay.  All right.
13   A.          Because it would have been a public
14   record and it would have been part of the
15   investigation.
16   Q.          Okay.  Okay.  If you would take a look
17   at Exhibit 38, the big giant one.
18   A.          Uh-huh.
19   Q.          And look at page 138 --
20               MR. VARDARO:  163.
21   Q.          163.  And that's the page --
22   A.          Up at the top?
23   Q.          -- up at the top, yeah.
24               I would like to point your attention
```

266

1     down to the last paragraph on the page.

2     A.         Okay.

3     Q.         And I'm just going to read it out loud

4     to be -- since it's the basis of a question.

5                Although it is a very close call, and I

6     do not find Sergeant Moore credible, I am

7     unwilling to sustain this allegation without some

8     form of corroboration of Officer Sorrell -- of

9     Officer Sorrell's statement.  Therefore I find

10    that the alleged conduct could not be supported or

11    refuted by a preponderance of the evidence.  And

12    he recommends not sustained.

13               My question is that:  As chief and as a

14    former commander of IAB, is that the general rule

15    that we're -- that you need -- if it's just one

16    witness, and for this purpose since assuming there

17    was only one witness, did you -- is it the rule

18    you have to have other corroboration to sustain a

19    charge?

20               MR. COGLIANESE:  Objection.

21    A.         There's no rule.  I mean, everything is

22    taken based on the information that we have for

23    that thing.  I would say when -- when we don't

24    have something that tips the scales, then it's

1    going to be not sustained.  It's -- it's just --

2    you can't get there and say that the evidence is

3    sufficient to make it sustained.  It's a fine

4    line.

5            And sometimes that just depends on what

6    you think you can prove.  Just like, you know,

7    prosecutors don't take all their cases even though

8    probable cause might be there, they might not take

9    it because they don't think they can get to beyond

10   a reasonable doubt.  So, you know, it's all about

11   what we think the evidence tells us, and there's

12   always differing opinions about what the evidence

13   says.

14   Q.        So the fact that Moore was not credible

15   as Sergeant Decker describes it, and there is

16   someone accusing him, that's not enough without

17   additional corroboration?

18   A.        That was Sergeant Decker's decision --

19   Q.        Right.

20   A.        -- to go that route.

21   Q.        Well, but this is just a

22   recommendation, right?

23   A.        He makes a recommendation of finding

24   and that's what -- how he --

1    Q.        Right.

2    A.        -- justified his decision.

3    Q.        I'm asking you:  Do you view situations

4    like he's describing here the same, that even if

5    you have somebody you don't believe is credible,

6    but you don't feel you have corroboration of some

7    kind, you don't think there should be a charge?

8    A.        A finding of sustained.

9    Q.        A finding of sustained?

10   A.        There's a difference there.

11   Q.        Okay.  You're right.  A finding of

12   sustained.

13   A.        Yes, I have to agree that I've been in

14   that same -- same reasoning situation where even

15   though I don't believe necessarily the officer, I

16   don't have enough.  I -- I can very clearly

17   remember a case where I thought the officers were

18   very guilty, but I didn't have enough

19   corroboration.  They weren't credible, but I

20   didn't have enough corroboration to make a

21   sustained finding.  And that's just one case, you

22   know, there's --

23   Q.        And -- and in a situation like this

24   where another officer specifically asked Moore

1  about whether he had made this statement and Moore

2  did not deny it, that's not enough to tip the --

3  to tip the scales?

4  　　　　　　　MR. COGLIANESE:  Objection.

5  A.　　　　　Well, it wasn't for Sergeant Decker or

6  anyone else that reviewed the information.

7  Q.　　　　　And you understand that -- let me make

8  it clear, there's a different witness that's not

9  referenced in this little section who in a

10  conversation with Sergeant Decker told him that he

11  had asked him about the allegations, and Moore did

12  not deny it, he just didn't respond?

13  A.　　　　　Is that included --

14  　　　　　　　MR. COGLIANESE:  Objection.

15  A.　　　　　-- in the rest of this?

16  Q.　　　　　It is included elsewhere in the

17  investigation.  Do you think that is pertinent?

18  A.　　　　　All of it is.

19  Q.　　　　　Okay.  As someone who has investigated

20  some cases, would that have tipped the scale for

21  you had it been discussed in connection with

22  Sorrell and Watkins in this section?

23  　　　　　　　MR. COGLIANESE:  Objection.

24  A.　　　　　Well, I didn't change the ruling, so I

1    think that it's clear that I didn't feel that I

2    could sustain the charge.

3    Q.        But as far as you recall, you

4    considered this other -- the other witness about

5    Moore --

6    A.        I considered --

7    Q.        -- not the whole thing?

8    A.        -- the information, yeah.

9    Q.        Okay.  Okay.  I think I am finished

10   with my questions.  I just want to give you an

11   opportunity if you have anything that you believe

12   sitting here at the moment you need to correct or

13   add to a prior answer, please let us know.

14   A.        I can't think of anything in

15   particular.

16   Q.        Okay.

17   A.        It was a long day.

18        MR. GITTES:  I am requesting that you

19   review and read the transcript when it's done up.

20        MR. COGLIANESE:  And she'll read.

21        THE WITNESS:  I understand.

22        THE VIDEOGRAPHER:  This concludes the

23   deposition.  We are off the record.  The time is

24   4:48.

271

1                (Signature not waived.)

2                     - - - - -

3            Thereupon, the foregoing proceedings

4            concluded at 4:47 p.m.

5                     - - - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

272

1    State of Ohio      :        C E R T I F I C A T E
     County of Franklin: SS
2
         I, Mary Bradley, RPR, a Notary Public in and
3    for the State of Ohio, certify that Kimberley K.
     Jacobs was by me duly sworn to testify to the whole
4    truth in the cause aforesaid; testimony then given
     was reduced to stenotype in the presence of said
5    witness, afterwards transcribed by me; the
     foregoing is a true record of the testimony so
6    given; and this deposition was taken at the time
     and place specified on the title page.
7
         Pursuant to Rule 30(e) of the Federal Rules of
8    Civil Procedure, the witness and/or the parties
     have not waived review of the deposition
9    transcript.

10       I certify I am not a relative, employee,
     attorney or counsel of any of the parties hereto,
11   and further I am not a relative or employee of any
     attorney or counsel employed by the parties hereto,
12   or financially interested in the action.

13       IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my seal of office at Columbus, Ohio, on
14   June 4, 2019.

15

16

17

18

19

20   _____
     Mary Bradley, Notary Public - State of Ohio
21   My commission expires September 19, 2019.

22

23

24

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling  2-Word Omitted  3-Wrong Word
4-Clarification  5-Other (Please explain)

Page/Line        Correction or Change        Reason Code

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

I, Kimberley K. Jacobs, have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.

Date_____Signature_____

The witness has failed to sign the deposition
within the time allowed.

Date_____Signature_____

Ref: Mb30921kj  S-mb P-bw

**Exhibits**

**30921 Exhibit 005** 4:5
110:4,6,11
**30921 Exhibit 006** 4:7
116:12,17
**30216 Exhibit 019** 4:8
167:4
**30921 Exhibit 020** 4:10
170:6
**30921 Exhibit 035** 4:11
220:11,15
**30921 Exhibit 038** 4:12
219:4,8,9
265:17
**30216 Exhibit 041** 4:14
159:3
**30921 Exhibit 054** 4:15
235:21
**30921 Exhibit 055** 4:17
235:16
**30921 Exhibit 057** 4:18
256:1,6
**30921 Exhibit 058** 4:19
234:14,19

**$**

**$30,000**
14:16

**0**

**000006**
256:15
**014417** 159:6
**05** 98:23
**07** 256:18

**1**

**10** 6:16 18:7
19:4
**10-3** 68:8
**100** 37:1
**10ish** 93:11
**10th** 117:10
236:16
239:20
240:10
**11** 257:3
**11:13** 81:20
**11:22** 81:24

**12** 24:6 257:3
**12:47** 147:2,
5
**13** 24:6 257:3
**138** 265:19
**13th** 240:11
**14** 108:6
**14419** 159:14
**147** 219:16
**14th** 227:8
**15** 81:15
170:22
178:11,13
**163** 265:20,
21
**17** 236:15
**18** 166:20
**18th** 257:6
**19** 94:23
159:18
166:23
167:4 173:6,
23,24
**1979** 9:15
**1980s** 261:9
**1987** 50:13
61:18 260:8
**1989** 58:3
**1990** 76:13,
14
**1990s** 17:1
**1991** 50:20
**1993** 51:18
**1995** 51:23
92:12
**1996** 80:1
**1996ish**
75:23
**1999** 75:20
79:24
149:23
**1:27** 148:2,6

**2**

**20** 6:16 18:7
148:2
159:21
170:2,6
174:19
**200-plus**
162:3
**2000** 51:17
**2000s** 79:8
**2001** 52:3
94:24 95:5
**2005** 52:5,17
**2006** 52:21
98:6
**2009** 52:23
53:1

**201** 5:4
**2011** 53:7,12
185:6
**2012** 9:11,12,
17 12:7
79:11 185:6
**2013** 49:23
**2014** 108:14,
23,24
112:20
114:5 118:9
123:15
149:14
151:11
153:18
**2015** 120:12
153:18
159:7 185:7
227:8
**2017** 236:16
**2018** 236:12
**2019** 5:3
148:2
**20th** 5:3
**23rd** 174:6,9
**24** 74:20
**240** 258:10
**28th** 174:8
**29th** 159:7
**2:18-cv-483**
5:7
**2aware** 9:7

**3**

**30** 55:18
66:8,9
**310** 32:14
**35** 220:11,15
**38** 218:24
219:4,9
265:17
**39** 7:15 158:5
**3:02** 216:18
**3:15** 216:22

**4**

**40** 17:5,6
67:9 80:22
178:13
**400** 5:3
**41** 158:5,6,9,
15 159:3
**45** 81:13
**4:18** 255:18
**4:27** 255:21
**4:47** 271:4
**4:48** 270:24

**5**

**5** 110:4,6,11
**50** 178:13
**54** 235:10,11,
16,21,24
**55** 235:10,16,
21 236:1
**57** 256:1,6
**58** 234:6,7,
14,19

**6**

**6** 116:12,17

**7**

**70s** 9:14
**79** 9:10 50:7
63:9

**8**

**8** 32:15
**80s** 55:12
57:14
**87** 55:19
**88** 50:17

**9**

**9** 32:15
**90** 36:24
261:9
**90s** 63:10
70:16 76:10
79:7,9 80:11
**91** 76:15,16
**92** 77:3
**93** 77:3
**96** 92:12
**97** 80:1
**9:34** 5:11
**9th** 236:12
239:17
240:14

**A**

**abide** 84:4
**ability** 21:11,
15 36:8
**abolishing**
153:11
**abolishment**
156:5,21
**absolutely**
34:21 37:18
82:24 92:10
101:19
103:18
170:17

172:19
187:14
241:12
250:24
261:17
**abuse** 108:2
**academy**
50:9 53:16
54:22 56:18,
23 63:22
98:4,10
**accept** 28:14
131:2
167:17
259:13
**acceptable**
112:3
**accepted**
125:7
129:20
**access** 41:9,
11
**accident**
18:18
**accidental**
36:17
**accidentally**
36:19
**accolades**
155:4,14
**accomplish**
191:7
**accomplishe
d** 121:1
231:13
**accordance**
117:18
**accountable**
37:11
**accounting**
224:15
**accreditation**
75:19
**accredited**
75:19 79:23
**accurately**
21:12,16,20
25:7 215:8,
12
**accusation**
116:3
137:10
**accusations**
263:17
**accused**
7:18 10:13
13:4 14:9
94:14
105:24
106:2,4,5
192:11
202:4
204:24
223:12
226:17
237:16,18
242:5 250:6
251:13,21

260:16

**accuser**
237:19
263:11
264:9,18,20

**accusers**
241:19
251:4,15,16

**accusing**
267:16

**acknowledged** 222:1
223:8

**acknowledging** 213:17

**act** 38:18,24
202:7 216:2
237:23
264:17

**acting** 35:13
253:22
254:4

**action** 7:18
10:12 30:22
33:2 42:14
44:6 83:10
87:12 105:1
115:12
160:18
212:19

**actions**
255:4

**actively**
192:21

**activities**
61:3

**activity**
155:7

**actual** 78:19
86:16,20
87:7 88:10,
15 114:23
126:3 194:7
217:23
220:16
227:23
239:24

**add** 65:12
142:16
151:16
270:13

**added** 61:15
66:3,4
107:19
139:23
205:7

**adding**
140:12
215:13

**addition** 16:5
26:22 80:9
150:14
168:11
196:22,23

**additional**
141:12
267:17

**address**
44:20

153:14
188:22
202:22
206:22

**addressed**
74:3 117:2
159:8,9
167:13
175:4
193:10

**addresses**
115:8
191:21

**adjustments**
150:8

**administrative** 28:21,23
29:9,24
34:8,9
50:19,23
51:20 53:11,
12 126:19
146:1

**admission**
262:22

**admits**
229:16

**admitted**
107:15,16
122:21
192:23
193:14
202:2
225:21,22
227:9
238:23
240:22

**admitting**
123:1

**advantage**
60:9,10

**adverse**
212:17,18

**advertising**
162:8

**advice** 144:3

**advise** 226:1

**advised**
35:12

**advisers**
30:2

**advocates**
152:7

**affairs** 13:6
24:16 25:11,
20,23 26:2,
3,7,13 27:16
29:3,21 31:1
32:3,7 33:4
34:16,24
52:4,8 56:22
64:23 80:20
90:19 94:17,
21 95:4
100:18,21
102:15,24
103:7,9
105:12
112:10,13,
17,19 118:9

145:24
169:14
178:11,16
213:2
218:19
236:7,10
246:10
253:3
255:14
260:8 261:3
262:10

**affect** 21:11,
15 66:14
149:2

**affirm** 171:24

**affirmatively**
20:3 222:8

**African**
47:13

**African-american**
47:13

**African-americans**
54:19 55:6,
18 64:8
120:12,21
127:22

**afternoon**
140:14
148:1

