1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Karl Shaw,                            :

      Plaintiff,              :
                      Case No. 2:18-cv-483
      vs.                     : Judge Graham
                      Magistrate Judge Vascura
City of Columbus,                     :
et al.,
                        :
      Defendants.
                        :

- - - - -

DEPOSITION OF JENNIFER KNIGHT

- - - - -

Taken at Spectrum Reporting LLC
400 S. Fifth Street, Ste. 201
Columbus, OH 43215
June 14, 2019, 11:54 a.m.

- - - - -

Spectrum Reporting LLC
400 S. Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

2

1                     A P P E A R A N C E S

2

ON BEHALF OF PLAINTIFF:
3
        The Gittes Law Group
4       723 Oak Street
        Columbus, OH 43205-1011
5       By Frederick M. Gittes, Esq. and
            Jeffrey P. Vardaro, Esq.
6
        and
7
        Walton & Brown, LLP
8       395 East Broad Street, Ste. 200
        Columbus, OH 43215
9       By Sean L. Walton, Esq.

10

ON BEHALF OF DEFENDANTS:
11
        Columbus City Attorney's Office
12      77 North Front Street, 4th Floor
        Columbus, OH 43215
13      By Richard N. Coglianese, Esq. and
            Cyndy Peterson, Esq.
14

15   ALSO PRESENT:

16      Karl Shaw

17

18

19

20

21

22

23

24

3

1                    Friday Morning Session

2                    June 14, 2019, 11:54 a.m.

3                    - - - - -

4              S T I P U L A T I O N S

5                    - - - - -

6         It is stipulated by counsel in attendance that

7    the deposition of Jennifer Knight, a witness

8    herein, called by the Plaintiff for

9    cross-examination, may be taken at this time by

10   the notary pursuant to notice and subsequent

11   agreement of counsel that said deposition may be

12   reduced to writing in stenotypy by the notary,

13   whose notes may thereafter be transcribed out of

14   the presence of the witness; that proof of the

15   official character and qualification of the notary

16   is waived.

17                    - - - - -

18

19

20

21

22

23

24

4

1                    I N D E X

2    Examination By                              Page

3    Mr. Vardaro - Cross                            5

4    Plaintiff's Exhibits                         Page

5    Exhibit 10 - E-mails to Decker from Cameron   37

6    Exhibit 11 - Informational Summary #9         57

7    Exhibit 15 - E-mails to E. Moore from R.     133
8                 Moore, 1/15/15

9    Exhibit 20 - Routing Sheet for Correspondence, 103
                  1/23/15
10   Exhibit 22 - Text Message                    121

11   Exhibit 26 - Informational Summary #57        81

12   Exhibit 35 - Informational Summary #68        81

13   Exhibit 38 - Investigative Summary to Knight 105
14                from Decker, 9/28/15

15   Exhibit 41 - Routing Sheet for Correspondence, 106
                  10/14/15
16   Exhibit 52 - Investigator's Case Chronology   78

17

18

19

20

21   (Exhibits retained by Spectrum Reporting)

22

23

24

5

```
 1                    JENNIFER KNIGHT

 2     being first duly sworn, testifies and says as

 3     follows:

 4                    CROSS-EXAMINATION

 5     BY MR. VARDARO:

 6     Q.          Could you state your name for the

 7     record.

 8     A.          Commander Jennifer L. Knight,

 9     K-N-I-G-H-T.

10     Q.          Okay.  Who's you're current employment?

11     A.          Columbus Division of Police.

12     Q.          And your current rank?

13     A.          Is commander.

14     Q.          Okay.  Are you -- I may have

15     misunderstood this.  Are you an interim or acting

16     deputy chief?

17     A.          I'm an acting deputy chief since

18     probably about coming on five months at this point

19     right now, but my official rank is commander.

20     Q.          Okay.  Have you been in a deposition

21     before?

22     A.          Yes.

23     Q.          About how many times?

24     A.          I have no idea.
```

6

```
1    Q.        Okay.  A pretty large number or --

2    A.        Fair amount.

3    Q.        Okay.  When was the last time you can

4    remember?

5    A.        It might have been this year.

6    Q.        Okay.  Do you remember what the case

7    was?

8    A.        No.

9    Q.        Okay.  Do you remember what the case

10   was about?

11   A.        I think -- I think it was relative to

12   my tenure in internal affairs, so it was related

13   to an internal affairs case.  I believe that was

14   the last one.

15   Q.        Okay.  Do you know whether it was a

16   citizen complaint or a shooting case or an

17   internal investigation or what?

18   A.        I believe the most recent one was

19   related to an internal investigation --

20   Q.        Okay.

21   A.        -- that occurred during that time.

22   Q.        Okay.  Any idea who the investigation

23   was?

24   A.        I think it was the Zimmerman Lazar
```

1    case, but honestly I could be wrong.

2    Q.          Okay.  Well, and how about do you

3    remember -- well, have you been in a deposition

4    about a discrimination case before?

5    A.          I'm sure I have.

6    Q.          Okay.  Is the Zimmerman Lazar case a

7    discrimination case or --

8    A.          I believe that was some of the

9    allegations that were made.

10   Q.          Okay.  Is that the one with the photos

11   from the cell phone or something like that?

12   A.          Yes.  Yes.

13   Q.          Okay.  Well, since it's been at least a

14   few months and some of these depositions may run

15   together a little bit, I'll go over some of the

16   ground rules that I use when I do depositions.

17               First of all, I introduced myself

18   earlier, but my name is Jeff Vardaro.  I'm one of

19   the attorneys for Karl Shaw in this case.  And I

20   will be asking you most, if not all, the questions

21   today.

22               If I ask you a question and you answer

23   it -- actually sorry.  If I ask you a question and

24   you don't understand the question, you understand

8

1    that you can ask me to rephrase it so you can

2    understand it?

3    A.        I do understand that.

4    Q.        If you answer a question and you don't

5    ask me to rephrase it, I'm going to assume that

6    you understood the question unless you tell me

7    otherwise, okay?

8    A.        Okay.

9    Q.        Also I'm going to be asking you some

10   questions about things that happened four or

11   five years ago.  I understand that nobody's memory

12   is perfect.  If you realize in the course of the

13   deposition that you got something wrong or you

14   remembered something that you didn't remember when

15   I first asked it, do you understand you can

16   interrupt me at any point to add to or correct one

17   of your previous answers?

18   A.        I do.

19   Q.        And you'll do that for me?

20   A.        I will.

21   Q.        Okay.  I'm going to ask you a couple

22   questions I ask almost everybody.  First of all,

23   do you suffer from any medical conditions or are

24   you on any medications or drugs that would affect

9

1    your ability to testify fully and accurately

2    today?

3    A.          No.

4    Q.          Okay.  Do you have -- have you ever

5    been convicted of a crime?

6    A.          Does that include traffic offenses?

7    Q.          It does not include non criminal

8    traffic offenses, I guess I will say.

9    A.          I do not think so.

10   Q.          Okay.  Did you have an opportunity to

11   meet with counsel to prepare for this deposition?

12   A.          Yes, I did.

13   Q.          When was that?

14   A.          Last week.

15   Q.          Okay.  Just the one time?

16   A.          Yes.

17   Q.          For about how long?

18   A.          Oh, maybe 40 minutes.

19   Q.          Okay.  Did you review any documents to

20   prepare for the deposition?

21   A.          I don't believe so.

22   Q.          Okay.  Have you reviewed the lawsuit in

23   this case, the complaint that Karl Shaw filed?

24   A.          When it was originally filed, I believe

1    I read it.  I have not read it since that time.

2    Q.          Okay.  Could you -- you reviewed, at

3    some point at least obviously, the investigative

4    summary and investigation materials about the Eric

5    Moore investigation from 2014, 2015, right?

6    A.          Yes.

7    Q.          When would you say is the last time

8    that you looked at those materials?

9    A.          I can tell you I have not looked at

10   those materials since I left internal affairs

11   in -- at the beginning of 2017.  I don't believe

12   I've looked at anything since then.

13            Prior to that time, it would have

14   probably been a large amount of time while I was

15   still in internal affairs that I had -- since I

16   had reviewed that material.  So it's been a long

17   time since I have reviewed anything for that case

18   in relation to any of the materials I believe.

19   Q.          Okay.  Have you reviewed any of your

20   e-mails or memos or anything like that from that

21   time period?

22   A.          No.

23   Q.          Okay.  What is your highest level of

24   education?

11

1    A.          Graduated from Capital Law School in

2    2016.

3    Q.          Okay.  With a JD?

4    A.          Uh-huh.

5    Q.          Okay.  What was your education prior to

6    that?

7    A.          I went -- graduated from Capital proper

8    several years prior to that.  Sometime in my 40s,

9    I can't remember the exact date, with my

10   bachelor's.

11   Q.          What was your bachelor's in?

12   A.          Political science and public

13   administration.

14   Q.          Okay.  I think I know the answer to

15   this, but do you practice law?

16   A.          I do not.

17   Q.          Okay.  Have you ever practiced law?

18   A.          I have not.

19   Q.          Okay.  Taken the bar exam?

20   A.          Yes, I have.

21   Q.          Pass the bar exam?

22   A.          Yes, I did.

23   Q.          Okay.  Congratulations.

24               And how long -- okay.  First of all,

1    how is it that you became an interim or acting

2    deputy chief?  Were you filling some vacancy?

3    A.          Yes.  Chief Kim Jacobs retired the

4    first part of February.  Chief Tom Quinlan or

5    Deputy Chief Tom Quinlan was named as the interim

6    chief of police until a -- they completed a

7    search -- national search for a chief of police.

8              I worked for Tom Quinlan, and I was his

9    commander for two years, and I had worked for him

10   previously.  We had a very good working

11   relationship.  He came to me and said, I have a

12   vacancy, I would like you to come up and fill that

13   vacancy that I am leaving, and it will probably be

14   for an extended period of time.  For continuity's

15   sake, he did not want a rotating acting schedule.

16             And I agreed to come up and operate as

17   the deputy chief of patrol north, which was his

18   previous position, and fill that vacancy until a

19   decision was made regarding whether or not he

20   would be named permanent chief or someone else

21   would be named chief.

22   Q.          So I think you may have already

23   answered a couple of my next questions, which is

24   was there -- there was no formal selection process

1    or application process for that position?

2    A.        No.  It's an acting position.

3    Typically short-term actings are rotated

4    positions.  Long-term actings are filled at the

5    discretion of the chief of police --

6    Q.        Okay.

7    A.        -- for those types of positions.

8    Q.        Not by seniority?

9    A.        No, not by seniority.

10   Q.        Were you the most senior commander?

11   A.        No.  No.

12   Q.        Okay.  Who would the most senior

13   commander have been, do you know?

14   A.        I think that would be Mike Springer.

15   Q.        Okay.  So your deputy chief assignment

16   is patrol north?

17   A.        Yes.

18   Q.        Okay.  Other than patrol, is there

19   anything under your command?

20   A.        Yes.  Actually, the strategic response

21   bureau is under that section right now.  We are

22   undergoing a reorganization that will occur the

23   14th of July, so we're transitioning, and I will

24   probably be moving subdivisions to be acting over

1    a different subdivision, which will include

2    different bureaus.  But right now I have zone one,

3    zone four and strategic response bureau.

4    Q.        Prior to being named acting deputy

5    chief, what was your assignment?

6    A.        I was the commander of zone four

7    patrol.

8    Q.        Who's now the commander of zone four

9    patrol?

10   A.        So I filled that vacancy with another

11   acting who was my lieutenant on third shift, who

12   is situated as the first person to get promoted to

13   commander anyway, so that would be the reasonable

14   and natural thing to do would be to put that

15   person in.  Worked out very well to just move him

16   into that position, because he had served as

17   acting in the past.

18   Q.        And who is it?

19   A.        Oh, I'm sorry.  Lieutenant Rob Sagle.

20   Q.        Okay.

21   A.        S-A-G-L-E.

22   Q.        All right.  And who's the commander in

23   zone one?

24   A.        Gary Cameron.

15

1    Q.        Okay.  So you're Commander Cameron's

2    direct supervisor currently?

3    A.        Yes.

4    Q.        Okay.  Prior to being zone four

5    commander, what was your assignment?

6    A.        Internal affairs commander.

7    Q.        For how long?

8    A.        Approximately two and a half years.

9    Q.        Okay.  So roughly you said the

10   beginning of 2017 is when you left IA?

11   A.        Correct.

12   Q.        So it would have been --

13   A.        Well, actually, I think it was

14   August -- August would have been three years,

15   so...

16   Q.        August 2014?

17   A.        Yeah, is that about right?  I think so.

18   Q.        I mean, August 2014 would have been

19   right around the time that this --

20   A.        Yes, that would be -- that would be

21   correct.

22   Q.        -- this particular investigation of

23   Eric Moore started.

24   A.        Okay.

1    Q.         Does that sound right to you that you

2    would have been just coming into IA?

3    A.         I was there approximately two and a

4    half years, so if you work that backwards, it's

5    going to be August of that, you know, prior period

6    of time.

7    Q.         Okay.  Was that your first assignment

8    as commander or did you --

9    A.         No.

10   Q.         -- come to IA from something else?

11   A.         I was previously assigned to the

12   technical services bureau.  Technical services

13   bureau is an assignment that handles fleet for the

14   Division of Police.  Police net and IT services

15   for the Division of Police, print shop and some --

16   some of the support services that we were.  And

17   that was my first assignment upon being promoted

18   to commander.

19   Q.         Okay.  And when was that that you were

20   promoted?

21   A.         That would have been October of 2012.

22   Q.         Okay.

23   A.         I believe.

24   Q.         And I don't actually -- so is there a

17

```
 1    test -- is there a promotional like civil service
 2    type process for promotion from commander to
 3    deputy chief?
 4    A.          No, there is not.
 5    Q.          That's all at the discretion of the
 6    chief?
 7    A.          It used to be a testing process.  It is
 8    no longer a testing process.  It is an appointed
 9    position with an interview process.
10    Q.          Okay.  And the interview is just with
11    the chief or --
12    A.          No.  Actually, the interview starts
13    with the chief.  The chief makes -- kind of
14    interviews all applicants, then makes a selection
15    of those applicants and sends a short list over to
16    the director's office.  The director's office is
17    actually the one that is the appointing authority
18    for that, but there's a variety of people that
19    will interview you at that level.
20    Q.          Okay.  Safety director's office is what
21    you're talking about?
22    A.          Yes.  I'm sorry.  Yes.
23    Q.          Okay.  All right.  And when -- so prior
24    to being commander, I assume you were a
```

18

1    lieutenant?

2    A.        Yes.

3    Q.        When were you promoted to lieutenant?

4    Even a ballpark is fine, it doesn't matter much.

5    A.        Okay.  So I was a lieutenant about

6    three and a half years.  If I got promoted to

7    commander in October of 2012, so about three and a

8    half years prior to that, or about -- yeah, about

9    three and a half years prior to that.

10   Q.        Okay.  And prior to that you were a

11   sergeant?

12   A.        Yes.

13   Q.        When were you promoted to sergeant?

14   A.        I was -- so I came on the division in

15   '96 -- 1996.  And I was promoted to sergeant, I

16   think in 2006, so 10 years later I was a sergeant

17   for three years.  So about 2009 I would say I was

18   promoted to lieutenant, and then about three years

19   later I was promoted to commander.

20   Q.        Okay.  In -- prior to being commander

21   of internal affairs, did you have internal affairs

22   experience as a lieutenant or a sergeant?

23   A.        No.  I had not served any time in

24   internal affairs prior to that.

19

1    Q.         Okay.  Did you -- did you have any

2    experience as a detective prior to becoming

3    commander of internal affairs?

4    A.         No, I did not.

5    Q.         Okay.  Maybe I'm looking at any other

6    kind of special investigative unit experience of

7    any kind?

8    A.         No.  I served the majority of my career

9    in a patrol assignment.

10   Q.         Okay.  Did you have to go through any

11   kind of application process to become the

12   commander of internal affairs in particular?

13   A.         No.  All commander assignments --

14   commanders serve at the will of the chief of

15   police.  Chief of police makes all assignments --

16   Q.         Okay.

17   A.         -- at the commander level.

18   Q.         Okay.  Once you were assigned to

19   internal affairs, did you have to go through some

20   kind of special training in terms of how that unit

21   works, or is it just on the job?

22   A.         It is mostly on-the-job training.  I

23   did attend an internal affairs investigative kind

24   of course that was in Las Vegas during the course

1    of my tenure there.  We're encouraged to look for

2    opportunities for training at that level.  Not a

3    lot of them exist for command of an actual unit.

4    Q.        What -- how long was the course in

5    Vegas?

6    A.        I think it was about a week long that I

7    was down there.

8    Q.        Okay.  And was it specifically for

9    commanding an investigative unit or just for

10   general internal affairs?

11   A.        General internal affairs.

12   Q.        Okay.  Do you remember any specific

13   thing that you remember thinking about that

14   training, oh, I didn't realize I should do that

15   or, oh, that's something --

16   A.        No.

17   Q.        -- I should really think about?

18   A.        I did not.

19   Q.        Okay.  Have you had training -- well,

20   I'll start with now I understand you went to law

21   school, did you have -- did you take any classes

22   in law school about equal employment opportunity

23   or discrimination?

24   A.        Yes.

1    Q.          What classes?

2    A.          I don't remember specifically, but it

3    was part of the coursework.

4    Q.          Okay.  Do you know, was it a general

5    employment law class or was it specifically about

6    discrimination?

7    A.          I think that what it was is general

8    labor law, labor and employment law class, and we

9    had sections on discrimination and employment

10   discrimination.

11   Q.          Do you remember who taught it?

12   A.          I do not.

13   Q.          Okay.  While you've been with the

14   Columbus Police, have you received in-service

15   training on equal employment opportunity,

16   discrimination, retaliation, that sort of thing?

17   A.          Yes, routinely.

18   Q.          Okay.  When was the last time you went

19   to EEO training?

20   A.          I believe we have EEO training or

21   something that touches on EEO training every year

22   at some point.  Whether it's encompassed in a

23   greater human resources type training module or

24   not, but typically we have something every single

22

1   year about that.

2   Q.          Okay.  What is your understanding of

3   the Columbus Division of Police's policies about

4   equal employment opportunity, discrimination,

5   retaliation?

6   A.          Could you be more specific?

7   Q.          Is there a policy prohibiting

8   discrimination or retaliation?

9   A.          Absolutely.

10  Q.          Okay.  How does it relate to the laws

11  at the state and federal level in terms of

12  discrimination and retaliation?

13  A.          It reflects the laws.

14              MR. COGLIANESE:  Objection.  Go ahead.

15              THE WITNESS:  Sorry.

16              MR. COGLIANESE:  That's okay.

17  Q.          Are there things that might not rise to

18  the level of a state or federal legal violation in

19  terms of discrimination that would still be

20  against division policy, or is it pretty much a

21  one to one?

22              MR. COGLIANESE:  Objection.  Go ahead.

23  A.          I believe there are.

24  Q.          Okay.  Do you have any examples?

23

1    A.        I do not.

2    Q.        Okay.  Is it your understanding that

3    Columbus police officers and civilian staff can be

4    disciplined and terminated for violations of the

5    division's EEO policies?

6    A.        Yes, it is my understanding.

7    Q.        Okay.  Are you familiar with the

8    term -- actually, I'll take that interruption as

9    an opportunity to withdraw my question.

10             You can -- by the way, if you need to

11   take a call, you can.

12   A.        No, I -- I can look at it and tell you

13   whether it's important or not.

14   Q.        Okay.  All right.  And I think I

15   promised you beforehand that I would say this on

16   the record and then immediately broke that

17   promise, but if you at any point need to take a

18   break for any reason, fatigue or work interruption

19   or whatever, just let me know and we can take a

20   break.  The only thing I'll ask is if there's a

21   question pending, I'll usually insist that you

22   answer the question before we take the break.

23   A.        I understand.

24   Q.        Unless it's an emergency.

1           Can you tell me, I think you already

2    talked a little bit about your relationship with

3    Chief Quinlan, but do you consider Chief Quinlan a

4    friend?

5    A.          A professional friend.

6    Q.          Okay.  No socializing outside of work?

7    A.          No.

8    Q.          Okay.  How about retired Chief Jacobs,

9    what's your relationship with her?

10   A.          Professional.

11   Q.          Okay.  The -- jump back a second.  The

12   EEO training that you've received with the

13   Columbus Police, do you -- did you get handouts,

14   materials and things like that from those kinds of

15   trainings?

16   A.          I don't recall.  I would believe it's

17   very likely.

18   Q.          Okay.

19   A.          We typically have handouts for almost

20   every training.

21   Q.          Do you keep your training materials

22   or --

23   A.          Not normally.

24   Q.          Okay.  What happens to them?

25

1    A.        I do not know.

2    Q.        Okay.  You just walk out of the

3    training without the materials or you toss them

4    later or --

5    A.        So if I find the materials something

6    that I would want to look at later, I would take

7    them back to my office and potentially file them

8    or read them and then discard them later.  If I

9    don't find that there's anything in there that I

10   would like to look at again, then I would leave

11   them in the room.

12   Q.        Okay.  So do you -- do you have access

13   to the materials from your EEO trainings that

14   you've received since you became a commander, for

15   instance?

16   A.        I would believe that if I wanted access

17   to any training materials of any of the courses

18   that we've had to take during inservice, I could

19   call the training academy in advanced training and

20   ask for those.

21   Q.        Who typically provides the EEO -- do

22   you typically -- who typically teaches the EEO

23   training courses for the Columbus Police that you

24   get inservice?

26

1    A.        I think the ones I recall, it's usually

2    somebody from human resources.

3    Q.        From CPD human resources?

4    A.        Yes.

5    Q.        Okay.  Okay.  So going back, your --

6    could you describe your relationship with Chief

7    Jacobs?

8    A.        Professional.

9    Q.        Okay.  Were you ever what you

10   considered personal friends?

11   A.        No.

12   Q.        Okay.  Did you ever go to her house or

13   have her over to your house?

14   A.        I don't believe she's ever been to my

15   house and I have never been to her house.

16   Q.        Okay.  How about Gary Cameron, same

17   questions?

18   A.        I've never been to Gary's house.  I

19   don't think Gary has ever been to my house.

20   Q.        Okay.  Did you -- did you at any point

21   report to Commander Cameron?

22   A.        I don't believe so.

23   Q.        Okay.  And prior to this current

24   assignment, did you ever have him reporting to

1    you?

2    A.        I don't -- other than when I was in an

3    acting position temporarily, I do not believe so.

4    Q.        Okay.  That would have been for like a

5    couple days or something at a time?

6    A.        Yeah, no long-term acting.

7    Q.        Jumping back to -- well, I guess I'll

8    ask about Chief Quinlan first.  Do you consider

9    him to be a mentor of yours or --

10   A.        I do now.

11   Q.        Okay.  Are there any other officers in

12   the department currently or retired you consider

13   to be your mentors as a police officer?

14   A.        Yes.  One of the first sergeants I ever

15   had was Sergeant Laura Suber.  She's still a

16   sergeant.  I've always considered her to be a

17   mentor.

18   Q.        Okay.  Anybody else?

19   A.        As far as mentors?  I don't believe so.

20   Q.        Okay.  How about friends in the

21   department, people that you hang out with,

22   socialize with, have that kind of relationship

23   with, do you have friends in the department?

24   A.        Friends, yes, I have friends.

1    Q.         Okay.  Who would you say are your

2    closest friends in the department?

3    A.         Laura Suber.  Sergeant Shantey Boxill.

4    Commander Rhonda Grizzell.  Lieutenant LuEllen

5    Kuykendoll.  Let me think.  I think that's the

6    core group of people that I would consider my

7    friends on the division.

8    Q.         Okay.  What's your -- what's been your

9    professional or personal experience with Ken

10   Decker?

11   A.         Professional.

12   Q.         Okay.

13   A.         He was a sergeant in internal affairs

14   when I was the commander of internal affairs.

15   Q.         Okay.  Was he already there when you

16   came on --

17   A.         Yes.

18   Q.         -- to internal affairs?

19             Okay.  Do you remember how long he had

20   been on internal affairs before you got there?

21   A.         No.  He was relatively tenured, though,

22   I do remember that.

23   Q.         Okay.  Did you have a good experience

24   with Sergeant Decker?

1    A.         I thought he was very competent.

2    Q.         Honest?

3    A.         Yes.

4    Q.         Did you ever have to discipline him for

5    anything or approve discipline of him?

6    A.         I don't recall any.

7    Q.         Okay.  Who was the sergeant between you

8    and -- I'm sorry, the lieutenant between you and

9    Sergeant Decker?

10   A.         Lieutenant Mike Deakins, I believe --

11   Q.         Okay.

12   A.         -- was the lieutenant out there.

13   Q.         Okay.  What -- same questions about

14   Lieutenant Deakins, reliable, honest, that kind of

15   thing?

16   A.         Yes.  Yes.

17   Q.         Okay.  Sergeant Decker has described to

18   us a sort of situation in internal affairs, I

19   guess traditionally or regularly, where a lot of

20   times the commander of IA would have a more

21   supervisory or more direct supervisory control

22   over investigations that a sergeant was doing than

23   a lieutenant, that the lieutenant often got sort

24   of skipped in the chain of command, at least

1    informally.  Does that sound right to you?

2    A.        What's the question?

3    Q.        The question is:  Was it the -- was it

4    true in internal affairs, at least at the time

5    when you were in internal affairs, that you would

6    often have a lot of direct interaction with the

7    sergeants that were doing the investigations?  And

8    at least for certain investigations, the

9    lieutenant might be a little more hands off?

10   A.        So I will say it's true that I had a

11   lot of interaction with the sergeants that were

12   doing investigations, for most of the

13   investigations.  I would have a lot of interaction

14   regarding their investigation regardless of what

15   level it would be.  It's a very small group of

16   people.  Those have to be signed and approved by

17   me.  So when they would have questions, they were

18   welcome to come in and ask me directly.  I always

19   tried to keep the lieutenants informed or in the

20   loop if there was decisions being made, but I

21   would say I had a lot of involvement in most

22   investigations, even very minor in nature.

23   Q.        Okay.  And the reason I ask is a lot of

24   times when we have depositions of police officers,

1    the emphasis is on the fact that you're in like a

2    paramilitary organization?

3    A.          Chain of command.

4    Q.          You have a chain of command, and

5    sergeants talk to lieutenants, lieutenants talk to

6    commander, that kind of thing.  And the point is

7    that the way you're describing it, it's a little

8    looser in internal affairs because it's a small

9    group and the commander has a lot of hands on?

10   A.          Correct.  Correct.  Our offices are

11   literally right next to each other.  If the

12   lieutenant isn't available, the commander is the

13   next person that needs to be asked that question.

14   My signature would go on everything, so it

15   wouldn't make any sense to wait and ask a

16   lieutenant if they're off on vacation for two

17   days, so -- because of the proximity and the small

18   nature of that environment, I think it is a little

19   different dynamic than you would see in other

20   parts of the Division of Police.  But the

21   lieutenants were always still very involved in

22   everything.

23   Q.          Okay.  And the other way that we've

24   heard that IA is a little bit different than a lot

32

1    of other units in the Columbus Division of Police

2    is that at least while Chief Jacobs was chief, the

3    commander of internal affairs would report

4    directly to the chief and not go through a deputy

5    chief; is that right?

6    A.          Correct.

7    Q.          Okay.  How many officers were in

8    internal affairs when you were in charge of

9    internal affairs?

10   A.          There were no officers there.

11   Q.          Or I'm sorry, how many --

12   A.          Sergeants.

13   Q.          -- sworn police personnel were in --

14   A.          Okay.  So we had two lieutenants, I

15   believe there were 20 investigators, sergeant

16   investigators, and I believe there were four

17   individuals that were the intake sergeants.  I

18   believe --

19   Q.          Okay.

20   A.          -- that was the number.

21   Q.          The intake sergeants would deal with

22   civilian complaints?

23   A.          That was purely intake.  They did not

24   do investigations.

1  Q.        Okay.  But, I mean, they were taking

2  intake from civilians not like if it was an --

3  A.        Internal?

4  Q.        -- internal investigation?

5  A.        Correct.  There's a different process

6  for internals.

7  Q.        What's the process for internals?

8  A.        The correct process for an internal

9  complaint is to write a letter up your chain of

10  command.  It will go all the way up your chain of

11  command to a deputy chief, who will then determine

12  if it comes to internal affairs or if it's

13  investigated by the chain of command.

14  Q.        Okay.  Is that how the Eric Moore

15  investigation started in 2014?

16  A.        I don't remember.

17  Q.        Okay.  What is the first thing you

18  remember hearing about the Eric Moore

19  investigation?

20  A.        I dealt with a lot of investigations

21  while I was there.  I don't remember what the

22  first thing I heard was about that investigation.

23  Q.        Okay.  Do you remember that the

24  investigation had a number of different sort of

1    relatively unrelated threads, I guess I'll call

2    it?

3    A.          Yes.

4    Q.          Some of it had to do with overtime and

5    property and some of it had to do with

6    discrimination, equal employment opportunity,

7    retaliation, that kind of thing?

8    A.          Yes.

9    Q.          And then there were aspects of the

10   investigation that had to do with Sergeant Moore's

11   conduct while he was in SRB, and then some parts

12   of it had to do with his later conduct while he

13   was in narcotics?

14   A.          Yes.

15   Q.          Okay.  Do you remember which part of

16   the investigation you became involved with first?

17   A.          No, I do not.

18   Q.          Okay.  Is it typical at the beginning

19   of an internal affairs investigation that there

20   will be a decision made by the chain of command

21   about whether the officer under investigation will

22   remain on duty during the investigation?

23   A.          It's not typical of every

24   investigation, no.

1    Q.          Okay.

2    A.          Just certain investigations where the

3    misconduct is -- has the appearance of being

4    critical in nature.

5    Q.          Okay.  What is critical misconduct?

6    A.          Critical misconduct is a very --

7    actually a very vague term.  It's misconduct that

8    is -- that is considered potentially terminable in

9    a lot of cases, or will result in departmental

10   charges or serious -- potentially serious

11   consequences.

12   Q.          Okay.  Can equal employment opportunity

13   policy violations be critical misconduct?

14   A.          They can be.

15   Q.          Okay.  Retaliation for -- against an

16   officer who's a witness in an EEO investigation,

17   would that typically be critical misconduct?

18   A.          It can be.

19   Q.          Okay.  Are there circumstances where it

20   would not be?

21   A.          Well, when an allegation is brought

22   forth, we have to evaluate that allegation and see

23   if there's any evidence of it.  The mere

24   allegation itself doesn't necessarily mean an

1   officer should be relieved of duty or it's termed

2   -- deemed critical misconduct.  If there's

3   absolutely no evidence that this occurred or the

4   veracity of the claim is in question.  Those

5   decisions are made at the level of chief or deputy

6   chief of police.  So internal affairs does not

7   make those -- those decisions at all.  Those are

8   just merely articulated to the deputy chief or the

9   chief of police.

10  Q.          Okay.  And I'm -- I know I had asked

11  you about leaving somebody on duty versus taking

12  them off duty during the investigation.  But

13  I'm -- I sort of have -- I'm trying at least to

14  switch subjects a little bit to just what is

15  considered and isn't considered critical

16  misconduct.

17            And so my question is:  You know, a

18  sustained allegation of retaliation against an

19  officer who's a witness in an EEO investigation,

20  are there any circumstances where that would not

21  be considered critical misconduct?

22            MR. COGLIANESE:  Objection.  Go ahead.

23  A.          I can't say there is no circumstances.

24  Every single time we get a situation, it seems to

37

1    be a different set of circumstances, and those

2    have to all be evaluated.  So I don't make those

3    decisions about whether an officer's relieved of

4    duty.  I am merely conveying the information and

5    the evidence that we have at the time, so I'm not

6    weighing in on those decisions at all.

7    Q.        Okay.  I'm going to hand you what's

8    been previously marked as Plaintiff's Exhibit 10.

9    And I want you to take a moment and just take a

10   look at that document and let me know when you're

11   ready to answer questions about it.

12   A.        Okay.

13   Q.        Do you have an understanding of what

14   that document is?

15   A.        It looks like an e-mail that details an

16   allegation that has come in.  And Gary Cameron's

17   being notified that one of the individuals is -- I

18   believe Sergeant Moore must have worked for him at

19   the time.  And he's being notified of the

20   information related to the allegations.

21   Q.        Okay.  And the purpose of the

22   notification -- first of all, the notification is

23   coming from Ken Decker?

24   A.        Okay.

1    Q.        Right?

2    A.        Yes.

3    Q.        Okay.  And the -- it appears that the

4    purpose of the conversation between Commander

5    Cameron and Sergeant Decker was so that Commander

6    Cameron could determine whether Sergeant Moore

7    would remain on duty during the pendency of the

8    investigation?

9              MR. COGLIANESE:  Objection.  Go ahead.

10   A.        It looks like he's advising him of the

11   investigation, some of the details of the

12   investigation or some of the allegations that are

13   being made and some of the details of the

14   allegations, and that Commander Cameron is

15   weighing in on some of that.

16   Q.        Okay.  And at the end of the chain,

17   which is the top of the page.

18   A.        Yes.

19   Q.        Commander Cameron is instructing

20   Sergeant Decker that he should keep him updated on

21   the investigation so that he can potentially

22   reconsider his decision to leave Eric Moore on

23   duty if more information comes to light?

24   A.        Yes, uh-huh.

39

1    Q.          And that includes an instruction that

2    if Sergeant Decker becomes aware of corroborated

3    allegations that would constitute critical

4    misconduct, he should let Commander Cameron know?

5    A.          Yes.  That's what it looks like he's

6    saying.

7    Q.          So at least for Sergeant Decker, he was

8    in a position where he would need to have some

9    understanding of what critical misconduct would be

10   to let Commander Cameron know what -- know that,

11   right?

12              MR. COGLIANESE:  Objection.  Go ahead.

13   A.          I would believe that he would have to

14   have an understanding of -- he was an experienced

15   and tenured internal affairs investigator.  He's

16   dealt with this stuff before.  I'm sure he

17   would -- if he had any questions, he would ask.

18   Q.          Okay.  And you also had that sort of --

19   at least a basic understanding of what a

20   commanding officer would mean when they said,

21   corroborated allegation of critical misconduct?

22   A.          Yes.

23   Q.          Okay.  Sergeant Decker informed you of

24   this communication with Commander Cameron?

1    A.        I don't recall.  I'm not on the

2    e-mail --

3    Q.        Okay.

4    A.        -- chain here, so I don't recall if I

5    was advised or not.  I see that Ron Gray is copied

6    on this, but I don't recall if I was advised of it

7    at all.

8    Q.        But you were aware at the time that at

9    least in Deputy Chief Gray's chain of command, his

10   desire and the desire of the officers under his

11   command was that if there was an officer being

12   investigated in their chain, they wanted to be

13   kept updated on the investigation so they could

14   make decisions about relief of duty?

15   A.        Okay.  My instruction comes from the

16   chief of police, that's who I report to.  Any

17   additional information -- if a deputy chief has

18   questions or anything about an investigation to a

19   certain degree, I would convey that information.

20   I would go to executive staff on occasion and give

21   them an overview of cases in general, but I

22   reported directly to Chief Jacobs, so I would keep

23   her informed of everything.

24             And if she, at some point, wanted me to

41

```
 1   provide additional information to a deputy chief

 2   that I shared with her, I would absolutely do so

 3   and did --

 4   Q.        Okay.

 5   A.        -- at some point.

 6   Q.        If Deputy Chief Gray came to you about

 7   an investigation without going through Chief

 8   Jacobs and said, can you tell me what's going on

 9   with such and such officer in my chain of command,

10   what would your response to that be?

11             MR. COGLIANESE:  Objection.  Go ahead.

12   A.        I believe my response would have been

13   to provide him the information I could.

14   Q.        Okay.  Did you have conversations with

15   Deputy Chief Gray where he let you know that he

16   wanted to be kept informed about the --

17   A.        I don't recall.

18   Q.        And I'm sorry, I'm going to -- that one

19   was a little bit of an exception, but we do need

20   to be careful as we go through the deposition.

21   I'm the type of person who sometimes takes a while

22   to get to the end of my question.

23   A.        Okay.

24   Q.        And so far it seems like you pretty
```

42

1    much stick to the point, but I'm going to try not

2    to interrupt your answers, and if you could try to

3    let me get to the end of the question --

4    A.          Absolutely.  Continue.

5    Q.          -- before you answer.

6                You just did it again.

7                Okay.  So you don't recall one way or

8    the other whether Deputy Chief Gray told you at

9    any point that he wanted to be kept informed as a

10   general matter about any investigations that were

11   going on within his chain of command?

12   A.          I do not recall specifically.

13   Q.          Okay.  Meaning it could have happened,

14   but you don't remember it if it did?

15   A.          Correct.

16   Q.          Okay.  Do you remember Deputy Chief

17   Gray or Commander Cameron coming to you about this

18   particular investigation, the Sergeant Moore

19   investigation, and asking you for information

20   about its status?

21   A.          I do not recall any particular times.

22   Q.          Okay.  As a general matter, if you

23   became aware during the course of one of your

24   sergeant's investigations of new information that

1    would corroborate an allegation of critical

2    misconduct or some new allegation that might

3    warrant taking the officer off of active duty,

4    what was your practice?

5              MR. COGLIANESE:  Objection.  Go ahead.

6    A.        The investigators in internal affairs

7    are dealing with these cases every single day.

8    They are expected to notify their lieutenant or

9    myself if they come across any additional evidence

10   or information that changes the course of the

11   case, and that would be included in that.

12   Evidence that would indicate that the misconduct

13   was more serious than previously believed or

14   evidence to support critical misconduct, that

15   would be brought to us.  My next course of conduct

16   would be to review that and then take it to my

17   boss, Chief Jacobs, and brief her.  Or if she

18   wanted me to brief the deputy chief involved and

19   say, this is what we have, this is the type of

20   evidence, this is the direction or course that

21   this has taken.  And then the decision to relieve

22   somebody of duty or make any changes regarding

23   their status would be hers.

24   Q.        Okay.  Do you remember any discussions

```
 1    with anyone about whether Eric Moore should remain
 2    on duty during the course of his internal affairs
 3    investigation?
 4    A.         That particular investigation was ever
 5    evolving.  So there was repeat -- every time we
 6    interviewed an individual, there would be
 7    additional allegations brought forth, so this
 8    particular investigation grew exponentially over a
 9    period of time.  There were constant changes.
10             And I don't remember a specific
11    conversation, and I don't remember with who, but I
12    do remember having these discussions every time
13    evidence or new allegations came to light what --
14    how do we proceed from this point?  This
15    particular investigation branched off into so many
16    different areas that this conversation had to
17    happen repeatedly.  Not just between me and the
18    investigator or the lieutenant, but me and the
19    chief of police as well, and whoever else in the
20    chain of command she felt it was necessary to
21    involve.
22    Q.         Okay.  So you remember multiple -- I
23    mean, maybe not remembering specific times that
24    they happened or the specific incidents, but you
```

1    remember having multiple conversations with Chief

2    Jacobs updating her on the evolving nature of this

3    investigation?

4    A.        Correct.

5    Q.        Okay.  Do you remember any of those

6    conversations involving the question of should

7    this guy still be supervising other officers?

8    Should this guy still have a gun and badge?

9    A.        I believe that was the context of some

10   of those conversations.

11   Q.        Now, it was the case in Eric Moore's

12   investigation that he was not relieved of duty

13   until after internal affairs completed the

14   investigation and issued a report?

