1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Karl Shaw,                          :

        Plaintiff,            :
                                 Case No. 2:18-cv-483
        vs.                   : Judge Graham
                                Magistrate Judge Vascura
City of Columbus,             :
et al.,
                              :
        Defendants.
                              :

- - - - -

DEPOSITION OF THOMAS QUINLAN

- - - - -

Taken at Spectrum Reporting LLC
400 S. Fifth Street, Ste. 201
Columbus, OH 43215
June 12, 2019, 11:09 a.m.

- - - - -

Spectrum Reporting LLC
400 S. Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

2

1                    A P P E A R A N C E S

2

   ON BEHALF OF PLAINTIFF:
3
        The Gittes Law Group
4       723 Oak Street
        Columbus, OH 43205-1011
5       By Frederick M. Gittes, Esq. and
             Jeffrey P. Vardaro, Esq.
6
        and
7
        Walton & Brown, LLP
8       395 East Broad Street, Ste. 200
        Columbus, OH 43215
9       By Sean L. Walton, Esq.

10
   ON BEHALF OF DEFENDANTS:
11
        Columbus City Attorney's Office
12      77 North Front Street, 4th Floor
        Columbus, OH 43215
13      By Richard N. Coglianese, Esq.

14
   ALSO PRESENT:
15
        Karl Shaw
16      David Rutz - Intern

17

18

19

20

21

22

23

24

3

1                 Wednesday Morning Session

2                 June 12, 2019, 11:09 a.m.

3                   - - - - -

4             S T I P U L A T I O N S

5                   - - - - -

6         It is stipulated by counsel in attendance that

7    the deposition of Thomas Quinlan, a witness

8    herein, called by the Plaintiff for

9    cross-examination, may be taken at this time by

10   the notary pursuant to notice and subsequent

11   agreement of counsel that said deposition may be

12   reduced to writing in stenotypy by the notary,

13   whose notes may thereafter be transcribed out of

14   the presence of the witness; that proof of the

15   official character and qualification of the notary

16   is waived.

17                  - - - - -

18

19

20

21

22

23

24

4

1                    I N D E X

2   Examination By                                Page

3   Mr. Vardaro - Cross                              5

4
    Plaintiff's Exhibits                           Page
5
    Exhibit 10 - E-mails to Decker from Cameron     60
6
    Exhibit 11 - Informational Summary #9          170
7
    Exhibit 38 - Investigative Summary to Knight   154
8                from Decker, 9/28/15

9   Exhibit 41 - Routing Sheet for Correspondence, 104
                 10/14/15
10
    Exhibit 44 - Informational Summary #8          166
11

12

13

14

15

16

17

18

19

20

21   (Exhibits retained by Spectrum Reporting)

22

23

24

5

```
 1                     THOMAS QUINLAN

 2    being first duly sworn, testifies and says as

 3    follows:

 4                     CROSS-EXAMINATION

 5    BY MR. VARDARO:

 6    Q.        Could you state your name for the

 7    record.

 8    A.        Thomas Quinlan, Q-U-I-N-L-A-N.

 9    Q.        What is your current employment?

10    A.        City of Columbus.

11    Q.        All right.  I will -- I guess I'll

12    start by introducing myself on the record.  My

13    name is Jeff Vardaro.  I'm one of the attorneys

14    for Karl Shaw in this case.

15              Have you been in a deposition before?

16    A.        Yes, sir.

17    Q.        About how many times?

18    A.        A dozen.

19    Q.        Okay.  When was the last time that you

20    can remember?

21    A.        Two, three months ago, maybe.

22    Q.        Okay.  What was the case?

23    A.        I'm trying to recall.  I honestly don't

24    recall.  I have several overlapping right now and
```

6

1    I don't recall the --

2    Q.          Okay.  Related to the work with the

3    Columbus Police?

4    A.          It is.  It is.

5    Q.          Okay.

6    A.          All of them have been.

7    Q.          Was it a discrimination case?

8    A.          No.  I think -- I think the last one I

9    was in -- involved in was out of the police

10   involved shooting possibly.

11   Q.          Okay.  And how about before that, last

12   time before two or three months ago?

13   A.          Same, just random times --

14   Q.          Okay.

15   A.          -- involved in a deposition work

16   related.

17   Q.          Okay.  Do you remember who was

18   conducting the deposition that you did a couple

19   months ago?

20   A.          I don't remember if that was -- that

21   wasn't yours.  I would have to check with city

22   attorney's office.  I do not know.

23   Q.          Okay.  Well, since you don't seem to

24   remember a whole lot about the -- even the more

1    recent depositions, I will go over some of the

2    ground rules, at least that I use during

3    depositions just as a refresh.

4    A.          Yes, sir.

5    Q.          I'm going to be asking you most, if not

6    all of the questions that you're asked today.  If

7    I ask a question and you don't understand it, I

8    would like you to tell me that you don't

9    understand it and I'll try to rephrase it in a way

10   you can understand.  Will you do that for me?

11   A.          Yes, sir.

12   Q.          And if you answer a question and you

13   don't ask me to clarify it, I'm going to assume

14   that you understood the question unless you've

15   told me.

16   A.          I understand that.

17   Q.          I'm also going to be asking you

18   questions about things that are -- at this point

19   happened four or five years ago.  I understand

20   that nobody's memory is perfect.  So if you

21   realize in the course of the deposition that you

22   said something wrong or you couldn't remember

23   something and then something jogs your memory and

24   you do, do you understand that you can interrupt

1  me at any time to correct what you've said or add

2  to it?

3  A.        Yes, sir.

4  Q.        And will you do that for me?

5  A.        Yes.

6  Q.        All right.  I'm going to ask you a

7  couple questions that I ask basically everybody

8  who goes through this.  Are you -- do you have any

9  medical conditions or are you on any medications

10  that would interfere with your ability to testify

11  fully and accurately today?

12  A.        No, sir.

13  Q.        Do you -- is there any other reason

14  that you couldn't testify fully or accurately

15  today?

16  A.        No, sir.

17  Q.        Okay.  I assume from your position that

18  I know the answer to this, but -- have you been

19  convicted of a crime at any point?

20  A.        No, sir.

21  Q.        Okay.  Did you have an opportunity to

22  meet with counsel to prepare for this deposition?

23  A.        Yes, sir.

24  Q.        When did that happen?

9

1    A.          A week or so ago.

2    Q.          Okay.  Was that the only time?

3    A.          Yes, sir.

4    Q.          Okay.  About how long was that prep?

5    A.          30, 35 minutes.

6    Q.          Okay.  And who did you meet with?  Rich

7    Coglianese?

8    A.          Yes, sir.  That was my answer.  Sorry.

9    Pointing doesn't work.  Sorry.

10   Q.          Yeah.  I will say --

11   A.          Right.

12   Q.          -- we're not on video --

13   A.          Right.

14   Q.          -- even if we were --

15   A.          I apologize.

16   Q.          -- the record needs --

17   A.          Right.  I understand that.  Slip of the

18   mind.

19   Q.          And now we'll go into another ground

20   rule, which is I sometimes, maybe more than other

21   attorneys, tend to meander around to my point and

22   so --

23               MR. COGLIANESE:  I haven't noticed.

24   Q.          -- I will say to both you and Rich, if

1    you could let me get to the end of the question

2    before you answer, and I will try to let you get

3    to the end of your answer before I interrupt you.

4    A.        Thank you.

5    Q.        And that will make it easier for Mary.

6              All right.  Did you review any

7    documents to prepare for your deposition today?

8    A.        A few e-mails.

9    Q.        Okay.  Do you remember what e-mails you

10   reviewed?

11   A.        I don't.  They're dated.  They were

12   back during the time this occurred, so I don't

13   recall.

14   Q.        Okay.  Do you remember who the

15   e-mails -- was it e-mails that you wrote or

16   received?

17   A.        Yes.  I think they're e-mails that I

18   wrote to look to see what they -- what the

19   contents was or refresh my recollection as I was

20   preparing.

21   Q.        Okay.  And they were about this -- the

22   investigation of Eric Moore or about Karl Shaw in

23   some other way?

24   A.        Yes, about the Eric Moore

1    investigation.

2    Q.          Okay.  I could be wrong, but I don't

3    know that I've actually seen any e-mails to or

4    from you about this investigation.  Have you been

5    asked to provide e-mails to counsel about this

6    investigation?

7    A.          The requests go to our public records

8    unit and they do a -- they have a software that

9    does a search.

10   Q.          Okay.

11   A.          So I'm never even notified, they just

12   go in and grab them and take them.

13   Q.          Okay.  How did you get the e-mails that

14   you were reviewing?

15   A.          I think I just did a query for Eric

16   Moore or something trying to refresh a date in my

17   mind.

18   Q.          Okay.  And at least a few e-mails

19   popped up?

20   A.          Yes, sir.

21   Q.          Okay.  Were any of them between you and

22   Chief Jacobs?

23   A.          I would have to recall.  I would have

24   to go back and look.  I don't recall any.

```
 1   Q.          Okay.

 2   A.          May have been.

 3   Q.          How about between you and Jennifer

 4   Knight?

 5   A.          There may have been, yes.

 6   Q.          Okay.  What about there's -- I'm going

 7   to get the name wrong, a Jeff Lokai?

 8   A.          It's Lokai.

 9   Q.          What's his first name?

10   A.          Jeff.

11   Q.          Oh, okay.

12   A.          Jeff Lokai.

13   Q.          Was there e-mails --

14   A.          I do not recall any with him.

15   Q.          Okay.  I will ask you once we're done

16   with this deposition, if you could do that query

17   again and send those --

18   A.          Provide them?

19   Q.          -- send what you've got to Rich and he

20   can just double check --

21   A.          Yes, sir.

22   Q.          -- that those have been provided to us.

23               THE WITNESS:  Please remind me of that.

24               MR. COGLIANESE:  Yeah.
```

13

```
 1              THE WITNESS:  Thanks.
 2   Q.         Okay.  Anything -- besides those
 3   e-mails, did you review anything else?
 4   A.         No.  I've not reviewed the
 5   investigation or anything.
 6   Q.         Okay.  Have you seen the complaint in
 7   this case, the lawsuit that Karl Shaw filed?
 8   A.         Probably in the very beginning when it
 9   was originally filed, but not since then.
10   Q.         Okay.  I guess putting aside the
11   specific e-mail, like what was in each particular
12   e-mail, because I understand you don't remember
13   exactly which e-mails you reviewed, was there
14   anything in the e-mails that you reviewed in
15   preparing for this deposition that helped to
16   refresh your memory about some specific thing?
17   A.         Nothing that I -- have no idea what
18   you're going to inquire about, so there's nothing
19   in there that said, oh, yeah, I need to remember
20   that or -- it was just general information about
21   a -- say maybe like a quick direction to Jen
22   Knight or something like that that I may do this
23   or send me this.  Something like that.
24   Q.         Okay.  Do you remember the time
```

14

```
1    frame -- I mean, I'm not asking for dates, but the
2    time frame in terms of what stage of the Moore
3    investigation that these e-mails would have been
4    from?
5    A.        I have no recollection of that.
6    Q.        Okay.  We'll get back into those
7    questions in a little bit, I'll switch subjects
8    for a second.
9              I may have asked this already, but
10   other than the e-mails, any other documents you
11   reviewed to prepare?
12   A.        No, sir.
13   Q.        Okay.  Can you tell me what is your
14   highest level of education?
15   A.        Master's degree.
16   Q.        Where did you get that?
17   A.        Central Michigan University.
18   Q.        Okay.  And when was that?
19   A.        2001, as I recall.
20   Q.        Okay.  Was that in criminal justice or
21   something else?
22   A.        No.  Human resource administration.
23   Q.        Okay.  And where did you get your
24   bachelor's degree?
```

1 A.  The Ohio State University.

2 Q.  Okay.  When was that?

3 A.  1993.

4 Q.  Okay.

5 A.  I believe.

6 Q.  And where did you go to high school?

7 A.  East Liverpool.

8 Q.  Okay.  Graduation?

9 A.  1984.

10 Q.  Okay.  When did you join the Columbus

11 Police?

12 A.  December of 1989, 24th.

13 Q.  Okay.  So you were -- you were going to

14 school at Ohio State as you were in the police

15 department?

16 A.  I was sitting out at that time until I

17 got through my one-year probation, then I went

18 back to school.  I had been going to school

19 previous to that.

20 Q.  Okay.  Do you have a major in -- at

21 Ohio State?

22 A.  Yes, sir.  Criminal justice.

23 Q.  Okay.  All right.  Okay.  And so what's

24 your current title with the Columbus Police?

1    A.          Interim chief of police.

2    Q.          Okay.  When did you become interim

3    chief?

4    A.          February 8th, 2019.

5    Q.          Okay.  And that was when Chief Jacobs

6    required?

7    A.          Yes, sir.

8    Q.          Okay.  Prior to being interim chief,

9    what was your assignment?

10   A.          Deputy chief of police.

11   Q.          Okay.  How long had you been deputy

12   chief?

13   A.          Since October of 2013, as I recall.

14   Right thereabouts.

15   Q.          And my understanding is the deputy

16   chiefs, at least under Chief Jacobs'

17   administration, were assigned -- they have a

18   particular divisions of the police department that

19   were under each deputy chief?

20   A.          Some divisions, yes, sir.

21   Q.          Okay.  And did -- were your

22   subdivisions the same throughout your time as

23   deputy chief or did they change?

24   A.          No.  They stayed the same.  I was

1    patrol north deputy chief the whole time.

2    Q.        Okay.  Prior to being -- actually, I'm

3    sorry.

4              In October 2013 when you became deputy

5    chief, was Chief Jacobs already the chief?

6    A.        Yes, sir.

7    Q.        Okay.  What was your assignment prior

8    to being deputy chief?

9    A.        Police commander.

10   Q.        Okay.  And what was your -- what were

11   you the commander over?

12   A.        Before I was promoted, training bureau.

13   Q.        Training bureau?  Okay.

14             When were you promoted to commander?

15   A.        It was about September of 2009, as I

16   recall, right around that September, October time

17   frame.

18   Q.        Okay.  Prior to that, you were a

19   lieutenant?

20   A.        Yes, sir.

21   Q.        How long were you a lieutenant?

22   A.        2001 -- February 2001, I believe, until

23   2009.

24   Q.        Okay.  When -- and prior to that I

1    assume a sergeant?

2    A.        Yes, sir.

3    Q.        When did you get promoted to sergeant?

4    A.        February 2006 -- or 1996.

5    Q.        Okay.  I don't want to go through every

6    single assignment that you had.

7    A.        I understand.

8    Q.        Were you in internal affairs at this

9    point?

10   A.        No, sir.

11   Q.        Okay.  Were you ever over internal

12   affairs?

13   A.        No.  I was companion to it,

14   professional standards bureau, which is -- handles

15   all the cases internal affairs puts out to the

16   chief for departmental charges.

17   Q.        When you say you were "companion," did

18   you mean you were in the professional standards

19   bureau?

20   A.        Yes, sir.

21   Q.        Okay.

22   A.        It's different than internal affairs,

23   internal affairs bureau and professional standards

24   bureau.

19

1    Q.        When were you in professional

2    standards?

3    A.        It was roughly some month in 2002,

4    early 2002 until April 2005 or '6.

5    Q.        Okay.  And that was under Chief Jackson

6    or --

7    A.        That was under Chief Jackson.

8    Q.        Okay.

9    A.        Might even have been 2004.  I

10   apologize.  I don't recall.  I think it was 2004,

11   actually.

12   Q.        Okay.  When you started or when you

13   finished?

14   A.        When I finished and when I went to

15   patrol.

16   Q.        A couple years?

17   A.        So February of 2004 I went to patrol.

18   Q.        Okay.  So a couple of years?

19   A.        Yes, sir.

20   Q.        Okay.  Is there a deputy chief, or was

21   there at the time that you were a deputy chief

22   that is over internal affairs?

23   A.        I don't recall at what point, but the

24   most recently internal affairs was a direct report

1    to the chief of police.

2    Q.        Okay.  But that was throughout the time

3    that Chief Jacobs was chief or --

4    A.        Yes.

5    Q.        Okay.  I want to talk a little bit

6    about your training in EEO, equal employment

7    opportunity.

8    A.        Yes, sir.

9    Q.        I guess I'll start with:  Did you get

10   special training as part of your master's degree

11   in human resources administration in equal

12   employment opportunity?

13   A.        I don't know if I would classify it as

14   specialized training.  I had courses between labor

15   law, administrative law and regulatory processes,

16   and other courses in human resources like that

17   that would -- that part of the course spoke on

18   EEO.

19   Q.        Okay.  No individual course just about

20   discrimination or retaliation or anything like

21   that?

22   A.        No, sir.

23   Q.        Okay.  While you were with the Columbus

24   Division of Police, have you had training in

1    discrimination, retaliation or other EEO

2    procedures?

3    A.          In-service training, yes, sir.

4    Q.          Okay.  When was your last in-service

5    training?

6    A.          I would have to review records.  I do

7    not know.

8    Q.          Okay.  Was it this year?

9    A.          We tend to do something at least every

10   other year at a minimum.

11   Q.          Okay.  Who provided the last in-service

12   training that you did on EEO if you remember?

13   A.          I would have to review records.  I

14   don't remember.  But we also do ethics training

15   every year, which kind of touches on it as well.

16   And Ohio Ethics Commission comes in and provides

17   that training.

18   Q.          Okay.  Do you remember whether your

19   last ethics training dealt with discrimination or

20   retaliation?

21   A.          I don't recall specifically.

22   Q.          Okay.  Do you remember whether your

23   last EEO training with the CPD was done by folks

24   from Columbus -- city of Columbus HR or Columbus

1    Police HR or somebody from the outside?

2    A.          That course is usually team taught by a

3    regular police instructor and a human resources

4    manager.

5    Q.          Okay.  When you say, "a regular police

6    instructor," you mean internal instructor from

7    CPD?

8    A.          Yes, sir.

9    Q.          Okay.  Who's the person at CPD who does

10   that?

11   A.          I've done a lot of training.  I don't

12   remember which one handles which activity.

13   Q.          Okay.  Have you ever been the person

14   that provided the training?

15   A.          No, sir.

16   Q.          Okay.  In any of the positions that we

17   just walked through, was it your responsibility

18   to, I guess other than as a general command staff

19   officer, was it your responsibility to administer

20   CPD's EEO policies?

21   A.          No.  I just want to add to what you

22   said, other than it's all our responsibility to

23   report.  I don't administer any of the policies.

24   Q.          Okay.  So your understanding as a CPD

1    officer is that if you see or learn about some

2    kind of discrimination or retaliation going on

3    within the CPD, you're obligated to report it to

4    somebody?

5    A.          Report to human resources manager and

6    to internal affairs.

7    Q.          Okay.  Have you ever done that?

8    A.          Yes.

9    Q.          When did you do that?

10   A.          I would have to review records and go

11   through IA files.  I don't recall, but it's --

12   this is one of the cases I sent forward.  I

13   mean --

14   Q.          When you say, "this is one of the

15   cases," you mean Eric Moore's investigation?

16   A.          Sorrell, Eric Moore investigation.  Any

17   other paperwork that came through on these

18   allegations that would come to the deputy chief, I

19   would send them to IA and instruct them to

20   investigate.  IA works with HR and decides who's

21   going to specifically handle it, if it's going to

22   be someone in the city administration or if IA

23   specifically is going to.

24   Q.          Okay.  So you would have been the one

1   that sent this to IA to be investigated in the

2   first place as an EEO?

3   A.          Yes, I -- as I recall.  I don't have

4   the record to reflect on right here, but as I

5   recall, yes.

6   Q.          Okay.  And I'm going to delve into this

7   in a couple of minutes, but just to try to get it

8   established, I guess.  At the time that the first

9   allegations from Wes Sorrell came out about Eric

10  Moore and discriminatory comments he allegedly

11  made, Eric Moore and Wes Sorrell were in your

12  chain of command?

13  A.          At the time they surfaced, yes.

14  Q.          Okay.  And I just want -- we've had

15  some confusion over this, but at the time Eric

16  Moore allegedly made the discriminatory comments,

17  he was in SRB?

18  A.          Yes, sir.

19  Q.          Was SRB under your chain of command?

20  A.          Yes, sir.

21  Q.          Okay.

22  A.          Now, I want to clarify real quick.  At

23  the time they were reported, I was there.  At the

24  time they actually occurred, I don't recall if I

1  was in that assignment yet or not.

2  Q.        Because you weren't deputy chief yet?

3  A.        Correct.

4  Q.        Okay.  All right.  So stepping back to

5  EEO training.  Is -- is it your understanding that

6  Columbus Police has its own EEO rules and

7  regulations separate from the laws that apply to

8  everybody?

9  A.        They're complimentary to the laws.

10 Q.        Okay.  What do you mean by that?

11 A.        They use the language of statute to

12 direct our employees of what the responsibilities

13 and expectations are, policy.

14 Q.        Okay.  Can there be violations of CPD

15 EEO policy that don't necessarily rise to the

16 level of a legal violation?

17 A.        Yes.

18 Q.        Okay.  But pretty much if it violates

19 state and federal EEO laws, it's also going to

20 violate CPD policy?

21 A.        Yes.  Not only the EEO policy, but we

22 also have a rule of conduct to obey laws and

23 ordinances.

24 Q.        So just in general, any CPD officer

1    that does something that violates the law, it's

2    going to violate CPD policy always basically?

3    A.       Yes.  With the condition that we have

4    to first investigate and determine just cause.

5    Because the contract requires, you know, a full

6    just cause determination prior to determining

7    sustained finding.

8    Q.       Okay.  And in your experience or to

9    your understanding, while you were deputy chief

10    under Chief Jacobs, was -- was it CPD's policy to

11    treat EEO violations as particularly serious?

12    A.       Yes.

13    Q.       Okay.  Are you familiar with the term

14    "critical misconduct" as it applies to the CPD?

15    A.       Yes.

16    Q.       What is critical misconduct?

17    A.       Conduct that would likely result in

18    departmental charges or some substantial job

19    action.

20    Q.       Okay.  Would an EEO violation typically

21    be treated as critical misconduct?

22    A.       Depends on the nature of it.  There are

23    some that are very -- relatively innocuous in

24    nature that someone may report.  There's others

1    that are blatant and need immediate, you know,

2    follow up.

3    Q.         Okay.  Can you give me an example of an

4    innocuous EEO violation?

5    A.         Someone is typing out something on a

6    computer screen, an e-mail to somebody and

7    somebody passes by behind them and sees something

8    that -- that, you know, says something that --

9    says something that's more of say a sexual nature

10   or whatever.  Someone takes offense to it.  That's

11   not directed towards that person; wasn't meant to

12   be seen by that person.  It's not something that's

13   horrendous, you know, just something that whatever

14   the term was an individual took offensively, even

15   though we don't know that it was intended that way

16   or it's used in maybe common language.

17             But if someone took offense to that,

18   then we would investigate that.  But that could be

19   innocuous.  It's not particularly harmful on its

20   face.  You have to understand what the person --

21   how the person received it.

22   Q.         Okay.  Is it also fair to say that if

23   something already violates some kind of CPD rule

24   on its own, but also is determined to be an EEO

1    violation, that that would make it more serious?

2    A.          Again, you can violate CPD rule and

3    EEO, but there's a spectrum or a continuum of how

4    critical that particular phrase, comment, action

5    was compared to others.

6    Q.          Okay.  Do CPD rules also prohibit

7    retaliation against officers who participate in

8    EEO investigations?

9    A.          Yes.

10   Q.          And they also prohibit retaliation

11   against officers who participate in internal

12   affairs investigations and other forms of

13   investigation, correct?

14   A.          Be more specific, all employees.

15   Q.          Okay.  Not just officers.

16   A.          Correct.

17   Q.          Would retaliation against an officer

18   who participated in the EEO investigation

19   typically be considered critical misconduct?

20   A.          Retaliation, yes.

21   Q.          Okay.  And how about retaliation

22   against an officer who participated in an IA

23   investigation?

24   A.          Let me phrase it in maybe a slightly

1   different way.  Not rephrase it, but answer it in

2   a slightly different way.  We take them to be

3   critical on their face.  We do not take job action

4   against someone without proof, so we have to

5   investigate first, because the contract requires a

6   person suffers no career disadvantage except for

7   just cause, and there's seven steps that we have

8   to prove before we can take a particular action

9   against them.

10  Q.        Did you say seven steps or some steps?

11  I didn't hear what --

12  A.        Well, there's seven steps typically

13  associated with just cause.

14  Q.        Okay.  Can you run me through quick

15  what those seven steps are?

16  A.        I know you know them, you're just

17  testing me, so...

18  Q.        I literally don't.  We don't do a lot

19  of FOP arbitrations, so...

20  A.        The seven steps are there must be a

21  rule.

22            The rule must be -- number two, the

23  rule must be reasonably related to the efficient,

24  effective operation of the workplace.

1          There has to be notice, number three.

2    Notice of a rule to the employee so you know it's

3    a rule.

4          Number four, there has to be an

5    investigation conducted.

6          Number five, the investigation must

7    provide sufficient proof that the rule was

8    violated by a preponderance of the evidence, or

9    sometimes it's looked at as clear and convincing

10   evidence.

11         Number six, you have to take into

12   consideration what you've done to other employees

13   who have done the same thing.

14         And number seven, you have to consider

15   the employee that's -- that's at fault or accused,

16   their specific work record, compliments, past

17   discipline, awards, stuff like that to see, have

18   we treated everybody the same?  Is there a reason

19   to progress this for this employee but not

20   another?  So you have to compare them.  That's the

21   seventh step.

22   Q.        Okay.  And those seven steps are what

23   you have to --

24              THE WITNESS:  Pass?

31

1          MR. COGLIANESE:  You did.

2     Q.          That was impressive, by the way.

3     A.          That may be the only one I get.

4     Q.          Those seven steps are what you have to

5     go through to justify departmental charges against

6     somebody?  Is that -- is that what there are steps

7     for?

8     A.          Departmental charges, or to take some

9     type of action that could cause someone a career

10    disadvantage.  Sometimes it could be just

11    relieving a person of duty can impact their

12    career, because they're not able to work special,

13    they can't maybe go to court and earn overtime or

14    schedule for other overtime assignments, so they

15    are losing pay without any just cause.  So there's

16    many issues that we have to think of.

17    Q.          Okay.  All right.  I want to just walk

18    through some of your relationships with people who

19    are involved in this case, witnesses and

20    decision-makers, things like that.

21    A.          Yes.

22    Q.          First of all, can you tell me your

23    relationship with retired Chief Jacobs?

24    A.          A mentor to me.  Has helped progress my

1    career from the time I made lieutenant.  Has, you

2    know, worked with me and helped develop me along

3    the way.  I have a lot of respect for Chief

4    Jacobs.

5    Q.         Okay.  Would you consider her a

6    personal friend?

7    A.         We haven't done anything outside of

8    work together as far as any type of interaction,

9    but I would consider her a friend.

10    Q.         Okay.  When did you first meet Chief

11    Jacobs?

12    A.         Throughout my career, throughout -- I

13    mean, she was a patrol lieutenant.  And when I was

14    an officer, I believe, and I had opportunities to

15    encounter her in the patrol admin office

16    periodically, didn't really get to know her much

17    until she was a commander over radio.

18          When I was promoted to lieutenant, she

19    called me in.  I was first on the list, so I had a

20    choice between three jobs that were open, because

21    three of us were being promoted.  And she invited

22    me to come work for her at radio room since I had

23    a choice of three jobs, and I accepted that

24    request.

33

1   Q.         Okay.  So she's been your direct

2   supervisor several different times over the course

3   of your career?

4   A.         Yes.  In radio room for a short time

5   period before she was moved to internal affairs.

6   And C4 and I was L4, so patrol.  Then as a deputy

7   chief -- actually, I'm sorry, she was a deputy

8   chief over me in training bureau for a short time

9   before she was made chief.  And then as chief, she

10  promoted me to deputy chief.

11  Q.         Okay.  When -- you said she was over

12  internal affairs at some point?

13  A.         Yes, sir.

14  Q.         And you were in that role, you had some

15  direct relationship with her?

16  A.         No, not direct relationship with her.

17  I, again, was assigned to professional standards.

18  I -- all the investigators, sergeants that

19  completed cases would bring their case to me for a

20  just cause review, and I would draft the

21  departmental charges against an officer, present

22  those charges to the chief and to the director for

23  suspension or termination for officer misconduct.

24  I had little to no interaction with Chief Jacobs

34

1    as she was the internal affairs commander.

2    Q.        Okay.  But you were -- you were in

3    professional standards when she was internal

4    affairs commander?

5    A.        Yes.

6    Q.        Okay.  What is the role -- you said you

7    would deal directly with the sergeants who did the

8    investigations when you were in professional

9    standards.  What is the role of the commander of

10   internal affairs in relation to professional

11   standards bureau?

12   A.        To assign cases, direct the cases as

13   they progress, and to review and approve the case

14   as it's finalized before it goes to chain of

15   command for decisions.

16   Q.        Okay.  Does the commander of IAB

17   participate in the decision-making process about

18   what things rise to the level of departmental

19   charges?

20   A.        They would -- sorry, they would have

21   input.

22   Q.        Okay.  Does professional standards

23   bureau -- go the other way around.  Does the

24   professional standards bureau have input into the

1    scope of an internal affairs investigation in

2    terms of what things are worth investigating and

3    what things are not?

4    A.          Not at that stage that you described.

5    Q.          What is -- is there a stage at which

6    they would?

7    A.          After the case comes to the chain of

8    command and the chief approves departmental

9    charges, it would come to the discipline grievance

10   liaison lieutenant, which was my role.  And I

11   would review it for just cause.  And I may say, if

12   we are going to prove this case to the standard we

13   need to meet, I will need this additional

14   information so I could send it back for additional

15   investigation at that point in order to close

16   gaps.

17   Q.          Okay.  So professional standards would

18   never basically be in a position of saying, don't

19   bother following up on this, this isn't worth

20   reviewing, that kind of thing.  But they might be

21   in the opposite position of saying, we need to do

22   more follow up on a particular issue in order to

23   justify such and such action?

24   A.          That virtually sounds correct.

1    Q.          Okay.

2    A.          I don't want to say never.  You said

3    never.

4    Q.          Yeah.

5    A.          I can't say never would be involved,

6    but virtually, that would be a correct statement.

7    Q.          Okay.  All right.  Thank you for

8    clarifying.

9              How about Deputy Chief Ronald Gray,

10   what's your relationship with him?

11   A.          Colleague.

12   Q.          Okay.  Is Deputy Chief Gray still with

13   the department or --

14   A.          He's retired.

15   Q.          Okay.  Did you ever report directly to

16   Deputy Chief Gray or vice versa?

17   A.          No, sir.

18   Q.          Okay.  Consider him a friend?

19   A.          Colleague.  Again, I don't do anything

20   outside of work.  I've never had interaction with

21   him outside of work, but I consider him a friend

22   through work.

23   Q.          Okay.  How about Deputy Chief Kuebler?

24   A.          I'm familiar with him.

37

```
 1   Q.        He's still with the department?
 2   A.        He is.
 3   Q.        Okay.  Is he a friend of yours?
 4   A.        Again, never anything outside of work,
 5   professional acquaintance and friend through work.
 6   Q.        Okay.  Did either of you report to the
 7   other directly at any point in your careers?
 8   A.        We were both street lieutenants at the
 9   same time.  Other than right now, I'm interim
10   chief, he reports to me as the deputy chief, I
11   can't think of any other time.
12   Q.        Okay.  How about Commander Gary
13   Cameron?
14   A.        Yes, sir.
15   Q.        I'm just going to go through those same
16   basic questions.  Are they a personal friend, are
17   they a colleague, are they --
18   A.        Yeah.
19   Q.        -- your arch nemesis, and, you know,
20   did you report to them or did they report to you.
21   A.        Okay.
22   Q.        Cameron?
23   A.        Or Cameron?  Not a personal friend.  I
24   have been to his house for a birthday party for
```

1    his sister-in-law, who was my secretary.  I've

2    been on one motorcycle ride with him with a group

3    of 20 people.  Other than that, no other direct

4    relationship.

5    Q.        Okay.  Are you in some kind of police

6    motorcycle club or group or something?

7    A.        No, no group like that that I know of.

8    Q.        Okay.  I understand from previous

9    depositions that a couple different family members

10   of Gary Cameron are secretaries in the department?

11   A.        His spouse and his mother -- his spouse

12   and his sister-in-law.

13   Q.        Okay.  Is one of them your secretary

14   currently?

15   A.        Not currently.

16   Q.        Okay.  Have they been at some point?

17   A.        Yes.  Both of them actually were at one

18   point.  As deputy chief, Nancy Cameron was my

19   first secretary and then Donna Custer was my

20   second secretary.

21   Q.        All right.  But they're both still

22   secretaries in the department?

23   A.        Yes.

24   Q.        Okay.  And no direct reporting

1    relationship between you and Cameron at any point?