**age** 17:4

**age-based**
17:7

**ageist** 45:10,
13 46:1

**agencies**
75:20
145:23
148:9

**agency**
143:17
145:4,9,16
146:4,13
243:12
244:8
247:24

**agree** 20:12
21:9 103:11
122:20
164:22
165:22
191:12
201:8
217:15
225:2
229:21
240:4
264:18
268:13

**agreed** 168:1

**agreement**
59:1 167:15

**agreements**
199:2

**ahead** 10:7
37:24 39:12
41:21 43:20
59:12 63:12
67:2,8,14

83:6 85:21
88:24 89:9
90:5 104:5
130:1 131:3
137:19
138:7 157:6
161:10
164:4
167:11
168:15
175:19
176:8
182:12
186:3
189:23
197:11
228:9
248:16
260:20

**allegation**
10:10 14:10
27:1 29:11,
19 86:20
115:9 122:7
125:2 126:8
129:11
130:5,6,14,
16,20 134:4,
20 135:2
138:8
139:12
140:7 141:8,
11 163:22
193:11
205:8,24
206:22
218:14
237:17
250:19
262:6 266:7

**allegations**
7:6,8 8:18
9:5 16:19
26:8 52:12
54:13 55:10
56:6 57:8
64:23 107:8,
11,19,21
108:3,6
109:16
113:14,19,
24 115:1,7,
18 138:13
139:8,22
140:9,10,12,
15 141:12,
13 142:3
160:4,11
187:6
195:21
203:5,9,22
204:2 220:4
226:15
263:10,20
269:11

**allege**
134:23

**alleged** 8:21
31:7 56:21
102:18
105:10
134:22
164:24
218:1 220:5
254:11
266:10

**allegedly**
134:6
223:10
255:8

**alleging**
104:16

**allowed** 34:2
74:12,14,21
81:10
138:19
150:20

**alluded**
127:19

**alternatively**
191:4

**amazingly**
77:13

**American**
47:14

**amount**
102:8 156:8,
23 226:24

**analysis**
90:2 231:19

**analysts**
93:7

**and/or** 30:2
35:19 91:5
116:21
171:8 234:2
252:24
253:1

**angry** 192:24

**announce**
5:12 154:13

**announced**
182:5

**answering**
39:10 136:7
144:9

**anticipate**
29:6,24

**anybody's**
230:21

**anymore**
92:6

**anyone's**
231:9

**apologized**
78:13

**apparently**
56:19 71:6

**appearing**
105:14

**appears**
105:6
116:24
170:21
219:12

**Apple** 58:19
76:7,18 79:3

**applicants**
178:4,5

**applied**
178:14

**applies** 45:1

apply 156:2
appropriately 104:7
182:19
216:4
223:19
approval 32:24 33:5,
13,17,21
34:4,17
114:21
122:19
approve 27:13 28:3
34:16
140:11
142:11
151:5 152:1
233:6
approved 114:9
122:15
237:12
approving 122:17
142:12
April 52:5
227:8
arbitration 37:2 97:24
arbitrations 16:6,7 36:4
area 14:8
94:16
260:11,13
areas 152:11
argue 103:2
arising 203:6
arrests 66:24
article 234:18,21,
23 235:2
asks 211:3,
15
aspect 121:23
187:23
263:10
aspects 217:3 259:6
assertion 229:23
assess 193:7
assigned 50:18 51:11,
21 52:4,17,
21 53:3,4
109:4
156:19
238:10,13
258:7
assignment 62:21 95:19
157:16
163:4
165:13
176:20
177:11,13

194:3 234:2
236:19
242:4
251:12
assignments 57:7,15
58:1,13 73:1
96:13
150:18
151:13
156:16
176:24
178:10
212:18
245:1
assist 91:2
assume 6:17
8:1 20:9
50:8 108:20
118:14
159:21
assuming 215:10
266:16
assumption 118:13,15
ATF 143:17
144:5,17
243:12,21
245:20
246:13
247:17
attachment 174:20
attempt 89:6
157:18
229:22
246:10
attend 76:6
89:13 91:13
92:6
attended 61:2 75:24
80:14 83:2
99:6
attention 42:12 140:8
143:3
157:22
159:4 161:5
166:2,7,10
172:17
180:3 188:8
206:20
210:11,12
249:19,22
265:24
attitude 62:8
attitudes 128:19
attorney 89:18
attorney's 13:21 21:24
22:1
attributed 111:24
234:22
235:2
August

108:6,13
authority 9:22 114:20
128:10
206:4 238:8,
12 239:5
authorize 114:7
automatic 146:8 200:4
AV 110:24
award 155:12
awards 155:4
aware 9:2
17:24 34:22
35:2 57:5
85:8,10,22
107:8
108:13
109:13,20
122:14
133:17
142:19
143:8,16,21,
23 144:14,
19,20
148:15,16
154:10
155:2,4,9,16
157:10,13
158:1 162:3,
10,19,24
163:17
165:6
175:11,15
176:3,9,11,
13 179:7,13,
21 183:5
188:24
189:6,15,22,
24 190:3,14,
17 193:24
198:14
199:16,19,
24 204:7,9
205:20,23
206:14
207:10,15,
17 208:2,14,
17,19,21,22
209:2,3,17,
20 210:3
221:14,21,
24 222:13
233:15
239:2
243:11
249:3 251:3,
5,19
awareness 43:17
209:22
224:17
awful 154:18
awhile 59:4

———
B
———

back 14:19
17:1 40:17

50:21 52:24
53:1 54:24
61:15 65:16
70:22 76:7
79:21 81:23
86:9 89:5
92:16 94:23
95:5 123:22
125:17
127:14
131:12
148:5,23,24
156:24
161:14
193:15
198:23,24
203:8 204:4
216:21
228:5 231:8
248:13
255:20
background 195:9
backseat 68:2,3,11
badge 241:22,24
balancing 137:21
band 101:9
based 8:18,
21 16:19
17:4 24:20
33:19 43:13
56:7 57:16
87:18 90:3
95:8 108:7
110:17
115:6 119:9,
22 121:5,6
122:20
123:1
128:19
131:5
132:10,17
133:20
156:16
178:21
182:15
187:4
200:21
212:6
224:16
226:18,21
228:6
237:13
249:12
261:21
266:22
Bash 253:23
Bash's 256:18
basically 28:12 37:9
69:12 78:6
103:2
125:16
149:24
151:21,23
153:4 156:8
basis 75:18
103:8
125:13

150:24
152:22
266:4
Bates 219:21
bathrooms 63:21
bear 28:17
beat 31:7
41:18 129:1
195:6
Becker 100:15
253:23
began 121:10
beginning 23:20 81:23
148:5 149:6,
9 216:21
252:13
behalf 5:20
behavior 9:21 10:1,2,
10,13 36:7
37:12 44:14,
18 72:8 78:5
107:15,16
122:23
127:19
198:3
200:23
201:1 233:8,
16,21
243:19
251:21
believed 128:19
believes 26:10 37:7
bell 104:3
143:20
185:7
190:24
benefits 93:8
bias 120:21,
23
bid 161:18
177:10
biennial 75:22
bifurcated 203:3
big 51:7
56:14 61:9
68:12 75:9
150:23
218:24
265:17
biggest 103:12
bit 48:1
53:15 65:17
138:6
155:20
170:23
180:3
bits 203:4

**black** 55:5 57:8 64:5 65:4,6 71:23 73:15 75:1 90:3,9,15 125:16 128:17,23 129:21 135:6 137:13 139:4 168:13 171:12,17, 20 176:6 186:19 195:4,8 200:5,7 205:13,16 207:19 223:1 225:15 241:4

**blacks** 60:8 72:21 135:8, 9

**blanket** 44:4

**board** 48:3 49:2

**body** 29:15 36:13

**boils** 73:22 137:24

**books** 35:24

**boss** 70:11, 13 200:9 201:9

**bottom** 159:7 219:21

**bought** 47:20

**box** 23:19

**boxes** 23:19

**Bradley** 5:8

**break** 8:16 21:6 41:6 78:13 81:9 216:9,11,12, 14 222:7 255:15

**breaks** 81:11

**bribe** 26:2

**briefly** 46:12 94:19 106:24

**bright** 37:5

**bring** 28:11 110:18 113:5 122:4 161:2 187:17 211:20

**bringing** 178:11

**brings** 184:16 209:5

**broke** 14:22

**brought** 24:1,19 42:12 88:6 108:7 114:18 140:4 145:1 157:22 180:2 184:2, 18 185:20 206:20 207:21 249:18,22

**Brust** 96:2, 11 159:8 176:5 179:12,21 180:14 181:6,19,21 183:1 185:19 188:10 189:1,18 190:9 207:24 210:20 211:3,4,12, 19,24 212:2, 15 213:16 214:3 217:2, 6,11,16,20, 24 218:15 221:16,19 222:1,6,11, 17,20

**Brust's** 210:16

**budget** 153:6,8 224:13

**building** 92:21

**bully** 217:12, 17 218:2

**bullying** 217:16 218:4

**bump** 148:13

**bunch** 78:21 124:17 214:24

**bureau** 17:2 25:21 28:6 52:2,22 57:9 79:12 90:20 92:15 93:1 94:17 96:18 100:18 111:2 149:24 150:5,6 192:10,22 224:5,18 225:20 241:4 251:6 253:8

**bureaus** 150:10,11

**bus** 47:10

**business** 93:14

**butt** 69:14

**buying** 47:8

—
**C**
—

**call** 86:18 101:14 102:9 106:13,16, 17 141:23 266:5

**called** 22:23, 24 23:4 25:18 28:20 29:9 32:10 36:22 37:1 56:22 86:19 102:10 117:13 186:23 201:23 229:17 230:8 231:22 232:7

**calling** 195:4 198:23

**calls** 25:24 60:17

**camera** 29:15

**Cameron** 98:1 171:8 176:4 179:12,21 180:14 181:6,20 183:1 184:4, 9,18 185:4, 18 188:1 189:1 190:23 211:21 212:16 217:6,11,16 218:2,3,9,15 252:20

**Cameron's** 161:6 165:14 171:4,9 174:6 184:10,11 218:20

**campus** 14:8 52:19

**candidate** 161:7 165:15 167:16 171:3,5 182:6 184:20

**candidates** 162:12,21 164:18,19 167:15 171:13 176:6 186:8, 21,22

**capacity** 11:6

**captain** 105:18 177:17,20

**card** 60:9

**care** 44:1

**career** 42:11 70:15 74:5 95:15 118:21 121:9

**careful** 219:1,19 250:8

**case** 5:4,7 6:8 7:12 8:3, 11,17,20,23 9:1,4,17 10:5,17 13:1,7 14:11,21 15:4 21:24 22:6,7 31:16 34:21 53:20 54:1,5 55:9, 16,17 56:6 57:6 58:11 59:10,11,19 68:4 87:2, 11,22 88:3, 6,16 104:21 106:12 123:14 140:2,16 159:3 184:20 186:8 189:16 203:15,16, 20 204:13, 16 207:14 221:5 226:21 227:1 242:2 243:17,24 244:4,9 247:18 248:17 249:17 251:1 259:5, 17,24 263:16 265:10 268:17,21

**cases** 6:18 11:4 12:8,12 13:16,17 15:8,24 16:2 37:20 41:15 56:4 87:17 105:8,14 106:12 139:23 145:22 146:2 192:1 195:6 259:11 260:24 267:7 269:20

**caused** 66:8

**causing** 226:7

**cautioned** 232:13

**cell** 141:3

**center** 47:22

**centers** 155:6

**ceremonies** 155:13

**ceremony** 66:10

**certainty** 118:17 181:16 183:4

**cetera** 123:11 137:14

**chain** 25:18 26:16,19,24 27:8 28:22 29:4,5 30:9 31:9,22 32:24 34:11 35:1 90:4 107:12 108:9 134:3, 5 135:13 139:8 156:19 158:3 202:14 204:7 226:1 238:21 241:18 261:4 262:9

**chains** 32:5 114:20

**chance** 21:22 61:20 131:23 256:9

**change** 52:11,15 149:2 154:13 166:11 197:10 269:24

**changed** 32:11 74:7, 8,19,23 182:5

**chapter** 32:15

**characterize** 239:22

**characterized** 137:6

**characterizing** 135:16

**charge** 17:2, 7 29:7 51:20 58:21 112:19 129:20 137:16 138:1,3 139:4 157:12 192:2 209:14 226:3 238:19

256:17
266:19
268:7 270:2

**charged**
29:21 41:23
90:24 106:1
168:8
191:15
199:10
221:7
240:23
247:18
257:20

**charges**
16:17 17:18
23:22,24
24:16,18
25:10,12
28:1,4,9
30:13,14,16,
17 33:8,16
126:13
141:18
144:5,18
157:1
160:14
179:9 192:2
198:15
199:4,8,9
221:6 227:2
238:24
255:6
256:12,20,
24 257:3,9,
14,18
258:13
259:22

**charging**
244:7 257:4

**charitable**
47:6

**chart** 77:18
150:9,13

**charter**
47:10

**check** 87:19
158:22

**checked**
88:2 223:6

**checking**
143:18

**chief** 5:20
6:9,11 7:7,
23 8:7,12,
20,24 9:3,9,
16,21,22
10:3,20 11:4
13:16 14:2,6
15:4,9 17:19
23:9 24:7,8,
11 27:11,12,
18,23 33:3
34:14,15
37:6 39:9
43:6,14
44:22 51:19
52:24 53:12,
13 70:14,20
71:6 74:5
75:18 76:1
79:1,2,11,14
82:1 84:14
86:15 87:10

90:1,8,15
93:5 95:2
98:17
108:21
109:5 110:9
111:7,16,19
112:14
116:15
117:2
121:23
131:14
132:1 136:3,
16,24
138:15
139:14
140:13
142:14
145:3,9,15
148:7 150:9,
12,22 151:4
152:17
159:1 167:2
183:10
186:19
188:2,18
199:22
202:6 207:5
212:1
213:14
218:20
221:4 224:6,
16 230:6
232:14,22
234:9,18
235:13,19
236:23
243:20
253:9,22
254:4
255:24
256:18
260:23
266:13

**chief's** 33:17

**chiefs** 35:12
100:12
113:5 150:3,
19 253:7,10,
11

**choices**
259:2

**chose** 35:8
42:17 61:21

**chosen** 62:7

**Christopher**
223:23

**chronology**
141:7
162:18
169:16

**church**
91:13,14
92:6

**circumstance** 188:3

**circumstances** 38:2,23
39:6 43:3
44:7 46:5
114:17
153:7
163:23
172:17

211:24
225:21
232:17

**circumstantial** 130:18

**citizen** 25:24
26:4,5 34:22
51:4,5 52:13
261:8

**city** 5:5,20
9:4 13:21
14:3,16,18
15:3,9 21:24
22:1 46:19
54:19,21
61:11 75:16
76:1,4,21
79:4 82:17
89:18 95:7
107:13
108:8

**city's** 76:7

**civil** 16:18
18:15,17,24
88:22 89:16

**civilian** 26:6
94:4 263:6

**claim** 7:3
12:18 39:16
115:14
134:6 198:1
200:22
232:20

**claimed**
105:21
133:5,14
168:12
169:2
201:18

**claims** 9:17
12:14 38:22

**clarify** 19:21
248:17

**clarifying**
231:6

**class** 44:15
55:7 69:10
76:19 77:1

**classes**
44:11

**classify** 10:4

**clear** 16:1
39:21 72:16
103:15
136:3,18
148:22
149:6,14
156:13
180:9
181:20
196:6
217:23
241:2
250:13,14,
23 269:8
270:1

**Clintonville**
52:19

**clip** 219:18
234:10

**close** 146:21
266:5

**closed** 35:19
143:5

**closely** 86:1

**co-workers**
69:13

**coach**
101:15

**coached**
54:22

**Coglianese**
5:19 10:7
18:12 34:20
37:24 39:1,9
41:21 43:20
45:21 59:12,
20 63:12,24
65:9 67:2,8,
14 73:2,8,18
75:4 81:8,
12,15 82:6
83:6,14
85:21,24
86:14,23
87:5 88:24
90:5 104:5
109:15
122:6
123:21
124:11,13,
16,23 125:8,
18 126:1
127:6,16
129:2,9
130:1 131:3,
8,14,18
132:1,4,6
133:19
134:8
135:15,20,
22 136:1,13,
24 137:19
138:7,21
141:19
142:13
144:6,11
146:19,22
157:6
158:21
159:13,16,
19 161:8,10,
21 164:4
165:17
167:11,22
168:15
169:6 170:1,
3 172:22
173:1,21,24
174:23
175:19
176:8,21
181:23
182:12
185:8 186:3,
13 187:1,19
188:15
189:5,23
190:13
191:1,14
192:13,17
193:2
194:11,20
195:10
196:15,21

197:7,12
198:4,17
199:6,14
200:10
201:2,13,20
202:5,9,21
205:3,19
206:8 208:4,
20 209:7,19
210:5 212:4
213:9,13
214:10,15
215:2,11,16,
20 216:1,5,
9,12 217:13,
22 218:11
221:20
222:3,15
223:17
225:6,24
228:8,23
229:8,18,24
230:11,19
231:24
232:8,21
233:2,19,22
234:9,12
235:4 237:7,
11 239:14,
21 240:8,19
241:8
242:14,21
243:7,9
244:1,5,12,
17 245:2,17,
24 246:5,15
247:8,12
248:4,7,12,
16 249:6,10
251:10
252:3,7
253:16
254:10,12,
17 260:20
261:1 262:4
266:20
269:4,14,23
270:20

**Coleman**
153:4

**collect** 151:7

**college**
80:12

**Columbus**
5:4,5,20
8:14,19
17:18 46:20
47:3,4
49:18,19
52:20 63:11
243:21,22
245:15
247:24

**combination**
217:18
258:12

**command**
15:10 25:18
26:17,19,24
27:8 28:22
29:4,5 30:9
31:10 32:5
33:1 35:1
90:4 107:12
108:9

114:20
134:3,5
135:13
139:8 150:4
151:9
156:20
158:4
202:15
204:7
222:24
226:2
232:15
238:21
241:1,18
250:10
261:4 262:9

**commander**
17:1 52:1,7,
18,22 64:23
85:11 92:14
98:23
102:24
103:10
104:20
105:6,12,19,
20,21 106:8
161:6
165:13
171:4,8
176:4,17
177:2,4,10
178:3,11,17,
22 179:12
182:24
183:1 184:4,
9,18 187:15,
20 188:1,10,
24 189:1,18
190:9,23
212:16
217:21
218:1,3,14,
20 239:11
242:12
246:19
252:20
253:7
261:13,22
266:14

**commanders**
30:9 31:12,
13 76:6
84:15
176:23
178:8,18
252:22

**commanding**
224:17

**comment**
42:16 44:5
45:13 124:5
130:6,13,16
134:21
141:16
195:24

**commentary**
209:16

**comments**
42:11 43:8,
16,17 45:18
46:1 59:10
60:8 69:4
70:1,2,3
71:3,9,14
72:1,23

77:12
103:22
104:3
118:22
119:22
123:18
128:20
130:11
134:16
137:12,13
140:4,23
141:5,13,14
163:16
186:16
196:14
200:5
202:18
205:17
249:14,15
251:8 254:9,
11 256:18

**commission**
16:19 75:19
88:22 89:16,
22

**committed**
27:20 262:7

**common**
178:16

**communicat**
**e** 112:12,13
189:11