15   A.        I believe that was the case.

16   Q.        Okay.  Do you have an understanding of

17   why that was?

18   A.        As we made decisions at different

19   junctures relative to the evidence and the

20   veracity of the evidence and whether we could

21   prove allegations that were relatively stale in

22   nature, being several years old, a lot of those

23   things we had to properly vet.  So just because an

24   allegation is made several years later, doesn't

1   mean we have evidence to support it.

2           And so as we were making those

3   decisions along the way, each time he's -- if he's

4   not relieved of duty and he's still supervising

5   individuals, first of all, that's not my decision

6   to make.  But I do believe that when the

7   investigation was done in the end, it was the

8   totality of the circumstances for the entire

9   investigation, it was something like 200 pages,

10  that led that decision to culminate in him being

11  relieved of duty.

12  Q.          Okay.  I want to go back to -- I mean,

13  I understand what you're saying in terms of it not

14  being your decision.  I mean, the chain of command

15  is who decides whether to take somebody off of

16  active duty?

17  A.          Correct.

18  Q.          But did Chief Jacobs give you any

19  understanding of why she had decided not to take

20  him off of active duty until the end of the

21  investigation?

22  A.          I don't recall her sharing with me why

23  she made the decision.

24  Q.          Okay.  Other than just one-on-one

1    conversations with Chief Jacobs as your

2    supervisor, I think you said you also would update

3    the executive staff about different

4    investigations?

5    A.        Yes.

6    Q.        Do you remember updating the executive

7    staff about this investigation as it went forward?

8    A.        I don't recall the dates that I would

9    come to executive staff.  That would be at her

10   request.  It was usually on a monthly basis.  I

11   would have a list of cases that were of interest

12   to them, and I would come and discuss that.  I

13   don't really remember what dates, and I don't

14   remember if this particular case was on the list,

15   but I would assume it would be.

16   Q.        Do you know whether somebody kept

17   minutes of executive staff meetings?

18   A.        There are minutes of executive staff

19   meetings kept.  They don't go into a lot of

20   details, because they're -- they're public record.

21   And we also allow officers to review what we

22   discussed at executive staff, so we're not going

23   to put a bunch of details about ongoing

24   investigations in there.  But I do not have copies

48

1    of any of those.

2    Q.         Did somebody keep attendance of

3    executive staff meetings?  Would that at least

4    appear in the minutes?

5    A.         I believe they have an attendance log

6    for that.

7    Q.         Okay.

8    A.         I just haven't --

9    Q.         Who keeps that log?

10   A.         That would probably be the chief's

11   secretary.

12   Q.         Okay.  At the time --

13   A.         Tina Hundley.

14   Q.         Okay.  It was Tina Hundley throughout

15   this period of time?

16   A.         I believe so.

17   Q.         Okay.  Do you remember any specific

18   discussion in executive staff meetings about the

19   question of whether Eric Moore should be remaining

20   on duty given some of the allegations and evidence

21   that had been collected against him during this

22   investigation?

23   A.         I don't remember any specific

24   discussions.

49

1    Q.          Okay.  Other than executive staff

2    meetings and one-on-one discussions with Chief

3    Jacobs -- oh, I'm sorry, I -- Fred is reminding me

4    that -- so when you said you don't remember any

5    specific discussions with executive staff about

6    Eric Moore's duty status, do you mean you don't

7    remember it one way or the other?  Like you don't

8    remember whether or not those discussions

9    happened?

10   A.          I'm sure they did.  It was -- if I

11   would come to executive staff with a list of

12   12 cases, I would go over each case briefly and

13   answer any questions.  There would be some

14   discussion regarding the case at the table.  I was

15   there to answer questions, so I don't remember any

16   specifics of any discussion.  But it would be

17   normal for that discussion to occur at least

18   briefly in my presence.

19   Q.          When would have been the earliest in

20   the investigation when those kinds of executive

21   staff discussions might have taken place?

22   A.          I don't recall.

23   Q.          What -- I'll ask a particular thing,

24   which is:  So there were so many different parts

1      of this investigation, including some that were

2      under Deputy Chief's Quinlan's chain of command

3      and some that were under Deputy Chief Gray's chain

4      of command in narcotics.  Do you remember there

5      being discussion about whether both of those

6      portions of the investigation should be handled

7      by -- under one chain or the other rather than

8      splitting them up or --

9      A.          I don't remember that discussion.

10     Q.          Okay.  How about any discussion about

11     whether this should all just be one investigation

12     or whether it should be one investigation about

13     the narcotics part and one investigation about the

14     SRB part, or one investigation about the overtime

15     and property stuff and one investigation about the

16     EEO stuff?  Did you have those kinds of

17     discussions?

18               MR. COGLIANESE:  Objection.  Go ahead.

19     A.          So internally, we would probably -- in

20     an investigation like this, and I do recall us

21     looking at whether or not when these allegations

22     start coming forward, whether we should separate

23     them.  We make the decision in internal affairs

24     whether or not we should separate them, should we

1    give them to an additional investigator there?  Is

2    that going to make things more difficult?  Is it

3    going to require additional interviews?  Is it

4    going to be -- require more time?  Are we going to

5    be doing things twice?  A lot of those types of

6    things are what we consider when we do that.

7                I remember this particular

8    investigation being something that every time we

9    would get a new course of allegations that we

10   would have to pursue, that we would have to

11   evaluate the best way to handle that and we would

12   look at that.  We left Ken Decker on this because

13   it involved all the same people, all the same

14   interviews.  And every time we had an interview

15   with that particular person, there was a new set

16   of allegations is what it appeared.  And so we

17   felt like bringing in a brand new investigator, at

18   this point, separating it would make it difficult.

19   I think that this investigation as a whole had to

20   be read as an entire investigation separated into

21   sort of blocks, which is what we did with this

22   investigation.

23   Q.          Okay.  And you've mentioned -- I mean,

24   it -- I'm sensing a little bit of maybe

```
 1    frustration in your voice, although you and I

 2    don't know each other, so I'm using my intuition

 3    here, I guess.  But -- about every time you

 4    interviewed somebody, there would be new

 5    allegations and you have to go into the

 6    allegations and it would develop further from

 7    there.

 8              It's also the case about this

 9    investigation that a whole lot of those

10    allegations that came up in the middle of

11    interviews about something else turned out to be

12    sustained; that they -- those were allegations of

13    actual misconduct that ended up being found

14    against Sergeant Moore, right?

15    A.          I don't recall the exact allegations,

16    and I don't recall the outcome of each one, but I

17    believe there were things that -- along the way

18    when we were -- it was brought to our attention

19    were required to investigate those.  Whether they

20    appeared to have any kind of nexus to the original

21    complaint or not when misconduct is brought to

22    internal affairs, we have to go and investigate

23    that.  And I believe some of those were sustained,

24    I just -- I don't recall which ones, and I don't
```

1    recall the allegations or at what point they were

2    brought forward.

3    Q.        Okay.  But I guess my point is, it's

4    not like your time was being wasted here.  The

5    investigation was growing because there were

6    credible allegations of some pretty serious

7    misconduct against Sergeant Moore?

8    A.        I never indicated that my time was

9    wasted.

10   Q.        Okay.  In addition to sharing

11   information with the chain of command, with Chief

12   Jacobs and with the executive staff about the

13   general status of the investigation, did you

14   provide anyone from the chain of command specific

15   pieces of evidence, interview summaries, interview

16   recordings, that kind of thing during the

17   investigation?

18   A.        I don't recall.

19   Q.        Okay.  One way or the other?

20   A.        I don't believe I -- I don't believe

21   that occurred.  I don't recall for sure, because

22   if it was requested and if the chief wanted me to

23   do that, I would obviously do that.

24   Q.        Okay.  You don't remember one way or

1    the other whether you were asked to provide any

2    evidence?

3    A.         I do not recall.

4    Q.         Okay.  One of the allegations that

5    ended up being sustained against Sergeant Moore

6    was that he used racial slurs against black

7    officers and black people in general while on

8    duty.  Do you remember that?

9    A.         I remember that being an allegation.  I

10   don't remember the outcome, and I don't remember

11   the evidence that would have sustained it if you

12   said it is sustained.

13   Q.         Okay.  Did you -- do you remember that

14   Sergeant Decker at one point interviewed several

15   officers from SRB, and several of them, both black

16   and white officers, reported hearing Sergeant

17   Moore describe Eric Cornett, for instance, as a

18   monkey or as an ape?

19   A.         I remember that being an allegation.

20   Q.         Okay.  Do you remember that an officer

21   corroborated the original allegation?

22   A.         I don't remember any of the details

23   regarding the evidence that supported the outcome

24   of any of those.

1  Q.        Okay.  If Sergeant Decker indicated

2  that he informed you when he did have

3  corroboration of that allegation, is there any

4  reason that you would have to dispute that?

5  A.        No.

6  Q.        Okay.  Do you remember whether you

7  shared that information with the chain of command

8  at the time?

9  A.        Chain of command being --

10  Q.        Meaning the chief or the executive

11  staff?

12  A.        The chief?  Okay.  I don't remember if

13  I did, but I would assume that I would share that

14  information.  So when we come to the point where

15  we get information that is sustained or we have

16  evidence, I would have brought that to the chief.

17  Q.        Okay.  Do you remember that there was

18  an allegation against Sergeant Moore that in a

19  particular conversation -- first of all, you

20  remember the source of the original allegations

21  against Sergeant Moore was Officer Wes Sorrell?

22  A.        Yes.

23  Q.        Okay.  Who was also under

24  investigation?

56

1    A.        Yes.

2    Q.        As part of this same investigation?

3    A.        Yes.

4    Q.        You remember that Officer Sorrell

5    indicated that there was a conversation with

6    Sergeant Moore and he believed that there was an

7    officer named Scott Watkins who was also in

8    attendance?  And Sergeant Moore, in that

9    conversation, used a racial slur against Officer

10   Eric Cornett and Sergeant Doug Williams calling

11   them apes or monkeys and saying that he was going

12   to take them out about back and kill them or take

13   them out back and shoot them or something along

14   those lines?

15             MR. COGLIANESE:  Objection.

16   Q.        Does that all sound familiar?

17   A.        So this sounds like an allegation that

18   we dealt with, yes.

19   Q.        Okay.  A serious allegation, you've got

20   a discrimination concern here with racial slurs

21   and also a threat of violence against officers?

22   A.        It's a serious allegation, yes.

23   Q.        Okay.  And if it was sustained, it

24   would certainly be critical misconduct?

1    A.        I believe so.

2    Q.        Okay.  I'm -- I guess I'm going to show

3    you what's been previously marked as Plaintiff's

4    Exhibit 11, which is Sergeant Decker's interview

5    summary of Officer Watkins about this allegation.

6    And it indicates that he interviewed Officer

7    Watkins on December 5th, 2014, which -- I mean,

8    that was in the scope of this investigation,

9    actually fairly early in the investigation, right?

10   A.        Uh-huh.

11   Q.        Sorry, you have to say yes or no.

12   A.        I'm sorry, what was the question?

13   Q.        That this was fairly early in the

14   investigation?

15   A.        Yes.

16   Q.        Okay.  I mean, I'll step back.

17             The time frame of the investigation, as

18   we understand it, was it started somewhere around

19   August of 2014.  The charges were not actually

20   issued against Sergeant Moore until I think about

21   March of 2016.

22   A.        Okay.

23   Q.        It was a -- I mean, this was a fairly

24   lengthy investigation?

58

1    A.        Yes.

2    Q.        Okay.  So this was just a couple months

3    into the investigation?

4    A.        Yes.

5    Q.        And at this point, Sergeant Moore was

6    still on duty as a sergeant?

7    A.        Yes.

8    Q.        Okay.  And if you could take a look --

9    I'm sorry, I'm going to grab this back from you.

10   A.        Okay.

11   Q.        I guess if you could just take a couple

12   minutes and starting where the Post-it note is

13   here at the bottom of the third page of this

14   exhibit.

15   A.        Yes.

16   Q.        Can you just read through from that

17   point for the next couple paragraphs.

18           MR. COGLIANESE:  Just for the record,

19   you're pointing to Bates 4524, it looks like the

20   last full paragraph at the bottom of that page?

21           MR. VARDARO:  Right.

22           MR. COGLIANESE:  Okay.

23   A.        Okay.

24   Q.        So at this point in Sergeant Decker's

1    investigation, you would agree that he has

2    corroboration from another officer that Sergeant

3    Moore has used racial slurs against another

4    officer, right?

5    A.        From --

6    Q.        From Officer Watkins?

7    A.        Officer Watkins.

8    Q.        Corroborating Wes Sorrell?

9    A.        It appears he's corroborating some of

10   the racial slurs, yes.

11   Q.        Okay.  And he's also corroborating

12   the -- I guess the concept that Sergeant Moore was

13   making threats of physical violence against Eric

14   Cornett?

15   A.        Yes.  He's indicating that he believes

16   he would have taken him out in the parking lot.

17   Q.        Okay.  And it would not be -- I mean,

18   first of all, are you aware of any reason to --

19   that Officer Watkins would make this up?

20   A.        No, I'm not.

21   Q.        Okay.  It would not be unusual for

22   officers describing an incident that wasn't

23   recorded on video or audio and it hadn't been

24   taken down specifically and so at the time they

1    might have different wording for a particular

2    conversation that happened?

3    A.          Correct.

4    Q.          Do you remember taking this

5    corroborating evidence to Chief Jacobs or the

6    executive staff at the time?

7    A.          I do not recall.

8    Q.          Okay.  All right.  Do you -- I mean,

9    when you say you don't recall it, and I'll keep

10   asking, you mean you don't remember whether you

11   did that or not?

12   A.          I do not remember whether I did that or

13   not.

14   Q.          Okay.  Do you remember whether or not

15   Sergeant Decker informed you of this corroboration

16   at the time?

17   A.          I do not remember whether he informed

18   me of the specifics of this at the time or not.

19   Q.          Okay.  What about in general?

20   A.          I'm aware of this allegation, I just

21   don't remember exactly when we had the discussion

22   regarding this allegation.

23   Q.          It would have been very unusual in the

24   course of this investigation and other

1    investigations that you were overseeing in

2    internal affairs that the officer, the sergeant

3    conducting the investigation would not inform you

4    of something along these lines within at least the

5    next couple of days, right?

6    A.        I would expect them to inform me, I

7    just don't recall the exact discussion if he did

8    inform me of this.

9    Q.        Okay.  And you remember that Sergeant

10   Decker in particular in this investigation was

11   talking to you on --

12   A.        A regular --

13   Q.        -- a very, very regular basis about

14   this investigation?

15   A.        Correct.

16   Q.        In part because he was looking for

17   guidance from you about how far he could go with

18   certain parts of his investigation, but in part

19   just to keep you informed of it?

20   A.        Correct.

21            MR. COGLIANESE:  Objection.  Go ahead.

22   Q.        I think as he described it, if I'm

23   remembering it, he said it started off that he

24   would give you an update about this maybe every

1    week or so, but then as it went on, it became more

2    like daily.  Does that sound right?

3    A.        I don't think it was quite that

4    frequent.  He would update me when he did

5    additional interviews depending on when those

6    were.  He would sometimes not do any additional

7    interviews and have any additional evidence for a

8    few weeks at a time, so I don't believe it was

9    daily.

10    Q.        Okay.  I'll represent to you that at

11    this stage of the investigation, the stage where

12    he's interviewed Officer Watkins, Sergeant Decker,

13    first of all, on the same day interviewed another

14    officer named Larry Wilson, a black officer who

15    reported to Sergeant Moore.  And then within a

16    couple of days after that, interviewed Officer

17    Shaw and Officer Whitney Lancaster, all of whom

18    made allegations against Sergeant Moore about

19    different racial or violent conduct.  Is that a

20    period of time when you would think that you would

21    have had pretty regular contact with Sergeant

22    Decker about the content of his interviews?

23            MR. COGLIANESE:  Objection.  Go ahead.

24    A.        I believe so.

63

1    Q.          Okay.  Do you remember that Officer
2    Wilson, in particular, confirmed that he had
3    personally heard Sergeant Moore also make threats
4    about putting Officer Cornett in his place and
5    potentially beating him up?
6    A.          I don't recall specifically.
7    Q.          Okay.  But you wouldn't deny that you
8    learned that during the investigation?
9    A.          I don't recall that allegation
10   specifically.
11   Q.          But because you don't recall it, that
12   doesn't mean you don't think it happened, it's
13   just that you don't remember the details at this
14   point?
15   A.          I don't remember.
16   Q.          Okay.  Do you remember that Officer
17   Wilson told Sergeant Decker that he had been in
18   Sergeant Moore's presence at points when people
19   had asked Sergeant Moore directly whether he made
20   these statements about Eric Cornett and Sergeant
21   Moore did not deny them?
22   A.          Could you clarify that question a
23   little?
24   Q.          Sure.  I mean, one of the -- a lot of

1    times officers will talk to each other about

2    different things whether they did them or not,

3    right?  I mean, that's pretty typical in the

4    Columbus Division of Police that officers will

5    talk to each other about events?

6    A.        Yes.

7    Q.        Okay.  Starting at a very basic level.

8    And if an officer goes to another officer and

9    says:  Is it true that you did X, Y and Z, and the

10   officer just doesn't even respond, that a lot of

11   times people will sort of take that as what we

12   would call a tacet admission?

13             MR. COGLIANESE:  Objection.  Go ahead.

14   Q.        Does that sound right?  Does that

15   sound --

16             MR. COGLIANESE:  Objection.

17   A.        I would believe that would happen.

18   Q.        Okay.  Well, you've investigated crimes

19   before I assume, many dozens and hundreds of

20   times?

21   A.        Yes.

22   Q.        Okay.  When you go to a suspect, I

23   understand they have the right to remain silent

24   and all of that, but if you went to the suspect of

1    a crime and said, did you rob this house or

2    something like that, and the suspect doesn't even

3    answer you, don't you take some meaning from that?

4                   MR. COGLIANESE:  Objection.

5    A.             Generally I would take something from

6    that.

7    Q.             It would be suspicious at minimum?

8    A.             Yes.

9    Q.             And so what I'm asking you is:  Do you

10   remember that Officer Wilson told Sergeant Decker

11   that he had had conversations with Sergeant Moore

12   where he and others had asked Sergeant Moore

13   whether he had committed this -- these racial

14   slurs and threats and Sergeant Moore had not

15   answered?  Rather than denying it, he had just not

16   answered?

17                  MR. COGLIANESE:  Objection.  Go ahead.

18   A.             I don't remember ever having that

19   conversation.

20   Q.             Okay.  Does that mean you think it

21   didn't happen?

22   A.             No, it does not mean that.

23   Q.             Okay.  Would that be another form of

24   corroboration of the allegations by Officer

1    Sorrell, that Sergeant Moore was reluctant to even

2    deny the allegations?

3              MR. COGLIANESE:  Objection.  Go ahead.

4    A.        I don't believe a failure to answer

5    relayed through another party would be a form of

6    corroboration that internal affairs should weigh

7    very heavily.

8    Q.        Okay.  Would it be something that would

9    be considered at all?

10   A.        Possibly.

11   Q.        Okay.  Do you remember that at the

12   conclusion of Sergeant Decker's investigation of

13   Eric Moore, the allegation that Sergeant Moore had

14   made a death threat against Eric Cornett and

15   Sergeant Williams was concluded as not sustained?

16   A.        I believe so.  I don't recall specific

17   outcomes of allegations.

18   Q.        Okay.  Do you remember -- well, first

19   of all, I'll represent to you, I don't think

20   there's any dispute in this case, that allegation

21   was concluded by IAB and upheld by the chain of

22   command as not sustained?

23   A.        Okay.

24   Q.        But there was no allegation in the

1    internal affairs investigation one way or the

2    other, and no conclusion because there was no

3    allegation that Sergeant Moore had made some

4    threat of physical violence against Eric Cornett,

5    whether or not it was a death threat.  Do you

6    remember why there was no allegation of a threat

7    short of a death threat?

8    A.        No.

9    Q.        Okay.  Certainly taking what Officer

10   Sorrell had alleged and adding to it Officer

11   Watkins' description here, there would be

12   sufficient evidence to sustain an allegation that

13   Sergeant Moore had made a threat?

14            MR. COGLIANESE:  Objection.  Go ahead.

15   A.        Based on what's written here?

16   Q.        Yes.

17   A.        I don't think based on what's written

18   here we would necessarily sustain an entire

19   allegation.

20   Q.        Okay.  What would lead -- what would

21   hold you back from it?

22   A.        I do not know.

23   Q.        Okay.

24   A.        But merely one party making a statement

1    is not the only thing that we weigh in sustaining

2    an allegation.

3    Q.        Okay.  What -- I mean, first of all,

4    let's say there are -- let's just assume, because,

5    again, I don't think it's in dispute, multiple

6    other officers confirmed that Sergeant Moore was

7    in the habit of saying that he was going to do

8    something violent to Eric Cornett, beat him up,

9    shoot him, whatever.  Sergeant Moore denied it,

10   but you got three or four officers, at least,

11   saying that they heard him say something to that

12   effect.  Would that be typically enough to sustain

13   the violation?

14            MR. COGLIANESE:  Objection.  Go ahead.

15   A.        We would evaluate each statement, the

16   veracity of each statement, the credibility of

17   each officer, and we would make a decision based

18   on that.

19   Q.        Okay.  Do you remember in this

20   investigation -- first of all, you remember that

21   there was ample reason to doubt the veracity of

22   Sergeant Moore's testimony, right?

23            MR. COGLIANESE:  Objection.  Go ahead.

24   A.        I believe -- I believe we did doubt the

1    veracity of some of his statements.

2    Q.          Do you remember Sergeant Decker saying

3    to you and many other people during the

4    investigation that pretty much every word out of

5    his mouth was a lie?

6    A.          I remember Sergeant Decker being

7    concerned that much of what he was telling us was

8    not truthful.  And I do remember discussions, as

9    would be typical, as to whether or not his

10   statements could be proven to be untruthful.

11   Q.          Okay.  But there was certainly a reason

12   to doubt their truth?

13   A.          Yes.

14   Q.          Okay.  And there was similar -- you

15   know, there was some concerns, I guess at the

16   beginning of the investigation, that Officer

17   Sorrell might have a motive to try to get Sergeant

18   Moore in trouble and so that he might not be -- he

19   might not take everything he said at face value?

20   A.          I believe so.

21   Q.          Okay.  Do you remember any other

22   officer that that kind of discussion took place

23   about during this investigation besides Moore, the

24   sort of principal people involved, Moore and

1    Sorrell?  Was there any reason to think that other

2    officers were purposefully making false

3    allegations?

4    A.        I don't remember if we discussed --

5    Q.        I'm sorry, I'm just going to finish my

6    question and let you get into it.

7              Did you have -- did you have

8    discussion -- I'll just rephrase the whole thing.

9              Did you have discussions with Sergeant

10   Decker or others about any other particular

11   officer having a reason to make up false

12   allegations against Sergeant Moore?

13             MR. COGLIANESE:  Objection.  Go ahead.

14   A.        I don't recall.  But it is a normal

15   course of business during an investigation to

16   discuss the veracity of every witness and every

17   focus in an investigation.

18   Q.        Okay.  But you don't remember

19   specifically any officer besides Moore or Sorrell

20   that there was any particular concern about their

21   honesty or --

22   A.        I do not remember.

23   Q.        Okay.  If there was -- well, first of

24   all, it would violate CPD rules for an officer to

1    make a threat of violence against another officer?

2    A.        Correct.

3    Q.        And it would be a pretty serious

4    violation?

5    A.        Correct.

6    Q.        And that would be true whether it was a

7    threat of violence through fists or beating and

8    not just a threat through a gun?

9    A.        Correct.

10   Q.        Okay.  It would be even more serious if

11   the threat was made using racial terms?

12   A.        Correct.

13   Q.        And that would certainly be considered

14   something that would be critical misconduct, a

15   racial threat of violence against another officer?

16   A.        Correct.

17   Q.        Did you have discussions with Chief

18   Jacobs or anybody else in the executive staff

19   about charging Sergeant Moore with the threat of

20   physical violence against Eric Cornett?

21             MR. COGLIANESE:  Objection.  Go ahead.

22   A.        I don't recall the details of my

23   conversations with her or executive staff.

24   Q.        Okay.  Certainly going back to

1   Commander Cameron's e-mails with Sergeant Decker

2   where he had asked to be updated about

3   corroborating evidence of critical misconduct.

4   Getting evidence corroborating a threat of

5   physical violence against Eric Cornett using

6   racial terms, that would certainly fall into the

7   description of what he was asking for?

8            MR. COGLIANESE:  Objection.  Go ahead.

9   A.       I believe that's what he's asking for.

10  Q.       Okay.  Do you know whether Sergeant

11  Decker informed Commander Cameron of the

12  corroborating evidence he had of the threat

13  against Eric Cornett?

14  A.       I do not know.

15  Q.       Okay.  Did you have discussions with

16  Sergeant Decker where you told him not to update

17  Commander Cameron until the investigation was

18  concluded?

19  A.       I don't believe so.

20  Q.       Okay.  If Sergeant Decker says that you

21  told him to wait until the allegations were either

22  determined as sustained or not sustained before

23  talking to anybody in the chain of command about

24  it, would you dispute that?

1          MR. COGLIANESE:  Objection.  Go ahead.

2    A.          I don't recall ever having that

3    conversation.  It is a normal course of business

4    for us to -- at some level, to discuss with the

5    chain of command where investigations are going.

6    This is a two-year long investigation, so I doubt

7    that there was any point where I said we're not

8    talking to the chain of command for two years.

9          We had regular discussions with the

10   chief of police, and executive staff was kept

11   abreast of where we were on this case.  So I don't

12   recall ever telling Sergeant Decker that we were

13   not going to discuss anything until this case was

14   completed.

15   Q.          Okay.  Is it possible that you would

16   have told him not to go directly to Commander

17   Cameron as Commander Cameron had asked because you

18   knew that you were sharing the information with

19   the higher up levels of the chain of command?

20          MR. COGLIANESE:  Objection.  Go ahead.

21   A.          That would be normal.  There are lots

22   of times as a normal course of business where we

23   do not directly share things with the chain of

24   command, because during the course of an ongoing

1    investigation, we don't want any leaks, we don't

2    want -- we don't know who has relationships with

3    other individuals.  There's a reason the commander

4    reports directly to the chief of police.  These

5    types of investigations are one of those reasons.

6    So a lot of times we provide very little

7    information to a chain of command in a serious and

8    long-term investigation other than the status of

9    what we're doing.

10   Q.        Okay.  So that would fit with your --

11   at least with your practice, even if you don't

12   remember one way or the other whether the

13   conversation occurred, that you might have told

14   Sergeant Decker, we're not going to share this

15   with the commander, but I'm going to go higher up?

16   A.        Correct.

17   Q.        Okay.  You told Sergeant Decker at some

18   point during the investigation -- well, first of

19   all, do you remember Sergeant Decker coming to you

20   approximately March of 2015 and telling you that

21   he had been informed by Officer Shaw of some new

22   allegations against Sergeant Moore, including

23   mishandling of a narcotics -- filling the

24   narcotics assignment, a threat that Sergeant Moore

1    had made against an officer named Dick Elias, and

2    also that Sergeant Moore was under investigation

3    by the ATF for purchasing an illegal weapons

4    enhancement?

5    A.          I remember discussions about additional

6    allegations related to those topics.

7    Q.          Okay.  Do you remember that Officer

8    Shaw was the source of the allegations?

9    A.          No.

10   Q.          Okay.  But you remember Sergeant Decker

11   relaying them to you?

12   A.          Correct.

13   Q.          You remember that they were all at the

14   same time?

15   A.          I don't recall the time frame, but I do

16   remember the -- the nature of the allegations.

17   Q.          Okay.  And they came to you at a point

18   when Sergeant Moore was still on duty, because the

19   investigation hadn't concluded?

20   A.          Yes, correct.

21   Q.          So he hadn't been taken off duty.

22               Do you remember telling Sergeant Decker

23   that he was not to investigate the Dick Elias

24   threat incident?

1    A.          No, I don't remember that.

2    Q.          Okay.  Would you deny that you told

3    Sergeant Decker he did not have authority to

4    follow up on that?

5    A.          I would state that he has authority to

6    follow up on any allegations.  I'm not familiar

7    with the Dick Elias threat.

8    Q.          Okay.

9    A.          I don't recall that one.  Investigators

10   have a lot of latitude in how they follow up on

11   allegations that are brought forth during the

12   course of an investigation.  It would not be for

13   me to say, you're not going to follow up on

14   something.

15   Q.          Okay.  Putting you aside, if a sergeant

16   in IAB is investigating something and they go to

17   their commander and say, can I add this to the

18   investigation, and the commander says, no, you may

19   not, they no longer would have authority to do it,

20   right?  Because their commander has told them not

21   to?

22   A.          Yes.  If their commander says, yes,

23   that specifically does not belong in this

24   investigation, it would not be included.

1    Q.          Okay.  Just to refresh your memory, the

2    Dick Elias incident involved Officer Elias --

3    first of all, do you know who Dick Elias is?

4    A.          No.

5    Q.          Okay.  I'll represent to you Officer

6    Elias is a Hispanic officer.  He apparently, from

7    the information we've been shared, reported an

8    incident in which he was walking down a hallway or

9    coming around a corner and Sergeant Moore saw him

10   and reached for his weapon.  Do you remember that?

11   A.          I do remember -- I do remember having a

12   discussion about that particular allegation.

13   Q.          Okay.  And the report, as it came to

14   Sergeant Decker, was that Officer Elias had

15   reported that incident to Lieutenant Brust who was

16   Sergeant Moore's direct supervisor --

17   A.          Uh-huh.

18   Q.          -- and that nothing was really done

19   about it.  And that's what was reported to

20   Sergeant Decker.  Does that sound familiar?

21   A.          So I remember the allegation being

22   brought forth at some point during the course of

23   this particular investigation.  I do not remember

24   if it was previously reviewed and potentially

78

1    investigated by the chain of command.  I remember

2    us having a discussion about the actions and the

3    nature of the allegation.  And I remember that it

4    was an incident that occurred in a hallway between

5    two individuals, and the one individual put his

6    hand on his weapon, no weapon was drawn or removed

7    from the holster.  And I don't recall if --

8    remember -- I don't remember any statements,

9    threatening statements being made at the same

10   time.

11   Q.        Do you remember how you got all of that

12   information?

13   A.        I believe it was relayed to me verbally

14   through Sergeant Decker.

15   Q.        Okay.  Do you -- well, I'll just --

16   we'll just start using the exhibit.  I'm going to

17   hand you what's previously been marked as

18   Exhibit 52, which I'll represent to you is one of

19   Sergeant Decker's chronologies related to this

20   investigation.

21             If you could turn to the portion of it

22   that is dated March 2015.  And, again, it's not in

23   his chronology, but I'll represent to you that

24   this allegation came to Sergeant Decker's

1    attention approximately March 13th -- or I'm

2    sorry, March 16th.  In the portion where it says,

3    also spoke with Officer Shaw about his new

4    allegations?

5    A.        Yes, I see that one.

6    Q.        Okay.  This was one of those new

7    allegations, the Elias incident.  And Sergeant

8    Decker indicates that he then met with Lieutenant

9    Deakins and with you to brief you on the new

10   allegations.  And then on March 18th, it indicates

11   that he spoke to you again and you read a

12   follow-up interview that Sergeant Decker had with

13   Officer Shaw and told him that he was only to

14   follow up on the text message, which we'll get to

15   in a minute, and the ATF investigation, but that

16   the remainder of his concerns would not be

17   investigated.

18            Does that refresh your recollection at

19   all that you told Sergeant Decker not to follow

20   up?

21   A.        I don't recall the context of that

22   discussion with Lieutenant Deakins or what details

23   and evidence we discussed regarding that decision

24   at all.

1    Q.        Okay.  But that doesn't mean that you

2    would dispute Sergeant Decker's chronology about

3    this point or his memory about it?

4    A.        That -- I would not dispute that we had

5    a conversation about it and that we made a

6    decision at some point based on what we had in

7    evidence to pursue one course of investigation and

8    not to pursue another.

9    Q.        Okay.  When you say, we made the

10   decision, it was you that made the decision?

11   A.        Well, I'm not the final decision-maker,

12   but I don't have all the facts, so it's usually a

13   round table discussion between myself, Sergeant

14   Decker and the lieutenant.

15   Q.        Okay.  Sergeant Decker says that he

16   wanted to and felt that he needed to pursue that

17   course of investigation further.  Would you

18   dispute that?

19            MR. COGLIANESE:  Objection.

20   A.        What course?

21   Q.        To further investigate the Elias

22   incident?

23            MR. COGLIANESE:  Objection.

24   A.        I don't recall what his position was.

81

1   Q.         Okay.  So going back to my question.

2   If he told us that he thought that they -- it

3   needed further investigation, you wouldn't dispute

4   him -- dispute that?

5   A.         I would not dispute that he felt

6   further investigation might be needed.

7   Q.         Okay.  In which case it was -- would be

8   you and Lieutenant Deakins or just you that told

9   him that it wouldn't happen?

10  A.         Correct.

11             MR. COGLIANESE:  Objection.

12  Q.         Okay.  I'm going to hand you what's

13  been marked as Plaintiff's Exhibit 35 and ask you

14  to just read -- I'll withdraw that completely,

15  because I'm looking at the wrong exhibit.

16             MR. COGLIANESE:  Jeff, while you're

17  getting organized, is now a good time for a break?

18             MR. VARDARO:  Yeah, this is fine.

19             (A recess is taken.)

20  Q.         I'm handing you what's been previously

21  marked as Plaintiff's Exhibit 26, and I've turned

22  it to the fourth page, which Rich will ask me to

23  confirm is Bates 004670.  And I would like you to

24  read for yourself the paragraph next to the

1    Post-it note there, which is the --

2    A.        Just this paragraph?

3    Q.        Yes, the second -- I guess the second

4    full paragraph on the page.

5              You've read it now?

6    A.        Yes.

7    Q.        Okay.  And if you flip just over to the

8    beginning of the exhibit, it indicates that this

9    is the informational summary Sergeant Decker made

10   of his conversation with Officer Shaw on

11   March 16th, 2015?

12   A.        Yes.

13   Q.        Okay.  So this would be the information

14   that Sergeant Decker indicated he shared with you

15   in his chronology on March 18th?

16   A.        I don't remember if he shared this

17   specific information, but --

18   Q.        If you look --

19   A.        -- it's stating --

20   Q.        -- at March -- March 18th?

21   A.        Let me look at it real quick.

22   Q.        This is Exhibit 52 you're looking at,

23   just for the record.

24   A.        Okay.

1    Q.          Do you have any reason to doubt that

2    this is the informational summary that Sergeant

3    Decker shared with you on March 18th?

4              MR. COGLIANESE:  Objection.

5    A.          I don't have a reason to doubt that.

6    Q.          Okay.  And this informational summary,

7    just to summarize the paragraph you just read,

8    actually indicates that Officer Shaw told Sergeant

9    Decker that the Elias incident consisted of

10   Sergeant Moore not just putting his hand toward

11   his weapon, but actually drawing it part way out

12   of his holster, making a hand gesture toward

13   Officer Elias, and that Officer Elias went to

14   Lieutenant Brust about it and Brust didn't do

15   anything.  And also Officer Shaw's sort of

16   analysis that he had the impression that Officer

17   Elias believed it was a racial incident?

18             MR. COGLIANESE:

19             Objection.  Go ahead.

20   Q.          All of those things are in this

21   paragraph.

22   A.          Okay.  And the question is?

23   Q.          I'm just asking if you agree that all

24   of those things -- that's a fair summary of what's

1    in the paragraph?

2    A.        Correct.

3              MR. COGLIANESE:  Objection.

4    Q.        So that's the information you had on

5    this incident at the time you instructed Sergeant

6    Decker that it should not be investigated further?

7              MR. COGLIANESE:  Objection.

8    A.        I don't recall what information I had

9    on that date.  This would have been some of the

10   things that we discussed.  We would have had a

11   conversation about that, so I don't remember what

12   else was shared when we made that -- when we had

13   that discussion, so I would believe that this is

14   not all the information that I had.

15   Q.        Okay.  What other information could you

16   have had at that point?

17   A.        I do not know.

18   Q.        Okay.  Do you remember having a

19   discussion with Lieutenant Brust about this

20   incident at any point?

21   A.        I did not have a discussion with

22   Lieutenant Brust.

23   Q.        Okay.  Did you have a discussion with

24   Sergeant Moore about it?

1    A.        I did not have a discussion with

2    Sergeant Moore.

3    Q.        Did you have a discussion with Dick

4    Elias about it?

5    A.        I did not.

6    Q.        Okay.  Assuming that Sergeant Decker

7    also indicated that he did not talk to Lieutenant

8    Brust or Dick Elias or Sergeant Moore about this

9    particular incident at the time, is there any

10   other information that you can think of that you

11   would have had at that point to make a decision

12   about how to investigate it?

13   A.        I would have looked at this particular

14   incident and I would have discussed this with

15   probably the lieutenant and Sergeant Decker

16   about -- because this is a summary of what

17   occurred.  This isn't a word-for-word

18   conversation.  I'm not listening to the

19   recordings.  I'm going to ask for his impression.

20   I'm going to ask for him to bring in any

21   additional information that he believes is

22   relevant to this particular topic.  We're going to

23   talk about the veracity of the witnesses when it

24   was reported, whether the chain of command may

```
 1    have already investigated this.  If it's brought

 2    to a lieutenant, which is indicated that the

 3    lieutenant was made aware, then it's possibly

 4    already been dealt with.  We would have discussed

 5    all of those things most likely and made a

 6    decision as to whether or not this particular

 7    allegation was going to be included with all the

 8    other allegations that we were investigating at

 9    the time.

10    Q.         Okay.  What you're describing sounds to

11    me a little bit like an investigation, like that

12    you would talk to see whether it was investigated

13    by the chain of command, you would analyze the

14    veracity of witnesses, and some of the other

15    things.  Do you have some recollection that

16    anything like that actually happened?

17    A.         That's not --

18               MR. COGLIANESE:  Objection.

19    A.         -- what I'm attempting to explain is

20    that we would have a discussion about the details

21    of this.  This is a summary.  There's always more

22    information that you get from an investigator when

23    you have a conversation with them about the

24    direction of the investigation, how they feel
```

1    about the conversation they had with these

2    individuals in person when the allegations were

3    brought forth, all of those things.  I'm having

4    that discussion with Decker and probably his

5    lieutenant and we're making a decision as to

6    whether this is yet another allegation that we

7    include in this investigation.

8    Q.        Okay.  And assuming that Sergeant

9    Decker, as I described it, and I don't -- again, I

10   don't think there's a dispute about this, Sergeant

11   Decker says he wanted to investigate this further

12   and you stopped him.  So his -- his analysis of

13   his conversation with Officer Shaw was basically,

14   this is credible enough that I want to look into

15   it further.  Given that or assuming that's true,

16   is there something else that would have stopped

17   you from doing it?

18            MR. COGLIANESE:  Objection.  Go ahead.

19   A.        So a detective that brings their

20   opinion to the table, it's absolutely considered

21   and evaluated.  And that doesn't mean that every

22   time they want to pursue a course of investigation

23   that we want them to do that.

24   Q.        But when you say, "a detective," you

1    mean Sergeant Decker?