2    A.          Yes.  He directly reported to me.

3    Q.          Okay.  When he was commander or --

4    A.          Yeah.  As a commander, I was deputy

5    chief, he was patrol zone one, he directly

6    reported to me.

7    Q.          Do you remember the time frame?

8    A.          He came over to zone one after he was

9    removed from narcotics vice, which would have

10   been, I don't know, 2016 maybe.  I don't recall.

11   Q.          Okay.

12   A.          '17 maybe, 2017.  Don't recall the time

13   frame.

14   Q.          Do you know why he was removed from

15   narcotics vice?

16   A.          Chief did not advise me.

17   Q.          Okay.  The same questions Commander --

18   or I guess she's acting -- or interim Deputy Chief

19   Jennifer Knight?

20   A.          Yes.

21   Q.          Go ahead.

22   A.          Yeah.  She's a direct report to me now.

23   I'm trying to think if she's ever been a direct

24   report other times.  I don't recall her ever being

1   a direct report to me or me to her.  Little to no

2   outside interaction.  We've been to a couple FOP

3   events after work hours where she was there, I was

4   there, her husband was there.  And other than

5   that, really nothing else that stands out with

6   acting Deputy Chief Knight.

7   Q.        Okay.  Is acting Deputy Chief Knight's

8   husband a police officer also?

9   A.        Police sergeant.

10  Q.        A police sergeant with CPD?

11  A.        Yes, sir.

12  Q.        Okay.  Has he ever been your direct

13  report?

14  A.        No, sir.

15  Q.        Okay.  What's his assignment?

16  A.        Internal affairs currently.

17  Q.        Okay.  Like the family business, I

18  guess.

19            Lieutenant Ty Brust?

20  A.        Yes, he's a classmate of mine.

21  Q.        Okay.  Consider him a friend?

22  A.        I consider him a friend.  We're

23  classmates.  We've spent a lot of time together.

24  But, again, over the last 30 years, since the

1    academy, other than a few reunions or

2    get-togethers, nothing outside of work.

3    Q.        Okay.  Lieutenant Echenrode -- or is he

4    commander now?

5    A.        He's commander now.

6    Q.        Okay.  Commander Echenrode?

7    A.        A great deal of respect for Commander

8    Echenrode.  No outside of work relationship or

9    activity.  He was a direct report to me when I was

10   deputy chief, and he was commander over SRB.  No

11   other direct report that I recall.

12   Q.        Okay.  When you say you have a great

13   deal of respect for him, does that come from

14   something in particular or you just --

15   A.        I think he's a straight shooter and

16   calls shots like he sees them.  And he was in SWAT

17   for years and had a reputation of being very level

18   headed and just an all around -- shortest way to

19   say it, everybody likes Joe Echenrode.

20   Q.        Okay.

21   A.        Not the arch nemesis you described.

22   Q.        Okay.  Any of these people that we

23   described previously not fit those descriptions?

24   I mean --

42

1    A.          None of them that you've said so far

2    are arch nemesis, no.

3    Q.          Okay.  Lieutenant Kemmerling?

4    A.          I know Lieutenant Kemmerling.

5    Q.          Okay.  Friend of yours?

6    A.          Absolutely not.

7    Q.          Okay.  Arch nemesis?

8    A.          Not a nemesis.

9    Q.          Okay.  What made you say, "absolutely

10   not"?

11   A.          I -- again, I explained Commander

12   Echenrode I have a great deal of respect for.  I

13   would describe Lieutenant Kemmerling as the

14   opposite.

15   Q.          Okay.  What -- any particular bad

16   experiences or --

17   A.          I think he's failed as a supervisor.

18   Q.          Okay.  In what sense?

19   A.          He's failed to supervise.

20   Q.          Okay.

21   A.          He had a job to do.  And he's had

22   multiple assignments and has not performed those

23   assignments to the expectations that I would have.

24   Q.          Okay.  Can you give me an example?

1  A.        Most recent one would be the Stormy

2  Daniels case.

3  Q.        Okay.  He was over vice?

4  A.        Yes.

5  Q.        Okay.

6  A.        He oversaw the operation.

7  Q.        Okay.  And what would you say he did

8  that didn't -- that he failed as a supervisor now?

9            MR. COGLIANESE:  And I'm just going to

10  jump in with an objection to the extent that it is

11  not privileged either through FBI investigations

12  that may or may not still be ongoing or anything

13  else, you can answer the question, but do not

14  divulge any information that is still privileged.

15  A.        Certainly understand that.

16            What did he do or didn't he do?  He did

17  not act as a supervisor over that particular

18  incident.  He was at scene.  He allowed officers

19  to make decisions that have greatly impacted the

20  division.  And he was aware of those decisions.

21  Did not do his job as the supervisor.  And he knew

22  about the operation in advance and was the acting

23  commander at the time and made no notification to

24  anyone for someone else to say time out.

1   Q.        Okay.  What about with respect to this

2   situation that we're talking about today and the

3   Eric Moore investigation, Karl Shaw's situation.

4   Do you feel like he had similar failures when he

5   was over -- he was over SRB at some point?

6   A.        He was.  The enforcement team, and I

7   named him, even though the original complaint did

8   not, I added him as a focus for failure to

9   supervise Eric Moore properly.  Eric Moore was

10  ultimately charged and terminated for theft of

11  time basically, overtime, but he turned a blind

12  eye to.  Arbitrator ultimately ruled to give

13  Sergeant Moore's position back, and a lot of that

14  was because Lieutenant Kemmerling failed in his

15  duties and signed the slips and asked no

16  questions, and that was his job to do.

17  Q.        Okay.  Was Lieutenant Kemmerling --

18  actually did he have anything sustained against

19  him in this investigation?

20  A.        The allegation I made against him was

21  determined by internal affairs to be not

22  sustained, which means that neither prove nor

23  disprove it.

24  Q.        Okay.  When internal affairs says, "not

1    sustained" on an investigation, the chain of

2    command can still overturn that and sustain it,

3    right?

4    A.         The chain of command can recommend and

5    argue more harsh or more lenient.  The deputy

6    chief will make the final determination.

7    Q.         Okay.  When you say, "more harsh or

8    more lenient," that can include turning something

9    from unfounded or not sustained to sustained?

10   A.         Yes, they can recommend that.

11   Q.         Okay.  You didn't do that in this

12   particular situation?

13   A.         I did not, because as the case was

14   presented to me without sending it back for -- he

15   was secondary to the main issue.  I wanted to move

16   forward with the termination case against Sergeant

17   Moore.  To have sent that back to get more

18   information, because IA did not obtain adequate

19   information in my opinion to have sustained it.

20   Had they done that, I think there would have been

21   a case to be made for failure to supervise,

22   mis-mal or nonfeasance.  The real issue at that

23   time was Sergeant Eric Moore and dealing with his

24   misconduct, so it would have taken several months

1    to send it back, which means this would have been

2    lingering, Eric Moore, so I left it not sustained

3    and went after the employee who I felt needed

4    terminated.

5    Q.          Okay.  And there was another employee

6    also who had charges sustained against him --

7    A.          Wes Sorrell.

8    Q.          -- which was Wes Sorrell?

9    A.          Yes, sir.

10   Q.          Okay.  All right.  Well, that's a good

11   segue into what's your relationship, then, with

12   Eric Moore?

13   A.          There is zero relationship other than

14   supervisor/subordinate.

15   Q.          Okay.  Did you ever supervise him

16   directly?

17   A.          Never directly.

18   Q.          Okay.  He was just several links down

19   in the chain at some points?

20   A.          At some point he was in my chain of

21   command, but several links down as you said.

22   Q.          How about Wes Sorrell?

23   A.          Never had any direct supervision of

24   him.

47

1    Q.        Okay.  And no personal relationship?

2    A.        No.

3    Q.        Okay.  How about Scott Watkins?

4    A.        Same, no -- at one point in the links

5    of the chain of command, but never direct report.

6    Q.        Okay.  Larry Wilson?

7    A.        I coached Larry Wilson as an FTO.

8    Other than that, I have no interaction or

9    throughout his career had very little

10   interaction --

11   Q.        Okay.

12   A.        -- dealings with him.

13   Q.        When were you his FTO?

14   A.        1992 maybe.

15   Q.        Okay.  How about Sergeant Doug

16   Williams?

17   A.        Only through the links of the chain of

18   command that I have interaction with him there.

19   Q.        Okay.  Eric Cornett?

20   A.        Again, through the chain of command.

21   Q.        Okay.  Stephanie Gibson?

22   A.        Supervised her once directly as a

23   forgery fraud sergeant.  She was a forgery fraud

24   detective.

1    Q.          Okay.

2    A.          And then again in the chain of command

3    later in her career.

4    Q.          Okay.  In your -- and not a personal

5    friend of yours?

6    A.          No.

7    Q.          Okay.  Did you have any negative

8    interactions with her when you were supervising

9    her?

10    A.          Nothing other than supervisory

11    corrective action.  Nothing, no serious

12    discipline, nothing that was -- would have maybe

13    questioned her competency or anything like that.

14    Q.          Okay.

15    A.          And just to clarify, all these I say

16    there's no personal relationship, it's not that I

17    dislike any of them, I just have no outside work

18    relationship with any of them.

19    Q.          Sure.  Just going back to Stephanie

20    Gibson for a second.  In your dealings with her,

21    you found her to be truthful, reliable?

22    A.          Interactions I had with her, yes.

23    Q.          Okay.  Is there some -- I mean --

24    A.          Nothing I know of.

1  Q.          Okay.

2  A.          I'm just --

3  Q.          Okay.

4  A.          -- for me, I've always had reliable

5  interactions with her.

6  Q.          Okay.  Mary Battle, do you know her?

7  A.          Same, yes.

8  Q.          Okay.  Just a -- some kind of indirect

9  supervisory relationship at some point?

10  A.          Yes.

11  Q.          Okay.  Falacia Dragin?

12  A.          I know of her.

13  Q.          Ever supervise her?

14  A.          I was -- at one point I was ultimately

15  over patrol admin and she was assigned.  I don't

16  recall what -- I think she was patrol south, so

17  she was assigned to deputy chief.  But when she

18  was administrative unassigned or just assigned to

19  patrol admin office in a restricted duty capacity,

20  my chain of command supervised her on a daily

21  basis, but she was permanently assigned patrol

22  south.

23  Q.          For a short period of time, long period

24  of time?

50

1    A.        Long period of time.

2    Q.        Okay.  So you know her relatively well?

3    A.        I don't know that I would even know her

4    to see her.

5    Q.        Okay.

6    A.        But I know the name.

7    Q.        Okay.  Karl Shaw?

8    A.        I know him.

9    Q.        Okay.  What -- how would you describe

10    your relationship?

11    A.        Same as with everyone else,

12    professional acquaintance.

13    Q.        Okay.  Never supervised him directly?

14    A.        No, not directly.

15    Q.        Okay.  Whitney Lancaster?

16    A.        I know him.

17    Q.        Okay.  Ever supervise him directly?

18    A.        Not directly.

19    Q.        Okay.  Not a personal friend?

20    A.        No.

21    Q.        Okay.  All right.  I think I'm finished

22    with that list.

23            I --

24    A.        There's 1,900 people, come on.

1   Q.        No, I know.  I could keep going and

2   going, but I think I'll stop.

3   A.        Okay.

4   Q.        We started getting into this and I'll

5   jump back to it.  When was the first that you

6   heard -- or what was the first that you heard

7   about what became the investigation of Eric Moore

8   that we were talking about?

9   A.        As I recall, this could be off a little

10  bit, but as I recall at the time, Lieutenant

11  Echenrode was assigned, came in and discovered

12  some irregularities and brought it to my

13  attention, or through the chain of command.

14  Q.        Okay.  Do you remember whether the

15  irregularities had to do with discriminatory

16  comments that Eric Moore made or whether it was

17  something else?

18  A.        I think the very first thing started

19  out with the Sorrell/Moore investigation.  And as

20  that progressed and Sorrell was under -- as I

21  recall it, when Sorrell felt he was under

22  suspicion of critical misconduct, he started

23  making allegations from years earlier that then

24  were brought to my attention that involved an EEO

1    nature.

2    Q.        Okay.  And when you say the

3    Sorrell/Moore investigation, you're talking about

4    the theft of time, theft of equipment, that kind

5    of --

6    A.        Yes, sir.

7    Q.        Okay.  And I will say most of the

8    questions that I have for you today obviously are

9    about the EEO aspect of things.

10   A.        I understand.

11   Q.        As opposed to the theft of time.  I may

12   get into some of that stuff one way or the other,

13   but -- but I will try to separate those out for

14   you.

15             What did you do when you first became

16   aware of this -- these allegations against Moore?

17   A.        Directed Lieutenant Echenrode to

18   conduct some interviews to get the facts of what

19   we were dealing with and put it in writing and

20   forward it.

21   Q.        Okay.  Who did you direct him to

22   interview?

23   A.        I don't recall the exact list of

24   people.  I think, you know, you mentioned --

1    sorry, I'm not supposed to look -- Watkins, that's

2    it.  Watkins, Doug Williams, might have been

3    Stephanie Gibson, people that would have been

4    around whatever Wes Sorrell had reported that may

5    have overheard or had knowledge of the allegation

6    of, if you will, hostile work environment.

7    Q.        Did you direct Echenrode to interview

8    Eric Moore?

9    A.        He was -- would have been the person --

10   I'm trying to remember.  We're speaking about the

11   EEO part of it?

12   Q.        Yeah.

13   A.        He would have -- I think I -- no, I

14   think what I did was direct him to gather the

15   information, what the allegation is from who might

16   have -- may have been witnesses and send it

17   forward.  Then I would assign it to IA who would

18   conduct a full investigation, which would have

19   involved an interview with the person that is

20   accused of misconduct.

21   Q.        Okay.  So this was after -- I mean, at

22   that point, you had already received the other

23   allegations, the property and time issues?

24   A.        I did.  I did.

1   Q.          What did you do when you learned about
2   those allegations?
3   A.          Well, the theft of time I assigned for
4   investigation as well, and directed that Commander
5   Curmode tighten up the oversight or the failure to
6   oversee the use of time.  And the allegation that
7   was forwarded to me included a self-disclosure of
8   what was, on its face, criminal conduct by Wes
9   Sorrell.  Since it was a self-admission, I ordered
10  him relieved of duty and a criminal investigation
11  be conducted against him.
12  Q.          Okay.  And I think you sort of
13  partially answered this.  You didn't direct for
14  Eric Moore to be relieved of duty at that point?
15  A.          Not at that time.  It was an allegation
16  from the years prior.
17  Q.          Okay.
18  A.          And theft of time was something that,
19  again, ranged over time that there was -- it
20  needed to have an investigation before, because he
21  denied it.  It wasn't a self-admission.
22  Q.          Okay.
23  A.          They needed proof first.
24  Q.          At the time that this stuff was coming

1    up, I mean, I'll represent to you my understanding

2    is the first indication that there was some

3    alleged misconduct by Moore or Sorrell would have

4    been August of 2014.  Does that sound about right?

5    A.        I'll go by your recollection that you

6    have in front of you better than my recollection.

7    Q.        At that point, you -- SRB was in your

8    chain of command as deputy chief?

9    A.        At that point, yes.

10   Q.        Okay.  Was narcotics in your chain of

11   command?

12   A.        No, sir.

13   Q.        Okay.  Do you remember that Eric Moore

14   at that -- by that time had transferred from SRB

15   to narcotics?

16   A.        I don't remember if it was by that

17   time.

18   Q.        Okay.

19   A.        At some point, I know he did.

20   Q.        Is it possible that he would have

21   already transferred?

22   A.        I would have to review records, but

23   it's possible.

24   Q.        Okay.  Assuming that Moore was already

1    in narcotics at the time these allegations came

2    up, would it have been your call about whether or

3    not to relieve him of duty?

4    A.          If evidence was brought to my attention

5    that we had corroboration of a theft offense in

6    the SRB chain of command, it would have been -- I

7    could have ordered that.  It would have been one

8    of the -- one of the decisions I was allowed to

9    make.  If it was a hostile work relation or

10   retaliation claim or anything like that, his

11   current chain of command would make that.

12   Q.          Why the distinction?

13   A.          Because we have to have spans of

14   control and unity of command.  It's hard to have

15   multiple people making decisions when there's

16   other deputy chiefs where I'm making decisions of

17   -- career-impacting decisions against their

18   members.  I can go to them and say, here's what we

19   know, here's what I recommend, but it's their

20   decision to make.

21   Q.          Okay.

22   A.          And Deputy Chief Mike Woods at the

23   time, I believe over narcotics.

24   Q.          Is it possible it was Ron Gray?

57

1    A.          At that time it could have been Ron

2    Gray.  I'm sorry.  It was a transition period

3    there.

4    Q.          Okay.  Woods supervised narcotics

5    previous to Gray or after?

6    A.          Super -- previous to Gray, you mean

7    Woods?

8    Q.          Yeah.  Woods -- that's what I'm saying,

9    was Deputy Chief Woods over narcotics before Gray

10   or after Gray?

11   A.          Okay.  Here's where there's just a

12   little bit of confusion and I've got to remember

13   myself.

14   Q.          Sure.

15   A.          We had an executive staff retreat where

16   I don't remember all the reporting chains, because

17   Gray was over narcotics at some point.  At some

18   point Chief Jacobs changed narcotics bureau to

19   place under the Homeland Security subdivision,

20   which Mike Woods was over.  I don't remember if

21   that's while Deputy Chief Gray was still here or

22   if he had retired and Mike Woods -- I don't

23   remember dates of all those.  But Deputy Chief

24   Gray had it originally and at some point Mike

1    Woods had it.  I don't remember the -- who had it

2    at what point.

3    Q.       Okay.  So let me step back for a

4    second, because I think I might be confused about

5    something.

6          So you had said if there was a theft

7    offense in the SRB chain of command, you would

8    have responsibility for relieving a person of duty

9    if it was corroborated.  But if it was a hostile

10    work environment or discrimination of some kind,

11    then that person's current chain of command would

12    handle it?

13    A.       Let me be maybe a little more clear

14    about it.  If someone else was in another chain of

15    command and I did have corroboration, although as

16    a deputy chief I may have the authority to

17    ultimately do that, I would not have done that.  I

18    would have gone to the deputy chief, and the two

19    of us, if there was a disagreement, would have

20    gone to the chief and made a decision whether to

21    relieve the person or leave them in their -- in

22    their position.  So I would not have ultimately

23    made that decision at that time.

24    Q.       Okay.  So assuming that Moore was

1    already out of SRB and was in narcotics, it would

2    have been something where at minimum, you would

3    have had to consult with whoever the deputy chief

4    was over narcotics?  And then if there was any

5    disagreement, it would have gone to Chief Jacobs?

6    A.          Again, to be very specific, not that I

7    would have had to, I would have.

8    Q.          Okay.  Because any deputy chief

9    could -- would have the authority to take

10   virtually any officer --

11   A.          Yes.

12   Q.          -- out of service --

13   A.          Yes.

14   Q.          -- but --

15   A.          The way it works, just so you

16   understand, I can take that person as an

17   intervening action as immediate, because there's a

18   threat or something going on.  Then it would go to

19   -- the relief of duty paperwork would go to that

20   deputy chief and the chief, and then they would

21   decide whether to reinstate or to uphold the

22   relief of duty.

23   Q.          Okay.  Chief Quinlan, I'm handing you

24   what's been previously marked as Plaintiff's

1    Exhibit 10, which I'll represent to you is an

2    e-mail chain that we were provided by the city in

3    this case.

4              I just want to ask if that clarifies

5    for you at all whose chain of command Sergeant

6    Moore was in at the point when the internal

7    affairs investigation, at least the portion of it

8    that had to do with EEO, came up?

9    A.        It would appear to be narcotics,

10   because this e-mail is from Commander Gary

11   Cameron, who was over narcotics, to Sergeant Ken

12   Decker, who was the internal affairs investigation

13   and --

14   Q.        And it looks like at the top he's

15   copying Chief Gray?

16   A.        Okay.

17   Q.        So does that -- I mean, does that

18   square with the idea that Deputy Chief Gray was

19   likely over narcotics, at least at that particular

20   time?

21   A.        Yes, that's what it would indicate to

22   me.

23   Q.        Okay.

24   A.        Now, when these became known, Sergeant

1    Eric Moore was in a new chain of command.

2    Q.         Okay.  And we're going to talk to Chief

3    Gray in a couple days, but I think at least for

4    our purposes today, I'll assume that Deputy Chief

5    Gray was over narcotics at the point when this

6    particular decision was being made about relieving

7    him from duty at the beginning of the

8    investigation.

9            So in terms of that decision, do you

10   remember one way or the other whether you were

11   involved in discussions about whether or not to

12   take Sergeant Moore off duty?

13   A.         I don't recall.

14   Q.         Okay.  Do you remember any discussion

15   that you had with Deputy Chief Gray about Sergeant

16   Moore's duty status?

17   A.         It's certainly possible, but I -- it's

18   been so long, and I've had so many others, there's

19   so many tentacles to this, I don't recall which

20   one is which.

21   Q.         Okay.  Were there any of the e-mails

22   that you reviewed in preparation for the

23   deposition about Sergeant Moore's on duty or off

24   duty status?

1    A.          No, not to my recollection.  I mean,

2    there were like two e-mails or something that I

3    looked at, so I don't recall.

4    Q.          Okay.  Do you remember any

5    conversations you had with Chief Jacobs about

6    decisions to leave Sergeant Moore on active duty

7    or relieve him of duty or assign him to

8    administrative duty or anything like that?

9    A.          It's possible, but I don't recall as I

10   sit here today that I had that discussion.

11   Especially if he was in a different chain of

12   command.

13   Q.          Okay.  During the course of this

14   investigation of Sorrell and Moore over the theft

15   of time, theft of property issues and/or over the

16   discrimination, retaliation issues, first of all,

17   all of those -- the whole investigation was

18   principally conducted by Sergeant Ken Decker?

19   A.          As I recall.

20   Q.          Did you have any conversations with

21   Sergeant Decker while the investigation was going

22   on before it was -- before Decker made his

23   findings?

24   A.          I'm sure I did.  But I'm also

1    reasonably certain they would have been focused on

2    the theft of time and the theft of equipment, not

3    on the EEO if that portion was being overseen by

4    IA and under employees under a different chain of

5    command.

6    Q.        Okay.  What would your conversations

7    have been with Decker about the theft of time and

8    equipment issues?

9    A.        Just general status updates.

10   Q.        Okay.

11   A.        Witnesses still to be interviewed,

12   evidence being discovered.

13   Q.        Was that typical of IA practice or your

14   practice in terms of investigations going on under

15   your chain of command?

16   A.        Not typical, but not unheard of.  On

17   complex cases, you can see there's a thousand

18   pages of -- that it would be.  A sergeant would

19   come in and get clarification or direction on how

20   much further do you want us to pursue this avenue

21   or et cetera.

22   Q.        Okay.  Did you have update type

23   conversations like that with Commander Knight

24   while this was going on?

64

1    A.          I would have to ask her if she

2    remembers, because I don't recall.  There's

3    certainly times she was in my office discussing

4    cases during this time frame, but, again, there's

5    multiple cases going on.  I don't recall if it was

6    this case or others.

7    Q.          Okay.  In a case under your chain of

8    command, would you expect that if internal affairs

9    came up with some new evidence that changed the

10   nature of the case or established some critical

11   fact that you would be updated on it?

12   A.          Not particularly.

13   Q.          Okay.

14   A.          Their job would be to notify the chief

15   of police probably.

16   Q.          Okay.

17   A.          Because that's their direct supervisor.

18   And as the deputy chief over that chain of

19   command, I'm going to only be making the decision

20   at the end, so my preference is to remain neutral

21   and out of the loop to the extent reasonable so I

22   don't have a lot of pre-drawn conclusions or

23   pieces of information.  I can get a case in full

24   after the chain of command's reviewed it and then

1    make my own determination based on the totality,

2    so I try to stay somewhat neutral and independent

3    in it.

4    Q.       Okay.  So what -- I mean, do you

5    remember what Decker was telling you about the

6    status of the case as it was going on?

7    A.       I don't remember what he was telling

8    me.  It was -- I'm sure it was case related at the

9    time, but with so much going on, I don't remember

10   what the focus was.

11   Q.       Okay.  I mean, was he telling you what

12   he was finding or was he telling you what he still

13   needed to do or what he was thinking about doing?

14   A.       The one thing that I specifically

15   recall discussing at some point was that he had

16   evidence that Eric Moore was being untruthful to

17   him during interviews.  And that in his words, as

18   I recall, it was basically virtually everything he

19   says is a lie.

20   Q.       Okay.

21   A.       And so we were pursuing that course.

22   Q.       Okay.

23   A.       Because that changes an investigation

24   into a clear termination case.

1   Q.        Okay.  Do you remember what stage he

2   told you that?

3   A.        I do not.

4   Q.        Okay.  Do you remember whether it was

5   before or after he finished his report?

6   A.        I do not.

7   Q.        Okay.  Was that an in-person

8   conversation or a phone call or an e-mail?

9   A.        In person.

10  Q.        Okay.  This was in your office or --

11  A.        In my office.

12  Q.        Okay.  Where was your office at the

13  time in relation to IA?

14  A.        8th floor.  IA is out on Long Street.

15  So 8th floor central police headquarters.  Totally

16  different buildings, facilities.

17  Q.        Okay.  So he would have had to

18  especially come over to headquarters?

19  A.        He would have been in headquarters to

20  gain records from HR, to talk to the chief.

21  Internal affairs are frequently on the 8th floor

22  dropping off packages, picking up packages.

23  Q.        Okay.  Was the chief involved in that

24  conversation as well when Decker was telling you

1    about the dishonesty?

2    A.          No, sir.

3    Q.          Okay.  Did you have -- did you convey

4    that over to the chief when Decker told you that?

5    A.          I'm sure at some point we had

6    discussion.  We either had private meetings,

7    sometimes we'll discuss a case in an executive

8    staff.  So I don't remember what point, but at

9    some point I'm sure we had some general discussion

10   on that.

11   Q.          Okay.  What was it about what Decker

12   told you that would have turned this into what you

13   called a clear termination case?

14   A.          Any untruthfulness in an administrative

15   matter when you're under orders to answer

16   questions truthfully, and that's just a hallmark

17   of our profession.  That turns it into a

18   termination case.

19   Q.          Okay.  Was it Chief Jacobs' policy,

20   written or unwritten or formal or informal, I

21   guess, during her administration that any

22   untruthfulness on duty was a termination offense?

23   A.          I'm not going to say it's a policy.  It

24   is a standing practice that if we sustain

1    allegations of untruthfulness -- remember during

2    the IA case, they're not sustained, there's an IAB

3    investigator saying this is what I'm seeing.  That

4    investigator still has to connect the dots.

5    Here's what we know to be true, here's what the

6    person reported, here's how we know it's false.

7    You have to connect those dots.  It's a standing

8    practice that when that happens, we're going to

9    recommend termination.

10   Q.        Okay.  Did you do anything in response

11   to what Decker told you about the untruthfulness?

12   A.        The only thing I would have done is to

13   tell him to keep pursuing that line and to make

14   sure he can lay out in the investigation the --

15   what we know to be factual and how we can prove

16   it's factual, and what he said and how we can

17   prove that's false.  And as I recall reviewing the

18   investigation, it wasn't as clear in the

19   investigation as what I felt it needed to be to

20   show A is true and B is false.

21   Q.        Okay.  Was there consideration at that

22   point when Decker told you about the

23   untruthfulness that he believed was happening to

24   take Moore off duty?

1    A.          Again, not a policy, but our practice

2    is on untruthfulness, once an allegation is

3    sustained, in many cases, in other cases once

4    there's an actual department hearing, a divisional

5    hearing, chief's hearing and a formal

6    recommendation for termination, then we relieve of

7    duty.

8    Q.          Okay.  The document I showed you

9    earlier, Plaintiff's Exhibit 10, I don't -- did

10   you have an opportunity to read it when you --

11   when I just showed it to you or did --

12   A.          I scanned the headlines on from the

13   back to the front.

14   Q.          Can you take a look at the top of it

15   where I think it's an e-mail from Cameron to

16   Decker copying Chief Gray.  Would you take a

17   moment and read that and let me know when you're

18   done.

19   A.          Yep.  Yes, sir.

20   Q.          In that e-mail, Cameron is instructing

21   Decker basically to keep him posted about any

22   developments in the investigation that would

23   warrant relieving Sergeant Moore of duty?

24   A.          It essentially says the same thing that

1    I said, that he's reporting A and B is accused to

2    be untruthful.  The lack of existing corroborating

3    evidence.  He's telling him to connect those dots.

4    Q.          Right.  But he's also saying, if you

5    connect the dots at some point in your

6    investigation, let me know and we can reconsider

7    the decision to take him off duty on an interim

8    basis?

9    A.          Yes.  How that typically works, again,

10   is on an allegation that is -- of this nature and

11   is dated, we are very careful, because we have

12   other ongoing lawsuits right now about relieving

13   officers of duty and putting in what others, we do

14   not call the fish bowl, but there -- in a lawsuit

15   it's alleging we put them in a fish bowl and

16   they're suffering a career disadvantage.  So we

17   are very careful to make that determination only

18   in the cases where we're extraordinarily

19   confident, or the chief has already recommended

20   termination.

21               So in this, he says should credible

22   evidence develop supporting the alleged critical

23   misconduct, advise me so I might reconsider this

24   decision.  When he says reconsider this decision,

1    I would assume that means that he's going to

2    consult with his deputy chief and the chief of

3    police to decide if we have enough strength to the

4    allegation to potentially disrupt someone's

5    career, cause a disadvantage to their career to do

6    the right thing.

7    Q.        Okay.  Is fish bowl the same thing as

8    580?

9    A.        It is.

10   Q.        Okay.

11   A.        I do not call it fish bowl.  I was

12   repeating what others -- what the lawsuits allege

13   and that's what it's referred to.  But we as the

14   patrol administrative office --

15   Q.        Okay.

16   A.        -- is where all restricted duty

17   officers go for the most part and officers that

18   are awaiting discipline outcomes.

19   Q.        Okay.  And there are other -- there are

20   other options besides 580 if you have concerns

21   about an officer's maintaining their duty status,

22   like they can be put on administrative assignment,

23   is that different?

24   A.        They're all administrative assignments.

72

1    Q.          Okay.

2    A.          We -- by default, typically we'll

3    assign to the patrol admin.  Others who are in a

4    restricted duty status for medical, let's say

5    they're pregnant, they're going to be off duty

6    for, just say nine months, whatever, we may place

7    them at the academy or in another position where

8    we have some consistent workflow for a nine-month

9    period versus someone that may be there

10   intermittently.

11   Q.          Okay.  You're familiar with an officer

12   Melissa McFadden?

13   A.          I am.

14   Q.          Okay.  Were you involved at all in

15   her -- in the investigation of her that --

16   A.          I was not.

17   Q.          Okay.  Were you aware of her -- there

18   was a period of time, fairly lengthy period of

19   time where she was assigned to the property room

20   rather than her regular assignment?

21   A.          Yes.

22   Q.          It was because of some allegations that

23   had been made against her?

24   A.          Yes.

73

1    Q.        How does that differ from the 580

2    assignment?

3    A.        I don't know what went into that

4    decision.  I was not privy to that.  I don't know.

5    Was not privy to that.

6    Q.        Okay.  But you were aware that you and

7    other command officers have the option, at least,

8    of reassigning officers to duties where they might

9    not have a direct supervisory authority or

10   wouldn't have contact with civilians, that kind of

11   thing?

12   A.        If they're relieved of duty, they do

13   not have police or supervisory authority.  And we

14   make a decision on where to place them based on

15   the needs and interests of the division and the

16   membership.  And those decisions are always

17   subject to review.

18   Q.        And I guess I'm just getting at

19   something a little in between, because my

20   understanding was McFadden was not actually

21   relieved of duty, she was just reassigned to

22   different duties.  She still had her service

23   weapon and things like that.

24   A.        As -- and, again, I'm speaking based on

74

1    our general practice, because I don't know the

2    specifics of that case.  As a general practice, if

3    someone's accused of misconduct and supervises

4    that individual, then the accused must be moved to

5    a different workstation so there is no ability to

6    have impact on the other party.

7              In the -- to draw a comparison with the

8    Eric Moore case, he was already in a different

9    assignment in a different workstation, so that

10   satisfied that.  Where Lieutenant McFadden was

11   overseeing the patrol sergeants and officers, so

12   we have to move that person, just like we did

13   Lieutenant Brian Lance and Sergeant Frencz when

14   they had an allegation.  We moved them out of

15   their patrol assignment to another work location

16   but did not relieve them of duty.  So that's how

17   that works as a general practice.

18   Q.         Okay.  Going back to the update that

19   you got from Ken Decker about alleged

20   untruthfulness.  Did you have any conversations

21   with Jeff Lokai about what you had heard from

22   Decker?

23   A.         It's possible at the time he was -- he

24   was a grievance liaison.  It's possible, but I

75

1    don't recall.