192:5

**communicat**
**ed** 239:4

**communicati**
**ons** 17:2
52:2 92:14
169:13

**community**
47:19,23
149:24
152:12,13

**compared**
121:9

**complain**
73:21 78:22

**complainant**
94:13
264:22

**complained**
45:20 158:1
179:10
217:5

**complaining**
121:16
221:19

**complaint**
26:4 51:3,4,
5 69:23
72:22 74:22
75:3,12
78:23 88:15
103:23,24
104:12
135:13
175:23
210:8
221:16
239:6 262:8
263:12
264:21

**complaints**
25:24 34:22
35:5 44:12
52:13 71:16,
21,24 86:19
90:8,16,21,
23 104:20
121:7
157:14,18
162:14
163:15
175:18
209:15
232:18
233:18
241:5 261:8

**complete**
102:23

**completed**
207:1

**completely**
223:21

**complicated**
202:24
204:10

**compliment**
17:6

**concern** 73:6
159:22
186:19
187:2,4,14
233:10

**concerned**
45:12 62:7
122:10

**concerns**
62:17
152:20,21
153:14
196:16
200:24
212:9
218:21
222:14
233:9
239:12,23

**concluded**
206:5
233:15
271:4

**concludes**
270:22

**conclusion**
134:15
144:23
256:16

**conduct**
8:18,21,22
9:5 10:19
16:20 29:16,
18 30:19
36:4 42:8
45:10 80:24
93:22
162:20
230:17
241:6
261:14
266:10

**conducted**
26:18,19
29:2 80:24

161:18
180:15
186:9 218:5
236:7,9

**conducting**
163:14
216:3

**confidence**
71:5

**confidentiall**
**y** 105:13

**confirm**
125:20
171:2
180:12
234:21

**confirmation**
126:5
127:12

**confirmed**
123:18
124:3,9,20
125:1,21,22
126:24
128:23
135:6
137:11
195:2 223:8
239:18

**confirming**
249:4

**conflict**
187:10

**confused**
20:8 230:17

**confusion**
95:1 207:5
258:5

**connection**
98:10
163:20
269:21

**consciousne**
**ss** 210:7

**consent**
161:6
171:10
238:4

**consequence**
**s** 72:11,12

**consideratio**
**n** 152:3
204:14
228:12
249:19

**consideratio**
**ns** 73:10

**considered**
30:24 41:20
45:13 166:2
167:16
182:10
270:4,6

**constraints**
156:14

**constructive**
36:5

**consultant**
48:10,12,16

**consultation**
144:15

**consulted**
91:4 94:9
114:23
261:15

**contact**
180:14
190:5 192:5
237:20
251:14

**contacted**
169:10,19
186:23
188:13
213:2

**contacts**
169:13

**content**
110:18
221:2
262:14

**contents**
173:20
209:21

**contest**
20:13

**context**
38:20 39:13,
18 99:21
101:9 218:5

**continue**
48:1 204:18
237:23

**continued**
136:4 203:5

**contract**
27:23 102:4,
13 103:2,7,
10 156:4,9
175:14
191:21,22
263:3,8
264:8 265:1

**contractor**
48:17

**contractors**
80:22

**contractual**
103:8

**contrast**
141:22

**contravened**
62:16

**control** 68:6,
8 76:24

**controversy**
184:19

**conversation**
92:5 116:4
121:18
185:4
187:24
190:11
192:24
208:1,18
211:22
217:4,10
226:13

252:22
269:10
**conversations** 60:24
**convinced**
129:12
138:1
**cookies**
237:2
**cooperate**
262:2
**coordinating**
97:3
**corner**
219:17
**Cornett**
124:12,22
125:23
127:2 129:7
137:16
**correct** 8:9
20:5 25:7
32:19 33:24
41:24 42:2
71:18 85:6,
16 86:6 97:4
99:10,22,24
112:24
117:12
118:6 123:4
129:17
142:1
146:10,12,
15 165:9
168:10
196:20
197:14
206:2
236:12
239:13
244:18
245:23
247:2,5,7
251:9 257:8,
15,21
261:20
264:16
270:12
**corrected**
247:3
**correctly**
25:3,9
144:13
**correspondence** 113:4
117:1,5,14
175:3
**corroborate**
128:4 129:5
**corroborated**
225:17
**corroboration** 266:8,18
267:17
268:6,19,20
**costs** 14:17
**counsel** 5:12
21:23 105:3
136:4
180:12
210:19

247:1
**counseled**
105:11
**counseling**
36:5,15
**count** 61:15
**county**
145:18
243:22
**couple**
150:21
171:20
176:18
223:9
**courses**
80:14,17
**court** 5:6,7
11:14 12:1
14:11,12,17,
23 15:2
55:21 62:16,
20 63:1 65:4
**cover** 24:23
25:1
**covering**
20:16
**CPD** 83:24
93:4 145:17
**create** 151:2,
12,24
153:13
264:3
**created**
57:13 65:5
149:23
150:10,18
**creating**
58:11
**credible**
266:6
267:14
268:5,19
**crew** 69:12
**criminal**
18:15,24
28:24 29:6,
17,18,22,23
41:15
122:23
126:19
144:18
145:5,11
146:3
243:19
244:9
263:10,18
264:9,10,12,
14,17
**criminally**
41:23
145:23
**critical** 27:22
30:6,20,24
31:19 32:21
34:11 36:1,
11,18,20,23
37:1,4,17,21
38:4,16
42:5,8 43:1,
8,19 44:6,23

45:13 46:10
192:12,15
**criticize**
101:15
**criticizing**
59:16,22
**cross-
examination**
6:4 215:19
**crossed**
96:12
100:11
**cultural**
78:18
**Culture**
47:14
**cunt** 78:10
**curious**
18:20
**customarily**
161:24
162:2
**cut** 12:13
131:19
136:1
142:13
**cutting** 136:6

**D**

**D.C.** 47:11
**damage** 36:8
**dangerous**
73:1
**dangers**
36:21
**date** 164:9
**dated** 159:7
236:12
240:10
257:6
**dates** 128:7
134:23
**day** 19:10
21:4 38:13
51:6 76:7
77:5 80:4,5
82:14,17
172:2 190:8
208:8
239:11
240:4
270:17
**days** 51:6
77:5 82:14
**DCC** 33:12,
24 34:2
36:15
160:12
189:13,14
191:16
**deadly** 12:4,
9,19
**deal** 75:9
**dealing**
92:15

**dealings**
96:11
**deals** 103:7
**dealt** 74:1
157:23,24
**debate** 37:4
65:12,24
**debating**
207:22
**December**
123:15
159:7
**decent**
120:24
**decide** 24:11
28:8 30:10,
11 33:3
61:19 72:11
115:5 126:9,
11,17 139:8
151:1,10
203:1
232:23
243:22
**decided**
23:22 27:3
62:20 65:16
102:6 106:9
142:4
144:16
145:10,17
153:11
160:16
176:5
190:10
256:24
**decides**
211:22
**deciding**
46:9
**decision**
13:7 14:23
17:8 24:22
41:6 45:24
55:21 87:12
89:21
106:10,21
115:20
129:10,16
130:3
132:13
133:2 139:6,
7 149:18
170:19,21
173:13,14,
20 174:7,9
187:7
189:19
205:21,23
206:3
209:11,14
218:19
225:3,7
226:8
237:21
243:3
249:20
250:5
251:22
259:7,16,19
263:14
267:18
268:2

**decision-
making** 41:7
62:11
160:19
222:17,21
237:22
**decisions**
30:18 35:14
60:4 77:15
84:22 97:23
150:16
151:4 153:9
204:8,9,14
**Decker**
100:23
123:19
124:19
128:17,18
135:5
143:10,15
144:2,16
168:23
169:4
179:10
181:7,9
193:15
196:18
202:1
207:22
208:15
211:10,19,
20 220:18
222:13
231:20
232:4
245:13
246:1,7,11
247:17
248:10,19,
23 249:21
265:6
267:15
269:5,10
**Decker's**
141:15
168:5
210:11
267:18
**declined**
107:1
243:13
**deeply** 72:6
**defendants**
5:20
**defending**
78:17
**defense**
28:12
**definition**
26:6
**degree** 165:4
**delay** 66:6,7
**delayed**
61:14 65:3,
20,23
**delved** 72:5
**demanded**
74:6
**demote**
254:15

demoted
258:21

demotion
254:15
258:6
259:20

denial 131:2

denied 131:1
133:9

deny 128:21
269:2,12

department
17:18 23:9
50:6 53:19
54:10 63:11
69:5 78:21
80:17 91:4
92:21,23
95:10 98:11
99:21 112:4
176:17
245:16
248:2
253:12

department's
138:17
140:17

departmental
23:22 24:15,
18 25:12
28:1,4,9
30:14,16,17
33:8,16
126:13
199:9 227:1
256:17

departmental
ly 257:4,20

depend
86:18

depending
27:1 29:14
30:5 42:15
82:4 226:10

depends
38:1,20
39:17 43:2
44:7 46:4
114:16
131:18
158:6
226:23
262:13,19,
23 267:5

depo 25:17
244:20

deposed
7:24 18:5
19:13

deposition
5:2,9 19:9
216:4
270:23

depositions
6:13 11:8
18:2,3

deputy
27:10,12,18,
23 33:3
34:14,15
35:12 51:19

52:24 53:11,
12 70:14
100:12
108:21
109:5 111:7,
16,19
112:14
113:5 183:9
188:1,18
218:20
236:23
253:7,10,11
254:4
256:18

derogatory
64:9 77:19,
21 119:22
124:5
127:20
130:6,11
134:21
249:14

describe
102:23
135:1

describes
156:4
267:15

describing
191:18
268:4

description
57:13 58:2
177:12

desirable
163:23

desire 250:3,
4

destroyed
117:17

detail 156:4
207:6

details 166:1
246:16

detective
29:20 57:9
152:14

deter 200:23
201:5,11
229:15
232:17,23
233:1,17
234:1

determinant
27:2

determine
24:3 90:2
94:12 120:7
144:7
168:20
226:14

determined
34:10 68:19
74:7 144:2

determines
25:21
114:14

determining
103:13
152:5

deterred
251:7

deterrent
229:20

deterring
229:14
231:15

device 200:3
245:22

dialogue
47:19

Dick 221:15

difference
25:22 29:23
119:23
262:22,23
268:10

differences
75:2

differently
62:18 119:6,
9 213:4
237:5

differing
267:12

difficult
251:17

direct 95:21,
24 99:1
100:20
129:6 136:5
140:12
178:14
196:17
229:1
238:11

directed
45:19 102:3
173:16

direction
113:7
139:21
246:20
256:23

directions
146:6 262:5

directive
32:9 115:7,
16

directives
32:1,2

directly
71:13 96:24
99:18 100:7
101:4 110:3
114:19
116:20
117:7 139:2
154:1
172:10
183:7
213:10
251:4,12

director
28:16 48:22
49:8 91:5
197:22
256:14
258:23
259:2,6,13,

15

disagreemen
t 185:14

disagreemen
ts 97:19

disappointed
119:5,13

disband
152:8

disbanded
155:23

disbanding
149:16

discharge
36:17

disciplinary
30:22 42:14
105:1
197:21

discipline
23:23 27:16
28:13 33:13,
20,22 35:22
36:6 42:19
90:3,10,11,
16 97:17,20
100:17
101:14
104:19
256:13
258:9,19
259:11

disciplined
13:19
100:16,22
104:18

discouraged
72:17
192:22

discouraging
119:20

discovered
85:5 143:19

discretion
32:5

discriminate
d 70:6 157:4

discriminatin
g 85:12
192:7
201:18
205:11

discriminatio
n 7:3 12:14,
19 13:10
14:10 16:18
37:19,21
42:4,7,15
47:16 54:14,
21 55:11
83:23 84:1,
17 85:8,19
104:16
115:14,15
121:8 122:4,
8 140:15,18
197:24
198:11
209:15
233:18

242:20

discriminator
y 42:24 43:7
44:5,14,18
72:7 187:3,
13 196:14
201:1
223:13
241:6
242:11
251:21
255:3

discuss
151:9 208:1
237:6

discussed
49:10 72:3
83:7 149:21
150:2 156:6
157:11
195:22
208:1 217:5
222:7
226:12
231:11
239:23
240:10
249:24
250:1,10
252:16
269:21

discussing
48:20 49:1
139:3
206:16

discussion
61:7,11 81:2
86:10 107:3
149:15,23
154:19
175:22
212:6 231:9
252:9
263:22

discussions
15:18 30:20
48:9,11
239:24
240:6
252:11,19
253:14

dismissed
17:10

dismissive
103:22
104:2

disobeyed
242:18

disparate
90:10,11,16

disparities
90:2

dispatchers
92:13

dispute
207:14
235:7
239:16
240:17

disregarded
135:4,12

164:18

**disregarding**
135:17
137:7

**distance**
41:4

**District** 5:6

**division** 5:7
9:15 26:5,9
36:22 47:7,
9,11 49:17,
18,19 54:4,
16 63:13
64:9 71:3
76:3 79:23
82:9,18
90:22 98:12
117:1
118:23
121:3
151:16
155:15
187:8
224:10
249:16

**document**
110:12,15
116:18,23
117:9
167:10
257:17
265:5

**documentati**
**on** 133:11

**documented**
36:5

**documents**
82:7 108:7
182:2 188:8
189:16
235:22
260:9

**dogs** 92:3

**donors** 48:2

**door** 106:24
107:2

**double** 130:5
158:22

**doubt** 216:5
267:10

**Doug** 97:8,9

**downtown**
52:19

**dragging**
68:10

**Dragin** 104:9

**draw** 159:4
221:18

**drop** 224:3

**dropped**
121:9

**drug** 155:6

**drugs** 21:11

**drums** 101:9

**drunk** 78:3

**due** 51:1

**duly** 6:2

**Duncan**
58:5,10

**Dunlap**
253:11
254:1

**duties** 114:4
225:4 226:6

**duty** 13:5
96:14
106:15,18
114:12,21,
23 116:2
122:13
163:1
213:19
214:7,22,23
225:7,23
226:13,23
236:15,21
241:21,23
242:16,17
243:18
249:18,23
250:2,8,11,
21,23
252:10,15

─────
**E**
─────

**e-mail** 190:3
200:22
201:4,8
228:17
231:21

**e-mailed**
189:18
192:21

**e-mails**
192:8
256:20

**earlier** 50:7
86:10 88:21
164:10
199:12
217:5 222:7
224:6 228:1,
12 231:5
240:23
246:18

**earliest** 7:12

**early** 51:17,
18 52:3 53:7
112:19
114:4
153:18
241:3 261:9

**earned** 61:22

**easier**
219:20
251:11

**east** 12:7
53:5

**Eastern** 5:7

**eat** 146:17

**Echenrode**
99:16 117:9

**EEO** 44:10
58:11,18,21
71:20 75:14,

17,23 76:4,
17 78:18
79:12,15,17
80:1,9,15,24
81:2 82:2
90:22 91:7
93:21
115:15
200:21
201:16
237:17,18
240:24

**EEO-**
**RELATED**
257:14

**EEOC** 16:19
94:15

**effect** 64:24
68:18 78:20
168:7
185:23
235:8

**efficient**
183:20

**effort** 192:9

**efforts**
155:21
157:4 191:9

**egregious**
36:7 37:7
73:24 192:1
226:16

**Ehrenborg**
161:9
165:12,19,
20,24
171:14,15,
24 180:11
182:1,5
191:3,9,10
230:7,10
231:13

**Elias** 208:16
221:15,18,
22 222:12
223:15

**Elias's**
222:19

**eliminated**
154:3

**emphasis**
78:9

**employed**
46:17,19,21
49:17 91:11,
16

**employee**
48:17 93:8
103:23,24
203:24

**employees**
26:6 94:5
120:10
121:3
155:10,15
226:9 250:4,
16

**employment**
13:17 16:2
17:20 54:3
83:10 90:21,

22 204:5
212:19

**enact** 43:10

**enacted**
225:8

**encourage**
215:7

**encouraged**
44:18

**encouraging**
78:5

**end** 23:20
27:14 39:17
257:17

**ended**
145:18

**ends** 256:18

**enforce**
84:16
232:15

**enforced**
85:3

**enforcement**
7:15 8:14
49:12 50:1
75:20 99:11
145:4,9,16
146:13
152:10,19,
20,23
153:11,16
154:5,11
244:8 245:8
247:24

**enforcement'**
**s** 153:2

**enforcing**
84:22

**engaged**
225:14

**engagement**
47:22

**engaging**
163:10
200:23

**ensue**
237:14

**ensued**
35:10 146:3

**entered**
190:12

**entire** 23:11
24:3 69:12
88:4 132:24
150:8
180:22

**entirety**
23:14

**entities**
150:10

**entitled**
182:15

**entity** 150:3

**entry** 55:4

**environment**
38:5 56:7,15

57:3

**epithets**
63:10 66:23

**Equal** 53:23
54:4

**equates** 37:4

**equating**
241:9

**equation**
227:14

**equipment**
111:4

**Eric** 22:19
87:22 95:14
107:10
109:14
111:10
116:21
118:10
124:10,12,
21 127:2
209:14
219:11
243:8

**essence**
228:21

**essentially**
263:19

**established**
206:9 233:3

**estimate**
18:23

**et al** 5:5

**ethics**
184:21
186:11

**ethnicity**
77:19
168:16

**evaluate**
232:19

**evaluation**
227:19

**evaluations**
212:18

**Evans**
193:18
207:12
210:10
211:5

**event** 223:21

**events**
47:18,19
51:8 99:6,13
104:12
202:15

**evidence**
13:6,8,10
29:14 35:10
36:13 39:18
41:20 125:6,
14,24
126:21
129:5,12,14
130:18,19
132:11,18
133:17
135:21

160:13
204:13
226:19,22,
24 243:14
245:21
250:19
252:17
262:19
266:11
267:2,11,12

**exact** 126:5
141:6 212:5
239:15

**examples**
128:23

**exception**
167:14

**exceptional**
178:22

**excessive**
14:9,13,15
27:20 45:2

**exclude**
13:16

**excluded**
57:8 119:8

**excluding**
9:18 17:21

**executive**
48:22 49:7