2    A.        Yeah, an investigator, Sergeant Decker.

3    So every time somebody comes to the table and

4    says, well, I think we should investigate, this is

5    a roundtable discussion, we determine whether or

6    not we're going to move in that direction.  With

7    this particular investigation, this was a common

8    occurrence every time we interviewed somebody.  So

9    we had to evaluate every new allegation when it

10   occurred, and whether during the course of this

11   investigation, we wanted to include it in the

12   investigation that was now coming -- would end up

13   being two years plus to complete.

14   Q.        Okay.  Did you have any understanding

15   at the time of when this incident occurred?

16   A.        I'm sure I did.

17   Q.        Okay.  Well, first of all, in the

18   paragraph of the -- that we were just reading,

19   Officer Shaw told Sergeant Decker that it was a

20   recent incident, recent encounter he had had with

21   Sergeant Moore?

22   A.        Okay.

23   Q.        Do you know whether you had anymore

24   specific information than that about when it

1    occurred?

2    A.          I don't recall what I knew at the time.

3    Q.          Okay.  I mean, it seems like in order

4    to find that out, you would have to either talk to

5    Officer Elias or Lieutenant Brust or Sergeant

6    Moore, right?

7    A.          Well --

8                MR. COGLIANESE:  Objection.

9    A.          -- if Sergeant Decker was informed as

10   to when it occurred, then we would already have

11   that information.

12   Q.          Okay.  This allegation was coming to

13   you during the middle of an investigation where

14   Sergeant Moore -- one of the principal allegations

15   against Sergeant Moore was he was making threats

16   against black officers, right?

17   A.          That was one of the allegations.

18   Q.          Okay.  Did that factor at all into your

19   analysis of whether this incident was worth

20   including in the investigation since it's another

21   potential threat of violence against an officer of

22   color?

23                MR. COGLIANESE:  Objection.

24   A.          I can't -- I cannot tell you what

1    factored into my decision at this time.

2    Q.        Okay.  Sergeant Decker told Officer

3    Shaw shortly after this meeting, he describes it

4    in his chronology, that he was instructed by his

5    chain of command that he was not going to be

6    investigating the Elias incident.  And that if

7    Elias wanted it investigated, he would have to

8    come in and make the allegation firsthand; that

9    there wasn't going to be a third-party complaint

10   on this.

11   A.        Uh-huh.

12   Q.        Does that refresh your recollection at

13   all about these discussions?

14             MR. COGLIANESE:  Objection.

15   A.        Not specifically, but that is a

16   mechanism that we use in situations when in

17   internal affairs we have individuals making

18   allegations about what they've heard from other

19   people.  Third-party allegations, third-hand,

20   fourth-hand allegations are difficult for us to

21   deal with.  The proper procedure for reporting

22   misconduct in the Division of Police is to put it

23   on paper and send it up through your chain of

24   command.

1   Q.          Okay.  If you get a secondhand or a

2   third-hand or whatever allegation from somebody,

3   and you decide you're only going to investigate it

4   if it comes firsthand, what is the procedure that

5   you follow to do that?

6   A.          So in internal affairs, there's no

7   specific procedure.  We look at it more on a

8   case-by-case basis.  We try in a lot of cases

9   to -- if allegations that don't necessarily have a

10  nexus to the original complaint on an internal

11  investigation are brought forth during the course

12  of an interview, we try to deal with those if we

13  can.

14              There has been several instances where

15  that has not occurred.  I think after this

16  particular case, because the way it expanded

17  exponentially every time someone was interviewed,

18  there was a multitude of additional allegations

19  brought forth that, you know, someone would be

20  interviewed and they would say, oh, yeah, well,

21  this person did this back on this date and this

22  person did this on this date.

23              Internal affairs has, since this case,

24  in a lot of situations moved towards requiring any

1    additional allegations be written down, either

2    firsthand or secondhand, be written down and sent

3    through the chain of command.

4    Q.        Okay.  I guess I was just asking if you

5    decided we're not going to investigate this unless

6    it's written down firsthand by the officer --

7    A.        Uh-huh.

8    Q.        -- how would you go about that

9    procedure?  I mean, it wouldn't be -- I guess to

10   me as a layperson who's never worked in internal

11   affairs or any police department, it seems a

12   little strange to go to an officer level person

13   like Officer Shaw and tell him to go tell Officer

14   Dick Elias, who's not even in his unit and not --

15   certainly not within his chain of command, that if

16   he wants to make a complaint about something, he

17   should put it down on paper, otherwise it's not

18   going to be investigated.  It would make more

19   sense to go to Officer Elias's chain of command

20   and have them have that conversation with him,

21   right?

22             MR. COGLIANESE:  Objection.  Go ahead.

23   A.        Okay.  So I don't recall what happened

24   in this particular circumstance, and I do not

93

1    recall how this was conveyed.  I don't remember

2    the details of that.  But we have several

3    different mechanisms for handling additional

4    complaints.  And it would not necessarily mean

5    internal affairs would contact them and then

6    expect them to write it down, because that's then

7    an order from internal affairs to have them do

8    that.

9              If somebody's bringing forth an

10   allegation that they say somebody else is making,

11   then having that information conveyed to them, I

12   don't remember if Decker actually contacted

13   somebody specifically and said this is what you

14   need to do.  I don't recall.

15   Q.        Okay.  You had no idea at the time

16   whether Officer Elias was aware of the other

17   allegation against Sergeant Moore about threats of

18   violence and that kind of thing, right?

19   A.        I'm not aware.

20   Q.        Okay.  And you also know in -- from

21   your EEO training and your law school training and

22   things like that that a lot of times if people

23   feel like they're being discriminated against or

24   subjected to some kind of harassment or that sort

94

1    of thing, that they can be very reluctant to

2    report it?

3              MR. COGLIANESE:  Objection.  Go ahead.

4    Q.        Don't you?  Isn't that something you've

5    learned?

6    A.        Yes.

7              MR. COGLIANESE:  Objection.

8    Q.        And you've learned that in IA also that

9    officers -- police officers can be reluctant to

10   bring complaints against other officers because

11   they know there can be repercussions?

12   A.        I would say that's not necessarily

13   accurate.

14   Q.        Okay.  You think police officers are

15   pretty ready to bring internal complaints against

16   their --

17   A.        I think we have evolved to the point

18   where police officers make allegations against

19   each other more often than citizens make

20   allegations against them.

21   Q.        Okay.  Do you think that's a good thing

22   or a bad thing?

23             MR. COGLIANESE:  Objection.

24   A.        I think that allegations that are --

95

1    baseless are a problem.  Allegations that officers

2    coming forth with allegations that have some

3    foundation are a good thing.

4    Q.        Were you involved in the

5    investigation -- I'm -- I actually don't have the

6    document with me at the time.  Do you remember an

7    investigation involving an Officer Meinhart and an

8    officer named Smith-Hughes where Meinhart was

9    accused of drawing his weapon on Smith-Hughes or

10   starting to do that?

11   A.        I don't recall.

12   Q.        Okay.  Assuming that it was a factor in

13   your analysis that Lieutenant Brust may already

14   have handled this at a chain of command level, the

15   Elias incident, again, Lieutenant Brust would not

16   have had all the information that internal affairs

17   had about other threatening conduct by Sergeant

18   Moore at the point when he would have handled

19   that, right?

20   A.        That was a statement.  What was the

21   question?

22   Q.        No, it was a question, because I said

23   "right" at the end.

24             I really do mean to ask you:  You

1    mentioned that one of the factors might have been

2    that you felt that Lieutenant Brust already

3    handled this in the chain of command level.  Do

4    you remember saying that?

5    A.        Yes.

6    Q.        Okay.  Lieutenant Brust would not have

7    had all the information that internal affairs had

8    about other allegations of threatening conduct by

9    Sergeant Moore, right?

10   A.        Yes.

11   Q.        Okay.  The other -- the other -- well,

12   there are a couple other things that Officer Shaw

13   reported to Sergeant Decker at the same time, but

14   one of them that I think I mentioned in passing

15   what seems like hours ago was that Sergeant Moore

16   was being investigated by the ATF.  Do you

17   remember that?

18   A.        Yes.

19   Q.        Okay.  Do you remember that Sergeant

20   Decker followed up on that allegation and talked

21   to the ATF about that incident?

22   A.        Yes.

23   Q.        And that the ATF agent in charge told

24   Sergeant Decker that they had documentation

1    showing that Sergeant Moore had ordered the

2    illegal weapons enhancement; they interviewed

3    Sergeant Moore, Sergeant Moore told them that he

4    had not actually taken possession of it and they

5    dropped the investigation at that point because

6    they took his word for it as a police officer?

7              MR. COGLIANESE:  Objection.  Go ahead.

8    A.        So the question is was I aware of --

9    Q.        Did Sergeant Decker tell you that?

10   A.        I don't remember exactly what Sergeant

11   Decker told me, but then we discussed whether

12   there was any illegal activity.  It was determined

13   that there was no criminal conduct there.  And

14   should we pursue that on our end if the ATF did

15   not believe that there was any criminal conduct

16   there.

17   Q.        But you don't remember Sergeant Decker

18   telling you that the ATF didn't really conclude

19   that there was no criminal conduct?  What they

20   concluded was they weren't going to prosecute it

21   because the person they were investigating was a

22   police officer and he was denying the conduct.

23             MR. COGLIANESE:  Objection.

24   A.        I don't remember that.

98

1    Q.          Okay.  Would you deny that he told you

2    that?

3    A.          I will tell you what I recall from the

4    situation that when this was brought to me,

5    Sergeant Decker was to talk to the ATF and find

6    out exactly what the law was regarding this

7    particular device, whether or not it was illegal

8    for him to look at it, order it, possess it,

9    take -- take possession of it, what was illegal.

10            And my understanding was that he looked

11   at it, potentially ordered it, but never took

12   possession of it, never received that order.  That

13   was my understanding that he -- there was nothing

14   illegal.  And the ATF -- I was never aware -- I

15   believe, at the time I was never aware that they

16   merely took his word for something and didn't

17   actually investigate whether he took possession of

18   it.  My understanding was that he did not take

19   possession of it and therefore they were not

20   pursuing anything, any criminal charges or

21   anything like that.

22   Q.          Okay.  So if Sergeant Decker were to

23   say that he told you that the only basis for the

24   ATF dropping this investigation was Sergeant

1    Moore's verbal denial that he took possession of

2    the device, you disagree with that?

3    A.         I disagree with that.

4               MR. COGLIANESE:  Objection.

5    Q.         Okay.  The fact that the ATF didn't --

6    didn't pursue this as a criminal charge against

7    Sergeant Moore, that wouldn't have prevented

8    internal affairs from investigating it as a

9    potential violation of CPD policies?

10   A.         Correct.

11              MR. COGLIANESE:  Objection.

12   Q.         Would you agree that a sustained

13   allegation that Sergeant Moore ordered an illegal

14   weapons enhancement would be relevant to an

15   investigation where he was being accused of

16   threatening to shoot black officers?

17              MR. COGLIANESE:  Objection.

18   A.         I don't necessarily believe that his

19   interest in this particular component indicated --

20   or was -- clearly had a nexus to this particular

21   investigation.

22   Q.         I'm sorry, is that -- you re-worded it

23   a little bit.  Are you saying that, no, you don't

24   agree that a sustained allegation that Sergeant

1    Moore ordered an illegal weapons enhancement would

2    be relevant to an investigation where he was being

3    accused of threatening to shoot black officers?

4              MR. COGLIANESE:  Objection.

5    A.        I will say that this particular

6    allegation that came to us, it wasn't clear that

7    there was a nexus to this investigation when we

8    became aware of this allegation.

9    Q.        I understand that answer.  But I still

10   would like you to answer the question I asked,

11   which is:  Would you agree that a sustained

12   allegation that Sergeant Moore ordered an illegal

13   weapons enhancement would be relevant to an

14   investigation where he was being accused of

15   threatening to shoot black officers?

16             MR. COGLIANESE:  Objection.

17   A.        Not necessarily.

18   Q.        Would you agree that a sustained

19   allegation that Sergeant Moore ordered an illegal

20   weapons enhancement -- or actually I'll re-word

21   this a little bit.

22             Would you agree that credible evidence

23   that Sergeant Moore ordered an illegal weapons

24   enhancement would be something that the chain of

1  command might want to know about Sergeant Moore in

2  determining whether it was safe to leave him on

3  duty and in possession of his service weapon?

4           MR. COGLIANESE:  Objection.

5  A.        I would agree that that information was

6  something that the chain of command might want to

7  be aware of.

8  Q.        Okay.  Did you do anything to make the

9  chain of command aware of that?

10  A.        Yes.  I believe I took that to Kim

11  Jacobs.

12  Q.        Okay.  Soon after receiving it?

13  A.        I do not know when that information was

14  brought to her.

15  Q.        Okay.  Probably before the actual

16  investigation concluded, though, since that was

17  like six or seven months later?

18  A.        Right.

19  Q.        Okay.  Do you remember what she said

20  about it?

21  A.        No.

22  Q.        Okay.  Do you also remember that some

23  of the allegations against Sergeant Moore had to

24  do with his handling of job openings in the

```
1    narcotics unit?

2    A.        Yes.

3    Q.        Okay.  Do you remember what the first

4    information you had about that -- those job

5    openings or that job process was in this

6    investigation?

7    A.        No.

8    Q.        Okay.  Do you remember that -- first of

9    all, there were a couple different openings that

10   Sergeant Moore was responsible for filling at the

11   time?

12   A.        I believe so.

13   Q.        Okay.  Do you remember that one of them

14   was filled by a white officer named Jeremy

15   Ehrenborg?

16   A.        I don't remember who filled what jobs.

17   Q.        Okay.  Do you remember that one of the

18   openings was filled in such a way that it resulted

19   in Chief Jacobs vacating the filling of the

20   position and reposting it?

21   A.        I remember hearing that.

22   Q.        Okay.  Do you remember that as part of

23   the process of vacating and refilling that

24   position, you were notified so that it could
```

1    possibly be included in the investigation of

2    Sergeant Moore?

3    A.        I don't believe it was included in the

4    investigation.

5    Q.        Okay.  I'm going to hand you what's

6    been marked as Plaintiff's Exhibit 20, which I'll

7    represent to you is a routing sheet about that

8    narcotics position.  And I think the date's on it,

9    somewhere in the vicinity of January 20th, 2015.

10   A.        Okay.

11   Q.        Is there anything on that that would

12   refresh your recollection that this was forwarded

13   to you for your information and potential

14   inclusion in your investigation or in Sergeant

15   Decker's investigation?

16   A.        Okay.  This was forwarded to internal

17   affairs for information.

18   Q.        Okay.

19   A.        Which means it's include -- we're not

20   being told to investigate in any way.

21   Q.        Okay.  What's the purpose of forwarding

22   it for information?

23             MR. COGLIANESE:  Objection.  Go ahead.

24   A.        So internal affairs is where every

```
 1    investigation goes or every letter of information,

 2    investigation or anything.  So I'm not sure if

 3    this was forwarded so that we could be the storage

 4    location for this or if this was forwarded because

 5    it involved these individuals that we were

 6    currently investigating and to put it with it to

 7    see if we needed it for anything, but there's no

 8    indication on here that we were required -- we're

 9    being told to include this in the investigation or

10    direct it in any way to interview anybody

11    regarding this incident, so...

12    Q.        Okay.  Who would it be forwarded to?  I

13    guess it's got your name on it --

14    A.        Yeah.

15    Q.        -- now that I look at it.

16    A.        It's forwarded generally to me, but

17    pretty much everything that comes to internal

18    affairs is forwarded to me, so I don't remember

19    ever seeing this.  I remember being aware there

20    was an issue with the chain of command selecting

21    jobs.  I remember vaguely being informed that

22    Chief Jacobs reposted the positions, because for

23    whatever reason, I don't recall exactly what

24    happened.  I don't remember this being included in
```

1    our investigation regarding everything else that

2    involved these individuals, so...

3    Q.          I mean, you recall that -- putting

4    aside the time frame, this did end up becoming

5    part of the investigation, this filling of this

6    job?

7    A.          It might have.  I haven't read the

8    investigation --

9    Q.          Okay.

10   A.          -- in years --

11   Q.          Okay.

12   A.          -- so...

13   Q.          I'm going to hand you what's been

14   marked as Plaintiff's Exhibit 38.  And I'll just

15   flip it to page 184 out of 208, which is marked at

16   the bottom 004148 in terms of the Bates stamp.

17   A.          Okay.

18   Q.          And I'll just ask you to take a look

19   and see if this reminds you that, in fact, the

20   filling of this narcotics position -- starts at

21   the very top of the page.

22   A.          Oh, okay.

23   Q.          And by no means do I want you to read

24   all of Exhibit 38 or even --

1    A.          Thank you.

2    Q.          -- any particular portion of it.  I'm

3    sure you've read it before, and we'll go to

4    different parts of it.  But I'm just asking you

5    whether this reminds you that Sergeant Decker did

6    end up investigating this job posting?

7    A.          If it's here, he did.

8    Q.          Okay.  Do you remember that at the same

9    time or in the same time frame that Officer Shaw

10   reported the Dick Elias incident and the ATF

11   incident that he reported that he had been pushed

12   out of bidding for these narcotics jobs that are

13   at issue in this?

14   A.          I don't recall the details of what he

15   reported at that time.

16   Q.          Okay.  Do you remember that there was

17   at some point a text message from Sergeant Moore

18   saying that Whitney Lancaster and Karl Shaw had

19   better not take the narcotics jobs because they

20   had called him a racist?

21   A.          I don't recall.

22   Q.          Okay.  I'm going to hand you what's

23   been marked as Plaintiff's Exhibit 41.  And I'm

24   turning it to page 014417 at the bottom.  And I'll

1    ask you to just take a look at that page and let

2    me know when you're ready to --

3    A.       The whole page?

4    Q.       Just the whole page, and let me know

5    when you're ready to answer questions about it.

6    And as long as you're flipping it over, I guess

7    you can read the page after that, too, which I

8    think is -- first of all, the page that you just

9    read, or the pages that you just read were

10    Lieutenant Brust's analysis --

11    A.       Yes.

12    Q.       -- of charges against Sergeant Moore

13    that internal affairs upheld about the filling of

14    these narcotics positions, right?

15    A.       Correct.  So he is weighing in on

16    whether he agrees with our conclusion and

17    recommending discipline for those sustained

18    violations.

19    Q.       Right.  And then the following pages

20    are Commander Terri Moore's response to Lieutenant

21    Brust's recommendations, right?

22    A.       Yes, correct.

23    Q.       And Commander Moore is recommending

24    documented constructive counseling for not fairly

1    and equitably filling a narcotics bureau

2    assignment, and another documented constructive

3    counseling for not following an order from Gary

4    Cameron?

5    A.          Correct.

6    Q.          Okay.  Do you have any recollection as

7    to why Sergeant Moore was not charged with any EEO

8    violations related to these narcotics positions?

9    A.          No.

10   Q.          Did you have any -- would you have had

11   any involvement or did you -- do you remember

12   having any involvement in discussions about

13   whether or not Sergeant Moore should be filling

14   narcotics vacancies considering that officers who

15   might apply for those vacancies were witnesses

16   against him in internal affairs investigation?

17   A.          I don't recall ever having a

18   conversation about whether or not they should --

19   he should be filling positions.  It's outside of

20   my position in internal affairs.  Everyone was

21   aware of the ongoing investigation, so it's not my

22   job as the internal affairs commander to tell

23   deputy chief or other commanders how to run their

24   shop.  I would not have gotten involved unless the

1    chief of police came to me and asked me for

2    information or my opinion.  And I don't recall any

3    conversations like that.

4    Q.          Okay.  Are you familiar with the EEO

5    policy that the Columbus Police have that when an

6    officer is charged within -- or alleged to have

7    committed an EEO violation, that they need to be

8    removed from any supervision of the person who's

9    making the complaint against them?

10   A.          Yes.

11   Q.          Okay.  What's your understanding of the

12   reason for that?

13   A.          The reason for that is to separate the

14   individuals involved, not punish individuals that

15   are bringing forth allegations by removing them

16   from their position.  The division believes that

17   moving the individual encourages -- the individual

18   that's being -- the allegation is against

19   encourages individuals to come forward with these.

20   And if we had a system where it was the other way

21   around and we were removing that person, it's a

22   form -- it's sometimes seen as a form of

23   punishment and it would discourage people from

24   coming forth.

110

1    Q.        Okay.  What's the purpose of separating

2    them at all?

3    A.        To limit their contact during the

4    course of an investigation.

5    Q.        Is one of the reasons to prevent

6    retaliation against the complainant?

7    A.        Yes.

8    Q.        Okay.  The same principle would apply

9    when someone who's being accused of EEO violations

10   is in a position, a command staff position where

11   they're potentially going to be hiring or filling

12   positions, right?

13   A.        If they're being accused of EEO

14   violations, correct.

15   Q.        Well, Sergeant Moore was being accused

16   of EEO violations at the time, right?

17   A.        I don't remember the exact allegations.

18   There was a lot of allegations made and, you know,

19   some of them are racial in nature, so I would

20   believe, yes, there's the potential for actual

21   allegations that are EEO related.

22   Q.        I mean, we've talked about the

23   allegations?

24   A.        Yes.

1    Q.         Including he was using racial slurs --

2    A.         Yes.

3    Q.         -- against black officers and

4    threatening to kill them, so that would be an EEO

5    issue, right?

6    A.         Yes.

7    Q.         Okay.  How -- well, I mean, the chain

8    of command, in order to determine whether Sergeant

9    Moore should be in a position of filling a

10   narcotics position, would need to know who the

11   witnesses and complaining -- the complaining

12   witnesses and complainants were in order to

13   determine whether that would be a concern, right?

14   A.         I would think they would need to know

15   that.

16   Q.         Okay.  But internal affairs would have

17   all that information?

18   A.         I don't believe internal affairs was

19   the only one that had that information.

20   Q.         Why is that?

21   A.         Well, I don't recall exactly who had

22   the information and who didn't, but this was an

23   ongoing investigation.  Most -- generally all of

24   executive staff, the chief, and I am sure the

1    deputy chiefs would have relayed that to their

2    commanders, the individuals involved in this

3    investigation, so I don't think it was a secret

4    who was involved.

5    Q.         Okay.  Do you remember that as part of

6    this investigation, one of the things that

7    Sergeant Decker was looking into was that

8    Commander Cameron had instructed Sergeant Moore

9    not to have contact with Whitney Lancaster and

10   Officer Shaw about these narcotics positions

11   because they were witnesses in the investigation

12   against him?

13   A.         I don't recall specifically.

14   Q.         Okay.

15   A.         But he clearly had --

16   Q.         That was the allegation you were just

17   reading about, right?

18   A.         Yeah.  So he clearly had knowledge.  It

19   was not a secret who was involved.  And he was

20   clearly directing people to ensure that they --

21   they did not fill jobs or have contact with

22   people.  He's clearly directing that.

23   Q.         Okay.  And that's because internal

24   affairs was informing the chain of command --

1    A.        Yes.

2    Q.        -- of the content of the investigation?

3    A.        Yes.

4    Q.        Okay.  As the commander of internal

5    affairs at the time, did it concern you that

6    the -- well, let's focus on the order that

7    Sergeant Moore was found to have violated in this

8    situation.  The order was don't contact Whitney

9    Lancaster about this job position because he's a

10   witness in the investigation against you, right?

11   A.        Yes.

12   Q.        And Sergeant Moore violated that order?

13   A.        Yes, he did.

14   Q.        Okay.  And do you remember that, in

15   fact, he -- it wasn't that he just like had a

16   casual conversation with Whitney Lancaster about

17   the position, but he actually admitted that in the

18   conversation, it was clear to Whitney Lancaster

19   that he was angry.  And it was clear that he

20   didn't want him to take the job.  And the reason

21   he was angry is because Whitney Lancaster had

22   called him a racist?

23            MR. COGLIANESE:  Objection.

24   A.        I don't recall --

114

```
1    Q.          Okay.

2    A.          -- the details.

3    Q.          I'm going to hand you what's been

4    marked as Plaintiff's Exhibit 35, which is one of

5    the summaries of investigative interviews that

6    Sergeant Decker conducted of Eric Moore.  And I

7    don't want you to read that whole document.

8    A.          Thank you.

9    Q.          I would like you to turn to, I think

10   they're paginated at the top, page 20 of the

11   interview.  Actually, if you hand it back to me, I

12   will mark the spot for you, that seems more

13   efficient and fits with Fred's preferences.

14              So I've marked a spot, the first full

15   paragraph on the top of page 20 where Officer

16   Decker is asking Sergeant Moore questions about

17   this particular conversation he had with Whitney

18   Lancaster.

19   A.          Uh-huh.

20   Q.          If you could just take a look at that

21   paragraph and let me know when you're ready to

22   answer questions about it.

23   A.          I'm prepared to answers questions --

24   Q.          Okay.
```

1    A.          -- about that paragraph.

2    Q.          So does this confirm to you that

3    Sergeant Moore admitted that in the conversation

4    he had with Whitney Lancaster, that he was angry

5    with Whitney Lancaster and he was angry because he

6    believed Whitney Lancaster had called him a

7    racist?  I'll stop there.

8             MR. COGLIANESE:  Objection.  Go ahead.

9    Q.          Does this confirm that?

10   A.          This indicates that's what occurred.

11   Q.          Okay.  And that -- I guess my question

12   is:  Internal affairs, under your command,

13   sustained an allegation against Sergeant Moore

14   that he had violated an order by talking to

15   Whitney Lancaster?

16   A.          Yes.

17   Q.          But there -- there was no finding of

18   retaliation against Sergeant Moore by internal

19   affairs.  And I guess my question is:  Why not?

20             MR. COGLIANESE:  Objection.  Go ahead.

21   A.          I don't know exactly why we worded the

22   allegations the way we worded it, but the

23   direction, it appears, is -- from the chain of

24   command and this entire -- these allegations --

1  specific allegations are coming from the chain of

2  command.  They're asking us to determine if he's

3  violated an order and they're asking us to

4  determine if he's improperly filled positions.

5  That is what we're investigating.

6  Q.        So you -- your testimony is that it was

7  up to the chain of command how the allegations

8  would be worded, not up to internal affairs?

9            MR. COGLIANESE:  Objection.

10 A.        No.  It -- we're given direction from a

11 chain of command.  We determine how the

12 allegations are written.  If there's additional

13 allegations added, this particular paragraph right

14 here is not overwhelming evidence of retaliation.

15 It is evidence that he was angry.  It is evidence

16 that he potentially filled a job inappropriately.

17 This paragraph doesn't indicate to me that he is

18 necessarily retaliating that would cause me to

19 write an additional allegation of retaliation.

20           I will tell you that every single

21 internal affairs investigation that is forwarded

22 to the chain of command, the chain of command has

23 an opportunity at any point to add additional

24 allegations.  Anyone in the chain of command can

117

1    make that recommendation, and they do.  That

2    happens frequently, actually.  So because internal

3    affairs doesn't craft a specific allegation

4    doesn't mean that it cannot be crafted or added at

5    any point.

6    Q.        Certainly the evidence that you're

7    looking at could have been used to justify a

8    sustained allegation of retaliation against

9    Sergeant Moore?

10            MR. COGLIANESE:  Objection.

11   A.        That evidence could have been used to

12   further investigate, draft an allegation and

13   pursue that line of questioning potentially, but

14   every internal affairs investigation that we have,

15   we have to remain within a certain scope.  It's an

16   issue of remaining contractual as well.  So we

17   have to be careful about our scope.  There is no

18   investigation that we can't come up with more

19   allegations and more allegations to investigate

20   and -- and expand an internal affairs

21   investigation, this one or any other.

22   Q.        Okay.  I guess -- well, let me -- I'll

23   add a couple facts in here that I think are

24   undisputed.  One is at the time that Sergeant

1    Moore had this conversation with Whitney

2    Lancaster, Whitney Lancaster was -- still had an

3    active bid on this job, on the narcotics job,

4    okay?

5    A.          Uh-huh.

6    Q.          And he was senior to the officer that

7    was ultimately selected for the narcotics job.

8    A.          Uh-huh.

9    Q.          And within a day or two after having

10   this conversation with Sergeant Moore, he withdrew

11   his bid.  Just taking that into account and noting

12   that what you just read is a summary of Sergeant

13   Moore's own testimony in response to Sergeant

14   Decker's questions --

15   A.          Yes.

16   Q.          -- is it fair to say that you could

17   have sustained an allegation of retaliation

18   against Sergeant Moore without doing any other

19   investigation about that particular conduct?

20   A.          I don't think that's fair to say.

21   Q.          Okay.  Why not?

22   A.          I think that if we were going to craft

23   a retaliation allegation, we would have to do

24   further investigation, ask questions pertinent to

1    his motives specifically for that, determine a lot

2    of additional things.  I don't think that we were

3    clearly crafting our questions relative to the

4    allegation that we were investigating.  And if we

5    wanted to investigate an additional allegation of

6    retaliation, I would expect that we would craft

7    questions for Sergeant Moore and Officer Lancaster

8    and anyone else involved that were more specific

9    to that allegation.

10   Q.       Okay.  What more questions would you

11   need to ask pertinent to his motives?  He says in

12   the interview that his motive for doing this was

13   because Whitney Lancaster called him a racist.

14   A.       His motive for doing what?

15   Q.       For having an angry conversation with

16   him that violated an order from Commander Cameron.

17   A.       So an angry conversation means he's

18   retaliating?

19   Q.       I'm asking you.

20   A.       I mean, if he -- if he's angry at him,

21   that's not necessarily going to meet the threshold

22   of retaliation in the work environment just

23   because he had an angry conversation.  So were his

24   actions -- was Officer Lancaster's removal or self

120

1    selection out of the process a result of that?  Is

2    it something that he did specifically because he

3    was, you know, retaliating for being called a

4    racist?  I think that if we have an allegation,

5    we're going to ask questions specific to that

6    allegation.  We're not going to just craft an

7    allegation and not ask any additional questions

8    relative to something serious.

9    Q.          Okay.  If an officer's being

10   interviewed by internal affairs about an

11   allegation about conduct that they've committed

12   and the officer is basically just answering a

13   question about something, and then in the course

14   of answering that question, they also just blurt

15   out basically like, oh, okay, and that was right

16   before I robbed that grocery store, you don't have

17   to start a new investigation and ask questions

18   about them -- about the grocery store in order to

19   add an allegation to the investigation, by the

20   way, Sergeant Moore also robbed a grocery store,

21   right?  You can make a conclusion based on the

22   admission?

23              MR. COGLIANESE:  Objection.  Go ahead.

24   A.          We'll probably ask a follow-up question

121

1    or two regarding the robbing of the grocery store.

2    I don't believe we're going to take that sole

3    statement and not ask any additional follow-up

4    questions related to that particular statement.

5    So, again, if we ask -- if we add additional

6    allegations, there's going to be several questions

7    specific to that allegation that we are going to

8    ask related to that.

9    Q.        Okay.  Sergeant Moore also sent a text

10   message to an officer named John Evans about this

11   conversation that he had with Whitney Lancaster,

12   in which he told John Evans that, again, that the

13   reason why he had the conversation with Whitney

14   Lancaster was because Whitney had called him a

15   racist, and he had an IA interview that Whitney

16   Lancaster did.  Do you remember that?

17   A.        No.

18   Q.        Okay.  Let me hand you what's been

19   marked as Plaintiff's Exhibit 22.  Maybe I'm not.

20              (A discussion is held off the record.)

21                    - - - - -

22           Thereupon, Plaintiff's Exhibit 22 is

23   marked for purposes of identification.

24                    - - - - -

122

1   Q.          I'm now handing you what's been

2   previously been -- well, what I've marked as

3   Plaintiff's Exhibit 22, which I will represent to

4   you were provided to us by the city and are text

5   messages that John Evans gave to Sergeant Decker

6   or forwarded to Sergeant Decker and which he

7   received from Sergeant Moore.

8          First I'll ask:  Have you seen those

9   before?

10  A.          I may have.

11  Q.          Okay.

12  A.          I don't recall.

13  Q.          Assuming that they were included as

14  part of the supportive information for Sergeant

15  Decker's internal affairs investigation --

16  A.          Uh-huh.

17  Q.          -- would that have been something that

18  you reviewed?

19  A.          It would have been.

20  Q.          Okay.  Doesn't this confirm that

21  Sergeant Moore was telling Officer Evans that he

22  had this conversation with Whitney Lancaster and

23  made it clear to him that he better not take the

24  narcotics job?

1              MR. COGLIANESE:  Objection.  Go ahead.

2    A.         It appears that he does not want him to

3    take the narcotics job.

4    Q.         But also not just that he didn't want

5    him to take it, but that he made it clear to

6    Whitney Lancaster that he better not take it?

7    A.         I don't know what Whitney Lancaster

8    perceived from this, but it looks like he's

9    indicating that he does not want him to take his

10   job.

11   Q.         Okay.  But Sergeant Moore actually told

12   Officer Evans that it was his intention to convey

13   that to Officer Lancaster?

14   A.         Okay.

15   Q.         Isn't that an accurate reading of that

16   text message?

17   A.         I guess.  He didn't speak, but it was

18   clear he better not take my job.  It appears that

19   he does not want Whitney Lancaster to take his

20   job.

21   Q.         Okay.  And that's what he was trying to

22   tell him, that's what he's saying to Officer

23   Evans?

24   A.         Yes.

124

1   Q.        That his motive was to make sure that

2   Whitney Lancaster knew that he better not take the

3   job?

4   A.        Yes.

5   Q.        Okay.  And the reason was because he

6   had his audiotape, meaning -- his audiotape, his

7   internal affairs interview, and he told Decker

8   that Sergeant Moore was a racist.  It's like the

9   first thing he says in the text message.

10            MR. COGLIANESE:  Objection.

11  A.        Yes.  He appears angry that he was

12  accused of being a racist in the internal affairs

13  investigation.

14  Q.        Okay.  And as a result of that anger,

15  he violated an order from Commander Cameron by

16  talking to Whitney Lancaster about the job and

17  made it clear to Whitney Lancaster in that

18  conversation that he better not take the job?

19  A.        Yes.

20            MR. COGLIANESE:  Objection.

21  Q.        Okay.  And, in fact, Whitney Lancaster

22  ended up not taking the job as a result?  You have

23  to say yes or no.

24  A.        Yes.

125

1   Q.          Okay.  So I guess I'll go back and ask

2   again, what possible more information would

3   internal affairs need to sustain an allegation of

4   retaliation against Sergeant Moore based on that?

5               MR. COGLIANESE:  Objection.

6   A.          Again, I don't know what additional

7   information.  I would have to sit down and

8   evaluate this.  I don't recall if we evaluated

9   that particular allegation at the time or if we

10  considered it.  We had a multitude of allegations

11  to consider.

12  Q.          Okay.

13  A.          Again, at any point, anyone in the

14  chain of command reads this investigation and

15  would like us to add an allegation all the way

16  through the chief of police, we're more than happy

17  to do so.

18  Q.          Okay.  Certainly this would have been

19  one of the things that you let the chain of

20  command know about so they could take action if

21  they needed to?

22  A.          That this text message was sent?

23  Q.          Yes.

24  A.          I would believe we advised someone in

126

1    the chain of command.

2    Q.         Okay.  And not just at the very end of

3    the investigation, but also at the time that you

4    learned of it?

5              MR. COGLIANESE:  Objection.

6    A.         I would assume so.

7    Q.         Okay.  The --

8    A.         The --

9    Q.         Go ahead.

10   A.         Relative to this, internal affairs was

11   not the only part of the Division of Police that

12   was aware this had occurred.  This was also

13   involving Gary Cameron, this was also involving

14   Lieutenant Brust, this was also involving another

15   chain of command.  So I don't know if they advised

16   anyone regarding the course of action, but Chief

17   Jacobs clearly was aware, because she -- she made

18   a decision to do something with the position when

19   they were posted.

20   Q.         Your understanding is that Chief Jacobs

21   was aware -- well, first of all, this text

22   message -- the -- do you have an understanding of

23   why Officer Moore -- or Sergeant Moore was charged

24   with failure to follow an order rather than

1    insubordination --

2    A.        No.

3    Q.        -- on this?

4            Do you remember any discussions about

5    charging him with insubordination rather than

6    failure to follow an order?

7    A.        I don't remember any discussions.

8    Q.        Okay.  Do you have an understanding

9    of the difference between --

10   A.        Yes.

11   Q.        -- failure to follow an order and

12   insubordination?

13   A.        Uh-huh.

14   Q.        What's the difference?

15   A.        There's some very nuance differences.

16   It's the level of -- it's generally the level of

17   charge.  Insubordination is considered a much

18   higher level of offense and results in higher

19   levels of discipline than just failing to follow

20   an order.  We often separate the two of those into

21   administrative in nature and operational in

22   nature.

23            If you fail to follow an order in an

24   operational environment, it's much more egregious

1    and serious than if you fail to follow an order in

2    an administrative environment.

3    Q.          Okay.  That's not a hard and fast rule,

4    though?

5    A.          No.

6    Q.          You could be charged with

7    insubordination in an administrative environment

8    as well?

9    A.          Correct.  And there's a lot of nuances

10   to that particular charge.  And when you look at

11   insubordination -- the contract requires that we

12   charge -- if we can charge you with something

13   other than insubordination, we must.  So we have

14   to evaluate that in the context of what our

15   history is, comparables and whether or not we have

16   handled it similarly in the past.

17          The union will make an argument,

18   contractual argument for that one very quickly.

19   So we have a tendency to look at the circumstances

20   of the incident, pull the comparables from that

21   particular type of charge and determine where this

22   particular offense falls.

23   Q.          Okay.  Do you remember doing that in

24   this situation?

129

```
 1    A.          So discipline is not my particular --
 2    internal affairs doesn't mete out discipline in
 3    any way, shape, or form.  We write out
 4    allegations.  We come to conclusions.  The chain
 5    of command is then to determine exactly what level
 6    of discipline is attached to that.  Pulling the
 7    comparables and making that decision as to whether
 8    that is an egregious violation or less, you know,
 9    egregious violation is the task of the chain of
10    command, so I would not do that.
11    Q.          Okay.  Do you have a recollection of
12    why Sergeant Moore was not charged with an EEO
13    violation for passing over black officers in this
14    narcotics position to get to a less senior white
15    officer?
16              MR. COGLIANESE:  Objection.
17    A.          I do not know why that occurred.
18    Q.          Okay.  Do you remember that Sergeant
19    Decker found that the basis -- do you remember
20    that Sergeant Decker's basis for finding that
21    Sergeant Moore did not handle this assignment
22    fairly or equitably was that there was several
23    African-American officers who indicated that they
24    did not pass on the job; that they were passed
```

130

1    over to get to Jeremy Ehrenborg anyway?

2    A.          I don't recall that specific

3    information.  I don't know exactly why.  I -- not

4    having read the investigation in so long, I don't

5    recall whether or not he was specifically passed

6    over those officers because of their race or he

7    passed over those officers because he liked --

8    would prefer to have Jeremy Ehrenborg if he was

9    friends with him.  I don't know the details to

10   that.

11   Q.          Okay.  Do you remember that as part of

12   this investigation it turned out -- well, first of

13   all, do you remember that Sergeant Decker went and

14   got all the e-mails that Sergeant Moore sent about

15   this narcotics vacancy?

16   A.          I would think that's normal course of

17   business.

18   Q.          Okay.  And it would also be normal to

19   read those e-mails, not just to collect them, but

20   also review them?

21   A.          Yes.

22   Q.          Okay.  And he would have -- if he

23   included them in the investigative packet, you

24   would have also reviewed them?