2    Q.         Okay.  And I'll jump back for a second.

3    In terms of 580 assignments or relief of duty,

4    there are concerns on both sides of that, right?

5    I mean, in terms of -- you would be concerned

6    about disrupting an officer's career for purposes

7    of grievance filing and things like that, but

8    there were also reasons to be concerned about

9    other -- other officers that might be affected by

10   their conduct or civilians that might be affected

11   by their conduct, the department might be affected

12   by their conduct if they remain on duty?

13   A.         I apologize.  Can you -- I did not

14   understand the question.

15   Q.         That's fair.

16              You mentioned that you are very careful

17   as a department about removing people from active

18   duty with the CPD because of disciplinary

19   allegations and that the concern is --

20   A.         Thoughtful decisions.

21   Q.         Okay.  All I'm getting at is:  Is it

22   fair to say that -- well, let me ask it a

23   different way.

24              What is the purpose of relieving an

76

1    officer of duty?

2    A.        Well, again, there's a difference

3    between relieving an officer and moving an

4    officer.  You move an officer as you were

5    describing with Lieutenant McFadden and others to

6    make sure that the person is not continuing to

7    have supervisory authority over the person who's

8    accused them of wrongdoing.  You relieve an

9    officer of duty as typically an intervening action

10   to safeguard the public or other officers while a

11   case is investigated to determine if there's

12   sufficient just cause to bring departmental

13   charges or other action against that employee.

14            And not to disrupt you there, but you

15   asked me to clarify anything I've said in the

16   past.  I thought of one thing I do want to

17   clarify.

18   Q.        Yes.

19   A.        When you asked about e-mails, as I try

20   to think back, I think what I was looking at was

21   not e-mails, but a calendar that I was looking to

22   see when I had -- usually like Ken Decker comes in

23   my office, I would usually put a note on my

24   calendar, I spoke to Ken Decker on this date and

1   time.  Commander Curmode, C-U-R-M-O-D-E, so

2   that's -- I believe when I was talking to Richard,

3   I was looking at dates that I may have had

4   interactions with either Sergeant Decker,

5   Commander Curmode or Joe Echenrode.  I think

6   that's what I was looking for, not e-mails.  Just

7   to clarify my previous testimony.

8   Q.        Okay.  Then I will revise my previous

9   request --

10  A.        I understand.

11  Q.        -- and say, if you can get that --

12  those -- I don't know whether they're separate --

13  A.        I can answer that.

14  Q.        -- notations or whatever, but if you

15  can get that calendar to Rich --

16  A.        Yeah, I can answer that.

17  Q.        -- so he can provide it.

18  A.        I tried to look it up while we were

19  having the meeting.  I went to my desk and looked

20  it up and could not find what I was looking for.

21  Q.        Okay.

22  A.        So that's the review I did.  I looked

23  up different comments where I maybe had an

24  interaction with Curmode or Officer Shaw or

1    something.  But they were based on a notation

2    unrelated to the investigation, and I could not

3    locate the one Decker that I recall, but I will

4    look.

5    Q.          Okay.  So the e-mails that you

6    described early on as the documents that you

7    reviewed in preparation for the deposition, there

8    were no e-mails?

9    A.          There may be, I would have to look.  I

10   don't recall.  But what I'm saying is what I was

11   looking for is to try to confirm dates that I

12   made -- I gave directions or had notification of

13   certain issues, and I could not find -- because at

14   the time I may make a note, but I may not -- I may

15   say something generically, met with Commander

16   Curmode on the investigation issue.  But I may not

17   say Shaw investigation or Moore investigation, I

18   may have.  Sometimes I do, sometimes I don't.  I

19   was trying to find it by a search for Moore's name

20   or whatever and did not see it.

21   Q.          Okay.  So when you said that you

22   reviewed documents to prepare for the deposition,

23   you really just -- you looked through -- you

24   looked for documents that might prepare you for

1    the deposition, but you didn't actually find any?

2    A.          That's my recollection.

3    Q.          Okay.  About when did you do that?

4    A.          It would have been within the last

5    couple weeks that I met with Richard.

6    Q.          Okay.  And I just want to clarify

7    whenever we're talking about that, I don't want to

8    know anything that you --

9    A.          I understand.

10   Q.          -- talked about during that meeting.

11   A.          I understand.

12   Q.          That's all privileged stuff.

13              Okay.  So that was -- before you

14   remembered that, we were talking about the purpose

15   of relieving.  And, again, I'm separating it from

16   what happened with McFadden and maybe other

17   officers.  When you're relieving an officer of

18   duty, the purpose is -- one of the purposes is to

19   protect the public and protect other officers.

20   What are you -- what are you protecting them from?

21   A.          If there is an indication that there

22   could be an immediate threat to the public or to

23   an officer, then we may make that decision to

24   relieve until we get enough facts to know one

1    direction or another.

2            In this case, as I recall, the -- the

3    allegation that was brought to me was two or

4    three years old at the time, or something to that

5    effect.  And there had been a continuing

6    commingled work environment with no evidence of

7    any hostility or action or derogatory interaction,

8    so there was no reason to take an intervening

9    action if there was no evidence that someone may

10   be actually in harm versus speech versus action.

11   Q.        A couple things, first of all, do you

12   remember for sure how long before -- how long

13   between when the statements that Moore made were

14   made and when they were reported?  You said a

15   couple different times during the deposition that

16   it was a period of years?

17   A.        I don't recall.  Because, again, we

18   have so many things going on.  Like I said,

19   tentacles.  We have Wes Sorrell making allegations

20   about overtime abuse.  We have another allegation

21   that Joe Echenrode developed where there was

22   allegations made of comments or derogatory or, if

23   you will, racist comments.  Those I don't remember

24   the sequence of timing and when it was.  But as I

1   recall, it had been a substantial time gap,

2   whether it was weeks, months or years, there was a

3   gap where there was no evidence since they were

4   working in the same environment.  Or currently

5   when I found out if at that time Moore was already

6   in a different work environment that there would

7   be any opportunity for workplace violence, because

8   they're not in the same workplace.

9   Q.          Okay.  But the reason I ask the

10  question is that all the information that we've

11  been provided that the comments took place in

12  April of 2014 and the report was like August,

13  September 2014.

14  A.          Okay.  That's possible.

15  Q.          So that -- I just want to make sure

16  you're not trying to dispute that.

17  A.          I'm not trying to dispute.  I'm saying

18  I don't recall, because there's so many

19  allegations coming from so many different angles.

20  If it -- if going by your timetable, my thinking

21  would have been, it's April, it's now September,

22  they worked in the same work environment during

23  that time, there's -- there may be speech that

24  we're investigating, but there's clearly no

1    action, nothing had happened.  So there's no

2    imminent threat.  Where if there was -- if someone

3    said -- separate from this case, if someone came

4    to me and said, that person needs to watch

5    themselves, you know, I'm going to end this or

6    something, as a future act, then that would be

7    something I would want to take action on until we

8    can get to the bottom of it.  Because there's a

9    belief that something may be imminently likely to

10   occur.  That was not the case here.

11   Q.         Okay.  And I'll address another thing

12   that you said was about in the same working

13   environment.  Again, the information that we've

14   been provided, it appeared that Sergeant Moore

15   transferred to narcotics sometime in the spring of

16   2014, so they wouldn't have still been working --

17   there would not have been the kind of relationship

18   that you're talking about where they continued

19   working together peacefully over some additional

20   period.

21   A.         And that all seems to make sense.

22   Because as I'm trying to refresh my memory, I

23   think some of the allegations that Sorrell made,

24   is that after he left SRB, he had taken equipment

```
 1    with him and other things, and so that would

 2    refresh my memory that he had already moved to a

 3    new assignment with a new position when some of

 4    these things from the Sorrell allegations, to

 5    other individuals that say they overheard Moore

 6    make either racist or inflammatory comments, not

 7    directed at them personally, but to others about

 8    either Sergeant Williams or Officer Shaw or --

 9    Q.        Okay.  And, again, this was not --

10    you're sort of describing a thought process of

11    somebody else, I guess, because you were not the

12    person who would have been actually making the

13    decision about whether to take Sergeant Moore off

14    duty, because he wasn't in your chain of command.

15    A.        Yeah.  I guess I'm explaining that's

16    how I would have processed it.  Or if I consulted

17    with another deputy chief, those would have been

18    the issues that I would have been talking about.

19    Q.        Okay.

20    A.        Again, as I said, I don't remember the

21    sequence of events.  So as my memory is being

22    refreshed through those dates, it would make sense

23    that it would never have been my decision as an

24    extreme circumstance to have made a decision to
```

1    relieve of duty.  It may have been a discussion,

2    but it would not have been an action I would have

3    taken.

4    Q.        Okay.  But as long as we're going into

5    that thought process of whoever's thought process

6    it would have been, there would be a concern,

7    wouldn't there, for an officer like Sergeant

8    Moore, who's got personal supervisory authority

9    over officers of all different races and who

10   has -- is directing investigations, narcotics

11   investigations involving individuals of all

12   different races, there would be a concern if there

13   was an allegation that the department felt that

14   would be sustained about discrimination, racial

15   bias?

16   A.        I would --

17   Q.        Wouldn't there?

18   A.        I would look at it differently.  I

19   would say that the persons accused, no proof of,

20   accused of and being investigated making -- to use

21   your kind of setup -- threatening remarks.

22   There's opportunity, and clearly nothing had

23   occurred, so that would allow me to believe that

24   this is just hyperbole or talk, not something a

85

1   person's actually contemplating.

2   Q.          Okay.  But putting aside the threats,

3   he was also being accused of making racially

4   discriminatory comments using the N word, using

5   descriptions like monkeys or apes to describe

6   black people, black officers.  Calling black

7   officers -- calling black people in general lazy.

8   Wouldn't that by itself, without any of the

9   threats, wouldn't that be -- itself be a concern

10  for leaving an officer on duty in a position where

11  they're supervising black officers?  Where they're

12  investigating black civilians?  Wouldn't that pose

13  a threat?

14          MR. COGLIANESE:  Objection.  Go ahead.

15  A.          Sorry.  I will use your words, there's

16  an allegation.  Again, there was no evidence of

17  that and no current allegation that this was a

18  realtime activity.  This is something, according

19  to this timeline, four, five, six months in

20  advance.  There was no concern that an immediate

21  action needed to be taken without having facts to

22  support it.  Because, again, the contract requires

23  us to -- that an employee not suffer a career

24  disadvantage except for just cause.

1    Q.          Okay.  And I guess I'll go back to one

2    of the purposes of relieving an officer of duty is

3    in -- on an interim basis is that sometimes an

4    officer is in a position to take actions during

5    the course of an investigation that might not be

6    easy to fix later basically; that you would want

7    to prevent.  And so the department decides in

8    certain circumstances, even before an allegation

9    is actually formally sustained, that if there's a

10   certain level of evidence to support that conduct,

11   you're going to take him off duty even while the

12   investigation is going on?

13   A.          What I said was if we have reason to

14   believe, a reasonable belief that there is an

15   imminent threat that we need to take an

16   intervening action on, in this case, there was

17   allegations from a third party who did not

18   personally see or hear it, overheard it from

19   another party about something that happened

20   several months in the rear.  And nothing had

21   happened to act on those allegations, so we had no

22   reason to believe it was more than idle,

23   inappropriate, disciplinary worthy, chatter.

24   Q.          Okay.  And I want you to try -- I mean,

1    I'm asking you to sort of, again, even your

2    descriptions of what happened in Moore's case in

3    terms of taking him off duty or not taking him off

4    duty.  It's kind of a hypothetical scenario,

5    because you're not the person -- from everything

6    that said, you're not the person that made that

7    decision.

8    A.        Okay.

9    Q.        I'm asking you to be a little bit more

10   hypothetical than that.  I'm talking about in

11   general in terms of the decision-making process

12   that you use and the decision-making process that

13   the division in general uses for taking officers

14   off duty.  Putting aside Eric Moore -- not Eric

15   Moore.  I guess I'm asking whether what you're

16   talking about in terms of imminent threats extends

17   to things beyond threats to a person's physical

18   safety and would extend to things like a threat

19   that a command officer might not treat officers

20   under their command appropriately or might not

21   handle investigations of civilians appropriately.

22   Isn't that a consideration that can come into play

23   in taking an officer off duty?

24              MR. COGLIANESE:  Objection.  Go ahead.

1    A.         With the right information in realtime

2    be made aware to parties in the chain of command,

3    it may drive that action.

4    Q.         Okay.

5    A.         Again, in a third-party case, not this

6    specific case, if I'm confronted with information

7    that is relayed by someone else that overheard

8    someone else and there's an allegation, I would

9    wait until at least we had some corroboration

10   that -- that there was some truth to the matter

11   and that someone in the future may be impacted if

12   we do not act.

13   Q.         Okay.

14   A.         And I did -- in any case I've been

15   involved in, regardless of the case, I -- when I

16   felt that, I took that action.  If I did not have

17   that knowledge, then I allowed the investigation

18   to continue to unfold until we got to that point.

19   Q.         Okay.  Let me give you a hypothetical

20   scenario.  And I'm not trying to represent to you

21   that this happened in this case by any means,

22   because I don't believe -- as far as I know, I

23   don't believe it did.

24              Let's say you've got a command officer,

89

```
1    sergeant or above, who's another officer, comes to

2    you with an allegation they're making racially

3    derogatory remarks about other officers or about a

4    race in general.  And I've got a recording of this

5    officer making those remarks, this officer's using

6    the N word, this officer's calling black people

7    monkeys and apes, officer is saying that black

8    people are lazy.

9            You've got a recording, so you know it

10   seems like a reliable recording.  You know that

11   the officer did what they're accused of doing.  Is

12   that a situation where it would be justified to

13   take the officer off duty while the investigation

14   is proceeding?

15           MR. COGLIANESE:  Objection.  Go ahead.

16   A.        In your hypothetical, that would be

17   information worthy serious consideration to take

18   that action.  But, again, it would be a

19   case-by-case, fact-driven decision.

20   Q.        Okay.  Is one of the reasons -- well,

21   first of all, let me go back.

22           You took Sorrell off duty based on his

23   admission that he had done something that might be

24   considered criminal?
```

1    A.        Yes.

2    Q.        What's the threat there?  What was

3    the -- what would be the reason to take them off

4    duty on an interim basis?

5    A.        It's what's in the best interest of the

6    division.  If he self-admitted that he committed a

7    crime, that would be a theft, a theft in office,

8    theft of division equipment.  That would be

9    something I could foresee recommending termination

10   for if the facts play out.

11              If I have that belief and I let him

12   continue working and he gets into a shooting, for

13   instance, of a citizen, and it comes out that I

14   was planning on wanting to terminate this officer

15   or recommend that, because of criminal conduct, if

16   I continue to let that person work, and as a

17   result this person ended up getting shot in an

18   unrelated incident, then that could create

19   liability for the city.  And part of my position

20   is try to limit the liability of the city.

21   Q.        Okay.  So even if the crime itself

22   wasn't necessarily threatening to somebody's

23   safety, because you basically could see a

24   situation where the person should be fired as a

1    result of their admission, it puts the city in a

2    liability situation that you would feel like they

3    should be taken off duty while the investigation's

4    going forward?

5    A.          In the fact pattern as you laid out,

6    yes.  If it was a self-admission to a criminal

7    act, it's not an allegation, then that's the time

8    I would make a decision until -- which in this

9    particular case, I did.  I had a criminal

10   investigation conducted.  As soon as I was

11   notified that this will not reach the level of

12   criminal burden of proof, I returned the officer

13   to duty.

14   Q.          Okay.  Who informed you that it

15   wouldn't reach the level of criminal burden of

16   proof?

17   A.          It's the subdivision chain of command.

18   I believe it was Deputy Chief Bash, but I believe

19   the inquiry, the investigation was conducted by

20   Sergeant Chris Bond.

21   Q.          Okay.  So it was an internal CPD

22   determination?

23   A.          Yes.

24   Q.          Okay.

92

1    A.          And that does not mean there's not an

2    administrative wrongdoing.  It means this doesn't

3    reach the bar to file a criminal charge.

4    Q.          Okay.  Once -- but once it was

5    determined that it didn't reach the bar of

6    criminal charge, immediately Sorrell was placed

7    back on duty?

8    A.          Yes.  Because, again, at that point, I

9    don't have justification to have Officer Sorrell

10   suffer career disadvantage without just cause.

11   Because at that point, I'm being told he's not

12   going to be criminally charged.

13   Q.          Okay.  Putting aside the criminal

14   nature of -- of the issue, the principle would

15   still apply that if you feel like you've got a

16   self-admission of what would qualify as critical

17   misconduct that is likely to result in

18   termination, there's still going to be a basis to

19   take the person off duty?

20              MR. COGLIANESE:  Objection.  Go ahead.

21   A.          No.  The -- once the criminal aspect of

22   it has been removed, then the administrative

23   investigation will be conducted to determine

24   policy violation, not legal violations.  If a

```
 1    policy violation is sustained and heard in a

 2    departmental hearing by a -- by the chief, who has

 3    the authority to recommend termination, if she, at

 4    that time, would recommend termination on that,

 5    then, again, termination would be on the table.

 6    He would have been relieved of duty.

 7              In the meantime, we did not have

 8    sufficient grounds to have him, in the FOP's view,

 9    suffer career disadvantage without just cause.

10    Nothing had been sustained at that point.

11    Q.        Okay.

12    A.        It was a mere admin allegation.

13    Q.        Was there some intervention by the FOP

14    to get Sorrell put back on duty, or was that just

15    basically once the criminal charge was not being

16    pursued?

17    A.        I would say they probably -- I'm just

18    spit balling this, probably called weekly or

19    biweekly to say, what's going on with the criminal

20    case?

21    Q.        Okay.  Did that factor in to your

22    determination to put him back on duty?  Or was it

23    just that would have been your decision even

24    without the FOP's involvement?
```

```
 1    A.          That would have been a decision -- once

 2    I was told there was no criminal going to be

 3    filed, that would have been my decision whether

 4    they ever talked to me.

 5    Q.          Okay.  If you've got an investigation

 6    going on and you -- well, I'm -- I don't mean you.

 7    If there's an investigation, an internal affairs

 8    investigation going on after an officer who's

 9    within your chain of command and information comes

10    to your attention that the officer's doing

11    something to interfere with the investigation or

12    retaliate against officers who are involved in the

13    investigation, would that be a reason to consider

14    taking them off duty?

15              MR. COGLIANESE:  Objection.  Go ahead.

16    A.          I'll repeat my previous answer.  It

17    would be a reason or a justification, but it,

18    again, would be fact driven.

19    Q.          Okay.  Meaning you would have to be

20    very confident that it had happened?

21    A.          Not necessarily confident that it

22    happened.  I would have to be briefed on what the

23    investigation -- what facts were known, and if

24    there's an ongoing threat or if there's a concern
```

1    for liability to the city if we do not take some

2    intervening action until the case was resolved.

3    Q.        So integrity of the investigation would

4    not be a basis for taking somebody off duty if

5    they're using their command authority as a command

6    officer, at least to interfere with the

7    investigation that's going on?

8              MR. COGLIANESE:  Objection.  Go ahead.

9    A.        I will repeat the previous answer.  It

10   would be a justification, but it would have to be

11   based on the specific facts known, not arbitrary

12   or capricious.

13   Q.        Okay.  I guess I'm just trying to

14   figure out what the specific facts would have to

15   be to get to the point where you would consider

16   taking somebody off duty for interfering with an

17   investigation?

18   A.        That's -- I guess what I'm trying to

19   explain is that every individual case is fact

20   specific.  And until you look at the facts known

21   in that case or the facts are being revealed in

22   that case at that point in time, you won't know.

23   It is not a policy or something you can use a

24   checklist on.  It is specifically driven by what

1    we know at the time and what we feel is the right

2    thing to do.

3    Q.         So case by case is what you're trying

4    to say?

5    A.         That would be a shorter way of saying

6    it.

7    Q.         Okay.  Did Chief Jacobs -- and I think

8    we'll take a break in a couple minutes.

9    A.         That's fine.  Use the bathroom real

10   quick.

11   Q.         Just figure this -- you know what, I

12   should have said this at the beginning, but this

13   is not an endurance contest.

14   A.         Oh, I know.

15   Q.         I know we are trying to cover a lot of

16   ground before you have to go.

17   A.         I know.  I respect that.

18   Q.         But if you need a break at any point --

19   A.         I can wait a few minutes --

20   Q.         -- just tell me.

21   A.         -- just to get rid of some water.

22   Q.         Okay.  All I was going to ask is did

23   Chief Jacobs at any point instruct you during this

24   investigation to keep tabs of what was happening

1    in the investigation so she could make a

2    determination of whether to keep Sergeant Moore on

3    duty or not?

4    A.        I can't say yes or no.  I don't

5    specifically recall either way.

6    Q.        Okay.  Did she instruct you to do

7    anything with respect to this investigation?

8    A.        Let me answer it this way:  Please keep

9    in mind there are multiple investigations going

10   on.  What direction she gave me on this specific

11   case versus the five, six, seven, ten others that

12   were balancing and juggling at the same time, I

13   can't say --

14   Q.        Okay.

15   A.        -- as I sit here today.

16             MR. VARDARO:  All right.  We'll leave

17   that as a stopping point for a break.

18             (A recess is taken.)

19   Q.        I have a general question about what I

20   was just asking you about, which is Chief Jacobs

21   and her oversight of you during this investigation

22   process, which is:  During the time that you were

23   deputy chief for Chief Jacobs, what was her

24   approach to ongoing internal affairs

1    investigations?  Did she get updates?  Did she

2    want to know what was going on with particularly

3    large or serious investigations?

4    A.        Since internal affairs was a direct

5    report to the chief, you would have to ask her,

6    because I don't know -- I was not included in this

7    loop.

8    Q.        Okay.  Even when it was an

9    investigation of an officer in your chain?

10   A.        What she did with people that were

11   direct reports to her, I don't know.  She would

12   have talked directly to internal affairs.  If she

13   did that, she would not have come to me as the

14   deputy chief, even if it was my chain of command,

15   because I didn't know what was going on typically.

16   Because, again, I said I tried to stay neutral and

17   disinterested in it.  So the investigation wasn't

18   impeded or interfered with or trying to steer it.

19   Q.        Okay.  There was a -- part of this

20   obviously was an allegation that Eric Moore had

21   threatened the life of a couple different black

22   officers while he was in SRB, one of who was Eric

23   Cornett.  Do you remember that?

24   A.        I don't remember the exact wording.

99

```
 1    When you said threatening life, I don't remember
 2    what the phrase was.
 3    Q.        Well, I -- I mean, I'll just represent
 4    to you the phrase as it was described in the
 5    original report was that he needed to -- referring
 6    to Eric Cornett and Doug Williams, that he needed
 7    to, quote, take their monkey asses out back and
 8    kill them.
 9    A.        I don't remember.
10              MR. COGLIANESE:  Objection.
11    Q.        It's not material to my question.
12    A.        Okay.
13    Q.        You remember there was a threat against
14    two black officers as part of this investigation?
15    That was the allegation?
16    A.        The allegation was -- I don't remember
17    the word "kill" being used, but I -- I don't
18    remember that.  It's been awhile.
19    Q.        Okay.
20    A.        But there was a threat -- or some could
21    interpret as a threat.
22    Q.        And strictly I'm asking you this as the
23    background to the real question I want to ask,
24    which is:  Do you remember that one of the
```

100

1    officers who was threatened in some way was Eric

2    Cornett?

3    A.         I believe so.  I don't specifically

4    recall the details, but I believe so.

5    Q.         Right.  And that may be an answer to

6    the next question I have.  Do you remember at some

7    point Eric Cornett asked to speak with Chief

8    Jacobs about the threat that he had learned had

9    been made against him?

10   A.         Sounds vaguely familiar, but I don't

11   recall the specifics.

12   Q.         Okay.  Do you remember one way or the

13   other if you actually had a conversation with Eric

14   Cornett about the threat and his request to speak

15   with Chief Jacobs?

16   A.         I may have, but I don't recall the

17   specifics.

18   Q.         Okay.  And that as part of that Eric --

19   you actually were in a phone call with Eric

20   Cornett where you then put Chief Jacobs on the

21   line and talked to him about the threat and the

22   precautions that were being taken?

23   A.         It's quite -- I'm sorry.

24   Q.         Your safety is also important to us, so

1    I do want to make sure you don't choke in the

2    middle of the deposition.  I would feel

3    responsible for that.

4    A.          I apologize.

5                That certainly sounds familiar.

6    Q.          Okay.

7    A.          That certainly sounds familiar.

8    Q.          What would have been the circumstance

9    there where an officer was asking to speak to the

10   chief about something like that and you would have

11   been involved in it?

12   A.          By policy, any officer is allowed to

13   request to speak to the chief.  It's up to the

14   chief whether to grant the request.

15   Q.          Okay.  But why would the deputy chief

16   be involved in that?

17   A.          The request must go through the chain

18   of command.

19   Q.          Okay.  All right.  And then the

20   other -- the other question I have about Chief

21   Jacobs in this investigation is there was a --

22   there was a point during this process where

23   Sergeant Decker had asked for permission to do a

24   polygraph examination of Sergeant Moore regarding

1    a couple of different allegations that Officer

2    Sorrell had made?

3    A.        He may have.

4    Q.        Were you involved at all in determining

5    whether or not a polygraph would be conducted?

6    A.        Not that I recall.  The -- that's

7    typically something the chief, by contract, has to

8    order.

9    Q.        Okay.  And I -- we do have records

10   indicating that Chief Jacobs told Commander Knight

11   that there would be no polygraph authorized in

12   this situation, and so I'm just trying to refresh

13   your recollection as to whether or not you were

14   involved in any discussions with the chief about

15   that?

16   A.        Not that I recall.

17   Q.        Okay.  At the conclusion of this

18   investigation, your -- well, first of all, as a

19   general matter, any time -- any time there's a

20   disciplinary charge against somebody or

21   departmental charges, I'm actual -- maybe you can

22   clarify for me.  What is the deputy chief's role

23   in reviewing a completed internal affairs

24   investigation?

```
 1   A.         The role of the deputy chief is to make

 2   a final disposition of whether the allegation is

 3   sustained or not.  And if it is sustained, what

 4   level discipline should occur.  If it is anything

 5   above what's called documented constructive

 6   counseling, the deputy chief must take it to the

 7   chief of police and get permission to issue a

 8   written reprimand or file departmental charges.

 9   The professional standards bureau lieutenant will

10   decide what charges will be filed.

11   Q.         Okay.  And we've seen documents in this

12   case indicating that you were the deputy chief who

13   made those determinations with respect to the Eric

14   Moore, Wes Sorrell investigation?

15   A.         Okay.

16   Q.         Does that sound right?

17   A.         I -- partially.  I would have only made

18   decisions on the disposition for the allegation

19   that occurred while under my chain of command.  I

20   recall there was some additional allegations made

21   under the narcotics chain of command and I

22   forwarded it to that chain of command to decide on

23   those issues.

24   Q.         I'm handing you what's been previously
```

1    marked -- what's previously been marked as

2    Plaintiff's Exhibit 41, which is a number of

3    collected documents about this investigation at

4    the conclusion of it.  And I want you to turn

5    particularly to the last few pages, which -- which

6    is -- well, at the -- actually the last, let's say

7    seven pages of this are a memo addressed to you

8    from Commander Knight dated September 28th, 2015?

9    A.          Curmode you mean?

10   Q.          No, from Commander Knight.

11               MR. COGLIANESE:  Which page are you on?

12   Q.          It's -- there are Bates stamp -- thank

13   you, Rich.

14               It's starting on Bates stamped pages

15   014421?

16   A.          Yes.  I have it now, sir.

17   Q.          At the end of the document, the very

18   last page of Exhibit 41, Bates stamped page

19   014427, it says, deputy chief signature, and I

20   assume that's your signature?

21   A.          Yes.

22   Q.          And throughout that document, there are

23   handwritten notes next to deputy chief's

24   determination.

1    A.        Okay.

2    Q.        And I want you to go through this

3    document and tell me if there's any other deputy

4    chief that you see making any determinations on

5    these charges?

6    A.        Not on these -- I'm sorry, there is.

7    Okay.  You want me to go through them from the

8    beginning?

9    Q.        Yeah.  I think -- I think we need to do

10   that in this situation unless you -- well, I guess

11   I'll direct you to a couple particular ones.

12   There's allegations numbered Roman numerals I

13   through XXI against Eric Moore.

14            MR. COGLIANESE:  Just objection for

15   purposes of the record.  And the pages that you're

16   pointing him to actually start in allegation

17   three.

18   Q.        Oh, interesting.  Sure.  Let's go with

19   there's -- there's Roman numerals of charges that

20   refer to Eric Moore, and the earliest one, as Rich

21   points out, seems to be allegation three, and then

22   it goes all the way up through allegation 21 on

23   page 5 of the document.

24   A.        Let me look back for a second at

1   something else.

2              MR. COGLIANESE:  And, again, just for

3   purposes of the record, actually there are some

4   numbers that are skipped in there as well.

5   Q.         Does it -- just to clarify this, would

6   it match your recollection and what you're seeing

7   in this document that these allegations are

8   grouped against three different officers, Moore,

9   Sorrell, Kemmerling like we talked about earlier?

10  And they are somewhat out of order because they're

11  grouped by which officer they're against rather

12  than put in numerical order?

13  A.         That would be correct.

14  Q.         Okay.  Like allegations 1 and 2 are

15  against -- 1, 2, 11, 13 and 18 are against

16  Sorrell?

17  A.         That is correct.

18  Q.         Allegation 15 is against Kemmerling?

19  A.         Yes.

20  Q.         And then all the rest of them are

21  against Moore?

22  A.         Yes.

23  Q.         And all of that is a long windup to

24  saying, there's some allegations on the fifth page

1    of this portion of the document, Bates stamp

2    014425, allegation 20 has to do with Eric Moore

3    not following an order from Commander Cameron?

4    A.        Yes.

5    Q.        And then the page before that there's

6    allegation 19 that says Eric Moore did not fairly

7    and equitably fill a narcotics bureau assignment

8    vacancy?

9    A.        Correct.

10   Q.        And I guess I'm trying to figure out,

11   is it -- there's a -- there's some initials there?

12   A.        Yes.

13   Q.        Are those your initials?

14   A.        No.

15   Q.        Whose initials are they?

16   A.        Can't tell, but it would be somebody in

17   the narcotics chain of command.

18   Q.        Is it possible it would be Deputy Chief

19   Gray or would it be somebody else?

20   A.        I see Terry Moore on here.  If he was

21   acting deputy chief, it could have been Terry

22   Moore.  Looking at the initial -- the initials,

23   doesn't look like it would be Gray.  Could have

24   been Mike Woods.  I don't know if that's a W.  I

1      don't know.

2              But, again, those were allegations that

3      were in a different chain of command, so I ruled

4      on -- as I recall it, I ruled on the ones that you

5      see my handwriting and I signed off on.  And then

6      I handed the entire case over to the narcotics

7      chain of command, which I believe was possibly

8      Mike Woods at that point, and that he made the

9      final dispositions on those that occurred while

10     assigned under his command.

11     Q.         Okay.  And after you signed this

12     document for the -- I mean, was this forwarded to

13     Chief Jacobs?

14     A.         No.

15     Q.         What happens after you sign this

16     document?

17     A.         So the deputy chief makes the decision

18     on whether the policy violation occurred.  As the

19     allegation specified, you know, 7, 8, 9.  If we

20     sustain it -- if the deputy chief sustains it, the

21     deputy chief would identify which rule of conduct

22     or work rule is being cited.  And then they'll

23     decide what the level of charge -- what the level

24     of discipline is.

```
 1              If it's a DCC, as you see on some of
 2    these, they're allowed to make that decision at
 3    their level.  Or if it's a written reprimand as a
 4    result of progressive discipline, they can issue a
 5    written reprimand.  If it's bypass and progressive
 6    and going to a written or a departmental charges,
 7    it must go to the chief of police.  Which if you
 8    notice on the back sheet, 014408 of the routing
 9    sheet, it states that I have discussed this with
10    the chief at executive staff and with PSB on
11    different occasions, the last one being 2/25/16,
12    and the chief approved bypassing progressive
13    discipline and filing departmental charges as
14    noted.  And then I forward it to professional
15    standards to have them create the charges and
16    specifications.
17    Q.         Okay.
18    A.         That's the process.
19    Q.         All right.  And it's possible that it's
20    in some document that I'm not seeing, but the --
21    can you tell from the routing sheet at the front
22    of this Plaintiff's Exhibit 41, the first page and
23    the attachment on the back, was this routing sheet
24    strictly about the -- the SRB faced charges
```

1    against Moore and Sorrell and Kemmerling or did

2    this cover the whole investigation, including the

3    stuff that happened while Moore was in narcotics?