80:11 151:9
253:1,5,9

**exempt** 42:6

**exercises**
77:7

**exhibit** 87:19
110:4,6,11
116:12,17
159:2,3
167:4
169:23
170:6
173:22
219:4,8
220:11,15
234:14,19
235:21
256:1,6,10
265:17

**exhibits**
218:23
235:12,16

**exist** 151:13

**existed** 66:5

**expand**
139:18
142:1 151:3,
14

**expansion**
140:21

**expect** 40:7
84:3,11,15
121:21
212:2
214:22
227:5

**expected**
66:16
202:14

**experience**
35:3 42:10
43:14 84:8
120:13
121:4
176:16
224:16
261:21

**experienced**
43:15 59:18
118:21
119:6,12
222:24

**experiences**
47:15 139:1
200:15

**explain**
25:16,22
36:1 45:23
71:22
126:21
137:17
138:24
173:5
186:15
218:15
230:23,24
231:2

**explained**
69:2 105:8

**explains**
232:9

**explanations**
230:16

**explicit**
119:17
121:8

**express**
59:21
212:14

**expressed**
212:9 241:5

**expressing**
59:16,23

**extended**
50:1

**extensive**
23:2,18

**extensively**
133:10

**extent**
225:17

———

**F**

**face** 14:22
62:8 68:12,
15

**Facebook**
155:14

**faces** 154:7

**fact** 41:16
46:8 55:3
66:8 71:8
130:10
143:16
171:20
188:24
190:3 199:3

231:11
242:7
243:11
245:12
247:23
267:14

**factor** 45:11
61:9 103:13

**factored**
46:8

**factors** 40:16
56:14
226:14

**facts** 233:14

**fail** 46:2

**failed** 36:11

**failing**
191:16
193:12

**fails** 26:15

**failure** 10:11
45:9,24
191:19

**fair** 9:8 10:24
20:10 206:7

**fairly** 111:2,3
152:22

**faking** 107:9

**Falacia**
104:8,14

**fall** 32:4
149:14

**false** 106:13,
16,17
113:14

**falsely**
168:12
169:2

**familiar** 58:7
184:22
185:14,15
217:14
221:2
223:22

**familiarity**
172:12

**families** 99:9

**family** 12:5,6
49:11 50:1
210:23

**faster** 148:14

**FBI** 243:21

**fearful**
207:11

**February**
22:12 151:6
236:12

**federal** 11:16
83:22 84:4
85:19
145:10
237:18

**feedback**
120:20
121:3,6

**feel** 19:22
21:6 31:17
33:8 44:17
104:24
121:22
129:4 132:4,
6,9 136:5,9,
19 140:8
159:6 200:8
215:24
227:4 268:6
270:1

**feeling** 37:6
61:8 78:20
119:7,8
188:20

**feelings** 60:6

**feels** 85:11
119:11

**fellow** 61:2
106:6

**felt** 13:5
24:21 27:19
57:24 83:19
94:12 121:5
131:1
139:11
157:3
182:14
190:22
212:24
214:20
217:16
218:3,16
233:3
242:11
255:10

**female** 62:1
74:10 77:9,
12 78:7

**fess** 56:1

**fight** 14:18
128:24
195:5
198:24

**fighting**
127:15
135:11
137:13

**figure** 43:24
100:10
265:7

**file** 22:23
23:3 28:4
71:21,24
74:7 75:3
108:8
112:11
162:15
169:12
256:24

**filed** 11:22
12:3 13:20
16:18 17:3
22:4 59:5,11
89:10 95:8
104:14,18
144:5,17
153:21
179:8,9
256:21

**files** 25:4

**fill** 50:24
151:20
152:5 163:4

**filled** 23:19

**filling** 176:24

**final** 61:14
66:1 259:16

**financial**
198:10
224:8

**find** 29:16
79:13 152:2
155:21
166:16
223:10
229:11
231:4
233:13
251:17
264:3 266:6,
9

**finding** 14:14
17:12 88:21
89:2,5 231:7
256:13
267:23
268:8,9,11,
21

**fine** 39:23
81:18
146:19
232:2 247:9
267:3

**finish** 87:6
131:8,14,16
135:20,23
136:16,17
137:2
142:14
194:11,20

**finished**
39:23
131:21,23
135:24
137:1,3
217:1 270:9

**finishing**
136:2

**fire** 77:1
78:12,20
148:14

**firearm**
36:19

**fired** 227:15
254:6,8,13

**firefighters'**
78:13

**fit** 75:7

**flagrantly**
191:13

**flip** 219:9
220:2

**flying** 154:18

**focus** 9:8
76:9 87:1
120:18
121:20
126:14

140:16
198:11

**focusing**
8:19 16:1

**follow** 20:8
25:14 31:21
36:12 86:2
94:14
103:10
138:20
140:22
141:2,17
146:1
175:14
191:16,19
193:12
212:2
222:11

**follow-up**
141:12

**food** 146:21

**football**
96:15

**FOP** 71:4
102:5 103:8
191:22
250:6,7
263:7 264:4

**force** 12:5,9,
19 13:16
14:9,13,15
16:2 26:23
27:3,5,20
45:2 67:22
261:5,6

**foregoing**
271:3

**forever**
156:15

**forfeiture**
28:14
259:12

**forgot** 20:19
148:10
149:10

**form** 7:3
42:7,14
181:5
206:21
215:11
266:8

**formal** 25:10,
12 33:12
71:16 72:22
74:22 75:11
105:1 205:5

**forms** 42:6
43:7

**forward**
34:12 113:9
115:1 203:7,
12,17 204:3,
17

**forwarded**
174:19,22,
24 175:7
240:11

**found** 14:15
17:21 35:10
105:4

113:23
124:4
134:19
165:11,19
191:18

**foundation**
47:3,5 48:21
49:7

**Fred** 5:13
81:8 124:13
131:8
135:22

**free** 21:6
78:3 132:4,6

**frequently**
76:2 82:12
178:7

**Friday** 51:15

**friend** 91:21
97:14 98:19
99:4,23

**friends** 93:16
210:24

**front** 68:1
69:12 82:8
193:6

**full** 21:4
82:17 132:2

**fulls** 47:10

**fully** 28:18

**fundraising**
48:1

**funds** 47:9,
20

**Fuqua**
120:13

———

**G**

———

**game** 96:15

**games** 61:1

**gamut**
262:17

**Gary** 98:1
253:17
254:1

**gather** 38:21
71:19

**gathering**
84:7 178:1

**gave** 68:17
74:9 156:7
170:24
196:8
207:13
210:12
246:19

**gay** 71:3,6,8
72:20

**gears** 234:3

**gender** 13:12
63:6,7 71:10
77:20
119:10,24
168:17

**general**

23:12 24:19
115:17
169:21
196:3
224:17
266:14

**generally**
23:19 25:11
26:20 30:19
87:7 155:8
232:10
252:21
261:5

**gesture**
223:2

**giant** 265:17

**gigs** 49:3,5

**girlfriend**
106:11,15,
17,23

**girlfriend's**
106:24

**gist** 209:20

**Gittes** 5:13,
22 6:5
81:10,14,17
123:22
124:15
131:9,12,16,
21 135:24
136:13
144:10,12
146:16,20,
24 158:7,12,
15,18
159:15
166:21
170:2
173:23
215:18,22
216:2,7,10,
14,16 234:7
247:10,14
255:15
256:4
270:18

**give** 18:4
42:6 46:6,11
73:10 79:17
113:6 132:2
141:21
158:8
169:24
174:10,16
235:9,12
270:10

**giving**
129:13
131:23
156:5
170:15
259:2

**goal** 191:4

**good** 13:4
39:4 60:20
110:21
111:12

**goody** 61:5

**Gordon**
89:17
142:23

**gotcha** 63:2

**grabbing**
223:2

**graffiti**
63:21,22

**Graham**
58:10

**grasp** 188:21

**Gray** 108:23
183:11,18
188:18
252:24
253:15

**great** 78:10
156:4

**Green** 12:5

**grievance**
104:14,19

**Grizzell**
239:11

**group** 47:6
54:3 60:4
65:18 66:20
120:11,18

**grouped**
258:11

**grumbling**
59:14

**guard** 213:18

**guess** 73:20
101:15
105:17
122:11
149:6
220:21
222:23
230:20
258:4

**guesstimate**
18:4 19:4
22:5

**guilty** 14:15
268:18

**gun** 68:4
207:19
223:3
241:21,24

**guy** 67:24
68:10,15,21

**guys** 78:12,
15

**Guyton** 92:7
93:15

———

**H**

———

**half** 80:5

**hall** 207:20
221:17
223:4

**hand** 38:8
220:14
221:17

**handcuffed**
68:5,22

**handcuffing**

27:4

**handcuffs**
45:4

**handed**
110:10
116:16
159:2 167:3
170:4 219:8
234:17
235:20

**handful** 22:8

**handle** 75:8
160:19

**handled**
13:21 233:7
258:19

**handling**
140:17,18

**hands** 29:20

**hang** 158:3,7
163:11
176:15

**hanging**
61:4,5

**happen**
38:11 41:4
42:21,22
44:16 70:19
71:7 82:3
177:3
218:13
241:10

**happened**
17:11 29:16
31:5 44:16
51:24 52:16
61:17 64:10,
12 66:15
68:19 70:13
74:1,4 83:19
101:24
115:2
132:16
145:19
153:18
175:21
180:22
195:19
223:6,14
236:18
240:17
241:9,20
244:23
265:8,9

**happening**
59:24 82:12
185:7
203:11
205:2

**harassing**
106:2,6

**harassment**
44:10 69:11
81:3

**hard** 153:9
222:19

**harm** 40:21
226:7

**hat** 26:15
31:6 115:23

hate 7:10

head 16:12

health 21:14

hear 38:12
59:2,8,14
60:21 63:10
66:23 67:13
90:14
119:12
120:18
131:23
133:18
136:12
173:13
211:13

heard 28:16
42:16 56:24
60:14 63:17
64:20 67:7
69:4 83:9,11
90:7 104:23
110:19
127:21,24
128:18
129:23
130:11
133:5,7
135:7
148:18
181:13
184:1 185:1
196:13
248:14

hearing
28:11 54:9
67:15 127:7
184:17
185:3,11
197:21
255:10
256:17,21
257:17

hearings
101:6,7

hears 131:17

held 30:21

helped 111:4
120:14

helpful 7:11
8:4

helping
47:20

Henry 12:5

hesitant
71:24 72:3,
21 73:4

hey 69:14
81:8 150:21
213:22

high 151:14

higher 27:7
33:11 65:15
70:4,7

highest
224:19

hindsight
167:9 225:1,
2

Hines 14:11

hire 48:21
79:4

hired 55:1,3

hiring 54:19,
21 56:13
91:18
151:16
164:2
209:16

historically
82:5

history 47:14
264:1

hold 37:10
86:23

hole 151:21

holes 50:24
152:5

Holocaust
47:12

Homeland
183:17

honestly
121:21

hope 181:2

hoping 16:10

hostile 56:7,
14 57:2

hotels 155:6

hour 20:18
37:1 80:6
81:13

hour- 82:14

hours 51:5
74:20 80:22
82:18,19
258:10

house
213:18

HR 91:6,7
92:20,24
93:4,6,7,20

hubbub
68:12

huge 262:21,
22

human 91:2,
4 92:24

hundred
18:10,13
214:11

hurt 200:7

hygienist
93:10

hypothetical
196:8

_____

I

IA 105:6
133:11

IAB 22:22
23:8,12 24:2
25:3 32:18
34:12,19

52:7 67:18
86:11,12
90:4 93:21,
23 104:1
108:8
113:12
134:11
135:14
138:19
139:7
141:17
145:6,12
160:23
162:15,23
169:9
175:24
198:7
204:24
217:21
218:1
261:11,22
266:14

IACP 80:22

idea 6:22
88:11
152:11,12
155:1
182:20
190:16
243:10

identical
125:22

identification
110:7,10
116:13
219:5
220:12
234:15
235:17
256:7

identified
159:2 167:3
170:5
220:15

ignore 42:17
44:9

illegal
148:16
155:7 200:3
243:6
245:22

imagination
6:12

imagine 6:11
77:14

immediately
29:16 54:23
180:20

imminent
38:11

impact 226:8
233:10

impacted
15:19

impartial
105:6,15

imperative
105:5

implemented
52:15

implementin
g 94:20,22

implicit
120:21,23

implying
186:1

importance
105:12

important
61:23 224:7

impression
82:2

inaccurate
235:3

inappropriate
70:1 106:7
138:4

incident
67:13 138:5
208:17
221:21

incidents
67:11 69:24
101:5
138:15

include 13:8
35:4 73:6
169:18
205:12,21,
24

included
64:14
112:11
127:22
185:9 186:4
197:3 202:4
206:1
269:13,16

includes
12:18 142:6

including
21:6 30:12
58:8 70:3
138:16
142:12
171:21
200:5 253:6

income
46:22

independent
48:16 83:22
134:13

indicating
195:11
197:1

indication
116:19
175:6 182:4
243:13

indicator
117:6

indirectly
71:14

individual
88:2 195:7
226:6

individually
74:18

individuals
59:17 61:8
85:10
168:12
175:17
225:14,15
251:5

industrial
93:10

inequities
57:14,24

informant
148:9

information
43:3 46:4
94:11 105:1
107:23
132:10,17,
20 133:21
135:17
137:7,8
142:20
160:22
167:23
174:1,15
180:3 181:8,
11 183:6
193:6
194:22
195:16
196:3,22,24
197:4
198:12
202:11,16
206:15,24
211:2
212:10,23
218:17
221:11
226:2,10,18
237:13
239:8 243:2
249:12
266:22
269:6 270:8

information's
240:9

informational
154:12

informed
123:8,12,17

infrequent
150:24

initial 31:3,9
89:1 108:3
123:16
161:7
162:21
163:14

initially
51:13 53:5
226:22

initiate
114:11
199:9

initiated
35:17,18
206:23

initiating
142:3

injury 27:4

inquiries
144:4
168:22
188:9,16
inside 50:18
insisted
44:14
instance
207:18
instances
64:7 71:15
instituted
75:17 76:4
instruct
141:17
172:23
215:23
248:22
instruction
170:13,16
189:8
instructions
142:1
169:19
instructor
76:24 77:6
78:5 106:3
instructors
80:21
insubordinat
e 191:13
insubordinati
on 36:10
37:13
189:10
191:18,24
192:3
193:11
insulting
76:22
intended
41:17 214:3
intent 41:20
194:17
intention
21:5
intentions
229:10
230:21
inter 163:10
interaction
47:23
interactions
100:24
interest
187:8,10
interested
13:17
140:14
183:3
202:12
225:19
internal 13:6
24:16 25:11,
20,23 26:2,
3,7,9,13,17
27:16 29:3,
21 31:1

32:1,3,7
33:4 34:16,
24 52:4,8
56:22 64:23
80:20 90:19
94:17,21
95:4 100:18,
20 102:14,
24 103:7,9
105:12
112:10,13,
17,19 115:9,
17 118:9
145:24
169:14
178:10,16
213:2
218:19
236:7,9
246:10
253:3
255:14
260:8 261:3
262:10
interpret
112:2
194:18,21
interpreted
194:16
interrupt
20:20 39:11,
22 82:21
86:22 136:9,
11 149:8,10
227:21
interrupting
136:10,15,
19
interruptions
136:4
interview
87:20 102:5,
7 105:16,20,
21 107:1
118:11,20
121:14
143:10
175:16
176:5,18
178:5
179:22
181:6,8,24
184:7,8,10,
12,14,17
185:5,6
187:9
190:19
193:1 202:1
209:4 217:6,
12 218:4,7
220:17,19
227:7,8
230:6 232:5
interviewed
118:8
124:19
134:22
143:10
177:10
178:12
179:11
183:2
185:18
186:20

189:17
199:2
242:10
interviewing
177:2,4
interviews
93:22,23
94:8 106:10,
22 107:24
123:19
126:23
127:19
135:5
138:12
168:6
178:15,17
179:23
180:15
184:5 186:9
190:19
202:17
206:17
207:15
221:7
investigate
30:10 32:6
90:22 115:6,
24 142:5,8
146:4
248:20
260:18
investigated
26:3,23 32:3
34:18,24
35:15,19,22
64:21,22
107:22
111:22
112:10
115:22
138:9
139:12
141:8
145:23
162:22
195:20
196:2,5
218:18
236:8 246:9
248:3
260:24
261:2,7
269:19
investigates
25:23 26:7
investigating
52:12,13
84:23 90:21,
24 143:18
169:9
202:11
205:12
243:12
246:12
248:23
investigation
22:19 23:1,
7,11,18 25:1
26:13,17,18
27:14,15
28:21 29:10,
17,18,22
30:1 31:2
33:1 35:9

37:14 48:10
57:2 86:17,
18 87:7 88:2
95:11
105:22
107:17
113:13,18,
20 116:21
118:10
123:9,13
133:1
134:11
135:3 138:9
139:18,20,
24 140:22
141:15
142:19
143:1,5,9,14
144:23
146:2,3
148:17
157:1,8,14,
20 160:3,12
162:14,16
163:18
164:16,23
165:2
167:20
175:24
179:15,17,
20 180:1
184:3
186:14,15
190:16,20
192:8
193:13,23
194:1
195:17
197:4,19
198:8,9
199:17,20
202:20
203:2,14
205:5,15
206:21,24
207:1
209:21
210:13
212:22
213:1
219:11
220:3,8
224:24
225:10
226:11,15
236:6,9
237:14,16
242:20
246:17
256:16,19
261:6 262:9
264:4
265:15
269:17
investigation
's 27:2
investigation
s 23:13,20
24:17 25:12,
18,21 27:9
28:24 81:1
86:11,13
90:4 91:3,7
93:21 94:2,4
105:7
115:17
202:24

203:3
204:12
261:4,14,16,
18 263:6
investigative
160:23
207:7
219:10,14
236:11
investigator
101:6,7
139:7
223:15
261:3
investigator'
s 169:13
investigators
169:17
invitation
161:18
invited 61:1,
2
involve 7:2
31:21
involved
8:17 9:4
12:13 13:12
15:3,9,13,17
27:11 31:11
34:11 39:13
41:16 48:9
56:2,6,17
91:17 93:21
94:1 100:17
103:21
106:9 114:3,
6 152:21
154:19
160:19
163:5
172:21
178:17
194:5 223:7,
12 225:13
241:3
253:13
259:6
263:14,21
involves
13:9 259:9
262:6
involving
6:18 7:13
12:4,9 17:18
104:12
184:17
220:4 221:6,
22 222:19