1    A.          I would have most likely reviewed them.

2    Q.          Okay.  Unfortunately, I think I'm going

3    to have to ask you to read several pages of the

4    internal affairs summary.  You know, I don't see

5    any way around it right now, but it's only a few

6    pages, though.  So I'm going to ask you to turn to

7    pages 197 to 200 of Exhibit 38.

8               MR. COGLIANESE:  Let's go off the

9    record while she's reading it.

10              MR. VARDARO:  Sure.

11              (A recess is taken.)

12              (Mr. Shaw left the room.)

13   Q.          Just for the record, Officer Shaw had

14   to -- oh, you noted it already -- had to leave,

15   but we're going to proceed without him.

16              You've now had an opportunity to read

17   pages 197 through most of page 200 of Exhibit 38?

18   A.          Yes.

19   Q.          Does this remind you that Sergeant

20   Decker found that Officers Stephanie Gibson and

21   Mary Battle were not offered the narcotics

22   position after Sergeant Moore told them they would

23   have an opportunity to be offered it and then they

24   were passed over despite that?

132

1    A.          I think the job was canceled, wasn't

2    it?

3    Q.          If you look at the routing sheet from

4    before, the job was canceled after it was offered

5    to and accepted by Officer Ehrenborg?

6    A.          Okay.  Yes.  Okay.  So, yes, it looks

7    like he -- the allegation that he inappropriately

8    filled the job was sustained.

9    Q.          Okay.  But in particular, there were

10   two African-American officers, Gibson and Battle,

11   who were -- who were passed over without their

12   consent in filling that job?

13   A.          Yeah, it appears like he indicated to

14   them in their interview or when speaking that he

15   indicated that he would contact them back and he

16   never did.

17   Q.          Okay.  Which was different from the way

18   that he dealt with the white officers who were

19   senior to Ehrenborg?

20   A.          Yeah.  I don't really see much

21   information about how he dealt with the white

22   officers, and I don't have any interviews from

23   Richard Moore and Brian Spann and Rice.

24   Q.          Okay.

1    A.         I'm not really sure how he dealt with

2    the white officers.

3    Q.         Okay.  Do you remember that there were

4    differences in the way that Sergeant Moore

5    responded to e-mails expressing interest in this

6    position between the black officers who responded

7    to it and the white officers who responded?

8    A.         I don't recall any differences.  I

9    don't recall looking at those.

10   Q.         Okay.  I'm going to hand you what's

11   been -- I'm going to hand you what's been marked

12   as Plaintiff's Exhibit 15.  And I'll represent to

13   you that these are e-mails that Sergeant Decker

14   collected in his investigation about the narcotics

15   job and which he says were included in the

16   investigative packet, and I think that's his

17   pagination at the bottom in handwriting.

18   A.         Okay.

19   Q.         I don't need you to read the whole

20   exhibit.

21   A.         Okay.

22   Q.         But I'll just point you there -- I'm

23   sorry.  There is a page marked 208 at the bottom

24   in Decker's handwriting?

134

1    A.        Yes, uh-huh.

2    Q.        And it's marked 4372 on the Bates

3    stamp?

4    A.        Yes.

5    Q.        It's an e-mail from Eric Moore to

6    Whitney Lancaster on December 20th, where Whitney

7    Lancaster expresses interest in the narcotics

8    assignment and Sergeant Moore responds:  Okay, let

9    me know when you can meet at the office.  You'll

10   be given a Spanish test.  It's pass or fail.

11   A.        Uh-huh.

12   Q.        Do you remember that -- first of all,

13   this was an -- this was a position where there was

14   an exceptional qualification of Spanish?

15   A.        Yes.

16   Q.        But an exceptional qualification does

17   not mean if you don't speak Spanish, you can't be

18   considered for the job?

19   A.        Correct.

20   Q.        And then if you flip a few more pages

21   in, there is a page marked 214, which is also

22   Bates stamped 4378.

23   A.        Uh-huh.

24   Q.        And this is a similar type of e-mail

1      string between Eric Moore and Karl Shaw.  And

2      around the middle of the page, Shaw is expressing

3      interest.  And then Sergeant Moore says:  A

4      lieutenant will be conducting your interview.

5      He's not available until Friday.  Are you

6      available at noon on Friday?  Let me know as soon

7      as possible so I can arrange to have a Spanish

8      translator available to administer the oral test.

9      A.        Yes.

10     Q.        Okay.  And then if you flip two more

11     pages you get to 216, which is also 4380?

12     A.        Yes, uh-huh.

13     Q.        And this is Eric Moore to Stephanie

14     Gibson, similar, indicating that he's going to

15     administer a Spanish-speaking test?

16     A.        Uh-huh.

17     Q.        Sorry, you have to say yes or no.

18     A.        Yes.  Sorry.

19     Q.        And if you go to page 221.  This is an

20     e-mail chain between Eric Moore and Falacia

21     Dragin, who's also an African-American officer,

22     right?

23     A.        Yes.

24     Q.        And at the bottom of the page, he's

1    asking Officer Dragin if she's a Spanish speaker.

2    And she basically says she is, but she's not

3    fluent enough to -- you know, she's not extremely

4    fluent.  And rather than informing her that that's

5    not an absolute requirement for the job, he just

6    says thanks.  Do you see that?

7    A.        Yes.

8    Q.        Okay.  If you can flip to the next

9    page.  This is the one -- I think it's actually

10   the back of the page maybe.  Oh, maybe not.

11   A.        That's the back page.

12   Q.        I'm sorry, you're right.  So this next

13   page is marked at the bottom 294?

14   A.        Yes.

15   Q.        This is an e-mail from Eric Moore to

16   David Hammerberg, who is a white officer.  And

17   Hammerberg expresses interest in the job.  And all

18   Eric Moore says is, give me a call please or can

19   you give me a call please.  Do you see that?

20   A.        Yes.

21   Q.        The following page 295, similarly

22   Russell Weiner is expressing interest in the job

23   and Sergeant Moore responds and says, can you give

24   me a call, Russ?  Do you see that?

137

```
1    A.        Yes.

2    Q.        And Russell Weiner is also a white

3    officer?

4    A.        Yes.

5    Q.        Okay.  And similarly page 296, the next

6    page after that, Bates stamp 4461, Norman Russell

7    is talking to him about the job.  And Officer

8    Russell expresses interest.  And he just says, can

9    you give me a call, Norman?

10   A.        Yes.

11   Q.        No -- and this is another white

12   officer?

13   A.        No.  Yes.

14   Q.        No mention of a Spanish speaking test,

15   no mention of pass/fail, anything like that?

16   A.        Correct.

17   Q.        And I'll represent to you that we've

18   looked at a number of other e-mails between

19   Sergeant Moore and the white officer applicants

20   and Sergeant Moore and the black officer

21   applicants.  And it appears consistent that the

22   black officers get sort of a warning that they

23   have to speak Spanish and the white officers just

24   get "call me."  Do you remember that from the
```

```
 1    investigation?
 2              MR. COGLIANESE:  Objection.  Go ahead.
 3    A.        I don't recall the specifics of the
 4    investigation as I'm looking through it, I don't
 5    know which officers are purporting to be Spanish
 6    speaking and which ones aren't.  I think it is
 7    normal that if they're going to claim the
 8    exceptional qualification, which is one of the
 9    reasons we can select -- we can either select
10    according to seniority or exceptional.  If they're
11    going to claim the exceptional, they have to be
12    able to be tested and prove it.
13              So I don't know which officers are
14    claiming that, other than Falacia Dragin indicates
15    that she has some Spanish-speaking ability, but
16    not enough to pass the test.  So I don't know
17    which officers are purporting to be Spanish
18    speaking.
19    Q.        If it turned out that none of the
20    officers involved purported to be Spanish speaking
21    and the black officers got a different message in
22    response than the white officers did, would that
23    raise a concern in your mind about a potential EEO
24    consideration on this?
```

1    A.         Yes.

2              MR. COGLIANESE:  Objection.

3    Q.         Adding in the fact that the officers

4    who told Sergeant Decker that they were not

5    offered the position or that Sergeant Moore didn't

6    come back to them with an offer once it got down

7    to them, as he promised them, were black, wouldn't

8    that also sort of enhance your concern about an

9    EEO violation here?

10             MR. COGLIANESE:  Objection.

11   A.         I don't recall what I was looking at at

12   the time specifically, and how we made the

13   decision to add or not add an EEO violation to

14   this particular.  But, again, anyone can add an

15   additional allegation during the course of this.

16   This is not internal affairs making the call and a

17   single decision about whether or not these

18   allegations are the allegations -- the only

19   allegations included in the investigation.

20   Q.         And just as a bottom line thing,

21   anything that you put in the internal affairs

22   investigation or anything that Sergeant Decker put

23   in the internal affairs investigation is not

24   binding on the chain of command; the chain of

140

```
 1    command can overrule you?

 2    A.          Not at all.

 3    Q.          In either direction?

 4    A.          And they do.

 5    Q.          Yes.  And I have no illusion about

 6    that.  I'm just asking you in terms of your

 7    thought process and your decision-making in this.

 8    Obviously, chain of command is more likely to

 9    sustain a charge against an officer if something

10    actually appears in the internal affairs

11    investigation as opposed to if you don't put it in

12    there, right?

13                MR. COGLIANESE:  Objection.  Go ahead.

14    A.          I would not say that that's standard

15    procedure.

16    Q.          Okay.

17    A.          But I think that the chain of command

18    is, you know -- can add or remove allegations as

19    they see fit.  And so if we decide to put

20    something in there, they have to deal with it in

21    one way or another.  But it is not unusual for the

22    chain of command to add an additional allegation.

23    Q.          It wasn't your practice to just sort of

24    present the facts in an investigation and not make
```

1    a recommendation about whether a certain charge

2    should or shouldn't be brought, right?

3    A.          A charge or an allegation?

4    Q.          I'm sorry.  An allegation.

5    A.          So leaving internal affairs most --

6    most investigations have our allegations and we --

7    you know, those allegations are based on what was

8    raised during the course of the investigation.  We

9    can add things if we see additional misconduct.

10          EEO was not something that was

11   forwarded us from the chain of command,

12   particularly in this particular job thing.

13   Related to these jobs, they didn't say, look at

14   this for an EEO violation.  We could have added

15   that if we chose to add that.  And if it left

16   internal affairs without that, the chain of

17   command could have added that as well.

18   Q.          If the -- well, first of all, and I'll

19   get to this in a little bit, but at some point in

20   this process, you had a conversation with Sergeant

21   Decker where you wanted him to sort of streamline

22   his allegations or his analysis of this

23   investigation?

24   A.          Yes.

142

1   Q.          And one of the reasons you wanted to

2   streamline it was not just because you like

3   shorter documents, it was because you thought it

4   would be more likely for the chain of command to

5   process the information efficiently and completely

6   if they had a shorter investigation?

7   A.          There were a couple reasons.  One of

8   them is I know from experience that this

9   particular investigation was well over 200 pages

10  when he was working on it.  And I know from

11  experience that the chain of command, when you get

12  into those more lengthy investigations, the

13  likelihood of them digesting every single word is

14  a lot less.  And I want to make sure they read it

15  all the way through the chain of command and I

16  want to make sure that we're not putting a bunch

17  of information in there that isn't necessarily

18  relevant to the outcome.

19  Q.          Okay.

20  A.          Another reason that I asked him to

21  streamline the investigation as much as possible

22  is Chief Jacobs was concerned about the length of

23  time it was taking to do it, the length of the

24  investigation, which I kept her apprised of.  And

143

 1    she was very concerned about that for whatever

 2    reason.  She wanted to make sure that our

 3    analysis, our review and summary of the evidence

 4    and all of the interviews was very pointed, and

 5    that we were moving forward with the investigation

 6    very quickly.

 7              Sergeant Decker has -- is a good

 8    investigator, very detail oriented, but has a

 9    habit of getting bogged down in details sometimes.

10    An investigation that one person can do in eight

11    pages will take him twenty.  And there will be a

12    lot of detail in there.  But a lot of the details

13    isn't necessarily relevant to the outcome.  And it

14    reduces the likelihood that it is properly

15    digested by the chain of command, and it extends

16    the length of the investigation, which is good for

17    no one.

18    Q.        Okay.  And for both of those reasons,

19    it would make sense that if internal affairs

20    thought there was evidence that would support an

21    EEO investigation on these narcotics positions, it

22    would be better to make that explicit in the

23    summary rather than hoping that the chain of

24    command, that you're already concerned might not

144

1     digest all of this information, would read not

2     just the summary, but all of the background

3     investigational materials and digest it and look

4     at all of that stuff?

5     A.          It would be better if we felt that that

6     was an appropriate allegation to include to

7     include that up front.

8     Q.          Okay.  Go ahead.

9     A.          Could I clarify something that was

10    stated earlier, please?

11    Q.          Sure.  Absolutely.

12    A.          We were discussing hypothetically what

13    if Sergeant Moore was talking during the course of

14    an interview and suddenly spurted out that he

15    robbed a bank.

16    Q.          I said grocery store, but yes.

17    A.          Grocery store or -- grocery store and

18    what would you do.  And I said, well, I would ask

19    follow-up questions.  I just wanted to clarify

20    that if he blurted out that he had committed a

21    criminal action, I would stop the interview

22    immediately, because it's criminal in nature.  We

23    cannot continue and we would stop that and he

24    would -- you know, we would assess where we're

1    going with that particular allegation.  It

2    probably wouldn't be included in that particular

3    investigation.  That would be a separate one.

4          And then we would have to consider

5    Garrity and everything else.  I think I just was

6    assuming that you were hypothetically discussing

7    what would happen if he blurted out misconduct,

8    but because that was criminal in nature, I wanted

9    to make sure that I clarified that we would not

10    continue that investigation --

11    Q.       Okay.

12    A.       -- interview.

13    Q.       I guess if the ATF had already

14    investigated the grocery store thing and decided

15    it wasn't criminal conduct, you could keep going

16    at that point?

17    A.       Uh-huh.

18          MR. COGLIANESE:  Objection.

19    Q.       The -- going back to the narcotics

20    positions.  In addition to the pattern of the

21    e-mail responses and the fact that the officers

22    who were passed over without their permission were

23    black -- well, actually, I'm sorry, I'll go a

24    slightly different direction.

146

1          First of all, at the end of the long

2    portion, the pages 197 to 200 that we took a break

3    so that you could read?

4    A.          Yes.

5    Q.          This is a letter of information from

6    Sergeant Moore talking about how he filled the

7    position where he indicated that without

8    exception, the officers senior to Ehrenborg passed

9    in favor of Ehrenborg.

10   A.          Yes, I see that.

11   Q.          Based on Sergeant Decker's conclusions

12   about this assignment, that was not accurate?

13   A.          I would -- I would say that that

14   particular statement from Sergeant Moore, I don't

15   remember reading that prior to this, but, yeah,

16   that's not accurate.

17   Q.          Okay.  And this -- do you remember that

18   this letter of information was something that was

19   forwarded up to Chief Jacobs?

20   A.          I don't remember exactly how it

21   occurred.

22   Q.          Assuming that you knew that at the

23   time, would that make it a more serious

24   inaccuracy?

147

1   A.          That it was forwarded to the chief,

2   this particular letter, and I knew that this

3   was -- this statement wasn't accurate?  Yes.

4   Q.          Okay.  Sergeant Decker wanted Sergeant

5   Moore to be charged with dishonesty for this

6   statement, among others, didn't he?

7   A.          Yes, he did.

8   Q.          Okay.  Do you have a recollection of

9   why he was not?

10  A.          I remember the discussions that we had.

11  I remember that I agreed with him on a lot of

12  these levels; that dishonesty was apparent.  When

13  we make a decision as to whether or not to charge

14  an officer with untruthfulness, there is a lot

15  that goes into that decision, and that is

16  discussed with the chief of police.  Because if we

17  charge somebody and we do not have the ability --

18  we don't have the evidence to support that for the

19  duration of the process to remove them from the

20  Division of Police, and we end up with that

21  individual back through arbitration or otherwise,

22  then we have an individual that has little or no

23  value as a police officer because they have a

24  sustained charge of untruthfulness.

148

```
 1              So when we make a decision to charge a
 2   police officer with untruthfulness, there is a lot
 3   more that goes into that particular decision than
 4   a lot of other decisions regarding charging
 5   officers.
 6   Q.        Okay.  Was it a decision that IA made
 7   or was it a decision that the chain of command
 8   overruled IA on?
 9   A.        That was a decision that was discussed
10   and decided on by the chief of police.
11   Q.        Okay.  As it turned out, I mean, you're
12   familiar with the arbitration proceedings in this
13   situation?
14   A.        Vaguely familiar.
15   Q.        Okay.  As it turned out, didn't the
16   arbitrator basically -- one of the reasons why
17   Sergeant Moore's discipline was overturned was
18   because he was charged with something short of
19   dishonesty on things that he was evidently being
20   dishonest about, and the arbitrator basically
21   said, well, there is no rule about deceptiveness,
22   it's either you're dishonest or you're not?
23              MR. COGLIANESE:  Objection.
24   Q.        Do you remember that?
```

1          MR. COGLIANESE:  Objection.  Go ahead.

2   A.          I do not recall.  I do not recall if I

3   really read the arbitrator's decision.  I knew

4   what decision came out of the arbitration.  I did

5   not agree with it.  An arbitrator's opinion as to

6   what they would have liked to have had varies

7   between arbitrators.

8          So, you know, whether or not we charged

9   him with an untruthfulness charge, to me it would

10  not necessarily have changed the outcome.  If the

11  arbitrator particularly felt that way, then that

12  would have been written in his decision.  But I

13  don't recall reading all of the decision for that

14  just knowing what the outcome was.

15  Q.          Okay.  This part of the investigation

16  didn't go to the arbitrator at all, right?

17  A.          Which part?

18  Q.          The narcotics position and how it was

19  filled?

20  A.          I don't recall.

21  Q.          Okay.

22  A.          Once this leaves internal affairs, I'm

23  not emotionally attached to any of these

24  investigations.  And the chain of command can do

150

1    what they want with it.  And once it leaves

2    internal affairs, unless it comes back to us for

3    additional information or investigation, we are

4    done.

5    Q.          Okay.  The information you read before

6    about the chain of command process in this, which

7    was Exhibit 41 --

8    A.          Yes.

9    Q.          -- where Lieutenant Brust and Commander

10   Moore [sic] were analyzing and recommending

11   discipline on these sustained findings related to

12   the narcotics position.

13   A.          Yes.

14   Q.          They only recommended DCC on each of

15   those?

16   A.          Yes.

17   Q.          Actually Lieutenant Brust didn't even

18   think there should be a DCC on the first one.  But

19   Commander Moore overruled him and recommended a

20   DCC.  DCC would not go to arbitration, right?

21   A.          A DCC could go to arbitration.

22   Q.          Okay.

23   A.          The union can arbitrate a decision, a

24   low-level decision based on a grievance process

1    just like they could arbitrate anything else.

2    Q.        Okay.  The -- you mentioned earlier

3    that you felt like you didn't -- that one of the

4    possibilities for why Sergeant Moore was not

5    charged with an EEO violation for the narcotics

6    position was because it may have been that he

7    skipped over people to get to Jeremy Ehrenborg

8    just because he preferred Ehrenborg as a buddy or

9    something like that --

10    A.        Uh-huh.

11    Q.        -- rather than because of race.  In

12    fact, you had information from the text message we

13    looked at before and his interview with Sergeant

14    Decker that one of the officers that he skipped

15    over to get to Ehrenborg or that he pushed out of

16    position to get to Ehrenborg was Whitney

17    Lancaster, and that he specifically did that

18    because Whitney Lancaster had called him a racist,

19    right?

20              MR. COGLIANESE:  Objection.  Go ahead.

21    A.        That was in the text message I believe.

22    Q.        Okay.  So it was clear that -- it's not

23    like he was telling Officer Evans, well, I -- I

24    pushed Whitney Lancaster out because otherwise he

152

1    would have taken the job and I wanted Ehrenborg

2    instead, he did it for retaliatory reasons?

3                    MR. COGLIANESE:  Objection.  Go ahead.

4    A.              I would not necessarily agree that that

5    was for retaliatory reasons.  He could have been

6    trying to get to Jeremy Ehrenborg for -- because

7    that was his friend.  And why he pushed Whitney

8    Lancaster out, why did he not select the next

9    white officer there?  Why did he go to Jeremy

10   Ehrenborg?  There's plenty of white officers all

11   the way down here that he could have -- if it was

12   based solely on race and not personality that he

13   could have selected.  So I really don't know the

14   answer to that question.

15   Q.              In your legal education and your EEO

16   training at the Columbus Division of Police, is it

17   your understanding that for something to be an EEO

18   violation or a violation of state or federal law

19   that the only reason somebody does something is

20   because of their race or in retaliation for

21   protected activity?

22   A.              No, that's not.

23                   MR. COGLIANESE:  Objection.

24   Q.              And, in fact, if it's a motivating

153

1   factor or a deciding factor or the cause of the

2   action, even if it's combined with some other

3   motive, it can still be illegal?

4   A.        Yes.

5             MR. COGLIANESE:  Objection.

6   Q.        And that's true of division policy as

7   well?

8   A.        It is.

9             MR. COGLIANESE:  Objection.

10  Q.        Okay.  And in terms of the motive to

11  get to Jeremy Ehrenborg instead of some other

12  officer, basically all you had in this

13  investigation was Sergeant Moore just saying

14  that's why he wanted to do it, right?

15  A.        Saying he wanted Jeremy?

16  Q.        Yeah.

17  A.        He's indicating clearly that he wants

18  Jeremy Ehrenborg to --

19  Q.        Right.

20  A.        -- in his -- to those he talked to

21  during the course of this.  And I -- I don't know

22  if it's exclusively because of race or if, you

23  know, it's partially because of race.  I have no

24  idea if that's the case.  His behavior is

154

1    inappropriate clearly.  The chain of command

2    identified his behavior as inappropriate.  And --

3    Q.         But it would have been far more serious

4    if it had an EEO specification on it?

5              MR. COGLIANESE:  Objection.

6    A.         If we had written an allegation with

7    EEO on it.

8    Q.         If it was sustained and upheld by the

9    chain of command that it was not just

10   inappropriate, but discriminatory or retaliatory?

11             MR. COGLIANESE:  Objection.

12   A.         I think that would have -- that would

13   have -- that additional allegation would have

14   definitely raised more red flags if we would have

15   put it in there, but the allegation of failing to

16   follow an order is pretty serious as well.  And

17   that was in there and --

18   Q.         Okay.

19   A.         -- received a DCC, so...

20   Q.         Okay.  But the failure to follow an

21   order allegation would also have been more serious

22   if it was failure to follow an order in order to

23   commit retaliation?

24             MR. COGLIANESE:  Objection.

1    A.          If it was for that reason.

2    Q.          And we know that it was?

3               MR. COGLIANESE:  Objection.

4    A.          It could have been -- I mean, we could

5    have written the allegation any number of ways.

6    We could have added allegations, we could have

7    removed allegations, we could have done any number

8    of things.

9    Q.          Yeah.  And I'm just asking:  If you had

10   done it that way, it would have been more serious?

11              MR. COGLIANESE:  Objection.

12   Q.          Failing to follow an order by itself is

13   not as serious as failing to follow an order in

14   order to interfere with an IA/EEO investigation

15   and retaliate against an officer.

16   A.          I think it would have looked more

17   serious on its face, but not necessarily resulted

18   in a sustained outcome from the chain of command.

19   Sometimes the way we write allegations is --

20   causes the chain of command to react in a way

21   that, you know, that we are not likely to get a

22   sustained.  So I think that if we would have

23   reworded that allegation, it would have definitely

24   raised red flags.  But I don't -- I'm not

1    guaranteeing that it would have come out of the

2    chain of command sustained in that case.

3    Q.         Even with an admission by the focus

4    officer that the reason he failed to follow the

5    order was because the officer had called him a

6    racist in an internal affairs investigation?

7              MR. COGLIANESE:  Objection.

8    A.         I do not control anything the chain of

9    command does once it leaves internal affairs.

10   Q.         Okay.

11   A.         Wish I did, but I do not.

12   Q.         But you control what goes in internal

13   affairs reports?

14   A.         I control the way -- the allegations to

15   a certain degree, the way the allegations are

16   written once they leave internal affairs.

17   Q.         Okay.  And are you telling me that the

18   reason why it wasn't alleged as failing to follow

19   an order in order to commit retaliation against an

20   officer was because you felt it would be less

21   likely to be sustained by the chain of command as

22   that charge?

23             MR. COGLIANESE:  Objection.

24   A.         No, that's not what I'm saying.

157

1    Q.         Okay.  So -- and I'm sorry.  In
2    addition to controlling the way that the
3    allegations are worded, you also control what
4    evidence is highlighted most prominently in the
5    investigation?  You and the sergeant who's writing
6    the report?
7    A.         Not necessarily.
8    Q.         Okay.  Who controls that?
9    A.         What evidence is highlighted?  How --
10   can you be more specific?
11   Q.         Well, I'll use an example.  This is a
12   208-page investigative report.  Roughly 160 pages
13   of it are about overtime and property theft
14   allegations, and only the very last couple dozen
15   pages have anything to do with equal employment
16   opportunity and the death threat against black
17   officers.  If internal affairs had wanted to put
18   the discrimination allegations up front or make
19   them a more substantial portion of what was
20   covered in the investigation, that was certainly
21   within your power and Sergeant Decker's?
22              MR. COGLIANESE:  Objection.
23   A.         So you're assuming because it's
24   lengthier that it's more important, and that's not

1    necessarily accurate.  An investigation involving

2    use of time -- time slips is very detailed,

3    requires a lot of minutia, and tends to be very

4    extensive in nature based on how it has to be

5    investigated, the information that has to be

6    included.  And just because something has more

7    pages doesn't mean that it is more important as

8    far as how we, you know, present it.  That was

9    never our goal.

10           Our goal was to deal with each

11   allegation independently in the best way that we

12   could.  So it depends on what the allegation is

13   and the amount of evidence, how many actual pages

14   are the result of -- result from that particular

15   investigation of that allegation.

16   Q.         In addition to what've already

17   discussed, the text message from Sergeant Moore to

18   John Evans that you looked at earlier indicated

19   that it wasn't just Whitney Lancaster who better

20   not take the narcotics job, it was also Officer

21   Karl Shaw, do you remember that?

22   A.         Yes.

23   Q.         Okay.  Do you also remember that

24   Officer Shaw told Sergeant Decker that once the

159

1   job was reposted after it was canceled --

2   A.        Uh-huh.

3   Q.        -- he talked to Lieutenant Brust about

4   the job and told him that -- told him that Moore

5   was saying threatening things about him taking the

6   job, and that Lieutenant Brust basically said,

7   I'll try to protect you, but I'm not going to be

8   there all the time?  And then Officer Shaw ended

9   up passing on the job as a result of that?

10            MR. COGLIANESE:  Objection.

11  A.        I don't recall specifically what

12  occurred there.

13  Q.        Okay.  Can you take a page -- can you

14  take a look at page 186 of Sergeant Decker's

15  summary?

16  A.        Yes.

17  Q.        And actually, if you hand me page 186,

18  I'll mark the spot that I want you to read.  If

19  you just read the last paragraph of page 186.

20            You've read it?

21  A.        Yes.

22  Q.        Does this remind you that Officer Shaw

23  told Lieutenant Brust that he -- that Sergeant

24  Moore was going around saying that he better not

1    take the job, or something to that effect, and

2    that he told Lieutenant Brust that he couldn't

3    take the job because of it after Lieutenant Brust

4    basically indicated that he couldn't protect him?

5                    MR. COGLIANESE:  Objection.

6    A.         Yes.

7    Q.         Okay.  So this is another incident of

8    retaliation by Sergeant Moore that resulted in a

9    black officer not getting one of these narcotics

10   positions?

11                   MR. COGLIANESE:  Objection.

12   A.         I'm not convinced that's retaliation,

13   but --

14   Q.         Okay.  Why not?

15   A.         I haven't read this entire thing, but I

16   don't have anything -- I'm going to get him, I

17   don't know if there's any indication what he meant

18   by that.  I haven't read the full interview.  I --

19   I can't make a statement as to whether or not

20   that's retaliation based on that single paragraph.

21   Q.         What would you need to know in order to

22   determine it was retaliation?

23   A.         I don't know.  I haven't really

24   evaluated that, but I would want to know what he

161

1    meant by -- did he indicate that he -- what he

2    meant by, I'm going to get him.  When we

3    interviewed Moore, did Moore actually indicate he

4    stated that?  Did he provide any qualifiers of

5    what he meant when he said that?

6              If Lieutenant Brust didn't -- you know,

7    why maybe Lieutenant Brust didn't think that this

8    was serious in nature since he was involved in

9    this personally.  He spoke to these individuals

10   and why he felt that this wasn't something that

11   needed to be dealt with for whatever reason.

12   Those are the kind of things that I would need to

13   know --

14   Q.        Okay.

15   A.        -- before I evaluated that, I think.

16   Q.        Do you remember that Sergeant Moore

17   admitted to Sergeant Decker in his

18   informational -- in his IA interview that the

19   reason that he said that about Karl Shaw in his

20   text message was because Karl Shaw had accused him

21   of being a racist?

22   A.        I remember the text message, but --

23   Q.        In the portion of the text message I'm

24   talking about where he says he was clear to

1    Lancaster that he better not take the job and he

2    says the same goes for Karl?

3                MR. COGLIANESE:  Objection.

4    A.          The same goes for Karl, okay.

5    Q.          And then if you take a look at

6    Exhibit 35, which I think is in front of you.

7    A.          Right here.

8    Q.          Yeah.

9    A.          Okay.

10   Q.          The very -- the second-to-last page or

11   the back of the last page, I guess, the front of

12   the last page.  It's page 21 of the interview.

13   A.          Uh-huh.

14   Q.          And it's marked at the bottom 4728.  If

15   you look at the second full paragraph or the

16   second paragraph, I guess?

17   A.          Yes.

18   Q.          It says, "I asked."  Can you read those

19   couple of sentences?

20   A.          I asked -- you wrote that it was clear

21   that he better not take my job.  And then you

22   wrote, the same goes for Karl and Richard Moore.

23   Why did you say the same goes for Karl?  Sergeant

24   Moore replied, well, because they -- he's accusing

163

1  me of being a racist and accusing me of all this

2  nonsense.

3  Q.          Okay.  You can stop there.

4  A.          Okay.

5  Q.          So, again, as with Whitney Lancaster,

6  who in the previous page of the interview he said

7  that he had told he better not take the job

8  because he called him a racist, he said basically

9  the same thing about Karl Shaw?

10 A.          Uh-huh.

11 Q.          You have to say yes or no.

12 A.          Yes.

13 Q.          Okay.  So, again, you don't need any

14 more information about this officer's motive, he's

15 telling internal affairs what his motive was for

16 saying the statement, right?

17             MR. COGLIANESE:  Objection.

18 A.          Because he's being accused of

19 misconduct of being a racist.

20 Q.          Right.

21 A.          That is why he doesn't want them to

22 take the positions.

23 Q.          Right.  Right.  And he -- so he's

24 taking action against these officers to discourage

164

1    them from taking the jobs because they have

2    participated in protected activity in accusing him

3    of race discrimination?

4              MR. COGLIANESE:  Objection.

5    Q.        Right?

6              MR. COGLIANESE:  Objection.

7    Q.        Is there something I've got wrong

8    there?

9              MR. COGLIANESE:  Outside of misquoting

10   this --

11             MR. VARDARO:  I'm sorry, Rich, I need

12   you to not make speaking -- you can say objection.

13   Your objection's on the record.  I want her

14   answer.

15   A.        Okay.  So what is the question for me?

16   Q.        The question is:  Sergeant Moore --

17   wasn't Sergeant Moore taking action against these

18   officers to discourage them from taking the jobs

19   because they participated in protected activity in

20   accusing him of race discrimination?

21             MR. COGLIANESE:  Objection.

22   A.        So --

23   Q.        Go ahead.

24             MR. COGLIANESE:  Read the entire

165

1    document.

2                    THE WITNESS:  Okay.

3                    MR. VARDARO:  You want to stop so she

4    can read the whole document?

5                    MR. GITTES:  Fine.

6                    MR. COGLIANESE:  Page 21.  If you're

7    not going to quote it accurately to her, then,

8    yes, she needs to read it.

9                    MR. VARDARO:  All right.  Let's take a

10   break.  You can read all of Exhibit 35.  Rich

11   knows exactly what's in it.

12                   THE WITNESS:  Okay.

13                   (A recess is taken.)

14   Q.        So for the record, my understanding is

15   you feel like you can answer the question?

16   A.        I will do my best to answer the

17   question.

18   Q.        Okay.

19   A.        Please repeat the question.

20   Q.        My question was:  Wasn't Sergeant Moore

21   taking action against these officers to discourage

22   them from taking the job because they participated

23   in protected activity by accusing him of race

24   discrimination?

1              MR. COGLIANESE:  Objection.  Go ahead.

2   A.          So looking at Sergeant Moore's summary,

3   he's indicating that he doesn't understand why

4   they wanted to work for him.  And he's indicating

5   that there wouldn't have been any problem if they

6   took the job.  So his statements indicate that

7   that's not necessarily what was going on here;

8   that he believes that Karl could have come over

9   and taken that job.  So it's not necessarily true

10  that he is taking action against them for those

11  reasons.

12  Q.          Okay.  He -- again, he -- he admitted

13  in the text message and admitted to Sergeant

14  Decker in the interview that he had an angry

15  conversation with Whitney Lancaster where he made

16  it clear to him that he better not take the job,

17  right?

18  A.          Yes.

19  Q.          Okay.  And he's also admitting in this

20  interview with Sergeant Decker and in the text

21  message that the same goes for Karl.  And the

22  reason was because Karl was calling him a racist,

23  right?

24              MR. COGLIANESE:  Objection.  Go ahead.

1    A.        That's what appears to be occurring.

2    Q.        Okay.  And then after that, he says to

3    Sergeant Decker, and also, you know, honestly, why

4    would they even want -- if they thought I was a

5    racist, why would they even want the job?  And

6    those kind of other things.

7              But none of that disputes what Sergeant

8    Moore is saying, which is, he conveyed to Whitney

9    Lancaster that he better not take the job in

10   response to Whitney Lancaster calling him a

11   racist, and none of it changes the fact that he

12   said the same thing about Karl Shaw, which caused

13   Karl not to take the job.  None of that is changed

14   by the fact that he then goes and sort of muses

15   about why would they even want to work for me?

16             MR. COGLIANESE:  Objection.  Go ahead.

17   Q.        Don't you agree?

18             MR. COGLIANESE:  Objection.

19   A.        Don't I agree that it doesn't

20   substantively change why he was doing it?  He's

21   indicating that there's a variety of reasons why.

22   That might be one of them.  This might also be one

23   of them.  But, again, I'm not sure what the

24   question is for me.  Is this related to --

168

1    Q.          Okay.

2    A.              -- is the question for me why I didn't

3    craft an allegation related to this particular

4    musing here?  Or some of the other text messages,

5    why there was not an additional allegation?  Is

6    that the question?

7    Q.          If you want to answer that, that's

8    fine, too.  I think I've asked that previously,

9    but I'm going -- I was going into a little bit

10   more about --

11   A.          Okay.

12   Q.              -- why would you need any more

13   information from an officer who's the focus of an

14   investigation to confirm their motive when they're

15   just saying it?

16   A.          Okay.

17               MR. COGLIANESE:  Objection.  Go ahead.

18   A.              Again, I can't tell you going back in

19   time why we crafted certain allegations and why we

20   didn't include a bunch of additional allegations.

21   I can't speak to what occurred years ago regarding

22   why this particular allegation was worded the way

23   it was and not worded the way you would like it to

24   be worded.  I don't know how to answer any

169

1    additional questions about what I was thinking

2    years ago regarding this particular summary of an

3    interview in a 200-page investigation.  Are you

4    asking my --

5    Q.        I guess my question is:  What is and

6    what was and wasn't important to you and internal

7    affairs and the Division of Police at the time in

8    the sense that if you have admissions from a

9    command officer of the Columbus Division of Police

10   that they have committed multiple violations of

11   the department policies and state and federal laws

12   prohibiting discrimination and retaliation, why it

13   wouldn't be important to internal affairs and the

14   Division of Police to make sure that they're held

15   accountable for those violations?

16            MR. COGLIANESE:  Objection.

17   A.        First of all, Sergeant Moore is not a

18   command officer, he is a sergeant.  He's not part

19   of command staff at all.  Second, those -- there

20   were numerous allegations, many sustained against

21   Eric Moore.  We felt that everything that was

22   brought to the table had importance.  We

23   investigated every single thing that we could to a

24   certain degree.  There -- there's nothing in this

1    investigation that we said was -- that we didn't

2    evaluate and determine had some importance at some

3    point.

4           But because we have to maintain a

5    certain scope of an investigation, this could --

6    this investigation itself could still be going on

7    given the number of allegations that were brought

8    to the table every time someone was interviewed.

9           And I'm sure you've read the numerous

10   investigative summaries of the interviews that

11   occurred during the course of this investigation.

12   So I had made no decisions personally without

13   consulting other people regarding whether or not

14   we should take allegations seriously.  How we

15   weighted allegations was based on conversations

16   that we had, evidence that was coming forth,

17   interviews that we were having at the time, and

18   that's how we determined how we -- further

19   investigation for every single allegation.

20   Q.       What is your understanding of what the

21   word "retaliation" means under the division of

22   police's policies and state and federal law?

23           MR. COGLIANESE:  Objection.

24   A.       In general, retaliation is behavior

1    that is the result -- behavior that is the result

2    to the detriment of a party regarding a protected

3    action.  It's behavior that -- and it's hard to

4    use it without the word "retaliation."  It's

5    basically behavior that's meant to harm an

6    individual during the course of an employment that

7    has filed a claim or made an allegation or has

8    made a complaint against a supervisor or somebody

9    in the Division of Police.

10            So we look at those actions, any

11   actions that occur and we evaluate whether or not

12   it was meant to harm that person, or based on an

13   allegation that was brought forth during the

14   course of an investigation or a complaint or

15   something like that.

16   Q.        There's no question in your mind that

17   Karl Shaw and Whitney Lancaster engaged in

18   protected activity for purposes of a retaliation

19   claim, right?

20            MR. COGLIANESE:  Objection.

21   A.        What protected activity?  Like --

22   Q.        That they --

23   A.        -- specifically?

24   Q.        -- accused Eric Moore of

172

1   discrimination?

2   A.          There's no question they were accusing

3   Eric Moore of discrimination.

4   Q.          Right.  And that is protected

5   activity --

6   A.          Correct.

7   Q.          -- for purposes of CPD policy?  For

8   purposes of state and federal laws --

9               MR. COGLIANESE:  Objection.

10  Q.          -- as you understand it?

11  A.          Yeah.

12  Q.          Okay.  There's no question that Eric

13  Moore's actions in the narcotics job as he

14  described them toward Whitney Lancaster and

15  Officer Shaw were motivated, at least in part, by

16  his anger at them for calling him a racist?

17              MR. COGLIANESE:  Objection.

18  Q.          Because he said it right out.

19              MR. COGLIANESE:  Objection.

20  A.          There's -- you're saying that that's

21  settled -- settled argument.

22  Q.          Yes.  It's obvious that he admitted

23  that he was motivated, at least in part, by his

24  anger because he found out they called him a

1    racist in an IA investigation?

2    A.          It appears that he has admitted that,

3    at least in part.