4    A.        This appears that it would have been

5    inclusive of both chains of command investigation

6    findings, because it has Commander Curmode's

7    letter outlining the allegations pertinent to that

8    chain of command, and Lieutenant Brust's letter

9    outlining the allegations unique to the narcotics

10   chain of command.

11   Q.        Okay.  And same question as before:  Do

12   you see any other deputy chief's signature on here

13   or initials or comments?

14   A.        I see the initials on the cover sheet

15   from IAB that we already discussed.

16   Q.        I'm sorry, did you say you do or you

17   don't see initials?

18   A.        I said on the cover -- this is called

19   the cover sheet.

20   Q.        Oh, I see.

21   A.        So this is -- this has the initials on

22   the 19 and 20 allegations.  That's a different

23   chain of command.  And I'm reasonably certain that

24   would have been Mike Woods, because as you notice

1    here, it goes through Lieutenant Brust and

2    Commander Terry Moore, just like it went through

3    Commander Curmode, then to me. Because it goes

4    through the other chain -- through the commanders,

5    then to me. I sent it over to PSB for a just

6    cause review. They confirmed just cause. I took

7    it to the chief, she approved departmental

8    charges. And that's where I made my final finding

9    on here.

10           So what -- what I would have assumed

11   happened just based on practice with other cases

12   is I ruled on mine, sent it over to the chain.

13   The deputy chief there has a routing sheet that

14   shows what the lieutenant and the commander wanted

15   and signed off on it, on the allegation pertinent

16   to that chain of command to make the ruling for

17   that chain of command.

18           And, again, I certainly would have

19   preferred that there either be initials and a

20   badge number or a name legible. But in this case,

21   there's not. That doesn't make it any less

22   binding that the -- that they go to a different

23   chain of command. You can clearly see it's

24   different handwriting than anybody else's. You

1    can see Terry Moore's handwriting on here, you can

2    see Lieutenant Brust's handwriting, Commander

3    Curmode's and mine.  Clearly somebody else's

4    handwriting, probably Deputy Chief Woods or

5    possibly Gray, but I don't think so.  And -- well,

6    this actually didn't come through until 2016, so

7    it would have been Mike Woods.

8            So he signed off on his portion,

9    returned it to me, and that's when I took it to

10   the chief.  Because his, if you notice, both the

11   ones he signed off on the DCC on the two

12   allegations, which he had the authority to issue

13   at his level without chief of police review and

14   approval.  So he ordered the DCCs, and that was

15   the final disposition.  No further review needed

16   on those allegations.  He had the authority to

17   issue the DCC.  The only thing that needed to go

18   to the chief were my allegations that I sustained

19   and wanted departmental charges on.

20   Q.       Okay.  Certainly in a case where the

21   deputy chief approves a DCC, if the chief's got it

22   in front of her, she's got the authority to say, I

23   want you to look at this harder and think about

24   departmental charges on this?

113

1    A.         She has the authority to do that.

2    Q.         Okay.   I mean, you've seen cases where

3    she did that?

4    A.         I have, yes.

5    Q.         Okay.

6    A.         Yeah.

7    Q.         And that by itself was not in those

8    cases that you saw, it wasn't like the FOP could

9    just come in and say, no, the chief overruled the

10   deputy chief on the DCC and took it to

11   departmental charges and so we're grieving it just

12   on that basis?

13   A.         What I can say -- I'm not really clear

14   exactly on the question, but what I can say, and

15   you can correct me if I'm misinterpreting the

16   question, is that the deputy chief on allegation

17   19 and 20 would have conferred, in all likelihood,

18   with Lieutenant Lokai and made sure that the

19   comparables for this violation would have been

20   supported by this level of discipline.

21          And if he, I assume, got confirmation

22   of that, because he did rule that way if the

23   lieutenant said, no, no, no, this has to go to

24   departmental charges, then I'm assuming he would

1    have sent that to the chief.

2    Q.        Okay.  We talked a little bit about at

3    the very beginning actually about -- well, maybe

4    not the very beginning, we talked about Sergeant

5    Decker's belief that Sergeant Moore was untruthful

6    to him during the investigation about the subject

7    matter of the investigation and --

8    A.        (Indicates affirmatively.)

9              MR. COGLIANESE:  Yes?

10   A.        Yes.

11   Q.        -- some of the -- actually, all of that

12   alleged untruthfulness that Sergeant Decker

13   believed he had found occurred while Sergeant

14   Moore was in the narcotics chain of command,

15   because the investigation didn't even start until

16   after he left SRB, right?

17   A.        I'm not -- I have to think through

18   exactly the sequence.

19   Q.        I'll withdraw the question.

20             But I will represent to you none of

21   this investigative activity happened until

22   Sergeant Moore was in narcotics.  And he certainly

23   wasn't interviewed by Ken Decker until he was in

24   narcotics, right?

```
1    A.          Yes.  What I can say is I don't know

2    if -- without looking in more detail whether he

3    was charged with lying to internal affairs that

4    occurred while he was assigned then to that chain

5    of command or if the untruthfulness were limited

6    to the unique allegations that were predated that.

7    Q.          Well, what Decker was telling you in

8    the meeting that you described at headquarters was

9    what was that he was being lied to by Sergeant

10   Moore, basically every word out of his mouth was a

11   lie in the interviews that he conducted.

12   A.          As I recall, yes.

13   Q.          And I guess I'm just asking you sort of

14   a jurisdictional technical question, which is:

15   Sergeant Moore was in narcotics at the time that

16   he was allegedly lying to Ken Decker.  So my

17   question is:  Would that have been considered a

18   narcotics issue or an SRB issue?

19   A.          If the chief directed internal affairs,

20   which she had direct supervisory oversight on, to

21   make that a new allegation, that would have been

22   dispositioned by narcotics --

23   Q.          Okay.

24   A.          -- not me, because the lie occurred at
```

116

1    that time.

2    Q.         Okay.  And if you take a look at 41 --

3    Exhibit 41, the last -- I think it's on page --

4    page 3 of that cover sheet, it's 014423 at the

5    bottom.

6    A.         Yes.

7    Q.         Allegation 9 is that Sergeant Eric

8    Moore was deceptive during the internal affairs

9    investigation.

10   A.         Yes.

11   Q.         And you have -- I think it's your

12   handwriting --

13   A.         Yes.

14   Q.         -- that says sustained and there's no

15   initials?

16   A.         Correct.

17   Q.         So that's your finding?

18   A.         Yes.

19   Q.         Can you explain why you would have been

20   the one to make that finding considering that, you

21   know, by its nature, that conduct occurred while

22   he was outside of your chain of command?

23   A.         Again, it was a complex investigation.

24   What happened here was I directed the

1  investigation into allegations A.  He lied about

2  the specific information being asked about

3  allegations A during his time in SRB.  And that's

4  what he was lying about.  So it came to me to

5  decide whether -- whether he was going to be

6  charged with untruthfulness about the original

7  investigation.

8  Q.          I'm not sure I completely understood

9  that.

10          You're saying basically because the

11  allegations that he was found to have lied about

12  were allegations involving SRB, it was under your

13  authority to sustain or not sustain those

14  allegations?

15  A.          Either chain of command, in essence,

16  we're both the same rank, could have made that

17  decision.  What the lie was about, although in a

18  different chain of command, we typically send

19  everything that stems from time you're in one

20  chain of command, everything related, encapsulated

21  by that comes back to the chain of command where

22  it occurred at the time.  The allegations that

23  occurred while he was in narcotics were

24  allegations that narcotics chain of command rules

1    on.

2              If you lie about the conduct or the

3    information you provide is untruthful about what

4    you're being investigated for that I directed the

5    investigation to occur, it would come back to me

6    to make that determination.

7    Q.        Okay.  Do you remember what it was that

8    Eric -- that you sustained Eric Moore lying about?

9    A.             That was one of the issues that I had

10   concerns on the investigation is that it was

11   difficult to connect the dots.  So one of the

12   things I think the arbitrator ultimately ruled on,

13   I don't remember the arbitration decision, but it

14   wasn't the facts are -- that that water bottle is

15   unopened and he said the water bottle was half

16   empty, that would be -- you could connect the dots

17   and say, that's a lie, you know that.

18             I don't remember that we were able to

19   show concretely how we could show that was a lie.

20   We just knew it to be untrue to the satisfaction

21   clear and convincing to an arbitrator.

22   Q.        Do you remember what the subject matter

23   was, though?

24   A.             I don't.  Like I said, everything that

119

1    he was asked was a spin, if you will, that's not

2    truthful.  I wasn't in the IA interviews, so I

3    don't recall that, but I was in on the chief's

4    hearing.  And in the chief's hearing, everything

5    he said was not believable.

6              So that's where I could understand why

7    it was so confusing.  That we're trying to ask

8    about this, we know this to be true, not because

9    he's saying the opposite, he's given some

10   explanation why that bottle would look half empty

11   to him.  We know it's not, but in his mind, it was

12   so convoluted, we knew he wasn't being open and

13   honest.  But it was hard to show that it was a

14   concrete lie.

15   Q.        Okay.  Can you tell me what your

16   process was in drawing the conclusions that you

17   drew on these allegations once Decker presented

18   them to you?

19   A.        Process was to read the investigation,

20   formulate a general understanding of what we can

21   corroborate, send it to professional standards,

22   have the just cause review done, which is the

23   seven steps I discussed.  And which the key one

24   there is to make sure there's proof of the

120

1    allegation.

2            They advise me on what they feel the

3    charges should be.  Like some of these that you

4    notice on Eric Moore, and this was key on

5    allegation 9 that you mentioned, Sergeant Eric

6    Moore was deceptive during an internal affairs

7    investigation.  I sustained it, but internal

8    affairs recommended rule conduct 1.15(a)5, which

9    is requirement to be truthful at all times.  As

10   you see, I changed it to rule of conduct 1.36,

11   which is unbecoming conduct.

12           We -- because his answers were so

13   unintelligible, I don't know how else to say it,

14   we could not say we know A to be true, he said B,

15   we can prove B is false.  It was so convoluted,

16   the best we could say is he was impeding the

17   investigation by not giving direct answers.  So

18   that's unbecoming conduct.

19   Q.          Okay.  And I just want to step back to

20   the question, because you answered it and then you

21   gave me an example, but I want to step back to the

22   answer.  You said the first step was to read the

23   investigation.  The investigation materials, as I

24   understand them from Sergeant Decker, consisted of

```
 1    first the IAB summary, which was something like

 2    200 pages long by itself?

 3    A.          Yes.

 4    Q.          I see an eye roll there.

 5    A.          Yes.

 6    Q.          So we'll get into that in a second.

 7                That it also had, as I think you

 8    referenced earlier, probably a thousand pages or

 9    more of supporting materials?

10    A.          Correct.

11    Q.          And I just want to get a sense of what

12    of that you actually looked at in reaching these

13    conclusions.

14    A.          I would have looked at all of it

15    scanning for information that was pertinent to the

16    allegations I'm trying to decide on.  That's not

17    to say I would have read every verbatim

18    transcript.  I would have looked at this portion

19    of the IAB summary, and if there's page references

20    in there, if there's something I wanted to see

21    what the full context was, maybe what the

22    statement was before or after it, I would go and

23    read that section of the transcript to make sure

24    it was not being mischaracterized.
```

1   Q.          Okay.  Did you find any instances where

2   you felt like Sergeant Decker had mischaracterized

3   his -- what he wrote in the summary?

4   A.          Again, I did not find what I thought to

5   be mischaracterizations.  I felt his frustration,

6   where you could not get a straight, intelligible

7   answer from the sergeant, which means, in my

8   opinion, he was impeding the investigation.

9   Q.          Okay.  Obviously the 208-page

10  investigative summary consisted of some

11  allegations under your chain of command and some

12  allegations that were not.  Did you skip the

13  allegations that were not in your chain of command

14  or did you read them for context?  Or did you do

15  something in between those things?  What did you

16  do?

17  A.          The summary, then I read the context of

18  a full appreciation of what was discovered.  My

19  decision-making would have been based on those

20  that I had authority over.

21  Q.          Okay.  Is it fair to say that there are

22  some investigations where you might treat an

23  allegation, a particular allegation differently

24  because of the surrounding allegations?  Like if

1    there's a pattern of conduct, it might make it

2    more serious than if it's just one isolated

3    incident?

4    A.        That's possible to happen.

5    Q.        Okay.  The --

6              THE WITNESS:  Can I go off the record

7    for one second?

8    Q.        Is there some reason we need to go off

9    the record?

10   A.        I'm sorry, I -- can I go off the

11   record?

12             MR. VARDARO:  Sure.

13             (A discussion is held off the record.)

14   Q.        Is it -- I'll try to ask my last

15   question in a clearer way.

16             Actually, you -- I think you answered

17   it.  So in a wide-ranging investigation like this

18   one, it -- I think it would be -- it would have

19   been maybe unwise for you not to read the whole

20   investigation so that you could at least see

21   whether maybe some of the things that Sergeant

22   Moore was being accused of in SRB had either

23   carried over into narcotics or were part of a

24   pattern that crossed over both chains of command,

1    so it -- I mean, does that make sense?

2    A.          I would say that I reviewed it at the

3    time enough to have a flavor of or a good feeling

4    of what the gravity of the misconduct was.

5    Q.          Okay.  In -- did you listen to any of

6    the interviews?

7    A.          Not the -- not the verbal --

8    Q.          Okay.

9    A.          -- recording.

10   Q.          Okay.  But you read some of the

11   interview summaries just to spot check?

12   A.          Yes, I did.

13   Q.          Okay.  Did you review any of the other

14   supporting materials, documents about equipment

15   and things like that?

16   A.          As I said, I reviewed everything that

17   was encompassing the investigation.  To the level

18   that I read through word for word, I can't state

19   that that occurred.  Because there was a lot of

20   documents that are -- that you recognize them on

21   their face what they are and know that there's not

22   something there that you have to dial down into.

23   Q.          Okay.  You mentioned in your note on

24   the routing sheet that's in Exhibit 41 that you

125

1    had executive staff discussions of this case?

2    A.        Yes, sir.

3    Q.        Would that have included the deputy

4    chief over narcotics as well --

5    A.        Yes.

6    Q.        -- as --

7    A.        Yes, sir.

8    Q.        Okay.  And it would also have included

9    the chief?

10   A.        Yes.

11   Q.        And professional standards?

12   A.        The commander of professional standards

13   is present.  The discipline grievance liaison

14   lieutenant is not.

15   Q.        Okay.  Who was the commander of PSB?

16   A.        Commander Kelly Weiner.  In 2016 it

17   probably was Commander Weiner, but I don't recall.

18   We've had -- Commander Moore was at one point

19   before he went to narcotics, I believe.  I don't

20   remember, though, the changes.

21   Q.        Okay.  Was part of the discussion in

22   the executive staff about this case which charges

23   would or would not be escalated to departmental

24   charges?

126

1    A.        No.

2    Q.        Okay.  What was the -- go ahead.

3    A.        Basically what the discussion is is

4    I've received the case, I reviewed it, I've sent

5    it to professional standards for a just cause

6    review.  They found just cause for the sustained

7    allegations that would -- that I would request

8    departmental charges for, because they're critical

9    misconduct.

10             The chief may ask some questions where

11   I give her a general update on what the nature of

12   it is.  And, I mean, this would all occur in five

13   minutes.  And then she would say, go ahead and

14   file departmental charges.  It's up to the

15   discipline grievance liaison lieutenant to

16   actually craft the charges by charge and

17   specification, bring it to me to look at and make

18   some language suggestions or changes if I see

19   anything.  And then once it's finalized, they take

20   it to the chief for a hearing date and a

21   signature.

22   Q.        Okay.  Sergeant Decker indicated to us

23   that there was a draft of his investigation prior

24   to the one that was forwarded to the chain of

127

1    command, and it was probably another 100 pages

2    beyond the 200-page summary.

3    A.        Okay.

4    Q.        Did you see the longer draft?

5    A.        I remember having a conversation -- I

6    don't know that I saw it.  I believe Commander

7    Knight, in her role of reviewing it, directed him

8    to streamline it.  And, in fact, because you asked

9    me this question before, it's entirely possible --

10    again, it's just hard to remember five years ago,

11    but it's entirely possible I had a conversation

12    with Commander Knight about concerns I had about

13    the packet prepared by Sergeant Decker.  And that

14    she told him to pare it down, because I remember

15    having a conversation, as I said, I remember

16    sitting in my office across from my desk and

17    telling him that the problem we need is we know A

18    to be true, he said B, here's how we can prove B

19    is a lie to charge him with untruthfulness.

20    That's the reason I ultimately went

21    with unbecoming conduct versus untruthfulness.

22    The investigation -- I tried to explain to

23    Sergeant Decker that the investigation, more is

24    not always better, I guess is the easiest way to

128

1   say it.  200 pages, 300 pages doesn't always sum

2   up what could be maybe said in 25 pages, so to

3   speak.  It's who reads verbatim 200 pages when you

4   have everything else on your desk at the same

5   time?  You look for -- I don't want to go into a

6   lot of detail.  I usually try to tell anybody,

7   especially deputy chiefs, are content driven, time

8   pressed and decision focused.

9           All the supplementary verbatim

10  transcripts can support that if I need to prove

11  something.  In the IA summary, I need to know the

12  nuts and bolts.  Again, content focused, time

13  pressed, decision focused.  Tell me what I need to

14  know to make a decision if you can do it in 20

15  pages, don't do it in 200.

16  Q.       So I take it that you're telling me you

17  don't remember one way or the other whether you

18  saw the longer draft?

19  A.       I do not recall that I saw the longer

20  draft.  I knew there was direction given to pare

21  it down.

22  Q.       Were you aware that the longer draft

23  from Sergeant Decker included additional sustained

24  allegations compared to the shorter draft?

129

1  A.        I can tell you I would not have read

2  the longer draft, so I would not necessarily know

3  anything about that, other than what I was briefed

4  on, and I don't recall what the briefing included.

5  Q.        Okay.  When you say you were briefed on

6  it, briefed by Decker or Knight?

7  A.        Verbally by Sergeant Decker in my

8  office, give me an update on it and lay out kind

9  of the overall picture.

10 Q.        Okay.  The issue of Sergeant Moore

11 using racially derogatory terms was under your

12 chain of command, correct?

13 A.        It would have occurred -- regardless of

14 when it was reported, it would have occurred while

15 under my chain of command.

16 Q.        Okay.  And the finding on that was a

17 sustained allegation of -- it would have been

18 allegation 16, which is on page 4 of that cover

19 sheet.  The finding was a sustained allegation

20 under rule of conduct 1.15(a)1, which has to do

21 with being courteous to other officers; is that

22 right?

23 A.        That's the -- 115 is be courteous at

24 all times.

130

1    Q.         Okay.  What's your understanding for

2    why he was charged with 1.15(a)1 versus an

3    allegation or a rule of conduct having to do with

4    equal employment opportunity?

5    A.         Ask the last part of it again.  I

6    caught all of it but the very last part.

7    Q.         115(a)1 doesn't have a whole lot to do

8    with equal employment opportunity or

9    discrimination.  It has to do with how officers

10   treat each other, right?

11   A.         Yes, or citizens.

12   Q.         And so my question is:  Why is there no

13   EEO charge on this -- on this allegation?

14   A.         Again, the chief and internal affairs

15   commander decide the scope of it and the

16   allegation.  That's the reason they put in here.

17   I can change them, as I did on several of these,

18   but they decide what the allegation is.

19              So that's what was presented to me, and

20   it was presented to me in a way that this is old

21   information that's very difficult to prove.

22   There's no evidence that rises to the level of

23   hostile work environment or something like that,

24   because it was old and conflicting statements from

1    different people that would be a difficult charge

2    to prove when we had other -- the concern was kind

3    of more of the long-term, if we look like we're

4    just piling on, the arbitrator may even be more

5    critical.  We wanted to go with our strongest case

6    for departmental charges, what we had the best

7    proof of.  This was very difficult to prove.  It

8    was all over the place in there who remembers what

9    from years ago and who was present and the

10   similar --

11   Q.        Okay.  Well, you had multiple officers

12   from SRB telling Sergeant Decker that they had

13   personally heard Sergeant Moore use words like the

14   N word and call black officers monkeys and apes.

15   And an officer saying that he had had a

16   conversation with Sergeant Moore where he said

17   that black people in general were lazy.  Do you

18   remember that?

19   A.        I don't remember exactly what was in

20   there.  I remember that there were other people

21   who were interviewed out of it, and some gave

22   supporting statements to that effect.

23   Q.        Okay.  What more would you have needed

24   to justify an actual EEO charge besides eyewitness

1    reports of racist statements?

2              MR. COGLIANESE:  Objection.  Go ahead.

3    A.            Again, what I would be looking at is

4    officers are reporting misconduct only when they

5    were -- in many cases -- in Wes Sorrell's case,

6    that initially brought it forward, after he was in

7    trouble, which makes things suspect that they're

8    brought forward at a later date.  If others are

9    now coming forward and saying, yeah, I heard that

10   a couple years ago, then they are also in

11   violation of withholding information.

12             So, again, it challenged their

13   credibility a little bit to say, yeah, a couple

14   years ago I heard it, but I didn't do anything

15   about it.  And they have an obligation to do

16   something about it if they really heard it.

17             So I think we had enough in our mind to

18   sustain and take some action on it.  But to take

19   further action like a departmental charge, I don't

20   think, as I talked to professional standards,

21   there was enough in the investigation to have

22   supported that type of -- that level of activity.

23   Q.            I guess I'll go back to my question,

24   which is:  What -- I understand that you feel that

1    the evidence that you had was not sufficient to

2    sustain a departmental charge on an EEO

3    violation -- well, first, let me start with that.

4    If it had been deemed to be an EEO violation

5    versus just a discourteous conduct, it would have

6    been something that you would have pursued a

7    departmental charge on?

8    A.          Again, everything's case specific.

9    Yeah, I would have to see the actual facts that

10   can be proven.

11   Q.          It certainly would be more serious to

12   put an EEO label on it than just a not courteous?

13   A.          Yes.

14   Q.          Okay.  And I guess my question is:

15   What -- what would you have been looking for in --

16   I mean, obviously unless Sergeant Moore is going

17   to either be recorded saying the N word or admit

18   to it, there's always going to be a question about

19   whether it actually happened.  I guess I'm asking,

20   is that what you needed?  You needed it to be on a

21   recording?  Or was there something in between

22   those things that would have escalated this to a

23   departmental charge in your mind?

24              MR. COGLIANESE:  Objection.  Go ahead.

134

```
 1    A.        The way I would describe that is this
 2    is -- all the employment actions are similar to
 3    like a criminal case where the accused has the
 4    just cause, the due process rights.  And it's up
 5    to the members who are the moving party, who are
 6    making the allegations to be -- to describe
 7    activity that would be supported and credible
 8    enough to make it that type of an allegation.  And
 9    I don't think they met that bar.
10    Q.        What -- what would have been different
11    that would have made it meet that bar if
12    they're -- what more evidence could there possibly
13    have been that would make it meet that bar,
14    besides a recording or an admission?
15              MR. COGLIANESE:  Objection.  Go ahead.
16    A.        I can't sit here and tell you about
17    going back through the thousand pages and going
18    back and reliving the discussions that I had with
19    the chief or professional standards or Commander
20    Knight of how we reached that conclusion.  I do
21    not recall.  At the time, that was the decision
22    that was made.
23    Q.        Okay.  Have you ever been involved in a
24    situation where the department sustained a hostile
```

1    work environment or other race discrimination

2    charge against an officer?

3    A.          I know that we have.  I don't recall

4    ones that I was involved in.

5    Q.          Okay.  What are the ones that you're

6    aware of?

7    A.          I would have to go back through the

8    records.  I remember cases that they occurred.  I

9    don't remember all the circumstances.

10   Q.          Okay.  Another charge that was under

11   your chain of command was the allegation of the

12   threat against Doug Williams and Eric Cornett, and

13   that one was forwarded as not sustained?

14   A.          Correct.

15   Q.          Which you upheld?

16   A.          Correct.

17   Q.          You knew from reading Sergeant Decker's

18   report that -- well, first of all, we talked about

19   multiple officers corroborated Sorrell's

20   allegation that Moore had made racial slurs,

21   right?

22   A.          I don't -- I don't recall what they

23   corroborated.  I just recall other officers

24   provided testimony and were asked questions about

1    that.  As I sit here today, I don't remember it

2    without reading through the whole case.

3    Q.        Well, let me put it this way:  Do you

4    remember that Sorrell recalled that Officer Scott

5    Watkins was present when Eric Moore made the

6    threat against Cornett and Williams?

7    A.        Seems familiar, but I don't recall the

8    specifics.

9    Q.        Okay.  Do you remember reading Decker's

10   description of an interview with Watkins where

11   Watkins said that he did remember Moore making

12   statements along the lines that calling Eric

13   Cornett a monkey or an ape?

14   A.        I don't recall.  I would have to read

15   the whole transcript.

16   Q.        Do you remember multiple officers,

17   including Watkins, including Larry Wilson,

18   including Whitney Lancaster, stating that they had

19   personally heard Eric Moore talk about fighting

20   Eric Cornett or beating him up?

21   A.        The fighting or something like that

22   sounds more familiar than the allegation of

23   threaten to kill.

24   Q.        Okay.  My question is:  If you got a --

137

1   if you have an officer who's accused of making a

2   death threat against other officers, as Eric Moore

3   was, and the finding is, well, we can't confirm

4   that he made the death threat, because there's no

5   sufficient corroboration, but he absolutely did

6   threaten physical violence against another officer

7   and used racial terms to do so, is it proper -- is

8   the proper conclusion to say, okay, well, that

9   allegation is not sustained because there wasn't a

10  death threat?  Or is there something else that

11  would be appropriate in that situation?

12          MR. COGLIANESE:  Objection.  Go ahead.

13  A.       The option would be to direct the

14  allegation to be re-worded that there was threats

15  to harm.

16  Q.       Would that be --

17  A.       That -- if we had done that, that may

18  have been something that we could have sustained.

19  We have to prove -- again, due process is the

20  employee accused is the one that has the

21  protections.  Just like in a criminal case, we

22  have the burden to prove that he made a threat to

23  kill either officer, and we did not have that

24  proof.

138

1    Q.          So what is the process if the charge is

2    Sergeant Eric Moore threatened to kill Sergeant

3    Doug Williams and Officer Eric Cornett and, again,

4    going to the hypothetical, he's interviewed and he

5    says, absolutely not, I didn't threaten to kill

6    Sergeant Williams and Eric Cornett, I threatened

7    to, you know, beat them up in the back parking

8    lot, what would be the next required procedural

9    step in order to sustain a charge?

10          MR. COGLIANESE:  Objection.  Go ahead.

11   A.          Again, an option is to reclassify the

12   allegation that Sergeant Eric Moore threatened

13   harm to Sergeant Williams and Officer Cornett, and

14   then have a new summary written that would have

15   shown where the validation is to prove that

16   allegation.  Again, we were answering the question

17   of whether we could prove the kill.

18   Q.          Would Eric Moore have had to be

19   re-interviewed with the new charge in that

20   situation, or could you just take his

21   investigational interview and just say, okay,

22   we're re-wording this charge as this?

23   A.          If there's sufficient --

24          MR. COGLIANESE:  Objection.

139

```
 1              THE WITNESS:  Sorry.
 2              MR. COGLIANESE:  Sorry.
 3    A.        If there's sufficient information
 4    there, we would not have to re-interview him.  It
 5    would have taken a new summary to explain how we
 6    can prove the new allegation as worded.
 7    Q.        Well, Decker's summary certainly lays
 8    out in an incredible level of detail basically
 9    everything that everybody said in the
10    investigation.  It's -- I mean, it would be --
11    you're not -- we're not talking about a big heavy
12    lift here to re-word the allegation from threaten
13    to kill to just threatened harm and then just
14    saying, I didn't find that that threat
15    corroborated, but he certainly threatened
16    physically on multiple occasions?
17    A.        I agree it's not a heavy lift.
18    Q.        Okay.  Would that be a serious charge,
19    an officer threatening physical harm against
20    another officer, especially in racially derogatory
21    terms?
22              MR. COGLIANESE:  Objection.  Go ahead.
23    A.        With everything else we had sustained,
24    I don't know that that would have overshadowed the
```

1    other charges, because, again, a threat to do

2    something is different than an action.  Speech is

3    different than an action.  The other cases that

4    were sustained were actions that we could prove.

5    Q.        Okay.  So in your estimation of CPD

6    policy, it's more serious to mishandle

7    departmental equipment than to use a racially

8    derogatory term to threaten to harm a black

9    officer?

10   A.        That's not what I'm saying.

11             MR. COGLIANESE:  Objection.

12   Q.        Well, can you clarify it for me?  What

13   he was found to have done, the more serious

14   charges, the things that resulted in the

15   departmental charges all had to do with theft of

16   property or mishandling of departmental property

17   or time.  And the charges that didn't get that

18   treatment as departmental charges had to do with

19   treatment of black officers by Eric Moore.  And so

20   I'm just trying to figure out where threatening to

21   harm somebody in racially derogatory terms might

22   fall in that spectrum?

23   A.        I was trying to look to see where --

24   when the date the investigation commenced was.  It

1    sounds like it was October of '14 or something.

2            And as you see on this, this came out

3    September of '15, this was signed in March of '16.

4    I think when we do that, we run the risk of

5    continuing to delay an investigation for another

6    month or two when there was, we felt, sufficiently

7    strong charges to go with termination.  We tend to

8    do a termination case.  We did terminate.  The

9    director heard it and terminated.  Arbitrator

10   ruled differently.

11           So I think we were looking at

12   continuing to drag a case out longer by sending

13   him back.  With something that long, we could have

14   sent it back five, six, seven times.  If we kept

15   wanting to add things, clean something up,

16   re-interview something, I think we felt we had

17   enough here to terminate, and that's what we

18   ultimately did.

19   Q.        In hindsight, do you think it would

20   have helped to include that allegation that -- as

21   a departmental charge that he had threatened to

22   harm black officers using racially derogatory

23   terms?

24           MR. COGLIANESE:  Objection.  Go ahead.

142

1    A.          I do not think so.  I think, again, a

2    threat to harm, something happened two years prior

3    with no evidence of any intent to act on that,

4    just speech, is different than the case that we

5    had proven that were actual actions.  And I think

6    that was our strongest case.

7    Q.          Okay.  These -- this reasoning that

8    you're giving me, is this something that you

9    discussed with Chief Jacobs and the rest of the

10   executive staff, or is this just your individual

11   analysis?

12   A.          I would say individual analysis.

13   Q.          Okay.  Did you have a discussion with

14   Chief Jacobs where there was a strategic

15   consideration of basically we don't want to charge

16   him with too many things, it will distract the

17   arbitrator, we don't want to spend any more time

18   on this, that kind of thing?

19   A.          Not that I recall.  I did the

20   discipline grievance job for about two years

21   myself and have been through numerous

22   arbitrations.  And so I believe I was basing a lot

23   of it based on my experience, on what we did have

24   and could prove and moving forward with that.  So

143

1    I think it was more of my experience.

2    Q.         Okay.  Do you recall any conversations

3    in which Chief Jacobs questioned whether maybe

4    there should be EEO charges or more serious

5    charges on the EEO aspects of this?

6    A.         I do not recall.

7    Q.         Okay.  Do you remember conversations

8    with Sergeant Decker where Sergeant Decker

9    advocated making further findings against Sergeant

10   Moore on the EEO aspects of the case?

11   A.         I don't recall the EEO aspects being

12   discussed further than what we had.

13   Q.         Do you remember him suggesting that

14   there should be a charge of untruthfulness based

15   not just on the overtime and equipment issues, but

16   also on the EEO aspects of the case and the threat

17   and some of the stuff that happened in narcotics?

18   A.         It's entirely possible.  Again, as I

19   said, I had given some constructive feedback to

20   Sergeant Decker that it was convoluted, the

21   investigation as written, and it needed to be

22   streamlined so the reader could find what it was

23   that they could prove.  People get lost in the

24   mass.  So it's possible we discussed it, but that

1    was it.

2    Q.          Okay.  Do you recall that in the final

3    version of Sergeant Decker's IAB summary, the only

4    allegation of untruthfulness against Sergeant

5    Moore was about a specific overtime or equipment

6    issue?

7    A.          I don't recall.

8    Q.          Okay.  But you do recall having a

9    conversation with Sergeant Decker about making --

10   making sure, in particular about the

11   untruthfulness allegations, that you could connect

12   the dots and that it was more clearly written than

13   what you had read?

14   A.          I recall having a discussion over the

15   entire set of -- scope of allegation that whatever

16   you are sustaining, if someone can turn to a page

17   and go there it is, I've got it.

18   Q.          Okay.  Did you become aware during the

19   course of the investigation or from reading

20   Sergeant Decker's summary that Sergeant Moore, in

21   addition to allegedly threatening Sergeant

22   Williams and Officer Cornett, had engaged in some

23   threatening conduct toward an officer named Dick

24   Elias?

1    A.        There's some recent conversation I've

2    had that refreshed my memory that that was an

3    allegation.  I don't remember at the time.