Irish 78:2
isolated
57:11
issue 30:22
31:8 33:7,11
57:7 103:12
110:20
128:10
143:4
145:11
159:24
163:21
189:9 192:6
205:9,10

210:4,21
224:8
227:16

**issued** 27:17
28:3 58:7,9,
11 89:21
90:3

**issues** 80:15
103:8
140:18
141:23
157:10
165:7
174:21
184:2
187:17
198:10,11
208:15
232:18
259:21

**issuing**
217:19

**Italian** 77:24

———

**J**

**Jackson**
70:23,24

**Jacobs** 5:2,
21 6:1,7

**James**
120:13

**January**
49:23
170:22

**jaw** 14:22

**Jeff** 5:15

**Jeff's** 159:11

**Jennifer**
100:1,16
101:20
144:3,15

**job** 50:17
51:18 57:13,
17,19 58:2
62:2 155:21
156:18
159:24
163:2 165:6
166:17
170:19
171:13
173:3 174:4,
11 177:12,
16,21
182:11,16
187:24
189:20
191:5
193:19
194:10
198:20
199:3 200:1,
9 201:12
204:23
210:22
211:9
212:14
217:17,19
224:6,13
227:5,24
228:18

229:15
231:22
232:13,24
242:13
250:15

**job-related**
229:7

**jobs** 156:9
163:7

**John** 193:18
210:10
211:5

**joined** 9:15

**joke** 38:7
112:1

**jokes** 72:23

**joking** 38:22
39:5,14,16
40:16

**Joseph**
70:22

**judge** 58:5,
10

**judged** 44:24

**judgment**
9:1 14:3
31:9 222:2
223:9

**July** 55:19

**jump** 249:16

**June** 151:6

**jungle** 77:17

**Justice**
95:10

**justification**
173:14
232:10,11

**justifications**
126:23

**justified**
268:2

**justify**
173:12

———

**K**

**K-9** 179:2

**Karl** 5:4
143:16
153:20
154:8 155:5
157:10
171:21
172:12
176:7 182:9
183:2 185:4
197:1
199:23
200:12
204:22
207:10
210:16
211:22
212:3 213:8
214:19
215:13
217:3 218:4
222:6,13

245:13

**Ken** 100:23
253:23

**Kent** 12:2

**Kerins** 74:13

**kicked**
68:11,15

**kill** 41:19
195:8 200:7

**killed** 68:14

**killing** 45:3

**Kim** 69:14

**Kimberley**
5:2 6:1,7

**kind** 13:11
19:8 25:15
46:14 57:11
63:22 67:7,
16 76:9
87:11
104:11
113:7,15
118:24
133:16
139:3
187:16
196:1
200:23
213:7
244:10
252:21
259:4
261:23
263:5 268:7

**kinds** 45:10
48:15 64:16,
19 119:19
184:3
187:17
188:13

**King** 12:6

**knew** 56:10
60:23 91:12
113:12
128:16
134:13
152:1
157:18
161:14
163:24
164:15,16,
22 165:1
171:3 178:2
182:13,16,
17,20
187:22
189:7
194:23
195:1,11
196:10
202:15
221:11
222:18

**Knight**
100:1,17
101:21
104:12,21
105:17,21
106:8 144:3,
15 254:3

**knocked**
106:23

**knowing**
179:15

**knowingly**
103:6

**knowledge**
35:15,19,24
56:16 97:2
100:24
114:16
124:2
133:15
134:9
153:23
161:16
172:14
177:7 186:7
188:17
195:18
199:8
205:18
242:6
244:11
253:12
254:8

**Kuebler**
236:24
237:1
253:23

———

**L**

**LA** 184:19

**labeled**
256:14

**lack** 125:14
141:20

**Lanata** 51:19
70:14

**Lancaster**
171:21
172:3 176:7
179:22,23
180:15
184:5
185:18
188:11
189:3,12,17
190:4,8,20
192:5,19,24
193:18
197:2
228:18
242:8,10

**Lancaster's**
172:15

**Lane** 5:9

**language**
67:7,16
127:2 138:4,
17

**large** 66:20

**late** 26:16
50:19 51:23
52:23 57:14
80:11
108:23
153:18

**laundry**
32:16

**law** 7:14 8:13
49:12 50:1
75:20 83:23
84:4,5 86:3,
5 99:11
117:19
138:18
145:3,9,16
146:13
148:9 200:4
202:8
237:18
244:8 245:8
247:23

**laws** 84:9,16
85:20 86:2
115:16

**lawsuit** 8:8,9
9:19 10:14
11:22 55:19
56:17 57:4
58:5,24 59:3
65:19 66:8
88:16 89:10
95:8 153:21
179:8 198:6

**lawsuits**
9:24 11:11
12:9 13:21
16:3,5,8
61:17

**lawyer's**
14:17

**Lazar** 11:19
13:2

**lazy** 135:10
186:1

**lead** 38:10

**leadership**
77:8 80:12

**leading**
243:17

**leads** 48:24
226:3

**learn** 122:11

**learned**
116:2 157:7,
20,23 159:9
168:13
180:18
205:14
209:9 217:9

**learning**
47:15
143:13
155:22
185:16
207:11
243:18

**leave** 28:14
197:17
251:11
259:12

**leaving**
94:16
215:15

**led** 188:8

**left** 78:20
111:10
126:9 148:7

188:5

**left-hand**
219:17

**legal** 30:2
83:15

**legally** 83:5

**length** 24:2,4

**lengthier**
204:18,19

**lengthy**
23:21 180:2
202:24
204:11

**lesser** 23:22

**let alone**
206:16

**letter** 109:24
110:2,18
111:21
112:8,15,23
113:6 116:7
121:12
127:4 164:1,
6 166:12,19
167:13
173:8,9,17,
19,21 174:6,
21 175:7
190:9
206:16
239:12,17
240:1,5,15,
17 258:6

**letting**
237:22

**level** 27:6,7,
21 32:23
33:6,12,23
35:8,22 36:6
42:18 45:5
152:15
209:22
210:7 226:4
258:9

**leveled** 26:9

**levels** 258:18
259:1

**liaison**
152:13

**lied** 167:10

**lieutenant**
11:22 12:15
30:8 50:21
51:12,20
74:5,10,13
76:15 77:2
78:16 85:11,
13 96:2,11
98:24 99:16
105:17
159:8 176:5,
18 177:2
178:3
179:12
181:19
183:1
188:10
189:1
207:24
210:15,20
211:3,4,12,

19,24 212:2,
15,24
213:16
214:3 217:2,
11,16,20,24
218:15
221:16,19
222:5,10,16,
20 236:10,
14 237:23
239:13
241:10,16
256:12

**lieutenants**
28:6 31:11
84:15

**light** 30:23
46:12 149:1
193:10
218:6
250:24

**lightly** 250:5

**lightning**
142:21
143:19
144:5,16
148:8,11
199:12,18
207:16
208:16
210:3
245:14
246:13
248:24

**likelihood**
124:5

**limit** 115:11
156:1
210:23

**limitations**
115:4

**limited**
156:23

**limits** 244:15

**lines** 29:13
36:12 60:12
107:14
185:2

**link** 142:21
143:20
144:5,17
148:8,11
199:13,18
207:16
208:16
210:4
245:14
246:13
248:24

**list** 16:8
18:19 32:16,
20 55:4,5,6,
15 61:14
65:13,14,15
66:1,3,4,18,
21 77:7,21
102:6
158:12,13
161:19
171:23
178:4
186:20

**listed** 32:8
160:4

**listen** 120:8

**listened**
212:5

**lists** 65:5
169:12

**litigated** 57:7

**lives** 92:1

**LLC** 5:10

**located**
111:1

**log** 117:5,11,
13,14

**logged** 113:4

**logs** 117:21

**long** 21:4
49:21 50:11
77:7 80:8
91:10 92:11
98:1 99:19
100:13
102:8 107:2
123:11
146:17
156:2
203:14,24
219:19
250:12
270:17

**longer** 203:1

**longstanding**
111:3

**lookback**
34:5 79:24

**looked** 22:22
30:1 74:11
102:9 104:2
210:2

**losing** 69:15

**lost** 14:19

**lot** 13:19,20
39:13 42:10
60:17,24
61:3,6,10
79:17 84:22
95:7 96:13
107:24
119:10
120:9,10
150:1,4
151:12,15
152:18,20
153:2,10
154:6,7,18
155:9
185:12
194:16
203:18
251:11
262:14
264:3

**lots** 36:3
172:2
247:13

**loud** 266:3

**lower** 33:22
151:18

192:1,2

**lunch** 146:17

**luncheon**
147:4

**lying** 37:14
168:8 199:1
257:10

———

**M**

**made** 9:18
13:7 17:7
20:18 30:19
31:10 41:22
42:11 45:19
51:8 52:10
56:20,21
60:5 68:17
69:22 70:3
71:3 94:18,
19 95:7
106:13,16
107:11
108:13
109:13
115:18,21
118:23
124:9,20
125:15
127:1,13
129:6
130:13
134:7,15
135:12
138:8,10
139:5,7
140:6,9
141:8
143:16
150:8 153:3
162:15
163:15
165:14
166:11
170:22
173:20
174:7,8
175:11
181:20
184:5
185:12
186:16
187:7
188:12,16
189:19
191:9 192:6
195:24
197:20,22
200:4
202:17
206:2
209:11,14
216:7
218:18
221:14,15
222:14
223:2
225:16
234:22
238:24
242:22
247:3 250:9,
13 251:8
259:17
260:15

269:1

**mail** 117:14

**maintain**
68:6 153:5

**maintained**
117:17,18

**maintaining**
151:17

**make** 16:1
19:12 24:22
25:8 28:12
30:4,11,21
35:13 39:21
40:6 41:4,5
44:4,12 68:7
71:16 74:22
75:11 78:23
84:21
103:15
105:23
106:17
115:9
118:13
125:14
128:9 129:4,
23 130:21
131:9 136:3
141:24
144:8,12
148:22
149:6
150:15
151:4,6
153:9
156:12
159:16
162:12
168:22
173:13
180:9,13
187:15
188:9
196:13
200:3 201:3
203:2,20
204:13,18
212:16
218:14
222:12
234:9
241:19
242:24
243:3
248:13
250:13,22
251:16,22
256:22
259:16
263:13
267:3
268:20
269:7

**make-up**
169:1

**makes**
119:13
262:21,22
267:23

**making** 59:9
66:24 72:22
77:15
103:22,24
104:2
112:10

115:1 130:5,
7 131:1
133:2
148:14
149:17
150:12
163:16
187:5 195:3
198:21
205:16,20,
23 226:8
232:18
249:12,13,
20 254:8
263:11,18
264:21

**male** 62:8
74:11 77:8,
11

**man** 12:6

**managed**
153:1

**management**
42:13

**manager**
91:6 92:24
93:6

**managers**
76:5,20

**managing**
43:18

**mandate**
80:8

**mandated**
79:1

**mandatory**
83:3

**manner**
164:17
179:11
217:5

**manual**
57:13 58:2
177:12

**March**
236:15,16
240:11

**marked**
110:6,10
116:12,16
166:21,22
169:23
219:5,8
220:12
234:8,15
235:17,20
256:7

**marks** 81:22
148:4
216:20

**married**
106:19

**Mary** 5:8

**match** 86:1
154:7

**material**
143:15

**materials**
80:16

**matter** 31:10
43:21 46:2
144:17
145:5 172:1
242:13

**matters**
92:16 93:21

**Mayor** 153:4

**Mcfadden**
11:23 12:16
236:10,14
237:6
239:13,19
240:6,21
241:10,16
251:1 254:7,
13 256:12

**meals** 47:18

**means** 38:9
39:8 40:18,
20 83:5,13
84:22 87:6
109:21
117:4 132:2
191:6 197:6
228:9
229:12
231:13
248:2

**meant** 10:16
40:22
145:12
227:18
246:8

**media** 81:23
148:5
216:21

**mediation**
89:7,13

**mediator**
89:17

**medications**
21:10

**meet** 21:22
75:21 95:13,
14 98:18

**meeting**
120:11,14
154:4,9,12,
13,22
190:21
207:24
210:16,18
217:2 222:6

**meetings**
120:8,9

**Melissa**
236:10
254:6,13

**members**
26:9 47:9,24
49:11 253:9

**membership**
49:2

**memories**
20:14 40:7

**memorized**
185:21

**memory**

20:13
103:20

**memory's**
149:7

**menacing**
41:24

**mention**
184:15
211:7

**mentioned**
12:24 18:3
37:13 40:15,
16 42:4
53:16 58:9
65:2 185:2
193:22
199:12
208:16
224:6
226:16

**mere** 247:23

**merit** 104:22

**merits** 44:24
243:23

**message**
193:17
194:2
196:24
201:5,22
202:16
208:18
210:9 213:7
225:17,22
227:9,15
228:13,15,
21 229:13
231:4,7
232:23
233:16

**messages**
119:17
206:17
239:4

**met** 22:1,3,
10 91:14
92:17 96:10
98:21 155:3
172:6

**method**
165:22

**methods**
233:4

**Michael** 5:9
253:23

**mid** 52:21
55:12 76:5,
20

**middle** 20:21
21:8

**miles** 36:24
37:1

**mind** 38:4
89:9 110:18
161:2 182:5
184:16
231:10

**mine** 10:11

**minor** 26:15
27:4

**minute**
210:15

**minutes** 41:2
234:4

**miscellaneou
s** 203:18

**mischaracter
izing** 197:13

**misconduct**
13:5 26:8
27:10,21,22
30:6,24
31:19 32:21
34:12 35:5
36:2,11,18,
20,23 37:2,
4,17,21
38:4,17 42:5
43:1,9,19
44:6,23
45:14 46:10
52:12 67:20
86:20
102:18
105:11
138:16
191:16
192:12,16
220:5

**mishandled**
13:6

**misinformed**
180:7

**misled** 168:4
169:2
227:20
228:13

**misreading**
230:15

**missed** 18:8

**missing**
257:10

**mission**
153:15

**misstatemen
t** 247:6

**mistake**
20:18 180:7

**misundersta
nding** 230:14

**modifying**
149:18

**moment**
48:14
110:11
170:8 197:9
224:4
234:20
270:12

**Monday**
51:16 148:1

**money** 31:8
141:22,23
263:19

**monkey**
112:5

**monkeys**
125:16
135:9 195:4

198:23

**month**
253:18

**months**
22:16 34:3,7
37:9 66:10
115:2
123:16
205:9

**Moore** 22:19
87:22,23
95:14
107:10,13,
19 109:14
110:20
111:10,24
116:2,21
118:10
123:9 124:9,
10,20
125:14,15
127:1,13
128:5,21
129:5,23
131:1 133:9
134:15
135:7 139:2
140:24
141:15
142:4,20
143:18
154:22
157:21
158:4 161:5,
17 162:11,
20 163:9,13,
17 165:13
166:7,13
167:10
171:4,7,9
173:5
175:16
180:1,10,13
181:22
187:16,20
189:3,11,16
190:3,11,21,
22 191:12
192:23
193:14,17
195:3,18
196:13,23,
24 197:21
198:16
199:18
204:22,23
207:18,23
209:14
210:10
211:2,5,8
213:1 214:6
217:18
220:18
221:16,22
222:1,14
225:4 231:1,
12,20 232:6
240:24
241:2,11
242:12
243:8 246:6,
8,9,19 249:5
250:3 252:1
253:14
266:6
267:14

268:24
269:1,11
270:5

**Moore's**
113:13,14
123:17
127:20
132:22
198:2
207:11
219:11
220:4 227:7
230:17
233:15
242:2

**morphed**
152:16

**move** 27:17
203:7,12,17
204:3,16
207:8
214:16
215:21
251:13

**moved**
150:10
154:23
240:6

**moving**
151:20
223:20

**multiple**
82:14
134:16
195:2
196:11
249:3
251:16

**multiplying**
107:20

**multitude**
12:10

**Museum**
47:12,14

---

**N**

**named** 8:8,9,
11 9:23 12:3
13:15 14:1
15:13,14,22
104:8

**names**
124:17,24
154:6

**narcotics**
111:11
154:24
157:5,15,19
158:2 160:1,
20 161:7
164:20
165:6
181:21
183:16
184:12
197:2 198:2,
21 206:6
210:22
224:5,18
225:20
251:24

**National**
47:13

**nature** 30:20
42:24 43:11
130:9 212:5
220:6 226:5
263:18
264:10,12,
15

**necessarily**
16:16 19:15
62:11 128:3
130:12
187:11
204:4
227:13
249:18
268:15

**necessity**
150:5

**necklace**
29:13

**needed**
24:21 51:9
103:9
111:22
112:9
139:12
150:2,23
152:14,15
214:21
218:17
244:24
261:19

**needing**
77:17

**negative**
59:9 64:5
130:5

**neighborhood** 92:1

**newspaper**
155:13
234:18

**niggers**
112:5

**nights** 51:14

**non-supervisory**
238:5

**normal** 31:20
176:17

**North** 52:19

**northwest**
52:20

**notes**
169:11,16

**notice**
156:21
163:3
257:19

**noticed**
120:3

**notices**
156:6

**November**
50:20 76:15
123:10

**number**
11:10 12:4,8
15:11 32:11
43:2 58:8
78:12 81:23
82:10 91:1
101:5,8
107:20
121:2 135:5
148:5
151:12,14
156:10
168:11
170:1 184:2
202:23
204:1 213:3
214:2
216:21
219:21
230:21

**numbers**
32:12
151:19
219:18,21

**numerical**
158:19

**numerous**
200:4

---

**O**

**oath** 246:22

**object** 144:7

**objecting**
247:12

**objection**
10:7 18:12
34:20 37:24
39:1 41:21
43:20 45:21
59:12,20
63:12,24
65:9 67:2,8,
14 73:2,8,18
75:4 82:6
83:6,14
85:21,24
86:14 88:24
90:5 104:5
109:15
122:6
123:21
124:11,13,
23 125:8,18
126:1 127:6,
16 129:2,9
130:1 131:3
133:19
134:8
135:15
137:19
138:7,21
141:19
157:6 161:8,
10,21 164:4
165:17
167:11,22
168:15
169:6
174:23
175:19
176:8,21
181:23
182:12

**obligated**
85:13 131:2
132:9

**observe**
63:10

**obvious**
220:2

**occasion**
97:16
101:24
134:17
247:3

**occasionally**
29:21

**occasions**
67:7 101:8
134:16
145:15
204:1

185:8 186:3,
13 187:1,19
188:15
189:5,23
190:13
191:1,14
192:13,17
193:2
194:11
195:10
196:15,21
197:7,12
198:4,17
199:6,14
200:10
201:2,13,20
202:5,9,21
205:3,19
206:8 208:4,
20 209:7,19
210:5 212:4
213:9,13
214:10,15
215:2,16,18
216:8
217:13,22
218:11
221:20
222:3,15
223:17
225:6,24
228:23
229:8,18,24
230:11,19