4               MR. COGLIANESE:  Objection.

5    Q.          Okay.  And it appears also that both of

6    these officers ended up passing on narcotics

7    assignments because of the product of that anger

8    by Sergeant Moore?

9    A.          That is what they indicated.

10              MR. COGLIANESE:  Objection.

11   Q.          Okay.  There was no reason to doubt

12   that?

13   A.          I don't have any reason to doubt that.

14   Q.          Okay.  Do you think it would be

15   understandable for an officer, particularly in a

16   covert assignment like narcotics, to pass on a

17   position where they would have to report to a

18   supervisor who they knew had told other officers

19   that they better not take the job?

20              MR. COGLIANESE:  Objection.

21   A.          I think that if supervisors are telling

22   people not to take a job, that that behavior is

23   not necessarily appropriate.  And if I was an

24   officer and I was in a -- trying to obtain a

174

1    covert position, I think I would be concerned if

2    the supervisor I was working directly for did not

3    want me.  But having taken jobs where they wanted

4    another person on the list, that has not dissuaded

5    me in the past.

6    Q.        Have you ever taken a job where the

7    supervisor said, Jennifer Knight better not take

8    this job?

9    A.        Not that I was aware of.

10   Q.        Okay.  If you had become aware of it,

11   wouldn't it have deterred you from taking that

12   job?

13             MR. COGLIANESE:  Objection.

14   A.        Probably not.

15   Q.        Okay.  Would you -- what would you have

16   done in response to that?  Would you have just

17   taken the job or would you have reported it to

18   somebody?

19             MR. COGLIANESE:  Objection.

20   A.        Personally?

21   Q.        Yes.

22   A.        I would have taken the job and not

23   reported it.

24   Q.        Okay.  Why's that?

175

1    A.         Just personal preference.

2    Q.         Okay.  Have you ever worked in a covert

3    assignment?

4    A.         I have not.

5    Q.         Okay.  If you found out that another

6    officer passed on a job because they were told

7    that the supervisor said they better not take the

8    job, would you have thought that was an

9    unreasonable decision by that officer?

10              MR. COGLIANESE:  Objection.

11   A.         No.

12   Q.         Okay.  If the officer actually reported

13   it to the supervisor's commander or lieutenant,

14   and the lieutenant basically shrugged and said,

15   well, can't protect you all the time, I'll do what

16   I can, do you think that would be further

17   deterrence for that officer of taking the position

18   knowing that they're not really going to be

19   protected?

20              MR. COGLIANESE:  Objection.

21   A.         I can't answer for somebody else.

22   Q.         Okay.  What's your reaction to reading

23   what you read about what Lieutenant Brust said

24   when Officer Shaw reported the threat by Sergeant

1    Moore that he better not take the job?

2    A.        I think Lieutenant Brust's actions were

3    inappropriate.

4    Q.        Okay.  Did you ask Sergeant Decker to

5    look into that, Lieutenant Brust's conduct in

6    failing to protect Officer Shaw in this situation?

7    A.        I don't recall.

8    Q.        Okay.  Sergeant Decker says that you

9    told him to just let Lieutenant Brust and

10   Commander Cameron's chain of command handle their

11   conduct about the situation.  Does that sound

12   right to you?

13   A.        I don't recall.

14   Q.        Okay.  Do you remember having any

15   conversations with Chief Jacobs about whether

16   there should be charges against Lieutenant Brust

17   or Commander Cameron in terms of their treatment

18   of the narcotics assignment?

19   A.        I don't remember what conversations we

20   had regarding this particular allegation.

21   Q.        Okay.  Do you remember that -- and I

22   think we may have discussed this a little bit

23   previously, but do you remember that Commander

24   Cameron and Lieutenant Brust, actually after they

177

1    prohibited Sergeant Moore from talking to Officer

2    Shaw and Officer Lancaster, did their own

3    interviews of Officer Shaw and Officer Lancaster

4    for the narcotics job?

5    A.         I don't remember.

6    Q.         Okay.  Does it refresh your memory at

7    all to know that Commander Cameron sat in

8    interviews with Lancaster and Shaw and gave them

9    sort of a lecture about police corruption and

10   their work ethic?  Does that ring a bell?

11   A.         It does not.

12   Q.         Okay.  You're smiling.  Why are you

13   smiling?

14   A.         I -- I don't recall that.

15   Q.         Is that kind of consistent with the way

16   that Commander Cameron operates towards

17   subordinate officers?  Is that what's driving this

18   reaction or --

19   A.         I'm not aware of whether he would

20   normally conduct interviews like that.  I'm not

21   aware of whether he would lecture somebody

22   regarding those types of things, but --

23   Q.         Okay.  I want to jump back for a

24   second.  We were talking about whether it would

1    deter different officers to know that the

2    supervisor in the position that they might take

3    had told people they better not take the

4    position --

5    A.        Uh-huh.

6    Q.        -- and whether that would deter them.

7              You understand that for purposes of a

8    retaliation, retaliation only is really actionable

9    under the law, I don't know about CPD policy, you

10   would know better than I would, under the law,

11   it's actionable if it would deter a reasonable

12   person?

13   A.        Yes.

14             MR. COGLIANESE:  Objection.

15   Q.        Clearly at least that -- the supervisor

16   saying that the officer better not take the job

17   would deter a reasonable officer from taking the

18   job?

19             MR. COGLIANESE:  Objection.

20   A.        I don't know if that would -- a

21   reasonable person and a reasonable officer are two

22   different people.

23   Q.        Okay.

24   A.        So I wouldn't know if that would deter

1    a reasonable officer --

2    Q.          Okay.

3    A.          -- from taking the position.

4    Q.          How do you -- how do you assess a

5    retaliation allegation as an internal affairs

6    commander without being able to make a

7    determination of what would deter a reasonable

8    officer?

9    A.          So typically when we have a retaliation

10   claim, and based on some type of EEO allegation,

11   we work very closely with HR.  It's not our area

12   of expertise.  We handle the investigation portion

13   of that.  We bring them in for an analysis of the

14   law.  It is their area of expertise.  And we want

15   to make sure that we're consistent and appropriate

16   in our response.  We'll do the investigation, but

17   we work very closely with an HR person in most

18   cases to determine whether or not this has been

19   something -- we'll gather the evidence and then

20   we'll meet with them to talk about whether this is

21   a sustained violation or not if there's any

22   concerns about, you know, that type of an

23   allegation.

24   Q.          Okay.  That didn't happen in this

```
1    particular instance, though?

2    A.          I don't recall if we met with HR.

3    Q.          Okay.

4    A.          It is something that we have been doing

5    for the last several years.

6    Q.          Okay.

7    A.          But I don't remember if we met with

8    them for this particular investigation.

9    Q.          Okay.  So if you could -- if you could

10   take a look at Exhibit 26, which I think is in

11   front of you somewhere.

12   A.          26?

13   Q.          Yes.  And I want you to read the first

14   roughly two and a half pages of that.

15               (A recess is taken.)

16   Q.          So you've now had the opportunity to

17   read the first two and a half pages of Exhibit 26.

18   Does this refresh your recollection that part of

19   the investigation included Officer Shaw's

20   allegation that Commander Cameron conducted his

21   narcotics interview in a way that appeared to

22   target him?

23   A.          It appears like he asked him several

24   questions and potentially lectured him.  I'm not
```

181

1    really sure what you mean by "target."

2    Q.        Well, he was selected for an interview

3    with Commander Cameron and Lieutenant Brust

4    because he had been identified as somebody who had

5    made a complaint against Eric Moore, right?  It's

6    on the first page.

7    A.        Yes.

8    Q.        Because they wanted to separate him

9    from Eric Moore and not have Eric Moore involved

10   in considering them for these positions?

11   A.        Sounds like a good decision.

12   Q.        Right.  And then conducted the

13   interview in a pretty confrontational way, right?

14             MR. COGLIANESE:  Objection.  Go ahead.

15   A.        It sounds like -- this appears that

16   he's challenging him regarding his work product.

17   Q.        Okay.  And it was a position to be

18   filled by seniority with an exceptional

19   qualification of Spanish, right?

20   A.        Yes.

21   Q.        Okay.  And you remember in the

22   investigation, none of the other officers who

23   applied for the positions were interviewed at all,

24   they were just asked whether they wanted the

1    position or not?

2          MR. COGLIANESE:  Objection.

3    A.       I believe they were asked and it was

4    indicated at some point they would be contacted if

5    an interview was necessary.

6    Q.       Okay.  Do -- I'll represent to you none

7    of them actually got interviewed.  Some of them

8    were called -- some of them he said, call me, and

9    then they called him and he asked them to pass so

10    that he could get to Ehrenborg.

11    A.       Okay.

12          MR. COGLIANESE:  Objection.

13    Q.       And then the black officers retreated

14    in a little different way that we've already

15    discussed, right?

16          MR. COGLIANESE:  Objection.

17    A.       So everyone passed.

18    Q.       Everyone either passed or Sergeant

19    Moore falsely claimed they passed and then he

20    selected Ehrenborg?

21    A.       White and black officers.

22    Q.       The white officers passed, the black

23    officers, he claimed that they passed?

24    A.       Okay.

1    Q.          He got to Ehrenborg.  No interviews.

2    The only two people who were interviewed were

3    Officer Shaw and Officer Lancaster by Commander

4    Cameron and that the interviews went like this?

5    A.          And this is the interview?

6    Q.          Correct.

7    A.          Okay.

8    Q.          You're familiar with the idea that when

9    an officer -- when a position is to be filled by

10   seniority or seniority plus an exceptional

11   qualification --

12   A.          Uh-huh.

13   Q.          -- sometimes the interview really is

14   just the supervisor talking to the person over the

15   phone and finding out whether they really want the

16   job?

17   A.          It's handled in a variety of ways.

18   Q.          But it can be as minimal as that?

19   A.          Yes.  It can be as minimal as that.  It

20   can also be as minimal as an e-mail.

21   Q.          Right.  So, again, with -- I don't

22   want -- I don't want you to have to review the

23   entire investigation, but the basic point is, the

24   only people who actually had sit-down interviews

184

```
 1    with any supervisor were Karl Shaw and Whitney

 2    Lancaster who were selected for that because they

 3    had made complaints of discrimination against Eric

 4    Moore.

 5              MR. COGLIANESE:  Objection.

 6    Q.        And so given that, does any of that --

 7    I mean, is any of this ringing a bell?  Do you

 8    remember any of that from the investigation?

 9    A.        I do remember some of these things.

10    Q.        Okay.  Do you remember --

11    A.        As I read them, they sound a little

12    more familiar.  What's the question?

13    Q.        Do you remember that Whitney Lancaster

14    had a nearly identical interview with Commander

15    Cameron and Lieutenant Brust and also was

16    concerned because of the way that Commander

17    Cameron was acting toward him in the interview?

18              MR. COGLIANESE:  Objection.

19    A.        I remember that it was similar to this

20    one.  Again, is there a question about Cameron?

21    What's the question?

22    Q.        I asked you the question that I'm

23    asking.  I just want to get -- I think you may

24    know from law school that there's a process
```

1    sometimes to this where we want to get the

2    foundational information to make sure that we're

3    on the same page before I ask you some of the

4    substantive questions.  I haven't gotten an

5    indication whether we're on the same page, because

6    you won't answer the questions.

7    A.          Okay.  So I'm vaguely remembering this

8    as I read it.  I remember this -- this interview,

9    having read this in the past.  I remember that

10   there was another interview that was similar.  I

11   remember they were conducted by Gary Cameron.  I

12   remember those facts.

13   Q.          Okay.  And I'm -- I want to ask:  Given

14   that these two officers were selected for the

15   process because they had made complaints of

16   discrimination and they both ended up reporting

17   that the interviews themselves seemed unusual and

18   inappropriate --

19   A.          Uh-huh.

20   Q.          -- did that raise a concern about

21   potential EEO violations or retaliation by

22   Commander Cameron?

23              MR. COGLIANESE:  Objection.  Go ahead.

24   A.          There was no inclusion of an additional

1    allegation, but all the evidence is available for

2    anyone to read and look at and see if his conduct

3    was something that they would prefer that we

4    address with an additional allegation.

5    Q.          Okay.  And do you recall that Sergeant

6    Decker actually asked to pursue his concerns about

7    the way that Commander Cameron and Lieutenant

8    Brust handled these issues and you told him that

9    you needed to just let the chain of command deal

10   with it?

11   A.          I do not recall that.

12   Q.          Would you deny that you had that

13   conversation with Sergeant Decker?

14   A.          I'm not going to confirm or deny that.

15   I don't recall if that ever happened.

16   Q.          Okay.  But because you don't recall if

17   that ever happened, you're not saying it didn't

18   happen, you just don't remember one way or the

19   other?

20   A.          Correct.

21   Q.          Okay.  In Karl Shaw's interview with

22   Sergeant Decker, he indicated that there was a --

23   yet another process of filling a narcotics

24   position after this where he determined that he

1    really needed to take a narcotics position, and he

2    told Lieutenant Brust he was willing to take it,

3    but then the position was filled by a more senior

4    white officer named Dave Allen.  Do you remember

5    that?

6    A.       No.

7    Q.       Do you know who Dave Allen is?

8    A.       No.

9    Q.       Okay.  Would you deny that Sergeant

10   Decker asked you if he could investigate why Dave

11   Allen took that position and you told him that he

12   could not investigate it because it was a rabbit

13   hole that he shouldn't go down?

14             MR. COGLIANESE:  Objection.

15   A.       I don't recall that conversation at

16   all.

17   Q.       Okay.  But if Sergeant Decker said that

18   he recalls it, you wouldn't dispute him?

19             MR. COGLIANESE:  Objection.

20   Q.       I'll withdraw it.

21             If I can refresh your recollection just

22   a little bit further.  Dave Allen is an officer

23   who's assigned to DEA task force.  Are you

24   familiar with the DEA task force?

188

1    A.        Yes.

2    Q.        He took -- the position that was open

3    was in an investigative unit of narcotics called

4    investigative C.

5    A.        Yes.

6    Q.        Dave Allen's assignment at the time

7    that he took that was investigative E, which is a

8    virtually identical assignment and had no impact

9    on his actual hours or pay or anything like that,

10   because he was on the DEA task force.

11   A.        Uh-huh.

12   Q.        So there's this sort of inexplicable

13   movement from him, from investigative E to

14   investigative C.  And Sergeant Decker thought that

15   that would be worth looking into in terms of

16   figuring out why he would do that at that time.

17   And you told him that it was not worth looking

18   into?

19   A.        Okay.

20   Q.        Does that --

21   A.        I will tell you that I don't recall

22   that conversation at all.  I'm not confirming or

23   denying that we ever had that conversation.  It

24   could have occurred years ago in the midst of

189

```
1    dozens and dozens of conversations about dozens
2    and dozens of allegations.  So I don't recall
3    that.  But it is normal for me to evaluate every
4    single time an additional potential allegation, or
5    not even an allegation, but something suspicious
6    is arising during the course of an interview.
7              We would look at the scope, we would
8    look and see if that was relevant to what we were
9    investigating, if it was -- there was enough
10   evidence to indicate that was serious misconduct
11   or misconduct that would have to be investigated.
12   But every suspicion by every investigator in
13   internal affairs related to a comment in an
14   interview is not necessarily going to be
15   investigated, because we are required to evaluate
16   things based on scope.
17   Q.         Okay.  And then one other aspect of
18   this narcotics position, do you remember in the
19   text message you looked at, and if you don't, it's
20   right in front of you in Exhibit 22, that Sergeant
21   Moore said to Officer Evans that what Richard
22   Moore, a white officer, had done was worse than
23   what the brothers had done?
24   A.         Okay.  I see the -- the sentence there.
```

1  Q.        Yeah.  Do you remember that Sergeant

2  Decker had concluded that this was the racial

3  language that he was referring to black officers

4  as brothers?

5  A.        I don't recall him ever indicating that

6  he has determined that that was racial language.

7  It doesn't appear derogatory.  The word "brothers"

8  doesn't necessarily appear derogatory there.  And

9  Sergeant Decker's, you know, personal feelings

10 about, you know, what the word means, that's kind

11 of ambiguous in my opinion as --

12 Q.        Well, I'm sorry, I should clarify.

13 Officer Evans told Sergeant Decker that he

14 believed when Sergeant Moore said, "the brothers,"

15 he was referring to black officers.

16 A.        Okay.

17 Q.        And Sergeant Moore claimed that when he

18 was referring to the brothers, he was referring to

19 something known as the brothers in Christ, which

20 is some --

21 A.        That doesn't sound familiar, but --

22 Q.        I don't think it was familiar to

23 anybody.  But Sergeant Decker told us that he

24 believed that Sergeant Moore was lying about that

1    and that he should be charged with untruthfulness

2    for falsely claiming that he was not using a

3    racial term there.

4    A.        Okay.  That -- we could have had that

5    conversation between myself and Sergeant Decker

6    and the lieutenant.  We could have had that

7    conversation based on the information that you're

8    just giving me right now with nothing else.  I

9    don't think that that's something that we would

10   pursue a lie -- specifically a lying charge

11   against an individual because they're claiming

12   that they meant something else when they used the

13   word "brothers."  It would be difficult to prove.

14   It wouldn't survive an arbitration.  It wouldn't

15   probably survive a discussion with the chief at

16   that point.

17   Q.        You mean without -- I'm sorry, without

18   further investigation you mean?

19   A.        So I don't think the word "brothers" in

20   itself looks like it would be a situation where we

21   would pursue a lying charge, because he said,

22   well, no, this is what I meant by the word

23   brothers, and someone else says, no, I think he

24   meant this.  It's a difficult -- it's going to be

192

1     difficult to prove that.  So I don't think we

2     would have pursued a lying charge based just on

3     that.  I'm sure we would have evaluated in the

4     context of everything else.

5             This particular investigation, when we

6     looked at pursuing lying charges against Sergeant

7     Moore was -- would be more of a totality of the

8     circumstances, because of a multitude of

9     interviews and a belief that what we were getting

10    from him, in a lot of cases, was less than -- less

11    than truthful or not as forthcoming as he should

12    have been.  It would not have been based on a

13    single use of the word "brothers" for a lying

14    charge.

15    Q.        Do you recall that, in fact, the charge

16    against Sergeant Moore for being deceptive in the

17    investigation as it was ultimately concluded in

18    the internal affairs investigation was that -- was

19    essentially limited to a couple of specific

20    incidences and did not result in the totality of

21    the circumstances?

22    A.        I do not recall that.  I will tell you

23    that the conversation about the multitude of

24    interviews that we had, the totality of the

193

1    circumstances, that was a conversation that I had

2    with Chief Jacobs on several different occasions

3    as we got further along in the investigation.  You

4    know, Sergeant Decker did bring to me that he

5    didn't feel that Sergeant Moore was especially

6    forthcoming and was deceptive in his responses

7    during the course of the internal affairs

8    investigation.

9            We have to evaluate potentially how

10   successful we're going to be in any of those.  So

11   I had that conversation with Chief Jacobs a couple

12   different times during the course of the

13   investigation about whether or not an

14   untruthfulness charge was appropriate.

15   Q.       Okay.  We've covered a fair amount of

16   ground on this narcotics position, so I just want

17   to take a moment to see whether you -- you agree

18   with me about the basic conclusions here.

19           First of all, is it accurate to say,

20   based on your recollection of this at the time,

21   that the narcotics openings were being filled by

22   Sergeant Moore, he was under investigation for

23   making racial slurs and violent threats toward

24   black officers which had been corroborated by

194

1    other officers at the time?

2    A.          Yes, he was under investigation for

3    those allegations.

4    Q.          And the allegations had been

5    corroborated by that point by Officer Watkins and

6    some of the other ones that we discussed?

7    A.          Some of them, yes.

8    Q.          Okay.  He ended up attempting, at

9    least, to fill the first narcotics position with a

10   less senior white officer and passed over more

11   senior black officers in order to do it, right?

12   A.          Yes.  He also passed over more senior

13   white officers.

14   Q.          He was untruthful in his written report

15   to Chief Jacobs when he claimed that all of the

16   black officers passed on the job in order to get

17   to Ehrenborg?

18   A.          Yes, it appears he was not entirely

19   truthful in that statement.

20   Q.          He violated an order not to contact one

21   of the more senior black officers who had applied

22   for the job and admitted that he had violated that

23   order because he was angry that the officer called

24   him a racist and he wanted to make clear to him

195

1    that he better not take the job?

2              MR. COGLIANESE:  Objection.

3    Q.        That's accurate?

4    A.        It appears so.

5    Q.        Officer Shaw, a more senior black

6    officer who had been passed over in the first

7    posting, then passed on the rebid posting because

8    he found out that he was threatened by Sergeant

9    Moore in a text message; is that accurate?

10             MR. COGLIANESE:  Objection.

11   A.        Could you repeat that one more time?

12   Q.        Officer Shaw passed on the rebid

13   opening for the narcotics job because he was

14   threatened by Sergeant Moore in a text message?

15   A.        I believe that's Officer Shaw's

16   statement.

17   Q.        Okay.  Well, confirmed by the text

18   message itself?

19   A.        I can't speak to exactly why he passed,

20   but that's what he stated was the reason he

21   passed.

22   Q.        Okay.  Well, that's what he told

23   Lieutenant Brust?

24   A.        In his interview.

196

1   Q.        Okay.  And Lieutenant Brust confirmed

2   that he told Officer Shaw that he couldn't protect

3   him all the time?

4   A.        That's in the investigation, yes.

5   Q.        Okay.  That same text message, as we

6   discussed, also contained potential racial

7   language calling Shaw and Lancaster the brothers,

8   although Sergeant Moore denied it?

9   A.        Denied that it was racial.

10            MR. COGLIANESE:  Objection.

11   Q.        Yes?

12   A.        I -- the word "brothers" to me doesn't

13   necessarily connotate racial language.

14   Q.        But it can, right?  I mean, that

15   sometimes an office --

16   A.        It could, yes.  It could.  So the

17   answer to that question was it could connotate or

18   it could not connotate racial language.

19   Q.        Sergeant Moore admitted to Sergeant

20   Decker that he sent that text message about

21   Officer Shaw and Officer Lancaster because he was

22   angry because they called him a racist earlier in

23   the internal affairs investigation?

24   A.        He did indicate that in his interview.

197

```
 1   Q.          Okay.  Officer Shaw reported the threat
 2   to Lieutenant Brust who was in charge of filling
 3   the position at that time and Lieutenant Brust
 4   took no action and did not report it?
 5               MR. COGLIANESE:  Objection.
 6   A.          I don't know if Lieutenant Brust
 7   reported it to anybody else.
 8   Q.          Okay.  He certainly took no action to
 9   do anything about it?
10   A.          I have no indication that he took
11   additional action from what I've read.
12   Q.          Okay.  The result of all of that was
13   that a less senior white officer than Officer Shaw
14   got the narcotics job?
15               MR. COGLIANESE:  Objection.
16   A.          I believe that job was canceled and --
17   Q.          I'm talking about the rebid job.  I'm
18   sorry.  The job ended up going to an officer named
19   Ernie Rice?
20   A.          Oh, okay, I'm not aware.
21   Q.          Do you know Ernie Rice?
22   A.          No.
23   Q.          Do you know Ernie Rice is a white
24   officer?
```

1    A.          No.

2    Q.          Okay.  And I think we just discussed

3    the other job went to a more senior white officer

4    who switched narcotics jobs, despite being on a

5    task force where the switch would have no effect

6    on his actual hours or duties?

7               MR. COGLIANESE:  Objection.

8    A.          Okay.

9    Q.          Do you have any dispute with that?

10   A.          That it went to those officers?

11   Q.          Yeah.

12   A.          And their race, no, I don't dispute

13   that it -- those are the officers that got the

14   jobs, or I don't -- and I don't dispute their

15   race.

16   Q.          Okay.  Out of all of that, Sergeant

17   Moore was never charged with any EEO violations as

18   part of the AI [sic] investigation or the chain of

19   command review of the IA investigation?

20   A.          Okay.

21              MR. COGLIANESE:  Objection.

22   Q.          Are you -- do you have any -- I mean,

23   that's -- you know that, right?

24   A.          Okay.  I will tell you I have not --

1    literally not looked at every allegation attached

2    to this.  And you're telling me that it wasn't, I

3    would concede that's probably accurate.  I have

4    not read every allegation attached to this.  I did

5    not follow this investigation after I left

6    internal affairs.  I do not know if there was any

7    additional allegations added.  I don't recall any,

8    so I'm not going to dispute that.

9    Q.        Okay.  Did you ever have discussions

10   about -- well, did you know that sergeant -- that

11   Officer Shaw and Officer Eric Cornett had filed

12   Ohio Civil Rights charges about their treatment

13   during this period?

14            MR. COGLIANESE:  Objection.

15   A.        I don't -- I don't recall, but it

16   wouldn't -- it's very possible.

17   Q.        Okay.  Were you in any discussions

18   where the command staff was expressing concerns

19   that if the department admitted that Sergeant

20   Moore had engaged in EEO violations or retaliation

21   of some kind, that that might affect the

22   department in terms of the Civil Rights Commission

23   proceedings?

24   A.        I don't recall ever being in that.

200

1  Q.         Okay.  Would you deny that that

2  occurred?

3  A.              No.  I think it might stand out in my

4  mind, but I don't really recall that conversation.

5  And, yeah, I don't recall any discussion like that

6  happening at an executive level.

7  Q.         Okay.

8  A.              And me being a part of it as a

9  commander.

10  Q.         Have you ever been involved in an EEO

11  investigation as commander of internal affairs

12  where EEO charges were upheld against an officer?

13  A.              I don't -- I don't know.  But that

14  would be a matter of record, I'm sure, during my

15  tenure.

16  Q.         You don't remember any?

17  A.              I don't recall any.

18  Q.         Okay.  Do you remember that at the

19  conclusion of this investigation, Sergeant Decker

20  -- or just prior to the conclusion, I guess,

21  Sergeant Decker gave you an initial report that

22  was even longer than the report that was

23  ultimately issued?

24  A.         Yes.

1   Q.          Something more like 300 pages than 200
2   pages?
3   A.          Yes.
4   Q.          How did he give you that?
5   A.          It is a rough draft copy and it is a
6   hard copy, not an electronic copy.  And that was
7   my opportunity to sit down and go through the
8   investigation.  And I will say that Sergeant
9   Decker, again, is a very detail-oriented person.
10  He puts a lot of information into his
11  investigations, whether it's this one or something
12  that is very minor in nature.
13          A lot of times there's more detail than
14  is necessary for an internal affairs
15  investigation.  We do not have to have a play by
16  play of every word stated in every -- during the
17  course of an investigation.  So it wouldn't be
18  unusual for Sergeant Decker to give me an
19  investigation and me to cut the length of it
20  strategically to make sure that what we're
21  focusing on is -- is relevant to the allegations
22  and there's not a bunch of tangents in there that
23  are not relevant to the investigation.
24          So, yes, I remember this one

1    specifically.  I remember it was very extensive.

2    And I remember it was reduced, the length was

3    reduced strategically to make sure that we were

4    focusing on the facts and evidence and important

5    things in this investigation.  And I was removing

6    redundancies and things that were not relevant to

7    what they needed to know, the chain of command

8    needed to know to make a decision on each

9    particular allegation.

10   Q.          Okay.  What happened to the hard copy

11   of the longer draft?

12   A.          Oh, gosh.  I don't know.

13   Q.          Do you know whether you kept it or you

14   gave it back to Sergeant Decker or --

15   A.          I would not have kept it.

16   Q.          Okay.

17   A.          I would have taken that hard copy and

18   gone through it and made changes, corrections,

19   line through, written on it, asked questions,

20   things like that.

21   Q.          But you have no idea where that would

22   be today?

23   A.          No.

24   Q.          Okay.  Did you have a practice of

1    shredding things like that, or it just was --

2    A.          It was a draft.  Internal affairs, you

3    know, investigators, every time, you know, we send

4    a draft through, those drafts have typos and so on

5    and so forth in them.  We don't necessarily keep

6    those drafts.  I don't know if Sergeant Decker

7    kept something that was merely a draft at that

8    point.  I just -- I don't recall what our

9    particular -- once it leaves internal affairs, we

10   have to retain that particular document, so if it

11   goes to -- it leaves internal affairs, it's no

12   longer a draft and it goes to the chain of

13   command.  And the chain of command sends it back

14   for additional information, we keep that one,

15   because it has left internal affairs as -- and

16   it's something more than a draft at that point.

17   So this particular one, I don't know if Sergeant

18   Decker put it in a file and kept it in his notes

19   or not.

20   Q.          I think you may have already answered

21   this next question, but did you show the draft to

22   anybody in the chain of command before it got

23   pared down to the current version?

24   A.          I wouldn't do that --

1    Q.          Okay.

2    A.          -- most likely.

3    Q.          Did you talk to anybody in the chain of

4    command about, I got this 300-page thing and it's

5    got all this --

6    A.          That's very possible.

7    Q.          Okay.

8    A.          I would have had a verbal conversation

9    with the chief of police or, you know, executive

10   staff at some point to talk about the length of

11   that, possibly.  And that I was reducing and, you

12   know, getting rid of some of the redundancies and

13   the things that weren't relevant.

14   Q.          Do you remember that the initial draft

15   of the report contained many more instances of

16   untruthfulness that Sergeant Decker wanted to be

17   charged than the final draft?

18              MR. COGLIANESE:  Objection.  Go ahead.

19   A.          I don't recall what was in that draft.

20   Q.          Okay.  So you wouldn't dispute Sergeant

21   Decker's recollection that it did?

22   A.          I would -- I would qualify that with

23   Sergeant Decker's feelings about whether something

24   should be included or not included would be

1   considered, but aren't necessarily -- aren't

2   necessarily what we should do with an

3   investigation.  His personal feelings about

4   whether he wants to include every single word or

5   every single feeling about whether somebody was

6   telling him the truth or not are considered, but

7   it isn't necessarily the best course of action to

8   include everything an investigator feels should be

9   included.

10   Q.      So it's consistent with your

11   recollection that Sergeant Decker wanted to charge

12   Sergeant Moore with more things than he ended up

13   getting charged with?

14           MR. COGLIANESE:  Objection.

15   Q.      In the -- or at least sustained

16   allegations in the report?

17   A.      It's very likely that Sergeant Decker

18   felt that way.

19   Q.      Okay.  The -- did you get an

20   explanation from the chain of command for why they

21   ended up -- well, first of all, do you remember

22   that whether the allegation came up from internal

23   affairs to the chain of command, the allegation

24   that Sergeant Moore was deceptive during his IA

1    interviews was -- included the rule of conduct

2    violation for dishonesty and that it was changed

3    by the chain of command to the rule of conduct

4    violation for unbecoming conduct?

5    A.          I recall that.

6    Q.          Okay.  Do you remember getting an

7    explanation from the chain of command for why they

8    did that?

9    A.          Chains of command never give me an

10   explanation as to why they don't agree with the

11   things that I send to them.

12   Q.          Okay.  And that includes this case?

13   A.          And that includes this case.  I don't

14   recall them ever giving me their reasoning behind

15   why they made a decision to go in a different

16   direction, and I have no control over that.

17   Q.          Okay.  Did you have any role -- I think

18   you may have already answered this.  Did you have

19   any role in the arbitration?  Were you a witness

20   or anything along those lines?

21   A.          I don't believe I did.

22   Q.          Okay.  You -- prior to your current

23   assignment, you were reassigned from internal

24   affairs to patrol?

```
 1    A.          Yes.
 2    Q.          Do you -- do you know why you were
 3    reassigned?
 4    A.          The chief never personally shared why
 5    she was reassigning me to patrol.  She doesn't
 6    have to.  I have personal feelings as to why, and
 7    those are based on the fact that we were not
 8    coming to the same conclusion on a variety of
 9    investigations.  She was not happy with my
10    findings and my outcomes for a variety of
11    investigations.  When my immediate supervisor is
12    not agreeing with me on a regular basis, it's
13    probably time as the internal affairs commander
14    that I find another position.  Because that has to
15    be a relationship where we're on the same page
16    most of the time, and we were not on several
17    investigations prior to my removal from internal
18    affairs and reassignment.  So I think that was
19    probably a good decision, whatever was the
20    reasoning behind it.
21    Q.          What investigations were you not on the
22    same page about?
23    A.          Oh, there were several.  But the one
24    that sticks out that was close in proximity to
```

1    when I left internal affairs was the case against

2    Officer Schwegler.  And he was an officer that was

3    accused of some critical misconduct.  And I -- the

4    chief and I were on a different page as to how it

5    should be investigated and what the outcome should

6    be.  And I firmly believed that that officer

7    needed to be terminated, and I don't think that

8    that was the direction that the division was

9    going.

10   Q.        What did Officer Schwegler do?

11   A.        Officer Schwegler did -- the first

12   thing that Officer Schwegler did was he sexually

13   harassed female officers at the academy.  I

14   believe he should have been terminated for that.

15   He was not.

16            Shortly thereafter, we received

17   information indicating that Officer Schwegler was

18   on duty going -- he was a married officer with

19   several children, but he was spending his entire

20   shift at his girlfriend's house on duty and not --

21   like he would literally leave the substation, go

22   to his girlfriend's house and stay there all

23   night.  And he would respond to calls sometimes --

24   the allegation was he would respond to calls from

1    his girlfriend's apartment.  He would clear calls

2    without responding.

3            We received this allegation shortly

4    after him being involved in the prior

5    investigation and that's critical misconduct.  And

6    I believed that the best way to ensure that we did

7    a good investigation was to do surveillance.

8    Surveillance is not something that Chief Jacobs

9    was comfortable with.  I was.

10           So during the course of that

11   investigation, we surveilled his girlfriend's

12   house and caught him doing that.  We conducted an

13   interview consistent with the contract.  The union

14   got very upset because of the way we did it and

15   was not happy and went to Chief Jacobs and asked

16   to have me removed, because I directed the

17   investigation.  And Chief Jacobs removed me based

18   on that conversation with the union.  That's what

19   occurred immediately prior to my removal.  There

20   were several other investigations that we

21   disagreed on leading up to that, but that was one

22   of the ones that I recall.

23   Q.       Do you remember any of the other ones?

24   A.       I would -- I would have to -- I would

210

1    have to review some of the investigations that

2    came out of IA at the time.  But I would say

3    generally during the beginning of my tenure in

4    internal affairs, her and I were on the same page

5    for every investigation.  During the course of my

6    tenure there, we started being -- having a

7    difference of opinion on how things should be

8    investigated, on how things -- the outcome of some

9    investigations.  And it just culminated at the end

10   of 2016 with the Schwegler investigation.

11          I believe there was another -- I think

12   there was an accusation made by an officer that I

13   was talking about her investigation, and that

14   accusation came down.  That's not unusual.  But

15   that was being investigated by internal affairs as

16   well, and that I had talked about an investigation

17   to somebody else.  And so that occurred around the

18   same time as the Schwegler investigation.

19   Q.        So did you -- Falacia Dragin?

20   A.        Yes, that was her name.

21   Q.        You were being accused of basically

22   reassuring the focus of the investigation that he

23   didn't have anything to worry about?

24   A.        Yes, that was the accusation.  And that

1    was investigated by internal affairs.  I was not

2    interviewed in that one.  Actually they

3    interviewed everybody else and said that they

4    didn't need to interview me unless I wanted to be

5    interviewed for that.  And I saw no point if they

6    had already come to a conclusion.

7              And that -- so those things occurred

8    about the same time that her loss of confidence in

9    us being on the same page for internal affairs

10   investigations, that's a very necessary portion of

11   that relationship with the chief of police, and

12   she reassigned me.

13   Q.        Did you feel that you were on the same

14   page as the chief about this investigation, the

15   Eric Moore investigation?

16   A.        Not always.

17   Q.        Okay.  What were you not on the same

18   page about?

19   A.        I don't recall specifically.  This was

20   a difficult investigation.  I will tell you that,

21   you know, based on what we knew about the way he

22   behaved, I felt that a sustained lying charge was

23   something that we could -- we could absolutely

24   sustain and argue.  But that's not my decision to

212

1    make.  I can -- it can leave internal affairs with

2    something that -- where he is not being

3    forthcoming and not necessarily truthful during

4    the course of the investigation, but I can't

5    control the outcome of that.  And I would say that

6    he most likely could have been charged -- we could

7    have pursued that at least.  We may not have been

8    able to survive an arbitration about that, but we

9    could have probably pursued it.

10   Q.        Did you feel that given the information

11   you had provided to the chief and the chain of

12   command about Sergeant Moore's conduct as the

13   investigation progressed, that the chain of

14   command should have removed him from active duty?

15   A.        I don't -- we talked about it at

16   different junctures during the course of the

17   investigation.  I think in the very beginning, no,

18   we don't necessarily believe that he should be

19   relieved of duty.  But as we are continuing to

20   interview, I don't remember at what point I had a

21   feeling or a determination that if it was my

22   decision to make, I would go in this direction.

23   But it's never really my decision to make.

24             My -- the chief would sometimes ask my

213

1    opinion about what I wanted to do or what I

2    thought, but it wasn't necessarily something that

3    she considered when she was making her decision.

4    My job was to relay the information that was

5    coming forward at certain points of the

6    investigation and to talk to her about, do you

7    want to make a change?  I don't get to weigh in on

8    that decision typically.

9    Q.          I just was -- meant to ask whether that

10   was one of the things that you didn't feel like

11   you were on the same page about during this

12   investigation?

13   A.          I would say I never expect me and

14   the -- I never expected me and the chief to agree

15   on everything.  The Moore investigation, we

16   were -- we disagreed about several things during

17   the course of the Moore investigation, but it

18   wasn't one of those ones that brought me to the

19   point where I felt like the chief was -- no longer

20   felt like her and I were on the same page.  I

21   don't think this was the investigation that

22   brought us there.

23   Q.          Okay.  This actually reminds me of

24   something that I missed.  There was a point in

```
1    this investigation that Sergeant Decker asked you
2    to request permission from the chief to do a
3    polygraph of Sergeant Moore?
4    A.        Uh-huh.
5    Q.        Do you remember that?
6    A.        No, but I would have -- I would have
7    requested that most likely, and Chief Jacobs would
8    have denied that.
9    Q.        Do you remember why Chief Jacobs denied
10   it?
11   A.        Because she would never let us do
12   polygraphs on anybody.
13   Q.        Okay.  The -- what was Officer
14   Schwegler's race?
15   A.        White.
16             MR. VARDARO:  Okay.  I think we're
17   probably close to being done.  We're just going to
18   take a quick break to make sure that we don't have
19   something I'm missing here.
20             THE WITNESS:  Okay.
21             (A recess is taken.)
22   Q.        Okay.  I was informed that it may not
23   have been 100 percent clear when I asked before.
24   But when we were talking about the narcotics
```

215

```
 1    position and I was sort of trying to sum it up, I
 2    had said that Sergeant Moore had filled the
 3    position with a less senior white officer and
 4    passed over more senior black officers in order to
 5    do it.  And you had responded that he passed over
 6    more senior black officers and also white
 7    officers?
 8    A.        It appeared from the list.
 9    Q.        Okay.  But no white officers who had
10    not withdrawn their bids or passed on the job,
11    right?
12              MR. COGLIANESE:  Objection.  Go ahead.
13    A.        I --
14    Q.        You're not aware of him passing over
15    white officers who had not withdrawn their bids?
16    A.        I am not.
17    Q.        Okay.  Officer Schwegler?
18    A.        Schwegler.
19    Q.        Was he terminated or not?
20    A.        Eventually he was.
21    Q.        Okay.  Chief Jacobs was not in favor of
22    it, but she ended up doing it or --
23    A.        So there was several investigations.
24    He finally was terminated from one of them.  My
```

1    feeling was that he should have been terminated

2    for the sexual harassment.