4    Q.        Okay.  In particular, you remember that

5    the allegation was that Dick Elias and Sergeant

6    Moore were walking down a hallway or around a

7    corner, and when Sergeant Moore saw Officer Elias,

8    he made a motion as if he was going to draw his

9    weapon?

10   A.        That's what I recall hearing recently.

11   Q.        Okay.

12   A.        I don't remember at the time.

13   Q.        Well, was it -- I mean, it was in

14   Sergeant Decker's summary, you would have --

15   A.        Right.

16   Q.        -- read it at the time?

17   A.        I would have read it at the time.

18   Q.        Okay.

19   A.        I don't remember it.

20   Q.        Were you -- I mean, were you consulted

21   at the time about whether that allegation should

22   be investigated further?

23   A.        I don't believe so.

24   Q.        Okay.  Sergeant Decker indicated in his

146

```
1    report that - and I'm quoting from the report,

2    that this -- well, actually I'm not quoting yet,

3    but he said that he was not pursuing that further

4    because, and I'm quoting, this concern was brought

5    to the attention of Lieutenant Brust at the time.

6                Does that -- is that an adequate

7    explanation for not including an allegation in an

8    IA summary?

9    A.          It is, because if he brought it to the

10   attention of Lieutenant Brust and Lieutenant Brust

11   says, I'll take care of it and counseled the

12   sergeant on that, then action would have already

13   been taken.  If we try to go back and issue some

14   other type of discipline out of it, the defense,

15   if you will, or the union position would be,

16   he's -- a card laid is a card played, as they say.

17   He's already -- this has already been

18   dispositioned by the lieutenant in realtime, we

19   can't go back now and change that.

20   Q.          So as soon as Lieutenant Brust went and

21   talked to Sergeant Moore about this incident, it

22   became out of bounds for internal affairs?

23   A.          Virtually, yes.  There are -- what our

24   recourse would have been is to go to Lieutenant
```

1    Brust and corrected him and said, don't do that

2    again, you've created a situation now where we

3    can't change the outcome of that.

4    Q.        Okay.  If you've got a situation where

5    a sergeant does something potentially illegal or

6    against departmental rules, and their lieutenant

7    basically wants to just protect them, doesn't that

8    put the lieutenant in a situation where they're

9    just -- they can prevent IA from investigating a

10   pretty serious charge?

11   A.        There is a mechanism to, again,

12   discipline the lieutenant and explain in writing

13   basically why you're disregarding that activity

14   because it was out of bounds and didn't have the

15   authority to disposition it.  There are certain

16   things that the deputy chief has to disposition or

17   the chief.

18        So if the lieutenant took a certain

19   action, then he wasn't -- didn't have the

20   authority to disposition it, then we could

21   overrule it and discipline him for interfering

22   with the deputy chief's right to disposition that.

23   Q.        What's the criteria for that?  I mean,

24   what are the things that the lieutenant would not

1    have the authority to deal with?

2    A.        If it came in as a citizen complaint or

3    if that allegation was directed to be conducted by

4    deputy chief or chief, he does not have the

5    authority to disposition the case.  If it's

6    something that was discovered in the

7    investigation, and I don't know the fact pattern

8    there, but if it's something that was brought to

9    Lieutenant Brust's attention and he went and took

10   care of it on his own, it was not something that

11   was designed to be -- or ordered to be

12   investigated by the chief or the deputy chief,

13   then he could take that action.  May not be the

14   action we wanted him to take, but he had the

15   authority to take the action at that time.

16   Q.        How could it be determined whether

17   Lieutenant Brust had done something inappropriate

18   or not without investigating it at the IAB level?

19   A.        Just based on the known facts at the

20   time, you can -- again, I don't know the fact

21   pattern you're referring to, but if the -- if the

22   allegation was brought to the chain of command

23   that he made a threatening move towards Dick Elias

24   and was not part of this investigation, and Brust

149

1    said, I'll take care of it, because that's

2    something that needs immediate attention, I'll

3    take care of it, and he took care of it, then he

4    had the authority to do that.

5            It may not be what he wanted him to do,

6    but he had authority to do it.  If it was part of

7    this investigation and I directed it to be

8    investigated, he did not have the authority to

9    disposition that.

10   Q.        Okay.  So even with Lieutenant Brust,

11   if he just decided, I don't think this is really

12   that serious, I'm just going to tell Sergeant

13   Moore not to threaten people with guns anymore,

14   then not only can Sergeant Moore not be

15   investigated or disciplined for the action, but

16   Lieutenant Brust can't be either, because it's

17   within his scope of authority?

18   A.        I didn't say he couldn't be

19   investigated for it.  I said, if it was -- if

20   these fact patterns or this criteria wasn't in

21   place, then he was within his authority.  He can

22   still be investigated to see if that was the fact

23   pattern.

24   Q.        Okay.  Given all of the other things

1    that you know about what Sergeant Moore was being

2    accused of and the timing of this, wouldn't that

3    have been appropriate in this situation to at

4    least investigate it to determine whether

5    Lieutenant Brust had handled it properly or that

6    he had actually handled it?

7                    MR. COGLIANESE:  Objection.  Go ahead.

8    A.          It wasn't my chain of command at the

9    time, so I can't speak to what they -- what

10   decisions they made around that --

11   Q.          Okay.

12   A.          -- situation.

13   Q.          Is that a decision that Commander

14   Knight could make on her own in terms of

15   instructing Decker about what to investigate?  Or

16   would she have had to consult with whoever the

17   deputy chief was over that chain of command?

18   A.          She could have made that direction.  It

19   would have been more likely that the chain of

20   command or the chief would have been consulted on

21   that to get additional direction.  Internal

22   affairs tries to stay neutral and disinterested in

23   not adding to the scope of an investigation

24   without getting permission from the chain of

1    command.

2    Q.         Okay.  What about deciding not to add

3    to the scope of the investigation?  Do they do

4    that on their own or do they check with the chain

5    of command?

6    A.         Case by case.

7    Q.         Okay.  Sergeant Decker told Officer

8    Shaw in response to -- it was Officer Shaw who

9    raised that concern with what happened with Elias.

10   Sergeant Decker told him in response to that that

11   he was instructed that they weren't going to take

12   any third-party complaints about officer -- about

13   Sergeant Moore, and that if Elias wanted to raise

14   it, he would have to raise it himself.  Is that an

15   accurate -- is that something appropriate within

16   the department?

17   A.         Sounds like a reasonable instruction.

18   Again, whether things are the way we would like

19   them to have occurred, I can't speak on -- I don't

20   have all the facts.  What you've described sounds

21   like a reasonable instruction, that if you feel

22   you are threatened, our policy is -- written

23   policy that the employee has to write a letter

24   requesting the case be investigated.

1    Q.        Okay.  But it's not always the

2    employee's choice, right?  The employee can be

3    instructed to write a letter?

4    A.        They can be, yes.

5    Q.        But that's what happened with Sorrell,

6    for instance, that Sorrell raised some concerns

7    informally and he was instructed to write a

8    letter?

9    A.        Yes.

10   Q.        Do you know one way or the other

11   whether Dick Elias was aware of all the other

12   threatening or inappropriate conduct that Sergeant

13   Moore was being accused of at the time?

14   A.        No knowledge.

15   Q.        Okay.  You really think it's reasonable

16   in that context to leave it to individual officers

17   whether they individually feel like it was a real

18   threat or not --

19              MR. COGLIANESE:  Objection.  Go ahead.

20   Q.        -- given that they might not know that

21   it's part of a pattern?

22              MR. COGLIANESE:  Objection.  Go ahead.

23   A.        They're trained and experienced police

24   officers who carry a firearm and defend themselves

1    and others all the time.  I give police officers a

2    lot of credit to be able to call something what it

3    is if it's something that they're concerned by or

4    feel that needs investigated.

5    Q.          Well, you understand that in this

6    particular situation, Officer Elias was the person

7    who brought it to the attention of Lieutenant

8    Brust at the time, because he felt that it was a

9    threatening situation?

10   A.          Yeah.  I don't have the facts.  That

11   was not in my chain of command.  I don't have the

12   facts that you're asking about.

13   Q.          Okay.  If this had been investigated

14   and it had been determined that, in fact, Sergeant

15   Moore had made a threatening gesture toward his

16   weapon as to another officer of color besides Eric

17   Cornett and Sergeant Williams, wouldn't that have

18   helped corroborate the threat allegations that he

19   was originally charged with?

20              MR. COGLIANESE:  Objection.  Go ahead.

21   A.          It would be considered in context with

22   the rest of the investigation.

23   Q.          Okay.  You also saw in Sergeant

24   Decker's report that Sergeant Moore was alleged to

1    have purchased an illegal weapons enhancement

2    called a lightning link?

3    A.          I don't even recall that.  I can't say

4    that -- I didn't see at the time, but that one

5    just is something I don't recall from the

6    investigation.

7    Q.          Okay.  I'm handing you what's been

8    marked previously as Exhibit 38, which is Sergeant

9    Decker's investigative summary.  Can you turn to

10   page 169 of that report?  The page numbers are at

11   the top.

12   A.          Yeah, I got it.

13   Q.          You can unclip it if you want.  Just be

14   aware it's not stapled.

15   A.          I got it.

16   Q.          Do you see a reference to lightning

17   link on that page?  I think it's toward the

18   bottom.

19   A.          I do see it.

20   Q.          Does this refresh your recollection

21   about what this was about?

22   A.          It refreshes it.  Like I said, it's

23   been a long time, but it refreshes it.

24   Q.          Sergeant Decker says in this stage of

155

1    the report that this allegation wasn't pursued

2    because, quote, this concern has also already been

3    addressed by the appropriate law enforcement

4    agency.

5              Is that consistent with CPD practice?

6    A.        Again, it's a decision that was made

7    outside my involvement or input, so I can't speak

8    to that.

9    Q.        I mean, you're the acting or interim

10   chief of the department.  I mean, if this is

11   something that if it came up now, you would only

12   have some input on, and even when you were deputy

13   chief, if it had happened within your chain of

14   command, you would certainly been able to do that,

15   right?

16   A.        Yes.

17   Q.        And I think we talked earlier about

18   you've had investigations in the past, including

19   this investigation, where something was

20   investigated as a potential crime, but it was

21   determined not to have been criminally chargeable,

22   but then it still proceeded as an administrative

23   investigation, right?

24   A.        Yes.

156

1    Q.        Isn't it inconsistent with the way that

2    the Columbus Police operate that just the fact

3    that something is determined not -- that a law

4    enforcement agency CPD or otherwise determines

5    that they're not going to proceed with the

6    criminal execution, that does not mean that it

7    couldn't -- that it might be -- might not be

8    something that IA should pursue or that the chain

9    of command should pursue?

10        MR. COGLIANESE:  Objection.  Go ahead.

11   A.        This is a concern I certainly could see

12   could have been turned into an expanded scope of

13   the investigation on.

14   Q.        Did you know that Sergeant Decker

15   consulted with the ATF agent in charge and the

16   agent told him that the reason that they didn't

17   prosecute Sergeant Moore was because he was a

18   police officer and they took his word as a police

19   officer that he didn't accept delivery of the

20   equipment he ordered?

21   A.        I don't recall that.

22   Q.        Okay.  If you had known that at the

23   point when this was being investigated, would that

24   have caught -- given you cause for concern?

157

```
1              MR. COGLIANESE:  Objection.  Go ahead.
2    A.         Yes.
3    Q.         If you knew that Jennifer Knight was
4    aware of that at the time that Sergeant Decker had
5    that conversation and instructed him not to follow
6    up because the ATF had already handled it, would
7    that give you cause for concern?
8              MR. COGLIANESE:  Objection.  Go ahead.
9    A.         Without confronting her and finding out
10   what she knew at the time or what -- the base for
11   her decision was or who else had input into her
12   decision, I can't speak to that.
13   Q.         Okay.  Given that Sergeant Moore was
14   being accused of threatening other officers,
15   including a potential death threat, wouldn't it
16   escalate that concern to know that whether or not
17   he had taken delivery of a device that would turn
18   a semiautomatic weapon into an automatic weapon?
19   A.         From what I understand --
20             MR. COGLIANESE:  Objection.  I'm sorry.
21   Go ahead.
22   A.         From what I understand here, he -- we
23   had information that he did not take possession of
24   it.
```

158

1   Q.        Okay.  And I'm representing to you,

2   Sergeant Decker was told by the ATF that, in fact,

3   there was no -- there was no information that he

4   didn't accept delivery, other than Sergeant Moore

5   just saying he didn't and them taking his word as

6   a police officer.  With that information, isn't

7   that -- wouldn't it make the concerns about the

8   death threat a little bit more serious?

9              MR. COGLIANESE:  Objection.

10  Q.        Or a lot more serious?

11             MR. COGLIANESE:  Objection.  Go ahead.

12  A.        Yes.

13  Q.        If Jennifer Knight decided on her own,

14  knowing that information, not to allow Sergeant

15  Decker to investigate that allegation further,

16  would that -- would that be a cause for concern

17  for you as a command officer?

18             MR. COGLIANESE:  Objection.  Go ahead.

19  A.        I do not know what information she was

20  acting on, so I can't -- I can't --

21  Q.        I'm asking you -- and I'm sorry, I'm

22  asking you to assume that Sergeant Decker was

23  being truthful to us when he told us that he

24  informed Jennifer Knight of that -- of what he

1   learned from the ATF.

2   A.          What I'm saying is I'm not going to

3   assume what Jennifer Knight was acting on in her

4   frame of reference or her knowledge base.  I don't

5   know, so I can't speak to the appropriateness of

6   her decision.

7   Q.          Okay.  When you read this report, even

8   though it was outside of your chain of command,

9   you had the authority to request additional

10  investigation on these issues if you wanted it,

11  right?

12  A.          Yes.

13  Q.          And, for instance, if you felt like,

14  okay, well, this might not be important to Deputy

15  Chief Gray or Deputy Chief -- gosh, I'm blanking

16  on the name of who took it over.

17  A.          Woods.

18  Q.          Woods.  If you felt like maybe they

19  didn't think it was pertinent by itself under the

20  narcotics chain, but it might be pertinent to my

21  investigation of the threat, you could have

22  instructed Decker to investigate it further?

23  A.          As I mentioned, I focused on the part

24  of the investigation that I was to weigh in on,

```
 1    and because of that, I did not take that part into

 2    my decision-making.

 3    Q.          Did you have any role in advising what

 4    should or shouldn't be charged on the allegations

 5    under the narcotics chain of command?

 6    A.          No.

 7    Q.          Okay.  Did you have any informal

 8    discussions with Deputy Chief Woods or Deputy

 9    Chief Gray about their charging decisions on those

10    things?

11    A.          Not the charging decisions about --

12    probably had some discussions about where I was at

13    on the investigation that I was forwarding to them

14    to decide on issues that occurred and any decision

15    they would need to make in their chain of command.

16    Q.          Okay.  Were you in meetings where

17    Deputy Chief Woods or Deputy Chief Gray were

18    explaining their decisions to Chief Jacobs about

19    these issues?

20    A.          Not that I recall.

21    Q.          Okay.  Did you have any reaction to

22    what you read in Decker's report about the

23    treatment of the filling of the narcotics position

24    involving Officer Shaw and others?
```

161

1    A.          I didn't have any information from the

2    other perspective of what was going on in that

3    chain.  I didn't know what their reasons were, so

4    I didn't have a reaction, because I wasn't going

5    to react to something I didn't have the full facts

6    on.

7    Q.          Okay.  Did you become aware while the

8    investigation was going -- I'll start I want to

9    talk about different timeframes, first of all,

10   while the investigation was going on, before

11   Decker's report, did you become aware that Decker

12   had recovered text messages from Sergeant Moore

13   making threatening comments about what would

14   happen if Officer Shaw, Officer Lancaster or

15   officer Richard Moore took the narcotics position?

16   A.          I don't recall obtaining the text

17   messages.  I recall some conversation about

18   knowing that there was statements or something

19   about that.

20   Q.          Did you take that into account in your

21   conclusions about the threats that Sergeant Moore

22   was alleged to have made against Cornett and

23   Williams?

24   A.          All I took into account was stuff that

162

1    was provided and sustained in the investigation,

2    not stuff that was conjecture or secondary to it.

3    Q.        Okay.  Were you involved at all in the

4    chief's decision to vacate and repost the

5    narcotics position that was at issue in this

6    investigation?

7    A.        No involvement that I recall.

8    Q.        Okay.  You were not involved in any

9    decision-making about how Sergeant Moore would be

10   charged or disciplined on the failure to follow an

11   order from Commander Cameron?

12   A.        No, I had no input in that.

13   Q.        Did you have any role in Sergeant

14   Moore's arbitration once he was terminated?

15   A.        No.  I don't even recall testifying.

16   It's possible because I've testified in different

17   things, but I don't recall having any role

18   whatsoever.

19   Q.        Okay.  Were you informed -- well, you

20   know that Officer Shaw and Officer Cornett both

21   filed charges with the Ohio Civil Rights

22   Commission related to these allegations?

23   A.        Yes.

24   Q.        When did you become aware of those

163

1  charges?

2  A.          Whenever they were served.

3  Q.          Okay.  Were you ever involved in

4  discussions of what the impact would be on the

5  Division of Police if the division took the

6  position that Sergeant Moore had committed an EEO

7  violation towards Officer Shaw and Officer

8  Cornett?

9              MR. COGLIANESE:  Objection.  Go ahead.

10 A.          No.

11 Q.          Okay.  Nobody ever discussed that one

12 way or the other, that it would be good --

13 A.          I can't say.

14 Q.          -- or bad?  I mean in your presence.

15 A.          I can say I was not involved in any

16 discussions.

17 Q.          I'm asking about your personal

18 knowledge.

19 A.          Yeah, not in my presence.

20             MR. VARDARO:  Okay.  I would like to

21 take a five-minute break, and I might be close to

22 done.

23             (A recess is taken.)

24 Q.          Chief Quinlan, earlier in the

1    deposition you -- we were talking about the racial

2    slurs by Sergeant Moore.  And you mentioned that

3    you felt like it didn't rise to the level of a

4    hostile work environment.  Can you explain what

5    you meant by that?

6    A.        My understanding of the case is that it

7    was done not in the -- not in the presence of

8    anyone other than Wes Sorrell, and Wes Sorrell's

9    credibility was nonexistent.  So that complicated

10   the issue.

11   Q.        Well, first of all, you remember other

12   officers corroborated that Sergeant Moore used

13   racial slurs toward other officers and towards

14   black people in general, right?

15   A.        Again, as you said, and there was

16   some -- read for their credibility, there was some

17   stuff made well after the fact that, again, made

18   some challenges to the credibility that they're

19   bringing something up many months after it

20   occurred.

21   Q.        Was this --

22   A.        When they have a requirement to report.

23   Q.        I understand that Wes Sorrell, there

24   were some questions about his motive for raising

1    concerns about Sergeant Moore.  Did you have some

2    similar concern about officers like Larry Wilson

3    and Scott Watkins?

4    A.          I don't remember what their statements

5    were to respond to what my assessment was of their

6    credibility at the time.

7    Q.          Okay.  Strictly the fact that an

8    officer didn't mention hearing the racial slur

9    from a white commanding officer at the time that

10   it was made, but then reported it in response to

11   questions in a later IA investigation, would that

12   be a reason to doubt their credibility?

13   A.          I would have to read the whole

14   transcript to see what the -- what the nature of

15   it was.

16   Q.          Okay.  I guess that doesn't really

17   answer the question that I asked, which is:  If

18   just the fact that an officer doesn't report a

19   racial slur as soon as they hear it and -- does

20   that cast doubt on their credibility when they

21   later answer an IA investigator's question and say

22   they did hear the racial slur?

23              MR. COGLIANESE:  Objection.  Go ahead.

24   A.          You would have to show me what it was

1    they said so I could try to refresh my mind why I

2    doubted or questioned their credibility.

3    Q.        Okay.  I will show you the summaries,

4    but I guess I'm just asking in general, there are

5    reasons why employees sometimes don't report

6    discrimination allegations, including fear of

7    retaliation, including not wanting to get somebody

8    in trouble.  I mean, that happens, right?

9    A.        Yes.

10   Q.        The fact that they don't immediately

11   report it doesn't automatically mean that they're

12   less credible when they describe it later --

13   A.        Correct.

14   Q.        -- right?  Okay.

15             And I'm looking at the wrong thing.  I

16   guess I'll start you with this one.  I'm going to

17   hand you what's previously marked as Plaintiff's

18   Exhibit 44, which is the informational summary

19   Sergeant Decker prepared of his interview with

20   Larry Wilson.  If you could take a look through it

21   and tell me if you see anything or it reminds you

22   of anything that would cast doubt on Officer

23   Wilson's credibility?

24   A.        So, for instance, on 004514 Bates, last

```
 1   paragraph, they, you know, just Wes and them said,

 2   you know, he thinks that all black people are

 3   inferior, that we're dumb.  So he's saying Wes

 4   said he thinks all black people are dumb.  He's

 5   not speaking on firsthand knowledge.  He says the

 6   N word got thrown around a lot.  Have I heard him

 7   say it?  No.  Do I believe he said it?  Yes.

 8   Something like that would be an example where it's

 9   not definitive.

10   Q.        Officer Wilson -- I mean, I'll ask you

11   to just read the whole thing.  I know it will take

12   a little bit of time, but you wanted to get a

13   sense of the whole thing.  There are things that

14   Officer Wilson describes that are not secondhand

15   or things that he heard around.  These are things

16   that he heard Sergeant Moore say himself.  And I'm

17   asking you whether there was any reason from the

18   informational summary or from anything else that

19   you knew that would cast doubt on Officer Wilson's

20   credibility describing what he heard firsthand?

21             MR. COGLIANESE:  Jeff, just to be

22   clear, are you going to have him read everything?

23   What exactly do you want him to read it for, just

24   so we can --
```

```
 1              MR. VARDARO:  I'm going to look at

 2    something because we have a little bit more detail

 3    on that, but I think I asked the question I want

 4    answered.

 5    Q.           And I guess in particular, were Officer

 6    Wilson's summary -- there's comments that he

 7    describes hearing Sergeant Moore say personally

 8    that he wants to wipe the floor with Eric Cornett,

 9    or take him out back, and that he threatened to

10    put a GPS on Eric Cornett's car and take his

11    badge.  And also that he observed Eric Moore

12    tacitly admit to making racial slurs, in that

13    other people asked him directly about it and he

14    didn't deny it.

15    A.           Again, without going through line by

16    line, there's just a lot of stuff in here as one

17    example that he hedged his answer that would not,

18    I don't think, stand up to being definitive.  I

19    asked Officer Wilson if he ever heard -- this is

20    on 004516 -- if he ever heard Sergeant Moore when

21    speaking with Sergeant Williams or Officer Cornett

22    refer to them as a monkey?  He responded, I don't

23    know.  I don't know.  And this is why I say I

24    don't know.  It all borders together.  And he goes
```

169

```
 1    on.  I've heard him many times say, if I could get
 2    him someplace, I would wipe the floor with him,
 3    but it's because of stuff that Eric Cornett had
 4    done to him that he felt was unjust.
 5              Officer Wilson elaborated.  Sergeant
 6    Moore goes, Larry, if I could get my hands, he
 7    goes, you know what, if all it takes for us to
 8    settle this like men, if we could just go back, we
 9    would settle it right there.
10              And, again, he's explaining that he
11    stated this was in an e-mail conversation or
12    something that to this day, I never saw it, I just
13    heard about it.  Again, there's just -- I didn't
14    feel there was enough here to -- with everything
15    else we had to -- to pursue that.
16    Q.        Well, in what you just read, it would
17    be accurate to say that Officer Wilson was not
18    definitive at all about hearing Sergeant Moore
19    make racial slurs, but he was very definitive
20    about hearing him say a number of times, if I
21    could get him someplace, I would wipe the floor
22    with him, and things along those lines?
23    A.        Yes.  And, again, this is something
24    that to my understanding was months old.  And they
```

170

1   had worked together and he never actually acted on

2   anything.  So I had no reason to believe this was

3   anything more than idle chatter between one

4   employee and another.  And that's -- that's where

5   that --

6   Q.        Okay.

7   A.           -- was resolved.

8   Q.        Can you take a look at Plaintiff's

9   Exhibit 11?  And I'll ask you the same question

10  about Officer Watkins.  And in particular, I want

11  you to take a look at pages 4 and 5 of this

12  summary where he confirms that Sergeant Moore

13  called Eric Cornett a monkey or an ape or both.

14  A.        He was asked if he had ever heard him

15  refer to officer as a monkey, an ape or the N

16  word, and I'm not repeating.  He responded, yes.

17  He asked, well, which one?  And he said, a monkey.

18  Q.        And he also said on page -- on the last

19  page, second-to-last paragraph of the whole

20  interview, that he had heard Sergeant Moore refer

21  to black people as a race as lazy?

22  A.        Correct.

23  Q.        And then the paragraph after that, he

24  heard -- he said that he heard him refer to

1    Officer Cornett as an ape?

2    A.          Yeah.  And he also -- he says

3    specifically, I never heard the N word, but he

4    said -- asked if he heard Sergeant Moore say he

5    was going to go talk to Lieutenant Kemmerling

6    about that ape?  I've heard him refer to Cornett

7    as an ape specifically about Kemmerling.  I don't

8    remember the timing on that.

9    Q.          Okay.  So, again, he's definitive about

10   him calling Officer Cornett racial slurs and he's

11   definitive about him calling black people lazy.

12   He's less definitive about the -- some of the

13   specific context here?

14   A.          Correct.  And to reiterate on the

15   allegation 16, Sergeant Eric Moore referred to

16   Williams, Cornett or others using racially

17   derogatory language, I sustained that and said

18   it's accurate.

19   Q.          Okay.  And I guess I'll go back to my

20   original question.  You said the reason why it was

21   sustained as discourteous but not as an EEO

22   violation was, at least in part, because you felt

23   it did not rise to the level of hostile work

24   environment.  And that's what I was sort of

172

1    reacting to is what -- what leads you to say that

2    in particular?

3                MR. COGLIANESE:  Objection.  Go ahead.

4    A.          The -- the individuals who state that

5    they were suffering career -- hostile work

6    environment had no knowledge based on my reading

7    of this of this occurring.  It was other

8    individuals who heard some stuff, but were all

9    over the place on what it was that they heard or

10   what the time frame was, whether it was two months

11   ago or two years ago.  And they did not report it,

12   so I sustained it that it was improper, absolutely

13   100 percent wrong, no question.

14               But to show -- again, the burden is on

15   us to show that it was sustained as a hostile work

16   environment.  There was no actions taken against

17   the officers.  They had no knowledge of it at the

18   time.  So I did not see how I could prove that was

19   a hostile work environment to something they had

20   no knowledge of.

21   Q.          Okay.  Would it have to -- I guess my

22   question is really about the -- what you mean by

23   "a hostile work environment."  Like what -- does

24   that have something to do with the Columbus Police

1    standard for what is and isn't an EEO violation?

2    A.         It follows the statutory language,

3    which I would have to pull out the directory and

4    go through the four or five items that are

5    specifically listed.  But if you have that --

6    again, generally in my mind I have an idea, but I

7    would have to cite what it was that I compared it

8    to.

9    Q.         Okay.  Did you have any conversations

10   with either division or city HR personnel about

11   what would or would not be an EEO violation in

12   these circumstances?

13   A.         Not as I recall.

14   Q.         Okay.  Commander Jennifer Knight was at

15   some point removed from internal affairs by Chief

16   Jacobs.  Were you aware of that?

17   A.         I will classify it or categorize it as

18   reassigned.

19   Q.         Okay.

20   A.         Which the chief does on a regular basis

21   to all commanders.

22   Q.         Okay.  Do you know why in particular

23   Jennifer Knight was reassigned from her position

24   in internal affairs?

174

1    A.        I just know that the chief made three

2    or four changes, which was her prerogative.  So I

3    don't know, you would have to ask her why she made

4    that specific decision.  I don't know.

5    Q.        Okay.  So the chief doesn't consult

6    with you about that?

7    A.        No.  She would not do that.

8    Q.        Okay.  And you didn't make any

9    recommendations about reassigning Jennifer Knight

10   from IA?

11   A.        No.  My entire limitation was when

12   she -- when the chief mentioned she was going to

13   make X moves, whatever individuals they were, and

14   said she was going to change the assignments of,

15   you know, A, B, and C, Jen Knight was one of them.

16   I said I would be happy to have her on patrol

17   north, so I welcomed her to come to my

18   subdivision.

19   Q.        Okay.  Were you aware at the time that

20   you told the chief that, and at the time that

21   Jennifer Knight was reassigned from IA, that there

22   had been allegations that Jennifer Knight was not

23   properly handling allegations of discrimination

24   that she was in charge of reviewing with IA?

1          MR. COGLIANESE:  Objection.  Go ahead.

2     A.          I don't know that they were about

3     allegations of discrimination.  I know there were

4     people -- I had heard that there were other chains

5     of command that did not like the outcomes of

6     investigations, did not feel they were being

7     investigated to their satisfaction.  That's all I

8     know.

9     Q.          What were the chains of commands that

10    had a problem with that?

11    A.          I believe it was Chief Kuebler and

12    possible Chief Bash, as I recall.  But I don't --

13    I can't confirm, just as I recall.

14    Q.          What's the best of your recollection

15    what that was about?

16    A.          I think how long it takes to get an

17    investigation through the chain of command was --

18    is just unacceptable.  The -- again, this type of

19    investigation that is so expansive and not

20    narrowly defined, to focus on the real issues, I

21    think we probably could have narrowed this down to

22    three concrete allegations that were critical

23    misconduct related, untruthfulness, unbecoming

24    conduct, violations of laws potentially.  If we

1    had that proof for EEO sake, could have narrowed

2    it down and had probably a better work product.

3    So I think they were wanting a change in direction

4    there.

5    Q.          Okay.  Do you remember specifically

6    whether there was a concern about an investigation

7    that Jennifer Knight had authority over for --

8    involving a racial profiling by patrol officers in

9    a particular zone?

10   A.          I remember the case.

11   Q.          Okay.  Do you remember the -- there was

12   concerns within the chain of command about

13   Jennifer Knight's handling of the case?

14   A.          I remember there were allegations made

15   by the person accused of discrimination making

16   allegations, but I did not investigate them.  I

17   don't have any firsthand knowledge of what was

18   occurring in those investigations.  I did not --

19   it was a whole different chain of command, so I

20   did not oversee those.

21   Q.          Okay.  How about the situation where

22   Falacia Dragin had raised a concern about Jennifer

23   Knight telling a white command officer that she

24   had made a discrimination complaint about that he

1   didn't need to worry about the investigation and

2   she was going to handle it?

3   A.          I know that allegation was made.  I

4   don't know what the actual statement was or what

5   the context was, so I made no conclusion on that.

6   Q.          Okay.  You don't know whether that had

7   any impact on Jennifer Knight's reassignment from

8   IA?

9   A.          The chief would not have talked to me

10  about that.

11  Q.          Okay.  With one exception, those are

12  all the questions I have for you today.  The one

13  exception is:  Do you have anything in what you've

14  said throughout the whole rest of the day that you

15  feel you need to add to or correct at this time?

16  A.          I feel I did that along the way.

17          MR. VARDARO:  All right.  Then those

18  are all the questions I have.

19          THE WITNESS:  Thank you, sir.

20          MR. COGLIANESE:  He'll read.

21          (Signature not waived.)

22                  - - - - -

23          Thereupon, the foregoing proceedings

24          concluded at 3:15 p.m.

178

```
1    State of Ohio     :      C E R T I F I C A T E
     County of Franklin: SS
2
          I, Mary Bradley, RPR, CRR, a Notary Public in
3    and for the State of Ohio, certify that Thomas
     Quinlan was by me duly sworn to testify to the
4    whole truth in the cause aforesaid; testimony then
     given was reduced to stenotype in the presence of
5    said witness, afterwards transcribed by me; the
     foregoing is a true record of the testimony so
6    given; and this deposition was taken at the time
     and place specified on the title page.
7
          Pursuant to Rule 30(e) of the Federal Rules of
8    Civil Procedure, the witness and/or the parties
     have not waived review of the deposition
9    transcript.

10        I certify I am not a relative, employee,
     attorney or counsel of any of the parties hereto,
11   and further I am not a relative or employee of any
     attorney or counsel employed by the parties
12   hereto, or financially interested in the action.

13        IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Columbus,
14   Ohio, on August 6, 2019.

15

16

17

18

19   _____
20   Mary Bradley, Notary Public - State of Ohio
     My commission expires September 19, 2019.
21

22

23

24
```

```
              Witness Errata and Signature Sheet
                Correction or Change Reason Code
          1-Misspelling  2-Word Omitted  3-Wrong Word
            4-Clarification  5-Other (Please explain)

Page/Line        Correction or Change        Reason Code

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____
```

I, Thomas Quinlan, have read the entire transcript of my deposition taken in this matter, or the same has been read to me.  I request that the changes noted on my errata sheet(s) be entered into the record for the reasons indicated.