231:24
232:8,21
233:2,19,22
235:4 237:7,
11 239:14,
21 240:8,19
241:8
242:14,21
243:7,9
244:1,5,12,
17 245:2,17,
24 246:5,15
248:4,12,16
249:6,10
251:10
252:3,7
253:16
254:10,12,
17 260:20
261:1 262:4
266:20
269:4,14,23

**occur** 119:14
174:14
177:6,8,13
252:20

**occurred**
42:24 67:11
71:12 85:16
114:17
133:12
150:11
170:20
176:10
180:4,6
224:24
252:11

**occurring**
130:23
221:23

**OCRC**
142:23
143:4 145:1
210:7

**October** 9:15
118:8
123:10
151:7

**offended**
69:16

**offending**
70:20

**offense**
78:10

**offer** 259:12

**offered** 62:5
76:7 82:8,18
177:16

**offering**
48:24

**offerings**
83:8

**office** 13:21
21:24 22:2
30:2,3
50:19,23
51:21,22
58:12,18
89:15,16
90:14 93:9,
14 117:7
150:20
189:19
190:5

**officer** 5:23
6:24 8:19,22
9:6,13 14:21
17:23 18:17
26:1,10,14,
22 27:11,12,
19,24 28:11,
13 29:12
31:6 35:4
36:8 37:10,
15 38:17,18,
21,24 43:18
49:22 50:13
54:6 56:16
57:11 62:1,
2,15 67:19,
20,23 68:8,
9,11,15
73:17 91:6,7
92:20 104:8

105:16,23,
24 106:11
107:9,11,18,
21 108:7
109:19
113:22
114:4 124:8,
9 125:19,21
126:5,24
143:9
155:21
157:3
165:12
171:15
172:15
177:5,10,14,
17,23 179:2,
9 181:5,20
182:2,4,22
185:11
191:3
192:18
193:17
198:1
199:24
200:11
207:12,19
208:14
210:20
212:9,21
214:8 217:4,
10 218:12
221:15,16,
18,22
222:18,24
223:1,2,4,7,
11,14,22
224:18
231:12
232:15
241:4
242:10
248:1
251:23
259:12
260:15,16
263:14
266:8,9
268:15,24

**officer's**
195:6 221:7

**officers**
11:19 12:24
13:19 14:8,
13,14 35:6
38:12,14
40:19 41:8
45:11 50:24
51:6 53:22
54:4 57:8
59:8,16 61:2
62:9,14 65:4
66:23 71:23
72:24 75:2
84:3,11 85:7
90:9,15
94:2,3,6
114:12
121:22
125:17
126:16
127:12
128:17,22
129:21
132:16,22
135:6,11
137:14

139:1,4
140:23
141:14
145:5,11
150:21
152:13
156:2
161:19
168:13
171:12,21
176:6,19
186:20
195:4,8
196:11
198:20,22,
23 199:3
200:5,7
205:13
224:20
225:18,19
226:17
232:13
241:4
268:17

**officers'** 72:1

**offices** 91:6

**official** 11:5
69:22 74:8
78:23

**officially**
69:8 100:22
156:22

**oftentimes**
36:9 113:5

**Ohio** 5:4,6
16:18 88:22
89:16

**oldest** 7:12

**omitted**
20:22

**one's** 149:7

**ongoing**
176:1
212:24
225:1,13
242:19
261:15

**open** 121:22
156:2,16

**opened**
139:17
162:16

**opening**
161:7,20
162:1,11,22
164:19
178:4
186:21

**openings**
160:1 162:9

**opinion**
15:21 70:7
74:2 103:1
107:4 120:2
126:16
150:23

**opinions**
267:12

**opportunity**
38:9 48:13

270:11

**opposed**
71:8 75:14
122:18

**opposite**
78:19

**order** 36:12
62:16,20
74:9,16,20,
23 89:12
90:1 114:19
117:8
140:21
141:2,21
142:8
158:20
170:19
171:1 182:9
189:11
190:4
191:17,19
193:12
196:4
236:14
237:10
242:18

**ordered** 65:4
106:14
139:17
143:19
145:24
165:7,10
175:16
180:5,10,13,
23 182:8
189:2
199:12,18
200:3
206:11
233:5
237:12
239:10
242:7 243:5
245:14,22

**ordering**
116:1
142:20
214:6
263:14,22

**orders** 58:8,
9,11 63:1
106:5

**organization**
47:1 152:4

**organization
al** 48:5 150:9,
13

**organize**
120:14

**orientation**
71:10
119:24

**original**
152:11

**originated**
173:16
174:18
240:14

**outcome**
160:11

**overheard**

103:21

**override**
129:16
130:4
132:12
173:14

**overriding**
130:12

**oversaw**
100:19

**overseeing**
163:13

**oversees**
188:2

**overtime**
107:8,9
108:2,6
110:20
113:15
141:4
152:21
153:2,3,5,8,
15 198:9
224:7,12,20
263:21

**owed** 14:16

———
**P**
———

**p.m.** 147:5
148:2 271:4

**package**
160:2,4
209:11

**packet** 23:8
24:2,3
133:11

**pages** 23:2
256:24
257:2

**paginated**
159:6

**paid** 49:3,5
76:21 80:20

**Pam** 89:17
142:23

**paper** 28:3

**paperwork**
11:1

**paragraph**
266:1

**part** 7:7 8:21
9:5 35:15
41:6 56:14,
15 62:11
75:20 76:23
90:20 101:8
108:3
116:20
118:9 124:3
129:19
132:15,16
139:4
145:20
152:3
155:22
159:4 160:2
161:23
169:12

174:21
179:14
184:23
190:15
192:9
193:23
224:5
227:13
228:1 230:4
232:14,19
236:8
237:21
265:14

**part-time**
48:22

**participants**
134:24

**participated**
94:7

**partner**
68:13

**partner's**
68:4,5

**partners**
68:2

**parts** 23:23
88:2 129:15
152:8 159:5
166:9 208:5
233:11

**pass** 199:3

**passed**
167:15
168:1,12,18
169:3
207:20

**passes**
263:13

**passing**
172:13
221:17
223:4
231:16

**past** 203:2

**paths** 96:12
100:10

**patrol** 50:4,8,
11,12,16,18,
21,23 51:12,
13,21,22
52:17,24
53:1,2,3,5,6
66:22 67:19
72:24 98:22
178:19
237:23

**Paul** 151:22

**pay** 151:22

**payroll** 93:13

**peer** 97:11,
12

**Pelt** 91:8
93:2

**penalties**
258:7

**pendency**
57:6 237:15

**pending**
11:12,21
13:1 59:3
175:18
192:8 204:2

**pension**
46:23

**people** 20:14
34:10 36:10
42:20 43:6
44:18 51:8
56:5 57:15,
24 59:10,14,
15,21 60:16,
21,22 61:24
64:8 66:8,20
70:4,7 71:20
72:17,20
73:3,10,13,
20 75:11
77:10,22
78:24 93:4
94:16
102:22
119:10,12,
19,21 120:8,
9 122:3
124:24
127:14
128:5,24
130:10
133:6 134:3,
22 135:12
142:9 150:1,
20 151:19,
20 154:6
167:24
168:3,17
169:2
171:19
180:14
187:5,12,18
188:12
194:3 195:5
200:1,6,24
201:11,12
202:17
210:24
214:8 224:9
226:17
231:15,16
232:17,23
233:1,23
234:1
241:18
242:4,19
244:7,21,24
249:8
251:15,20
263:23

**people's**
60:5 138:11
230:22

**percentages**
137:22

**perception**
122:7

**perfect** 40:8
149:7

**perfectly**
244:23

**perform**
226:6
241:24

**period** 14:7
34:2 82:5
94:24
115:10,19
156:17
228:19

**periphery**
81:2

**permission**
107:13
163:7
165:14
171:5

**permitted**
162:20

**person** 37:8
40:23 42:15
43:15 45:18
70:20 72:20
73:15 92:9
94:13
112:22
176:7,18
178:5
182:10
186:20
188:2 192:6
204:5
213:18
223:7,11
227:4
229:16
233:17
263:11
264:21

**person's**
203:23

**personal**
10:5 21:18,
23 42:10
97:14 99:23
179:22,23
180:15
195:17

**personally**
6:19 7:16,
17,19 9:18,
24 11:6 14:2
15:3 64:21
91:19 95:14
129:22
178:12

**personnel**
47:11 63:13
64:5,10 71:4
91:2,5 93:9
145:24
150:4
233:10
263:5,6

**pertinent**
23:24 115:3
245:15
269:17

**Peter** 49:15
151:22

**phase**
163:14

**phone** 43:23
107:14
123:3 140:7

**phones**
141:3

**phrase** 83:9,
11 227:22
253:5

**physically**
41:1

**pick** 156:15
178:3

**picture**
150:23

**piece** 28:3

**pieces**
160:22

**pin** 128:8

**pinched**
69:14

**pipes** 101:9

**place** 55:3,
13 69:17
99:7 120:1
148:18
177:22
179:15,17
187:9 188:4
238:10
241:17
251:17

**places** 128:7
134:24

**plaintiff** 5:14,
16,18

**Plaintiff's**
110:6,11
116:12,16
159:3
174:19
219:4,8
220:11
234:14,19
235:16,20
256:6

**plan** 77:16

**plans** 48:8,
15

**play** 231:18

**playing**
183:24

**pleaded**
250:7

**pledge** 153:4

**PMS** 77:15

**POE** 53:19
56:6

**POER** 53:21,
22 54:3
55:9,17 56:6
60:4

**point** 25:9
43:1 47:24
49:4 81:9,14
96:23
107:18
108:1
109:12
111:5,9
116:10
122:12,22

126:2
142:18
149:13,17
151:16
153:23
154:10,21
157:2,13
161:12
164:16
165:5
170:24
173:3 179:8,
20 190:1
199:17,19
203:4,20
210:1
226:12
227:11
242:3,18
243:5
244:21
249:5,13
250:24
265:24

**pointed**
126:4

**pointing**
159:11

**points** 61:12
65:13,15,16
66:3 202:23
225:3 252:8

**poker** 61:1

**police** 6:24
8:18,22 9:13
17:18 18:17
23:9 26:10
36:24 47:3,
4,7 48:10
49:18,19,22
53:14,22
54:4,17 59:8
62:1,15
63:11 70:21
73:17 74:6
77:1 78:14
79:2 80:11
117:2 121:4,
23 187:8
224:10
241:22
242:1
245:15
248:1
249:16

**police-involved**
120:17

**policies**
15:20 83:24
84:9,16 86:1
112:4
138:18
202:7

**policing**
149:24
152:12

**policy** 36:16
43:5,10
44:8,22
68:20 84:4
86:2,7
138:14,23
145:2,8,13

248:1,6,8
250:9
262:12

**polygraph**
263:9,12,15,
23

**polygraphs**
261:24
263:1,2
264:1 265:7

**poor** 222:2
223:8

**portion**
22:22 198:8
220:3,4,7
232:5

**portions**
149:16

**position**
62:5,15
92:22
167:17
173:12
175:17
177:3,5
181:21
182:1,9
183:3
184:12
190:6,10,24
197:2 198:2
201:10
206:6
207:23
211:23
218:6 238:5
239:5 249:7
254:3,4

**positions**
151:3,13
153:13
156:2
178:13

**possession**
113:2

**possibility**
35:9 49:8
91:14
109:18
110:22
111:12
160:5

**possibly** 7:5
255:3

**post** 163:7

**posted**
174:5,11,12

**posting**
160:20
163:5
166:17
233:7

**postings**
156:10
174:14

**potential**
8:10 67:3
68:13
113:23
145:11
186:21

199:8 226:7
**potentially**
63:15 83:12
116:20
145:4
264:15
**power** 84:18
**powers**
241:23
242:1,8
**practically**
45:1
**practice**
31:20 87:9
169:8
178:19
258:18
**practices**
75:21 86:10
176:23
**precedent**
249:15
**preferred**
161:6
165:15
171:3,5
182:6
**prepare**
141:18
**prepared**
120:15
138:10
**preparing**
66:1 162:12
**preponderan**
**ce** 266:11
**presence**
5:12 63:19
64:10
114:17
**present** 5:23
48:14 89:19
**presented**
199:7
**president**
71:4
**pretty** 99:3
264:20
**prevent**
47:15
192:10
229:22
**prevented**
251:24
**preventing**
230:3
231:15
**previous**
137:1 150:3,
19 260:6
**previously**
18:6 159:2
166:22
167:3
169:23
170:5
195:21

**print** 234:18
**prior** 8:12,24
9:3 33:22
55:6,14
66:5,10
67:18 88:4
98:21
110:17
114:23
115:2 143:3
152:16
166:17
174:9 192:2
207:17
239:24
240:6
256:16,21
270:13
**priorities**
103:14
**priority** 85:7
244:4
**private** 69:17
**privileges**
62:3
**privy** 60:24
**pro** 72:13
**probable**
17:13,20
88:21 89:2,5
267:8
**problem**
141:10
245:7
**problems**
21:14
244:20
**procedure**
150:15
**procedures**
19:9
**proceedings**
271:3
**process**
25:22 41:7
141:7 156:7
157:15
158:2
162:21
163:10,12,
14 164:2,3,
11 165:6,8,
11,15 166:6,
10 175:11,
14 177:13,
22 179:1
194:5
204:10
206:6,10
209:16
218:16
254:2
260:19
**productive**
185:13
**productivity**
184:20
**profanity**
60:22

**professional**
28:5 253:8
**professionall**
**y** 9:24
**program**
120:15
**programs**
47:7 82:15
**progress**
34:2,3 123:9
**progression**
224:23
**progressive**
33:19
**prohibited**
180:13
242:9
**prohibiting**
83:23,24
**prohibitions**
232:16
**promising**
260:12
**promoted**
50:15 52:1,
23 55:14,18
59:17,22
65:17 66:9,
14,17,18
71:6,9 76:15
83:20
111:17
119:19
153:5
**promotion**
17:9 56:14
58:8 65:3,6,
20 66:10
**promotions**
55:11,13
56:8 61:17
**prompt**
115:10
**pronounce**
236:24
**proof** 105:10
245:14
**properly**
193:7
**property**
26:11
141:24
238:13
239:10,19
240:7
**prosecutable**
243:15
**prosecute**
145:4,10
243:13,23
245:20
246:13
**prosecuted**
247:24
**prosecutes**
244:9
**prosecution**
145:17

**prosecutor's**
30:2,3
**prosecutors**
145:18
243:22
267:7
**prospective**
201:10
**protect**
187:10
250:3
**protection**
126:20
**prove** 130:19
138:1
226:12
267:6
**provided**
102:11
126:5
156:22
181:9
212:23
**providing**
47:9 102:5
**public** 16:11,
14,17 28:16
38:15 91:6
117:19
197:22
226:9
250:17
256:14
258:23
259:7,14,16
265:13
**pull** 29:15
223:3
**punched**
14:21
**punishment**
33:7 45:5
128:11
259:1
**purchase**
246:10
**purpose**
205:4 259:1
266:16
**purposes**
51:7 54:20
110:7
116:13
219:5
220:12
234:15
235:17
256:7
**pursue**
146:14
246:2
247:17
261:24
**pursued**
247:18
**pursuing**
162:11
**pursuits**
36:24

**push** 190:23
**pushed**
242:13
**put** 12:21
29:19 47:21
65:13,16
68:8 72:7
77:17
143:22
169:11
181:4 188:6
224:1 227:6
230:22
234:10
238:18
239:10,18
247:10
**putting**
17:21 45:3
199:23
221:17

**Q**

**qualification**
**s** 156:17
**question**
13:4,8 15:5
19:19,21
20:7,9,21
21:8 37:16
39:10 66:1
72:2 74:24
82:22 87:24
92:8 96:3
110:14
116:17
123:20
124:14,15
125:12
131:10,17,
19,22,24
132:5 136:7
144:9,13
145:7,20
157:13
162:17
164:17
181:1,4
182:7
189:21
199:15
201:4,7
214:17
215:21,23
217:24
225:11
233:11
245:3,4,18
247:15
248:13,17
254:18
266:4,13
**questions**
19:8,16
94:10 98:20
100:2
104:23
131:20
143:7
154:20
169:10
183:19
184:4
185:20

187:11,12,
17 188:14
211:13
270:10

**quickly**
46:16
240:18

**Quinlan**
98:17 109:6
111:6,15
112:14
183:15
252:24
253:20

**Quinlan's**
254:4

**quoted**
234:19

**quotes** 235:6

---

**R**

**race** 56:7
57:16 60:8,9
64:4 77:20
90:3 109:13
119:9,23
168:16
169:1
198:11

**racial** 63:10
66:23 72:1
118:22
127:13
169:1
198:21

**racially** 64:9

**racism** 121:8
164:24
192:11
201:1 220:5
232:18

**racist** 43:7,
16 45:9,12
46:1,7,8
63:21,22
72:23
109:14,16,
18 118:22
123:17,18
127:2
128:18,19
129:23
134:15,20
137:12
138:4,16
140:23
141:4,14,16
163:16
195:3,24
196:14
200:5
201:18,23
202:4,18
205:1,16
209:16
223:13
225:16
229:17
230:9
231:23
232:7 241:6
242:5 249:4,

13 254:8,11

**raise** 47:20
97:19

**raised**
153:15
200:24

**raising**
232:18
233:17

**Ramparts**
184:19
185:19
186:10

**ran** 100:3

**rank** 76:10
177:5,23
178:15
238:9

**ranked** 66:13

**ranking** 70:4,
7 223:11

**rankings**
65:14

**ranks** 151:18

**rape** 226:18

**raped** 29:13

**rare** 260:10

**rarely** 18:16
126:9 203:3
206:23

**rationale**
222:20
233:24

**re-reading**
132:24

**reach** 24:17
43:1 210:6
226:4

**reaching**
207:19
223:3

**reaction**
111:20
119:3 197:5

**read** 23:8,10,
13 24:3,12,
13,19,22
25:4 87:10,
15,17 88:1,
4,15 89:20
118:10
119:4
121:14
123:22,24
127:5
131:12
132:3
155:13,14
184:1,6,24
186:5 188:7
191:22
194:24
195:15
196:9,10
210:2 215:3,
7 219:13
220:7,19,24
221:2,6
231:9 232:4

234:20
246:17
247:19
248:13,15
266:3
270:19,20

**reading**
24:24 25:9
54:9 87:18
127:7
143:15
160:18
184:13,17
185:3
190:15
206:24
210:13
220:20

**ready**
216:10,15,
23

**real** 46:16
105:10
146:21

**realistic**
213:21

**realize** 20:18
149:5

**realized**
20:22

**realm** 41:2

**reason** 8:1
19:20 21:18
62:4 66:6
129:19
145:16
165:10
168:21
182:8
191:11
221:5 227:9