3    Q.          Okay.

4    A.          And then the second investigation that

5    occurred related to his activities with his

6    girlfriend, in my opinion, were definitely

7    terminable.  And so, yeah, he should have been

8    terminated.

9    Q.          But that's the one that resulted in his

10   termination is the one with his girlfriend?

11   A.          I think that part B of that after I

12   left internal affairs was handled by the

13   subsequent commander and they ruled for

14   termination moving forward.  So he eventually was

15   terminated, just not when I felt that he should.

16   Q.          Oh, yeah, did he get discipline out of

17   sexual harassment one?

18   A.          Yes, he received discipline.

19   Q.          What was the discipline?

20   A.          I think he did a significant amount of

21   days off.  So it was -- you know, it was serious

22   consequences, it was critical misconduct.  I just

23   firmly believe that that should have resulted in

24   termination.

217

1   Q.        What -- did he admit to the sexual

2   harassment or did --

3   A.         No, he did not.  But he had three

4   different women that were -- came forward.  We had

5   very similar stories.  He lied during the course

6   of the investigation, we could not prove that.

7   Q.        Okay.

8   A.         He did not admit it, but that we still

9   had substantive evidence to support that it

10  occurred.

11  Q.        Okay.  And then was one of the other

12  investigations that you did not see eye to eye or

13  were not on the same page with the chief the

14  investigation of racial profiling in zone seven?

15  A.        Zone five, precinct seven.

16  Q.        Oh, okay.  I'm sorry.

17  A.        Precinct seven definitely.

18  Q.        Okay.  What was that about?

19  A.        Sure you don't want to close the door

20  now?

21  Q.        If you could sum up.  Actually, I'll

22  interrupt you just this one time.

23  A.        Thank you.

24  Q.        Is it the case that essentially your

218

1    conclusion and the conclusion of your -- the

2    sergeant who was doing the investigation was that

3    two white officers in zone five, seventh precinct

4    were engaging in racial profiling and the chief

5    did not support that conclusion?

6    A.          That would be a very brief summary of

7    -- yes, that would be a very brief summary of what

8    occurred.

9    Q.          Okay.  It's an accurate summary?

10   A.          Yes.

11   Q.          Okay.  There were other officers who

12   you believe were engaging in this same conduct in

13   that precinct or that zone that the chief didn't

14   allow you to investigate; is that also accurate?

15   A.          That is accurate.

16   Q.          Okay.  Were there other concerns you

17   had about the chief's response to that

18   investigation or supervision of that

19   investigation?

20   A.          I had a lot of concerns about that

21   investigation.  I do not necessarily get to direct

22   the course of every investigation.  When I became

23   aware of certain conduct, I brought it to chief

24   and the chief determined the scope and direction

1    of the investigation.

2    Q.        Based on your experience in these cases

3    that we've described, did you have concerns about

4    the chief's approach to cases that had racial

5    implications?

6    A.        I had concerns about these particular

7    cases.  I don't think that it was necessarily

8    related to cases with racial implications, because

9    there were no racial implications in the Schwegler

10   case.  But I -- I had concerns about the course of

11   the investigations that we were doing at some

12   point, and I believed we should go in a different

13   direction.  And that is where her opinion of

14   internal affairs and their -- their -- the way

15   they conduct investigations and mine diverged.

16   Q.        Okay.  I guess I'll take it a different

17   direction changing it to EEO implications.  Did

18   you have concerns about the chief's resistance to

19   findings that officers had committed serious

20   violations of CPD EEO policy and state and federal

21   laws in that area?

22            MR. COGLIANESE:  Objection.  Go ahead.

23   A.        I don't really know if it was relative

24   to cases just involving EEO.  I will tell you that

220

1    there were several cases that I had concerns about

2    the direction internal affairs was permitted to go

3    regarding investigations.

4    Q.        Okay.

5    A.        And, yes, some of them were related to

6    EEO allegations.

7    Q.        With one exception, I'm done with my

8    questions.  The one exception is is there anything

9    in this many hours that you -- we've talked that

10   you feel that you need to add to or correct in

11   your testimony?

12   A.        At this point, no.  I can't recall

13   anything that I would like to correct at this

14   point.

15   Q.        Okay.  And you'll have an opportunity

16   to read and correct your transcript.

17   A.        Yes.  Thank you.

18             MR. VARDARO:  I have no further

19   questions.

20             MR. COGLIANESE:  She'll read.

21             (Signature not waived.)

22                  - - - - -

23             Thereupon, the foregoing proceedings

24             concluded at 4:51 p.m.

221

```
 1   State of Ohio     :      C E R T I F I C A T E
     County of Franklin: SS
 2
         I, Mary Bradley, RPR, CRR, a Notary Public in
 3   and for the State of Ohio, do hereby certify the
     within named Jennifer Knight was by me first duly
 4   sworn to testify to the whole truth in the cause
     aforesaid; testimony then given was by me reduced
 5   to stenotypy in the presence of said witness,
     afterwards transcribed by me; the foregoing is a
 6   true record of the testimony so given; and this
     deposition was taken at the time and place as
 7   specified on the title page.

 8       I do further certify I am not a relative,
     employee or attorney of any of the parties hereto,
 9   and further I am not a relative or employee of any
     attorney or counsel employed by the parties
10   hereto, or financially interested in the action.

11       IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Columbus,
12   Ohio, on August 6, 2019.

13

14

15

16

17

18

19
     _____
20   Mary Bradley, Notary Public - State of Ohio
     My commission expires September 19, 2019.
21

22

23

24
```

222

```
                Witness Errata and Signature Sheet
                  Correction or Change Reason Code
           1-Misspelling  2-Word Omitted  3-Wrong Word
             4-Clarification  5-Other (Please explain)

     Page/Line        Correction or Change        Reason Code

     _____    _____    _____

     _____    _____    _____

     _____    _____    _____

     _____    _____    _____

     _____    _____    _____

     _____    _____    _____

     _____    _____    _____

     _____    _____    _____

     _____    _____    _____

     _____    _____    _____

     _____    _____    _____

     _____    _____    _____

     _____    _____    _____
```

I, Jennifer Knight, have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.

Date_____Signature_____

The witness has failed to sign the deposition
within the time allowed.

Date_____Signature_____

                         Ref: Mb30926jk  S-mb P-bw

**Exhibits**

**30216 Exhibit 010** 4:5 37:8
**30921 Exhibit 011** 4:6 57:4
**30921 Exhibit 015** 4:7 133:12
**30216 Exhibit 020** 4:9 103:6
**30925 Exhibit 022** 4:10 121:19,22 122:3 189:20
**30921 Exhibit 026** 4:11 81:21 180:10,17
**30921 Exhibit 035** 4:12 81:13 114:4 162:6 165:10
**30921 Exhibit 038** 4:13 105:14,24 131:7,17
**30216 Exhibit 041** 4:15 106:23 150:7
**30921 Exhibit 052** 4:16 78:18 82:22

**0**

**004148** 105:16
**004670** 81:23
**014417** 106:24

**1**

**10** 18:16 37:8
**100** 214:23
**11** 57:4
**12** 49:12
**13th** 79:1
**14th** 13:23
**15** 133:12
**160** 157:12
**16th** 79:2 82:11
**184** 105:15
**186** 159:14, 17,19
**18th** 79:10 82:15,20 83:3

**197** 131:7,17 146:2
**1996** 18:15

**2**

**20** 32:15 103:6 114:10,15
**200** 46:9 131:7,17 142:9 146:2 201:1
**200-page** 169:3
**2006** 18:16
**2009** 18:17
**2012** 16:21 18:7
**2014** 10:5 15:16,18 33:15 57:7,19
**2015** 10:5 74:20 78:22 82:11 103:9
**2016** 11:2 57:21 210:10
**2017** 10:11 15:10
**208** 105:15 133:23
**208-page** 157:12
**20th** 103:9 134:6
**21** 162:12 165:6
**214** 134:21
**216** 135:11
**22** 121:19,22 122:3 189:20
**221** 135:19
**26** 81:21 180:10,12,17
**294** 136:13
**295** 136:21
**296** 137:5

**3**

**300** 201:1
**300-page** 204:4
**35** 81:13 114:4 162:6 165:10
**38** 105:14,24 131:7,17

**4**

**40** 9:18
**40s** 11:8
**41** 106:23 150:7
**4372** 134:2
**4378** 134:22
**4380** 135:11
**4461** 137:6
**4524** 58:19
**4728** 162:14
**4:51** 220:24

**5**

**52** 78:18 82:22
**5th** 57:7

**9**

**96** 18:15

**A**

**ability** 9:1 138:15 147:17
**abreast** 73:11
**absolute** 136:5
**absolutely** 22:9 36:3 41:2 42:4 87:20 144:11 211:23
**academy** 25:19 208:13
**accepted** 132:5
**access** 25:12,16
**account** 118:11
**accountable** 169:15
**accurate** 94:13 123:15 146:12,16 147:3 158:1 193:19 195:3,9 199:3 218:9,14,15
**accurately** 9:1 165:7
**accusation** 210:12,14,24

**accused** 95:9 99:15 100:3,14 110:9,13,15 124:12 161:20 163:18 171:24 208:3 210:21
**accusing** 162:24 163:1 164:2,20 165:23 172:2
**acting** 5:15,17 12:1,15 13:2,24 14:4,11,17 27:3,6 184:17
**actings** 13:3,4
**action** 125:20 126:16 144:21 153:2 163:24 164:17 165:21 166:10 171:3 197:4,8,11 205:7
**actionable** 178:8,11
**actions** 78:2 119:24 171:10,11 172:13 176:2
**active** 43:3 46:16,20 118:3 212:14
**activities** 216:5
**activity** 97:12 152:21 164:2,19 165:23 171:18,21 172:5
**actual** 20:3 52:13 101:15 110:20 158:13 188:9 198:6
**add** 8:16 76:17 116:23 117:23 120:19 121:5 125:15 139:13,14 140:18,22 141:9,15 220:10
**added**

**116:13** 117:4 141:14,17 155:6 199:7
**adding** 67:10 139:3
**addition** 53:10 145:20 157:2 158:16
**additional** 40:17 41:1 43:9 44:7 51:1,3 62:5,6,7 75:5 85:21 91:18 92:1 93:3 116:12,19,23 119:2,5 120:7 121:3,5 125:6 139:15 140:22 141:9 150:3 154:13 168:5,20 169:1 185:24 186:4 189:4 197:11 199:7 203:14
**address** 186:4
**administer** 135:8,15
**administration** 11:13
**administrative** 127:21 128:2,7
**admission** 64:12 120:22 156:3
**admissions** 169:8
**admit** 217:1,8
**admitted** 113:17 115:3 161:17 166:12,13 172:22 173:2 194:22 196:19 199:19
**admitting** 166:19
**advanced** 25:19
**advised** 40:5,6 125:24 126:15
**advising** 38:10

**affairs** 6:12,
13 10:10,15
15:6 18:21,
24 19:3,12,
19,23 20:10,
11 28:13,14,
18,20 29:18
30:4,5 31:8
32:3,8,9
33:12 34:19
36:6 39:15
43:6 44:2
45:15 50:23
52:22 61:2
66:6 67:1
90:17 91:6,
23 92:11
93:5,7 95:16
96:7 99:8
103:17,24
104:18
107:13
108:16,20,
22 111:16,
18 112:24
113:5
115:12,19
116:8,21
117:3,14,20
120:10
122:15
124:7,12
125:3
126:10
129:2 131:4
139:16,21,
23 140:10
141:5,16
143:19
149:22
150:2 156:6,
9,13,16
157:17
163:15
169:7,13
179:5
189:13
192:18
193:7
196:23
199:6
200:11
201:14
203:2,9,11,
15 205:23
206:24
207:13,18
208:1 210:4,
15 211:1,9
212:1
216:12
219:14
220:2

**affect** 8:24
199:21

**African-american**
129:23
132:10
135:21

**agent** 96:23

**agree** 59:1
83:23 99:12,
24 100:11,
18,22 101:5
149:5 152:4

167:17,19
193:17
206:10
213:14

**agreed** 12:16
147:11

**agreeing**
207:12

**agrees**
107:16

**ahead** 22:14,
22 36:22
38:9 39:12
41:11 43:5
50:18 61:21
62:23 64:13
65:17 66:3
67:14 68:14,
23 70:13
71:21 72:8
73:1,20
83:19 87:18
92:22 94:3
97:7 103:23
115:8,20
120:23
123:1 126:9
138:2
140:13
144:8 149:1
151:20
152:3
164:23
166:1,24
167:16
168:17
181:14
185:23
204:18
215:12
219:22

**AI** 198:18

**allegation**
35:21,22,24
36:18 37:16
39:21 43:1,2
45:24 54:9,
19,21 55:3,
18 56:17,19,
22 57:5
60:20,22
63:9 66:13,
20,24 67:3,
6,12,19 68:2
77:12,21
78:3,24 86:7
87:6 88:9
89:12 90:8
91:2 93:10,
17 96:20
99:13,24
100:6,8,12,
19 109:18
112:16
115:13
116:19
117:3,8,12
118:17,23
119:4,5,9
120:4,6,7,
11,19 121:7
125:3,9,15
132:7
139:15
140:22

141:3,4
144:6 145:1
154:6,13,15,
21 155:5,23
158:11,12,
15 168:3,5,
22 170:19
171:7,13
176:20
179:5,10,23
180:20
186:1,4
189:4,5
199:1,4
202:9
205:22,23
208:24
209:3

**allegations**
7:9 37:20
38:12,14
39:3 44:7,13
45:21 48:20
50:21 51:9,
16 52:5,6,
10,12,15
53:1,6 54:4
55:20 62:18
65:24 66:2,
17 70:3,12
72:21 74:22
75:6,8,16
76:6,11
79:4,7,10
86:8 87:2
89:14,17
90:18,19,20
91:9,18 92:1
94:18,20,24
95:1,2 96:8
101:23
109:15
110:17,18,
21,23
115:22,24
116:1,7,12,
13,24
117:19
121:6
125:10
129:4
139:18,19
140:18
141:6,7,22
155:6,7,19
156:14,15
157:3,14,18
168:19,20
169:20
170:7,14,15
189:2 194:3,
4 199:7
201:21
205:16
220:6

**alleged**
67:10 109:6
156:18

**Allen** 187:4,
7,11,22

**Allen's** 188:6

**ambiguous**
190:11

**amount** 6:2
10:14

158:13
193:15
216:20

**ample** 68:21

**analysis**
83:16 87:12
89:19 95:13
107:10
141:22
143:3
179:13

**analyze**
86:13

**analyzing**
150:10

**anger** 124:14
172:16,24
173:7

**angry**
113:19,21
115:4,5
116:15
119:15,17,
20,23
124:11
166:14
194:23
196:22

**answering**
120:12,14

**answers**
8:17 42:2
114:23

**anymore**
88:23

**apartment**
209:1

**ape** 54:18

**apes** 56:11

**apparent**
147:12

**apparently**
77:6

**appearance**
35:3

**appeared**
51:16 52:20
180:21
215:8

**appears** 38:3
59:9 115:23
123:2,18
124:11
132:13
137:21
140:10
167:1 173:2,
5 180:23
181:15
194:18
195:4

**applicants**
17:14,15
137:19,21

**application**
13:1 19:11

**applied**
181:23
194:21

**apply** 108:15
110:8

**appointed**
17:8

**appointing**
17:17

**apprised**
142:24

**approach**
219:4

**approve** 29:5

**approved**
30:16

**approximately** 15:8 16:3
74:20 79:1

**arbitrate**
150:23
151:1

**arbitration**
147:21
148:12
149:4
150:20,21
191:14
206:19
212:8

**arbitrator**
148:16,20
149:11,16

**arbitrator's**
149:3,5

**arbitrators**
149:7

**area** 179:11,
14 219:21

**areas** 44:16

**argue** 211:24

**argument**
128:17,18
172:21

**arising** 189:6

**arrange**
135:7

**articulated**
36:8

**aspect**
189:17

**aspects** 34:9

**assess**
144:24
179:4

**assigned**
16:11 19:18
187:23

**assignment**
13:15 14:5
15:5 16:7,
13,17 19:9
26:24 74:24
108:2
129:21
134:8
146:12
173:16
175:3
176:18

188:6,8
206:23
**assignments**
19:13,15
173:7
**assume** 8:5
17:24 47:15
55:13 64:19
68:4 126:6
**assuming**
85:6 87:8,15
95:12
122:13
145:6
146:22
157:23
**ATF** 75:3
79:15 96:16,
21,23 97:14,
18 98:5,14,
24 99:5
106:10
145:13
**attached**
129:6
149:23
199:1,4
**attempting**
86:19 194:8
**attend** 19:23
**attendance**
48:2,5 56:8
**attention**
52:18 79:1
**attorneys**
7:19
**audio** 59:23
**audiotape**
124:6
**August**
15:14,16,18
16:5 57:19
**authority**
17:17 76:3,
5,19
**aware** 39:2
40:8 42:23
59:18 60:20
86:3 93:16,
19 97:8
98:14,15
100:8 101:7,
9 104:19
108:21
126:12,17,
21 174:9,10
177:19,21
197:20
215:14
218:23

———

**B**

**bachelor's**
11:10,11
**back** 24:11
25:7 26:5
27:7 46:12
56:12,13
57:16 58:9

67:21 71:24
81:1 91:21
114:11
125:1
132:15
136:10,11
139:6
145:19
147:21
150:2
162:11
168:18
177:23
202:14
203:13
**background**
144:2
**backwards**
16:4
**bad** 94:22
**badge** 45:8
**ballpark** 18:4
**bank** 144:15
**bar** 11:19,21
**based** 67:15,
17 68:17
80:6 120:21
125:4 141:7
146:11
150:24
152:12
158:4
160:20
170:15
171:12
179:10
189:16
191:7 192:2,
12 193:20
207:7
209:17
211:21
219:2
**baseless**
95:1
**basic** 39:19
64:7 183:23
193:18
**basically**
87:13
120:12,15
136:2
148:16,20
153:12
159:6 160:4
163:8 171:5
175:14
210:21
**basis** 47:10
61:13 91:8
98:23
129:19,20
207:12
**Bates** 58:19
81:23
105:16
134:2,22
137:6
**Battle** 131:21
132:10

**beat** 68:8
**beating** 63:5
71:7
**beginning**
10:11 15:10
34:18 69:16
82:8 210:3
212:17
**behaved**
211:22
**behavior**
153:24
154:2
170:24
171:1,3,5
173:22
**belief** 192:9
**believed**
43:13 56:6
83:17 115:6
190:14,24
208:6 209:6
219:12
**believes**
59:15 85:21
109:16
166:8
**bell** 177:10
184:7
**belong** 76:23
**bid** 118:3,11
**bidding**
106:12
**bids** 215:10,
15
**binding**
139:24
**bit** 7:15 24:2
31:24 36:14
41:19 51:24
86:11 99:23
100:21
141:19
168:9
176:22
187:22
**black** 54:6,7,
15 62:14
89:16 99:16
100:3,15
111:3
129:13
133:6
137:20,22
138:21
139:7
145:23
157:16
160:9
182:13,21,
22 190:3,15
193:24
194:11,16,
21 195:5
215:4,6
**blocks** 51:21
**blurt** 120:14
**blurted**
144:20
145:7

**bogged**
143:9
**boss** 43:17
**bottom**
58:13,20
105:16
106:24
133:17,23
135:24
136:13
139:20
162:14
**Boxill** 28:3
**branched**
44:15
**brand** 51:17
**break** 23:18,
20,22 81:17
146:2
165:10
214:18
**Brian** 132:23
**briefly** 49:12,
18
**bring** 85:20
94:10,15
179:13
193:4
**bringing**
51:17 93:9
109:15
**brings** 87:19
**broke** 23:16
**brothers**
189:23
190:4,7,14,
18,19
191:13,19,
23 192:13
196:7,12
**brought**
35:21 43:15
44:7 52:18,
21 53:2
55:16 76:11
77:22 86:1
87:3 91:11,
19 98:4
101:14
141:2
169:22
170:7
171:13
213:18,22
218:23
**Brust** 77:15
83:14 84:19,
22 85:8 89:5
95:13,15
96:2,6
126:14
150:9,17
159:3,6,23
160:2,3
161:6,7
175:23
176:9,16,24
181:3
184:15
186:8 187:2
195:23

**196:1 197:2,
3,6
Brust's**
107:10,21
176:2,5
**buddy** 151:8
**bunch** 47:23
142:16
168:20
201:22
**bureau** 13:21
14:3 16:12,
13 108:1
**bureaus** 14:2
**business**
70:15 73:3,
22 130:17

———

**C**

**call** 23:11
25:19 34:1
64:12
136:18,19,
24 137:9,24
139:16
182:8
**called**
106:20
113:22
115:6
119:13
120:3
121:14
151:18
156:5 163:8
172:24
182:8,9
188:3
194:23
196:22
**calling** 56:10
166:22
167:10
172:16
196:7
**calls** 208:23,
24 209:1
**Cameron**
14:24 26:16,
21 38:5,6,
14,19 39:4,
10,24 42:17
72:11,17
73:17 108:4
112:8
119:16
124:15
176:17,24
177:7,16
180:20
181:3 183:4
184:15,17,
20 185:11,
22 186:7
**Cameron's**
15:1 37:16
72:1 176:10
**canceled**
132:1,4
159:1

197:16

**Capital** 11:1, 7

**career** 19:8

**careful** 41:20 117:17

**case** 6:6,9, 13,16 7:1,4, 6,7,19 9:23 10:17 43:11 45:11,15 47:14 49:12, 14 52:8 66:20 73:11, 13 81:7 91:16,23 153:24 156:2 206:12,13 208:1 217:24 219:10

**case-by-case** 91:8

**cases** 35:9 40:21 43:7 47:11 49:12 91:8 179:18 192:10 219:2,4,7,8, 24 220:1

**casual** 113:16

**caught** 209:12

**caused** 167:12

**cell** 7:11

**chain** 29:24 31:3,4 33:9, 10,13 34:20 38:16 40:4, 9,12 41:9 42:11 44:20 46:14 50:2, 3,7 53:11,14 55:7,9 66:21 72:23 73:5, 8,19,23 74:7 78:1 85:24 86:13 90:5, 23 92:3,15, 19 95:14 96:3 100:24 101:6,9 104:20 111:7 112:24 115:23 116:1,7,11, 22,24 125:14,19 126:1,15 129:4,9 135:20 139:24 140:8,17,22 141:11,16 142:4,11,15 143:15,23 148:7 149:24 150:6 154:1,

9 155:18,20 156:2,8,21 176:10 186:9 198:18 202:7 203:12,13, 22 204:3 205:20,23 206:3,7 212:11,13

**Chains** 206:9

**challenging** 181:16

**change** 167:20 213:7

**changed** 149:10 167:13 206:2

**changing** 219:17

**charge** 32:8 96:23 99:6 127:17 128:10,12, 21 140:9 141:1,3 147:13,17, 24 148:1 149:9 156:22 191:10,21 192:2,14,15 193:14 197:2 205:11 211:22

**charged** 108:7 109:6 126:23 128:6 129:12 147:5 148:18 149:8 151:5 191:1 198:17 204:17 205:13 212:6

**charges** 35:10 57:19 98:20 107:12 176:16 192:6 199:12 200:12

**charging** 71:19 127:5 148:4

**chief** 5:16,17 12:2,3,4,5,6, 7,17,20,21 13:5,15 14:5 17:3,6,11,13 19:14,15 24:3,8 26:6 27:8 32:2,4, 5 33:11 36:5,6,8,9

40:9,16,17, 22 41:1,6,7, 15 42:8,16 43:17,18 44:19 45:1 46:18 47:1 49:2 50:3 53:11,22 55:10,12,16 60:5 71:17 73:10 74:4 102:19 104:22 108:23 109:1 111:24 125:16 126:16,20 142:22 146:19 147:1,16 148:10 176:15 191:15 193:2,11 194:15 204:9 207:4 208:4 209:8, 15,17 211:11,14 212:11,24 213:14,19 214:2,7,9 215:21 217:13 218:4,13,23, 24

**chief's** 48:10 50:2 218:17 219:4,18

**chiefs** 112:1

**children** 208:19

**chose** 141:15

**Christ** 190:19

**chronologies** 78:19

**chronology** 78:23 80:2 82:15 90:4

**circumstanc** e 92:24

**circumstanc** es 35:19 36:20,23 37:1 46:8 128:19 192:8,21 193:1

**citizen** 6:16

**citizens** 94:19

**city** 122:4

**civil** 17:1 199:12,22

**civilian** 23:3 32:22

**civilians** 33:2

**claim** 36:4 138:7,11 171:7,19 179:10

**claimed** 182:19,23 190:17 194:15

**claiming** 138:14 191:2,11

**clarified** 145:9

**clarify** 63:22 144:9,19 190:12

**class** 21:5,8

**classes** 20:21 21:1

**clear** 100:6 113:18,19 122:23 123:5,18 124:17 151:22 161:24 162:20 166:16 194:24 209:1 214:23

**close** 207:24 214:17 217:19

**closely** 179:11,17

**closest** 28:2

**COGLIANES** E 22:14,16, 22 36:22 38:9 39:12 41:11 43:5 50:18 56:15 58:18,22 61:21 62:23 64:13,16 65:4,17 66:3 67:14 68:14, 23 70:13 71:21 72:8 73:1,20 80:19,23 81:11,16 83:4,18 84:3,7 86:18 87:18 89:8, 23 90:14 92:22 94:3, 7,23 97:7,23 99:4,11,17 100:4,16 101:4 103:23 113:23 115:8,20 116:9 117:10 120:23 123:1 124:10,20 125:5 126:5 129:16 131:8 138:2

139:2,10 140:13 145:18 148:23 149:1 151:20 152:3,23 153:5,9 154:5,11,24 155:3,11 156:7,23 157:22 159:10 160:5,11 162:3 163:17 164:4,6,9, 21,24 165:6 166:1,24 167:16,18 168:17 169:16 170:23 171:20 172:9,17,19 173:4,10,20 174:13,19 175:10,20 178:14,19 181:14 182:2,12,16 184:5,18 185:23 187:14,19 195:2,10 196:10 197:5,15 198:7,21 199:14 204:18 205:14 215:12 219:22 220:20

**collect** 130:19

**collected** 48:21 133:14

**color** 89:22

**Columbus** 5:11 21:14 22:3 23:3 24:13 25:23 32:1 64:4 109:5 152:16 169:9

**combined** 153:2

**comfortable** 209:9

**command** 13:19 20:3 29:24 31:3,4 33:10,11,13 34:20 40:9, 11 41:9 42:11 44:20 46:14 50:2,4 53:11,14 55:7,9 66:22 72:23 73:5, 8,19,24 74:7

78:1 85:24
86:13 90:5,
24 92:3,15,
19 95:14
96:3 101:1,
6,9 104:20
110:10
111:8
112:24
115:12,24
116:2,7,11,
22,24
125:14,20
126:1,15
129:5,10
139:24
140:1,8,17,
22 141:11,
17 142:4,11,
15 143:15,
24 148:7
149:24
150:6 154:1,
9 155:18,20
156:2,9,21
169:9,18,19
176:10
186:9
198:19
199:18
202:7
203:13,22
204:4
205:20,23
206:3,7,9
212:12,14

**commander**
5:8,13,19
12:9 13:10,
13 14:6,8,
13,22 15:1,
5,6 16:8,18
17:2,24
18:7,19,20
19:3,12,13,
17 25:14
26:21 28:4,
14 29:20
31:6,9,12
32:3 38:4,5,
14,19 39:4,
10,24 42:17
72:1,11,17
73:16,17
74:3,15
76:17,18,20,
22 107:20,
23 108:22
112:8 113:4
119:16
124:15
150:9,19
175:13
176:10,17,
23 177:7,16
179:6
180:20
181:3 183:3
184:14,16
185:22
186:7 200:9,
11 207:13
216:13

**commanders**
19:14
108:23
112:2

**commanding**
20:9 39:20

**comment**
189:13

**Commission**
199:22

**commit**
154:23
156:19

**committed**
65:13 109:7
120:11
144:20
169:10
219:19

**common**
88:7

**communicati**
**on** 39:24

**comparables**
128:15,20
129:7

**competent**
29:1

**complainant**
110:6

**complainant**
**s** 111:12

**complaining**
111:11

**complaint**
6:16 9:23
33:9 52:21
90:9 91:10
92:16 109:9
171:8,14
181:5

**complaints**
32:22 93:4
94:10,15
184:3
185:15

**complete**
88:13

**completed**
12:6 45:13
73:14

**completely**
81:14 142:5

**component**
99:19

**concede**
199:3

**concept**
59:12

**concern**
56:20 70:20
111:13
113:5
138:23
139:8
185:20

**concerned**
69:7 142:22
143:1,24
174:1
184:16

**concerns**
69:15 79:16
179:22
186:6
199:18
218:16,20
219:3,6,10,
18 220:1

**conclude**
97:18

**concluded**
66:15,21
72:18 75:19
97:20
101:16
190:2
192:17
220:24

**conclusion**
66:12 67:2
107:16
120:21
200:19,20
207:8 211:6
218:1,5

**conclusions**
129:4
146:11
193:18

**conditions**
8:23

**conduct**
34:11,12
43:15 62:19
95:17 96:8
97:13,15,19,
22 118:19
120:11
145:15
176:5,11
177:20
186:2 206:1,
3,4 212:12
218:12,23
219:15

**conducted**
114:6
180:20
181:12
185:11
209:12

**conducting**
61:3 135:4

**confidence**
211:8

**confirm**
81:23 115:2,
9 122:20
168:14
186:14

**confirmed**
63:2 68:6
195:17
196:1

**confirming**
188:22

**confrontatio**
**nal** 181:13

**Congratulati**
**ons** 11:23

**connotate**
196:13,17,
18

**consent**
132:12

**consequence**
**s** 35:11
216:22

**consideratio**
**n** 138:24

**considered**
26:10 27:16
35:8 36:15,
21 66:9
71:13 87:20
125:10
127:17
134:18
205:1,6
213:3

**consisted**
83:9

**consistent**
137:21
177:15
179:15
205:10
209:13

**constant**
44:9

**constitute**
39:3

**constructive**
107:24
108:2

**consulting**
170:13

**contact**
62:21 93:5
110:3 112:9,
21 113:8
132:15
194:20

**contacted**
93:12 182:4

**contained**
196:6
204:15

**content**
62:22 113:2

**context** 45:9
79:21
128:14
192:4

**continue**
42:4 144:23
145:10

**continuing**
212:19

**continuity's**
12:14

**contract**
128:11
209:13

**contractual**
117:16
128:18

**control**

29:21 156:8,
12,14 157:3
206:16
212:5

**controlling**
157:2

**controls**
157:8

**conversation**
38:4 44:11,
16 55:19
56:5,9 60:2
65:19 73:3
74:13 80:5
82:10 84:11
85:18 86:23
87:1,13
92:20
108:18
113:16,18
114:17
115:3 118:1,
10 119:15,
17,23
121:11,13
122:22
124:18
141:20
166:15
186:13
187:15
188:22,23
191:5,7
192:23
193:1,11
200:4 204:8
209:18

**conversation**
**s** 41:14 45:1,
6,10 47:1
65:11 71:23
109:3
170:15
176:15,19
189:1

**convey**
40:19
123:12

**conveyed**
93:1,11
167:8

**conveying**
37:4

**convicted**
9:5

**convinced**
160:12

**copied** 40:5

**copies** 47:24

**copy** 201:5,6
202:10,17

**core** 28:6

**corner** 77:9

**Cornett**
54:17 56:10
59:14 63:4,
20 66:14
67:4 68:8
71:20 72:5,
13 199:11

correct 8:16
15:11,21
31:10 32:6
33:5,8 42:15
45:4 46:17
60:3 61:15,
20 71:2,5,9,
12,16 74:16
75:12,20
81:10 84:2
99:10
107:15,22
108:5
110:14
128:9
134:19
137:16
172:6 183:6
186:20
220:10,13,
16
corrections
202:18
corroborate
43:1
corroborated
39:2,21
54:21
193:24
194:5
corroborating 59:8,9,11
60:5 72:3,4,
12
corroboration 55:3 59:2
60:15 65:24
66:6
corruption
177:9
counsel 9:11
counseling
107:24
108:3
couple 8:21
12:23 27:5
58:2,11,17
61:5 62:16
96:12 102:9
117:23
142:7
157:14
162:19
192:19
193:11
courses
25:17,23
coursework
21:3
covered
157:20
193:15
covert
173:16
174:1 175:2
CPD 26:3
70:24 99:9
172:7 178:9
219:20
craft 117:3
118:22

119:6 120:6
168:3
crafted 117:4
168:19
crafting
119:3
credibility
68:16
credible 53:6
87:14
100:22
crime 9:5
65:1
crimes 64:18
criminal 9:7
97:13,15,19
98:20 99:6
144:21,22
145:8,15
critical 35:4,
5,6,13,17
36:2,15,21
39:3,9,21
43:1,14
56:24 71:14
72:3 208:3
209:5
216:22
CROSS-
EXAMINATIO
N 5:4
culminate
46:10
culminated
210:9
current 5:10,
12 26:23
203:23
206:22
cut 201:19

———
D
daily 62:2,9
date 11:9
84:9 91:21,
22
date's 103:8
dated 78:22
dates 47:8,
13
Dave 187:4,
7,10,22
188:6
David 136:16
day 43:7
62:13 118:9
days 27:5
31:17 61:5
62:16
216:21
DCC 150:14,
18,20,21
154:19
DEA 187:23,
24 188:10

Deakins
29:10,14
79:9,22 81:8
deal 32:21
90:21 91:12
140:20
158:10
186:9
dealing 43:7
dealt 33:20
39:16 56:18
86:4 132:18,
21 133:1
161:11
death 66:14
67:5,7
157:16
December
57:7 134:6
deceptive
192:16
193:6
205:24
deceptiveness 148:21
decide 91:3
140:19
decided
46:19 92:5
145:14
148:10
decides
46:15
deciding
153:1
decision
12:19 34:20
38:22 43:21
46:5,10,14,
23 50:23
68:17 79:23
80:6,10
85:11 86:6
87:5 90:1
126:18
129:7
139:13,17
147:13,15
148:1,3,6,7,
9 149:3,4,
12,13
150:23,24
175:9
181:11
202:8
206:15
207:19
211:24
212:22,23
213:3,8
decision-
maker 80:11
decision-
making
140:7
decisions
30:20 36:5,7
37:3,6 40:14
45:18 46:3
148:4
170:12

Decker
28:10,24
29:9,17
37:23 38:5,
20 39:2,7,23
51:12 54:14
55:1 60:15
61:10 62:12,
22 63:17
65:10 69:2,6
70:10 72:1,
11,16,20
73:12 74:14,
17,19 75:10,
22 76:3
77:14,20
78:14 79:8,
12,19 80:14,
15 82:9,14
83:3,9 84:6
85:6,15
87:4,9,11
88:1,2,19
89:9 90:2
93:12 96:13,
20,24 97:9,
11,17 98:5,
22 106:5
112:7 114:6,
16 122:5,6
124:7
129:19
130:13
131:20
133:13
139:4,22
141:21
143:7 147:4
151:14
158:24
161:17
166:14,20
167:3 176:4,
8 186:6,13,
22 187:10,
17 188:14
190:2,13,23
191:5 193:4
196:20
200:19,21
201:9,18
202:14
203:6,18
204:16
205:11,17
214:1
Decker's
57:4 58:24
66:12 78:19,
24 80:2
103:15
118:14
122:15
129:20
133:24
146:11
157:21
159:14
190:9
204:21,23
deemed 36:2
degree 40:19
156:15
169:24
denial 99:1

denied 68:9
196:8,9
214:8,9
deny 63:7,21
66:2 76:2
98:1 186:12,
14 187:9
200:1
denying
65:15 97:22
188:23
department
27:12,21,23
28:2 92:11
169:11
199:19,22
departmental
35:9
depending
62:5
depends
158:12
deposition
5:20 7:3
8:13 9:11,20
41:20
depositions
7:14,16
30:24
deputy 5:16,
17 12:2,5,17
13:15 14:4
17:3 32:4
33:11 36:5,8
40:9,17
41:1,6,15
42:8,16
43:18 50:2,3
108:23
112:1
derogatory
190:7,8
describe
26:6 54:17
describes
90:3
describing
31:7 59:22
86:10
description
67:11 72:7
desire 40:10
detail 143:8,
12 201:13
detail-
oriented
201:9
detailed
158:2
details 37:15
38:11,13
47:20,23
54:22 63:13
71:22 79:22
86:20 93:2
106:14
114:2 130:9
143:9,12

detective 19:2 87:19, 24

deter 178:1, 6,11,17,24 179:7

determination 179:7 212:21

determine 33:11 38:6 88:5 111:8, 13 116:2,4, 11 119:1 128:21 129:5 160:22 170:2 179:18

determined 72:22 97:12 170:18 186:24 190:6 218:24

determining 101:2

deterred 174:11

deterrence 175:17

detriment 171:2

develop 52:6

device 98:7 99:2

Dick 75:1,23 76:7 77:2,3 85:3,8 92:14 106:10

difference 127:9,14 210:7

differences 127:15 133:4,8

difficult 51:2, 18 90:20 191:13,24 192:1 211:20

digest 144:1, 3

digested 143:15

digesting 142:13

direct 15:2 29:21 30:6 77:16 104:10 218:21

directed 209:16

directing 112:20,22

direction 43:20 86:24

88:6 115:23 116:10 140:3 145:24 206:16 208:8 212:22 218:24 219:13,17 220:2

directly 30:18 32:4 40:22 63:19 73:16,23 74:4 174:2

director's 17:16,20

disagree 99:2,3

disagreed 209:21 213:16

discard 25:8

discipline 29:4,5 107:17 127:19 129:1,2,6 148:17 150:11 216:16,18, 19

disciplined 23:4

discourage 109:23 163:24 164:18 165:21

discretion 13:5 17:5

discriminated 93:23

discrimination 7:4,7 20:23 21:6,9,10,16 22:4,8,12,19 34:6 56:20 157:18 164:3,20 165:24 169:12 172:1,3 184:3 185:16

discriminatory 154:10

discuss 47:12 70:16 73:4,13

discussed 47:22 70:4 79:23 84:10 85:14 86:4 97:11 147:16 148:9 158:17 176:22 182:15 194:6 196:6