Date_____Signature_____

The witness has failed to sign the deposition within the time allowed.

Date_____Signature_____

Ref: Mb30925tq  S-mb P-bw

**Exhibits**

**30216 Exhibit 010** 4:5 60:1 69:9

**30921 Exhibit 011** 4:6 170:9

**30921 Exhibit 038** 4:7 154:8

**30216 Exhibit 041** 4:9 104:2,18 109:22 116:3 124:24

**30921 Exhibit 044** 4:10 166:18

_____

**0**

**004514** 166:24

**004516** 168:20

**014408** 109:8

**014421** 104:15

**014423** 116:4

**014425** 107:2

**014427** 104:19

_____

**1**

**1** 106:14,15

**1,900** 50:24

**1.15(a)1** 129:20 130:2

**1.15(a)5** 120:8

**1.36** 120:10

**10** 60:1 69:9

**100** 127:1 172:13

**11** 106:15 170:9

**115** 129:23

**115(a)1** 130:7

**13** 106:15

**14** 141:1

**15** 106:18 141:3

**16** 129:18 141:3 171:15

**169** 154:10

**17** 39:12

**18** 106:15

**19** 107:6 110:22 113:17

**1984** 15:9

**1989** 15:12

**1992** 47:14

**1993** 15:3

**1996** 18:4

_____

**2**

**2** 106:14,15

**2/25/16** 109:11

**20** 38:3 107:2 110:22 113:17 128:14

**200** 121:2 128:1,3,15

**200-page** 127:2

**2001** 14:19 17:22

**2002** 19:3,4

**2004** 19:9,10, 17

**2005** 19:4

**2006** 18:4

**2009** 17:15, 23

**2013** 16:13 17:4

**2014** 55:4 81:12,13 82:16

**2015** 104:8

**2016** 39:10 112:6 125:16

**2017** 39:12

**2019** 16:4

**208-page** 122:9

**21** 105:22

**24th** 15:12

**25** 128:2

**28th** 104:8

_____

**3**

**3** 116:4

**30** 9:5 40:24

**300** 128:1

**35** 9:5

**38** 154:8

**3:15** 177:24

_____

**4**

**4** 129:18 170:11

**41** 104:2,18 109:22 116:2,3 124:24

**44** 166:18

_____

**5**

**5** 105:23 170:11

**580** 71:8,20 73:1 75:3

_____

**6**

**6** 19:4

_____

**7**

**7** 108:19

_____

**8**

**8** 108:19

**8th** 16:4 66:14,15,21

_____

**9**

**9** 108:19 116:7 120:5

_____

**A**

**ability** 8:10 74:5

**absolutely** 42:6,9 137:5 138:5 172:12

**abuse** 80:20

**academy** 41:1 72:7

**accept** 156:19 158:4

**accepted** 32:23

**account** 161:20,24

**accurate** 151:15 169:17 171:18

**accurately** 8:11,14

**accused** 30:15 53:20 70:1 74:3,4 76:8 84:19, 20 85:3 89:11 123:22 134:3 137:1, 20 150:2 152:13 157:14 176:15

**acquaintance** 37:5 50:12

**act** 43:17 82:6 86:21 88:12 91:7 142:3

**acted** 170:1

**acting** 39:18 40:6,7 43:22 107:21 155:9 158:20 159:3

**action** 26:19 28:4 29:3,8 31:9 35:23 48:11 59:17 76:9,13 80:7,9,10 82:1,7 84:2 85:21 86:16 88:3,16 89:18 95:2 132:18,19 140:2,3 146:12 147:19 148:13,14, 15 149:15

**actions** 86:4 134:2 140:4 142:5 172:16

**active** 62:6 75:17

**activity** 22:12 41:9 85:18 114:21 132:22 134:7 147:13

**actual** 69:4 102:21 131:24 133:9 142:5 177:4

**add** 8:1 22:21 141:15 151:2 177:15

**added** 44:8

**adding** 150:23

**addition** 144:21

**additional** 35:13,14 82:19 103:20 128:23 150:21 159:9

**address** 82:11

**addressed** 104:7 155:3

**adequate** 45:18 146:6

**admin** 32:15 49:15,19 72:3 93:12

**administer** 22:19,23

**administration** 14:22 16:17 20:11 23:22 67:21

**administrative** 20:15 49:18 62:8 67:14 71:14,22,24 92:2,22 155:22

**admission** 89:23 91:1 134:14

**admit** 133:17 168:12

**advance** 43:22 85:20

**advise** 39:16 70:23 120:2

**advising** 160:3

**advocated** 143:9

**affairs** 18:8, 12,15,22,23 19:22,24 23:6 28:12 33:5,12 34:1,4,10 35:1 40:16 44:21,24 60:7,12 64:8 66:21 94:7 97:24 98:4, 12 102:23 115:3,19 116:8 120:6, 8 130:14 146:22 150:22 173:15,24

**affected** 75:9,10,11

**affirmatively** 114:8

**agency** 155:4 156:4

**agent** 156:15,16

**agree** 139:17

**ahead** 39:21 85:14 87:24 89:15 92:20 94:15 95:8 126:2,13 132:2 133:24 134:15 137:12 138:10 139:22 141:24 150:7 152:19,22 153:20 156:10

157:1,8,21
158:11,18
163:9
165:23
172:3 175:1

**allegation**
44:20 53:5,
15 54:6,15
69:2 70:10
71:4 74:14
80:3,20
84:13 85:16,
17 86:8 88:8
89:2 91:7
93:12 98:20
99:15,16
103:2,18
105:16,21,
22 106:18
107:2,6
108:19
111:15
113:16
115:21
116:7 120:1,
5 122:23
129:17,18,
19 130:3,13,
16,18 134:8
135:11,20
136:22
137:9,14
138:12,16
139:6,12
141:20
144:4,15
145:3,5,21
146:7 148:3,
22 155:1
158:15
171:15
177:3

**allegations**
23:18 24:9
51:23 52:16
53:23 54:2
56:1 68:1
72:22 75:19
80:19,22
81:19 82:23
83:4 86:17,
21 102:1
103:20
105:12
106:7,14,24
108:2 110:7,
9,22 112:12,
16,18 115:6
117:1,3,11,
12,14,22,24
119:17
121:16
122:11,12,
13,24 126:7
128:24
134:6
144:11
153:18
160:4
162:22
166:6
174:22,23
175:3,22
176:14,16

**allege** 71:12

**alleged** 55:3
70:22 74:19
114:12
153:24
161:22

**allegedly**
24:10,16
115:16
144:21

**alleging**
70:15

**allowed**
43:18 56:8
88:17
101:12
109:2

**analysis**
142:11,12

**and/or** 62:15

**angles** 81:19

**answering**
138:16

**answers**
120:12,17

**anymore**
149:13

**ape** 136:13
170:13,15
171:1,6,7

**apes** 85:5
89:7 131:14

**apologize**
9:15 19:10
75:13 101:4

**appeared**
82:14

**appears**
110:4

**applies**
26:14

**apply** 25:7
92:15

**appreciation**
122:18

**approach**
97:24

**appropriately**
87:20,21

**appropriaten
ess** 159:5

**approval**
112:14

**approve**
34:13

**approved**
109:12
111:7

**approves**
35:8 112:21

**April** 19:4
81:12,21

**arbitrary**
95:11

**arbitration**
118:13
162:14

**arbitrations**
29:19
142:22

**arbitrator**
44:12
118:12,21
131:4 141:9
142:17

**arch** 37:19
41:21 42:2,7

**argue** 45:5

**aspect** 52:9
92:21

**aspects**
143:5,10,11,
16

**asses** 99:7

**assessment**
165:5

**assign** 34:12
53:17 62:7
72:3

**assigned**
16:17 33:17
49:15,17,18,
21 51:11
54:3 72:19
108:10
115:4

**assignment**
16:9 17:7
18:6 25:1
40:15 71:22
72:20 73:2
74:9,15 83:3
107:7

**assignments**
31:14 42:22,
23 71:24
75:3 174:14

**assume** 7:13
8:17 18:1
61:4 71:1
104:20
113:21
158:22
159:3

**assumed**
111:10

**assuming**
55:24 58:24
113:24

**ATF** 156:15
157:6 158:2
159:1

**attachment**
109:23

**attention**
51:13,24
56:4 94:10
146:5,10
148:9 149:2
153:7

**attorney's**
6:22

**attorneys**
5:13 9:21

**August** 55:4
81:12

**authority**
58:16 59:9
73:9,13 76:7
84:8 93:3
95:5 112:12,
16,22 113:1
117:13
122:20
147:15,20
148:1,5,15
149:4,6,8,
17,21 159:9
176:7

**authorized**
102:11

**automatic**
157:18

**automatically**
166:11

**avenue**
63:20

**awaiting**
71:18

**awards**
30:17

**aware** 43:20
52:16 72:17
73:6 88:2
128:22
135:6
144:18
152:11
154:14
157:4 161:7,
11 162:24
173:16
174:19

**awhile** 99:18

---

**B**

---

**bachelor's**
14:24

**back** 10:12
11:24 14:6
15:18 25:4
35:14 44:13
45:14,17
46:1 48:19
51:5 58:3
69:13 74:18
75:2 76:20
86:1 89:21
92:7 93:14,
22 99:7
105:24
109:8,23
117:21
118:5
120:19,21
132:23
134:17,18
135:7 138:7
141:13,14
146:13,19
168:9 169:8
171:19

**background**
99:23

**bad** 42:15
163:14

**badge**
111:20
168:11

**balancing**
97:12

**balling** 93:18

**bar** 92:3,5
134:9,11,13

**base** 157:10
159:4

**based** 65:1
73:14,24
78:1 89:22
95:11
111:11
122:19
142:23
143:14
148:19
172:6

**Bash** 91:18
175:12

**basic** 37:16

**basically** 8:7
26:2 35:18
44:11 65:18
69:21 86:6
90:23 93:15
115:10
117:10
126:3 139:8
142:15
147:7,13

**basing**
142:22

**basis** 49:21
70:8 86:3
90:4 92:18
95:4 113:12
173:20

**Bates**
104:12,14,
18 107:1
166:24

**bathroom**
96:9

**Battle** 49:6

**beat** 138:7

**beating**
136:20

**beginning**
13:8 61:7
96:12 105:8
114:3,4

**belief** 82:9
86:14 90:11
114:5

**believable**
119:5

**believed**
68:23
114:13

**bias** 84:15

**big** 139:11

**binding**
111:22

**birthday**
37:24

bit 14:7 20:5
51:10 57:12
87:9 114:2
132:13
158:8
167:12
168:2

biweekly
93:19

black 85:6,7,
11,12 89:6,7
98:21 99:14
131:14,17
140:8,19
141:22
164:14
167:2,4
170:21
171:11

blanking
159:15

blatant 27:1

blind 44:11

bolts 128:12

Bond 91:20

borders
168:24

bother 35:19

bottle
118:14,15
119:10

bottom 82:8
116:5
154:18

bounds
146:22
147:14

bowl 70:14,
15 71:7,11

break 96:8,
18 97:17
163:21

Brian 74:13

briefed 94:22
129:3,5,6

briefing
129:4

bring 33:19
76:12
126:17

bringing
164:19

brought
51:12,24
56:4 80:3
132:6,8
146:4,9
148:8,22
153:7

Brust 40:19
111:1 146:5,
10,20 147:1
148:17,24
149:10,16
150:5 153:8

Brust's
110:8 112:2
148:9

buildings
66:16

burden
91:12,15
137:22
172:14

bureau
17:12,13
18:14,19,23,
24 33:8
34:11,23,24
57:18 103:9
107:7

business
40:17

bypass
109:5

bypassing
109:12

_____

C

C-U-R-M-O-
D-E 77:1

C4 33:6

calendar
76:21,24
77:15

call 56:2 66:8
70:14 71:11
100:19
131:14
153:2

called 32:19
67:13 93:18
103:5
110:18
154:2
170:13

calling 85:6,
7 89:6
136:12
171:10,11

calls 41:16

Cameron
37:13,22,23
38:10,18
39:1 60:11
69:15,20
107:3
162:11

capacity
49:19

capricious
95:12

car 168:10

card 146:16

care 146:11
148:10
149:1,3

career 29:6
31:9,12
32:1,12 33:3
47:9 48:3
70:16 71:5
75:6 85:23
92:10 93:9
172:5

career-
impacting
56:17

careers 37:7

careful
70:11,17
75:16

carried
123:23

carry 152:24

case 5:14,22
6:7 13:7
31:19 33:19
34:13 35:7,
12 43:2
45:13,16,21
60:3 64:6,7,
10,23 65:6,
8,24 67:7,
13,18 68:2
74:2,8 76:11
80:2 82:3,10
86:16 87:2
88:5,6,14,
15,21 91:9
93:20 95:2,
19,21,22
96:3 97:11
103:12
108:6
111:20
112:20
125:1,22
126:4 131:5
132:5 133:8
134:3 136:2
137:21
141:8,12
142:4,6
143:10,16
148:5 151:6,
24 164:6
176:10,13

case-by-case
89:19

cases 18:15
23:12,15
33:19 34:12
63:17 64:4,5
69:3 70:18
111:11
113:2,8
132:5 135:8
140:3

cast 165:20
166:22
167:19

categorize
173:17

caught 130:6
156:24

central 14:17
66:15

cetera 63:21

chain 24:12,
19 34:14
35:7 45:1,4
46:19,20
47:5,17,20
48:2 49:20
51:13 55:8,
10 56:6,11

58:7,11,14
60:2,5 61:1
62:11 63:4,
15 64:7,18,
24 83:14
88:2 91:17
94:9 98:9,14
101:17
103:19,21,
22 107:17
108:3,7
110:8,10,23
111:4,12,16,
17,23
114:14
115:4
116:22
117:15,18,
20,21,24
122:11,13
126:24
129:12,15
135:11
148:22
150:8,17,19,
24 151:4
153:11
155:13
156:8 159:8,
20 160:5,15
161:3
175:17
176:12,19

chains 57:16
110:5
123:24
175:4,9

challenged
132:12

challenges
164:18

change
16:23
130:17
146:19
147:3
174:14
176:3

changed
57:18 64:9
120:10

charge 92:3,
6 93:15
102:20
108:23
126:16
127:19
130:13
131:1,24
132:19
133:2,7,23
135:2,10
138:1,9,19,
22 139:18
141:21
142:15
143:14
147:10
156:15
174:24

chargeable
155:21

charged
44:10 92:12

115:3 117:6
130:2
153:19
160:4
162:10

charges
18:16 26:18
31:5,8
33:21,22
34:19 35:9
46:6 76:13
102:21
103:8,10
105:5,19
109:6,13,15,
24 111:8
112:19,24
113:11,24
120:3
125:22,24
126:8,14,16
131:6 140:1,
14,15,17,18
141:7 143:4,
5 162:21
163:1

charging
160:9,11

chatter 86:23
170:3

check 6:21
12:20
124:11
151:4

checklist
95:24

chief 11:22
16:1,3,5,8,
10,12,16,19,
23 17:1,5,8
18:16 19:5,
7,20,21
20:1,3 23:18
25:2 26:9,10
31:23 32:3,
10 33:7,8,9,
10,22,24
35:8 36:9,
12,16,23
37:10 38:18
39:5,16,18
40:6,7 41:10
45:6 49:17
55:8 56:22
57:9,18,21,
23 58:16,18,
20 59:3,5,8,
20,23 60:15,
18 61:2,4,15
62:5 64:14,
18 66:20,23
67:4,19
69:16 70:19
71:2 83:17
91:18 93:2
96:7,23
97:20,23
98:5,14
100:7,15,20
101:10,13,
14,15,20
102:7,10,14
103:1,6,7,12
104:19
105:4

107:18,21
108:13,17,
20,21 109:7,
10,12 111:7,
13 112:4,10,
13,18,21
113:9,10,16
114:1
115:19
125:4,9
126:10,20
130:14
134:19
142:9,14
143:3
147:16,17
148:4,12
150:17,20
155:10,13
159:15
160:8,9,17,
18 163:24
173:15,20
174:1,5,12,
20 175:11,
12 177:9

**chief's** 69:5
102:22
104:23
110:12
112:21
119:3,4
147:22
162:4

**chiefs** 16:16
56:16 128:7

**choice**
32:20,23
152:2

**choke** 101:1

**Chris** 91:20

**circumstanc**
**e** 83:24 101:8

**circumstanc**
**es** 86:8 135:9
173:12

**cite** 173:7

**cited** 108:22

**citizen** 90:13
148:2

**citizens**
130:11

**city** 5:10
6:21 21:24
23:22 60:2
90:19,20
91:1 95:1
173:10

**Civil** 162:21

**civilians**
73:10 75:10
85:12 87:21

**claim** 56:10

**clarification**
63:19

**clarifies** 60:4

**clarify** 7:13
24:22 48:15
76:15,17
77:7 79:6

102:22
106:5
140:12

**clarifying**
36:8

**classify**
20:13
173:17

**classmate**
40:20

**classmates**
40:23

**clean** 141:15

**clear** 30:9
58:13 65:24
67:13 68:18
113:13
118:21
167:22

**clearer**
123:15

**close** 35:15
163:21

**club** 38:6

**coached**
47:7

**Coglianese**
9:7,23 12:24
31:1 43:9
85:14 87:24
89:15 92:20
94:15 95:8
99:10
104:11
105:14
106:2 114:9
132:2
133:24
134:15
137:12
138:10,24
139:2,22
140:11
141:24
150:7
152:19,22
153:20
156:10
157:1,8,20
158:9,11,18
163:9
165:23
167:21
172:3 175:1
177:20

**colleague**
36:11,19
37:17

**collected**
104:3

**color** 153:16

**Columbus**
5:10 6:3
15:10,24
20:23 21:24
25:6 156:2
172:24

**command**
22:18 24:12,
19 34:15
35:8 45:2,4

46:21 47:5,
18,20 48:2
49:20 51:13
55:8,11
56:6,11,14
58:7,11,15
60:5 61:1
62:12 63:5,
15 64:8,19
73:7 83:14
87:19,20
88:2,24
91:17 94:9
95:5 98:14
101:18
103:19,21,
22 107:17
108:3,7,10
110:5,8,10,
23 111:16,
17,23
114:14
115:5
116:22
117:15,18,
20,21,24
122:11,13
123:24
127:1
129:12,15
135:11
148:22
150:8,17,20
151:1,5
153:11
155:14
156:9
158:17
159:8 160:5,
15 175:5,17
176:12,19,
23

**command's**
64:24

**commander**
17:9,11,14
32:17 34:1,
4,9,16 37:12
39:3,4,17
41:4,5,6,7,
10 42:11
43:23 54:4
60:10 63:23
77:1,5 78:15
102:10
104:8,10
107:3 110:6
111:2,3,14
112:2
125:12,15,
16,17,18
127:6,12
130:15
134:19
150:13
162:11
173:14

**commanders**
111:4
173:21

**commanding**
165:9

**commands**
175:9

**commenced**
140:24

**comment**
28:4

**comments**
24:10,16
51:16 77:23
80:22,23
81:11 83:6
85:4 110:13
161:13
168:6

**commingled**
80:6

**Commission**
21:16
162:22

**committed**
90:6 163:6

**common**
27:16

**companion**
18:13,17

**comparables**
113:19

**compare**
30:20

**compared**
28:5 128:24
173:7

**comparison**
74:7

**competency**
48:13

**complaint**
13:6 44:7
148:2
176:24

**complaints**
151:12

**completed**
33:19
102:23

**completely**
117:8

**complex**
63:17
116:23

**complicated**
164:9

**complimenta**
**ry** 25:9

**compliments**
30:16

**computer**
27:6

**concern**
75:19 84:6,
12 85:9,20
94:24 131:2
146:4 151:9
155:2
156:11,24
157:7,16
158:16
165:2 176:6,
22

**concerned**
75:5,8 153:3

**concerns**
71:20 75:4
118:10
127:12
152:6 158:7
165:1
176:12

**concluded**
177:24

**conclusion**
102:17
104:4
134:20
137:8 177:5

**conclusions**
64:22
119:16
121:13
161:21

**concrete**
119:14
175:22

**concretely**
118:19

**condition**
26:3

**conditions**
8:9

**conduct**
25:22 26:17
52:18 53:18
54:8 75:10,
11,12 86:10
90:15
108:21
116:21
118:2 120:8,
10,11,18
123:1
127:21
129:20
130:3 133:5
144:23
152:12
175:24

**conducted**
30:5 54:11
62:18 91:10,
19 92:23
102:5
115:11
148:3

**conducting**
6:18

**conferred**
113:17

**confident**
70:19 94:20,
21

**confirm**
78:11 137:3
175:13

**confirmation**
113:21

**confirmed**
111:6

**confirms**
170:12

conflicting 130:24

confronted 88:6

confronting 157:9

confused 58:4

confusing 119:7

confusion 24:15 57:12

conjecture 162:2

connect 68:4,7 70:3,5 118:11,16 144:11

consideration 30:12 68:21 87:22 89:17 142:15

considered 28:19 89:24 115:17 153:21

consisted 120:24 122:10

consistent 72:8 155:5

constructive 103:5 143:19

consult 59:3 71:2 150:16 174:5

consulted 83:16 145:20 150:20 156:15

contact 73:10

contemplating 85:1

content 128:7,12

contents 10:19

contest 96:13

context 121:21 122:14,17 152:16 153:21 171:13 177:5

continue 88:18 90:12,16

continued 82:18

continuing 76:6 80:5 141:5,12

continuum 28:3

contract 26:5 29:5 85:22 102:7

control 56:14

conversation 66:8,24 100:13 127:5,11,15 131:16 144:9 145:1 157:5 161:17 169:11

conversations 62:5,20 63:6,23 74:20 143:2,7 173:9

convey 67:3

convicted 8:19

convincing 30:9 118:21

convoluted 119:12 120:15 143:20

copying 60:15 69:16

corner 145:7

Cornett 47:19 98:23 99:6 100:2, 7,14,20 135:12 136:6,13,20 138:3,6,13 144:22 153:17 161:22 162:20 163:8 168:8, 21 169:3 170:13 171:1,6,10, 16

Cornett's 168:10

correct 8:1 25:3 28:13, 16 35:24 36:6 106:13, 17 107:9 113:15 116:16 121:10 129:12 135:14,16 166:13 170:22 171:14 177:15

corrected 147:1

corrective 48:11

corroborate 119:21

153:18

corroborated 58:9 135:19, 23 139:15 164:12

corroborating 70:2

corroboration 56:5 58:15 88:9 137:5

counsel 8:22 11:5

counseled 146:11

counseling 103:6

couple 6:18 8:7 19:16,18 24:7 38:9 40:2 61:3 79:5 80:11, 15 96:8 98:21 102:1 105:11 132:10,13

courses 20:14,16

court 31:13

courteous 129:21,23 133:12

cover 96:15 110:2,14,18, 19 116:4 129:18

CPD 21:23 22:7,9,24 23:3 25:14, 20,24 26:2, 14 27:23 28:2,6 40:10 75:18 91:21 140:5 155:5 156:4

CPD's 22:20 26:10

craft 126:16

create 90:18 109:15

created 147:2

credibility 132:13 164:9,16,18 165:6,12,20 166:2,23 167:20

credible 70:21 134:7 166:12

credit 153:2

crime 8:19 90:7,21 155:20

criminal 14:20 15:22 54:8,10 89:24 90:15

91:6,9,12,15 92:3,6,13,21 93:15,19 94:2 134:3 137:21 156:6

criminally 92:12 155:21

criteria 147:23 149:20

critical 26:14,16,21 28:4,19 29:3 51:22 64:10 70:22 92:16 126:8 131:5 175:22

CROSS-EXAMINATION 5:4

crossed 123:24

Curmode 54:5 77:1,5, 24 78:16 104:9 111:3

Curmode's 110:6 112:3

current 5:9 15:24 56:11 58:11 85:17

Custer 38:19

____

D

daily 49:20

Daniels 43:2

date 11:16 76:24 126:20 132:8 140:24

dated 10:11 70:11 104:8

dates 14:1 57:23 77:3 78:11 83:22

day 169:12 177:14

days 61:3

DCC 109:1 112:11,17, 21 113:10

DCCS 112:14

deal 34:7 41:7,13 42:12 148:1

dealing 45:23 52:19

dealings 47:12 48:20

dealt 21:19

death 137:2, 4,10 157:15

158:8

December 15:12

deceptive 116:8 120:6

decide 59:21 71:3 103:10, 22 108:23 117:5 121:16 130:15,18 160:14

decided 149:11 158:13

decides 23:20 86:7

deciding 151:2

decision 56:20 58:20, 23 61:6,9 64:19 70:7, 24 73:4,14 79:23 83:13, 23,24 87:7 89:19 91:8 93:23 94:1,3 108:17 109:2 117:17 118:13 128:8,13,14 134:21 150:13 155:6 157:11,12 159:6 160:14 162:4 174:4

decision-makers 31:20

decision-making 34:17 87:11, 12 122:19 160:2 162:9

decisions 34:15 43:19, 20 56:8,15, 16,17 62:6 73:16 75:20 103:18 150:10 160:9,11,18

Decker 60:12 62:18,21,22 63:7 65:5 66:24 67:4, 11 68:11,22 69:16,21 74:19,22 76:22,24 77:4 78:3 101:23 114:12,23 115:7,16 119:17 120:24 122:2 126:22 127:13,23

128:23
129:6,7
131:12
143:8,20
144:9
145:24
150:15
151:7,10
154:24
156:14
157:4 158:2,
15,22
159:22
161:11
166:19

**Decker's**
114:5
135:17
136:9 139:7
144:3,20
145:14
153:24
154:9
160:22
161:11

**deemed**
133:4

**default** 72:2

**defend**
152:24

**defense**
146:14

**defined**
175:20

**definitive**
167:9
168:18
169:18,19
171:9,11,12

**degree**
14:15,24
20:10

**delay** 141:5

**delivery**
156:19
157:17
158:4

**delve** 24:6

**denied** 54:21

**deny** 168:14

**department**
15:15 16:18
36:13 37:1
38:10,22
69:4 75:11,
17 84:13
86:7 134:24
151:16
155:10

**departmental**
18:16 26:18
31:5,8 33:21
34:18 35:8
76:12 93:2
102:21
103:8 109:6,
13 111:7
112:19,24
113:11,24
125:23
126:8,14

131:6
132:19
133:2,7,23
140:7,15,16,
18 141:21
147:6

**Depends**
26:22

**deposition**
5:15 6:15,18
7:21 8:22
10:7 12:16
13:15 61:23
78:7,22 79:1
80:15 101:2
164:1

**depositions**
7:1,3 38:9

**deputy**
16:10,11,15,
19,23 17:1,
4,8 19:20,21
23:18 25:2
26:9 33:6,7,
10 36:9,12,
16,23 37:10
38:18 39:4,
18 40:6,7
41:10 45:5
49:17 55:8
56:16,22
57:9,21,23
58:16,18
59:3,8,20
60:18 61:4,
15 64:18
71:2 83:17
91:18 97:23
98:14
101:15
102:22
103:1,6,12
104:19,23
105:3
107:18,21
108:17,20,
21 110:12
111:13
112:4,21
113:10,16
125:3 128:7
147:16,22
148:4,12
150:17
155:12
159:14,15
160:8,17

**derogatory**
80:7,22 89:3
129:11
139:20
140:8,21
141:22
171:17

**describe**
42:13 50:9
85:5 134:1,6
166:12

**describes**
167:14
168:7

**describing**
76:5 83:10
167:20

**description**
136:10

**descriptions**
41:23 85:5
87:2

**designed**
148:11

**desk** 77:19
127:16
128:4

**detail** 115:2
128:6 139:8
168:2

**details** 100:4

**detective**
47:24

**determination**
26:6 45:6
65:1 70:17
91:22 93:22
97:2 104:24
118:6

**determinations**
103:13
105:4

**determine**
26:4 76:11
92:23 150:4

**determined**
27:24 44:21
92:5 148:16
153:14
155:21
156:3

**determines**
156:4

**determining**
26:6 102:4

**develop** 32:2
70:22

**developed**
80:21

**developments** 69:22

**device**
157:17

**dial** 124:22

**Dick** 144:23
145:5
148:23
152:11

**differ** 73:1

**difference**
76:2

**differently**
84:18
122:23
141:10

**difficult**
118:11
130:21
131:1,7

**direct** 19:24
25:12 33:1,
15,16 34:12
38:3,24
39:22,23
40:1,12

41:9,11
46:23 47:5
52:21 53:7,
14 54:13
64:17 73:9
98:4,11
105:11
115:20
120:17
137:13

**directed**
27:11 52:17
54:4 83:7
115:19
116:24
118:4 127:7
148:3 149:7

**directing**
84:10

**direction**
13:21 63:19
80:1 97:10
128:20
150:18,21
176:3

**directions**
78:12

**directly** 34:7
36:15 37:7
39:2,5
46:16,17
47:22 50:13,
14,17,18
98:12
168:13

**director**
33:22 141:9

**directory**
173:3

**disadvantage**
29:6 31:10
70:16 71:5
85:24 92:10
93:9

**disagreement** 58:19 59:5

**disciplinary**
75:18 86:23
102:20

**discipline**
30:17 35:9
48:12 71:18
103:4
108:24
109:4,13
113:20
125:13
126:15
142:20
146:14
147:12,21

**disciplined**
149:15
162:10

**discourteous**
133:5
171:21

**discovered**
51:11 63:12
122:18
148:6

**discrimination** 6:7 20:20
21:1,19 23:2
58:10 62:16
84:14 130:9
135:1 166:6
174:23
175:3
176:15,24

**discriminatory** 24:10,16
51:15 85:14

**discuss** 67:7

**discussed**
109:9
110:15
119:23
142:9
143:12,24
163:11

**discussing**
64:3 65:15

**discussion**
61:14 62:10
67:6,9 84:1
123:13
125:21
126:3
142:13
144:14

**discussions**
61:11
102:14
125:1
134:18
160:8,12
163:4,16

**dishonesty**
67:1

**disinterested**
98:17
150:22

**dislike** 48:17

**disposition**
103:2,18
112:15
147:15,16,
20,22 148:5
149:9

**dispositioned** 115:22
146:18

**dispositions**
108:9

**disprove**
44:23

**dispute**
81:16,17

**disregarding**
147:13

**disrupt** 71:4
76:14

**disrupting**
75:6

**distinction**
56:12

**distract**
142:16

**division**
20:24 43:20
73:15 87:13
90:6,8 163:5
173:10

**divisional**
69:4

**divisions**
16:18,20

**divulge**
43:14

**document**
69:8 104:17,
22 105:3,23
106:7 107:1
108:12,16
109:20

**documented**
103:5

**documents**
10:7 14:10
78:6,22,24
103:11
104:3
124:14,20

**Donna** 38:19

**dots** 68:4,7
70:3,5
118:11,16
144:12

**double** 12:20

**doubt**
165:12,20
166:22
167:19

**doubted**
166:2

**Doug** 47:15
53:2 99:6
135:12
138:3

**dozen** 5:18

**draft** 33:20
126:23
127:4
128:18,20,
22,24 129:2

**drag** 141:12

**Dragin** 49:11
176:22

**draw** 74:7
145:8

**drawing**
119:16

**drew** 119:17

**drive** 88:3

**driven** 94:18
95:24 128:7

**dropping**
66:22

**due** 134:4
137:19

**duly** 5:2

**dumb** 167:3,
4

**duties** 44:15

73:8,22

**duty** 31:11
49:19 54:10,
14 56:3 58:8
59:19,22
61:7,12,16,
23,24 62:6,
7,8 67:22
68:24 69:7,
23 70:7,13
71:16,21
72:4,5
73:12,21
74:16 75:3,
12,18 76:1,9
79:18 83:14
84:1 85:10
86:2,11
87:3,4,14,23
89:13,22
90:4 91:3,13
92:7,19
93:6,14,22
94:14 95:4,
16 97:3

___

**E**

**e-mail** 13:11,
12 27:6
60:2,10 66:8
69:15,20
169:11

**e-mails** 10:8,
9,15,17
11:3,5,13,18
12:13 13:3,
13,14 14:3,
10 61:21
62:2 76:19,
21 77:6
78:5,8

**earlier** 51:23
69:9 106:9
121:8
155:17
163:24

**earliest**
105:20

**early** 19:4
78:6

**earn** 31:13

**easier** 10:5

**easiest**
127:24

**East** 15:7

**easy** 86:6

**Echenrode**
41:3,6,8,19
42:12 51:11
52:17 53:7
77:5 80:21

**education**
14:14

**EEO** 20:6,18
21:1,12,23
22:20 24:2
25:5,6,15,
19,21 26:11,
20 27:4,24
28:3,8,18

51:24 52:9
53:11 60:8
63:3 130:13
131:24
133:2,4,12
143:4,5,10,
11,16 163:6
171:21
173:1,11
176:1