230:9,13
245:11
247:22
250:20
265:3

**reasonable**
113:11,17
201:12
232:4
233:17
267:10

**reasoning**
102:22
126:7,22
222:16
268:14

**reasons** 43:2
58:2 73:5
75:1,6,11
153:10
187:3,13
243:17,23
244:6

**reassign**
251:2,17

**reassigned**
102:16,19
103:13
156:3
236:20
237:15

238:2,5,7
239:19
240:7 249:7
251:1 252:1

**reassigning**
252:6,10

**reassigns**
102:21

**reassure**
215:13

**reassuring**
213:20

**rebid** 166:4
173:3
175:11
180:10,24
182:8 188:9

**rebidding**
170:19

**recall** 7:5,8,
13 8:10,16,
23 10:9,12
11:3 13:14,
24 15:24
16:4,6,24
24:24 56:1,5
57:10 58:4,
13,14,22
60:15 64:1,
3,11,24
67:15 69:1,3
88:8 89:23
90:6 95:19,
23 96:10
100:7
104:11
114:1,8,22,
24 115:19
116:4,8
118:12,20
124:24
126:6,22
129:15
137:21
141:6
142:19,22
143:3,7
144:1,14
149:17
153:17
159:10
160:8 161:4,
17 163:12,
20 167:6,9
168:5,16
175:20,21
180:1
181:10
181:13,14,
24 184:13,
16 185:3,11,
16 186:2
189:4,12
190:7,14,18
193:14,16
199:13,16
237:9 238:1
239:9,15
246:16
247:15
248:21
249:1,11
263:22
270:3

**receipt**
257:24

**receive**
27:24 34:23
45:5 46:23

**received**
33:24 110:2
117:4 121:7
155:5 164:1
167:24
183:6
237:14
242:3

**recent** 82:13
172:18

**recently**
88:5,7
244:19

**recess** 81:21
147:4
216:19
255:19

**recipient**
71:13

**recognitions**
155:9

**recognize**
110:13,15
116:18
235:22
236:3

**recollection**
24:24 57:10
129:22
140:6 141:1
160:7
179:14
191:2
193:21

**recommend**
27:23 28:15
30:11 198:5,
15 250:21
254:19,24
259:14,24

**recommenda
tion** 28:13
31:23
129:17
162:13
197:22
203:21
227:3
242:23
243:1
256:11,13
258:12
259:7,18
260:5,10
267:22,23

**recommenda
tions** 17:8
94:15
237:17

**recommende
d** 24:18
25:10,13
160:14
165:24
180:11
182:1,6
249:22

254:6,14,15

**recommendi ng** 258:24 259:9

**recommends** 266:12

**reconsiderati on** 89:4,21

**record** 5:11, 22 16:11,14, 17 35:24 37:9 81:20, 24 102:5,9, 10 107:4 110:9 116:15 117:19 123:24 132:3 146:23 147:2 148:6, 11 156:13 159:1 167:2 181:19 216:13,18, 22 219:7 235:19 247:11 248:15 255:18,21 265:11,14 270:23

**recorded** 5:9 107:3 181:5 208:2 210:18 217:10

**recording** 181:18 210:20

**recordings** 183:24

**records** 22:13 168:20 239:10 265:11

**recruit** 44:15

**recruiting** 47:18

**recruits** 44:11 106:3

**redo** 165:8, 11 166:2

**redone** 182:19 206:12

**refer** 6:9 90:10 170:12

**reference** 46:13 112:4 217:12

**referenced** 88:10 95:4 269:9

**references** 112:5

**referring** 22:18 41:5

64:8 90:12 135:9 173:6 175:13 198:8

**refers** 174:20

**reflected** 127:4

**refused** 104:17

**refuted** 266:11

**regard** 57:24 94:16 96:13 107:15 119:16 137:24 140:4 152:4 162:8 176:24 237:22 238:9 252:17 256:19 263:3,4,7

**regarded** 137:7

**regular** 75:18 103:8 152:22

**regularity** 177:1,3

**related** 6:23 7:3 9:5 10:19 17:20 48:10 57:3 58:12 61:16 62:20 64:4 65:19 99:12 100:17 101:3 104:12 140:18 152:19,20 157:15 159:12,24 181:8 209:15 212:22 239:5

**relationship** 101:2

**relevant** 120:16 130:3 160:16 212:24 259:21

**relief** 114:23 226:13 250:8,21,23

**relieve** 114:21 214:23 225:3,7 226:20,23 241:2 243:18 249:17 250:2

**relieved** 114:12

116:2 122:12 163:1 214:7, 21 227:10 231:3,6 236:15,19, 20 241:7,21 242:16,17 249:5,23 250:17 252:15

**relieving** 114:3 241:23 250:11 252:9

**religion** 77:20 119:24

**relive** 228:5

**rely** 6:12

**relying** 134:10 264:5,6

**remain** 225:23 237:19

**remark** 138:10

**remarks** 223:13 242:5

**remember** 7:11,21,22 8:2,6 9:17 11:15 15:12 16:22 17:17 20:16 32:9 40:9,12 54:1,2,5,9, 12 55:23 56:4,12,13 58:17 59:4, 5,21 60:1,11 61:6 62:19 64:7 67:10 76:19 80:12 88:14,18,19, 22 89:1 96:17 102:2 103:6 108:18 109:3,13,17, 22,24 111:6, 16 113:21 118:5 119:2 127:3,7,11, 17 128:2 133:1 136:8 137:23 143:11,13 146:21 149:3,8,10 154:21 159:23 161:13,22 163:9 166:1 170:15 180:18 185:24 186:18 188:19 193:20 206:7 209:9,

24 255:8 268:17

**remembered** 20:23

**remind** 159:24

**remotely** 186:11

**remove** 237:18

**removed** 102:14

**reopen** 139:18

**reopening** 139:19

**reorganizatio n** 244:22

**reorganizatio nal** 52:12

**reorganized** 53:6 80:20

**reorganizing** 95:4 149:16, 18

**repeat** 124:14,15

**repeated** 252:12

**repeating** 37:11 63:17, 20

**rephrase** 19:22

**report** 42:17, 21 43:6,15, 16 44:19 45:9 46:2,7 67:19 69:7 70:8 72:8,9, 11,13 73:4 85:8,13,16 118:24 121:16 125:7 127:3 144:2 160:24 178:15 198:14 207:7 211:21 219:14,17 223:1 236:11 241:17 246:12,24 247:16,20

**reported** 45:16 46:9 67:12,22,23 68:16,24 85:22 115:12 130:22 140:23 157:11 179:9 218:8 223:6 225:14,15

**reporter** 5:8

**reporting** 5:10 44:17 67:15 73:10 84:23 113:14 139:1 141:14 205:15 234:1

**reports** 85:4 123:16 238:11

**reposted** 174:5,12 180:5 233:5

**represent** 108:5 118:7 133:4,10 160:23 180:11 181:17 220:1,16 222:10

**representatio n** 243:20

**representativ e** 12:2 92:13

**represented** 133:6

**representing** 5:14 133:24

**reprimand** 27:13 28:1,2 30:13 33:10, 15 34:4 36:18 37:7,8 126:13

**reprimands** 36:15 160:15

**request** 173:4

**requested** 123:24 132:3 173:15 248:15 265:7

**requesting** 270:18

**requests** 150:16,19 151:2,5,8,12 152:1

**required** 26:12 68:2 75:16,23,24 76:1,5,19 85:16

**requirement** 117:20 168:4

**requires** 126:19 156:9

**resentment** 60:3 61:7

**reserved**

192:1

**resolved**
17:10 55:13

**resource**
244:20

**resources**
91:2,4 92:24
244:16
245:10

**respect**
128:20
137:9,15
138:3
197:24
198:12
218:4
240:21

**respond**
104:7 126:3
132:4,6
233:12
269:12

**responded**
174:9
228:11
229:4

**response**
213:12

**responsibiliti
es** 90:20
163:2
238:11

**responsibilit
y** 10:20
232:14

**rest** 19:10
140:14
269:15

**result** 55:15,
19 58:4,14,
23 102:17
126:12
157:20
227:1
243:16
250:19

**resulted** 14:3
24:15

**retaliated**
157:3
212:13

**retaliating**
201:22

**retaliation**
7:4 73:7
75:6 83:4,24
84:17
201:19
227:16
232:16,20
233:24

**retaliatory**
202:7 233:8

**retired** 6:10
22:11
253:17,18
254:2

**retirement**
46:18

**reverse**
128:14
256:23

**review** 22:13
23:20 27:8
28:6,7 90:1
94:11 126:3,
14 137:6
144:24
151:8
160:12
206:22
255:6
270:19

**reviewed**
11:1 22:15
23:2,23
27:10,18
88:5 132:11
133:10
143:1 157:2
160:17
193:9
198:13
260:9 269:6

**reviewers**
126:6

**Rich** 5:19
39:23 81:5
215:22
248:18

**Richard**
253:22

**ride** 68:2
74:9,12,17,
21

**ride-along**
56:18

**Rights** 16:18
53:23 54:5
88:22 89:16

**ring** 104:3
143:20
185:7
190:24

**rise** 35:7
42:18

**risk** 233:20

**robbing**
151:22

**role** 7:6
13:22 142:2

**roll** 60:17

**room** 77:15
188:5
190:12
238:13
239:11,19
240:7 245:9

**rose** 27:21

**rotating**
51:14

**route** 267:20

**routinely**
127:13

**routing**
113:3
170:10
174:7 175:8

189:10
196:10
206:5
235:23
236:18
256:15

**rude** 26:1
27:13

**rule** 85:15,18
146:8 198:3
264:8
266:14,17,
21

**rules** 55:2
58:12
103:10
156:5 191:8
257:5 263:7

**ruling** 14:12,
16,19 15:2
269:24

**rulings**
197:20

**rumors**
154:18

**run** 95:15
96:14

**running**
210:22
244:21

―――――

**S**

―――――

**sad** 119:13

**safety** 28:16
197:23
212:10
256:14
258:23
259:14,16

**Safety's** 91:6
259:7

**said/he**
261:23
262:7,13,18

**sank** 65:17

**Saturday**
51:15

**save** 80:16
140:13
224:2

**scale** 269:20

**scales**
266:24
269:3

**scenarios**
146:7

**scenes**
66:12

**schedule**
24:20 28:10
174:13

**scheduled**
51:6,7,9

**Scheduling**
50:24

**scoring**

66:14

**screens** 68:1

**Sean** 5:17

**seat** 68:1

**secretary**
113:4 117:5

**section** 23:3
152:10
153:12
154:5 220:8
269:9,22

**Security**
183:17

**seek** 33:16
239:5 241:1

**seeking** 34:4
157:15
176:20
249:9
251:24

**sees** 25:17

**segment**
82:17

**selected**
158:2

**selecting**
194:4 254:2

**selection**
162:13
163:10,14
164:3,11
165:6,8,11
180:20
194:5 206:6,
10

**send** 112:17
150:18
194:2

**sending**
198:19
200:22
204:22
213:8 227:9
228:17
229:13

**senior**
167:16
171:19
172:1,2
176:6
182:10,17
186:19

**seniority**
54:23,24
57:18,22
59:18 60:6
61:9,12,23
62:17 65:13,
14,16 66:2
156:17
171:13,16
178:21

**sense**
202:23
213:21

**sensitivity**
78:19

**sentence**
167:18

**separate**
157:12,22
179:22
258:15

**separated**
94:14 204:5

**separately**
211:10

**separating**
187:4

**separation**
241:20

**September**
108:14
112:20
114:5
117:10

**sequence**
202:15

**sergeant**
26:10 27:5
30:8 31:10,
21 50:15,16
55:14 67:21,
24 68:16,17
69:20 76:14
97:5,8
104:15
107:12,19
110:1,3
111:21
116:2 118:8,
20 121:11
123:17,19
124:10,19,
20,21
125:13
127:1,19
128:5
130:24
132:22
133:9
134:15
135:5,7
140:19,24
142:20
143:14,18
144:1,15
154:22
157:21
161:5,17
162:11,20
163:9,17
164:1
165:13
166:7,13
167:10
168:23
169:4,10
171:4,7,9
173:5
175:16
179:10
180:10,12
181:7,22
186:24
187:16
191:12
192:11
193:14,17
194:4,10
195:3,18
196:18
197:21

198:2,16
199:17,24
201:16
202:1
204:22,23
207:18,21
212:20
213:1 214:6
220:17,18
221:22,24
222:12
223:12,24
224:1 225:4,
13,22 227:7
230:16
231:1,11,12,
20 232:4,5
233:15
240:24
241:2,11
242:2,8
245:13,22
246:1,6,7,8,
9,11 248:10,
19,23 249:4,
21 250:3
251:2 252:1
261:3,9
265:6 266:6
267:15,18
269:5,10

**sergeant's**
61:13 65:3
201:1

**sergeants**
65:6 84:15
93:23
178:12,13

**services**
92:21

**Session**
148:1

**set** 58:12
150:14
203:18
204:1

**settled** 9:4
13:23 15:24
59:7

**settlement**
14:20,22
15:18 55:16,
20 58:24
89:7

**settlements**
15:6,8,11

**severe**
128:11

**sexes** 77:9

**sexist** 42:11
43:6,16
45:9,12 46:1
69:4 70:2,3
72:23 77:13

**sexists**
78:21

**sexual** 44:10
69:10 71:10
72:1 81:3
119:24

**share** 218:21

221:11

**shared** 211:1
212:11,16
222:13
223:19

**Shaw** 5:4,23
140:19
143:9,16
153:20
155:3 157:3,
10 171:22
172:12
176:7 179:9,
23 180:16
181:5,20
182:2,4,9,22
183:2 184:6,
10,11,12,20
185:4,11
188:11
193:18
197:1 198:1
200:12
202:3
204:23,24
207:10
208:14
210:16,20
211:22
212:3,9,21
213:8
214:19
215:13
217:3,4,11,
16 218:4,12
222:6,13
228:18
245:13
251:23

**Shaw's**
17:23
155:21
199:23
218:7

**she'll** 270:20

**sheet** 113:3
170:10
174:7 175:8
189:10
196:10
235:24
236:18
256:15

**sheets** 206:5

**shift** 51:14,
15,17,18
57:18,19,20
61:21 98:24
177:16,21

**shoes** 61:5
199:23
230:22

**shooting**
45:3

**shootings**
120:17

**short** 33:7
52:19
244:21
255:15

**shortly**
190:11

**shot** 12:6

**shout** 77:11

**shouted** 78:8

**shouting**
77:23

**show** 82:8
113:6
240:16

**showed** 68:9

**showing**
113:15

**shown** 175:8
233:6

**shut** 107:2

**sickness**
51:1

**side** 12:7
187:6

**sided** 159:17

**sidetracked**
87:1

**sign** 27:5

**signature**
257:7,23
271:1

**signed**
256:15
257:4

**significant**
120:11
130:11
153:3

**signs** 121:8
257:22

**similar**
186:16

**similarly**
185:17

**simple** 7:20

**simply**
167:21
186:23

**simultaneou**
**s** 106:10,22

**single** 38:12
134:17
207:6 244:9

**singling**
74:18
155:19

**sinking**
151:17

**sister-in-law**
100:12

**sit** 93:22
124:7
178:23

**sitting** 8:5
13:14 54:8
67:5 124:18
160:6
181:12
182:24
209:24
270:12

**situation**
29:14 43:22
44:24
103:21
130:15
222:12,19
247:22
251:3,20
259:22
260:14
261:23
262:24
268:14,23

**situations**
73:13 250:9
262:15
268:3

**six-week**
259:19

**sized** 120:11

**skills** 178:22
179:1

**slightly**
130:23
133:8

**slowness**
65:24

**slur** 46:8

**slurs** 72:22
118:22
127:13
198:21
249:4

**smaller**
220:3

**Smith-**
**hughes**
223:23

**social** 61:3
99:6

**socialize**
91:23 93:18
96:6 98:14
99:5

**somebody's**
249:22

**someplace**
6:16 152:2
251:14

**something's**
31:4

**son** 49:15
50:3

**Sorrell**
107:9,11,14,
18,21 108:7
113:22
114:4
116:21
122:12
124:8
125:20
129:7 133:7
137:11
140:6 214:9
240:23
263:16,18,
23 266:8
269:22

**Sorrell's**
127:3 266:9

**sort** 121:20
148:8
202:12

**sought**
120:20
121:2
164:18

**sound** 58:7
112:1
182:18
183:12
184:22
185:14
213:20
217:14
226:16

**sounds**
71:16 79:7
130:4
185:15
213:21
231:14

**source**
110:20

**sources**
185:17

**south** 5:3
53:6

**Southern** 5:6

**Spanish**
168:4

**speak** 20:4
233:23

**speaking**
42:9 168:4

**special** 62:3
96:14

**specific**
10:9,13 11:4
13:24 15:24
16:4 48:15
59:13 60:2,
11,16 64:4
65:1 104:6
115:13
116:4,8
126:23
128:7,23
130:15,16
132:21
134:14
135:13
137:16,21
141:13
160:7
161:23
168:22
181:10
257:9

**specifically**
7:9 14:1
15:14 16:8
58:23 64:1
80:13 99:8
102:2 114:8
120:10
133:6
143:12
156:6 160:8

167:8
173:15
175:20
177:4
268:24

**specifications** 141:18
189:9 258:8

**specifics**
17:16 54:2
56:13
196:17,19

**Spectrum**
5:10

**speeches**
69:10

**spelled**
237:5

**spoke**
189:16
190:6
192:18,21

**spoken** 38:6

**spontaneous**
102:7

**spot** 87:19
88:1

**squad** 164:2

**SRB** 109:4
111:2,7,10
148:21
149:17,18,
23 152:8,10,
19,20,23
153:2,11,15
154:3,5,11,
14,23 155:4,
22 244:22

**staff** 15:10
150:4 151:9,
10 250:10
253:1,6,9

**staffing**
150:16

**stage** 31:3

**stamp**
219:21

**stand** 73:23

**standard**
79:22

**standards**
28:5 75:21
253:8

**standing**
36:16 69:13

**staple** 219:1

**start** 76:16
148:7 156:9
203:10

**started** 92:15
107:17
141:16
142:23
149:15,20
152:9 164:3
165:14

**starting** 55:6
76:11

**state** 11:16
12:1 83:23
84:4 85:19
89:15 116:9
145:7,10

**stated**
243:10
246:19,23,
24

**statement**
44:4 68:18
111:23