198:2

discussing 144:12 145:6

discussion 48:18 49:14, 16,17 50:5, 9,10 60:21 61:7 69:22 70:8 77:12 78:2 79:22 80:13 84:13, 19,21,23 85:1,3 86:20 87:4 88:5 121:20 191:15 200:5

discussions 43:24 44:12 48:24 49:2, 5,8,21 50:17 69:8 70:9 71:17 72:15 73:9 75:5 90:13 108:12 127:4,7 147:10 199:9,17

dishonest 148:20,22

dishonesty 147:5,12 148:19 206:2

dispute 55:4 66:20 68:5 72:24 80:2, 4,18 81:3,4, 5 87:10 187:18 198:9,12,14 199:8 204:20

disputes 167:7

dissuaded 174:4

diverged 219:15

division 5:11 16:14,15 18:14 22:3, 20 28:7 31:20 32:1 64:4 90:22 109:16 126:11 147:20 152:16 153:6 169:7, 9,14 170:21 171:9 208:8

division's 23:5

document 37:10,14 95:6 114:7 165:1,4 203:10

documentation 96:24

documented 107:24 108:2

documents 9:19 142:3

door 217:19

doubt 68:21, 24 69:12 73:6 83:1,5 173:11,13

Doug 56:10

dozen 157:14

dozens 64:19 189:1, 2

draft 117:12 201:5 202:11 203:2,4,7, 12,16,21 204:14,17, 19

drafts 203:4, 6

Dragin 135:21 136:1 138:14 210:19

drawing 83:11 95:9

drawn 78:6

driving 177:17

dropped 97:5

dropping 98:24

drugs 8:24

duly 5:2

duration 147:19

duties 198:6

duty 34:22 36:1,11,12 37:4 38:7,23 40:14 43:3, 22 44:2 45:12 46:4, 11,16,20 48:20 49:6 54:8 58:6 75:18,21 101:3 208:18,20 212:14,19

dynamic 31:19

—————
E
—————

e-mail 37:15 40:2 134:5, 24 135:20 136:15

145:21 183:20

e-mails 10:20 72:1 130:14,19 133:5,13 137:18

earlier 7:18 144:10 151:2 158:18 196:22

earliest 49:19

early 57:9,13

education 10:24 11:5 152:15

EEO 21:19, 20,21 23:5 24:12 25:13, 21,22 35:16 36:19 50:16 93:21 108:7 109:4,7 110:9,13,16, 21 111:4 129:12 138:23 139:9,13 141:10,14 143:21 151:5 152:15,17 154:4,7 179:10 185:21 198:17 199:20 200:10,12 219:17,20, 24 220:6

effect 68:12 160:1 198:5

efficient 114:13

efficiently 142:5

egregious 127:24 129:8,9

Ehrenborg 102:15 130:1,8 132:5,19 146:8,9 151:7,8,15, 16 152:1,6, 10 153:11, 18 182:10, 20 183:1 194:17

electronic 201:6

Elias 75:1,23 76:7 77:2,3, 6,14 79:7 80:21 83:9, 13,17 85:4,8 89:5 90:6,7 92:14 93:16 95:15

106:10

**Elias's** 92:19

**emergency**
23:24

**emotionally**
149:23

**emphasis**
31:1

**employment**
5:10 20:22
21:5,8,9,15
22:4 34:6
35:12
157:15
171:6

**encompasse
d** 21:22

**encounter**
88:20

**encouraged**
20:1

**encourages**
109:17,19

**end** 38:16
41:22 42:3
46:7,20
88:12 95:23
97:14 105:4
106:6 126:2
146:1
147:20
210:9

**ended** 52:13
54:5 124:22
159:8 173:6
185:16
194:8
197:18
205:12,21
215:22

**engaged**
171:17
199:20

**engaging**
218:4,12

**enhance**
139:8

**enhancemen
t** 75:4 97:2
99:14 100:1,
13,20,24

**ensure**
112:20
209:6

**entire** 46:8
51:20 67:18
115:24
160:15
164:24
183:23
208:19

**environment**
31:18
119:22
127:24
128:2,7

**equal** 20:22
21:15 22:4
34:6 35:12

157:15

**equitably**
108:1
129:22

**Eric** 10:4
15:23 33:14,
18 38:22
44:1 45:11
48:19 49:6
54:17 56:10
59:13 63:20
66:13,14
67:4 68:8
71:20 72:5,
13 114:6
134:5 135:1,
13,20
136:15,18
169:21
171:24
172:3,12
181:5,9
184:3
199:11
211:15

**Ernie** 197:19,
21,23

**essentially**
192:19
217:24

**ethic** 177:10

**evaluate**
35:22 51:11
68:15 88:9
125:8
128:14
170:2
171:11
189:3,15
193:9

**evaluated**
37:2 87:21
125:8
160:24
161:15
192:3

**Evans**
121:10,12
122:5,21
123:12,23
151:23
158:18
189:21
190:13

**events** 64:5

**eventually**
215:20
216:14

**evidence**
35:23 36:3
37:5 43:9,
12,14,20
44:13 45:19,
20 46:1
48:20 53:15
54:2,11,23
55:16 60:5
62:7 67:12
72:3,4,12
79:23 80:7
100:22
116:14,15
117:6,11

143:3,20
147:18
157:4,9
158:13
170:16
179:19
186:1
189:10
202:4 217:9

**evidently**
148:19

**evolved**
94:17

**evolving**
44:5 45:2

**exact** 11:9
52:15 61:7
110:17

**exam** 11:19,
21

**examples**
22:24

**exception**
41:19 146:8
220:7,8

**exceptional**
134:14,16
138:8,10,11
181:18
183:10

**exclusively**
153:22

**executive**
40:20 47:3,
6,9,17,18,22
48:3,18
49:1,5,11,20
53:12 55:10
60:6 71:18,
23 73:10
111:24
200:6 204:9

**exhibit** 37:8
57:4 58:14
78:16,18
81:13,15,21
82:8,22
103:6
105:14,24
106:23
114:4
121:19,22
122:3 131:7,
17 133:12,
20 150:7
162:6
165:10
180:10,17
189:20

**exist** 20:3

**expand**
117:20

**expanded**
91:16

**expect** 61:6
93:6 119:6
213:13

**expected**
43:8 213:14

**experience**

18:22 19:2,6
28:9,23
142:8,11
219:2

**experienced**
39:14

**expertise**
179:12,14

**explain**
86:19

**explanation**
205:20
206:7,10

**explicit**
143:22

**exponentially**
44:8 91:17

**expresses**
134:7
136:17
137:8

**expressing**
133:5 135:2
136:22
199:18

**extended**
12:14

**extends**
143:15

**extensive**
158:4 202:1

**extremely**
136:3

**eye** 217:12

———
**F**
———

**face** 69:19
155:17

**fact** 31:1
99:5 105:19
113:15
124:21
139:3
145:21
151:12
152:24
167:11,14
192:15
207:7

**factor** 89:18
95:12 153:1

**factored**
90:1

**factors** 96:1

**facts** 80:12
117:23
140:24
185:12
202:4

**fail** 127:23
128:1
134:10

**failed** 156:4

**failing**
127:19
154:15
155:12,13

156:18
176:6

**failure** 66:4
126:24
127:6,11
154:20,22

**fair** 6:2 83:24
118:16,20
193:15

**fairly** 57:9,
13,23
107:24
129:22

**Falacia**
135:20
138:14
210:19

**fall** 72:6

**falls** 128:22

**false** 70:2,11

**falsely**
182:19
191:2

**familiar** 23:7
56:16 76:6
77:20 109:4
148:12,14
183:8
184:12
187:24
190:21,22

**fast** 128:3

**fatigue** 23:18

**favor** 146:9
215:21

**February**
12:4

**federal**
22:11,18
152:18
169:11
170:22
172:8
219:20

**feel** 86:24
93:23
165:15
193:5
211:13
212:10
213:10
220:10

**feeling** 205:5
212:21
216:1

**feelings**
190:9
204:23
205:3 207:6

**feels** 205:8

**felt** 44:20
51:17 80:16
81:5 96:2
144:5
149:11
151:3
156:20
161:10
169:21

205:18
211:22
213:19,20
216:15
**female**
208:13
**figuring**
188:16
**file** 25:7
203:18
**filed** 9:23,24
171:7
199:11
**fill** 12:12,18
112:21
194:9
**filled** 13:4
14:10
102:14,16,
18 116:4,16
132:8 146:6
149:19
181:18
183:9 187:3
193:21
215:2
**filling** 12:2
74:23
102:10,19
105:5,20
107:13
108:1,13,19
110:11
111:9
132:12
186:23
197:2
**final** 80:11
204:17
**finally**
215:24
**find** 25:5,9
89:4 98:5
207:14
**finding**
115:17
129:20
183:15
**findings**
150:11
207:10
219:19
**fine** 18:4
81:18 165:5
168:8
**finish** 70:5
**firmly** 208:6
216:23
**firsthand**
90:8 91:4
92:2,6
**fists** 71:7
**fit** 74:10
140:19
**fits** 114:13
**flags** 154:14
155:24
**fleet** 16:13

**flip** 82:7
105:15
134:20
135:10
136:8
**flipping**
107:6
**fluent** 136:3,
4
**focus** 70:17
113:6 156:3
168:13
210:22
**focusing**
201:21
202:4
**follow** 76:4,
6,10,13
79:14,19
91:5 126:24
127:6,11,19,
23 128:1
154:16,20,
22 155:12,
13 156:4,18
199:5
**follow-up**
79:12
120:24
121:3
144:19
**force** 187:23,
24 188:10
198:5
**foregoing**
220:23
**form** 65:23
66:5 109:22
129:3
**formal** 12:24
**forthcoming**
192:11
193:6 212:3
**forward** 47:7
50:22 53:2
109:19
143:5 213:5
216:14
217:4
**forwarded**
103:12,16
104:3,4,12,
16,18
116:21
122:6
141:11
146:19
147:1
**forwarding**
103:21
**found** 52:13
113:7
129:19
131:20
172:24
175:5 195:8
**foundation**
95:3
**foundational**
185:2

**fourth** 81:22
**fourth-hand**
90:20
**frame** 57:17
75:15 105:4
106:9
**Fred** 49:3
**Fred's**
114:13
**frequent**
62:4
**frequently**
117:2
**Friday** 135:5,
6
**friend** 24:4,5
152:7
**friends** 26:10
27:20,23,24
28:2,7 130:9
**front** 144:7
157:18
162:6,11
180:11
189:20
**frustration**
52:1
**full** 58:20
82:4 114:14
160:18
162:15
**fully** 9:1

——————

**G**

——————

**Garrity** 145:5
**Gary** 14:24
26:16,19
37:16 108:3
126:13
185:11
**Gary's** 26:18
**gather**
179:19
**gave** 122:5
177:8
200:21
202:14
**general**
20:10,11
21:4,7 40:21
42:10,22
53:13 54:7
60:19
170:24
**generally**
65:5 104:16
111:23
127:16
210:3
**gesture**
83:12
**Gibson**
131:20
132:10
135:14
**girlfriend**

216:6,10
**girlfriend's**
208:20,22
209:1,11
**GITTES**
165:5
**give** 40:20
46:18 51:1
61:24
136:18,19,
23 137:9
201:4,18
206:9
**giving** 191:8
206:14
**goal** 158:9,
10
**good** 12:10
28:23 81:17
94:21 95:3
143:7,16
181:11
207:19
209:7
**gosh** 202:12
**grab** 58:9
**graduated**
11:1,7
**Gray** 40:5
41:6,15
42:8,17
**Gray's** 40:9
50:3
**greater**
21:23
**grew** 44:8
**grievance**
150:24
**Grizzell** 28:4
**grocery**
120:16,18,
20 121:1
144:16,17
145:14
**ground** 7:16
193:16
**group** 28:6
30:15 31:9
**growing** 53:5
**guaranteeing**
156:1
**guess** 9:8
27:7 29:19
34:1 52:3
53:3 57:2
58:11 59:12
69:15 82:3
92:4,9
104:13
107:6
115:11,19
117:22
123:17
125:1
145:13
162:11,16
169:5
200:20

219:16
**guidance**
61:17
**gun** 45:8
71:8
**guy** 45:7,8

——————

**H**

——————

**habit** 68:7
143:9
**half** 15:8
16:4 18:6,8,
9 180:14,17
**hallway** 77:8
78:4
**Hammerberg**
136:16,17
**hand** 37:7
78:6,17
81:12 83:10,
12 103:5
105:13
106:22
114:3,11
121:18
133:10,11
159:17
**handing**
81:20 122:1
**handle** 51:11
129:21
176:10
179:12
**handled** 50:6
95:14,18
96:3 128:16
183:17
186:8
216:12
**handles**
16:13
**handling**
93:3 101:24
**handouts**
24:13,19
**hands** 30:9
31:9
**handwriting**
133:17,24
**hang** 27:21
**happen**
44:17 64:17
65:21 81:9
145:7
179:24
186:18
**happened**
8:10 42:13
44:24 49:9
60:2 63:12
86:16 92:23
104:24
186:15,17
202:10
**happening**
200:6
**happy**

125:16
207:9
209:15

**harassed**
208:13

**harassment**
93:24 216:2,
17 217:2

**hard** 128:3
171:3 201:6
202:10,17

**harm** 171:5,
12

**heard** 31:24
33:22 63:3
68:11 90:18

**hearing**
33:18 54:16
102:21

**heavily** 66:7

**held** 121:20
169:14

**higher** 73:19
74:15
127:18

**highest**
10:23

**highlighted**
157:4,9

**hiring** 110:11

**Hispanic**
77:6

**history**
128:15

**hold** 67:21

**hole** 187:13

**holster** 78:7
83:12

**honest** 29:2,
14

**honestly** 7:1
167:3

**honesty**
70:21

**hoping**
143:23

**hours** 96:15
188:9 198:6
220:9

**house** 26:12,
13,15,18,19
65:1 208:20,
22 209:12

**HR** 179:11,
17 180:2

**human** 21:23
26:2,3

**Hundley**
48:13,14

**hundreds**
64:19

**hypothetically** 144:12
145:6

---

**I**

**IA** 15:10
16:2,10
29:20 31:24
94:8 121:15
148:6,8
161:18
173:1
198:19
205:24
210:2

**IA/EEO**
155:14

**IAB** 66:21
76:16

**idea** 5:24
6:22 93:15
153:24
183:8
202:21

**identical**
184:14
188:8

**identification**
121:23

**identified**
154:2 181:4

**illegal** 75:3
97:2,12
98:7,9,14
99:13 100:1,
12,19,23
153:3

**illusion**
140:5

**immediately**
23:16
144:22
209:19

**impact** 188:8

**implications**
219:5,8,9,17

**importance**
169:22
170:2

**important**
23:13
157:24
158:7 169:6,
13 202:4

**impression**
83:16 85:19

**improperly**
116:4

**in-service**
21:14

**inaccuracy**
146:24

**inappropriate**
154:1,2,10
176:3
185:18

**inappropriately** 116:16
132:7

**incidences**
192:20

**incident**
59:22 75:24
77:2,8,15
78:4 79:7
80:22 83:9,
17 84:5,20
85:9,14
88:15,20
89:19 90:6
95:15 96:21
104:11
106:10,11
128:20
160:7

**incidents**
44:24

**include** 9:6,7
14:1 87:7
88:11
103:19
104:9 144:6,
7 168:20
205:4,8

**included**
43:11 76:24
86:7 103:1,3
104:24
122:13
130:23
133:15
139:19
145:2 158:6
180:19
204:24
205:9 206:1

**includes**
39:1 206:12,
13

**including**
50:1 74:22
89:20 111:1

**inclusion**
103:14
185:24

**independently** 158:11

**indicating**
59:15 123:9
135:14
153:17
166:3,4
167:21
190:5
208:17

**indication**
104:8
160:17
185:5
197:10

**individual**
44:6 78:5
109:17
147:21,22
171:6
191:11

**individuals**
32:17 37:17
46:5 74:3
78:5 87:2
90:17 104:5
105:2
109:14,19
112:2 161:9

**inexplicable**
188:12

**inform** 61:3,
6,8

**informally**
30:1

**information**
37:4,20
38:23 40:17,
19 41:1,13
42:19,24
43:10 53:11
55:7,14,15
73:18 74:7
77:7 78:12
82:13,17
84:4,8,14,15
85:10,21
86:22 88:24
89:11 93:11
95:16 96:7
101:5,13
102:4
103:13,17,
22 104:1
109:2
111:17,19,
22 122:14
125:2,7
130:3
132:21
142:5,17
144:1 146:5,
18 150:3,5
151:12
158:5
163:14
168:13
185:2 191:7
201:10
203:14
208:17
212:10
213:4

**informational**
82:9 83:2,6
161:18

**informed**
30:19 39:23
40:23 41:16
42:9 55:2
60:15,17
61:19 72:11
74:21 89:9
104:21
214:22

**informing**
112:24
136:4

**initial** 200:21
204:14

**inservice**
25:18,24

**insist** 23:21

**instance**
25:15 54:17
180:1

**instances**
91:14
204:15

**instructed**
84:5 90:4

112:8

**instructing**
38:19

**instruction**
39:1 40:15

**insubordination** 127:1,5,
12,17 128:7,
11,13

**intake** 32:17,
21,23 33:2

**intention**
123:12

**interaction**
30:6,11,13

**interest**
47:11 99:19
133:5 134:7
135:3
136:17,22
137:8

**interfere**
155:14

**interim** 5:15
12:1,5

**internal** 6:12,
13,17,19
10:10,15
15:6 18:21,
24 19:3,12,
19,23 20:10,
11 28:13,14,
18,20 29:18
30:4,5 31:8
32:3,8,9
33:3,4,8,12
34:19 36:6
39:15 43:6
44:2 45:13
50:23 52:22
61:2 66:6
67:1 90:17
91:6,10,23
92:10 93:5,7
94:15 95:16
96:7 99:8
103:16,24
104:17
107:13
108:16,20,
22 111:16,
18 112:23
113:4
115:12,18
116:8,21
117:2,14,20
120:10
122:15
124:7,12
125:3
126:10
129:2 131:4
139:16,21,
23 140:10
141:5,16
143:19
149:22
150:2 156:6,
9,12,16
157:17
163:15
169:6,13
179:5

189:13
192:18
193:7
196:23
199:6
200:11
201:14
203:2,9,11,
15 205:22
206:23
207:13,17
208:1 210:4,
15 211:1,9
212:1
216:12
219:14
220:2

**internally**
50:19

**internals**
33:6,7

**interrupt**
8:16 42:2
217:22

**interruption**
23:8,18

**interview**
17:9,10,12,
19 51:14
53:15 57:4
79:12 91:12
104:10
114:11
119:12
121:15
124:7
132:14
135:4
144:14,21
145:12
151:13
160:18
161:18
162:12
163:6
166:14,20
169:3
180:21
181:2,13
182:5 183:5,
13 184:14,
17 185:8,10
186:21
189:6,14
195:24
196:24
209:13
211:4
212:20

**interviewed**
44:6 52:4
54:14 57:6
62:12,13,16
88:8 91:17,
20 97:2
120:10
161:3 170:8
181:23
182:7 183:2
211:2,3,5

**interviews**
17:14 51:3,
14 52:11
62:5,7,22

114:5
132:22
143:4
170:10,17
177:3,8,20
183:1,4,24
185:17
192:9,24
206:1

**introduced**
7:17

**intuition**
52:2

**investigate**
52:19,22
75:23 80:21
85:12 87:11
88:4 91:3
92:5 98:17
103:20
117:12,19
119:5
187:10,12
218:14

**investigated**
33:13 40:12
64:18 78:1
79:17 84:6
86:1,12 90:7
92:18 96:16
145:14
158:5
169:23
189:11,15
208:5 210:8,
15 211:1

**investigating**
76:16 86:8
90:6 97:21
99:8 104:6
106:6 116:5
119:4 189:9

**investigation**
6:17,19,22
10:4,5 15:22
30:14 33:4,
15,19,22,24
34:10,16,19,
21,22,24
35:16 36:12,
19 38:8,11,
12,21 40:13,
18 41:7
42:18,19
44:3,4,8,15
45:3,12,14
46:7,9,21
47:7 48:22
49:20 50:1,
6,11,12,13,
14,15,20
51:8,19,20,
22 52:9
53:5,13,17
55:24 56:2
57:8,9,14,
17,24 58:3
59:1 60:24
61:3,10,14,
18 62:11
63:8 66:12
67:1 68:20
69:4,16,23
70:15,17
72:17 73:6

74:1,8,18
75:2,19
76:12,18,24
77:23 78:20
79:15 80:7,
17 81:3,6
86:11,24
87:7,22
88:7,11,12
89:13,20
91:11 95:5,7
97:5 98:24
99:15,21
100:2,7,14
101:16
102:6 103:1,
4,14,15
104:1,2,9
105:1,5,8
108:16,21
110:4
111:23
112:3,6,11
113:2,10
116:21
117:14,18,
21 118:19,
24 120:17,
19 122:15
124:13
125:14
126:3 130:4,
12 133:14
138:1,4
139:19,22,
23 140:11,
24 141:8,23
142:6,9,21,
24 143:5,10,
16,21 145:3,
10 149:15
150:3
153:13
155:14
156:6 157:5,
20 158:1,15
168:14
169:3 170:1,
5,6,11,19
171:14
173:1
179:12,16
180:8,19
181:22
183:23
184:8
191:18
192:5,17,18
193:3,8,13,
22 194:2
196:4,23
198:18,19
199:5
200:11,19
201:8,15,17,
19,23 202:5
205:3 209:5,
7,11,17
210:5,10,13,
16,18,22
211:14,15,
20 212:4,13
17 213:6,12,
15,17,21
214:1 216:4
217:6,14
218:2,18,19,

21,22 219:1

**investigation al** 144:3

**investigations**
29:22 30:7,
8,12,13,22
32:24 33:20
35:2 42:10,
24 47:4,24
61:1 73:5
74:5 141:6
142:12
149:24
201:11
207:9,11,17,
21 209:20
210:1,9
211:10
215:23
217:12
219:11,15
220:3

**investigative**
10:3 19:6,23
20:9 114:5
130:23
133:16
157:12
170:10
188:3,4,7,
13,14

**investigator**
39:15 44:18
51:1,17
86:22 88:2
143:8
189:12
205:8

**investigators**
32:15,16
43:6 76:9
203:3

**involve**
44:21

**involved**
31:21 34:16
43:18 51:13
69:24 77:2
95:4 104:5
105:2
108:24
109:14
112:2,4,19
119:8
138:20
161:8 181:9
200:10
209:4

**involvement**
30:21
108:11,12

**involving**
45:6 95:7
126:13,14
158:1
219:24

**issue** 104:20
106:13
111:5
117:16

**issued** 45:14
57:20
200:23

21,22 219:1

**issues** 186:8

—— J ——

**Jacobs** 12:3
24:8 26:7
32:2 40:22
41:8 43:17
45:2 46:18
47:1 49:3
53:12 60:5
71:18
101:11
102:19
104:22
126:17,20
142:22
146:19
176:15
193:2,11
194:15
209:8,15,17
214:7,9
215:21

**January**
103:9

**JD** 11:3

**Jeff** 7:18
81:16

**Jennifer** 5:1,
8 174:7

**Jeremy**
102:14
130:1,8
151:7 152:6,
9 153:11,15,
18

**job** 19:21
101:24
102:4,5
105:6 106:6
108:22
113:9,20
116:16
118:3,7
122:24
123:3,10,18,
20 124:3,16,
18,22
129:24
132:1,4,8,12
133:15
134:18
136:5,17,22
137:7
141:12
152:1
158:20
159:1,4,6,9
160:1,3
162:1,21
163:7
165:22
166:6,9,16
167:5,9,13
172:13
173:19,22
174:6,8,12,
17,22 175:6,
8 176:1
177:4
178:16,18
183:16
194:16,22

195:1,13
197:14,16,
17,18 198:3
213:4
215:10

**jobs** 102:16
104:21
106:12,19
112:21
141:13
164:1,18
174:3 198:4,
14

**John** 121:10,
12 122:5
158:18

**July** 13:23

**jump** 24:11
177:23

**Jumping**
27:7

**junctures**
45:19
212:16

**justify** 117:7

———

**K**

**K-N-I-G-H-T**
5:9

**Karl** 7:19
9:23 106:18
135:1
158:21
161:19,20
162:2,4,22,
23 163:9
166:8,21,22
167:12,13
171:17
184:1
186:21

**Ken** 28:9
37:23 51:12

**kill** 56:12
111:4

**Kim** 12:3
101:10

**kind** 17:13
19:6,7,11,
20,23 27:22
29:14 31:6
34:7 52:20
53:16 69:22
93:18,24
161:12
167:6
177:15
190:10
199:21

**kinds** 24:14
49:20 50:16

**knew** 73:18
89:2 124:2
146:22
147:2 149:3
173:18
211:21

**Knight** 5:1,8
174:7

**knowing**
149:14
175:18

**knowledge**
112:18

**Kuykendoll**
28:5

———

**L**

**labor** 21:8

**Lancaster**
62:17
106:18
112:9 113:9,
16,18,21
114:18
115:4,5,6,15
118:2 119:7,
13 121:11,
14,16
122:22
123:6,7,13,
19 124:2,16,
17,21 134:6,
7 151:17,18,
24 152:8
158:19
162:1 163:5
166:15
167:9,10
171:17
172:14
177:2,3,8
183:3 184:2,
13 196:7,21

**Lancaster's**
119:24

**language**
190:3,6
196:7,13,18

**large** 6:1
10:14

**Larry** 62:14

**Las** 19:24

**latitude**
76:10

**Laura** 27:15
28:3

**law** 11:1,15,
17 20:20,22
21:5,8 93:21
98:6 152:18
170:22
178:9,10
179:14
184:24

**laws** 22:10,
13 169:11
172:8
219:21

**lawsuit** 9:22

**layperson**
92:10

**Lazar** 6:24
7:6

**lead** 67:20

**leading**
209:21

**leaks** 74:1

**learned** 63:8
94:5,8 126:4

**leave** 25:10
38:22 101:2
131:14
156:16
208:21
212:1

**leaves**
149:22
150:1 156:9
203:9,11

**leaving**
12:13 36:11
141:5

**lecture**
177:9,21

**lectured**
180:24

**led** 46:10

**left** 10:10
15:10 51:12
131:12
141:15
199:5
203:15
208:1
216:12

**legal** 22:18
152:15

**length**
142:22,23
143:16
201:19
202:2
204:10

**lengthier**
157:24

**lengthy**
57:24
142:12

**letter** 33:9
104:1 146:5,
18 147:2

**level** 10:23
17:19 19:17
20:2 22:11,
18 30:15
36:5 64:7
73:4 92:12
95:14 96:3
127:16,18
129:5 200:6

**levels** 73:19
127:19
147:12

**lie** 69:5
191:10

**lied** 217:5

**lieutenant**
14:11,19
18:1,3,5,18,
22 28:4
29:8,10,12,
14,23 30:9
31:12,16
43:8 44:18
77:15 79:8,
22 80:14

81:8 83:14
84:19,22
85:7,15
86:2,3 87:5
89:5 95:13,
15 96:2,6
107:10,20
126:14
135:4 150:9,
17 159:3,6,
23 160:2,3
161:6,7
175:13,14,
23 176:2,5,
9,16,24
181:3
184:15
186:7 187:2
191:6
195:23
196:1 197:2,
3,6

**lieutenants**
30:19 31:5,
21 32:14

**light** 38:23
44:13

**likelihood**
142:13
143:14

**limit** 110:3

**limited**
192:19

**lines** 56:14
61:4 206:20

**list** 17:15
47:11,14
49:11 174:4
215:8

**listening**
85:18

**literally**
31:11 199:1
208:21

**location**
104:4

**log** 48:5,9

**long** 9:17
10:16 11:24
15:7 20:4,6
28:19 73:6
107:6 130:4
146:1

**long-term**
13:4 27:6
74:8

**longer** 17:8
76:19
200:22
202:11
203:12
213:19

**looked** 10:8,
9,12 85:13
98:10
137:18
151:13
155:16
158:18
189:19
192:6 199:1

**loop** 30:20

**looser** 31:8

**loss** 211:8

**lot** 20:3
29:19 30:6,
11,13,21,23
31:9,24
33:20 35:9
45:22 47:19
51:5 52:9
59:16 63:24
64:10 74:6
76:10 91:8,
24 93:22
110:18
119:1 128:9
142:14
143:12
147:11,14
148:2,4
158:3
192:10
201:10,13
218:20

**lots** 73:21

**low-level**
150:24

**Luellen** 28:4

**lying** 190:24
191:10,21
192:2,6,13
211:22

———

**M**

**made** 7:9
12:19 30:20
34:20 36:5
38:13 45:18,
24 46:23
62:18 63:19
66:14 67:3,
13 71:11
75:1 78:9
80:5,9,10
82:9 84:12
86:3,5
110:18
122:23
123:5
124:17
126:17
139:12
148:6
166:15
170:12
171:7,8
181:5 184:3
185:15
202:18
206:15
210:12

**maintain**
170:4

**majority** 19:8

**make** 31:15
36:7 37:2
40:14 43:22
46:6 50:23
51:2,18
59:19 63:3
68:17 70:11

71:1 85:11
90:8 92:16,
18 94:18,19
101:8 117:1
120:21
124:1
128:17
140:24
142:14,16
143:2,19,22
145:9
146:23
147:13
148:1
157:18
160:19
164:12
169:14
179:6,15
185:2
194:24
201:20
202:3,8
212:1,22,23
213:7
214:18

**makes**
17:13,14
19:15

**making** 46:2
59:13 67:24
70:2 83:12
87:5 89:15
90:17 93:10
109:9 129:7
139:16
193:23
213:3

**March** 57:21
74:20 78:22
79:1,2,10
82:11,15,20
83:3

**mark** 114:12
159:18

**marked** 37:8
57:3 78:17
81:13,21
103:6
105:14,15
106:23
114:4,14
121:19,23
122:2
133:11,23
134:2,21
136:13
162:14

**married**
208:18

**Mary** 131:21

**material**
10:16

**materials**
10:4,8,10,18
24:14,21
25:3,5,13,17
144:3

**matter** 18:4
42:10,22
200:14

**meaning**
42:13 55:10

65:3 124:6

**means**
103:19
105:23
119:17
170:21
190:10

**meant**
160:17
161:1,2,5
171:5,12
191:12,22,
24 213:9

**mechanism**
90:16

**mechanisms**
93:3

**medical** 8:23

**medications**
8:24

**meet** 9:11
119:21
134:9
179:20

**meeting** 90:3

**meetings**
47:17,19
48:3,18 49:2

**Meinhart**
95:7,8

**memory** 8:11
77:1 80:3
177:6

**memos**
10:20

**mention**
137:14,15

**mentioned**
51:23 96:1,
14 151:2

**mentor** 27:9,
17

**mentors**
27:13,19

**mere** 35:23

**message**
79:14
106:17
121:10
123:16
124:9
125:22
126:22
138:21
151:12,21
158:17
161:20,22,
23 166:13,
21 189:19
195:9,14,18
196:5,20

**messages**
122:5 168:4

**met** 79:8
180:2,7

**mete** 129:2

**middle** 52:10
89:13 135:2

**midst** 188:24

**Mike** 13:14
29:10

**mind** 138:23
171:16
200:4

**mine** 219:15

**minimal**
183:18,19,
20

**minimum**
65:7

**minor** 30:22
201:12

**minute** 79:15

**minutes** 9:18
47:17,18
48:4 58:12

**minutia**
158:3

**misconduct**
35:3,5,6,7,
13,17 36:2,
16,21 39:4,
9,21 43:2,
12,14 52:13,
21 53:7
56:24 71:14
72:3 90:22
141:9 145:7
163:19
189:10,11
208:3 209:5
216:22

**mishandling**
74:23

**misquoting**
164:9

**missed**
213:24

**missing**
214:19

**misunderstood** 5:15

**module**
21:23

**moment** 37:9
193:17

**monkey**
54:18

**monkeys**
56:11

**monthly**
47:10

**months** 5:18
7:14 58:2
101:17

**Moore** 10:5
15:23 33:14,
18 37:18
38:6,22
42:18 44:1
48:19 52:14
53:7 54:5,17
55:18,21
56:6,8 57:20
58:5 59:3,12
62:15,18

63:3,19,21
65:11,12,14
66:1,13
67:3,13
68:6,9
69:18,23,24
70:12,19
71:19 74:22,
24 75:2,18
77:9 83:10
84:24 85:2,8
88:21 89:6,
14,15 93:17
95:18 96:9,
15 97:1,3
99:7,13
100:1,12,19,
23 101:1,23
102:10
103:2
106:17
107:12,23
108:7,13
110:15
111:9 112:8
113:7,12
114:6,16
115:3,13,18
117:9 118:1,
10,18 119:7
120:20
121:9 122:7,
21 123:11
124:8 125:4
126:23
129:12,21
130:14
131:22
132:23
133:4 134:5,
8 135:1,3,
13,20
136:15,18,
23 137:19,
20 139:5
144:13
146:6,14
147:5
150:10,19
151:4
153:13
158:17
159:4,24
160:8 161:3,
16 162:22,
24 164:16,
17 165:20
167:8
169:17,21
171:24
172:3 173:8
176:1 177:1
181:5,9
182:19
184:4
189:21,22
190:14,17,
24 192:7,16
193:5,22
195:9,14
196:8,19
198:17
199:20
205:12,24
211:15
213:15,17
214:3 215:2

**Moore's**
34:10 45:11
49:6 63:18
68:22 77:16
99:1 107:20
118:13
148:17
166:2
172:13
212:12

**motivated**
172:15,23

**motivating**
152:24

**motive** 69:17
119:12,14
124:1 153:3,
10 163:14,
15 168:14

**motives**
119:1,11

**mouth** 69:5

**move** 14:15
88:6

**moved** 91:24

**movement**
188:13

**moving**
13:24
109:17
143:5
216:14

**multiple**
44:22 45:1
68:5 169:10

**multitude**
91:18
125:10
192:8,23

**muses**
167:14

**musing**
168:4

————————

**N**

————————

**named** 12:5,
20,21 14:4
56:7 62:14
75:1 95:8
102:14
121:10
187:4
197:18

**narcotics**
34:13 50:4,
13 74:23,24
102:1 103:8
105:20
106:12,19
107:14
108:1,8,14
111:10
112:10
118:3,7
122:24
123:3
129:14
130:15
131:21
133:14

134:7
143:21
145:19
149:18
150:12
151:5
158:20
160:9
172:13
173:6,16
176:18
177:4
180:21
186:23
187:1 188:3
189:18
193:16,21
194:9
195:13
197:14
198:4
214:24

**national** 12:7

**natural** 14:14

**nature** 30:22
31:18 35:4
45:2,22
75:16 78:3
110:19
127:21,22
144:22
145:8 158:4
161:8
201:12

**necessarily**
35:24 67:18
91:9 93:4
94:12 99:18
100:17
116:18
119:21
142:17
143:13
149:10
152:4
155:17
157:7 158:1
166:7,9
173:23
189:14
190:8
196:13
203:5 205:1,
2,7 212:3,18
213:2
218:21
219:7

**needed**
80:16 81:3,6
104:7
125:21
161:11
186:9 187:1
202:7,8
208:7

**net** 16:14

**nexus** 52:20
91:10 99:20
100:7

**night** 208:23

**nobody's**
8:11

**nonsense**

163:2

**noon** 135:6

**normal** 49:17
70:14 73:3,
21,22
130:16,18
138:7 189:3

**Norman**
137:6,9

**north** 12:17
13:16

**note** 58:12
82:1

**noted** 131:14

**notes** 203:18

**notification**
37:22

**notified**
37:17,19
102:24

**notify** 43:8

**noting**
118:11

**nuance**
127:15

**nuances**
128:9

**number** 6:1
32:20 33:24
137:18
155:5,7
170:7

**numerous**
169:20
170:9

---
**O**
---

**objection**
22:14,22
36:22 38:9
39:12 41:11
43:5 50:18
56:15 61:21
62:23 64:13,
16 65:4,17
66:3 67:14
68:14,23
70:13 71:21
72:8 73:1,20
80:19,23
81:11 83:4,
19 84:3,7
86:18 87:18
89:8,23
90:14 92:22
94:3,7,23
97:7,23
99:4,11,17
100:4,16
101:4
103:23
113:23
115:8,20
116:9
117:10
120:23
123:1
124:10,20
125:5 126:5

129:16
138:2 139:2,
10 140:13
145:18
148:23
149:1
151:20
152:3,23
153:5,9
154:5,11,24
155:3,11
156:7,23
157:22
159:10
160:5,11
162:3
163:17
164:4,6,12,
21 166:1,24
167:16,18
168:17
169:16
170:23
171:20
172:9,17,19
173:4,10,20
174:13,19
175:10,20
178:14,19
181:14
182:2,12,16
184:5,18
185:23
187:14,19
195:2,10
196:10
197:5,15
198:7,21
199:14
204:18
205:14
215:12
219:22

**objection's**
164:13

**obtain**
173:24

**obvious**
172:22

**occasion**
40:20

**occasions**
193:2

**occur** 13:22
49:17
171:11

**occurred**
6:21 36:3
53:21 74:13
78:4 85:17
88:10,15
89:1,10
91:15
115:10
126:12
129:17
146:21
159:12
168:21
170:11
188:24
200:2
209:19
210:17

211:7 216:5
217:10
218:8

**occurrence**
88:8

**occurring**
167:1

**October**
16:21 18:7

**offense**
127:18
128:22

**offenses** 9:6,
8

**offer** 139:6

**offered**
131:21,23
132:4 139:5

**office** 17:16,
20 25:7
134:9
196:15

**officer** 27:13
34:21 35:16
36:1,19
39:20 40:11
41:9 43:3
54:20 55:21
56:4,7,9
57:5,6 59:2,
4,6,7,19
61:2 62:12,
14,16,17
63:1,4,16
64:8,10
65:10,24
67:9,10
68:17 69:16,
22 70:11,19,
24 71:1,15
74:21 75:1,7
77:2,5,6,14
79:3,13
82:10 83:8,
13,15,16
87:13 88:19
89:5,21 90:2
92:6,12,13,
19 93:16
95:7,8 96:12
97:6,22
102:14
106:9 109:6
112:10
114:15
118:6 119:7,
24 120:12
121:10
122:21
123:12,13,
22 126:23
129:15
131:13
132:5
135:21
136:1,16
137:3,7,12,
19,20 140:9
147:14,23
148:2
151:23
152:9
153:12
155:15

156:4,5,20
158:20,24
159:8,22
160:9
168:13
169:9,18
172:15
173:15,24
175:6,9,12,
17,24 176:6
177:1,2,3
178:16,17,
21 179:1,8
180:19
183:3,9
187:4,22
189:21,22
190:13
194:5,10,23
195:5,6,12,
15 196:2,21
197:1,13,18,
24 198:3
199:11
200:12
208:2,6,10,
11,12,17,18
210:12
214:13
215:3,17

**officer's** 37:3
120:9
163:14

**officers** 23:3
27:11 30:24
32:7,10
40:10 45:7
47:21 54:7,
15,16 56:21
59:22 64:1,4
68:6,10 70:2
89:16 94:9,
10,14,18
95:1 99:16
100:3,15
108:14
111:3
129:13,23
130:6,7
131:20
132:10,18,
22 133:2,6,7
137:22,23
138:5,13,17,
20,21,22
139:3
145:21
146:8 148:5
151:14
152:10
157:17
163:24
164:18
165:21
173:6,18
177:17
178:1
181:22
182:13,21,
22,23
185:14
190:3,15
193:24
194:1,11,13,
16,21
198:10,13
208:13

**215:**4,6,7,9, 15 **218:**3,11 **219:**19

**offices** 31:10

**official** 5:19

**Ohio** 199:12

**on-the-job** 19:22

**one-on-one** 46:24 49:2

**ongoing** 47:23 73:24 108:21 111:23

**open** 188:2

**opening** 195:13

**openings** 101:24 102:5,9,18 193:21

**operate** 12:16

**operates** 177:16

**operational** 127:21,24

**opinion** 87:20 109:2 149:5 190:11 210:7 213:1 216:6 219:13

**opportunities** 20:2

**opportunity** 9:10 20:22 21:15 22:4 23:9 34:6 35:12 116:23 131:16,23 157:16 180:16 201:7 220:15

**opposed** 140:11

**oral** 135:8

**order** 89:3 93:7 98:8,12 108:3 111:8, 12 113:6,8, 12 115:14 116:3 119:16 120:18 124:15 126:24 127:6,11,20, 23 128:1 154:16,21, 22 155:12, 13,14 156:5, 19 160:21 194:11,16, 20,23 215:4