**effect** 80:5
131:22

**effective**
29:24

**efficient**
29:23

**elaborated**
169:5

**Elias** 144:24
145:5,7
148:23
151:9,13
152:11
153:6

**else's** 111:24
112:3

**employee**
30:2,15,19
46:3,5 76:13
85:23
137:20
151:23
152:2 170:4

**employee's**
152:2

**employees**
25:12 28:14
30:12 63:4
166:5

**employment**
5:9 20:6,12
130:4,8
134:2

**empty**
118:16
119:10

**encapsulated**
117:20

**encompassin
g** 124:17

**encounter**
32:15

**end** 10:1,3
64:20 82:5
104:17

**ended** 90:17

**endurance**
96:13

**enforcement**
44:6 155:3
156:4

**engaged**
144:22

**enhancemen
t** 154:1

**entire** 108:6
144:15
174:11

**environment**
53:6 58:10
80:6 81:4,6,
22 82:13
130:23
135:1 164:4
171:24
172:6,16,19,
23

**equal** 20:6,
11 130:4,8

**equipment**
52:4 63:2,8
82:24 90:8
124:14
140:7
143:15
144:5
156:20

**equitably**
107:7

**Eric** 10:22,24
11:15 23:15,
16 24:9,11,
15 44:3,9
45:23 46:2,
12 47:19
51:7,16 53:8
54:14 55:13
61:1 65:16
74:8 87:14
98:20,22
99:6 100:1,
7,13,18,19
103:13
105:13,20
107:2,6
116:7 118:8
120:4,5
135:12
136:5,12,19,
20 137:2
138:2,3,6,
12,18
140:19
153:16
168:8,10,11
169:3
170:13
171:15

**escalate**
157:16

**escalated**
125:23
133:22

**essence**
117:15

**essentially**
69:24

**established**
24:8 64:10

**estimation**
140:5

**ethics** 21:14,
16,19

**events** 40:3
83:21

**everything's**
133:8

**evidence**
30:8,10 56:4

63:12 64:9
65:16 70:3,
22 80:6,9
81:3 85:16
86:10
130:22
133:1
134:12
142:3

**exact** 52:23
98:24

**examination**
101:24

**exception**
177:11,13

**execution**
156:6

**executive**
57:15 67:7
109:10
125:1,22
142:10

**Exhibit** 60:1
69:9 104:2,
18 109:22
116:3
124:24
154:8
166:18
170:9

**existing** 70:2

**expanded**
156:12

**expansive**
175:19

**expect** 64:8

**expectations**
25:13 42:23

**experience**
26:8 142:23
143:1

**experienced**
152:23

**experiences**
42:16

**explain**
95:19
116:19
127:22
139:5
147:12
164:4

**explained**
42:11

**explaining**
83:15
160:18
169:10

**explanation**
119:10
146:7

**extend** 87:18

**extends**
87:16

**extent** 43:10
64:21

extraordinarily 70:18

extreme 83:24

eye 44:12 121:4

eyewitness 131:24

**F**

face 27:20 29:3 54:8 124:21

faced 109:24

facilities 66:16

fact 64:11 91:5 94:18 95:19 127:8 148:7,20 149:20,22 153:14 156:2 158:2 164:17 165:7,18 166:10

fact-driven 89:19

factor 93:21

facts 52:18 79:24 85:21 90:10 94:23 95:11,14,20, 21 118:14 133:9 148:19 151:20 153:10,12 161:5

factual 68:15,16

failed 42:17, 19 43:8 44:14

failure 44:8 45:21 54:5 162:10

failures 44:4

fair 27:22 75:15,22 122:21

fairly 72:18 107:6

Falacia 49:11 176:22

fall 140:22

false 68:6, 17,20 120:15

familiar 26:13 36:24 72:11 100:10 101:5,7 136:7,22

family 38:9

40:17

fault 30:15

FBI 43:11

fear 166:6

February 16:4 17:22 18:4 19:17

federal 25:19

feedback 143:19

feel 44:4 91:2 92:15 96:1 101:2 120:2 132:24 151:21 152:17 153:4 169:14 175:6 177:15,16

feeling 124:3

felt 46:3 51:21 68:19 84:13 88:16 122:2,5 141:6,16 153:8 159:13,18 164:3 169:4 171:22

fighting 136:19,21

figure 95:14 96:11 107:10 140:20

file 92:3 103:8 126:14

filed 13:7,9 94:3 103:10 162:21

files 23:11

filing 75:7 109:13

fill 107:7

filling 160:23

final 45:6 103:2 108:9 111:8 112:15 144:2

finalized 34:14 126:19

find 77:20 78:13,19 79:1 122:1,4 139:14 143:22

finding 26:7 65:12 111:8 116:17,20 129:16,19 137:3 157:9

findings 62:23 110:6

143:9

fine 96:9

finished 19:13,14 50:21 66:5

firearm 152:24

fired 90:24

firsthand 167:5,20 176:17

fish 70:14,15 71:7,11

fit 41:23

five-minute 163:21

fix 86:6

flavor 124:3

floor 66:14, 15,21 168:8 169:2,21

focus 44:8 65:10 175:20

focused 63:1 128:8,12,13 159:23

folks 21:23

follow 27:2 35:22 157:5 162:10

FOP 29:19 40:2 93:13 113:8

FOP's 93:8, 24

foregoing 177:23

foresee 90:9

forgery 47:23

formal 67:20 69:5

formally 86:9

forms 28:12

formulate 119:20

forward 23:12 45:16 52:20 53:17 91:4 109:14 132:6,8,9 142:24

forwarded 54:7 103:22 108:12 126:24 135:13

forwarding 160:13

found 48:21 81:5 114:13 117:11 126:6 140:13

frame 14:1,2 17:17 39:7, 13 64:4 159:4 172:10

fraud 47:23

Frencz 74:13

frequently 66:21

friend 32:6,9 36:18,21 37:3,5,16,23 40:21,22 42:5 48:5 50:19

front 55:6 69:13 109:21 112:22

frustration 122:5

FTO 47:7,13

full 26:5 53:18 64:23 121:21 122:18 161:5

fully 8:11,14

future 82:6 88:11

**G**

gain 66:20

gap 81:1,3

gaps 35:16

Gary 37:12 38:10 60:10

gather 53:14

gave 78:12 97:10 120:21 131:21

general 13:20 22:18 25:24 63:9 67:9 74:1,2, 17 85:7 87:11,13 89:4 97:19 102:19 119:20 126:11 131:17 164:14 166:4

generally 173:6

generically 78:15

gesture 153:15

get-togethers 41:2

Gibson 47:21 48:20 53:3

give 27:3 42:24 44:12 88:19 126:11 129:8 153:1 157:7

giving 120:17 142:8

good 46:10 124:3 163:12

gosh 159:15

GPS 168:10

grab 11:12

Graduation 15:8

grant 101:14

gravity 124:4

Gray 36:9, 12,16 56:24 57:2,5,6,9, 10,17,21,24 60:15,18 61:3,5,15 69:16 107:19,23 112:5 159:15 160:9,17

great 41:7,12 42:12

greatly 43:19

grievance 35:9 74:24 75:7 125:13 126:15 142:20

grieving 113:11

ground 7:2 9:19 96:16

grounds 93:8

group 38:2, 6,7

grouped 106:8,11

guess 5:11 13:10 20:9 22:18 24:8 39:18 40:18 67:21 73:18 83:11,15 86:1 87:15 95:13,18 105:10 107:10 115:13 127:24 132:23 133:14,19 165:16 166:4,16 168:5 171:19 172:21

guns 149:13

**H**

**half** 118:15
119:10

**hallmark**
67:16

**hallway**
145:6

**hand** 166:17

**handed**
108:6

**handing**
59:23
103:24
154:7

**handle** 23:21
58:12 87:21
177:2

**handled**
150:5,6
157:6

**handles**
18:14 22:12

**handling**
174:23
176:13

**hands** 169:6

**handwriting**
108:5
111:24
112:1,2,4
116:12

**handwritten**
104:23

**happen** 8:24
123:4
161:14

**happened**
7:19 79:16
82:1 86:19,
21 87:2
88:21 94:20,
22 110:3
111:11
114:21
116:24
133:19
142:2
143:17
151:9 152:5
155:13

**happening**
68:23 96:24

**happy**
174:16

**hard** 56:14
119:13
127:10

**harder**
112:23

**harm** 80:10
137:15
138:13
139:13,19
140:8,21
141:22
142:2

**harmful**
27:19

**harsh** 45:5,7

**He'll** 177:20

**headed**
41:18

**headlines**
69:12

**headquarters**
66:15,18,19
115:8

**hear** 29:11
86:18
165:19,22

**heard** 51:6
74:21 93:1
131:13
132:9,14,16
136:19
141:9 167:6,
15,16,20
168:19,20
169:1,13
170:14,20,
24 171:3,4,6
172:8,9
175:4

**hearing** 69:4,
5 93:2 119:4
126:20
145:10
165:8 168:7
169:18,20

**heavy**
139:11,17

**hedged**
168:17

**held** 123:13

**helped** 13:15
31:24 32:2
141:20
153:18

**high** 15:6

**highest**
14:14

**hindsight**
141:19

**Homeland**
57:19

**honest**
119:13

**honestly**
5:23

**horrendous**
27:13

**hostile** 53:6
56:9 58:9
130:23
134:24
164:4
171:23
172:5,15,19,
23

**hostility** 80:7

**hours** 40:3

**house** 37:24

**HR** 21:24

**human** 14:22
20:11,16
22:3 23:5

**husband**
40:4,8

**hyperbole**
84:24

**hypothetical**
87:4,10
88:19 89:16
138:4

**I**

**IA** 23:11,19,
20,22 24:1
28:22 45:18
53:17 63:4,
13 66:13,14
68:2 119:2
128:11
146:8 147:9
156:8
165:11,21
174:10,21,
24 177:8

**IAB** 34:16
68:2 110:15
121:1,19
144:3
148:18

**idea** 13:17
60:18 173:6

**identify**
108:21

**idle** 86:22
170:3

**illegal** 147:5
154:1

**immediately**
92:6 166:10

**imminent**
82:2 86:15
87:16

**imminently**
82:9

**impact** 31:11
74:6 163:4
177:7

**impacted**
43:19 88:11

**impeded**
98:18

**impeding**
120:16
122:8

**important**
100:24
159:14

**impressive**
31:2

**improper**
172:12

**in-person**
66:7

**in-service**
21:3,4,11

**inappropriate**
86:23
148:17
152:12

**incident**
43:18 90:18
123:3
146:21

**include** 45:8
141:20

**included**
54:7 98:6
125:3,8
128:23
129:4

**including**
110:2
136:17,18
146:7
155:18
157:15
166:6,7

**inclusive**
110:5

**inconsistent**
156:1

**incredible**
139:8

**independent**
65:2

**indicating**
102:10
103:12

**indication**
55:2 79:21

**indirect** 49:8

**individual**
20:19 27:14
74:4 95:19
142:10,12
152:16

**individually**
152:17

**individuals**
83:5 84:11
172:4,8
174:13

**inferior**
167:3

**inflammatory**
83:6

**informal**
67:20 160:7

**informally**
152:7

**information**
13:20 35:14
43:14 45:18,
19 53:15
64:23 81:10
82:13 88:1,6
89:17 94:9
117:2 118:3
121:15
130:21
132:11
139:3

157:23
158:3,6,14,
19 161:1

**informational**
166:18
167:18

**informed**
91:14
158:24
162:19

**initial** 107:22

**initially**
132:6

**initials**
107:11,13,
15,22
110:13,14,
17,21
111:19
116:15

**innocuous**
26:23 27:4,
19

**input** 34:21,
24 155:7,12
157:11
162:12

**inquire** 13:18

**inquiry** 91:19

**instance**
90:13 152:6
159:13
166:24

**instances**
122:1

**instruct**
23:19 96:23
97:6

**instructed**
151:11
152:3,7
157:5
159:22

**instructing**
69:20
150:15

**instruction**
151:17,21

**instructor**
22:3,6

**integrity**
95:3

**intelligible**
122:6

**intended**
27:15

**intent** 142:3

**interaction**
32:8 33:24
36:20 40:2
47:8,10,18
77:24 80:7

**interactions**
48:8,22 49:5
77:4

**interest** 90:5

**interesting**

**interests**
73:15

**interfere**
8:10 94:11
95:6

**interfered**
98:18

**interfering**
95:16
147:21

**interim** 16:1,
2,8 37:9
39:18 70:7
86:3 90:4
155:9

**intermittently**
72:10

**internal** 18:8,
11,15,22,23
19:22,24
22:6 23:6
28:11 33:5,
12 34:1,3,10
35:1 40:16
44:21,24
60:6,12 64:8
66:21 91:21
94:7 97:24
98:4,12
102:23
115:3,19
116:8 120:6,
7 130:14
146:22
150:21
173:15,24

**interpret**
99:21

**interrupt**
7:24 10:3

**intervening**
59:17 76:9
80:8 86:16
95:2

**intervention**
93:13

**interview**
52:22 53:7,
19 124:11
136:10
138:21
166:19
170:20

**interviewed**
63:11
114:23
131:21
138:4

**interviews**
52:18 65:17
115:11
119:2 124:6

**introducing**
5:12

**investigate**
23:20 26:4
27:18 29:5
150:4,15
158:15
159:22

105:18

176:16

**investigated**
24:1 76:11
84:20 118:4
145:22
148:12
149:8,15,19,
22 151:24
153:4,13
155:20
156:23
175:7

**investigating**
35:2 81:24
85:12 147:9
148:18

**investigation**
10:22 11:1,
4,6 13:5
14:3 23:15,
16 28:13,18,
23 30:5,6
35:1,15
44:3,19 45:1
51:7,19 52:3
53:18 54:4,
10,20 60:7,
12 61:8
62:14,17,21
65:23 68:14,
18,19 69:22
70:6 72:15
78:2,16,17
86:5,12
88:17 89:13
91:10,19
92:23 94:5,
7,8,11,13,23
95:3,7,17
96:24 97:1,
7,21 98:9,17
99:14
101:21
102:18,24
103:14
104:3 110:2,
5 114:6,7,15
116:9,23
117:1,7
118:5,10
119:19
120:7,17,23
122:8
123:17,20
124:17
126:23
127:22,23
132:21
139:10
140:24
141:5
143:21
144:19
148:7,24
149:7
150:23
151:3
153:22
154:6
155:19,23
156:13
159:10,21,
24 160:13
161:8,10
162:1,6
165:11

175:17,19
176:6 177:1

**investigation
's** 91:3

**investigation
al** 138:21

**investigations** 28:8,12
34:8 43:11
63:14 84:10,
11 87:21
97:9 98:1,3
122:22
155:18
175:6
176:18

**investigative**
114:21
122:10
154:9

**investigator**
68:3,4

**investigator's** 165:21

**investigators**
33:18

**invited** 32:21

**involved** 6:9,
10,15 31:19
36:5 51:24
53:19 61:11
66:23 72:14
88:15 94:12
101:11,16
102:4,14
134:23
135:4 162:3,
8 163:3,15

**involvement**
93:24 155:7
162:7

**involving**
84:11
117:12
160:24
176:8

**irregularities**
51:12,15

**isolated**
123:2

**issue** 35:22
45:15,22
78:16 92:14
103:7 109:4
112:12,17
115:18
129:10
144:6
146:13
162:5
164:10

**issues** 31:16
53:23 62:15,
16 63:8
78:13 83:18
103:23
118:9
143:15
159:10
160:14,19
175:20

**items** 173:4

**— J —**

**Jackson**
19:5,7

**Jacobs**
11:22 16:5
17:5 20:3
26:10 31:23
32:4,11
33:24 57:18
59:5 62:5
96:7,23
97:20,23
100:8,15,20
101:21
102:10
108:13
142:9,14
143:3
160:18
173:16

**Jacobs'**
16:16 67:19

**Jeff** 5:13
12:7,10,12
74:21
167:21

**Jen** 13:21
174:15

**Jennifer** 12:3
39:19 157:3
158:13,24
159:3
173:14,23
174:9,21,22
176:7,13,22
177:7

**job** 26:18
29:3 42:21
43:21 44:16
64:14
142:20

**jobs** 32:20,
23

**Joe** 41:19
77:5 80:21

**jogs** 7:23

**join** 15:10

**juggling**
97:12

**jump** 43:10
51:5 75:2

**jurisdictional**
115:14

**justice** 14:20
15:22

**justification**
92:9 94:17
95:10

**justified**
89:12

**justify** 31:5
35:23
131:24

**— K —**

**Karl** 5:14
10:22 13:7
44:3 50:7

**Kelly** 125:16

**Kemmerling**
42:3,4,13
44:14,17
106:9,18
110:1 171:5,
7

**Ken** 60:11
62:18 74:19
76:22,24
114:23
115:16

**key** 119:23
120:4

**kill** 99:8,17
136:23
137:23
138:2,5,17
139:13

**kind** 21:15
23:2 27:23
35:20 38:5
49:8 52:4
58:10 73:10
82:17 84:21
87:4 129:8
131:2
142:18

**knew** 43:21
118:20
119:12
128:20
135:17
157:3,10
167:19

**Knight** 12:4
13:22 39:19
40:6 63:23
102:10
104:8,10
127:7,12
129:6
134:20
150:14
157:3
158:13,24
159:3
173:14,23
174:9,15,21,
22 176:7,23

**Knight's**
40:7 176:13
177:7

**knowing**
158:14
161:18

**knowledge**
53:5 88:17
152:14
159:4
163:18
167:5 172:6,
17,20
176:17

**Kuebler**
36:23

175:11

**L**

**L4** 33:6
**label** 133:12
**labor** 20:14
**lack** 70:2
**laid** 91:5
146:16
**Lancaster**
50:15
136:18
161:14
**Lance** 74:13
**language**
25:11 27:16
126:18
171:17
173:2
**large** 98:3
**Larry** 47:6,7
136:17
165:2
166:20
169:6
**law** 20:15
26:1 155:3
156:3
**laws** 25:7,9,
19,22
175:24
**lawsuit** 13:7
70:14
**lawsuits**
70:12 71:12
**lay** 68:14
129:8
**lays** 139:7
**lazy** 85:7
89:8 131:17
170:21
171:11
**leads** 172:1
**learn** 23:1
**learned** 54:1
100:8 159:1
**leave** 58:21
62:6 97:16
152:16
**leaving**
85:10
**left** 46:2
82:24
114:16
**legal** 25:16
92:24
**legible**
111:20
**lengthy**
72:18
**lenient** 45:5,
8
**letter** 110:7,8
151:23

**level** 14:14
25:16 34:18
41:17 86:10
91:11,15
103:4
108:23
109:3
112:13
113:20
124:17
130:22
132:22
139:8
148:18
164:3
171:23
**liability**
90:19,20
91:2 95:1
**liaison** 35:10
74:24
125:13
126:15
**lie** 65:19
115:11,24
117:17
118:2,17,19
119:14
127:19
**lied** 115:9
117:1,11
**lieutenant**
17:19,21
32:1,13,18
35:10 40:19
41:3 42:3,4,
13 44:14,17
51:10 52:17
74:10,13
76:5 103:9
110:8 111:1,
14 112:2
113:18,23
125:14
126:15
146:5,10,18,
20,24 147:6,
8,12,18,24
148:9,17
149:10,16
150:5 153:7
171:5
**lieutenants**
37:8
**life** 98:21
99:1
**lift** 139:12,17
**lightning**
154:2,16
**likelihood**
113:17
**likes** 41:19
**limit** 90:20
**limitation**
174:11
**limited** 115:5
**lines** 136:12
169:22
**lingering**

46:2
**link** 154:2,17
**links** 46:18,
21 47:4,17
**list** 32:19
50:22 52:23
**listed** 173:5
**listen** 124:5
**literally**
29:18
**Liverpool**
15:7
**locate** 78:3
**location**
74:15
**Lokai** 12:7,8,
12 74:21
113:18
**long** 9:4
16:11 17:21
49:23 50:1
61:18 66:14
80:12 84:4
106:23
121:2
141:13
154:23
175:16
**long-term**
131:3
**longer** 127:4
128:18,19,
22 129:2
141:12
**looked** 30:9
62:3 77:19,
22 78:23,24
121:12,14,
18
**loop** 64:21
98:7
**losing** 31:15
**lost** 143:23
**lot** 6:24
22:11 29:18
32:3 40:23
44:13 64:22
96:15
124:19
128:6 130:7
138:8
142:22
153:2
158:10
167:6
168:16
**lying** 115:3,
16 117:4
118:8

**M**

**made** 24:11,
16 32:1 33:9
42:9 43:23
44:20 45:21
51:16 58:20,
23 61:6
62:22 72:23

78:12 80:13,
14,22 82:23
83:24 87:6
88:2 100:9
102:2
103:13,17,
20 108:8
111:8
113:18
117:16
134:11,22
135:20
136:5 137:4,
22 145:8
148:23
150:10,18
153:15
155:6
161:22
164:17
165:10
174:1,3
176:14,24
177:3,5
**main** 45:15
**maintaining**
71:21
**major** 15:20
**make** 10:5
28:1 43:19
45:6 56:9,
11,20 65:1
68:13 70:17
73:14 76:6
78:14 79:23
81:15 82:21
83:6,22 91:8
97:1 101:1
103:1 109:2
111:16,21
115:21
116:20
118:6
119:24
121:23
123:1 124:1
126:17
128:14
134:8,13
150:14
158:7
160:15
169:19
174:8,13
**makes**
108:17
132:7
**making**
51:23 56:15,
16 64:19
80:19 83:12
84:20 85:3
89:2,5 105:4
134:6
136:11
137:1 143:9
144:9,10
161:13
168:12
176:15
**manager**
22:4 23:5
**March** 141:3

**marked**
59:24 104:1
154:8
166:17
**Mary** 10:5
49:6
**mass** 143:24
**master's**
14:15 20:10
**match** 106:6
**material**
99:11
**materials**
120:23
121:9
124:14
**matter** 67:15
88:10
102:19
114:7
118:22
**Mcfadden**
72:12 73:20
74:10 76:5
79:16
**meander**
9:21
**Meaning**
94:19
**means** 44:22
46:1 71:1
88:21 92:2
122:7
**meant** 27:11
164:5
**meantime**
93:7
**mechanism**
147:11
**medical** 8:9
72:4
**medications**
8:9
**meet** 8:22
9:6 32:10
35:13
134:11,13
**meeting**
77:19 79:10
115:8
**meetings**
67:6 160:16
**Melissa**
72:12
**members**
38:9 56:18
134:5
**membership**
73:16
**memo** 104:7
**memory**
7:20,23
13:16 82:22
83:2,21
145:2
**men** 169:8

mention
165:8

mentioned
52:24 75:16
120:5
124:23
159:23
164:2
174:12

mentor
31:24

mere 93:12

messages
161:12,17

met 78:15
79:5 134:9

Michigan
14:17

middle 101:2

Mike 56:22
57:20,22,24
107:24
108:8
110:24
112:7

mind 9:18
11:17 97:9
119:11
132:17
133:23
166:1 173:6

mine 40:20
111:12
112:3

minimum
21:10 59:2

minutes 9:5
24:7 96:8,19
126:13

mis-mal
45:22

mischaracter
izations
122:5

mischaracter
ized 121:24
122:2

misconduct
26:14,16,21
28:19 33:23
45:24 51:22
53:20 55:3
70:23 74:3
92:17 124:4
126:9 132:4
175:23

mishandle
140:6

mishandling
140:16

misinterpreti
ng 113:15

moment
69:17

monkey 99:7
136:13
168:22
170:13,15,

17

monkeys
85:5 89:7
131:14

month 19:3
141:6

months 5:21
6:12,19
45:24 72:6
81:2 85:19
86:20
164:19
169:24
172:10

Moore 10:22,
24 11:16
14:22 23:16
24:10,11,16
44:3,9
45:17,23
46:2,12
51:7,16
52:16 53:8
54:14 55:3,
13,24 58:24
60:6 61:1,12
62:6,14
65:16 68:24
69:23 74:8
78:17 80:13
81:5 82:14
83:5,13 84:8
87:14,15
97:2 98:20
101:24
103:14
105:13,20
106:8,21
107:2,6,20,
22 110:1,3
111:2 114:5,
14,22
115:10,15
116:8 118:8
120:4,6
123:22
125:18
129:10
131:13,16
133:16
135:20
136:5,11,19
137:2 138:2,
12,18
140:19
143:10
144:5,20
145:6,7
146:21
149:13,14
150:1
151:13
152:13
153:15,24
156:17
157:13
158:4
161:12,15,
21 162:9
163:6 164:2,
12 165:1
167:16
168:7,11,20
169:6,18
170:12,20
171:4,15

Moore's
23:15 44:13
61:16,23
78:19 87:2
112:1
162:14

mother
38:11

motion 145:8

motive
164:24

motorcycle
38:2,6

mouth
115:10

move 45:15
74:12 76:4
148:23

moved 33:5
74:4,14 83:2

moves
174:13

moving 76:3
134:5
142:24

multiple
42:22 56:15
64:5 97:9
131:11
135:19
136:16
139:16

___

**N**

___

named 44:7
144:23

Nancy 38:18

narcotics
39:9,15
55:10,15
56:1,23
57:4,9,17,18
59:1,4 60:9,
11,19 61:5
82:15 84:10
103:21
107:7,17
108:6 110:3,
9 114:14,22,
24 115:15,
18,22
117:23,24
123:23
125:4,19
143:17
159:20
160:5,23
161:15
162:5

narrowed
175:21
176:1

narrowly
175:20

nature 26:22,
24 27:9 52:1
64:10 70:10
92:14
116:21

126:11
165:14

necessarily
25:15 90:22
94:21 129:2

needed 46:3
54:20,23
65:13 68:19
85:21 99:5,6
112:15,17
131:23
133:20
143:21

negative
48:7

nemesis
37:19 41:21
42:2,7,8

neutral 64:20
65:2 98:16
150:22

nine-month
72:8

nobody's
7:20

nonexistent
164:9

nonfeasance
45:22

north 17:1
174:17

notation
78:1

notations
77:14

note 76:23
78:14
124:23

noted 109:14

notes 104:23

notice 30:1,2
109:8
110:24
112:10
120:4

noticed 9:23

notification
43:23 78:12

notified
11:11 91:11

notify 64:14

number
29:22 30:1,
4,6,11,14
104:2
111:20
169:20

numbered
105:12

numbers
106:4
154:10

numerals
105:12,19

numerical
106:12

numerous
142:21

nuts 128:12

___

**O**

___

obey 25:22

objection
43:10 85:14
87:24 89:15
92:20 94:15
95:8 99:10
105:14
132:2
133:24
134:15
137:12
138:10,24
139:22
140:11
141:24
150:7
152:19,22
153:20
156:10
157:1,8,20
158:9,11,18
163:9
165:23
172:3 175:1

obligated
23:3

obligation
132:15

observed
168:11

obtain 45:18

obtaining
161:16

occasions
109:11
139:16

occur 82:10
103:4 118:5
126:12

occurred
10:12 24:24
84:23
103:19
108:9,18
114:13
115:4,24
116:21
117:22,23
124:19
129:13,14
135:8
151:19
160:14
164:20

occurring
172:7
176:18

October
16:13 17:4,
16 141:1

offense
27:10,17
56:5 58:7
67:22

**offensively**
27:14

**office** 6:22
32:15 49:19
64:3 66:10,
11,12 71:14
76:23 90:7
127:16
129:8

**officer** 22:19
23:1 25:24
28:17,22
32:14 33:21,
23 40:8
59:10 72:11
76:1,3,4,9
77:24 79:17,
23 83:8 84:7
85:10 86:2,4
87:19,23
88:24 89:1,
5,7,11,13
90:14 91:12
92:9 94:8
95:6 98:9
101:9,12
102:1
106:11
131:15
135:2 136:4
137:1,6,23
138:3,13
139:19,20
140:9
144:22,23
145:7 151:7,
8,12 153:6,
16 156:18,
19 158:6,17
160:24
161:14,15
162:20
163:7 165:8,
9,18 166:22
167:10,14,
19 168:5,19,
21 169:5,17
170:10,15
171:1,10
176:23

**officer's**
71:21 75:6
89:5,6 94:10

**officers** 28:7,
11,15 43:18
70:13 71:17
73:7,8 74:11
75:9 76:10
79:17,19
84:9 85:6,7,
11 87:13,19
89:3 94:12
98:22 99:14
100:1 106:8
129:21
130:9
131:11,14
132:4
135:19,23
136:16
137:2
140:19
141:22
152:16,24
153:1
157:14

**Ohio** 15:1,
14,21 21:16
162:21

**one-year**
15:17

**ongoing**
43:12 70:12
94:24 97:24

**open** 32:20
119:12

**operate**
156:2

**operation**
29:24 43:6,
22

**opinion**
45:19 122:8

**opportunities**
32:14

**opportunity**
8:21 20:7,12
69:10 81:7
84:22 130:4,
8

**opposed**
52:11

**opposite**
35:21 42:14
119:9

**option** 73:7
137:13
138:11

**options**
71:20

**order** 35:15,
22 102:8
106:10,12
107:3 138:9
162:11

**ordered** 54:9
56:7 112:14
148:11
156:20

**orders** 67:15

**ordinances**
25:23

**original** 44:7
99:5 117:6
171:20

**originally**
13:9 57:24
153:19

**outcome**
147:3

**outcomes**
71:18 175:5

**outlining**
110:7,9

**overheard**
53:5 83:5
86:18 88:7

**overlapping**
5:24

**overrule**
147:21

**overruled**
113:9

**oversaw**
43:6

**oversee** 54:6
176:20

**overseeing**
74:11

**overseen**
63:3

**overshadowed** 139:24

**oversight**
54:5 97:21
115:20

**overtime**
31:13,14
44:11 80:20
143:15
144:5

**overturn**
45:2

— P —

**p.m.** 177:24

**packages**
66:22

**packet**
127:13

**pages** 63:18
104:5,7,14
105:15
121:2,8
127:1 128:1,
2,3,15
134:17
170:11

**paperwork**
23:17 59:19

**paragraph**
167:1
170:19,23

**pare** 127:14
128:20

**parking**
138:7

**part** 20:10,17
53:11 71:17
90:19 98:19
99:14
100:18
123:23
125:21
130:5,6
148:24
149:6
152:21
159:23
160:1
171:22

**partially**
54:13
103:17

**participate**
28:7,11
34:17

**participated**
28:18,22

**parties** 88:2

**party** 37:24
74:6 86:17,
19 134:5

**Pass** 30:24

**passes** 27:7

**past** 30:16
76:16
155:18

**patrol** 17:1
19:15,17
32:13,15
33:6 39:5
49:15,16,19,
21 71:14
72:3 74:11,
15 174:16
176:8

**pattern** 91:5
123:1,24
148:7,21
149:23
152:21

**patterns**
149:20

**pay** 31:15

**peacefully**
82:19

**people** 31:18
38:3 41:22
50:24 52:24
53:3 56:15
75:17 85:6,7
89:6,8 98:10
131:1,17,20
143:23
149:13
164:14
167:2,4
168:13
170:21
171:11
175:4

**percent**
172:13

**perfect** 7:20

**performed**
42:22

**period** 33:5
49:23 50:1
57:2 72:9,18
80:16 82:20

**periodically**
32:16

**permanently**
49:21

**permission**
101:23
103:7
150:24

**person** 22:9,
13 27:11,12,
20,21 29:6
31:11 53:9,
19 58:8,21
59:16 66:9
68:6 74:12

76:6,7 82:4
83:12 87:5,6
90:16,17,24
92:19 153:6
176:15

**person's**
58:11 85:1
87:17

**personal**
32:6 37:16,
23 47:1
48:4,16
50:19 84:8
163:17

**personally**
83:7 86:18
131:13
136:19
168:7

**personnel**
173:10

**persons**
84:19

**perspective**
161:2

**pertinent**
110:7
111:15
121:15
159:19,20

**phone** 66:8
100:19

**phrase** 28:4,
24 99:2,4

**physical**
87:17 137:6
139:19

**physically**
139:16

**picking**
66:22

**picture** 129:9

**pieces** 64:23

**piling** 131:4

**place** 24:2
57:19 72:6
73:14 81:11
131:8
149:21
172:9

**Plaintiff's**
59:24 69:9
104:2
109:22
166:17
170:8

**planning**
90:14

**play** 87:22
90:10

**played**
146:16

**point** 7:18
8:19 9:21
18:9 19:23
33:12 35:15
37:7 38:16,
18 39:1 44:5

46:20 47:4
49:9,14
53:22 54:14
55:7,9,19
57:17,18,24
58:2 60:6
61:5 65:15
67:5,8,9
68:22 70:5
88:18 92:8,
11 93:10
95:15,22
96:18,23
97:17 100:7
101:22
108:8
125:18
156:23
173:15