125:20
134:6 168:2
182:15
215:14
266:9 269:1

**statements**
128:3
129:23
132:22
184:4 195:3
196:19
225:16
234:22
235:1 249:4
251:9
255:13

**States** 5:6

**status** 10:19
92:19

**statute** 115:4

**stay** 48:2
224:12

**stayed** 52:4

**steal** 31:8

**steamroll**
203:11

**steps** 112:7
262:1

**stock** 148:14

**stole** 29:12

**stood** 64:17
252:17

**stop** 92:2
203:10
249:20

**stopped**
121:15

**stopping**
206:18

**story** 69:9

**strange**
74:11

**stream** 203:5

**street** 5:3
50:13,16
152:15
177:23

**stress**
240:23

**striking**
194:1

**strong** 60:6

**strongest**
204:13
227:16

**strongly**
44:17 71:8
74:1 233:4

**struggling**
68:5,7
210:21

**Stubblefield**
56:17

**study** 120:5

**stuff** 60:17,
21 81:2
113:16
139:3 158:4
193:8 196:2
202:18

**stupidity**
137:13

**subdivision**
53:5,7 96:22
108:21
109:8,11

**subject** 36:3
119:21
156:19

**submitted**
132:12
181:7
186:12
188:13

**subsequent**
79:6 99:2
149:1
174:13

**subset**
132:19

**substation**
56:19 69:11

**successes**
152:18

**sudden**
58:18

**sued** 7:16,19
8:7 11:5,18
54:19,20

**suffer** 44:13

**sufficient**
267:3

**suggest**
170:18

**suggested**
79:4 132:8
182:21
202:20
265:6

**suggestion**
249:12

**suit** 10:18
11:7,9 12:3
13:20,24

**Suite** 5:3

**suits** 12:4
14:1

**summaries**
86:13 87:10

**summarized**
202:2

**summary**
22:15,17,21,
23 23:2,6,7
86:17 87:8,
18 88:1,4,7,
9 118:11
143:2
184:23
185:9,17
186:4 188:7
190:15,20
194:24
196:9,23
209:20
210:2
219:10
220:17
236:6
247:20

**Sunday**
51:16

**superior**
37:15

**supervise**
187:24
238:19

**supervised**
96:24 99:19
101:4 154:1
172:8,10
261:11,18

**supervisee**
97:1

**supervising**
98:9 238:17
251:4,7,13,
20

**supervisor**
26:20 29:20
95:21,24
97:12 98:7
99:1 100:5,
20 163:4
169:9
222:24
259:5 260:7

**supervisors**
74:12,21
77:2 162:4
169:20

**supervisory**
238:9,12
259:21

**supplement**
152:11

**support**
35:11
160:13

**supported**
47:17
266:10

**supporters**
47:8

**supporting**
129:8

**supports**
47:6

**suppose**
67:3

**supposed**

104:1
250:15

**surround**
60:20

**surveillance**
111:4
152:22

**suspect**
67:17 68:3,
12

**suspects**
67:1

**suspended**
40:20 41:10,
13,14

**suspension**
28:15 259:9,
15,20

**suspension/
termination/
demotion**
258:10

**sustain**
105:10
125:13,24
130:20
266:7,18
270:2

**sustainable**
134:14,18,
19 135:2

**sustained**
124:6 125:2,
3,7 126:10,
12,20
128:14
129:11,17,
20 130:4,6,8
137:17
138:11
160:14
226:5 227:1
262:16,17
266:12
267:1,3
268:8,9,12,
21

**sustaining**
126:8

**SWAT** 57:9
152:24
178:23
179:2

**switch** 46:15
53:17 234:3

**Switching**
148:19

**sworn** 6:2
151:18
263:4,6

**system**
259:3

_____

T
_____

**table** 69:12
149:23

**takes** 194:10

taking 55:4
60:9 62:15
127:14
135:10
151:22
200:9
201:12
203:14
212:13,21
217:19
229:15,22
230:4
232:24
234:2
241:23

talk 18:2
53:15
121:11,22
133:13
136:14
148:21
155:20
170:23
172:23
188:19
189:3 192:9
210:15
236:23
242:9,19
248:23

talked 18:1
60:16,19
71:20 77:19
80:15 88:20
104:21
106:24
127:14
140:5 150:4
184:19
187:18
208:13,15
209:17
218:8,12
242:12
250:7

talking 7:16,
17 11:7 49:3
59:3,15
67:1,9 82:1,
5 89:14
94:23 95:2
105:7,14
118:21
121:15
125:4 135:8,
10 137:22
141:11,12
142:24
159:13,20
167:12
173:22
175:24
179:19
196:7 198:6,
7 208:7
211:2
231:15
243:8
244:20
263:5

talks 192:9

tampon
77:18

tangible
83:9,10,17

target 42:1
45:24

TASER
26:23 27:7

task 104:17

taught 44:10,
15

teach 69:10

tech 110:24

technically
51:22

telling 40:12
43:13 60:14
129:3 188:3,
18 193:8
201:21,24
204:24
209:12
222:6

tells 41:19
210:20,22
211:4
267:11

tenure 10:3
44:22
145:15
151:3

term 31:18

terminable
203:15

terminated
258:20

termination
198:5
203:16,21
204:16,17
226:4
243:16
249:15,17
250:20
254:6,14,19,
24 258:5
259:18,23

terminational
227:2

terminology
141:10

terms 64:9,
17,19,20
66:13 77:19,
21,23 83:15
128:18
132:9 194:7
232:12

terrible
78:24

test 55:4
61:13

testified
18:3,11,15
23:16 39:2
45:22 65:7,
11 69:4
127:23
130:2
133:20
178:6
196:13
228:24

246:3,18,21
248:5

testifies 6:2

testify 21:12,
15,19 25:7

testifying
62:19

testimony
126:3
129:13
136:5
137:12
138:11,22
182:3 197:9,
10 228:6
230:1
255:10

text 193:17
194:2
196:24
198:3,19
201:5,17
202:2,16
204:22
206:17
207:12
208:18
210:9 211:4,
5,7,10
225:17,22
227:9,15
228:4,10,13,
14 231:4
232:17
233:15

texted 251:9

texting 200:1

theft 141:23,
24 164:23
263:19,21

thereof
141:20

thing 13:11,
12 24:21
58:3 73:12,
21 78:11
86:12 90:18
97:5 105:2
122:22
127:21
142:23
143:4
155:19
157:22
185:19
229:12
231:3 264:7
266:23
270:7

things 20:16
25:18 31:24
32:2 36:23
39:20 42:23
58:13 60:19
63:23 64:15
73:23 77:22
88:7,9
105:13
106:7 115:1,
5 119:6,15,
20 128:1,6
133:12
135:1,7

141:3 142:1,
8 148:24
149:1
164:24
172:21
183:24
184:15
187:23
192:20
199:9
200:19
203:6,18
204:12,18
208:21
209:10
213:3
214:12,18,
24 231:14
244:16
258:9

thinking 75:9
78:4 122:2
137:18
203:19
204:3
257:12
259:18

thought 17:6
18:9 23:24
41:4 62:13
64:15,18
73:14,24
78:24 95:1,2
102:12
120:16,18,
23 122:22
133:16
139:21
179:1,18
194:12,20
252:14
259:20
261:11
268:17

threat 38:3
41:13,22
56:20,21
68:21
109:14,16,
18 115:11
123:18
124:9,20
125:15,16,
23 127:2
128:4,21
129:6 130:7,
8,23 131:1
132:21
133:5,12
134:14
137:10,16
194:9 198:3
200:6
209:17
228:22
229:1,3,5,7
260:15

threaten
38:17,23

threatened
195:7
198:19
205:13

threatening
40:23

128:24
194:2,6
195:5
198:24
207:18
225:16

threats 37:22
38:12
115:13
124:2
126:16
129:24
163:16
207:12
222:14
223:14
239:1

three-day
47:12

three-year
79:24

throw 264:7

throwing
19:7

Thursday
51:15

tight 45:4

till 52:23

Tim 100:15
253:23

time 7:10,20
10:1 14:7
17:19 19:13
20:19 22:9
34:2 36:23
37:7 41:3
47:24 51:19
54:7 56:10
57:5 58:5
66:17,24
70:13 77:3
79:14,22,23
81:3,20,24
82:4 89:24
94:24 95:17
96:16,23
98:5 99:2,7,
20 100:11,
13 106:2,4,
5,20 108:1,
23 109:4,10
111:5,9
112:18
113:11,21
115:10,11,
19 116:10
120:17
122:22
123:9,10,11
126:10,14
130:9,17,23
132:11
139:15
140:13
141:24
147:2 148:6
149:8
151:17
153:23
154:2,10,21
155:2 156:1,
8,14,17,23
161:12

162:11
164:2,17,23
171:20
174:11
176:12,14
177:17,20
178:9
182:14
183:5,11,24
185:13
186:9 190:1
202:23
203:4,5,20
206:19
210:13,23
211:18
213:7,22
215:14,20
216:18,22
220:23
221:12,15
224:2,3
225:3 227:7
236:21
241:1 242:3,
18 243:3
249:2,13
250:1 252:9
254:7
255:18,21
263:21
270:23
**timeline**
174:10,15
**timeliness**
115:6
**times** 6:15
13:20 18:4,
10,14,22
29:17 42:23
57:12 69:9
76:17 82:9,
11 91:3,23
92:2 106:1
121:2 128:7
134:23
150:16,19
203:11
230:22
249:24
**timewise**
8:17
**timing** 124:4
212:7 227:6
239:15
**tip** 269:2,3
**tipped**
269:20
**tips** 266:24
**today** 8:6
13:15 19:16
20:2,17
21:12,16,20
22:14 54:8
67:5 124:8,
18 159:9
160:6
181:12
182:24
198:11
207:7
208:13,14
210:1 211:3

221:12
240:23
**told** 35:23
38:7 44:11
63:18,20
69:9,17
71:4,7
102:11
104:16,23
105:5 108:1,
19 109:17
113:22
128:17,18
134:2
148:12
150:17
151:6
165:18
173:19
178:1
180:21
181:7
186:10
188:20
192:4
198:10
206:10
211:7,8
212:3,6
216:1
217:11,18
222:11
231:20
246:2
269:10
**tolerate**
103:16
**Tom** 253:20
**Tony** 70:14
**top** 265:22,
23
**torture** 21:5
**tossed** 77:13
**total** 151:18
**totally** 46:15
121:22
148:19
**touch** 48:2
69:18,19
140:16
146:9 167:1
**touched**
72:10
148:24
**touching**
69:16 70:1
**tourniquets**
47:8
**tower** 89:16
**track** 224:7,
13
**traffic** 18:17
**trafficking**
155:6
**trainer** 76:21
**training**
46:13 51:2,7
52:21 53:17
63:22 71:20

72:5,6
75:13,15,17,
23 76:4,8,
17,22 78:18,
19 79:12
80:2,9,10,
14,23,24
82:2,14
83:2,4 86:4
96:19 98:4,
10 120:15,
19,21,23,24
200:21
201:15
**trainings**
75:24 79:6,
15,17 80:4
**trait** 77:9
**traits** 77:8
**tramping**
77:17
**transcript**
88:10 184:6,
13,24
185:22
210:19
215:4
270:19
**transgressio
n** 78:14
**treated** 119:8
121:5
127:23
**treating**
105:13
**trial** 14:2
18:11,15,17,
24 19:1
53:20
**trials** 18:2,10
**triennial**
75:22
**trip** 47:12
**trouble** 68:8
**true** 131:7
167:21
185:12
213:23
224:20
244:10
**trust** 36:8
102:24
103:4
186:15
226:6 227:4
250:14,16
**truthfully**
21:12,15,20
**turned** 48:12
55:1 182:17
**turning**
26:11
**turns** 264:4
**two-hour**
82:15
**type** 27:9,20
37:11 44:13,
21 47:21

55:21 56:20
212:19
227:3 239:7
260:10
**types** 121:6
**typical** 221:8
**Typically**
151:5
**Tyree** 12:6

———

**U**

**U.S.** 94:15
**Uh-huh**
25:19 30:7
49:20 55:24
158:24
167:19
170:7
255:23
265:18
**ultimately**
32:22 66:4
156:21
**unable** 198:1
**unassigned**
51:16
**unaware**
133:9
218:16
**unclear**
90:19
227:18
**uncomfortabl
e** 200:8,18
**uncover**
262:20
**understand**
10:23 12:23
15:16 19:18,
19,20 20:17,
24 28:18
31:4 39:6
40:1,4,7,10,
14 72:20
73:3,13 75:1
86:3,12
90:11 99:14
119:11
125:3 128:9
129:4
130:21
132:5,7
149:7
162:17
169:22
171:1 173:7
176:2
188:23
201:3,4
204:21
205:2 207:3,
4 209:8,13
213:15
248:18
254:5
256:22
258:5 259:3
260:2 269:7
270:21

**understandin
g** 10:16 25:2
201:16
202:13
228:6
245:18
247:21
**understands**
131:10
245:9 258:2
**understood**
20:10 25:9
45:8 62:13
129:18
138:5 157:2
165:21
243:4
**undertaken**
263:4
**underway**
113:19
**unfounded**
262:17
**uniformed**
103:24
152:12
**union** 92:13,
16 156:7
**unit** 95:20
96:17 97:11
99:18
100:10
101:4
110:24
155:22
224:19
225:13
**United** 5:5
**units** 57:9
151:3 153:1
**unlike**
133:12
**unnoticed**
74:2
**unofficial**
111:2
**unofficially**
101:14
**unspecific**
194:14
**untruthful**
103:17
255:9,11,13
**untruthfulne
ss** 203:23
255:1
**unusual**
178:1,3
260:5
**unwilling**
266:7
**upheld**
258:23
**upset** 59:23
201:17
207:10
218:7 223:5
250:4

190:4

**V**

**vacancies**
51:1
**vacated**
180:19
**vacation**
51:2
**vacuum**
30:19
**Van** 91:8
93:2
**Vardaro** 5:15
158:5,10,13,
16,19
166:20,22,
23 188:5
190:12
218:24
234:6
235:11
256:2
265:20
**variety** 73:4
75:5,10
231:14
244:6 262:5
**vehicle**
74:17
**verbal**
109:21
113:7
**verbally**
239:3
**verified**
168:3
**verify** 245:21
**versa** 187:7
**verse** 5:5
**version**
129:6 158:6
**versions**
130:24
**vice** 162:22
164:2 187:6
193:19
**victim** 41:17
**video** 29:15
262:21
**view** 10:17
61:24 62:14
268:3
**viewed** 30:6
32:21 34:1
42:13 43:8
62:18 63:5
73:15
229:14
**violate** 103:1
**violated**
15:20 103:6
**violates**
138:17
**violation**
85:15,18,19
102:4,12

**violations**
240:24
257:5,20
**violence**
37:23 38:4
124:10,21
125:17,23
229:1,3,5
239:1
**violent**
38:18,24
127:1
137:10
**violently**
200:6
**visit** 47:12
**vital** 152:10
**volunteer**
46:24 47:3
**volunteered**
173:11
**vote** 71:5

**W**

**wait** 57:21
**waiting**
231:16
**waived** 271:1
**walk** 150:20
**walked** 69:14
**walking** 92:3
**Walton** 5:17
**wanted**
57:17
120:18
121:2 144:8
150:17
151:15,24
154:18
165:19
177:21
191:3,9
194:12
196:17
218:13,14
230:2,7
231:12
241:19
251:6
**wanting** 75:7
182:16
**war** 77:15,16
**warning**
231:21
239:4
**warnings**
217:19
**Washington**
47:11
**watching**
212:17
**Watkins**
124:19
125:21
126:5,24

129:8 133:7
137:11
269:22
**ways** 72:9
190:21
194:17
214:2
**weapon** 38:8
41:12 68:6
148:14
200:3
221:18
243:6
**weapons**
41:10
**wear** 26:15
115:23
**wearing** 31:5
**week** 44:15
51:6
**weeks** 66:15
207:20
223:9
**weigh**
135:21
137:9,12,15
**weighed**
122:17
134:4
**weighing**
137:23
**weight** 69:15
**Wes** 116:21
**Wheeler**
58:22
**wheels** 47:22
**white** 55:4
66:23
128:17,23
129:21
135:6 171:3
186:23
205:16
223:2,7
**Whitney**
171:21
172:3 176:7
189:3 197:1
242:8
**wife** 99:8
**Williams**
97:5,8,9
110:1,3
111:21
118:8,20
121:11
124:10,21
129:7
137:17
**Williams'**
164:1
**win** 55:16
**wise** 98:11
**withdrew**
182:4
**witnessed**
69:20

**witnesses**
39:18,19
103:22
130:22
195:2
205:15
242:19
249:3 251:8
**woman**
54:22 61:3
62:4,15,22
72:19 73:15
77:14
**women**
54:20 57:20
62:7 71:23
72:21 74:19
75:1
**won** 54:20,
21
**wondering**
158:11
**Woods**
253:23
**Wop** 78:1,9
**word** 127:13
135:8
137:14
142:7
185:24
195:4
198:23
221:3 232:6
235:5 265:2
**wording**
130:24
133:8
**words** 83:17
125:22
135:4
162:14
184:22
185:23
227:17,23
228:3 235:7
**work** 6:23
8:14 26:16
46:24 47:3
48:5,16
49:16 56:7,
15 57:2
91:15,24
93:8,18
95:18 97:7,
14 98:11,15
99:5 100:18
101:3
106:20
113:14,15
121:24
152:14,15
155:5 185:5
186:1
224:20
225:13
241:17
251:6,24
258:17,21,
22
**worked**
97:11 98:3,
19 99:17
100:9 101:3

153:24
192:11
**worker** 106:6
**working**
51:19 59:9
72:24 96:17
98:5 198:21
242:4 249:9
**workplace**
120:1
**works** 25:17
96:13
103:15
192:23
259:3
**worried**
184:21
224:3
**worse**
259:10
**worth** 202:10
**worthy**
259:19
**wow** 17:3
**wrap** 203:13
**write** 260:17
**writing** 239:4
262:11
**written** 28:1,
2 30:12
33:9,15 34:4
36:15,17
86:21
126:12
138:12
160:15
173:8,9
174:6 193:8
263:2
**wrong** 20:20
103:2
168:22
247:2
**wrote** 166:12

**Y**

**year** 53:13,
24 79:7,12,
20 80:3
82:3,10
150:16,19
153:6
155:13
224:24
225:1,9
**years** 7:15,
24 8:2 9:9
20:16 24:6,
10,11 35:4
36:14,16
37:12 44:11
51:3,10
52:6,9,23
59:2 60:19
63:9 66:22
67:9 69:5
80:2 82:4,
11,13 87:10
88:6,12

90:8,15 91:1
103:5 115:2,
23 117:23
133:2
137:20,24
150:2,12
195:24
260:7,8
**yell** 78:1

___

**Z**

___

**Zimmerman**
11:19 13:2
**zone** 51:13
52:17 98:23
99:1 237:24
**zoning** 92:21