**ordered** 97:1

**98:**11 **99:**13 **100:**1,12,19, 23

**organization** 31:2

**organized** 81:17

**oriented** 143:8

**original** 52:20 54:21 55:20 91:10

**originally** 9:24

**outcome** 52:16 54:10, 23 142:18 143:13 149:10,14 155:18 208:5 210:8 212:5

**outcomes** 66:17 207:10

**overrule** 140:1

**overruled** 148:8 150:19

**overseeing** 61:1

**overtime** 34:4 50:14 157:13

**overturned** 148:17

**overview** 40:21

**overwhelmin g** 116:14

――――――

**P**

**p.m.** 220:24

**packet** 130:23 133:16

**pages** 46:9 107:9,19 131:3,6,7,17 134:20 135:11 142:9 143:11 146:2 157:12,15 158:7,13 180:14,17 201:1,2

**paginated** 114:10

**pagination** 133:17

**paper** 90:23 92:17

**paragraph** 58:20 81:24

**82:**2,4 **83:**7, 21 **84:**1 **88:**18 **114:**15,21 **115:**1 **116:**13,17 **159:**19 **160:**20 **162:**15,16

**paragraphs** 58:17

**paramilitary** 31:2

**pared** 203:23

**parking** 59:16

**part** 12:4 21:3 34:15 50:13,14 56:2 61:16, 18 83:11 102:22 105:5 112:5 122:14 126:11 130:11 149:15,17 169:18 172:15,23 173:3 180:18 198:18 200:8 216:11

**partially** 153:23

**participated** 164:2,19 165:22

**parts** 31:20 34:11 49:24 61:18 106:4

**party** 66:5 67:24 171:2

**pass** 11:21 129:24 134:10 138:16 173:16 182:9

**pass/fail** 137:15

**passed** 129:24 130:5,7 131:24 132:11 145:22 146:8 175:6 182:17,18, 19,22,23 194:10,12, 16 195:6,7, 12,19,21 215:4,5,10

**passing** 96:14 129:13 159:9 173:6 215:14

**past** 14:17

**128:**16 **174:**5 **185:**9

**patrol** 12:17 13:16,18 14:7,9 19:9 206:24 207:5

**pattern** 145:20

**pay** 188:9

**pendency** 38:7

**pending** 23:21

**people** 17:18 27:21 28:6 30:16 51:13 54:7 63:18 64:11 69:3, 24 90:19 93:22 109:23 112:20,22 151:7 170:13 173:22 178:3,22 183:2,24

**perceived** 123:8

**percent** 214:23

**perfect** 8:12

**period** 10:21 12:14 16:5 44:9 48:15 62:20 199:13

**permanent** 12:20

**permission** 145:22 214:2

**permitted** 220:2

**person** 14:12,15 31:13 41:21 51:15 87:2 91:21,22 92:12 97:21 109:8,21 143:10 171:12 174:4 178:12,21 179:17 183:14 201:9

**personal** 26:10 28:9 175:1 190:9 205:3 207:6

**personality** 152:12

**personally** 63:3 161:9 170:12 174:20 207:4

**personnel** 32:13

**pertinent** 118:24 119:11

**phone** 7:11 183:15

**photos** 7:10

**physical** 59:13 67:4 71:20 72:5

**pieces** 53:15

**place** 49:21 63:4 69:22

**Plaintiff's** 37:8 57:3 81:13,21 103:6 105:14 106:23 114:4 121:19,22 122:3 133:12

**play** 201:15, 16

**plenty** 152:10

**point** 5:18 8:16 10:3 21:22 23:17 26:20 31:6 40:24 41:5 42:1,9 44:14 51:18 53:1,3 54:14 55:14 58:5,17,24 63:14 73:7 74:18 75:17 77:22 80:3,6 84:16,20 85:11 94:17 95:18 97:5 106:17 116:23 117:5 125:13 133:22 141:19 145:16 170:3 182:4 183:23 191:16 194:5 203:8, 16 204:10 211:5 212:20 213:19,24 219:12 220:12,14

**pointed** 143:4

**pointing** 58:19

**points** 63:18 213:5

**police** 5:11 12:6,7 13:5 16:14,15 19:15 21:14 23:3 24:13

25:23 27:13
30:24 31:20
32:1,13
36:6,9 40:16
44:19 64:4
73:10 74:4
90:22 92:11
94:9,14,18
97:6,22
109:1,5
125:16
126:11
147:16,20,
23 148:2,10
152:16
169:7,9,14
171:9 177:9
204:9
211:11
**police's** 22:3
170:22
**policies** 22:3
23:5 99:9
169:11
170:22
**policy** 22:7,
20 35:13
109:5 153:6
172:7 178:9
219:20
**Political**
11:12
**polygraph**
214:3
**polygraphs**
214:12
**portion**
78:21 79:2
106:2 146:2
157:19
161:23
179:12
211:10
**portions**
50:6
**position**
12:18 13:1,2
14:16 17:9
27:3 39:8
80:24
102:20,24
103:8
105:20
108:20
109:16
110:10
111:9,10
113:9,17
126:18
129:14
131:22
133:6
134:13
139:5 146:7
149:18
150:12
151:6,16
173:17
174:1
175:17
178:2,4
179:3
181:17
182:1 183:9

186:24
187:1,3,11
188:2
189:18
193:16
194:9 197:3
207:14
215:1,3
**positions**
13:4,7
104:22
107:14
108:8,19
110:12
112:10
116:4
143:21
145:20
160:10
163:22
181:10,23
**possess**
98:8
**possession**
97:4 98:9,
12,17,19
99:1 101:3
**possibilities**
151:4
**possibly**
66:10 86:3
103:1
204:11
**Post-it** 58:12
82:1
**posted**
126:19
**posting**
106:6 195:7
**potential**
89:21 99:9
103:13
110:20
138:23
185:21
189:4 196:6
**potentially**
25:7 35:8,10
38:21 63:5
77:24 98:11
110:11
116:16
117:13
180:24
193:9
**power**
157:21
**practice**
11:15 43:4
74:11
140:23
202:24
**practiced**
11:17
**precinct**
217:15,17
218:3,13
**prefer** 130:8
186:3
**preference**
175:1

**preferences**
114:13
**preferred**
151:8
**prepare**
9:11,20
**prepared**
114:23
**presence**
49:18 63:18
**present**
140:24
158:8
**pretty** 6:1
22:20 41:24
53:6 62:21
64:3 69:4
71:3 94:15
104:17
154:16
181:13
**prevent**
110:5
**prevented**
99:7
**previous**
8:17 12:18
163:6
**previously**
12:10 16:11
37:8 43:13
57:3 77:24
78:17 81:20
122:2 168:8
176:23
**principal**
69:24 89:14
**principle**
110:8
**print** 16:15
**prior** 10:13
11:5,8 14:4
15:4 16:5
17:23 18:8,
9,10,20,24
19:2 26:23
146:15
200:20
206:22
207:17
209:4,19
**problem**
95:1 166:5
**procedure**
90:21 91:4,7
92:9 140:15
**proceed**
44:14
131:15
**proceedings**
148:12
199:23
220:23
**process**
12:24 13:1
17:2,7,8,9
19:11 33:5,
7,8 102:5,23
120:1 140:7

141:20
142:5
147:19
150:6,24
184:24
185:15
186:23
**product**
173:7
181:16
**professional**
24:5,10 26:8
28:9,11
**profiling**
217:14
218:4
**progressed**
212:13
**prohibited**
177:1
**prohibiting**
22:7 169:12
**prominently**
157:4
**promise**
23:17
**promised**
23:15 139:7
**promoted**
14:12 16:17,
20 18:3,6,
13,15,18,19
**promotion**
17:2
**promotional**
17:1
**proper** 11:7
90:21
**properly**
45:23
143:14
**property**
34:5 50:15
157:13
**prosecute**
97:20
**protect**
159:7 160:4
175:15
176:6 196:2
**protected**
152:21
164:2,19
165:23
171:2,18,21
172:4
175:19
**prove** 45:21
138:12
191:13
192:1 217:6
**proven** 69:10
**provide** 41:1,
13 53:14
54:1 74:6
161:4
**provided**
122:4

212:11
**proximity**
31:17
207:24
**public** 11:12
47:20
**pull** 128:20
**Pulling** 129:6
**punish**
109:14
**punishment**
109:23
**purchasing**
75:3
**purely** 32:23
**purported**
138:20
**purporting**
138:5,17
**purpose**
37:21 38:4
103:21
110:1
**purposefully**
70:2
**purposes**
121:23
171:18
172:7,8
178:7
**pursue** 51:10
80:7,8,16
87:22 97:14
99:6 117:13
186:6
191:10,21
**pursued**
192:2 212:7,
9
**pursuing**
98:20 192:6
**pushed**
106:11
151:15,24
152:7
**put** 14:14
47:23 78:5
90:22 92:17
104:6
139:21,22
140:11,19
154:15
157:17
203:18
**puts** 201:10
**putting** 63:4
76:15 83:10
105:3
142:16

———
**Q**
———

**qualification**
134:14,16
138:8
181:19
183:11

qualifiers
161:4

qualify
204:22

question
7:22,23,24
8:4,6 23:9,
21,22 30:2,3
31:13 36:4,
17 41:22
42:3 45:6
48:19 57:12
63:22 70:6
81:1 83:22
95:21,22
97:8 100:10
115:11,19
120:13,14,
24 152:14
164:15,16
165:15,17,
19,20
167:24
168:2,6
169:5
171:16
172:2,12
184:12,20,
21,22
196:17
203:21

questioning
117:13

questions
7:20 8:10,22
12:23 26:17
29:13 30:17
37:11 39:17
40:18 49:13,
15 107:5
114:16,22,
23 118:14,
24 119:3,7,
10 120:5,7,
17 121:4,6
144:19
169:1
180:24
185:4,6
202:19
220:8,19

quick 82:21
214:18

quickly
128:18
143:6

Quinlan
12:4,5,8
24:3 27:8

Quinlan's
50:2

quote 165:7

_____

R

rabbit 187:12

race 130:6
151:11
152:12,20
153:22,23
164:3,20
165:23

198:12,15
214:14

racial 54:6
56:9,20
59:3,10
62:19 65:13
71:11,15
72:6 83:17
110:19
111:1 190:2,
6 191:3
193:23
196:6,9,13,
18 217:14
218:4 219:4,
8,9

racist 106:20
113:22
115:7
119:13
120:4
121:15
124:8,12
151:18
156:6
161:21
163:1,8,19
166:22
167:5,11
172:16
173:1
194:24
196:22

raise 138:23
185:20

raised 141:8
154:14
155:24

rank 5:12,19

re-word
100:20

re-worded
99:22

reached
77:10

react 155:20

reaction
175:22
177:18

read 10:1
25:8 51:20
58:16 79:11
81:14,24
82:5 83:7
105:7,23
106:3 107:7,
9 114:7
118:12
130:4,19
131:3,16
133:19
142:14
144:1 146:3
149:3 150:5
159:18,19,
20 160:15,
18 162:18
164:24
165:4,8,10
170:9
175:23
180:13,17
184:11

185:8,9
186:2
197:11
199:4
220:16,20

reading
88:18
112:17
123:15
131:9
146:15
149:13
175:22

reads 125:14

ready 37:11
94:15 107:2,
5 114:21

real 82:21

realize 8:12
20:14

reason 23:18
30:23 55:4
59:18 68:21
69:11 70:1,
11 74:3
83:1,5
104:23
109:12,13
113:20
121:13
124:5
142:20
143:2
152:19
155:1 156:4,
18 161:11,
19 166:22
173:11,13
195:20

reasonable
14:13
178:11,17,
21 179:1,7

reasoning
206:14
207:20

reasons 74:5
110:5 138:9
142:1,7
143:18
148:16
152:2,5
166:11
167:21

reassigned
206:23
207:3
211:12

reassigning
207:5

reassignmen
t 207:18

reassuring
210:22

rebid 195:7,
12 197:17

recall 24:16
26:1 29:6
40:1,4,6
41:17 42:7,
12,21 46:22

47:8 49:22
50:20 52:15,
16,24 53:1,
18,21 54:3
60:7,9 61:7
63:6,9,11
66:16 70:14
71:22 73:2,
12 75:15
76:9 78:7
79:21 80:24
84:8 89:2
92:23 93:1,
14 95:11
98:3 104:23
105:3
106:14,21
108:17
109:2
111:21
112:13
113:24
122:12
125:8 130:2,
5 133:8,9
138:3
139:11
149:2,13,20
159:11
176:7,13
177:14
180:2 186:5,
11,15,16
187:15
188:21
189:2 190:5
192:15,22
199:7,15,24
200:4,5,17
203:8
204:19
206:5,14
209:22
211:19
220:12

recalls
187:18

received
21:14 24:12
25:14 98:12
122:7
154:19
208:16
209:3
216:18

receiving
101:12

recent 6:18
88:20

recess 81:19
131:11
165:13
180:15
214:21

recollection
79:18 86:15
90:12
103:12
108:6
129:11
147:8
180:18
187:21
193:20
204:21

205:11

recommenda
tion 117:1
141:1

recommenda
tions 107:21

recommende
d 150:14,19

recommendi
ng 107:17,23
150:10

reconsider
38:22

record 5:7
23:16 47:20
58:18 82:23
121:20
131:9,13
164:13
165:14
200:14

recorded
59:23

recordings
53:16 85:19

red 154:14
155:24

reduced
202:2,3

reduces
143:14

reducing
204:11

redundancie
s 202:6
204:12

referring
190:3,15,18

refilling
102:23

reflects
22:13

refresh 77:1
79:18 90:12
103:12
177:6
180:18
187:21

regular
61:12,13
62:21 73:9
207:12

regularly
29:19

relate 22:10

related 6:12,
19 37:20
75:6 78:19
108:8
110:21
121:4,8
141:13
150:11
167:24
168:3
189:13
216:5 219:8
220:5

relation
10:18

relationship
12:11 24:2,9
26:6 27:22
207:15
211:11

relationships
74:2

relative 6:11
45:19 119:3
120:8
126:10
219:23

relay 213:4

relayed 66:5
78:13 112:1

relaying
75:11

relevant
85:22 99:14
100:2,13
142:18
143:13
189:8
201:21,23
202:6
204:13

reliable
29:14

relief 40:14

relieve 43:21

relieved 36:1
37:3 45:12
46:4,11
212:19

reluctant
66:1 94:1,9

remain 34:22
38:7 44:1
64:23
117:15

remainder
79:16

remaining
48:19
117:16

remember
6:4,6,9 7:3
8:14 11:9
20:12,13
21:2,11
28:19,22
33:16,18,21,
23 34:15
42:14,16
43:24 44:10,
11,12,22
45:1,5 47:6,
13,14 48:17,
23 49:4,7,8,
15 50:4,9
51:7 53:24
54:8,9,10,
13,19,20,22
55:6,12,17,
20 56:4
60:4,10,12,
14,17,21
61:9 63:1,
13,15,16

65:10,18
66:11,18
67:6 68:19,
20 69:2,6,8,
21 70:4,18,
22 74:12,19
75:5,7,10,
13,16,22
76:1 77:10,
11,21,23
78:1,3,8,11
82:16 84:11,
18 93:1,12
95:6 96:4,
17,19 97:10,
17,24
101:19,22
102:3,8,13,
16,17,21,22
104:18,19,
21,24 106:8,
16 108:11
110:17
112:5
113:14
121:16
127:4,7
128:23
129:18,19
130:11,13
133:3
134:12
137:24
146:15,17,
20 147:10,
11 148:24
158:21,23
161:16,22
176:14,19,
21,23 177:5
180:7
181:21
184:8,9,10,
13,19 185:8,
9,11,12
186:18
187:4
189:18
190:1
200:16,18
201:24
202:1,2
204:14
205:21
206:6
209:23
212:20
214:5,9

remembered
8:14

remembering
44:23 61:23
185:7

remind
131:19
159:22

reminding
49:3

reminds
105:19
106:5
213:23

removal
119:24
207:17

209:19

remove
140:18
147:19

removed
78:6 109:8
155:7
209:16,17
212:14

removing
109:15,21
202:5

reorganizatio
n 13:22

repeat 44:5
165:19
195:11

repeatedly
44:17

repercussion
s 94:11

rephrase
8:1,5 70:8

replied
162:24

report 26:21
32:3 40:16
45:14 77:13
94:2 157:6,
12 173:17
194:14
197:4
200:21,22
204:15
205:16

reported
40:22 54:16
62:15 77:7,
15,19 85:24
96:13
106:10,11,
15 174:17,
23 175:12,
24 197:1,7

reporting
26:24 90:21
185:16

reports 74:4
156:13

reposted
104:22
159:1

reposting
102:20

represent
62:10 66:19
77:5 78:18,
23 103:7
122:3
133:12
137:17
182:6

request
47:10 214:2

requested
53:22 214:7

require 51:3,
4

required
52:19 104:8
189:15

requirement
136:5

requires
128:11
158:3

requiring
91:24

resistance
219:18

resources
21:23 26:2,3

respond
64:10
208:23,24

responded
133:5,6,7
215:5

responding
209:2

responds
134:8
136:23

response
13:20 14:3
41:10,12
107:20
118:13
138:22
167:10
174:16
179:16
218:17

responses
145:21
193:6

responsible
102:10

result 35:9
120:1
124:14,22
158:14
159:9 171:1
192:20
197:12

resulted
102:18
155:17
160:8 216:9,
23

results
127:18

retain 203:10

retaliate
155:15

retaliating
116:18
119:18
120:3

retaliation
21:16 22:5,
8,12 34:7
35:15 36:18
110:6
115:18
116:14,19
117:8

118:17,23
119:6,22
125:4
152:20
154:23
156:19
160:8,12,20,
22 169:12
170:21,24
171:4,18
178:8 179:5,
9 185:21
199:20

retaliatory
152:2,5
154:10

retired 12:3
24:8 27:12

retreated
182:13

review 9:19
43:16 47:21
130:20
143:3
183:22
198:19
210:1

reviewed
9:22 10:2,
16,17,19
77:24
122:18
130:24
131:1

reworded
155:23

Rhonda 28:4

Rice 132:23
197:19,21,
23

Rich 81:22
164:11
165:10

Richard
132:23
162:22
189:21

rid 204:12

Rights
199:12,22

ring 177:10

ringing
184:7

rise 22:17

rob 14:19
65:1

robbed
120:16,20
144:15

robbing
121:1

role 206:17,
19

Ron 40:5

room 25:11
131:12

rotated 13:3

rotating 12:15
rough 201:5
roughly 15:9 157:12 180:14
round 80:13
roundtable 88:5
routinely 21:17
routing 103:7 132:3
rule 128:3 148:21 206:1,3
ruled 216:13
rules 7:16 70:24
run 7:14 108:23
Russ 136:24
Russell 136:22 137:2,6,8

**S**

S-A-G-L-E 14:21
safe 101:2
Safety 17:20
Sagle 14:19
sake 12:15
sat 177:7
schedule 12:15
school 11:1 20:21,22 93:21 184:24
Schwegler 208:2,10,11, 12,17 210:10,18 215:17,18 219:9
Schwegler's 214:14
science 11:12
scope 57:8 117:15,17 170:5 189:7, 16 218:24
Scott 56:7
search 12:7
second-to-last 162:10
secondhand 91:1 92:2
secret 112:3, 19
secretary

48:11
section 13:21
sections 21:9
select 138:9 152:8
selected 118:7 152:13 181:2 182:20 184:2 185:14
selecting 104:20
selection 12:24 17:14 120:1
send 90:23 203:3 206:11
sends 17:15 203:13
senior 13:10, 12 118:6 129:14 132:19 146:8 187:3 194:10,11, 12,21 195:5 197:13 198:3 215:3, 4,6
seniority 13:8,9 138:10 181:18 183:10
sense 31:15 92:19 143:19 169:8
sensing 51:24
sentence 189:24
sentences 162:19
separate 50:22,24 109:13 127:20 145:3 181:8
separated 51:20
separating 51:18 110:1
sergeant 18:11,13,15, 16,22 27:15, 16 28:3,13, 24 29:7,9, 17,22 32:15 34:10 37:18 38:5,6,20 39:2,7,23 42:18 52:14 53:7 54:5, 14,16 55:1,

18,21 56:6, 8,10 57:4,20 58:5,6,24 59:2,12 60:15 61:2,9 62:12,15,18, 21 63:3,17, 18,19,20 65:10,11,12, 14 66:1,12, 13,15 67:3, 13 68:6,9,22 69:2,6,17 70:9,12 71:19 72:1, 10,16,20 73:12 74:14, 17,19,22,24 75:2,10,18, 22 76:3,15 77:9,14,16, 20 78:14,19, 24 79:7,12, 19 80:2,13, 15 82:9,14 83:2,8,10 84:5,24 85:2,6,8,15 87:8,10 88:1,2,19,21 89:5,9,14,15 90:2 93:17 95:17 96:9, 13,15,19,24 97:1,3,9,10, 17 98:5,22, 24 99:7,13, 24 100:12, 19,23 101:1, 23 102:10 103:2,14 106:5,17 107:12 108:7,13 110:15 111:8 112:7, 8 113:7,12 114:6,16 115:3,13,18 117:9,24 118:10,12, 13,18 119:7 120:20 121:9 122:5, 6,7,14,21 123:11 124:8 125:4 126:23 129:12,18, 20,21 130:13,14 131:19,22 133:4,13 134:8 135:3 136:23 137:19,20 139:4,5,22 141:20 143:7 144:13 146:6,11,14 147:4 148:17 151:4,13 153:13 157:5,21 158:17,24

159:14,23 160:8 161:16,17 162:23 164:16,17 165:20 166:2,13,20 167:3,7 169:17,18 173:8 175:24 176:4,8 177:1 182:18 186:5,13,22 187:9,17 188:14 189:20 190:1,9,13, 14,17,23,24 191:5 192:6, 16 193:4,5, 22 195:8,14 196:8,19 198:16 199:10,19 200:19,21 201:8,18 202:14 203:6,17 204:16,20, 23 205:11, 12,17,24 212:12 214:1,3 215:2 218:2
sergeant's 42:24
sergeants 27:14 30:7, 11 31:5 32:12,17,21
serve 19:14
served 14:16 18:23 19:8
service 17:1 101:3
services 16:12,14,16
set 37:1 51:15
settled 172:21
seventh 218:3
sexual 216:2,17 217:1
sexually 208:12
Shantey 28:3
shape 129:3
share 55:13 73:23 74:14
shared 41:2 55:7 77:7 82:14,16 83:3 84:12 207:4
sharing 46:22 53:10

73:18
Shaw 7:19 9:23 62:17 74:21 75:8 79:3,13 82:10 83:8 87:13 88:19 90:3 92:13 96:12 106:9, 18 112:10 131:12,13 135:1,2 158:21,24 159:8,22 161:19,20 163:9 167:12 171:17 172:15 175:24 176:6 177:2, 3,8 183:3 184:1 195:5, 12 196:2,7, 21 197:1,13 199:11
Shaw's 83:15 180:19 186:21 195:15
She'll 220:20
sheet 103:7 132:3
shift 14:11 208:20
shoot 56:13 68:9 99:16 100:3,15
shooting 6:16
shop 16:15 108:24
short 17:15 67:7 148:18
short-term 13:3
shorter 142:3,6
shortly 90:3 208:16 209:3
show 57:2 203:21
showing 97:1
shredding 203:1
shrugged 175:14
sic 150:10 198:18
signature 31:14 220:21
signed 30:16
significant 216:20

silent 64:23

similar 69:14
134:24
135:14
184:19
185:10
217:5

similarly
128:16
136:21
137:5

single 21:24
36:24 43:7
116:20
139:17
142:13
160:20
169:23
170:19
189:4
192:13
205:4,5

sit 125:7
201:7

sit-down
183:24

situated
14:12

situation
29:18 36:24
98:4 113:8
128:24
148:13
176:6,11
191:20

situations
90:16 91:24

skipped
29:24 151:7,
14

slightly
145:24

slips 158:2

slur 56:9

slurs 54:6
56:20 59:3,
10 65:14
111:1
193:23

small 30:15
31:8,17

smiling
177:12,13

Smith-
hughes 95:8,
9

socialize
27:22

socializing
24:6

sole 121:2

solely
152:12

somebody's
93:9

Sorrell 55:21
56:4 59:8
66:1 67:10

69:17 70:1,
19

sort 21:16
29:18,23
33:24 36:13
39:18 51:21
64:11 69:24
83:15 93:24
137:22
139:8
140:23
141:21
167:14
177:9
188:12
215:1

sound 16:1
30:1 56:16
62:2 64:14,
15 77:20
176:11
184:11
190:21

sounds
56:17 86:10
181:11,15

source 55:20
75:8

Spanish
134:10,14,
17 135:7
136:1
137:14,23
138:5,17,20
181:19

Spanish-
speaking
135:15
138:15

Spann
132:23

speak
123:17
134:17
137:23
168:21
195:19

speaker
136:1

speaking
132:14
137:14
138:6,18,20
164:12

special 19:6,
20

specific
20:12 22:6
44:10,23,24
48:17,23
49:5 53:14
66:16 82:17
88:24 91:7
116:1 117:3
119:8 120:5
121:7 130:2
157:10
192:19

specifically
20:8 21:2,5
42:12 59:24
63:6,10

70:19 76:23
90:15 93:13
112:13
119:1 120:2
130:5
139:12
151:17
159:11
171:23
191:10
202:1
211:19

specification
154:4

specifics
49:16 60:18
138:3

spending
208:19

splitting 50:8

spoke 79:3,
11 161:9

spot 114:12,
14 159:18

Springer
13:14

spurted
144:14

SRB 34:11
50:14 54:15

staff 23:3
40:20 47:3,
7,9,17,18,22
48:3,18
49:1,5,11,21
53:12 55:11
60:6 71:18,
23 73:10
110:10
111:24
169:19
199:18
204:10

stage 62:11

stale 45:21

stamp
105:16
134:3 137:6

stamped
134:22

stand 200:3

standard
140:14

start 20:20
50:22 78:16
120:17

started 15:23
33:15 57:18
61:23 210:6

starting
58:12 64:7
95:10

starts 17:12
105:20

state 5:6
22:11,18
76:5 152:18
169:11

170:22
172:8
219:20

stated
144:10
161:4
195:20
201:16

statement
67:24 68:15,
16 95:20
121:3,4
146:14
147:3,6
160:19
163:16
194:19
195:16

statements
63:20 69:1,
10 78:8,9
166:6

stating 82:19

status 42:20
43:23 49:6
53:13 74:8

stay 208:22

step 57:16

Stephanie
131:20
135:13

stick 42:1

sticks
207:24

stop 115:7
144:21,23
163:3 165:3

stopped
87:12,16

storage
104:3

store 120:16,
18,20 121:1
144:16,17
145:14

stories 217:5

strange
92:12

strategic
13:20 14:3

strategically
201:20
202:3

streamline
141:21
142:2,21

string 135:1

stuff 39:16
50:15,16
144:4

subdivision
14:1

subdivisions
13:24

Suber 27:15
28:3

subjected
93:24

subjects
36:14

subordinate
177:17

subsequent
216:13

substantial
157:19

substantive
185:4 217:9

substantively
167:20

substation
208:21

successful
193:10

suddenly
144:14

suffer 8:23

sufficient
67:12

sum 215:1
217:21

summaries
53:15 114:5
170:10

summarize
83:7

summary
10:4 57:5
82:9 83:2,6,
24 85:16
86:21
118:12
131:4 143:3,
23 144:2
159:15
166:2 169:2
218:6,7,9

supervising
45:7 46:4

supervision
109:8
218:18

supervisor
15:2 47:2
77:16 171:8
173:18
174:2,7
175:7 178:2,
15 183:14
184:1
207:11

supervisor's
175:13

supervisors
173:21

supervisory
29:21

support
16:16 43:14
46:1 143:20
147:18
217:9 218:5

supported
54:23

supportive
122:14

surveillance
209:7,8

surveilled
209:11

survive
191:14,15
212:8

suspect
64:22,24
65:2

suspicion
189:12

suspicious
65:7 189:5

sustain
67:12,18
68:12 125:3
140:9
211:24

sustained
36:18 52:12,
23 54:5,11,
12 55:15
56:23 66:15,
22 72:22
99:12,24
100:11,18
107:17
115:13
117:8
118:17
132:8
147:24
150:11
154:8
155:18,22
156:2,21
169:20
179:21
205:15
211:22

sustaining
68:1

switch 36:14
198:5

switched
198:4

sworn 5:2
32:13

system
109:20

T

table 49:14
80:13 87:20
88:3 169:22
170:8

tacet 64:12

takes 41:21

taking 33:1
36:11 43:3
60:4 67:9
118:11
124:22
142:23
159:5
163:24

164:1,17,18
165:21,22
166:10
174:11
175:17
178:17
179:3

talk 31:5
64:1,5 85:7,
23 86:12
89:4 98:5
179:20
204:3,10
213:6

talked 24:2
96:20
110:22
153:20
159:3
210:16
212:15
220:9

talking 17:21
61:11 72:23
73:8 115:14
124:16
137:7
144:13
146:6
161:24
177:1,24
183:14
197:17
210:13
214:24

tangents
201:22

target 180:22
181:1

task 129:9
187:23,24
188:10
198:5

taught 21:11

teaches
25:22

technical
16:12

telling 69:7
73:12 74:20
75:22 97:18
122:21
151:23
156:17
163:15
173:21
199:2 205:6

temporarily
27:3

tendency
128:19

tenure 6:12
20:1 200:15
210:3,6

tenured
28:21 39:15

term 23:8
35:7 191:3

termed 36:1

terminable

35:8 216:7

terminated
23:4 208:7,
14 215:19,
24 216:1,8,
15

termination
216:10,14,
24

terms 19:20
22:11,19
46:13 71:11
72:6 105:16
140:6
153:10
176:17
188:15
199:22

Terri 107:20

test 17:1
134:10
135:8,15
137:14
138:16

tested
138:12

testifies 5:2

testify 9:1

testimony
68:22 116:6
118:13
220:11

testing 17:7,
8

text 79:14
106:17
121:9 122:4
123:16
124:9
125:22
126:21
151:12,21
158:17
161:20,22,
23 166:13,
20 168:4
189:19
195:9,14,17
196:5,20

theft 157:13

thing 14:14
20:13 21:16
23:20 29:15
31:6 33:17,
22 34:7
49:23 53:16
68:1 70:8
93:18 94:1,
21,22 95:3
124:9
139:20
141:12
145:14
160:15
163:9
167:12
169:23
204:4
208:12

things 8:10
22:17 24:14

45:23 51:2,
5,6 52:17
64:2 73:23
83:20,24
84:10 86:5,
15 87:3
93:22 96:12
112:6 119:2
125:19
141:9
148:19
155:8 159:5
161:12
167:6
177:22
184:9
189:16
202:5,6,20
203:1
204:13
205:12
206:11
210:7,8
211:7
213:10,16

thinking
20:13 169:1

third-hand
90:19 91:2

third-party
90:9,19

thought 29:1
81:2 140:7
142:3
143:20
167:4 175:8
188:14
213:2

threads 34:1

threat 56:21
66:14 67:4,
5,6,7,13
71:1,7,8,11,
15,19 72:4,
12 74:24
75:24 76:7
89:21
157:16
175:24
197:1

threatened
195:8,14

threatening
78:9 95:17
96:8 99:16
100:3,15
111:4 159:5

threats 59:13
63:3 65:14
89:15 93:17
193:23

threshold
119:21

time 6:3,21
9:15 10:1,7,
13,14,17,21
12:14 15:19
16:6 18:23
21:18 27:5
30:4 36:24
37:5,19 40:8
44:5,9,12
46:3 48:12,

15 51:4,8,14
52:3 53:4,8
55:8 57:17
59:24 60:6,
16,18 62:8,
20 75:14,15
78:10 81:17
84:5 85:9
86:9 87:22
88:3,8,15
89:2 90:1
91:17 93:15
95:6 96:13
98:15
102:11
105:4 106:9,
15 110:16
113:5
117:24
125:9 126:3
139:12
142:23
146:23
158:2 159:8
168:19
169:7 170:8,
17 175:15
188:6,16
189:4
193:20
194:1
195:11
196:3 197:3
203:3
207:13,16
210:2,18
211:8
217:22

times 5:23
29:20 30:24
42:21 44:23
64:1,11,20
73:22 74:6
93:22
193:12
201:13

Tina 48:13,
14

today 7:21
9:2 202:22

told 42:8
63:17 65:10
72:16,21
73:16 74:13,
17 76:2,20
79:13,19
81:2,8 83:8
88:19 90:2
96:23 97:3,
11 98:1,23
103:20
104:9
121:12
123:11
124:7
131:22
139:4
158:24
159:4,23
160:2 163:7
173:18
175:6 176:9
178:3 186:8
187:2,11
188:17
190:13,23

types 13:7
51:5 74:5
177:22

typical
34:18,23
64:3 69:9

typically
13:3 21:24
24:19 25:21,
22 35:17
68:12 179:9
213:8

typos 203:4

———
U
———

uh-huh 11:4
38:24 57:10
77:17 90:11
92:7 114:19
118:5,8
122:16
127:13
134:1,11,23
135:12,16
145:17
151:10
159:2
162:13
163:10
178:5
183:12
185:19
188:11
214:4

ultimately
118:7
192:17
200:23

unbecoming
206:4

undergoing
13:22

understand
7:24 8:2,3,
11,15 20:20
23:23 46:13
57:18 64:23
100:9 166:3
172:10
178:7

understanda
ble 173:15

understandin
g 22:2 23:2,6
37:13 39:9,
14,19 45:16
46:19 88:14
98:10,13,18
109:11
126:20,22
127:8
152:17
165:14
170:20

understood
8:6

undisputed
117:24

union 128:17
150:23
209:13,18

unit 19:6,20
20:3,9 92:14
102:1 188:3

units 32:1

unreasonabl
e 175:9

unrelated
34:1

untruthful
69:10
194:14

untruthfulne
ss 147:14,24
148:2 149:9
191:1
193:14
204:16

unusual
59:21 60:23
140:21
185:17
201:18
210:14

update 47:2
61:24 62:4
72:16

updated
38:20 40:13
72:2

updating
45:2 47:6

upheld 66:21
107:13
154:8
200:12

upset 209:14

———
V
———

vacancies
108:14,15

vacancy
12:2,12,13,
18 14:10
130:15

vacating
102:19,23

vacation
31:16

vague 35:7

vaguely
104:21
148:14
185:7

Vardaro 5:5
7:18 58:21
81:18
131:10
164:11
165:3,9
214:16
220:18

varies 149:6

variety 17:18
167:21
183:17
207:8,10

Vegas 19:24

20:5

veracity 36:4
45:20 68:16,
21 69:1
70:16 85:23
86:14

verbal 99:1
204:8

verbally
78:13

version
203:23

versus 36:11

vet 45:23

vicinity
103:9

video 59:23

violate 70:24

violated
113:7,12
115:14
116:3
119:16
124:15
194:20,22

violation
22:18 68:13
71:4 99:9
109:7 129:8,
9,13 139:9,
13 141:14
151:5
152:18
179:21
206:2,4

violations
23:4 35:13
107:18
108:8 110:9,
14,16
169:10,15
185:21
198:17
199:20
219:20

violence
56:21 59:13
67:4 71:1,7,
15,20 72:5
89:21 93:18

violent 62:19
68:8 193:23

virtually
188:8

voice 52:1

———
W
———

wait 31:15
72:21

waived
220:21

walk 25:2

walking 77:8

wanted
25:16 40:12,
24 41:16
42:9 43:18

53:22 80:16
87:11 88:11
90:7 119:5
141:21
142:1 143:2
144:19
145:8 147:4
152:1
153:14,15
157:17
166:4 174:3
181:8,24
194:24
204:16
205:11
211:4 213:1

warning
137:22

warrant 43:3

wasted 53:4,
9

Watkins 56:7
57:5,7 59:6,
7,19 62:12
194:5

Watkins'
67:11

ways 155:5
183:17

weapon
77:10 78:6
83:11 95:9
101:3

weapons
75:3 97:2
99:14 100:1,
13,20,23

week 9:14
20:6 62:1

weeks 62:8

weigh 66:6
68:1 213:7

weighing
37:6 38:15
107:15

weighted
170:15

Weiner
136:22
137:2

Wes 55:21
59:8

what've
158:16

white 54:16
102:14
129:14
132:18,21
133:2,7
136:16
137:2,11,19,
23 138:22
152:9,10
182:21,22
187:4
189:22
194:10,13
197:13,23
198:3
214:15

195:22
196:2

Tom 12:4,5,8

top 38:17
105:21
114:10,15

topic 85:22

topics 75:6

toss 25:3

totality 46:8
192:7,20,24

touches
21:21

traditionally
29:19

traffic 9:6,8

training
19:20,22
20:2,14,19
21:15,19,20,
21,23 24:12,
20,21 25:3,
17,19,23
93:21
152:16

trainings
24:15 25:13

transcript
220:16

transitioning
13:23

translator
135:8

treatment
176:17
199:12

trouble
69:18

true 30:4,10
64:9 71:6
87:15 153:6
166:9

truth 69:12
205:6

truthful 69:8
192:11
194:19
212:3

turn 78:21
114:9 131:6

turned 52:11
81:21
130:12
138:19
148:11,15

turning
106:24

twenty
143:11

two-year
73:6

type 17:2
21:23 41:21
43:19
128:21
134:24
179:10,22

215:3,6,9,15
218:3

**Whitney**
62:17
106:18
112:9 113:8,
16,18,21
114:17
115:4,5,6,15
118:1,2
119:13
121:11,13,
14,15
122:22
123:6,7,19
124:2,16,17,
21 134:6
151:16,18,
24 152:7
158:19
163:5
166:15
167:8,10
171:17
172:14
184:1,13

**Why's**
174:24

**Williams**
56:10 66:15

**Wilson** 62:14
63:2,17
65:10

**withdraw**
23:9 81:14
187:20

**withdrawn**
215:10,15

**withdrew**
118:10

**witnesses**
85:23 86:14
108:15
111:11,12
112:11

**women**
217:4

**word** 69:4
97:6 98:16
142:13
170:21
171:4 190:7,
10 191:13,
19,22
192:13
196:12
201:16
205:4

**word-for-**
**word** 85:17

**worded**
115:21,22
116:8 157:3
168:22,23,
24

**wording** 60:1

**work** 16:4
23:18 24:6
119:22
166:4
167:15

177:10
179:11,17
181:16

**worked** 12:8,
9 14:15
37:18 92:10
175:2

**working**
12:10
142:10
174:2

**works** 19:21

**worry** 210:23

**worse**
189:22

**worth** 89:19
188:15,17

**write** 33:9
93:6 116:19
129:3
155:19

**writing** 157:5

**written**
67:15,17
92:1,2,6
116:12
149:12
154:6 155:5
156:16
194:14
202:19

**wrong** 7:1
8:13 81:15
164:7

**wrote**
162:20,22

———————
**Y**
———————

**year** 6:5
21:21 22:1

**years** 8:11
11:8 12:9
15:8,14 16:4
18:6,8,9,16,
17,18 45:22,
24 73:8
88:13
105:10
168:21
169:2 180:5
188:24

———————
**Z**
———————

**Zimmerman**
6:24 7:6

**zone** 14:2,3,
6,8,23 15:4
217:14,15
218:3,13