**pointing** 9:9
105:16

**points** 46:19
105:21

**police** 6:3,9
15:11,14,24
16:1,10,18
17:9 20:1,24
22:1,3,5
25:6 38:5
40:8,9,10
64:15 66:15
71:3 73:13
103:7 109:7
112:13
152:23
153:1 156:2,
18 158:6
163:5
172:24

**policies**
22:20,23

**policy** 25:13,
15,20,21
26:2,10
67:19,23
69:1 92:24
93:1 95:23
101:12
108:18
140:6
151:22,23

**polygraph**
101:24
102:5,11

**popped**
11:19

**portion** 60:7
63:3 107:1
112:8
121:18

**pose** 85:12

**position** 8:17
35:18,21
44:13 58:22
72:7 83:3
85:10 86:4
90:19
146:15
160:23
161:15
162:5 163:6
173:23

**positions**
22:16

**possession**
157:23

**possibly**
6:10 108:7
112:5
134:12

**posted** 69:21

**potential**
155:20
157:15

**potentially**
71:4 147:5
175:24

**practice**
63:13,14
67:24 68:8
69:1 74:1,2,
17 111:11
155:5

**pre-drawn**
64:22

**precautions**
100:22

**predated**
115:6

**preference**
64:20

**preferred**
111:19

**pregnant**
72:5

**prep** 9:4

**preparation**
61:22 78:7

**prepare** 8:22
10:7 14:11
78:22,24

**prepared**
127:13
166:19

**preparing**
10:20 13:15

**preponderan
ce** 30:8

**prerogative**
174:2

**presence**
163:14,19
164:7

**present**
33:21
125:13
131:9 136:5

**presented**
45:14
119:17
130:19,20

**pressed**
128:8,13

**pretty** 25:18
147:10

**prevent** 86:7
147:9

**previous**

15:19 38:8
57:5,6 77:7,
8 94:16 95:9

**previously**
41:23 59:24
103:24
104:1 154:8
166:17

**principally**
62:18

**principle**
92:14

**prior** 16:8
17:2,7,18,24
26:6 54:16
126:23
142:2

**private** 67:6

**privileged**
43:11,14
79:12

**privy** 73:4,5

**probation**
15:17

**problem**
127:17
175:10

**procedural**
138:8

**procedures**
21:2

**proceed**
156:5

**proceeded**
155:22

**proceeding**
89:14

**proceedings**
177:23

**process**
34:17 83:10
84:5 87:11,
12 97:22
101:22
109:18
119:16,19
134:4
137:19
138:1

**processed**
83:16

**processes**
20:15

**product**
176:2

**profession**
67:17

**professional**
18:14,18,23
19:1 33:17
34:3,8,10,
22,24 35:17
37:5 50:12
103:9
109:14
119:21
125:11,12
126:5

132:20
134:19

**profiling**
176:8

**progress**
30:19 31:24
34:13

**progressed**
51:20

**progressive**
109:4,5,12

**prohibit**
28:6,10

**promoted**
17:12,14
18:3 32:18,
21 33:10

**proof** 29:4
30:7 54:23
84:19 91:12,
16 119:24
131:7
137:24
176:1

**proper**
137:7,8

**properly**
44:9 150:5
174:23

**property**
53:23 62:15
72:19
140:16

**prosecute**
156:17

**protect**
79:19 147:7

**protecting**
79:20

**protections**
137:21

**prove** 29:8
35:12 44:22
68:15,17
120:15
127:18
128:10
130:21
131:2,7
137:19,22
138:15,17
139:6 140:4
142:24
143:23
172:18

**proven**
133:10
142:5

**provide** 11:5
12:18 30:7
77:17 118:3

**provided**
12:22 21:11
22:14 60:2
81:11 82:14
135:24
162:1

**PSB** 109:10
111:5

125:15

**public** 11:7
76:10 79:19,
22

**pull** 173:3

**purchased**
154:1

**purpose**
75:24 79:14,
18

**purposes**
61:4 75:6
79:18 86:2
105:15
106:3

**pursue** 63:20
156:8,9
169:15

**pursued**
93:16 133:6
155:1

**pursuing**
65:21 68:13
146:3

**put** 52:19
70:15 71:22
76:23 93:14,
22 100:20
106:12
130:16
133:12
136:3 147:8
168:10

**puts** 18:15
91:1

**putting**
13:10 70:13
85:2 87:14
92:13

—— Q ——

**Q-U-I-N-L-A-
N** 5:8

**qualify** 92:16

**query** 11:15
12:16

**question** 7:7,
12,14 10:1
43:13 75:14
81:10 97:19
99:11,23
100:6
101:20
110:11
113:14,16
114:19
115:14,17
120:20
123:15
127:9
130:12
132:23
133:14,18
136:24
138:16
165:17,21
168:3 170:9
171:20
172:13,22

questioned
48:13 143:3
166:2

questions
7:6,18 8:7
14:7 37:16
39:17 44:16
52:8 67:16
126:10
135:24
164:24
165:11
177:12,18

quick 13:21
24:22 29:14
96:10

Quinlan 5:1,
8 59:23
163:24

quote 99:7
155:2

quoting
146:1,2,4

—————

R

race 89:4
135:1
170:21

races 84:9,
12

racial 84:14
135:20
137:7 164:1,
13 165:8,19,
22 168:12
169:19
171:10
176:8

racially 85:3
89:2 129:11
139:20
140:7,21
141:22
171:16

racist 80:23
83:6 132:1

radio 32:17,
22 33:4

raise 151:13,
14

raised 151:9
152:6
176:22

raising
164:24

random 6:13

ranged 54:19

rank 117:16

re-interview
139:4
141:16

re-
interviewed
138:19

re-word
139:12

re-worded

137:14

re-wording
138:22

reach 91:11,
15 92:3,5

reached
134:20

reaching
121:12

react 161:5

reacting
172:1

reaction
160:21
161:4

read 69:10,
17 119:19
120:22
121:17,23
122:14,17
123:19
124:10,18
129:1
136:14
144:13
145:16,17
159:7
160:22
164:16
165:13
167:11,22,
23 169:16
177:20

reader
143:22

reading
135:17
136:2,9
144:19
172:6

reads 128:3

real 24:22
45:22 96:9
99:23
152:17
175:20

realize 7:21

realtime
85:18 88:1
146:18

rear 86:20

reason 8:13
30:18 80:8
81:9 86:13,
22 90:3
94:13,17
123:8
127:20
130:16
156:16
165:12
167:17
170:2
171:20

reasonable
64:21 86:14
151:17,21
152:15

reasoning
142:7

reasons 75:8
89:20 161:3
166:5

reassigned
73:21
173:18,23
174:21

reassigning
73:8 174:9

reassignmen
t 177:7

recall 5:23,
24 6:1 10:13
11:23,24
12:14 14:19
16:13 17:16
19:10,23
21:21 23:11
24:3,5,24
39:10,12,24
41:11 49:16
51:9,10,21
52:23 61:13,
19 62:3,9,19
64:2,5
65:15,18
68:17 75:1
78:3,10
80:2,17
81:1,18 97:5
100:4,11,16
102:6,16
103:20
108:4
115:12
119:3
125:17
128:19
129:4
134:21
135:3,22,23
136:7,14
142:19
143:2,6,11
144:2,7,8,14
145:10
154:3,5
156:21
160:20
161:16,17
162:7,15,17
173:13
175:12,13

recalled
136:4

received
10:16 27:21
53:22 126:4

recent 7:1
43:1 145:1

recently
19:24
145:10

recess 97:18
163:23

reclassify
138:11

recognize
124:20

recollection
10:19 14:5
55:5,6 62:1

79:2 102:13
106:6
154:20
175:14

recommend
45:4,10
56:19 68:9
90:15 93:3,4

recommenda
tion 69:6

recommenda
tions 174:9

recommende
d 70:19
120:8

recommendi
ng 90:9

reconsider
70:6,23,24

record 5:7,
12 9:16 24:4
30:16
105:15
106:3 123:6,
9,11,13

recorded
133:17

recording
89:4,9,10
124:9
133:21
134:14

records 11:7
21:6,13
23:10 55:22
66:20 102:9
135:8

recourse
146:24

recovered
161:12

refer 105:20
168:22
170:15,20,
24 171:6

reference
154:16
159:4

referenced
121:8

references
121:19

referred
71:13
171:15

referring
99:5 148:21

reflect 24:4

refresh 7:3
10:19 11:16
13:16 82:22
83:2 102:12
154:20
166:1

refreshed
83:22 145:2

refreshes
154:22,23

regular 22:3,
5 72:20
173:20

regulations
25:7

regulatory
20:15

reinstate
59:21

reiterate
171:14

related 6:2,
16 29:23
65:8 117:20
162:22
175:23

relation
34:10 56:9
66:13

relationship
31:23 33:15,
16 36:10
38:4 39:1
41:8 46:11,
13 47:1
48:16,18
49:9 50:10
82:17

relationships
31:18

relayed 88:7

reliable
48:21 49:4
89:10

relief 59:19,
22 75:3

relieve 56:3
58:21 62:7
69:6 74:16
76:8 79:24
84:1

relieved
54:10,14
73:12,21
93:6

relieving
31:11 58:8
61:6 69:23
70:12 75:24
76:3 79:15,
17 86:2

reliving
134:18

remain 64:20
75:12

remarks
84:21 89:3,5

remember
5:20 6:17,
20,24 7:22
10:9,14
13:12,19,24
21:12,14,18,
22 22:12
39:7 51:14
53:10 55:13,
16 57:12,16,
20,23 58:1
61:10,14
62:4 65:5,7,

9 66:1,4
67:8 68:1
80:12,23
83:20 98:23,
24 99:1,9,
13,16,18,24
100:6,12
118:7,13,18,
22 125:20
127:5,10,14,
15 128:17
131:18,19,
20 135:8,9
136:1,4,9,
11,16 143:7,
13 145:3,4,
12,19
164:11
165:4 171:8
176:5,10,11,
14

**remembered**
79:14

**remembers**
64:2 131:8

**remind** 12:23

**reminds**
166:21

**removed**
39:9,14
92:22
173:15

**removing**
75:17

**repeat** 94:16
95:9

**repeating**
71:12
170:16

**rephrase** 7:9
29:1

**report** 19:24
22:23 23:3,5
26:24 36:15
37:6,20
39:22,24
40:1,13
41:9,11 47:5
66:5 81:12
98:5 99:5
135:18
146:1
153:24
154:10
155:1 159:7
160:22
161:11
164:22
165:18
166:5,11
172:11

**reported**
24:23 39:2,6
53:4 68:6
80:14
129:14
165:10

**reporting**
38:24 57:16
70:1 132:4

**reports**
37:10 98:11

132:1

**repost** 162:4

**represent**
55:1 60:1
88:20 99:3
114:20

**representing**
158:1

**reprimand**
103:8 109:3,
5

**reputation**
41:17

**request**
32:24 77:9
100:14
101:13,14,
17 126:7
159:9

**requesting**
151:24

**requests**
11:7

**required**
16:6 138:8

**requirement**
120:9
164:22

**requires**
26:5 29:5
85:22

**resolved**
95:2 170:7

**resource**
14:22

**resources**
20:11,16
22:3 23:5

**respect** 32:3
41:7,13
42:12 44:1
96:17 97:7
103:13

**respond**
165:5

**responded**
168:22
170:16

**response**
68:10 151:8,
10 165:10

**responsibiliti
es** 25:12

**responsibilit
y** 22:17,19,22
58:8

**responsible**
101:3

**rest** 106:20
142:9
153:22
177:14

**restricted**
49:19 71:16
72:4

**result** 26:17
90:17 91:1

92:17 109:4

**resulted**
140:14

**retaliate**
94:12

**retaliation**
20:20 21:1,
20 23:2
28:7,10,17,
20,21 56:10
62:16 166:7

**retired** 31:23
36:14 57:22

**retreat** 57:15

**returned**
91:12 112:9

**reunions**
41:1

**revealed**
95:21

**review** 10:6
13:3 21:6,13
23:10 33:20
34:13 35:11
55:22 73:17
77:22 111:6
112:13,15
119:22
124:13
126:6

**reviewed**
10:10 13:4,
13,14 14:11
61:22 64:24
78:7,22
124:2,16
126:4

**reviewing**
11:14 35:20
68:17
102:23
127:7
174:24

**revise** 77:8

**Rich** 9:6,24
12:19 77:15
104:13
105:20

**Richard** 77:2
79:5 161:15

**rid** 96:21

**ride** 38:2

**rights** 134:4
162:21

**rise** 25:15
34:18 164:3
171:23

**rises** 130:22

**risk** 141:4

**role** 33:14
34:6,9 35:10
102:22
103:1 127:7
160:3
162:13,17

**roll** 121:4

**Roman**
105:12,19

**Ron** 56:24
57:1

**Ronald** 36:9

**room** 32:22
33:4 72:19

**roughly** 19:3

**routing**
109:8,21,23
111:13
124:24

**rule** 9:20
25:22 27:23
28:2 29:21,
22,23 30:2,
3,7 108:21,
22 113:22
120:8,10
129:20
130:3

**ruled** 44:12
108:3,4
111:12
118:12
141:10

**rules** 7:2
25:6 28:6
117:24
147:6

**ruling** 111:16

**run** 29:14
141:4

─────
**S**
─────

**safeguard**
76:10

**safety** 87:18
90:23
100:24

**sake** 176:1

**satisfaction**
118:20
175:7

**satisfied**
74:10

**scanned**
69:12

**scanning**
121:15

**scenario**
87:4 88:20

**scene** 43:18

**schedule**
31:14

**school** 15:6,
14,18

**scope** 35:1
130:15
144:15
149:17
150:23
151:3
156:12

**Scott** 47:3
136:4 165:3

**screen** 27:6

**Ron** 56:24

**search** 11:9
78:19

**second-to-
last** 170:19

**secondary**
45:15 162:2

**secondhand**
167:14

**secretaries**
38:10,22

**secretary**
38:1,13,19,
20

**section**
121:23

**Security**
57:19

**sees** 27:7
41:16

**segue** 46:11

**self-
admission**
54:9,21 91:6
92:16

**self-admitted**
90:6

**self-
disclosure**
54:7

**semiautomat
ic** 157:18

**send** 12:17,
19 13:23
23:19 35:14
46:1 53:16
117:18
119:21

**sending**
45:14
141:12

**sense** 42:18
82:21 83:22
121:11
124:1
167:13

**separate**
25:7 52:13
77:12 82:3

**separating**
79:15

**September**
17:15,16
81:13,21
104:8 141:3

**sequence**
80:24 83:21
114:18

**sergeant**
18:1,3 40:9,
10 44:13
45:16,23
47:15,23
60:5,11,24
61:12,15,23
62:6,18,21
63:18 69:23
74:13 77:4
82:14 83:8,

13 84:7 89:1
91:20 97:2
101:23,24
114:4,5,12,
13,22 115:9,
15 116:7
120:5,24
122:2,7
123:21
126:22
127:13,23
128:23
129:7,10
131:12,13,
16 133:16
135:17
138:2,6,12,
13 143:8,9,
20 144:3,4,
9,20,21
145:5,7,14,
21 147:5
149:12,14
150:1 151:7,
10,13
152:12
153:14,17,
23,24 154:8,
24 156:14,
17 157:4,13
158:2,4,14,
22 161:12,
21 162:9,13
163:6 164:2,
12 165:1
166:19
167:16
168:7,20,21
169:5,18
170:12,20
171:4,15

**sergeants**
33:18 34:7
74:11

**served** 163:2

**service**
59:12 73:22

**set** 144:15

**settle** 169:8,
9

**setup** 84:21

**seventh**
30:21

**sexual** 27:9

**Shaw** 5:14
10:22 13:7
50:7 77:24
78:17 83:8
151:8
160:24
161:14
162:20
163:7

**Shaw's** 44:3

**sheet** 109:8,
9,21,23
110:14,19
111:13
116:4
124:24
129:19

**shooter**
41:15

**shooting**
6:10 90:12

**short** 33:4,8
49:23

**shorter** 96:5
128:24

**shortest**
41:18

**shot** 90:17

**shots** 41:16

**show** 68:20
118:19
119:13
165:24
166:3
172:14,15

**showed**
69:8,11

**shown**
138:15

**shows**
111:14

**sides** 75:4

**sign** 108:15

**signature**
104:19,20
110:12
126:21
177:21

**signed** 44:15
108:5,11
111:15
112:8,11
141:3

**similar** 44:4
131:10
134:2 165:2

**single** 18:6

**sir** 5:16 7:4,
11 8:3,12,
16,20,23
9:3,8 11:20
12:21 14:12
15:22 16:7,
20 17:6,20
18:2,10,20
19:19 20:8,
22 21:3
22:8,15
24:18,20
33:13 36:17
37:14 40:11,
14 46:9 52:6
55:12 67:2
69:19
104:16
125:2,7
177:19

**sister-in-law**
38:1,12

**sit** 62:10
97:15
134:16
136:1

**sitting** 15:16
127:16

**situation**
44:2,3 45:12
89:12 90:24
91:2 102:12
105:10
134:24
137:11
138:20
147:2,4,8
150:3,12
153:6,9
176:21

**skip** 122:12

**skipped**
106:4

**slightly**
28:24 29:2

**Slip** 9:17

**slips** 44:15

**slur** 165:8,
19,22

**slurs** 135:20
164:2,13
168:12
169:19
171:10

**software**
11:8

**somebody's**
90:22

**someone's**
71:4 74:3

**someplace**
169:2,21

**Sorrell** 23:16
24:9,11
46:7,8,22
51:20,21
53:4 54:9
55:3 62:14
80:19 82:23
83:4 89:22
92:6,9 93:14
102:2
103:14
106:9,16
110:1 136:4
152:5,6
164:8,23

**Sorrell's**
132:5
135:19
164:8

**Sorrell/
moore** 51:19
52:3

**sort** 54:12
83:10 87:1
115:13
171:24

**sound** 55:4
103:16

**sounds**
35:24
100:10
101:5,7
136:22
141:1
151:17,20

**south** 49:16,
22

**spans** 56:13

**speak** 100:7,
14 101:9,13
128:3 150:9
151:19
155:7
157:12
159:5

**speaking**
53:10 73:24
167:5
168:21

**special**
20:10 31:12

**specialized**
20:14

**specific**
13:11,16
28:14 30:16
59:6 88:6
95:11,14,20
97:10 117:2
133:8 144:5
171:13
174:4

**specifically**
21:21 23:21,
23 65:14
95:24 97:5
100:3 117:3,
7 173:5
176:5

**specification**
126:17

**specification
s** 109:16

**specifics**
74:2 100:11,
17 136:8

**spectrum**
28:3 140:22

**speech**
80:10 81:23
140:2 142:4

**spend**
142:17

**spent** 40:23

**spin** 119:1

**spit** 93:18

**spoke** 20:17
76:24

**spot** 124:11

**spouse**
38:11

**spring** 82:15

**square** 60:18

**SRB** 24:17,
19 41:10
44:5 55:7,14
56:6 58:7
59:1 82:24
98:22
109:24
114:16
115:18
117:3,12

**123:22
131:12**

**staff** 22:18
57:15 67:8
109:10
125:1,22
142:10

**stage** 14:2
35:4,5 66:1
154:24

**stamp**
104:12
107:1

**stamped**
104:14,18

**stand** 168:18

**standard**
35:12 173:1

**standards**
18:14,18,23
19:2 33:17
34:3,9,11,
22,24 35:17
103:9
109:15
119:21
125:11,12
126:5
132:20
134:19

**standing**
67:24 68:7

**stands** 40:5

**stapled**
154:14

**start** 5:12
20:9 105:16
114:15
133:3 161:8
166:16

**started** 19:12
51:4,18,22

**starting**
104:14

**state** 5:6
15:1,14,21
25:19
124:18
172:4

**stated**
169:11

**statement**
36:6 121:22
177:4

**statements**
80:13
130:24
131:22
132:1
136:12
161:18
165:4

**states** 109:9

**stating**
136:18

**status** 61:16,
24 63:9 65:6
71:21 72:4

statute 25:11

statutory 173:2

stay 65:2 98:16 150:22

stayed 16:24

steer 98:18

stems 117:19

step 30:21 58:3 120:19, 21,22 138:9

Stephanie 47:21 48:19 53:3

stepping 25:4

steps 29:7, 10,12,15,20 30:22 31:4,6 119:23

stop 51:2

stopping 97:17

Stormy 43:1

straight 41:15 122:6

strategic 142:14

streamline 127:8

streamlined 143:22

street 37:8 66:14

strength 71:3

strictly 99:22 109:24 165:7

strong 141:7

strongest 131:5 142:6

stuff 30:17 52:12 54:24 79:12 110:3 143:17 161:24 162:2 164:17 168:16 169:3 172:8

subdivision 57:19 91:17 174:18

subdivisions 16:22

subject 73:17 114:6 118:22

subjects 14:7

substantial 26:18 81:1

suffer 85:23 92:10 93:9

suffering 70:16 172:5

suffers 29:6

sufficient 30:7 76:12 93:8 133:1 137:5 138:23 139:3

sufficiently 141:6

suggesting 143:13

suggestions 126:18

sum 128:1

summaries 124:11 166:3

summary 121:1,19 122:3,10,17 127:2 128:11 138:14 139:5,7 144:3,20 145:14 146:8 154:9 166:18 167:18 168:6 170:12

Super 57:6

supervise 42:19 44:9 45:21 46:15 49:13 50:17

supervised 47:22 49:20 50:13 57:4

supervises 74:3

supervising 48:8 85:11

supervision 46:23

supervisor 33:2 42:17 43:8,17,21 64:17

supervisor/ subordinate 46:14

supervisory 48:10 49:9 73:9,13 76:7 84:8 115:20

supplementa ry 128:9

support 85:22 86:10 128:10

supported 113:20 132:22

134:7

supporting 70:22 121:9 124:14 131:22

supposed 53:1

surfaced 24:13

surrounding 122:24

suspect 132:7

suspension 33:23

suspicion 51:22

sustain 45:2 67:24 108:20 117:13 132:18 133:2 138:9

sustained 26:7 44:18, 22 45:1,9,19 46:2,6 68:2 69:3 84:14 86:9 93:1,10 103:3 112:18 116:14 118:8 120:7 126:6 128:23 129:17,19 134:24 135:13 137:9,18 139:23 140:4 162:1 171:17,21 172:12,15

sustaining 144:16

sustains 108:20

SWAT 41:16

switch 14:7

sworn 5:2

—— T ——

table 93:5

tabs 96:24

tacitly 168:12

takes 27:10 169:7 175:16

taking 87:3, 13,23 94:14 95:4,16 158:5

talk 20:5 61:2 66:20 84:24 136:19 161:9 171:5

talked 79:10 94:4 98:12 100:21 106:9 114:2, 4 132:20 135:18 146:21 155:17 177:9

talking 44:2 51:8 52:3 77:2 79:7,14 82:18 83:18 87:10,16 139:11 164:1

taught 22:2

team 22:2 44:6

technical 115:14

telling 65:5, 7,11,12 66:24 70:3 115:7 127:17 128:16 131:12 176:23

ten 97:11

tend 9:21 21:9 141:7

tentacles 61:19 80:19

term 26:13 27:14 140:8

terminate 90:14 141:8, 17

terminated 44:10 46:4 141:9 162:14

termination 33:23 45:16 65:24 67:13, 18,22 68:9 69:6 70:20 90:9 92:18 93:3,4,5 141:7,8

terms 14:2 35:2 61:9 63:14 75:3,5 87:3,11,16 129:11 137:7 139:21 140:21 141:23 150:14

Terry 107:20, 21 111:2 112:1

testified 162:16

testifies 5:2

testify 8:10, 14

testifying 162:15

testimony 77:7 135:24

testing 29:17

text 161:12, 16

theft 44:10 52:4,11 54:3,18 56:5 58:6 62:14, 15 63:2,7 90:7,8 140:15

thereabouts 16:14

thing 13:16 30:13 35:20 51:18 65:14 68:12 69:24 71:6,7 73:11 76:16 82:11 96:2 112:17 142:18 166:15 167:11,13

things 7:18 31:20 34:18 35:2,3 52:9 73:23 75:7 80:11,18 83:1,4 87:17,18 118:12 122:15 123:21 124:15 132:7 133:22 140:14 141:15 142:16 147:16,24 149:24 151:18 160:10 162:17 167:13,15 169:22

thinking 65:13 81:20

thinks 167:2, 4

third-party 88:5 151:12

Thomas 5:1, 8

thought 76:16 83:10 84:5 122:4

Thoughtful 75:20

thousand 63:17 121:8 134:17

threat 59:18 79:22 82:2 85:13 86:15 87:18 90:2 94:24 99:13, 20,21 100:8,

14,21
135:12
136:6 137:2,
4,10,22
139:14
140:1 142:2
143:16
152:18
153:18
157:15
158:8
159:21

**threaten**
136:23
137:6 138:5
139:12
140:8
149:13

**threatened**
98:21 100:1
138:2,6,12
139:13,15
141:21
151:22
168:9

**threatening**
84:21 90:22
99:1 139:19
140:20
144:21,23
148:23
152:12
153:9,15
157:14
161:13

**threats** 85:2,
9 87:16,17
137:14
161:21

**thrown** 167:6

**tighten** 54:5

**time** 5:19
6:12 8:1 9:2
10:12 13:24
14:2 15:16
16:22 17:1,
16 19:21
20:2 24:8,
13,15,23,24
32:1 33:4,8
37:9,11
39:7,12
40:23 43:23,
24 44:11
45:23 49:23,
24 50:1
51:10 52:4,
11 53:23
54:3,6,15,
18,19,24
55:14,17
56:1,23 57:1
58:23 60:20
62:15 63:2,7
64:4 65:9
66:13 72:18,
19 74:23
77:1 78:14
80:4 81:1,5,
23 91:7 93:4
95:22 96:1
97:12,22
102:19
115:15

116:1 117:3,
19,22 124:3
128:5,7,12
134:21
140:17
142:17
145:3,12,16,
17,21 146:5
148:15,20
150:9
152:13
153:1,8
154:4,23
157:4,10
165:6,9
167:12
172:10,18
174:19,20
177:15

**timeframes**
161:9

**timeline**
85:19

**times** 5:17
6:13 33:2
39:24 64:3
80:15 120:9
129:24
141:14
169:1,20

**timetable**
81:20

**timing** 80:24
150:2 171:8

**title** 15:24

**today** 7:6
8:11,15 10:7
44:2 52:8
61:4 62:10
97:15 136:1
177:12

**told** 7:15
66:2 67:4,12
68:11,22
92:11 94:2
102:10
127:14
151:7,10
156:16
158:2,23
174:20

**top** 60:14
69:14
154:11

**totality** 65:1

**Totally** 66:15

**touches**
21:15

**trained**
152:23

**training**
17:12,13
20:6,10,14,
24 21:3,5,
12,14,17,19,
23 22:11,14
25:5 33:8

**transcript**
121:18,23
136:15
165:14

**transcripts**
128:10

**transferred**
55:14,21
82:15

**transition**
57:2

**treat** 26:11
87:19
122:22
130:10

**treated** 26:21
30:18

**treatment**
140:18,19
160:23

**trouble**
132:7 166:8

**true** 68:5,20
119:8
120:14
127:18

**truth** 88:10

**truthful**
48:21 119:2
120:9
158:23

**truthfully**
67:16

**turn** 104:4
144:16
154:9
157:17

**turned** 44:11
67:12
156:12

**turning** 45:8

**turns** 67:17

**Ty** 40:19

**type** 31:9
32:8 63:22
132:22
134:8
146:14
175:18

**typical**
63:13,16

**typically**
26:20 28:19
29:12 70:9
72:2 76:9
98:15 102:7
117:18

**typing** 27:5

_____
**U**
_____

**ultimately**
44:10,12
49:14 58:17,
22 118:12
127:20
141:18

**unacceptable**
175:18

**unassigned**
49:18

**unbecoming**
120:11,18
127:21
175:23

**unclip**
154:13

**understand**
7:7,9,10,16,
19,24 9:17
13:12 18:7
27:20 38:8
43:15 52:10
59:16 75:14
77:10 79:9,
11 119:6
120:24
132:24
153:5
157:19,22
164:23

**understandin
g** 16:15
22:24 25:5
26:9 55:1
73:20
119:20
130:1 164:6
169:24

**understood**
7:14 117:8

**unfold** 88:18

**unfounded**
45:9

**unheard**
63:16

**unintelligible**
120:13

**union** 146:15

**unique** 110:9
115:6

**unit** 11:8

**unity** 56:14

**University**
14:17 15:1

**unjust** 169:4

**unopened**
118:15

**unrelated**
78:2 90:18

**untrue**
118:20

**untruthful**
65:16 70:2
114:5 118:3

**untruthfulne
ss** 67:14,22
68:1,11,23
69:2 74:20
114:12
115:5 117:6
127:19,21
143:14
144:4,11
175:23

**unwise**
123:19

**unwritten**
67:20

**update** 63:22
74:18
126:11
129:8

**updated**
64:11

**updates** 63:9
98:1

**upheld**
135:15

**uphold** 59:21

_____
**V**
_____

**vacancy**
107:8

**vacate** 162:4

**vaguely**
100:10

**validation**
138:15

**Vardaro** 5:5,
13 97:16
123:12
163:20
168:1
177:17

**verbal** 124:7

**Verbally**
129:7

**verbatim**
121:17
128:3,9

**versa** 36:16

**version**
144:3

**versus** 72:9
80:10 97:11
127:21
130:2 133:5

**vice** 36:16
39:9,15 43:3

**video** 9:12

**view** 93:8

**violate** 25:20
26:2 28:2

**violated** 30:8

**violates**
25:18 26:1
27:23

**violation**
25:16 26:20
27:4 28:1
92:24 93:1
108:18
113:19
132:11
133:3,4
163:7
171:22
173:1,11

**violations**
25:14 26:11
92:24
175:24

**violence**
81:7 137:6

**virtually**
35:24 36:6
59:10 65:18
146:23

———

**W**

**wait** 88:9
96:19

**waived**
177:21

**walk** 31:17

**walked** 22:17

**walking**
145:6

**wanted**
45:15
111:14
112:19
121:20
131:5
148:14
149:5
151:13
159:10
167:12

**wanting**
90:14
141:15
166:7 176:3

**warrant**
69:23

**watch** 82:4

**water** 96:21
118:14,15

**Watkins** 47:3
53:1,2
136:5,10,11,
17 165:3
170:10

**weapon**
73:23 145:9
153:16
157:18

**weapons**
154:1

**week** 9:1

**weekly** 93:18

**weeks** 79:5
81:2

**weigh**
159:24

**Weiner**
125:16,17

**welcomed**
174:17

**Wes** 24:9,11
46:7,8,22
53:4 54:8
80:19
103:14
132:5 164:8,
23 167:1,3

**whatsoever**
162:18

**white** 165:9
176:23

**Whitney**
50:15
136:18

**whoever's**
84:5

**wide-ranging**
123:17

**Williams**
47:16 53:2
83:8 99:6
135:12
136:6 138:3,
6,13 144:22
153:17
161:23
168:21
171:16

**Wilson** 47:6,
7 136:17
165:2
166:20
167:10,14
168:19
169:5,17

**Wilson's**
166:23
167:19
168:6

**windup**
106:23

**wipe** 168:8
169:2,21

**withdraw**
114:19

**withholding**
132:11

**witnesses**
31:19 53:16
63:11

**Woods** 56:22
57:4,7,8,9,
20,22 58:1
107:24
108:8
110:24
112:4,7
159:17,18
160:8,17

**word** 85:4
89:6 99:17
115:10
124:18
131:14
133:17
156:18
158:5 167:6
170:16
171:3

**worded**
139:6

**wording**
98:24

**words** 65:17
85:15
131:13

**work** 6:2,15
9:9 30:16
31:12 32:8,
22 36:20,21,
22 37:4,5
40:3 41:2,8

48:17 53:6
56:9 58:10
74:15 80:6
81:6,22
90:16
108:22
130:23
135:1 164:4
171:23
172:5,15,19,
23 176:2

**worked** 32:2
81:22 170:1

**workflow**
72:8

**working** 81:4
82:12,16,19
90:12

**workplace**
29:24 81:7,8

**works** 23:20
59:15 70:9
74:17

**workstation**
74:5,9

**worry** 177:1

**worth** 35:2,
19

**worthy** 86:23
89:17

**write** 151:23
152:3,7

**writing** 52:19
147:12

**written** 67:20
103:8 109:3,
5,6 138:14
143:21
144:12
151:22

**wrong** 7:22
11:2 12:7
166:15
172:13

**wrongdoing**
76:8 92:2

**wrote** 10:15,
18 122:3

———

**X**

**XXI** 105:13

———

**Y**

**year** 21:8,10,
15

**years** 7:19
19:16,18
40:24 41:17
51:23 54:16
80:4,16 81:2
127:10
131:9
132:10,14
142:2,20
172:11

———

**Z**

**zone** 39:5,8
176:9