1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Kevin C. Morgan II,          :

      Plaintiff,          :

      vs.               : Case No. 2:17-cv-00829
                     Judge Marbley
City of Columbus,          : Magistrate Judge Deavers
Ohio, et al.,
                  :

      Defendants.          :


- - - - -

DEPOSITION OF KIMBERLEY K. JACOBS

- - - - -


Taken at Spectrum Reporting LLC
400 South Fifth Street, Suite 201
Columbus, OH 43215
July 22, 2019, 9:34 a.m.


- - - - -


Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

2

1                    A P P E A R A N C E S

2

    ON BEHALF OF PLAINTIFF:
3

         The Gittes Law Group
4        723 Oak Street
         Columbus, OH 43205
5        By Jeffrey P. Vardaro, Esq.
            Frederick M. Gittes, Esq.
6
                and
7
         Walton + Brown, LLP
8        395 E. Broad Street, Suite 200
         Columbus, OH 43215
9        By Sean L. Walton, Esq.

10

    ON BEHALF OF DEFENDANTS:
11
         City of Columbus Assistant City Attorney
12       77 N. Front Street
         Columbus, OH 43215
13       By Richard N. Coglianese, Esq.

14

15  ALSO PRESENT:

16       Kevin C. Morgan II

17

18

19

20

21

22

23

24

3

1                    Monday Morning Session

2                    July 22, 2019, 9:34 a.m.

3                    - - - - -

4              S T I P U L A T I O N S

5                    - - - - -

6         It is stipulated by counsel in attendance that

7     the deposition of Kimberley K. Jacobs, a witness

8     herein, called by the Plaintiff for

9     cross-examination, may be taken at this time by

10    the notary pursuant to notice and subsequent

11    agreement of counsel that said deposition may be

12    reduced to writing in stenotypy by the notary,

13    whose notes may thereafter be transcribed out of

14    the presence of the witness; that proof of the

15    official character and qualification of the notary

16    is waived.

17                    - - - - -

18

19

20

21

22

23

24

4

1                          I N D E X

2    Examination By                              Page

3    Mr. Vardaro - Cross                            5

4
     Plaintiff's Exhibits                         Page
5
     Exhibit 1 - Memo, 11-14-14 IAB                 95
6               Database #201311-0235

7    Exhibit 4 - 6-10-14 Kirby                     227
                IAB Database #201402-0067
8
     Exhibit 8 - Chief's Hearing IAB #201402-0067  231
9
     Exhibit 9 - Memo, 7-9-14 IAB#201402-0067      234
10
     Exhibit 15 - Interview of Morgan, 9-25-14     147
11
     Exhibit 19 - Chief's Hearing IAB #201311-0235 144
12
     Exhibit 24 - Routing Sheet for Houseberg,     274
13                5-15-14

14

15

16

17

18

19

20

21

22
     (Exhibits retained by Spectrum Reporting LLC.)
23

24

5

1                        KIMBERLEY K. JACOBS

2      being first duly sworn, testifies and says as

3      follows:

4                        CROSS-EXAMINATION

5      BY MR. VARDARO:

6      Q.          Could you state your name for the

7      record.

8      A.          Kim Jacobs.

9      Q.          All right.  And I think we've been

10     introduced before, but my name is Jeff Vardaro.

11     I'm representing Kevin Morgan in this case.  And I

12     will be asking you most if not all the questions

13     today.

14     A.          Okay.

15     Q.          I know from another case we've been

16     working on that you've been deposed fairly

17     recently.  But just to try to refresh some of the

18     ground rules for you -- well, first of all, have

19     you been in any depositions since your deposition

20     in the Carl Shaw case a few weeks ago?

21     A.          No.

22     Q.          Okay.  As I said, I'll be asking you

23     most if not all the questions.  If I ask you a

24     question and you don't understand the question,

6

```
 1    you understand that you can ask me to rephrase the
 2    question?
 3    A.        I do.
 4    Q.        And you'll do that if you don't
 5    understand it?
 6    A.        I will.
 7    Q.        And if you answer a question and you
 8    don't ask me to rephrase it, I'm going to assume
 9    you understood the question unless you tell me
10    otherwise, okay?
11    A.        Okay.
12    Q.        The other thing is I'm going to be
13    asking you some questions about different things
14    that happened a few years ago.  And I understand
15    that your memory, like everybody else's, is not
16    perfect.  So if you realize in the middle of the
17    deposition that you need to add something to what
18    you said before or correct something that you got
19    wrong, you understand you can do that even in the
20    middle of a question if you need to.
21    A.        Okay.
22    Q.        And will you do that for me?
23    A.        Yes, I will.
24    Q.        Okay.  I'm going to assume no new
```

7

1    medical conditions or drugs or medications that

2    you're on since the last deposition?

3    A.        Correct.

4    Q.        Okay.  No new criminal convictions

5    since then?

6    A.        No.

7    Q.        Okay.  And did you have an opportunity

8    to meet with counsel to prepare for this

9    deposition?

10    A.        I did.

11    Q.        When was that?

12    A.        Last week.

13    Q.        Okay.  Just the one time?

14    A.        I believe on Thursday.

15    Q.        Okay.

16    A.        That's all I recall.

17    Q.        Okay.  And for about how long?

18    A.        Probably under two hours.

19    Q.        Okay.  Did you review any documents to

20    prepare for the deposition?

21    A.        I did.

22    Q.        What did you review?

23    A.        I reviewed a copy of the investigation

24    summary and the charges and some prior

8

1    disciplinary decisions that might be brought up

2    as, you know, comparable or whatever.

3    Q.          Okay.  So first of all, you said the

4    investigative summary.  You're talking about the

5    internal affairs summary of the Kevin Morgan

6    investigation?

7    A.          I am.

8    Q.          Okay.  And the charges against Kevin

9    Morgan is what you're referring to?

10   A.          Correct.

11   Q.          Okay.  Did you review any of the

12   interview transcripts or hearing transcripts?

13   A.          No.

14   Q.          Okay.  Did you listen to any

15   recordings?

16   A.          No.

17   Q.          Okay.  In terms of -- did you review

18   the lawsuit in this case?

19   A.          No.

20   Q.          Have you ever seen it?

21   A.          I don't recall.

22   Q.          Okay.  In terms of the other

23   disciplinary decisions, can you remember what they

24   were, the ones that you said you reviewed?

9

```
 1    A.          I reviewed many of the decisions that I
 2    made as chief of police.
 3    Q.          Okay.
 4    A.          So back to 2012 forward that were
 5    resulting in departmental charges or suspensions.
 6    Q.          Okay.  But you don't remember which
 7    particular ones?
 8    A.          There's -- I don't know -- dozens of
 9    them.
10    Q.          Okay.  So you reviewed dozens of
11    investigations to prepare for this?
12    A.          Not investigations.
13    Q.          Okay.
14    A.          A summary.
15    Q.          You reviewed dozens of internal affairs
16    summaries of those?
17    A.          No.  No.
18    Q.          Oh, I'm sorry?
19    A.          We kept -- we posted a blurb on our
20    division's intranet that explained what the
21    charges were and gave a paragraph of what the case
22    was about.
23    Q.          Okay.  Is there a name for that
24    document in the department?
```

1    A.          The discipline database.

2    Q.          The discipline database.

3                Okay.  Is it also referred to as like a

4    disciplinary grid or something to that effect?

5    A.          Maybe somebody does.

6    Q.          Not by you?

7    A.          No.  It's on the division's intranet.

8    Q.          Okay.

9    A.          Under the Professional Standards Bureau

10   discipline link.

11   Q.          Okay.  What information does it have on

12   it for each case?

13   A.          Generally the officer's name, the rule

14   of conduct that was violated, the chief's

15   recommendation.  And then oftentimes the

16   director's recommendation and then a summary of

17   the case like I said and usually a paragraph or

18   two.

19   Q.          Okay.  And that's just kept updated on

20   a, like, sort of a rolling basis?

21   A.          Yeah.  The professional standards

22   bureau.

23   Q.          Okay.

24   A.          Discipline grievance lieutenants are

11

1    responsible for keeping it up to date.

2    Q.        Okay.  How far back does it go?

3    A.        Well, I think at least until 2012, but

4    I don't know if it goes back further than that.  I

5    was interested in making sure that our personnel

6    were informed of some of those decisions so that

7    they would have notice of what types of incidents,

8    about what type of thing to prevent rumors and

9    just to give notice.

10   Q.        Because officers might otherwise talk

11   without information about what happened in a

12   particular disciplinary case, is that the --

13   A.        That's part of it.

14   Q.        Okay.  Well, what's the other part?

15   A.        Just so that they understand that there

16   are ramifications to behavior that is in violation

17   of our rules.

18   Q.        Okay.  You want the consequences for

19   misconduct to be clear and predictable for the

20   officers I guess?

21   A.        I believe that it's a responsibility to

22   give them real information rather than to just

23   leave it out there and let word spread verbally

24   rather than in written form.  And to let them know

1   that if they want to know more, they can, you

2   know, find out.  But a lot of times things get

3   discussed and it's not based on the real facts, so

4   it's --

5   Q.        Okay.  Well, I guess I'll go back to my

6   question, though.  You do want the consequences

7   for officers' misconduct to be clear and

8   predictable for officers so they know the

9   consequences of actions?

10  A.        I believe it's important for them to

11  understand what the outcomes of certain cases

12  were, which might lead them to understand what the

13  consequences could be for similar behavior, yes.

14  Q.        Okay.  And I'm sorry for the pause, but

15  I want to get a better understanding of this

16  document, the disciplinary summary document that

17  we were just talking about.  And I will say I have

18  not printed out this document that we've been

19  provided in discovery, but I have it on my

20  computer here.

21          So for the record, I'm showing you a

22  screen from my computer here, and I just want you

23  to tell me whether this document that I'm showing

24  you is the same as what you're describing or is it

13

1   something different.  And if it's too small, you

2   can let me know.

3   A.          It goes back to 2007.  Are there other

4   pages?

5   Q.          There's multiple pages.

6   A.          How do you page?

7   Q.          I can --

8   A.          I mean, that doesn't look like the

9   exact image of mine.

10  Q.          Okay.  Is there more information in

11  yours about what the cases are about?

12  A.          I would say so.

13  Q.          Okay.

14  A.          Yeah.  Yes.

15  Q.          When was it that you reviewed that

16  summary?

17  A.          Yesterday and today.

18  Q.          Okay.  So you still have access to the

19  division intranet?

20  A.          No.  No.  I had a printed out version

21  from the professional standards.

22  Q.          Okay.  From when?  When was it printed

23  out?

24  A.          Last week.

14

1    Q.        Oh, okay.  So the division provided it

2    to you --

3    A.        After.

4    Q.        -- in preparation for the deposition?

5              I'll just say for the record I don't

6    think that's something we've been provided.

7              MR. COGLIANESE:  I thought it was.  But

8    I can talk to Van and make sure you get a copy.

9              MR. VARDARO:  It will be helpful as

10   soon as possible.

11             MR. COGLIANESE:  Yeah.  I believe

12   you've been provided a copy.

13             MR. VARDARO:  Okay.  I think I would

14   have seen that in the file, but if you -- if you

15   can point me to it, we'll deal with it after the

16   deposition.

17   BY MR. VARDARO:

18   Q.        Other than that summary that we were

19   just talking about, did you review any other

20   materials related to other cases besides Kevin

21   Morgan's to prepare for this deposition?

22   A.        No.

23   Q.        Okay.  So you haven't for instance

24   reviewed the internal affairs summary for the

1    investigation of Sergeant Constable and Sergeant

2    Jones and some of the other sergeants?

3    A.        I didn't review any materials from IA,

4    no.

5    Q.        Okay.  So I think we listed the Morgan

6    internal affairs summary, the Morgan charges, that

7    disciplinary summary we were just talking about.

8    I don't think you mentioned, were there any other

9    documents that you reviewed?

10   A.        No.

11   Q.        Okay.  We went through the last time we

12   did your deposition -- I won't go through the same

13   kinds of things that we did with you as

14   background, we'll just rely on what you told us

15   previously.

16           But I do have a few more officers to

17   ask about in terms of your personal or

18   professional relationships.  And just to try to

19   keep it relatively quick, I'm really just asking

20   for each of these people whether you ever were

21   their direct supervisor, whether you have a

22   personal relationship with them, positive or

23   negative outside of work, or whether they're a

24   person you particularly didn't get along with, or

```
 1    if they're -- and I guess I'll add if there's any
 2    reason that you have to believe that they're not
 3    honest or trustworthy I guess.
 4              First one Sergeant Ray Meister?
 5    A.        I don't believe I've ever been his
 6    direct supervisor.  I don't have a personal
 7    relationship with him.  I don't have any reason to
 8    believe he's not trustworthy.  What was the other
 9    question?  Whether I --
10    Q.        Oh, any reason --
11    A.        -- I don't like him?
12    Q.        Any conflict or any, you know --
13    A.        No.
14    Q.        -- reason that you had to have a
15    negative relationship with him?
16    A.        Not that I'm aware of.
17    Q.        Okay.  Sergeant I think it's Daniel
18    Weaver.
19    A.        I don't have a personal relationship
20    with him.  Don't believe I've ever been a direct
21    supervisor of him.  Don't have any reason to not
22    trust him at all.
23    Q.        Okay.  Sergeant Ken Decker?
24    A.        Same.
```

17

```
 1   Q.          Okay.  Sergeant Babcock?

 2   A.          Never been his direct supervisor.

 3   Don't have a personal relationship with him.  I

 4   don't have any evidence that I can't trust him.

 5   Q.          Okay.  You said that in a way that

 6   makes me think -- do you have some?

 7   A.          Just a --

 8   Q.          Repeat --

 9   A.          Just an old, old, old case, you know, I

10   wondered whether or not, you know, he got his

11   facts right.

12   Q.          Okay.

13   A.          But it's --

14   Q.          What was that about?

15   A.          About a kick to the head back in --

16   well before 2010, I can't remember the date.

17   Q.          Okay.  Before you were chief?

18   A.          Yes.

19   Q.          Okay.  It was him that kicked somebody

20   in the head?

21   A.          No.  It was just his -- his review of

22   it and various other things.

23   Q.          Okay.

24   A.          Like I said, I don't have any reason to
```

1    say that I can't trust him.

2    Q.        Was it a patrol officer that did the

3    kick?

4    A.        Yes.

5    Q.        Who was the officer?

6    A.        Well, it was not sustained, so I can't

7    prove that it was.

8    Q.        Okay.  But who was the officer?

9    A.        I believe it was Norm Baldwin.

10   Q.        Okay.  And Sergeant Babcock had done

11   some kind of review of that?

12   A.        Yeah.

13   Q.        And concluded that it either didn't

14   happen or --

15   A.        Yeah.  I think he might have been at

16   the scene or something along those lines.

17   Q.        Okay.

18   A.        I don't recall.

19   Q.        And you suspected that he was

20   protecting the patrol officer or --

21   A.        I thought that might be a possibility.

22   Q.        Okay.  This was when you were in

23   internal affairs or --

24   A.        No.  A deputy chief reviewing --

1    Q.          Okay.

2    A.          -- the investigation.

3    Q.          Okay.  But despite your suspicion in

4    this case, you went along with the not sustained

5    recommendation because you didn't have any

6    evidence?

7    A.          That's not the way that I would

8    describe it.

9    Q.          Okay.  How would you describe it?

10   A.          The information that first came to me

11   made me believe that the actual incident had

12   occurred as alleged.  I wasn't satisfied that

13   there was enough information to make my decision.

14   I sent it back for more information.  And by the

15   time it came back, the stories had been jumbled

16   and the witnesses were no longer as certain as

17   they were originally.  And so despite my concerns

18   that it was in fact true, I could not find the

19   evidence to sustain it.

20   Q.          Okay.  When you say "the witnesses,"

21   were those police witnesses or civilian witnesses?

22   A.          Civilian.

23   Q.          Okay.  So they went back and reviewed

24   -- interviewed the civilian witnesses again

1     after --

2     A.          Yes.

3     Q.          -- and then their stories had either

4     changed or their memories had faded to that

5     effect?

6     A.          Correct.

7     Q.          Who was the chief at the time?

8     A.          Probably Chief Distelzweig.

9     Q.          Okay.  And the chief -- well, this was

10    not sustained, so the chief didn't overrule that

11    and sustained discipline against Officer Baldwin?

12    A.          Correct.

13    Q.          Okay.  There was no video, I assume?

14    A.          Not to my recollection.

15    Q.          Okay.  Sergeant -- I'm going back to

16    your relationships.

17    A.          Yeah.

18    Q.          Sergeant Richard Brooks?

19    A.          I don't believe I've ever been a direct

20    supervisor.  I -- what was the other one?

21    Q.          Do you have a friendship outside of

22    work?

23    A.          Oh, no.

24    Q.          Okay.  Never an enemyship outside of

1   work?

2   A.          No, not at all.  I -- I totally respect

3   Sergeant Brooks.

4   Q.          Okay.  Officer Anthony or Tony Roberts?

5   A.          I don't believe I've ever been a direct

6   supervisor.  I don't know him personally outside

7   of work.  And I have no reason to -- to not

8   believe that he's trustworthy.

9   Q.          Okay.  Have you ever dealt with any

10  disciplinary matters dealing with Tony Roberts?

11  A.          Potentially.  But I don't recall what.

12  Q.          Okay.  You have a memory that you might

13  have dealt with discipline with him, but you don't

14  remember what it was about?

15  A.          Correct.

16  Q.          Okay.  A county prosecutor named Jeff

17  Blake, do you know him?

18  A.          No.

19  Q.          Okay.

20  A.          I mean I might have met him at some

21  point in time.

22  Q.          Okay.

23  A.          But I don't know him as a, you know,

24  personal friend or anything like that.

1    Q.        Okay.

2    A.        I've met a lot of prosecutors, so I

3    can't say that I haven't met him.

4    Q.        Okay.  No particular recollection or

5    impression of Jeff Blake then?

6    A.        No.

7    Q.        Okay.  Officer Christopher Bond?

8    A.        I don't believe I've ever directly

9    supervised him.  I don't have a personal

10   relationship with him off duty.  And I trust him

11   for --

12   Q.        Okay.

13   A.        You know, I don't have any reason not

14   to trust him at all.

15   Q.        Okay.  George Speaks?

16   A.        He was my boss.  I don't believe that

17   we've -- well, of course I've never supervised

18   him.

19   Q.        Sure.

20   A.        I don't think that we've done anything

21   really socially.  We've done things off duty, you

22   know, like get together for lunch or dinner or

23   something like that maybe once or twice.

24   Q.        Uh-huh.

1   A.          But more of a celebratory, you know,

2   retirement kind of a thing or whatever else.

3   But --

4   Q.          Okay.

5   A.          -- I don't have any reason to not trust

6   him at all.

7   Q.          Okay.  You consider him a friend?

8   A.          A colleague.  I don't know.  He kind of

9   -- you know, what's a friend?  You know, I like

10   him.

11   Q.          Uh-huh.

12   A.          I've dealt with him for many, many

13   years.  So, yeah, I suppose you could call him a

14   friend.  But I don't socialize with him.

15   Q.          All right.  So kind of a work friend?

16   A.          Correct.

17   Q.          Okay.  Van Irwin?

18   A.          I don't believe I've ever directly

19   supervised him.  I don't have an off duty personal

20   relationship with him.  I totally trust him.

21   Q.          Okay.  Van Irwin at least during the

22   time we're talking about and maybe now was in

23   professional standards?

24   A.          Correct.

24

1    Q.        What was his rank, lieutenant?

2    A.        Lieutenant.

3    Q.        Okay.  So is there a commander of

4    professional standards?

5    A.        Yes.

6    Q.        Okay.  Who was the commander at the

7    time of this?  You don't remember.  Okay.

8    A.        Potentially Commander Hyland.

9    Q.        Okay.

10   A.        But I don't know.

11   Q.        Okay.  I had a misunderstanding of how

12   professional standards works, but I think you

13   cleared it up.

14             Same question for I think it's Jeff

15   Lokai?

16   A.        Same.  Don't have a personal

17   relationship with him.  Don't believe I've ever

18   supervised him directly.  And I trust him.

19   Q.        Okay.  Kevin Morgan?

20   A.        Kevin Morgan?

21   Q.        Never his direct supervisor?

22   A.        Never supervised him.  Don't have a

23   personal relationship with him.  And certainly I

24   had concerns about being able to trust his word as

1  a result of this investigation.

2  Q.        Okay.  But no other reason?

3  A.        No.

4  Q.        Okay.  Had you had any prior dealings

5  with Kevin Morgan prior to this investigation?

6  A.        Not that I recall.

7  Q.        Okay.  Bronson Constable?

8  A.        Never supervised him.  Don't have a

9  personal relationship with him.  And I don't

10 really trust some of the things that he has said

11 or done.

12 Q.        Okay.  Can you tell me the reason why

13 you don't trust some of the things he's said or

14 done?

15 A.        I'm aware of previous disciplinary

16 issues that he's been involved in that lead me to

17 believe that he's not always truthful.

18 Q.        Okay.  Multiple incidents?

19 A.        Uh-huh.

20 Q.        I'm sorry.  You have to say yes or no.

21 A.        Yes.

22 Q.        Okay.  How about Doug Jones?

23 A.        Same.  I've never direct -- well, I

24 don't think I've ever directly supervised him.

26

1    Don't have a personal relationship with him.  And

2    pretty much the same, but not to the same level as

3    Bronson Constable.  He hasn't been involved in a

4    lot of other incidents that I'm aware of regarding

5    his truthfulness; it certainly came into question

6    in regards to one investigation.

7    Q.        That's the time reporting, leave

8    reporting investigation he was involved in?

9    A.        Correct.

10   Q.        Okay.  And we'll get into that later

11   obviously.

12             Zane Kirby?

13   A.        Same with that.  But I -- I don't have

14   any reason not to basically trust him.

15   Q.        Okay.

16   A.        I think that he admitted what had gone

17   on with him and acknowledged his misdeeds.

18   Q.        Okay.  And again we'll go a little

19   deeper into that.

20             Denise Reffitt?

21   A.        Haven't personally supervised her.

22   Don't have a personal relationship with her off

23   duty.  Don't have any reason not to trust her.

24   Q.        Okay.  My understanding she was

1   previously an internal affairs at some point?

2   A.        Yes.

3   Q.        But not while you were over internal

4   affairs?

5   A.        Yes.  Yes, she was.

6   Q.        But not your --

7   A.        I was the commander and she was a

8   sergeant.

9   Q.        Okay.

10  A.        There was lieutenant in between.

11  Q.        Okay.  Doug Williams?

12  A.        I don't believe I've ever supervised

13  him.  Don't have a personal relationship with him.

14  And certainly I have concerns sometimes about

15  whether I can trust him or not.

16  Q.        Okay.  What concerns do you have about

17  Doug Williams?

18  A.        There have been a number of incidents

19  that he's been involved in or alleged to have been

20  involved in where things have come up that I just

21  don't know how truthful he's been on some of those

22  things, but haven't been able to necessarily prove

23  any of those types of things.

24  Q.        Okay.  He's never been charged with

```
 1    untruthfulness?

 2    A.          Not to my knowledge.

 3    Q.          Okay.  He's never had a sustained

 4    charge of untruthfulness certainly?

 5    A.          Not to my knowledge.

 6    Q.          Okay.  Can you tell me anything about

 7    any examples of those incidents where you felt

 8    like he may not have been truthful?

 9    A.          Yeah.  I think that he's reported his

10    gun being stolen two or three times, which is just

11    very highly unusual.  And I don't have any more

12    specifics.  It's just that he doesn't have the

13    best reputation and I've --

14    Q.          Okay.

15    A.          -- decided that I need to, you know,

16    deal with the facts on what I do know and what I

17    don't.  But you asked me if I trust him, and I

18    said no.

19    Q.          Okay.  David LaRoche, did you ever

20    supervise him directly?

21    A.          No.  And I don't have a personal

22    relationship with him.  And I don't have any

23    reason to say I -- I think that he kind of fessed

24    up to some of his misdeeds, if you will, rule
```

29

1    violations.  But certainly there was questions

2    that were brought forth that made me wonder

3    whether you can always trust him, but that was

4    back -- back related to one investigation.

5    Q.        Okay.  Joseph Houseberg?

6    A.        Same thing with the first two.  The

7    third one there was a question about being able to

8    trust him, but it got resolved through the

9    disciplinary process.

10   Q.        Okay.  Zach Rosen?

11   A.        Same thing.  I would say that as far as

12   trusting him, I think that he has made a lot of

13   questionable decisions, and so I wouldn't

14   necessarily put a lot of faith in some of his

15   decision making.

16   Q.        You have questions about his judgment?

17   A.        Yes.

18   Q.        But questions about his honesty?

19   A.        I don't have any indication that he's

20   lied about stuff.

21   Q.        Okay.  Eric Moore?

22   A.        I have a lot of questions about his

23   truthfulness.

24   Q.        Okay.  And I think we talked about your

1    relationship in the previous --

2    A.        Yeah.

3    Q.        I don't remember whether we asked you

4    your relationship with Melissa McFadden.

5    A.        I don't believe I've ever directly

6    supervised her.  I don't have a personal

7    relationship with her.  And I would say that I

8    question, you know, how much I can trust her.

9    Q.        Okay.  Has she ever had a sustained

10   untruthful?

11   A.        Not to my knowledge.

12   Q.        Okay.  All right.  I want to ask you

13   some general questions about the way the

14   disciplinary process worked.  And I will say I'm

15   really talking about during the period when you

16   were chief of police.

17   A.        Okay.

18   Q.        Well, first of all, actually, that

19   raises an interesting one for me.

20             Do you feel like you made any changes

21   in the way the disciplinary process worked when

22   you became chief compared to chiefs before you?

23   A.        Well, I can't say for sure because I

24   didn't see them in action all the time when they

31

1    were making their previous decisions.  I tried to

2    make a point of being fair and informed.  You

3    know, sharing the information, I put notice out

4    when I felt it was appropriate to advise people of

5    changes perhaps in what discipline might be, the

6    outcome of certain things.  I worked with our

7    labor attorneys and HR officials to try to make

8    sure that we were making solid decisions.

9    Q.       Okay.  But you didn't -- when you came

10    into office as chief, you didn't sort of set out

11    to make particular changes that you're -- that you

12    can remember in terms of how disciplinary

13    processes are handled or how discipline is meted

14    out?

15    A.       Well, by saying "changes," I'm not sure

16    again.

17    Q.       Uh-huh.

18    A.       But I can tell you that I was very

19    determined to make the disciplinary process

20    transparent and one that relied on just cause, one

21    that, you know, took things into consideration

22    that decision-makers have to have.  I think I

23    documented more than previous chiefs.  But I had

24    studied, you know, discipline philosophies and

1   various other things and was determined to make

2   this process one that I felt could stand up to

3   scrutiny.

4   Q.          Okay.  What did you do to study

5   discipline philosophies?

6   A.          I read articles about discipline and,

7   you know, whether you post information, whether

8   you don't post information, how you do it.  We had

9   looked at what they call education based

10  disciplinary systems.  I'd looked at matrixes that

11  other agencies have used.  You know, I had done a

12  lot of study about that when I was in internal

13  affairs.  So going to training courses, reading

14  articles, looking up things, like I said,

15  consulting with experts, I felt like I had done a

16  lot of research about how to manage the

17  disciplinary process.

18  Q.          Okay.  In terms of the articles that

19  you read, was there like one or two that stuck out

20  as oh, here, this is what I wanted to do with the

21  department?

22  A.          No, huh-uh.

23  Q.          Okay.  Were they typically articles

24  circulated among chiefs of police like through

```
 1    organizations like International Association of

 2    Chiefs of Police, or was it academic articles, or

 3    what are we talking about?

 4    A.          I would say a combination of all of

 5    that.  And then there's websites, AELE and various

 6    other places that you can, you know, see

 7    information about what's been done in other

 8    government agencies not just police agencies.  So,

 9    no, nothing -- not one thing in particular, but

10    there was a compilation of a lot of different

11    things.

12    Q.          Okay.  When you say the -- you

13    mentioned that you looked at discipline matrices

14    from other departments.  First of all, did the

15    Columbus Division of Police have a discipline

16    matrix when you were chief?

17    A.          No.

18    Q.          Has it ever had one to your knowledge?

19    A.          As far back as I know, no.

20    Q.          Okay.  What departments matrix or what

21    department -- what different department's

22    matrixes?

23    A.          Phoenix.

24    Q.          Okay.  Phoenix, Arizona you're talking
```

34

1    about?

2    A.        Yeah.  LA has done an education based

3    thing and they have come up with some standards.

4    But we have an agreement with the union that we

5    don't create a matrix without negotiating, so it

6    wasn't something that we were going to even try to

7    do.  I don't like the philosophy of a matrix

8    because it doesn't take into account the case by

9    case details that are different among things.

10   Q.        Sure.

11             What is education based discipline?

12   A.        The philosophically -- Lee Baca I

13   believe from LA.

14   Q.        Is it the LA County Sheriff, former?

15   A.        He's in prison now I think.

16   Q.        Yeah.  I was going to say.  That's your

17   guru?

18   A.        But he was touted as this, you know,

19   great guy that, you know, came up with this

20   philosophy about how to correct behavior through

21   training.  And after our review of it, it seemed

22   like their disciplinary process was even harsher

23   than ours and they were backing off some of that

24   really harshness.  So once again it didn't seem to

1    be very relevant to our situation.

2    Q.        Okay.  So education based discipline is

3    not necessarily the philosophy you were trying to

4    use?

5    A.        Correct.

6    Q.        You had mentioned that you were posting

7    notice about changes in discipline?

8    A.        I would send out announcements.  I

9    talked to FOP and said from here on out, you know,

10   the disciplinary process for, for instance, a

11   drunk driving situation will be 80 hours minimum,

12   and that will be minimum based on behavior that

13   may or may not accompany any of that.  Prior to my

14   announcement, and prior to my being chief, the

15   kind of standard for a drunk driving departmental

16   charge was 40 hours suspension, and so I went

17   along with that, but I grew very concerned that it

18   wasn't sending the right message, so I wanted to

19   change that.  And so I put out notice to everybody

20   saying that if you get charged with drunk driving,

21   it's going to be at least 80 hours if not more and

22   up to termination.  We did the same thing for

23   accidental discharges that could have been

24   prevented if you had used the bullet trap at

1    substations.

2    Q.        What's a bullet trap?

3    A.        It's basically a tube where you would

4    point the barrel of your shotgun so that if it

5    accidentally goes off, the discharge would go into

6    this barrel which is metal and would contain the

7    pellets rather than it blowing a hole in the wall

8    or hurting somebody.

9    Q.        So this is a specifically about

10   accidental discharges that happen inside a

11   substation?

12   A.        Yes.

13   Q.        And it's about -- the discharge would

14   happen when somebody is taking the shotgun off a,

15   like --

16   A.        They exchange the shotgun from shift to

17   shift to shift to shift, and so they're supposed

18   to make the shotgun cruiser ready.  And by that,

19   that means that you've unloaded it, reloaded it

20   and you know what position it's in, whether the

21   safety's on, and all that kind of stuff.  And some

22   people got complacent about that, and a number of

23   holes appeared in the substations.  And typical

24   discipline in the past had been a written

1    reprimand for all accidental discharges.

2    Q.          Uh-huh.

3    A.          And I was not convinced that that was

4    the way to go.  We had bullet traps that we made

5    available to everyone and I think the notice was

6    not just about the bullet trap but -- that was the

7    main focus of that, to try to get officers to use

8    the bullet trap in the substations but also

9    whenever you're emptying a weapon to do it in a

10   safe manner and use whatever tools are available

11   to ensure that it doesn't go off accidentally.

12   Q.          Okay.  Other than the bullet trap rule

13   -- I'm going to call it a rule; I understand that

14   there may be issues with the union about whether

15   something is really a rule or not I guess.  But

16   your rule of thumb or whatever you want to call it

17   for accidental discharges and for drunk driving

18   incidents, any other changes that you remember

19   posting?

20   A.          Related to the drunk driving one, I

21   believe I also included that if you lost your

22   driver's privileges for a long period of time,

23   that that would be taken into consideration as

24   well.  If you've refused to blow and they took

```
 1    your driver's license -- in some counties they

 2    took your driver's license for a year and no

 3    occupational privileges, meaning that you cannot

 4    perform the duties of a police officer for a year.

 5    And I consider that to be serious misconduct.

 6    Q.        Would you say --

 7    A.        I don't remember anything else.

 8    Q.        I mean that the DUI or drunk driving

 9    issue was a priority for you for any particular

10    reason or --

11    A.        I had a lot of them --

12    Q.        And --

13    A.        -- come before me.

14    Q.        Okay.  And you felt like officers

15    weren't taking it seriously enough or --

16    A.        I was very concerned that too many

17    officers were getting intoxicated and driving.

18    Q.        Okay.

19    A.        And it -- you know, potentially has the

20    -- you know, you could kill somebody.  But also

21    just the damaging effects that it does on, you

22    know, our reputation, their reputation, you know,

23    it's financially damaging to whoever is involved.

24    And then, you know, you've got to worry whether or
```

39

```
1    not they're alcoholics and whether or not they're

2    abusing alcohol.  So I thought by making the

3    corrective action harsher that that might get

4    their attention and they might use, you know, a

5    ride sharing service or call a friend or something

6    else instead of being out there and driving.

7    Q.          Okay.  You touched on a number of

8    things, I guess I'll come back to them in just a

9    minute.

10              But going back sort of to the general

11   issues about how discipline was handled while you

12   were chief, can you tell me once -- as I

13   understand it, a disciplinary process might

14   initiate with an internal affairs investigation or

15   a chain of command investigation.  At some point

16   in the process, there's a determination of whether

17   there's going to be departmental charges against

18   the officer, and we can talk about that in a

19   minute.  But once there's been a departmental

20   charge sustained against an officer, can you tell

21   me -- can you give me an overview of how is the

22   level of discipline for that charge determined?

23   Yeah.  And, again, all of these questions I'm

24   really asking about while you were chief.
```

1   A.          Okay.  There is no matrix as we've

2   previously discussed.  All of it is taken into

3   consideration with regard to the evidence before

4   me.  If there are any previous comparables for

5   this particular case or for that particular rule

6   of conduct, that's looked at.  You know, whether

7   or not somebody has accepted responsibility, their

8   tenure, you know, if they've had a -- well, we can

9   only look back four years.  But whether they've

10  had a good disciplinary history, a good work

11  history, the level of training that they've

12  received, if they've had notice, did the

13  investigation, you know, prove things, is it

14  51 percent preponderance of the evidence, is it

15  clear and convincing, is it, you know, a greater

16  standard.  And then just what -- ultimately for my

17  recommendation, and understand I didn't always

18  make the final decision, my recommendation based

19  on what I think is appropriate for not only the

20  rule violation but for what I believe is going to

21  accomplish the appropriate corrective action, you

22  know, for this particular officer, you know, and

23  whether or not it may or may not be arbitrated is

24  at least sometimes discussed.  And whether or not,

1  you know, it can be through that process and stand

2  up to it is another one.

3  Q.        Okay.  I want to talk about two

4  particular -- I have questions about I guess two

5  particular things on that list.  One is you said

6  their tenure, the officer's tenure?

7  A.        Yeah.

8  Q.        Do you literally just mean how many

9  years they've been in the department?

10  A.        It just calls for at least considering

11  the officer's work performance and their years of

12  service.

13  Q.        Okay.

14  A.        I had a case where I'd recommended

15  termination for somebody that I believe was

16  stealing.  And the judge basically said they've

17  been an outstanding employee for many years and

18  you get them back.

19  Q.        Okay.

20  A.        The arbitrator.

21  Q.        Who was that?

22  A.        The officer?

23  Q.        Yeah.

24  A.        Chad Knode.

1    Q.          Okay.  What did Chad Knode do?

2    A.          He participated with another officer

3    who went to prison in --

4    Q.          Oh, this was -- I think we've heard

5    about things this was stealing military surplus or

6    something like that?

7    A.          Yes.  He took equipment that belonged

8    to either the City of Columbus or the military --

9    Q.          Uh-huh.

10   A.          -- to scrap yards, scrapped it and took

11   the cash and did not return that money to the City

12   of Columbus.

13   Q.          Do you remember what his tenure was at

14   the time?

15   A.          I think he had 20-something years.

16   Q.          Okay.  And did he have basically

17   20-something years of no prior discipline?

18   A.          Well, we're only allowed to look back

19   four years.

20   Q.          Okay.

21   A.          And the records aren't kept beyond six

22   years, so --

23   Q.          Okay.

24   A.          -- if there was disciplinary action.

1    If there wasn't, then it was three years.

2    Q.        Okay.  You said the level of training

3    the officer had?

4    A.        Yeah.  Whether or not they've been

5    trained in this particular, you know, situation.

6    Q.        In the sense that if it's something

7    that they may have never encountered before and

8    think just mishandled it, that would be treated

9    less seriously if they knew very well that what

10   they were doing was wrong?

11   A.        If they weren't trained on it, then it

12   would be the responsibility of the City or the

13   division for not training them.

14   Q.        Okay.

15   A.        Unless it was a violation of law and,

16   you know --

17   Q.        Sure.

18   A.        They had it right in front of them do

19   this do, you know.

20   Q.        Okay.

21   A.        Then that's the training, don't do

22   this.

23   Q.        Okay.  And that's my -- that was going

24   to be my first additional question here, which is

```
1    whether the conduct is criminal, is that a factor

2    in terms of how serious it would be --

3    A.        Well --

4    Q.          -- treated for discipline?

5    A.          -- certainly if it's criminal and we've

6    got a conviction, then we generally do a rule of

7    conduct violation regarding a conviction of some

8    sort.  I don't -- I mean, a lot of these cases

9    that are investigated criminally might not be

10   criminal.  Some of them are, some of them aren't.

11   Q.        Uh-huh.

12   A.          So I guess that you could say that that

13   is part of the consideration.

14   Q.          Okay.  I guess my question is I've seen

15   a lot of investigations as we've reviewed these

16   where everything is put on hold in terms of

17   internal affairs while there's a criminal

18   investigation conducted.  And then once the

19   criminal investigation concludes, then the

20   internal affairs administrative investigation

21   starts.  And my question is why?  Why do you stop

22   the process for the criminal investigation and

23   then start it up again?

24   A.          I have legal advisors.
```

1    Q.        Okay.  Do you have an understanding of

2    why?

3    A.        Yeah.  Generally we don't want to give

4    the appearance that we've treated one of our own

5    officers differently than we would a citizen by

6    not investigating things criminally.

7    Q.        Uh-huh.

8    A.        So if we believe a theft occurred, then

9    should we just say, well, they're an officer, we

10   don't have to investigate it criminally.  And so

11   there's a lot of concern that the appearance of

12   not doing a criminal investigation looks like we

13   have a bias towards our officer and are treating

14   them differently.

15   Q.        Uh-huh.

16   A.        I get that.  And so I have agreed to do

17   a number of investigations as a criminal

18   investigation first.  My preference is to do

19   concurrent investigations if we're going to do a

20   criminal investigation as well.

21   Q.        Uh-huh.

22   A.        But there are a lot of concerns about

23   ordering a participant to speak, you know, a focus

24   officer to speak because that could then give the

```
 1    appearance that we've ordered them to talk and

 2    maybe criminal charges shouldn't be filed, you

 3    know, whether two investigations got mixed.

 4    Q.        Uh-huh.

 5    A.        And have violated their constitutional

 6    right for, you know, self-defense, you know.

 7    Q.        Okay.

 8    A.        And yet there are sometimes when we

 9    have moved forward administratively at the same

10    time as a criminal investigation.  We've been

11    successful that way, so in general it's listening

12    to either the legal advice or the advice of the

13    director of public safety or someone else to

14    proceed criminally first and then do the

15    administrative so there is no mixing.  We've had a

16    number of challenges with regard to that.  And

17    obviously, you know, the delay in getting the

18    administrative thing done means that they've been

19    on our payroll longer.  That officer that I

20    referenced earlier, that investigation was

21    conducted by the federal agencies for about three

22    years, and the length of that criminal

23    investigation was one of the reasons why I believe

24    the arbitrator gave him his job back.
```

1    Q.          That's Knode?

2    A.          Yes.

3    Q.          Okay.  Is rank something that would be

4    taken into account in terms of the seriousness of

5    -- or not seriousness, but the degree of

6    discipline issued for an offense?

7    A.          Yes.

8    Q.          How is rank taken into account?

9    A.          I believe the supervisors have more

10   training, more responsibility, sometimes more

11   opportunity to be autonomous.  Officers in general

12   don't get to flex their hours, they don't get to,

13   you know, be someplace else without a whole bunch

14   of different approvals.  So a supervisor taking

15   advantage of that autonomy is certainly something

16   that I consider as part of their outcome, the

17   outcome of the disciplinary action.

18   Q.          Okay.  And because of that, it's a more

19   -- if an officer and a sergeant or a lieutenant

20   commit essentially the same offense, you would

21   take it -- it would be more discipline most likely

22   for the higher ranking officer?

23   A.          It depends.

24                MR. COGLIANESE:  Objection.

48

1    Q.          I guess what I'm trying to get at is

2    the answer you just gave when I asked how is rank

3    taken into account is you're telling me the

4    supervisors have more training and more

5    responsibility, more autonomy.  And so it's

6    something you take into account in the outcome of

7    the disciplinary action.  I guess I -- if it's not

8    to make the discipline -- is it to make the

9    discipline less serious for a higher ranking

10   officer?

11              MR. COGLIANESE:  Objection.

12   A.          It all depends on the facts of the

13   cases.  You know, was supervision at all related

14   to that?  I mean drunk driving has nothing to do

15   with supervision.

16   Q.          Okay.

17   A.          So it's all based on the facts, what

18   the charges are.

19   Q.          Okay.

20   A.          Very rarely I've ever seen a case have

21   the same exact fact pattern.

22   Q.          Of course.

23   A.          Of a serious nature.  A lot of people

24   not wearing their hats, pretty similar.

49

```
1   Q.          Right.  Or shooting a hole in the wall
2   of a substation?
3   A.          Some of them are.
4   Q.          I guess.  I guess there could be
5   multiple ways that happens?
6   A.          Uh-huh.
7   Q.          When rank is taken into account in
8   discipline, it would be taken into account to make
9   it a more serious offense for the higher ranking
10  officer?
11  A.          Potentially.
12              MR. COGLIANESE:  Objection.
13  Q.          Okay.  I would not think that there
14  would be a situation -- you can correct me if I'm
15  wrong -- where a higher ranking officer would
16  receive less discipline because of their higher
17  rank?
18              MR. COGLIANESE:  Objection.  Go ahead.
19  A.          I mean, you're talking about some
20  theoretical that I don't have an example of.  So,
21  you know, even with an OVI case, I can see an
22  officer that was driving recklessly and all that
23  kind of thing getting more discipline than a
24  sergeant that was, you know, asleep at a stop
```

1    sign.

2    Q.        And I am asking you a hypothetical.

3    A.        Yeah.

4    Q.        I'm talking about all things being

5    equal, if the offense has something to do with

6    supervision let's say and there's a supervisor

7    being disciplined rather than an officer, you

8    would expect the supervisor to receive at least

9    equal to but most likely more discipline than the

10   patrol officer?

11            MR. COGLIANESE:  Objection.  Go ahead.

12   A.        If all things are equal, then -- and it

13   has to do with supervision, then, yes, I could say

14   that that might be the case.  But, again, I'm not

15   going to give an absolute because I just don't

16   have any facts.

17   Q.        Okay.  You mentioned burdens of proof,

18   I guess in terms of whether you're sort of

19   51 percent sure that the officer did it versus

20   99 percent sure.  How does that play into the

21   discipline?

22   A.        I take it into consideration as to how

23   strong the evidence is.

24   Q.        Okay.  Is that in terms of how strong

1    the evidence is in your own mind or in terms of

2    how you think an arbitrator is going to look at

3    the strength of the evidence?

4    A.          Mostly mine.  But I certainly do

5    consider at times whether or not I think that this

6    is a case that an arbitrator could find.  But, you

7    know, like our burden of proof for administrative

8    investigations is preponderance of the evidence.

9    Q.          Uh-huh.

10   A.          Some arbitrators just decide that they

11   want clear and convincing.

12   Q.          Uh-huh.

13   A.          So I don't try to go with clear and

14   convincing just knowing that some arbitrators do

15   that because I don't know which arbitrator is

16   going to have the case.  And --

17   Q.          True.

18   A.          -- I don't know if that's the standard

19   that they're going to use.  So I relied mostly on

20   my judgment because that's the one thing that I

21   have control over.

22   Q.          And if you feel convinced that an

23   officer committed serious misconduct, would you

24   rather recommend the serious discipline even if

 1    you -- it might be overturned by the arbitrator,

 2    or would you rather issue discipline that you feel

 3    like is definitely going to hold up?

 4                 MR. COGLIANESE:  Objection.  Go ahead.

 5    A.          If I believe that the officer needs to

 6    have corrective action, I'm going to recommend

 7    corrective action.

 8    Q.          Okay.  Even if there's a chance that an

 9    arbitrator might send it back?

10    A.          I don't recall ever making a decision

11    not to discipline somebody because an arbitrator

12    might negate that.

13    Q.          Okay.  How about what's the rule of the

14    union?  And I know this is a general question, so

15    let me explain it.

16                 But what's the role of the union in

17    terms of that?  In terms of are there cases where

18    the union is sort of more and less, you know,

19    strenuously objecting to discipline for an

20    officer, and if so does that get taken into

21    account?

22                 MR. COGLIANESE:  Objection.  Go ahead.

23    A.          I think that I could say that, yes,

24    there are times when I feel like they are

1    absolutely convinced that an officer is either

2    innocent or shouldn't be disciplined at a certain

3    level and they make their feelings known to me

4    and/or others. And then there are other cases

5    where I think that they understand that

6    disciplinary action needs to take place, they're

7    not fighting it so strenuously.

8    Q.      Okay. And does that influence -- did

9    that influence your disciplinary recommendations

10    or is it just a background fact?

11    A.      Well, I would say I certainly

12    considered it. You know, in particular, you know,

13    some of our police involved shooting situations,

14    they were very, very, you know, strenuous about

15    some of their recommendations or fighting for a

16    particular officer. And I think they have been

17    with some other officers as well. But it's just I

18    consider everything.

19    Q.      Uh-huh. Okay. So you're saying there

20    are situations where you may have given lesser

21    disciplinary recommendations because you felt the

22    union was going to make a bigger issue of it?

23          MR. COGLIANESE: Objection. Go ahead.

24    A.      Well, the union objecting to it or not

1    is sometimes coinciding with what I thought was

2    the appropriate level of discipline.  So I can't

3    say that -- go ahead and repeat the question

4    again.

5    Q.        Are you saying there are situations

6    where you may have given lesser disciplinary

7    recommendations because you felt the union was

8    going to make a bigger issue of it than other

9    similar cases?

10   A.        I would say I probably did take that

11   into consideration, yes.

12   Q.        Can you give me an example?

13   A.        Well, like you brought up Doug Williams

14   before.  You know, I thought that his accidental

15   discharge when he was wrestling around with a

16   person and his gun was in his hand and he -- I

17   mean, he came close to shooting this person.  And

18   an 8-hour suspension seemed to me that that's not

19   nearly enough, but it was beyond a written

20   reprimand which was the standard, and I thought,

21   well, at least I get my foot in the door with an

22   8-hour suspension.  And so I thought, yes, indeed

23   they were going to object to that, and so I didn't

24   go higher than an 8-hour suspension but I did go

1    with the 8-hour suspension.

2    Q.        Okay.

3    A.        So I would say that's probably an

4    example of where I knew that the union was going

5    to object, I still did what I thought was at least

6    somewhat appropriate if -- you know, it might have

7    been harsher, but I thought that that at least

8    made a statement.

9    Q.        So the Doug Williams case was an

10   example where you gave lesser discipline than you

11   really wanted to because you felt the union would

12   make an issue of it if you did more?

13             MR. COGLIANESE:  Objection.  Go ahead.

14   A.        I just can't say, you know, what else I

15   would have done.

16   Q.        Okay.

17   A.        I --

18   Q.        I mean, just my understanding of the

19   Doug Williams case is that was by far the most

20   discipline that had ever been given to an officer

21   for an accidental discharge?

22   A.        I think at that time.

23   Q.        Okay.  And in fact there had been many

24   prior cases involving accidental discharges in

1    which the officers got a written reprimand?

2    A.          Correct.

3    Q.          Including some cases where the

4    discharge was near a civilian or during a scuffle

5    with a civilian?

6    A.          I don't know those cases.  This was one

7    that came up while I was chief.  So I don't know

8    all of the different accidental discharges

9    circumstances, but I do know that this one

10   concerned me.

11   Q.          Okay.  Did you take into account what

12   you described earlier in terms of your sort of

13   assessment of Sergeant Williams' reputation or

14   trustworthiness?

15   A.          That wasn't about trustworthiness.

16   That was about the circumstances that he -- even

17   as a supervisor -- I mean, in the videotape that

18   we had, we saw an officer that actually took

19   control of the situation and handled his own

20   weapon properly and Sergeant Williams did not.  So

21   I took into consideration his status as a

22   supervisor, his tenure.  But I didn't -- it wasn't

23   a matter of trustworthiness at that point in time.

24   Q.          Okay.  Going back to the status of the

1    supervisor thing, in addition to supervisors sort

2    of greater degree of autonomy and training and

3    that sort of thing, is it fair to say that it's

4    important for supervisors to set an example for

5    lower ranking officers than be held to a higher

6    standard of conduct in general?

7              MR. COGLIANESE:  Objection.  Go ahead.

8    A.        I believe it's extremely important for

9    supervisors to lead by example.

10   Q.        Okay.

11   A.        The higher standard is not something

12   that is codified.  You know, I think all police

13   officers should be held to a higher standard.

14   And, you know, there are situations that apply

15   just to supervisors for their behavior, so if

16   that's a higher standard, then I guess that

17   certainly applies.  But it doesn't say the same

18   circumstances that they'll be treated differently

19   for everything, you know.

20   Q.        Okay.  But just taking the example you

21   gave about wearing your hat.

22   A.        Uh-huh.

23   Q.        Assuming the supervisor is in a

24   position where they're required to wear their hat.

1    If a supervisor's sort of flouting the rules about

2    hat wearing, that may be taken more seriously than

3    for a patrol officer because the supervisor is

4    sort of demonstrating to the lower ranking

5    officers that they don't have to follow the rules

6    since my supervisor is not following the rules?

7            MR. COGLIANESE:  Objection.  Go ahead.

8    A.        Are you asking if it's taken more

9    seriously by me?

10   Q.        Yeah.

11   A.        I don't consider hat violations to be

12   extremely important.

13   Q.        Okay.

14   A.        Chief Jackson did.

15   Q.        Okay.

16   A.        And I don't believe that he insisted

17   that different levels of disciplinary action were

18   taken for supervisors as opposed to officers on a

19   regular basis.  It might have been on an

20   intermittent or, you know, indeterminant basis.

21   But I'm not aware of what his policy was on

22   wearing the hat.

23            Certainly I think that if a supervisor

24   is not wearing a hat, that it would be hard for

1    them to expect their officers to always wear their

2    hat and that leading by example thing.  But I

3    don't think that it would necessarily result in

4    different discipline.  It's a DCC generally, and I

5    don't get involved in those decisions.

6    Q.        Sure.

7    A.        I didn't get involved.  I keep talking

8    as if this is the present, and I am not the chief

9    anymore.

10   Q.        Uh-huh.  You mentioned -- actually I

11   think it was when you were talking about drunk

12   driving, you mentioned the role of the division's

13   public image?

14   A.        Uh-huh.

15   Q.        Is the division's public image

16   something that would be taken into account in

17   terms of handing out discipline?

18   A.        Yes, indeed.

19   Q.        Okay.  So things that officers do that

20   are more likely to cause the division public

21   humiliation or embarrassment would be taken more

22   seriously?

23   A.        I don't know about more seriously.  You

24   know, it --

1  Q.        It might?

2  A.        It's a factor in whether or not that

3  rule is used and, you know, there are other things

4  that never come to anybody's attention that are

5  extremely serious.

6  Q.        Uh-huh.

7  A.        So I don't know about the more

8  seriously.

9  Q.        And again for each of these factors I'm

10  really talking about all other things being equal,

11  if it's something that's embarrassing to the

12  division, it might result in more discipline?

13            MR. COGLIANESE:  Objection.  Go ahead.

14  A.        Because there's a rule of conduct that

15  says that you should not bring disrepute, then,

16  yes, they're taught the potential is there.

17  Q.        Okay.  How about the degree of harm to

18  the public, is that taken into account in

19  discipline, harm or potential harm to the public?

20  A.        I'm not sure what you mean by "harm."

21  Q.        Things that are dangerous to members of

22  the public or cause the public financial harm, are

23  those taken more seriously than things that don't?

24  A.        Sure.

1    Q.        Are things that are physically

2    dangerous to officers and civilians taken more

3    seriously than things that aren't?

4    A.        Can you give me an example?

5    Q.        I think the example you used was that

6    the accidental discharge near a civilian might be

7    taken more seriously than one that happens in the

8    wall at the -- against the wall of a substation

9    for instance?

10   A.        Absolutely.

11   Q.        Okay.  Things that might cause somebody

12   physical harm would generally be taken more

13   seriously than things that are, you know, strictly

14   an internal financial issue?

15   A.        No.  It depends.

16   Q.        No.  Can you explain?

17   A.        The best example that I could give is a

18   use of force --

19   Q.        Okay.

20   A.        -- that is outside of policy.  A use of

21   force that's outside of the policy is often done

22   in the heat of the moment, split second decision

23   making is going on, you know, the officer is in a

24   volatile situation, might sense that there's some

1    danger and act inappropriately.  I take all that

2    into consideration.  But somebody that

3    purposefully, you know, violates --

4    Q.          Steals property?

5    A.          -- our rules, steals property, violates

6    our rules, not necessarily harm to the public and

7    maybe it doesn't come to the attention of the

8    public.  But I consider it to be deceitful,

9    purposeful, and -- you know, whereas the officer's

10   behavior is -- oftentimes may be negligent or

11   reckless, not purposeful.  So their own

12   culpability is extremely important.  And I can't

13   say that the use of force is more serious than the

14   other.

15   Q.          Okay.  What about a purposeful use of

16   force against a civilian, intentionally doing

17   something without cause versus intentionally

18   stealing a piece of property from the division?

19              MR. COGLIANESE:  Objection.  Go ahead.

20   A.          It all depends on the facts and what

21   the situation is.

22   Q.          Okay.  There's no division rule that a

23   use of force against a civilian is a less serious

24   offense than a theft of property for instance?

1   There's no blanket rule like that?

2   A.        No.

3   Q.        Okay.  Exposing the division to

4   potential legal liability, does that make an

5   offense more serious in terms of discipline

6   potentially?

7             MR. COGLIANESE:  Objection.  Go ahead.

8   A.        I mean, I can't say that it doesn't.

9   But, you know, an officer does an illegal search,

10  you expose the city to, you know, legal liability,

11  you know, financially.  But you go back to, you

12  know, what was their mental state, you know, what

13  was their purpose, all that kind of stuff.  And so

14  there are -- certainly the potential is there if

15  they expose the city to something.  But, you know,

16  officers fail to control at a stop sign and get in

17  a car accident and cost the city tens of thousands

18  of dollars and they still get a DCC for, you know,

19  perhaps their driving.  So it -- it's not one

20  thing.

21  Q.        Okay.  And that applies even violations

22  of peoples' constitutional or civil rights may be

23  dealt with less seriously than things that don't?

24  A.        Depending --

```
 1              MR. COGLIANESE:  Objection.

 2    A.        -- on the circumstances.

 3    Q.        Okay.

 4              MR. GITTES:  Can we take a break?

 5              MR. VARDARO:  Can we wait a minute?

 6              MR. GITTES:  Sure.  Yeah.  Okay.

 7    BY MR. VARDARO:

 8    Q.        I think you were getting at this

 9    before.  But certainly if the offense involves the

10    honesty and integrity of the officer, that would

11    be dealt with more seriously than something that

12    doesn't?

13              MR. COGLIANESE:  Objection.

14    Q.        All other things being equal?

15              MR. COGLIANESE:  Objection.  Go ahead.

16    A.        It depends on what that's all about.  I

17    mean --

18    Q.        Okay.  Well, we'll get back into that

19    in a second.  Let's take 5 minutes?

20              (A short recess is taken.)

21    BY MR. VARDARO:

22    Q.        Chief Jacobs, before we went on break,

23    I was asking you about disciplinary infractions or

24    misconduct that implicates the honesty and
```

1    integrity of the officer involved.

2    A.          Yes.

3    Q.          And I guess you gave me -- you said

4    that -- whether that factors into the level of

5    discipline depends on what it's all about.  I

6    guess what I'm asking is if misconduct that an

7    officer comits is dishonest or intentionally

8    untruthful, that's more serious than conduct that

9    isn't dishonest or untruthful, right?

10                MR. COGLIANESE:  Objection.  Go ahead.

11   A.          I would say in general, yes.

12   Q.          Well, I'm asking all these questions

13   I'm asking you in general.  I mean, obviously

14   we're going to talk about some specific things.

15   A.          Okay.

16   Q.          So the factors that I've heard you say

17   in terms of what you took into account at the time

18   you were chief for the level of discipline were

19   the level of evidence in the case, how much

20   evidence there was?

21   A.          Yes.

22   Q.          Whether there were comparable prior

23   cases?

24   A.          Yes.

66

1  Q.        Whether the officer accepted

2  responsibility for their actions?

3  A.        Yes.

4  Q.        And just in terms of that one, that's

5  sort of related to what we were just talking about

6  in terms of honesty and integrity, if the officer

7  has basically admitted that they did the thing

8  wrong versus continuing to claim that they didn't,

9  you take that into account?

10 A.        I would say yes in general.

11 Q.        Okay.  If the officer when they were

12 asked, the officer said I didn't do it and then it

13 turned out that they actually -- you could prove

14 100 percent they did do it, they would be charged

15 with untruthfulness on top of the other charges,

16 right?

17           MR. COGLIANESE:  Objection.  Go ahead.

18 A.        That depends.

19 Q.        I mean, if it's proven that the officer

20 was untruthful?

21 A.        If it was proven --

22           MR. COGLIANESE:  Objection.

23 A.        -- that the officer was untruthful,

24 yes.  That would certainly be a consideration.

67

1    Q.        Okay.

2    A.        But sometimes they can deny something

3    and still not be in their mind's eye lying because

4    they believe it to be otherwise.

5    Q.        Okay.  If the officer had a good -- the

6    other factors you've listed, the officer's prior

7    history in the department, their history of

8    service?

9    A.        What's the question?

10   Q.        Whether that was a factor in the

11   discipline?

12   A.        Yes.

13   Q.        Their past disciplinary acts or

14   disciplinary history?

15   A.        Correct.

16   Q.        The burden of proof for that particular

17   type of discipline, whether it preponderance or

18   clear and convincing?

19             MR. COGLIANESE:  Objection.

20   A.        Well, I don't --

21   Q.        Well, you said that was something you

22   didn't really take into account, your standard was

23   preponderance, some arbitrators applied higher

24   standards?

1    A.         The city's level of proof needed to

2    sustain the charges is a preponderance of the

3    evidence.  In the cases that I saw, it ranged from

4    51 percent to 100 percent.

5    Q.         Okay.  So if you're absolutely certain

6    that the officer conducted the misconduct, they're

7    likely to get a higher level of discipline than if

8    you were just pretty sure that they did it?

9               MR. COGLIANESE:  Objection.

10   A.         Not necessarily.

11   Q.         Okay.  So what did you mean when you --

12   when you were talking about how sure you were that

13   they did the misconduct being a factor in

14   discipline?

15   A.         Well, it depends on what the charges

16   are.  I mean, you know, I could be -- I could be

17   preponderance of the evidence and 100 percent sure

18   and still give the same level of discipline,

19   depending on what the comparables were and what --

20   everything else was involved.

21   Q.         I'm going by the list that you gave us

22   in terms that you said the level of evidence, the

23   level of proof was a factor in terms of how

24   serious the disciplinary --

1    A.          I said it was one of the considerations

2    that I take into --

3    Q.          Well, how would it be a consideration?

4    A.          If I felt that -- I have to decide.  I

5    think if it's 51 percent preponderance of the

6    evidence and then if I am very convinced then I'm

7    very convinced.

8    Q.          Okay.

9    A.          It's a consideration that I --

10   Q.          And how does that play into the level

11   of discipline that's handed out?

12               MR. COGLIANESE:  Objection.

13   A.          I can't give you a hypothetical answer

14   without knowing what the facts are.

15   Q.          I guess I want to make sure you

16   understand what I'm asking you.  What I'm asking

17   you is once you've decided you're going to sustain

18   a departmental charge against an officer, my

19   question was about the factors that would be taken

20   into account in terms of what level of discipline

21   is given, whether they're terminated, whether

22   they're suspended, how long a suspension, whether

23   it's a reprimand or suspension, those kind of

24   things.  You mentioned in response to that whether

```
 1    it's 51 percent or 100 percent being a factor in

 2    those things.  And I guess I'm trying to figure

 3    out in what direction?  I mean, I think it's a

 4    pretty basic question.  If you're more sure,

 5    you're more likely to give a higher level of

 6    discipline; is that accurate?

 7                 MR. COGLIANESE:  Objection.

 8    A.        I would say that that can happen, yes.

 9    Q.        Okay.  You mentioned the level of

10    discipline needed to achieve the corrective

11    action?

12    A.        I did.

13    Q.        What does that mean?

14    A.        Do I think that this is an appropriate

15    level to prevent future similar conduct from

16    occurring.

17    Q.        Okay.  You mentioned the risk of

18    arbitration, and I think we talked about that,

19    that's another factor, but maybe not one that you

20    took particularly strongly into account?

21                 MR. COGLIANESE:  Objection.

22    A.        I considered it always.  Well, not

23    always, I guess.  But I certainly considered it at

24    times and took it into consideration.  I mean, I
```

1    typically would discuss the outcome of a hearing

2    with the people that were present outside of the

3    FOP and then the focus officer and say what do you

4    think, and sometimes that would come up and

5    sometimes it wouldn't.

6    Q.        Okay.  You mentioned a tenure of the

7    officer, that's one of the -- that was another

8    factor?

9    A.        Yes.

10   Q.        The level of training the officer

11   received was a factor?

12   A.        Yes.

13   Q.        Whether the conduct was criminal or not

14   with a conviction?

15   A.        I don't know that I distinguished it

16   being a conviction.  Certainly that goes into the

17   charges that might come in and then that could add

18   on.  But it could be a totally administrative

19   case, not criminal and still be very serious.

20   Q.        Okay.  But if the officer committed a

21   crime, that would be factored into the discipline?

22   A.        Yes.

23             MR. COGLIANESE:  Objection.

24   Q.        The officer's rank is a factor?

1  A.        Yes.

2  Q.        The level of public embarrassment is a

3  factor?

4  A.        Yes.

5  Q.        And whether there's harm to the public

6  or the division is a factor?

7  A.        Yes.

8  Q.        And whether the conduct was intentional

9  or just reckless or negligent is a factor?

10  A.        Their culpability was a consideration.

11  Q.        Okay.

12  A.        Their known culpability.

13  Q.        Okay.  Other than those I think

14  probably 14 or 15 different things that I just

15  mentioned, any other factors generally that you

16  can think of in terms of how serious the

17  discipline handed out would be?

18  A.        I don't think we talked about

19  aggravating circumstances, you know.

20  Q.        Yeah.  Let's talk about them.

21  A.        There's mitigating and aggravating

22  circumstances.

23  Q.        Are there other things that aren't on

24  that list that would be aggravated or mitigating

73

1    circumstances?

2    A.        I described earlier the mitigating for

3    an officer using unnecessary force, you know, a

4    volatile situation, you know, thinking that this

5    was necessary but it really wasn't or whatever,

6    that's a mitigating circumstance. Aggravating is

7    where you've plotted, where you've, you know,

8    purposefully done something that you actually knew

9    what you were doing and continued to do it, so

10   that's an aggravating circumstance. Aggravating

11   on an OVI. You know, one thing is to, you know,

12   fall asleep at the wheel with the car running,

13   stopped at a stop sign. Another one would be to

14   maybe flee and not pull over right away and to,

15   you know, fight with the arresting officer or to

16   give them a hard time or try to get out of the

17   situation by saying you're a cop. Those would be

18   aggravating circumstances.

19   Q.        Okay. But a lot of that seems like

20   it's bound up in the last factor that we talked

21   about which is about whether the misconduct is

22   purposeful or intentional or premedicated versus

23   whether it's reckless or negligent.

24   A.        It's related to it.

1    Q.        Okay.

2    A.        But not exclusively.

3    Q.        Okay.  Are there other mitigating

4    factors that you haven't already mentioned?

5              MR. COGLIANESE:  Objection.

6    A.        I can't think of any other examples

7    right now.

8    Q.        Okay.  How about other aggravating

9    factors?

10             MR. COGLIANESE:  Objection.

11   A.        I can't think of anything specific.

12   Q.        Okay.  How about just sort of how you

13   value the officer in terms of their value to the

14   department, is that something you take into

15   account?

16   A.        Yeah.  I suppose if that's a judgment

17   that I feel comfortable making, you know.  I don't

18   always know, and I certainly can't predict, but

19   you know if I believe that the corrective action

20   is one in which is probably going to change

21   behavior and that person can continue to be a

22   productive police officer, whereas the corrective

23   action isn't going to change anything and they

24   might consider or might continue to be a problem,

1    then that might be a factor that I can take into

2    consideration.  It might not be anything that I

3    can do anything about, though.

4    Q.        Okay.

5    A.        Yeah.  Or accurately assess.

6    Q.        Okay.  Any other factors that we

7    haven't talked about that you can think of in

8    general that you would have taken into account?

9    A.        Not right offhand.

10   Q.        Okay.  I want to talk obviously about

11   the Kevin Morgan investigation that resulted in

12   his termination.  Fair to say the general time

13   frame we're talking about is 2013 to 2015; does

14   that sound right to you?

15   A.        Yes.

16   Q.        Okay.  In particular the misconduct he

17   was alleged to have committed happened in 2013, he

18   was terminated in 2015, and the investigation in

19   various forms went on in between those times?

20   A.        Correct.

21   Q.        Okay.  What was the first thing that

22   you heard about it when -- like when in the

23   process would you have heard about it?

24   A.        I don't recall specifically.  I

1    sometimes was informed of the initiation of

2    investigations and sometimes I wasn't.  I would

3    assume this one was shortly after it initiated

4    because he was relieved of duty.  And in general I

5    was advised of those kinds of circumstances and/or

6    why.

7    Q.        Okay.  Typically there would be a

8    routing sheet at least that would go up to you, to

9    your level when somebody was relieved of duty?

10   A.        Not necessarily, no.

11   Q.        Okay.

12   A.        But, you know, whether it was a routing

13   sheet or somebody verbally told me, in general I

14   was advised of serious allegations and relief of

15   duties.

16   Q.        Okay.  Do you have any independent

17   recollection of what the first thing you would

18   have heard about Kevin Morgan's case was?

19   A.        Along the lines of working special duty

20   employment and I think it referred to his double

21   dipping.  But, you know, basically getting paid

22   for being two places at the same time, which

23   obviously shouldn't happen.

24   Q.        What was your involvement in the

1    investigation as it was going on?

2    A.          I don't recall any specific --

3    Q.          Okay.  Commander --

4    A.          -- involvement.

5    Q.          Commander Jennifer Knight was in charge

6    of internal affairs during this time period.  Does

7    that sound right?

8    A.          I don't know the dates of her tenure

9    there.

10   Q.          Okay.

11   A.          I had at least four different internal

12   affairs commanders in seven years, so I don't know

13   what the tenure of hers was.

14   Q.          Commander Knight, do you remember

15   Commander Knight keeping you generally informed

16   and updated about this investigation?

17   A.          She may have.

18   Q.          Okay.  Do you remember having any

19   discussions with Ray Meister the sergeant

20   investigating Kevin Morgan?

21   A.          I don't remember any specific

22   conversation that I had with him.  He might have

23   been at the hearing --

24   Q.          Okay.

1    A.         -- ultimately and we might have talked

2    then.  But I don't remember during the pendency of

3    the case.

4    Q.         Okay.  Having reviewed the

5    investigative summary in the last -- you said you

6    reviewed it in the last week or so?

7    A.         Uh-huh.

8    Q.         Sorry.  You have to say yes.

9    A.         Yes.

10   Q.         You also remember Ken Decker was

11   involved in the investigation?

12   A.         I believe he was one of the IA

13   sergeants that helped with some interviews.

14   Q.         Okay.  Did you have any involvement in

15   assigning Sergeant Decker to assist Sergeant

16   Meister or was that completely within internal

17   affairs?

18   A.         Not to my knowledge.

19   Q.         Okay.  Do you have any understanding of

20   why Sergeant Decker was assisting Sergeant Meister

21   with the investigation?

22   A.         No.

23   Q.         Okay.  Did you have discussions at

24   executive staff meetings about the progress of

79

1    this case as it was going on?

2    A.          I would assume we did.  I generally

3    tried to be kept apprised of relief of duty

4    status.  And if we're doing a criminal

5    investigation, then I would have asked to be kept

6    advised of what was the status of the criminal

7    investigation.

8    Q.          Okay.  What would be the general nature

9    of those status reports or --

10   A.          Where does it stand, you know, what's

11   going on, do we have anything new, do we have any,

12   you know, reason to put him back to work or not.

13   You know, general questioning about where the

14   investigation stood.

15   Q.          Okay.  I want to talk -- I want to jump

16   back for a second and talk in general about what

17   is -- when Officer Morgan was relieved of duty,

18   which was shortly after this investigation

19   started --

20   A.          Uh-huh.

21   Q.          -- he was assigned to something called

22   580.  What does that mean when an officer is

23   relieved of duty and assigned to 580?

24   A.          They're relieved of their badge and gun

1    and told not to perform any police duties,

2    activities.  And then 580 is the patrol

3    administrative office, and they find work for our

4    personnel there to answer the phones, to help

5    people coming into the office find things, do

6    things, they organize and distribute subpoenas,

7    basically whatever work the patrol administrative

8    sergeant feels needs to be done during that shift.

9    Q.        Okay.  How many officers are typically

10   on relieved of duty status at one time and

11   assigned a 580?

12   A.        It fluctuates.

13   Q.        Okay.  What's the range?

14   A.        As far as being relieved of duty,

15   probably one or two because everybody knew during

16   my tenure that I tried to minimize the number of

17   people that were, you know, relief of duty status.

18   It was something that I purposefully tried to

19   shorten the time in a relief of duty status if

20   possible.

21   Q.        Why?

22   A.        Because if the officer could still do

23   some work that we trusted could be done in the

24   right way and it wasn't a termination case, then

1    they could go back to work and wait out the

2    pendency.  But if you are facing a termination

3    case, if it's about untruthfulness, if it's about

4    I don't trust you to do the job in the way that

5    needs to be done, then you would generally stay

6    off.  I didn't always get involved in all of those

7    decisions.  But the ones that came to my

8    attention, I tried to monitor the status of.

9    Certainly something the union had complained about

10   and I told them and did make some changes to

11   monitor how long people were in a relief of duty

12   status so that we weren't neglecting to pay

13   attention to that status.

14   Q.        Okay.  For officers relieved of duty,

15   the sergeant had a fair amount of discretion in

16   terms of what they were actually doing?

17   A.        The patrol administrative sergeant?

18   Q.        Yes.

19   A.        As far as I know, yes.

20   Q.        Okay.  I mean they could be located in

21   various different places within the 580 office?

22   They could be doing various different kinds of

23   what I would call make work duties?

24   A.        Well, there was always work to be done.

1   I worked there for four years as a sergeant and

2   there was always work to be done.  But if you had

3   10 people, then I suppose you might have to find

4   something for them to do.

5   Q.        Okay.

6   A.        But, yeah, I -- I mean I didn't tell

7   the sergeant to tell them what to make them do if

8   that's what you mean.

9   Q.        I mean during this time period that

10  we're talking about, I mean Officer Morgan was in

11  580 from roughly November 2013 until September

12  1st, 2015 when he was terminated.  So almost two

13  years, right?  That sounds right?

14  A.        That sounds like an almost two-year

15  period of time.

16  Q.        Okay.  And during the same period of

17  time Bronson Constable was in 580 for almost that

18  whole period of time if not longer?

19  A.        I don't know what the dates for

20  sergeant was.

21  Q.        Okay.  But it was the same general time

22  frame that the Constable Jones investigation was

23  going on?

24  A.        You have that information.  I don't

1    have it in front of me.

2    Q.          Okay.  My understanding was you just

3    reviewed this?

4                MR. COGLIANESE:  Objection.

5    Q.          A whole list of these cases?

6    A.          Didn't have that kind of information in

7    it.

8    Q.          Okay.  No time frames?

9    A.          I don't have one for him.

10   Q.          Okay.  The Constable and Jones were in

11   580 during the pendency of their investigation

12   though, right?

13   A.          I don't recall.

14   Q.          Okay.  You don't remember whether they

15   were or not?

16   A.          I don't know where they were assigned.

17   I don't know how long they may have been relieved

18   of duty.

19   Q.          Okay.  How about officer -- we

20   mentioned Officer Kirby before when he was under

21   investigation.  Was he relieved of duty?

22   A.          Potentially.

23   Q.          Okay.  There was an officer -- was

24   officer -- along with -- well, you don't know that

1  one, okay.

2          There's an Officer Randall Lyons who

3  was relieved of duty during this time frame.  Does

4  that ring a bell?

5  A.        Yes.

6  Q.        Okay.

7  A.        I don't know what time frame it was.

8  But I know that he was relieved of duty because he

9  was disciplined for time problems while he was

10  relieved of duty.

11  Q.        Right.  So we're talking -- I mean,

12  assuming that I'm correct that all of those

13  officers were investigated during this time frame

14  and all of those officers were relieved of duty

15  during the investigation we're talking about, at

16  least five or six officers assigned in 580 during

17  that time frame?

18  A.        What's the question?

19  Q.        I'm just asking you whether you agree

20  that that's -- that would be an unusually large

21  number of officers to be assigned to 580 at the

22  same time --

23          MR. COGLIANESE:  Objection.  Go ahead.

24  Q.        -- based on what you told me.

1    A.         I can't say unusual or not because I

2    don't keep track of the numbers or --

3    Q.         You said it would usually be one or

4    two?

5    A.         That's my guess.

6    Q.         Okay.  And this was probably three

7    times that many during this --

8               MR. COGLIANESE:  Objection.

9    A.         Okay.

10   Q.         -- during this two-year time frame.

11              MR. COGLIANESE:  Objection.

12   A.         Okay.

13   Q.         So that's more?

14   A.         Okay.

15              MR. COGLIANESE:  Objection.

16   Q.         All right.  Aside from -- well, who do

17   you consider -- who did you consider at the time

18   to be your executive staff, was it just the deputy

19   chiefs or were there other people?

20   A.         General -- executive staff is the six

21   deputy chiefs and the public standards bureau

22   commander.

23   Q.         Okay.

24   A.         That's how we describe executive staff.

 1   Q.          Okay.  So aside from talking about the

 2   status of Officer Morgan's case with your

 3   executive staff, did you have discussions -- and

 4   potentially with whoever the commander of internal

 5   affairs was, did you have conversations with

 6   anybody else about Officer Morgan's case as it was

 7   going on?

 8   A.          I would assume that I had conversations

 9   with the internal affairs commander.  My immediate

10   staff sat in on executive staff meetings, so they

11   might have been present when that was discussed.

12   Q.          Okay.  Who was that?

13   A.          My secretary, Tina Hundley.  I don't

14   know which sergeant I had back then.  It might

15   have been Sergeant Wellday.

16   Q.          When you say which sergeant you had,

17   what do you mean?  What role did that person play?

18   A.          My aide.

19   Q.          Oh, you had an aide, a sergeant who was

20   just your aide?

21   A.          Yes.  And he was in my office when I

22   became chief, but he left I can't remember what

23   year it was.

24   Q.          Okay.  How about Lieutenant Irwin or

1    Lieutenant Lokai, did you have discussions with

2    either of them as the Morgan investigation was

3    proceeding?

4    A.         I don't recall.

5    Q.         Okay.  Would that have been typical?

6    A.         Not generally.

7    Q.         Okay.

8    A.         Not during the investigation.

9    Q.         Because you would usually go through

10   the commander of ESB rather than the lieutenants?

11            MR. COGLIANESE:  Objection.

12   A.         Well, the PSB commander sat in

13   executive staff.

14   Q.         But the lieutenant did not?

15   A.         Correct.

16   Q.         Okay.

17   A.         And they would -- they would get

18   involved in the case as it was wrapping up.

19   Q.         Okay.  Basically at the point when it

20   was time to determine whether there would be

21   departmental charges and then during the hearing

22   process?

23   A.         I asked the PSB lieutenants to review

24   investigations for just cause and to -- and for

1    the deputy chiefs.  And then if they believe there

2    was just cause, then they would talk to the deputy

3    chief about a recommendation that they could make

4    to me about whether it's critical -- of a critical

5    nature and whether or not it should be a written

6    reprimand or departmental charges.

7    Q.        Okay.  But that would usually be the

8    first involvement of professional standards is

9    after the internal affairs summary is complete?

10   A.        From my point of view, I don't know

11   what other people reach out to them for.

12   Q.        Okay.

13   A.        And they may.

14   Q.        There's a person named Jeff Furbee?

15   A.        He's the city attorney's office legal

16   advisor to the division police.

17   Q.        Okay.  What was the role of Mr. Furbee

18   in termination of an investigation process?

19             MR. COGLIANESE:  And I am going to

20   instruct you not to answer as to any questions you

21   had with Mr. Furbee.

22   Q.        Okay.  And I am not asking you the --

23   necessarily the content of conversations, but just

24   whether or not you would have had conversations

1    with him during this investigation?

2    A.        Because this was a criminal

3    investigation, I would say that that might very

4    well have occurred.

5    Q.        Okay.  How about once the criminal

6    investigation was over?

7    A.        Not that I recall.

8    Q.        Okay.  Once the internal affairs

9    investigation had concluded, what was your role at

10   that point?  Did you -- well, first of all, let me

11   ask, did you read the internal affairs summary

12   once it was completed at the time?

13   A.        To the best of my recollection.

14   Q.        Okay.  That would have been typical of

15   your --

16   A.        Correct.

17   Q.        Sorry.  You answered before I could

18   even think of the word I was going to use.

19   A.        My method.

20   Q.        Your methods.  You would particularly

21   in a case where termination was a possibility, you

22   would certainly read the internal affairs summary?

23   A.        Correct.

24   Q.        And the interviews, the interview

90

```
1    transcripts?

2    A.          Are you asking if I read them?

3    Q.          Yeah.

4    A.          I don't recall.

5    Q.          You don't remember whether you read

6    Kevin Morgan's interviews in this case?

7    A.          I don't recall.

8    Q.          Okay.

9    A.          I'm not saying I didn't.  I just don't

10   recall specifically reading them.

11   Q.          Okay.  It's possible that you

12   recommended his termination as an officer without

13   reading his internal affairs interview?

14   A.          I mean it's certainly possible.

15   Q.          Okay.

16   A.          I don't know that it's probable, but --

17   Q.          Okay.  You just don't remember one way

18   or the other though?

19   A.          Correct.

20   Q.          Okay.  Do you remember whether you

21   listened to any recordings of interviews?

22   A.          I don't recall.

23   Q.          Okay.  Was it typical of your process

24   to listen to recordings of internal affairs
```

91

1   reviews?

2   A.          I would say it's not typical.

3   Q.          Okay.  Did you have any questions once

4   you read the summary where you asked for any

5   follow-up investigation or further work by the

6   investigators?

7   A.          Not that I recall.

8   Q.          Okay.  Did you review a draft of the

9   internal affairs summary before it was submitted

10  or just the final version?

11  A.          I don't recall reviewing a draft.

12  Q.          Okay.  Was it typical to see a draft or

13  not?

14  A.          No.

15  Q.          Okay.  Once you got the internal

16  affairs investigative summary, who did you discuss

17  it with?

18  A.          I don't recall specifically.  I can

19  only say what I would typically do, and that's to

20  talk to the discipline grievance lieutenants, the

21  deputy chief that made the ruling.

22  Q.          In this case that was Deputy Chief

23  Kuebler, does that sound right?

24  A.          You know more than I do on that.

1    Q.        Okay.  So you don't remember

2    discussions with Deputy Chief Kuebler about this

3    particular --

4    A.        Nothing specific.  Not at this time,

5    no.

6    Q.        Okay.  Who else?  Besides the -- when

7    you say the disciplinary and grievance

8    lieutenants, you're talking about the lieutenants

9    in professional standards --

10   A.        I don't remember --

11   Q.        You don't remember?

12   A.        -- if they were the ones that dealt

13   with this case or not.

14   Q.        Do you remember any discussions with

15   Irwin or Jeff Lokai about this case?

16   A.        I don't remember any specific

17   conversations, no.

18   Q.        Okay.  Besides the disciplinary

19   grievance lieutenants and the deputy chief, who

20   would you typically discuss an internal affairs

21   investigation with once it was complete?

22   A.        Once it was complete, typically not

23   very many other people.  Once I had made the

24   decision, had a departmental charges hearing then

1     as I said before, often whoever came to the

2     hearing I would talk to after the hearing itself.

3     Q.          Okay.  Prior to the hearing, did you

4     have any discussions with anyone from the FOP

5     about this case?

6     A.          I don't recall.

7     Q.          Would you typically?

8     A.          I don't know that "typical" is the

9     right way to describe it.

10    Q.          Okay.

11    A.          But certainly there were some

12    incidental conversations that we had at times

13    bumping into each other in the hallway or there

14    for a grievance hearing and they say, hey, can I

15    talk to you afterwards.  But I don't recall any

16    specific conversation about this particular case,

17    but it could have happened.

18    Q.          Okay.  Who would you typically talk to

19    from the FOP along those lines?

20    A.          Generally would have been either the

21    grievance chairman or one of the assistant

22    grievance representatives.

23    Q.          Okay.  Who would those have been at the

24    time?

94

1    A.        Or the president of the union,

2    depending on, you know, who's there.

3    Q.        Who was the president at that point?

4    A.        In 2000 what?

5    Q.        2015 roughly, early 2015?

6    A.        I'm not sure if Jason was in there then

7    or not.

8    Q.        Jason Pappus?

9    A.        Yeah.  Jim Gilbert was the union

10   president when I became chief in 2012.  I don't

11   remember when he left.

12   Q.        Okay.  But you don't remember any

13   particular conversations with the union about this

14   case?

15   A.        Nothing specific, no.

16   Q.        Okay.  How about with the safety

17   director's office, did you give them a heads up

18   that a case might be coming to them or anything

19   like that?

20   A.        I wouldn't generally do that.  I did

21   occasionally, but that happened more so after

22   Mayor Ginther came into office, which was 2016,

23   because he wanted to be advised, and I had monthly

24   meetings with him.

1    Q.          Okay.

2    A.          I had some occasional meetings with

3    Mayor Coleman, but not maybe as regularly.

4    Q.          So you had monthly meetings with the

5    Mayor, not necessarily the safety director would

6    be in the meetings or what?

7    A.          Most of the time, yes.

8    Q.          Okay.

9    A.          And they were called monthly meetings,

10   but they didn't happen every month.

11   Q.          Okay.  There's a notation -- well, I'll

12   just show it to you.

13              MR. VARDARO:  Do you have the exhibits,

14   previous exhibits?

15              THE REPORTER:  Give me one second.

16              (A short recess is taken.)

17   BY MR. VARDARO:

18   Q.          I'm handing you what's been previously

19   marked as Plaintiff's Exhibit 1, which is the

20   internal affairs summary for Kevin Morgan,

21   including a cover sheet at the top.  This is what

22   you reviewed last week?

23   A.          Yep.

24   Q.          Okay.

96

1    A.         Well, I don't -- I don't recall that I

2    saw --

3    Q.         The cover sheet?

4    A.         Yeah.

5    Q.         It would have started with just the

6    report?

7    A.         I think I -- I don't remember seeing

8    this, but --

9    Q.         Okay.  You've seen it at some point,

10   though?

11   A.         Yeah.

12   Q.         Okay.  If you look at the first page,

13   the cover sheet --

14   A.         Uh-huh.

15   Q.         -- there's a notation right above the

16   exhibit sticker --

17   A.         Yep.

18   Q.         -- about "Allegation II:  Officer

19   Morgan accepted payment for special duty shifts he

20   did not work."

21   A.         Correct.

22   Q.         There's a list of charges that are

23   typed in from internal affairs.

24   A.         Yes.

97

1    Q.          And then there's the deputy chief's

2    determination which is sustained.  And the

3    corrective action says, "Departmental charge."

4    And then there's a notation under there that's

5    handwritten that says, "plus ROC 1.04 per chief."

6    And is that your initials?

7    A.          Yes.

8    Q.          Did you write that?

9    A.          It looks like my handwriting.

10   Q.          Okay.  What's ROC 1.04?

11   A.          Rule of conduct 104.

12   Q.          Yeah.  What is that rule of conduct?

13   A.          Cause for dismissal, I believe.

14   Q.          Okay.  Do you recall why you wrote in

15   cause for dismissal?

16   A.          Because I wanted to add that charge.

17   Q.          Okay.  Why?

18   A.          Because I thought it was appropriate.

19   Q.          Why?

20   A.          Because I thought that the behavior was

21   something that couldn't be tolerated.  That meant

22   that it was strong enough behavior done with

23   enough culpability to warrant termination.

24   Q.          Okay.  And the second page, the back of

1    that same sheet you wrote the same thing in for

2    Allegation III?

3    A.          Correct.

4    Q.          Which was, "accepted full payment for

5    special duty jobs when he failed to work the full

6    shift, due to arriving late...or leaving...early."

7    So same answer, that's why you wrote that in?

8    A.          Yes.

9    Q.          Okay.  In order to reach a decision to

10   terminate Kevin Morgan, he didn't need to be

11   charged with Rule of Conduct 1.04, right?

12   A.          Correct.

13   Q.          And officers have been terminated

14   certainly in the past without being charged with

15   Rule of Conduct 1.04?

16   A.          Is that a question?

17   Q.          Yeah.  I'm asking you.

18   A.          Yes.

19   Q.          Okay.  Do you recall other cases where

20   you handwrote in 1.04 on a charging sheet like

21   this?

22   A.          Not specifically, no.

23   Q.          Okay.  Do you think you did it in any

24   other cases while you were chief?

99

```
 1    A.          I believe that I did it in the Randy

 2    Mayhew case.

 3    Q.          What's the Randy Mayhew case?

 4    A.          He was charged with violating our rules

 5    with regard to -- I believe that he solicited

 6    prostitutes for sex for money while he was on

 7    duty, and I believe that I added that charge.  I

 8    don't know if I wrote it on this particular sheet.

 9    But this particular rule of conduct is not

10    something that is, like, listed as an allegation

11    by internal affairs typically.  They investigate

12    the allegation and then they try to determine what

13    rule violations occurred, but they don't generally

14    look at is this cause for dismissal.  That's

15    something that comes from my perspective.

16    Q.          Okay.  Other than the Randy Mayhew

17    case, can you think of any other ones where you

18    added it?

19    A.          I believe that there are probably

20    others, I just don't recall what they are.

21    Q.          Okay.

22    A.          I just was testifying last week about

23    Randy Mayhew, that's why I remember it.

24    Q.          Okay.  I'll come back to that.
```

1          You recall that in this case there was

2     a criminal investigation prior to the

3     administrative investigation?

4     A.          In the Kevin Morgan case, yes.

5     Q.          Yes.

6          And the determination of the criminal

7     investigation was that criminal charges would not

8     be filed?

9     A.          Correct.

10    Q.          Okay.  And in particular the prosecutor

11    was Jeff Blake.  I don't know if you -- if that's

12    listed.

13    A.          I remember seeing that name in the

14    investigation summary.

15    Q.          Yes.  You knew that the prosecutor told

16    internal affairs there were several reasons why

17    prosecution would not be pursued in the case?

18    A.          I believe there were more than one,

19    yeah.

20    Q.          Okay.  And the reasons included the

21    property manager, the company that was involved in

22    the apartment complex didn't want to pursue

23    criminal charges?

24    A.          Because she didn't want to have to go

1    to court and testify, yeah.

2    Q.        The property manager said in the

3    criminal investigation that she actually wanted

4    the officers who were working security at the

5    apartment complex to vary their hours so that the

6    people who were around the apartment complex would

7    sort of be on their toes?

8    A.        I believe that was one of the listed

9    reasons.

10   Q.        Okay.  And that because of that and

11   because of Officer Morgan's likely explanation

12   that he was working alternative hours to the ones

13   that he was assigned, that it would be difficult

14   to prove the case?

15             MR. COGLIANESE:  Objection.

16   A.        I don't know the specific words used,

17   but --

18   Q.        That was the gist of it, though?

19   A.        Yeah.  I'll take your gist.

20   Q.        Okay.  In the internal affairs summary,

21   do you remember that Sergeant Meister who wrote

22   the summary indicated that the only reasons that

23   Officer Morgan was not criminally prosecuted for

24   the charge of theft in office was because the

1    property manager didn't want to prosecute and

2    because he himself had not given an interview?

3    A.        I think that what Meister listed was

4    different than what Jeff Blake was quoted as.

5    Q.        Okay.

6    A.        But it was in the investigative

7    summary.

8    Q.        Okay.  But the investigative summary --

9    I mean, the fact that what he listed was different

10   than what the prosecutor himself had listed in

11   terms of why he wasn't prosecuted, was that a

12   concern for you?

13   A.        Well, the information from Jeff Blake

14   was in there, so it wasn't like an omission there.

15   I -- it wasn't a concern of mine with regard to my

16   decision on the outcome of the disciplinary case.

17   If it was a concern of mine with regard to how

18   well he did an investigative summary and justified

19   his own thing, that's usually not something that I

20   dwelled on because that -- or the sergeant has a

21   lieutenant, a commander to address deficiencies if

22   there are any in the way that they summarize a

23   case.

24   Q.        Did it suggest to you any problems with

1    the objectivity of the investigation?

2    A.        It did not give me any concerns that

3    affected the evidence.  I didn't -- you know, it

4    didn't strike me, no, as, oh, I can't trust what

5    Sergeant Meister has said because he left out a

6    couple of things here in his own.

7    Q.        Uh-huh.

8    A.        Because I have said for many, many,

9    many years that, you know, you don't have to

10   repeat information to justify your own stance.  If

11   it's already spelled out, then it's all there.

12   Q.        Uh-huh.

13   A.        If it had been an omission, then that

14   would be, you know, more concerning.  But I don't

15   always go down the path of, well, they left that

16   out, therefore they're not objective.  Because if

17   it's already stated someplace else, I don't always

18   expect them to repeat that.

19   Q.        Okay.  Did you follow up with anybody

20   when you realized in reviewing this that he had

21   overstated the criminal case against Officer

22   Morgan that he needed to be -- you know, that

23   Sergeant Meister needed to understand that this

24   was not something that should be done?

```
 1    A.          I don't recall that.

 2                MR. COGLIANESE:  Objection.

 3    Q.          Okay.  Because you don't recall it, do

 4    you think it didn't happen or do you just -- you

 5    don't remember one way or another whether you gave

 6    any feedback on the investigative summary?

 7                MR. COGLIANESE:  Objection.

 8    A.          I don't recall.  I don't recall giving

 9    any feedback.

10    Q.          Okay.  But does that mean that you

11    think that you didn't give any feedback?

12    A.          I don't -- I can't speculate as to

13    that.

14    Q.          Okay.  You just don't remember?

15    A.          Correct.

16    Q.          Okay.  Do you have any recollection of

17    why Officer Morgan remained relieved of duty after

18    the prosecution was refused?

19    A.          Because I still viewed it as a

20    potential termination case.

21    Q.          Okay.  Do you recall about this

22    investigation that Officer Morgan's basic

23    explanation was that he had worked his -- the

24    hours that he was -- the number of hours he was
```

1    supposed to work on the job but he didn't do it on

2    the days that he was expected to do them?

3    A.          I recall that that was part of his

4    explanation, yes.

5    Q.          Okay.  If you had believed that that's

6    what he was actually doing, would you still have

7    viewed it as a termination case?

8                MR. COGLIANESE:  Objection.  Go ahead.

9    A.          That wasn't the facts.

10   Q.          Okay.  I mean you didn't believe that,

11   that was your -- your termination decision was

12   based on the premise that Officer Morgan was not

13   actually working the number of hours he was

14   supposed to work?

15   A.          Correct.

16   Q.          Not just that he was not working the

17   days he was supposed to work?

18   A.          Correct.

19   Q.          If it was just a matter of he was

20   switching days without proper authorization, that

21   would not have risen to the level of termination?

22               MR. COGLIANESE:  Objection.  Go ahead.

23   A.          That's a possibility.

24   Q.          Okay.  There's some possibility that he

1    would have been terminated just for working on

2    Tuesdays instead of Wednesdays or Thursdays

3    instead of Tuesdays or something like that?

4            MR. COGLIANESE:  Objection.  Go ahead.

5    A.        It depends on the responses that he

6    would have given and various other factors that

7    might have played out differently had he had some

8    proof of that or other evidence.  He had some

9    evidence, but then he had no evidence of some of

10   the other stuff that seemed like there's, you

11   know, a reason why there's no evidence because he

12   didn't have the evidence.  So it's still

13   theoretical.

14   Q.        I guess I don't really understand what

15   you're telling me.  So you're saying that there's

16   some scenario, some hypothetical scenario where

17   Officer Morgan could have been terminated even if

18   he had worked all the hours he was supposed to

19   work just because he worked them on different

20   days?

21   A.        Are you saying if there's evidence of

22   that?

23   Q.        Yeah.  Well, let's say that he

24   convinced you that he actually was -- you know, he

1    was supposed to work Wednesdays, but he worked

2    Sundays instead, same number of hours.  Didn't get

3    any money that he didn't earn, just shifted days

4    without authorization.  Is there a scenario where

5    that still would have resulted in his termination?

6              MR. COGLIANESE:  Objection.  Go ahead.

7    A.        Based on just -- just that, and that he

8    wasn't actually getting paid for not working and I

9    had proof of that and was convinced that that was

10   the case, then that -- yeah, that's a possibility

11   that he might have been, you know, given

12   corrective action that wouldn't have resulted in

13   termination.

14   Q.        The bottom line conclusion of Sergeant

15   Meister's internal affairs summary was that he

16   couldn't confirm or disprove that Officer Morgan

17   was working other days than the ones that he was

18   assigned; isn't that right?

19              MR. COGLIANESE:  Objection.  Go ahead.

20   A.        I don't recall that I read all of his

21   -- his explanation.  But I don't believe that

22   there was any evidence to confirm or to deny that

23   he hadn't switched his days because there wasn't

24   any evidence.

1    Q.        Okay.  I'm just asking in terms of

2    Sergeant Meister's report, his basic conclusion

3    was Morgan says that he was working other days

4    than the ones that he was assigned and he worked

5    all of his hours.  I can't -- I can't prove that,

6    I can't disprove that.

7              MR. COGLIANESE:  Objection.

8    Q.        That's basically the gist of his

9    report.

10             MR. COGLIANESE:  Objection.

11   A.        I -- I don't recall what he --

12   Q.        Okay.

13   A.        How he described it.

14   Q.        Can you take a look?

15   A.        I can read it.

16   Q.        In Exhibit 1 there's the investigative

17   summary is paginated at the top of every page.

18   Can you take a look at page 62 of his report.  And

19   on the -- I think it's about -- well, I'll find

20   it.

21   A.        The last paragraph.

22   Q.        The last paragraph says, "Most of

23   Officer Morgan's claims regarding dates and times

24   he allegedly worked could not be confirmed or

109

1      proven false."  Do you see that?

2      A.          Yes, I do.

3      Q.          That's consistent -- I mean, that's

4      what's in Sergeant Meister's report is most of

5      these situations he just didn't have proof one way

6      or the other?

7                  MR. COGLIANESE:  Objection.

8      A.          The sentence says, "Most of Officer

9      Morgan's claims regarding dates and times he

10     allegedly worked could not be confirmed or proven

11     false."

12     Q.          Okay.  That's consistent with your

13     understanding at the time?

14     A.          Yeah.

15     Q.          Okay.  I mean, you didn't read that

16     last week and you were like, oh, I didn't remember

17     that?

18     A.          Correct.

19     Q.          And the basic problem in the

20     investigation was there were documents that

21     basically confirmed that he wasn't there on

22     Wednesdays from 9:00 p.m. until 1:00 a.m., which

23     was the expectation?

24     A.          Documents?

1    Q.        There were -- you know, like, there was

2    certain times when he was working at a Giant Eagle

3    supermarket during some portion of that particular

4    shift?

5    A.        Yes.

6    Q.        So there was -- you know, you could

7    essentially prove he wasn't there on Wednesdays

8    from 9:00 until 1:00 a.m.?

9    A.        The proof was strong --

10   Q.        Yeah.

11   A.        -- that there were definitely

12   Wednesday --

13   Q.        And he -- and Officer Morgan was

14   admitting --

15            MR. COGLIANESE:  Go ahead.

16   Q.        I'm sorry.  Go ahead.

17            MR. COGLIANESE:  If you would like to

18   finish your answer, go ahead.  Don't let Jeff cut

19   you off.

20   A.        There was definitely proof that he was

21   not working from 9:00 p.m. until 1:00 a.m. on

22   Wednesday nights on a number of occasions.

23   Q.        Okay.  And it wasn't even really

24   disputed.  I mean Officer Morgan was not saying,

1    yes, I was there every Wednesday from 9:00 p.m.

2    until 1:00 a.m.?

3    A.          His explanation was that, yes, he had

4    changed his shifts.

5    Q.          Right.  But you didn't have

6    documentation confirming every time he did that?

7    A.          Correct.

8    Q.          Okay.

9    A.          He did not submit any.

10    Q.          Right.  And there was -- Officer

11    Roberts, Tony Roberts was the coordinator, the

12    special duty coordinator for this assignment, the

13    Stratford Lakes assignment?

14    A.          That is correct.

15    Q.          And he had some calendars showing when

16    the officers were supposed to be there and

17    sometimes when they had switched their shift, but

18    even he did not keep those calendars during the

19    entire period of this investigation?

20    A.          That's what I recall.

21    Q.          And even the ones that he did -- and

22    that was because in fact the property manager had

23    actually asked him to stop submitting calendars at

24    a certain point because it was just paperwork she

1    didn't need?

2    A.        I recall reading that.

3    Q.        And then even for the period of time

4    when Officer Roberts did keep and submit the

5    calendar, some of them were not accurate to his

6    own records because Officer Morgan was informing

7    him I'm switching to a different day because of

8    some conflict and Officer Roberts acknowledged

9    that he got those communications but he didn't

10    actually change it on the calendar?

11    A.        Yes.

12    Q.        Do you remember that?

13    A.        Because they are postdated basically

14    and he didn't go back and correct dates that had

15    previously occurred.

16    Q.        Okay.  But he acknowledged, Officer

17    Roberts acknowledged that he had some calendars

18    that weren't even accurate to the times that

19    Officer Morgan told him?

20    A.        I believe so.

21    Q.        Okay.  Do you remember whether there

22    was any effort to review for comparison sake

23    Officer Roberts' time and marking in service logs

24    for this assignment?

1  A.        I do not.

2  Q.        Or anybody else's?

3  A.        I don't recall.

4  Q.        Okay.  Did you ask for them to do that?

5  A.        Not that I recall.

6  Q.        Okay.  I mean it was clear from your

7  review of this investigation that the timekeeping

8  for this job was pretty haphazard?

9            MR. COGLIANESE:  Objection.  Go ahead.

10 A.        The timekeeping --

11 Q.        By this --

12 A.        -- by whom?

13 Q.        By Officer Roberts, by Officer Morgan,

14 by the property manager?

15 A.        I don't know whose responsibility

16 you're referring to as far as timekeeping.  I

17 mean, obviously there was some notation going in

18 as an invoice that said pay him for Wednesday from

19 9:00 to 1:00.

20 Q.        And even sometimes the invoices were

21 submitted by a different officer than the person

22 who actually submitted -- who actually --

23 A.        I don't recall.

24 Q.        -- did the work?

114

```
 1    A.          I don't recall that fact.

 2    Q.          Okay.  Would you dispute it?

 3    A.          No.

 4    Q.          Okay.  Do you disagree with the

 5    assertion that basically the timekeeping in

 6    general for this job was pretty haphazard?

 7                MR. COGLIANESE:  Objection.  Go ahead.

 8    A.          Maybe some aspects of it.  But I mean I

 9    -- I mean, that's a generalization for every --

10    every particular person.  And he was getting paid,

11    so that part of it wasn't haphazard.

12    Q.          Okay.  Do you remember that there was

13    actually an issue in terms of getting paid for

14    this job, that sometimes it would be delayed

15    significantly?  The apartment complex was not

16    doing a particularly great job of paying the --

17    paying timely?

18    A.          I don't recall that fact.

19    Q.          Okay.  But you wouldn't dispute it?

20    A.          No.

21    Q.          Okay.  As a general matter when an

22    allegation against an officer can't be proven or

23    disproven based on documents and the officer

24    denies the misconduct, isn't it the division's
```

115

1   practice to mark those -- to conclude those

2   allegations as not sustained?

3              MR. COGLIANESE:  Objection.  Go ahead.

4   A.         The definition for not sustained is

5   when it can't be proven or disproven.

6   Q.         So that's a yes?

7   A.         Well, you asked about the division.

8   And many, many people have different opinions

9   about the same evidence.  So the division has a

10  guidance on what would amount to a not sustained

11  and that is the guidance.

12  Q.         Okay.  So when an allegation can't be

13  proven or disproven based on documents and the

14  officer denies a charge, that would fit within the

15  guidance of not sustained?

16             MR. COGLIANESE:  Objection.  Go ahead.

17  A.         Yes.  With that being that it's a

18  person's opinion not the division.  You know, the

19  division has guidance to give to people who read

20  an investigation and decide whether they believe

21  that that's the case.

22  Q.         Okay.  Besides the guidance, it's the

23  practice of the -- when you were the chief it was

24  the practice of the chain of command that when

1     their opinion was that the documents didn't prove

2     or disprove the allegation and the officer was

3     denying the charge, they would conclude that as

4     not sustained?

5                MR. COGLIANESE:  Objection.  Go ahead.

6     A.         If their opinion was that it couldn't

7     be proven or disproven, then that was what they

8     should write down.

9     Q.         Okay.  That included you?

10    A.         Yeah.

11    Q.         Okay.  Given that there were no

12    documents proving or disproving Officer Morgan's

13    claim that he was switching days, another way to

14    confirm whether or not he was telling the truth

15    about that would be to talk to eyewitnesss, right?

16    A.         Yes.

17    Q.         Okay.  Do you remember that in this

18    investigation Officer Morgan actually presented

19    several potential witnesses, some of them by name,

20    some of them by just sort of identifying

21    information who might be able to prove that he was

22    working this job on days other than the ones he

23    was assigned?

24    A.         I only recall one.  But I --

1    Q.          Okay.

2    A.          I know that he gave reference to, hey,

3    I talked to people, I, you know -- I checked them

4    out.  But I don't remember anything other than one

5    specific name, and that was a person that he had a

6    relationship with.

7    Q.          Okay.  But that's the security officer

8    from the Kroger?

9    A.          I believe that's where he worked.

10   Q.          Do you remember what the relationship

11   was?

12   A.          I think he served as a mentor or friend

13   or something along those lines to this particular

14   security guard.

15   Q.          What was the significance to you of the

16   fact that he had a relationship with him?

17   A.          That they might have talked about, you

18   know, do you ever remember seeing me.  And

19   sometimes when you have these kinds of

20   conversations, it leads people to believe that

21   that might be what they actually experienced.  The

22   research that I've done on memory and recollection

23   says that, you know, people can be easily

24   influenced by having a conversation about

```
 1    particulars and prompting people to remember

 2    something and might not actually have occurred,

 3    but it's a consideration.

 4    Q.        So it's something that would lessen the

 5    weight of that witness's recollection?

 6    A.        It has the potential to lessen that

 7    weight.

 8    Q.        Okay.  Do you recall that in that --

 9    first of all, do you remember what the -- what

10    that was all about, the security guard's --

11    A.        I just recall that the security guard

12    saw him working in October of 2013 on a particular

13    date that I don't -- I don't believe was a

14    scheduled work date for Officer Morgan.

15    Q.        Right.  And that would corroborate

16    Officer Morgan's recollection or claim that he was

17    working other days than the ones that he was

18    assigned?

19              MR. COGLIANESE:  Objection.  Go ahead.

20    A.        One day.

21    Q.        Okay.  Do you remember that in Officer

22    Morgan's interview he indicated that the security

23    officer had records confirming the incident that

24    he was talking about?
```

```
 1              MR. COGLIANESE:  Objection.  Go ahead.

 2   A.         Not specifically, but --

 3   Q.         Okay.

 4   A.         -- I mean, it could very well be in

 5   there.

 6   Q.         Okay.  Do you remember that he

 7   described the incident in terms of basically that

 8   the Kroger officer had called him for help with a

 9   potential theft at the Kroger and that he was able

10   to help because he was at the Stratford Lakes

11   complex?

12   A.         That sounds familiar.

13   Q.         Okay.  And do you remember reading in

14   the summary that Sergeant Meister had actually

15   followed up with the security officer and the

16   security officer had confirmed what Officer Morgan

17   was --

18   A.         I believe so.

19   Q.         -- reporting?  And he confirmed the

20   particular day?

21   A.         Could be.

22   Q.         Okay.  Nothing in the internal affairs

23   summary as I've reviewed it indicates any effort

24   to get the records that Officer Morgan described.
```

120

1    Does that -- do you remember that?

2              MR. COGLIANESE:  Objection.  Go ahead.

3    A.          No, not particularly.

4    Q.          Okay.  Would you have expected internal

5    affairs to try to find the records if there were

6    any?

7    A.          If it was something that -- yeah, if

8    the sergeant felt like it got confirmed and there

9    wasn't any reason not to, then he could have just

10   put it in there and says sounds -- sounds good,

11   you know.

12   Q.          Okay.

13   A.          If he had enough information to say

14   that, yeah, that particular day, you know, I

15   agree.  You know, there's one of those things

16   where we've already talked about the pendency of

17   this case taking a long time and does that delay

18   it another week, another month, you know, two

19   months?  So choices have to be made.  So I can't

20   give you a blanket answer that, yeah, you know,

21   you should get those records, but if it's going to

22   take another six months, then no, you shouldn't

23   get those records.

24   Q.          Okay.  I'm handing you what's

1    previously been marked as Plaintiff's 15, which

2    I'll represent to you is the second part of Kevin

3    Morgan's investigative interviews with internal

4    affairs.  He was interviewed on two different

5    dates.  This contains interview material from the

6    second date.

7    A.        Okay.

8    Q.        And I'm going to direct you -- there's

9    actually -- there's numbers at the bottom of each

10   page and there's numbers at the top of each page.

11   A.        Okay.

12   Q.        And the pagination at the top is a

13   little bit hard to follow only because there were

14   two parts of his investigation that -- of his

15   interview that day.  They interviewed him for such

16   a long period of time that they ran out of tape

17   and then they had to start another interview.

18   A.        Okay.

19   Q.        So the first 100 pages of that are

20   paginated and then there's a second set of pages.

21   So if you could turn to page 100 of the first

22   part.

23   A.        At the top?

24   Q.        And then find the start of the second

 1    part, basically.  At the top, yes.

 2    A.         Okay.  Is this it?

 3    Q.         So then you're -- if you can find the

 4    first page of the next part and then flip from

 5    there to page 5 at the top, which I believe is 153

 6    at the bottom.

 7    A.         Yes.

 8    Q.         Okay.  I'll flip with you.  Can you

 9    take a look at -- the very bottom of the page

10    Officer Morgan says, "I know I worked on the

11    13th."  Do you see that part?

12    A.         Yes.

13    Q.         Okay.  Can you read from there and then

14    through the next couple pages to the bottom of

15    155, which is page 7 at the top.  And just tell me

16    when you are ready to answer questions about that.

17    A.         How far did you want me to read?

18    Q.         I think you're past it.

19    A.         Okay.

20    Q.         This confirms that Officer Morgan

21    stated to the investigating officers that he

22    believed Kyle DeGoey, the security officer, had

23    records if his company that showed that this

24    incident occurred as described?

123

1          MR. COGLIANESE:  Objection.  Go ahead.

2    Q.          The bottom of 154.  Says he's got

3    records from the security company or the security

4    company has records.

5    A.          Officer Morgan said that the company

6    would have documentation for the security guard's

7    records I guess.

8    Q.          Okay.

9    A.          He didn't say that he -- that the

10   security company would have documentation of his

11   behavior, I don't --

12   Q.          Okay.

13   A.          I don't believe.  But --

14   Q.          At least highlighted that there might

15   be some documentation that they could look at?

16   A.          Correct.  Correct.

17   Q.          Okay.  And you knew that Sergeant

18   Meister followed up with Corporal DeGoey?

19   A.          That was in the investigative summary.

20   Q.          Yeah.  I mean, he conducted an

21   interview with DeGoey and had an audio file for

22   that interview.  Do you recall whether you

23   listened to the audio?

24   A.          I do not recall.

124

1    Q.        Okay.  It was clear from the

2    investigative summary -- well, first of all,

3    there's nothing in the investigative summary, I

4    think we covered, that has any documentation from

5    the security company or from DeGoey?

6              MR. COGLIANESE:  Objection.  Go ahead.

7    A.        Is that a question?

8    Q.        Yeah.  I'm asking you.  Did you mean --

9    well, let me put it this way:  When you reviewed

10   the investigative summary last week and probably

11   at the time, did you -- what was your impression

12   of the interview of DeGoey?

13   A.        I believe that there was an example

14   that Officer Morgan had probably worked on a

15   different date than the date that he was

16   scheduled.

17   Q.        Okay.  And that date occurred prior to

18   any suspicion being raised about him not working

19   his assigned hours?

20             MR. COGLIANESE:  Objection.

21   Q.        And it occurred a couple weeks before

22   any report --

23   A.        I can't say when anybody else had

24   suspicions but before it was brought to our

1    attention.

2    Q.        Okay.  And to your knowledge before it

3    was brought to Officer Morgan's attention that

4    anybody suspected this?

5    A.        I don't know.

6    Q.        Okay.  I mean, at the very beginning of

7    the investigative summary, if you look at

8    Exhibit 1, page -- well, I don't -- we can go back

9    and confirm the dates.  But taking my word for a

10   moment that October 13th was prior to any report

11   being made to the department, that Officer Morgan

12   wasn't there when he was supposed to be?

13   A.        I don't recall when the property

14   manager let Officer Roberts know.  But I believe

15   that there had been some conversation as early as

16   September that Officer Roberts had with Officer

17   Morgan, but I can't recall specifically what that

18   was about.  But I could be wrong.

19   Q.        Okay.

20   A.        I think it's in there.

21   Q.        But assuming for the moment that

22   Officer Morgan had not been confronted about not

23   being where he was supposed to be when he was --

24   A.        By whom?

126

1    Q.        By anybody.

2    A.        I don't know when he was confronted.

3    Q.        Okay.  I'm asking you to make an

4    assumption with me for a second just for the

5    purpose of the question.

6    A.        What kind of an assumption do you want

7    me to make?

8    Q.        Do you know what an assumption is?

9              MR. COGLIANESE:  Objection.  Come on,

10   Jeff.

11             MR. VARDARO:  Well, Rich, I'm sorry.

12   You're here sighing deeply, and Chief Jacobs is

13   sitting here saying, well, what do you want me to

14   assume, what do you want me to assume?

15   Q.        I'm asking you to assume for the moment

16   for the purpose of the question that October 13th

17   was prior to Officer Morgan being accused of or

18   suspected or confronted about the idea that he was

19   not working the hours that he was supposed to

20   work.  Can you assume that for the moment?

21   A.        Well, it certainly could be an

22   assumption, but I don't have any proof that it --

23   he wasn't --

24   Q.        That's not my question.

127

1    A.        -- notified by --

2    Q.        I'm just asking you to make the

3    assumption.

4    A.        -- anybody before that.

5    Q.        Can you make the assumption for me?

6    A.        I thought I mentioned earlier that I

7    thought he had had a conversation with Officer

8    Roberts in September or something like that.  I'm

9    not sure what I'm recollecting, but I -- I just

10   don't know.  So, yeah, I mean, I can make an

11   assumption, but I'm not going to say that it's

12   foolproof.

13   Q.        Okay.  I'm just asking you to make the

14   assumption.

15   A.        Okay.

16   Q.        And that's the premise for the

17   question.

18   A.        Okay.

19   Q.        Okay.  Assuming that was the case and

20   there was an example confirming that Officer

21   Morgan was working a different day than the one he

22   was assigned, wouldn't that make it more likely

23   that he was telling the truth about his practice

24   of working different days to make up the hours

1    that he wasn't working on Wednesdays?

2             MR. COGLIANESE:  Objection.

3    A.        It corroborates one example.

4    Q.        Okay.  Doesn't corroborating that one

5    example prior to the suspicion being raised to

6    Officer Morgan make it more likely that he was

7    telling the truth in general?

8             MR. COGLIANESE:  Objection.

9    A.        Not necessarily.  It corroborates one

10    example.  He could have made it up about every

11    other time but knew that he had one corroborating

12    example.  I don't know.  I mean, I certainly

13    considered that that was corroborated.

14    Q.        Okay.  Did you know that Corporal

15    DeGoey also indicated that he had seen Officer

16    Morgan on other dates, he couldn't name the dates,

17    but he had seen him at other times that were not

18    Wednesdays during this time frame?

19    A.        If it was in the investigation, I would

20    have --

21    Q.        Well, I'll say it's not in the

22    investigative summary.  I'm asking you whether you

23    knew that other than from reading the

24    investigative summary?

129

1    A.        Not that I recall.

2    Q.        Okay.  Assuming that DeGoey had told

3    that to Sergeant Meister, would you have expected

4    it to appear in the summary?

5              MR. COGLIANESE:  Objection.

6    A.        Potentially if -- if there were other

7    dates, yes.

8    Q.        If DeGoey had offered or indicated to

9    Sergeant Meister that he had his own documentation

10   confirming that this incident occurred, would you

11   have expected that to appear in the summary?

12   A.        On the 13th?

13             MR. COGLIANESE:  Objection.

14   Q.        Yes.

15   A.        It could have been added, yeah,

16   certainly.

17   Q.        Okay.  I mean, the -- if he said it and

18   it wasn't added, would that raise a concern in

19   your mind about the nature of the summary?

20   A.        Well, I already told you that, you

21   know, if it was a readily available document,

22   then, yeah.  But I'm not going to wait another

23   month or so just to get a document if there's no

24   reason to believe that it's not accurate.

130

1    Q.         Okay.  But in this case there was a

2    reason to believe that it might not be accurate,

3    right?  You told me the reason which was the prior

4    relationship and the conversation?

5              MR. COGLIANESE:  Objection.

6    A.         I don't think that there was much

7    dispute about whether or not that particular

8    incident was true.

9    Q.         Okay.  So you took it as a given that

10   this one happened as described?

11   A.         Well, at least on that date, yeah.

12   Q.         Okay.  Can you take a look at page 15

13   of Exhibit 1, the investigative summary?  Page 15

14   of the investigative summary?

15   A.         Number 15 at the top?

16   Q.         Yeah.

17   A.         Okay.

18   Q.         If you could just read the

19   investigative summary of DeGoey's interview.  It

20   starts in the middle of page 15 and goes onto the

21   next page.

22   A.         Okay.

23   Q.         If you could assume for a moment that

24   in Sergeant Meister's conversation with Corporal

```
 1    DeGoey, Corporal DeGoey actually volunteered to

 2    Sergeant Meister that he had a prior relationship

 3    with Officer Morgan, and they had had a recent

 4    conversation about this incident, and that it

 5    wasn't in response to Sergeant Meister asking him

 6    how he remembered things with such vivid detail.

 7    Would you agree with me that this investigative

 8    summary is not accurate?

 9              MR. COGLIANESE:  Objection.

10    A.        I'm not sure I understand the question.

11    Q.        In his actual interview with Corporal

12    DeGoey, it was Corporal DeGoey that mentioned

13    first that he had talked to Kevin Morgan about

14    this incident recently and that they had a prior

15    relationship through their church.  But in the

16    investigative summary, Sergeant Meister describes

17    it as if he -- the investigator was puzzled as to

18    how Corporal DeGoey remembered this with such

19    vivid detail, and it was only then that he

20    mentioned this conversation with Officer Morgan

21    and their prior relationship.  And I am asking

22    you:  Assuming the version that I just told you is

23    true, that makes this investigative summary

24    inaccurate?
```

```
 1              MR. COGLIANESE:  Objection.
 2    A.        I don't know that it makes it
 3    inaccurate.  He could have followed up with a
 4    question and still accurately wrote down that he
 5    asked him how he remembered.
 6    Q.        Okay.  But if he didn't do that, that
 7    would make this inaccurate?
 8              MR. COGLIANESE:  Objection.
 9    A.        He didn't do what?
10    Q.        Ask him how he remembered this with
11    such vivid detail?
12    A.        Well, yeah, if he didn't ask him a
13    question about it, then that would be inaccurate.
14    Q.        Okay.  Assuming that Corporal DeGoey
15    told -- well, first of all, assuming Corporal
16    DeGoey told Sergeant Meister that the reason he
17    could remember this so vividly was because he was
18    sending text messages about the incident as it was
19    happening and he had them on his phone, would you
20    have expected that to go into this summary?
21    A.        That would have been beneficial.
22    Q.        And it would have made the summary
23    pretty different in terms of its tone?
24              MR. COGLIANESE:  Objection.
```

1    A.        Tone?  I didn't get the impression that

2    the sergeant disbelieved this date.

3    Q.        Okay.

4    A.        So --

5    Q.        Okay.

6    A.        It could have been phrased differently,

7    certainly, yes.

8    Q.        Okay.

9    A.        But I didn't read from this that he was

10   disbelieving the corporal about that particular

11   one because he said that was the date that he

12   could testify to and it didn't sound as if he was

13   disputing that.

14   Q.        Okay.  In response to the question

15   about whether he had testified about any other

16   specific dates if Corporal DeGoey told Sergeant

17   Meister that his hours at Kroger were Fridays and

18   Sundays during this time period and that he

19   remembered Officer Morgan coming in on multiple

20   occasions to the Kroger and using the bathroom or

21   getting coffee or something like that, considering

22   that Officer Morgan was only assigned to Stratford

23   Lakes on Wednesdays, would you have expected that

24   information to go into this summary?

```
 1              MR. COGLIANESE:  Objection.
 2      A.             Certainly it could have been explored
 3      more.  I also know that Officer Morgan was working
 4      at another special duty location and/or two.
 5      Q.             Uh-huh.
 6      A.             So I don't know that Corporal DeGoey
 7      would have clarified with him, hey, are you
 8      working at Stratford tonight or Briar Hill tonight
 9      or Giant Eagle tonight?  So I don't know that him
10      saying that I saw him on a Friday or what did you
11      say, Sunday?
12      Q.             Sunday.
13      A.             Necessarily proved that he was working
14      at a place that he said he was --
15      Q.             Uh-huh.
16      A.             -- in his own testimony, so --
17      Q.             I mean you remember the Kroger was
18      across the street from Stratford Lakes?
19      A.             Okay.
20      Q.             I'll represent to you that Kroger was
21      across the street from Stratford Lakes.  If
22      Corporal DeGoey said the reason why he called
23      Officer Morgan on this particular occasion was
24      that he had seen him on prior nights at the Kroger
```

1     and that Officer Morgan had recognized them from

2     their past acquaintance at the church and told

3     him, hey, I'm working across the street on this

4     special duty assignment, would you have expected

5     that to go into the summary?

6               MR. COGLIANESE:  Objection.  Go ahead.

7     A.          I think that you have to decide what

8     should be in a summary or not.  And I go back to I

9     don't take from here that he was disputing that

10    particular date and time.  If he felt that it was

11    relevant, he should have put it in.

12    Q.          I mean, it would have been relevant,

13    right?  It would be further corroboration --

14    A.          Potentially, yes.

15    Q.          -- of Officer Morgan's basic exact

16    defense to these charges, which was he was

17    regularly working different hours than the ones he

18    was assigned on a repeated basis?

19    A.          It could have, yes.

20    Q.          And considering that there was no

21    documentation one way or the other about the vast

22    majority of the instances involved, having an

23    eyewitness who saw him on multiple occasions at a

24    location right by the special duty assignment

1     would have been pretty important corroboration of

2     Officer Morgan's account?

3     A.          It would have been --

4                 MR. COGLIANESE:  Objection.

5     A.          -- more information.

6     Q.          Okay.

7     A.          Yeah.

8     Q.          And it would be important because

9     that's basically the only information that Officer

10    Morgan would have had to offer?

11                MR. COGLIANESE:  Objection.

12    A.          Well, he could have had other

13    information.

14    Q.          Yeah.  He could have done a better job

15    of documenting --

16    A.          Correct.

17    Q.          -- his time for sure?

18    A.          Correct.

19    Q.          There's no -- I don't think anybody

20    disputes that.  I think even Officer Morgan said

21    it to you in his chief's hearing.

22    A.          Correct.

23    Q.          But if there was an eyewitness who

24    said, oh, yeah, I saw him on a pretty regular

1    basis at a location that made it pretty likely

2    that he was working the special duty assignment

3    and it wasn't on Wednesdays, that would be

4    important to include in the investigative report?

5    A.        I would say --

6              MR. COGLIANESE:  Objection.

7    A.        -- that I consider important to include

8    all relevant information that we have.

9    Q.        And that would be relevant information?

10   A.        It sounds like it could be.

11   Q.        Yeah.

12             I mean, is there some question in your

13   mind about whether it would be relevant?

14   A.        I would just go back to specific dates

15   and times are always more important than I think I

16   remembered him on --

17   Q.        Uh-huh.

18   A.        -- some of these days.

19   Q.        But in the absence of a specific date,

20   a general, yeah, I saw him on a regular basis

21   would be valuable information in the

22   investigation?

23             MR. COGLIANESE:  Objection.

24   A.        It would be something to consider, yes.

1   Q.          Besides just Corporal DeGoey, Officer

2   Morgan gave to the investigators and to you

3   information about other people who could similarly

4   corroborate his claim that he was doing this job,

5   just on different days.

6   A.          I didn't hear a question.

7   Q.          Do you remember that?

8   A.          Go ahead and ask it again then.

9   Q.          Do you remember that Officer Morgan

10  offered other potential people who might be able

11  to corroborate his account that he was working

12  this assignment on a regular basis?

13  A.          Not specifically.  I don't remember

14  names and specific persons.

15  Q.          I'm not saying he gave names.  I'm just

16  saying do you remember that he offered that there

17  were other people who he would come into contact

18  that the investigators might be able to follow-up

19  with?

20  A.          I believe that he said that he had had

21  other contacts with people while he was working at

22  Stratford.  But I don't remember him giving us any

23  information that -- who that was, where it was and

24  all of that.

1    Q.        I mean it wasn't just that he said I

2    saw people.  He said I saw this one guy who lived

3    in this particular type of location and you can

4    try and find him?

5    A.        He potentially could have said that and

6    I just don't recall it.

7    Q.        Okay.  So you don't remember one way or

8    another whether he said that?

9    A.        I don't recall right now, no.

10   Q.        Okay.  Do you -- if he had said that to

11   the investigators, would you have expected them to

12   make an effort to try to figure out who those

13   people were?

14   A.        If there was enough information that

15   they could have followed up on to get that, again,

16   it goes back to specific dates and times.  So I

17   don't know if they could have corroborated that

18   information or not.

19   Q.        Okay.

20   A.        And it just depends on the amount of

21   information that was available to try to --

22   accomplish that.

23   Q.        I mean -- I'm sorry.  I'll let you --

24   A.        Yeah.

1    Q.          I mean, it's not your position that if

2    Officer Morgan -- given that Officer Morgan didn't

3    have, you know, organized documentation showing I

4    was there on this date, I was there on this date,

5    I was there on this date, it's not your position

6    that the only way he could corroborate his account

7    was by having people say, yes, I saw him at 9:30

8    p.m. on Friday, October whatever?  He could -- he

9    could at least make his account more likely by

10   presenting witnesses who said, well, I worked late

11   on Fridays and I would come back to my apartment

12   and I would see him stationed at the Stratford

13   Lakes apartment where he would have no other

14   reason to be.  That would make it more likely that

15   he was telling the truth?

16              MR. COGLIANESE:  Objection.

17   A.          More likely telling the truth that he

18   -- that he worked different days than Wednesdays?

19   Q.          Yes.

20   A.          Yes.

21   Q.          And more likely that he was working

22   times at Stratford Lakes when he wasn't marking in

23   service on the radio?

24              MR. COGLIANESE:  Objection.

1    Q.          Since they didn't have a lot of -- they

2    didn't have marked in service information showing

3    that he had marked in.

4    A.          What was the question?

5    Q.          Well, for example, I'll go back to the

6    DeGoey example.  On October 13th, it's pretty

7    clear that Officer Morgan was working the

8    Stratford Lakes assignment but he hadn't marked in

9    service.

10   A.          Okay.

11   Q.          And his failure to mark in service was

12   one of the main sources of evidence that he wasn't

13   working the assignment.

14   A.          It was one of the factors, yes.

15   Q.          Okay.  So Corporal DeGoey's testimony

16   didn't just show that there was a date that

17   Officer Morgan worked other than the one he was

18   assigned, it also showed that on at least one

19   occasion he worked the assignment but he didn't

20   mark in service?

21   A.          Correct.

22              MR. COGLIANESE:  Objection.

23   Q.          Okay.  So if there were other witnesses

24   who also said I saw him on a Friday or I saw him

142

1    on a Sunday or I saw him on a Tuesday, it would

2    corroborate two aspects of Officer Morgan's

3    account.  One would be that he worked other days

4    than the ones he was assigned and that he worked

5    -- he was working at Stratford Lakes during time

6    periods when he had not marked in service.

7              MR. COGLIANESE:  Objection.

8    Q.        Right?

9    A.        It could, yes.

10   Q.        Okay.  And that would not just depend

11   on the concept of a witness somehow remembering,

12   you know, a year or more after the fact I saw him

13   on such and such a date at such and such a time,

14   it could also be at least somewhat corroborated by

15   a witness saying I saw him regularly at this

16   apartment complex or I was accustom to seeing him

17   on Fridays when I came home from work or something

18   along those lines.

19             MR. COGLIANESE:  Objection.

20   A.        I already answered that.  What --

21   Q.        I'm just saying --

22   A.        What's the difference?

23   Q.        -- not just that he was working other

24   days but that he was working days that he had not

 1   marked in service.

 2           MR. COGLIANESE:  Objection.

 3   Q.      Do you remember having a chief's

 4   hearing for Officer Morgan's discipline?

 5   A.      Yes.

 6   Q.      Do you remember Officer Morgan telling

 7   you that there were specific people that he saw at

 8   the apartment complex who might be able to

 9   corroborate his account in response to your

10   questions?

11   A.      I don't recall any names being given.

12   But I'm not saying --

13   Q.      I'm not asking you about names.  I'm

14   saying there were, like, individual people that he

15   remembered seeing.

16   A.      He might very well have said that.

17   Q.      Okay.  Having reviewed the

18   investigative summary, there were no other

19   interviews that the officers conducted or no other

20   indication that the internal affairs sergeants had

21   tried to find any people like that, right?

22           MR. COGLIANESE:  Objection.

23   A.      There's -- I don't recall any other

24   names of people that they interviewed, yes.  And I

144

1    don't know what lengths they went to to track down

2    people that were unnamed by Officer Morgan.

3    Q.        Okay.

4              MR. VARDARO:  I'm going to need 19.

5    BY MR. VARDARO:

6    Q.        I'm handing you what's been marked as

7    Plaintiff's Exhibit 19.  This is -- well, first of

8    all, can you tell me, does this appear to be your

9    chief's hearing for Officer Morgan?

10                        - - - - -

11             Thereupon, Plaintiff's Exhibit 19 is

12   marked for purposes of identification.

13                        - - - - -

14   A.        It appears to be a transcript of it,

15   yes.

16   Q.        Okay.  Can you take -- there's pages at

17   the bottom.  I'm actually not sure what the

18   pagination is based on.  But it starts at page 55.

19   A.        Yes.

20   Q.        P55.

21   A.        Yeah.

22   Q.        Can you take a look at P65?  Do you see

23   toward the end of the hearing -- well, actually, I

24   will say this does look like it's towards the end

1   of the hearing because there are only a couple

2   more pages after that, right?

3   A.       Yep.

4   Q.       So toward the end of the hearing at the

5   bottom of that page you say, "Did you talk to

6   people?" And he says, "Yes ma'am." And you say,

7   "You know, did you do anything to make it clear

8   that" --

9   A.       Wait.  Wait.  Where are you?

10  Q.       I'm at the bottom of page P65.

11  A.       Okay.

12  Q.       Do you see those questions, where that

13  starts?

14  A.       Okay.

15  Q.       And then if you flip over to the next

16  page, do you see in the first long paragraph of

17  his response you've asked him, "Was there somebody

18  that you checked in with; who did you talk to?"

19  A.       Uh-huh.

20  Q.       And he lists a person who is not

21  employed by Stratford but did extra work in the

22  office and who would know that he was around and

23  was doing the work.  And then there's another

24  person who -- a male black truck driver who lived

1    where he parked at and would comment come home at

2    1:00 or 2:00 in the morning and would come over

3    and talk to him while he was in his truck -- I'm

4    sorry.  His mom would come down the steps and come

5    over and talk to him?  Do you remember Officer

6    Morgan telling you these things during the chief's

7    hearing?

8    A.          Well, I see it there, so.

9    Q.          Okay.  Did you do anything after this

10   to ask the sergeants to try to find these people

11   and see whether Officer Morgan was telling the

12   truth about them?

13   A.          No.

14   Q.          Okay.  Why not?

15   A.          I believe that the evidence that we had

16   at that time was sufficient, that he'd had an

17   opportunity prior to this to give that

18   information.  If it wasn't followed up when he

19   gave it, if he gave it prior to that.  Your

20   opportunity to give us information is -- is, you

21   know, long before you get to the chief's hearing.

22   Q.          Uh-huh.

23   A.          And unless -- unless I feel like there

24   is not enough evidence or that this is totally

1   brand-new evidence that actually could persuade me

2   in a different direction.  But just based on this,

3   you know, that it doesn't -- you know, I never --

4   I never came to the conclusion that he was never

5   at Stratford Lake.  You know, there were

6   definitely times when he was at Stratford Lake.

7   So trying to match up dates with people that had

8   seen him after the fact more than a year, two

9   years later wasn't going to change my opinion that

10   we had evidence that these rule violations had

11   occurred.  That did not sound to me that it was

12   going to be the kind of information that would

13   change the facts that I had in front of me.

14   Q.        Can you take a look at Exhibit 15, it's

15   the -- I think it's this one.  Yeah.  I'll just

16   flip to the page for you if you don't mind, save a

17   little bit of time.  And for the record, I'm

18   flipping to the twelfth page of the second part of

19   this exhibit, which has number 160 at the bottom.

20            Just the first thing you said was, you

21   know, the chief's hearing is obviously not the

22   time when you come up with for the first time new,

23   you know, potentially exculpatory information.

24   Looking at the top of this page, this confirms the

1    chief's hearing wasn't the first time he mentioned

2    the truck driver guy, right?

3    A.        Correct.

4    Q.        He told that to the sergeants, so if

5    you had followed up with the sergeants after the

6    chief's hearing and said, hey, did he mention this

7    at the time, that would have confirmed at least

8    that, oh, yeah, he mentioned it, we just didn't

9    ever try to find this guy.  Would that have raised

10   a concern with you?

11            MR. COGLIANESE:  Objection.  Go ahead.

12   Q.        For you I should say?

13   A.        So what was the question?

14   Q.        If you had gone to Sergeant Meister --

15   is that the -- Sergeant Meister is at the chief's

16   hearing, right?  The IA sergeant would typically

17   be at the chief's hearing?

18   A.        He was.  Yeah, they usually are but not

19   always.

20   Q.        So if you had pulled Sergeant Meister

21   aside after the chief's hearing and said, hey,

22   he's talking about a potential witness here, did

23   you try to -- did he ever mention that to you or

24   is this just brand new information, presumably

1    Sergeant Meister would have said, oh, yeah, he

2    mentioned it at some point.  And then would you

3    have -- you know, do you remember any conversation

4    like that for instance?

5    A.          Could have occurred.

6    Q.          Okay.  I mean if Sergeant Meister

7    had --

8    A.          Those --

9                MR. COGLIANESE:  Hold on.

10   A.          -- conversations aren't recorded.  So I

11   cannot remember something that happened that long

12   ago specifically about this particular thing.

13   Q.          I understand.  I'm just saying assuming

14   that you would have had a conversation like

15   that --

16   A.          Uh-huh.

17   Q.          -- and Sergeant Meister said, oh, yeah,

18   he mentioned it, and you said, you know, well, did

19   you talk to this person.  And he said no, we never

20   even bothered to try to find this person who he

21   said could potentially corroborate his account.

22   Would that raise a concern for you about the

23   investigation?

24                MR. COGLIANESE:  Objection.

150

1    A.          It would depend on the type of answer

2    that I got, yes.

3    Q.          Okay.  I will represent -- you know, I

4    don't want to go find all the portions of the

5    interview again on your time, because it's -- I

6    don't think it's reasonably in dispute.

7              But Officer Morgan mentioned at least a

8    couple of other people who he says he told Officer

9    Tony Roberts to talk to to confirm that he was

10   actually working this assignment, including this

11   sort of part-time volunteer property manager

12   person and someone who he calls the African guy

13   who he doesn't really specify, but he makes it

14   clear that Tony Roberts knew who the African guy

15   was.  And the officers -- the sergeants first of

16   all don't ask any follow-up questions about who

17   Officer Morgan might be talking about.  And second

18   don't indicate at all that they went to try to

19   find or identify or talk to Tony Roberts about.

20   Does that raise a concern for you about the

21   investigation?

22              MR. COGLIANESE:  Objection.

23   A.          If they believed that they could get

24   information that would follow-up on some of his

1    statements, then certainly I think that that would

2    be information worth knowing.  I don't know what

3    their considerations were.  I don't know what

4    direction they may or may not have been given by

5    the internal affairs chain of command with regard

6    to following up, getting more information, whether

7    they felt like let's focus on this instead of

8    that.

9    Q.        Yeah.

10   A.        So looking at it, you know, without

11   knowing all of that in the context in which it was

12   done, yeah, you could say it looks like, you know,

13   it could have been better.  But I don't know all

14   the considerations that were in play at the time.

15   Q.        I mean just looking at the

16   investigation, it seems as if these sergeants,

17   particularly Sergeant Meister, did a ton of

18   legwork to find information about Officer Morgan's

19   potential misconduct?

20   A.        But we're not just the sergeant --

21   Q.        Within the department -- not just?  I'm

22   sorry.

23   A.        Not just the sergeant.  Chris Bond did

24   a great investigation.

1    Q.        Yeah.

2    A.        You know.

3    Q.        The criminal investigation, which took

4    place before Officer Morgan provided any --

5    A.        Correct.

6    Q.        -- information because he was advised

7    to not give a voluntary criminal interview?

8    A.        Correct.

9    Q.        Which is typical of officers, right?  I

10   mean, the FOP attorneys usually tell them don't

11   give an interview in a criminal investigation

12   because you're -- you don't have your guaranteed

13   protections?

14   A.        I would say that's more often than not.

15   Q.        You certainly don't hold it against an

16   officer in a disciplinary investigation that they

17   didn't participate in the criminal investigation?

18   A.        That would be true.

19   Q.        Illegal?  It would be illegal if you

20   did that, correct?

21   A.        Correct.

22             MR. COGLIANESE:  Objection.

23   Q.        So you don't do it?

24   A.        Correct.

153

1    Q.        So Officer Bond certainly didn't have

2    an opportunity to follow-up on witnesses on behalf

3    of Officer Morgan because Officer Morgan wasn't

4    participating in it?

5    A.        Those that he brought up, yes.

6    Q.        And he didn't have, for instance, the

7    information about Corporal DeGoey and the incident

8    at the Kroger?

9    A.        To my knowledge.

10   Q.        Okay.  But all of these, Officer Bond,

11   Sergeant Meister, Sergeant Decker, they did a lot

12   of digging to find documents that showed Officer

13   Morgan was not working on the Wednesday nights

14   when he was assigned.  But I haven't identified

15   virtually anything that they did to follow-up on

16   information that might corroborate Officer

17   Morgan's account other than calling Corporal

18   DeGoey.  And so my -- I mean, I guess you

19   mentioned well, it depends on how long it would

20   have taken to do this or it depends on how long it

21   would have taken to do that.  The investigation

22   all told took almost two years.  Would it really

23   have been a consideration of, oh, it's going to

24   take an extra day to go over to Stratford Lakes

1    and try to find this person?

2                MR. COGLIANESE:  Objection.

3    A.          That's not my -- that's not my call

4    back when the investigation is underway.

5    That's --

6    Q.          You were the chief of police.

7    A.          I don't have the day-to-day chronology

8    of what a case is doing.  So that's the call of

9    the lieutenant and the commander in internal

10   affairs to say go follow-up on that.  They read

11   this back and forth, back and forth, they -- they

12   prepare a draft, they send it back, they go say go

13   do this, go do that.  So it's not something that

14   is brought to my attention should we follow-up on

15   that, should we follow-up on that.  That's --

16   Q.          During --

17               MR. COGLIANESE:  Hold on.  She's not

18   done.

19   Q.          I'm sorry.  I'm not doing it on

20   purpose, Rich.  Go ahead.

21   A.          It's just the way that the structure of

22   internal affairs is set up to provide guidance

23   with regard to how the investigation should be

24   conducted.  And then if they feel like there's a

1      gap or anything else, then they would direct them

2      to close that gap.  If they felt that there was a

3      bias, they -- you know, they should, you know,

4      point that out and try to make sure that there is

5      no bias.  That's all part of the internal affairs

6      chain of command review process.

7      Q.        During your term as chief, who did the

8      commander of internal affairs report to?

9      A.        I think for the entire time that was

10     me.

11     Q.        And that was a change that came in?

12     A.        Correct.

13     Q.        Prior to that there had been a layer of

14     command in between you and --

15     A.        Deputy chief, yeah.

16     Q.        Okay.  And at the end of the internal

17     affairs process once the conclusions came in and

18     once things came from a chain of command, you

19     certainly had the authority as chief to say I'm

20     not satisfied with this investigation, and in this

21     particular respect, please go do some follow-up?

22     A.        That depended.  If it was a citizen

23     complaint, then I couldn't oftentimes ask for more

24     investigation because of time limits.  And if it

```
 1    was an internal investigation such as this, then

 2    that depended on whether or not I felt that there

 3    was something that was, you know, important to the

 4    outcome.  But I don't -- I don't recall too many

 5    instances where by the time it got to me, that I

 6    would have sent it back and said, you know, this

 7    is lacking something that I need to have.

 8    Q.        The only thing that you saw that was

 9    lacking at the end of this investigation was there

10    wasn't a charge of 1.04 for cause for dismissal?

11    A.        I would --

12              MR. COGLIANESE:  Objection.

13    A.        I would not say that.

14    Q.        Okay.  Was there something else

15    lacking?

16              MR. COGLIANESE:  Objection.

17    A.        I don't recall specifically having some

18    of the concerns that you've raised about not

19    following up with some of these particular persons

20    or not, I could have very well brought that up in

21    the chief's hearing afterwards to get it

22    addressed.  But, you know, I always -- not always.

23    There are a number of times when I think an

24    investigation could have gone in a different
```

1    method, manner, asked better questions, followed

2    up with more people.  I've very -- I don't

3    remember ever seeing a perfect investigation.

4    Q.        Okay.  In your time when you were

5    commander for IAB, if you had been confronted with

6    this investigative summary and the interview of

7    Kevin Morgan raising these potential corroborating

8    witnesses, would you have instructed the

9    investigators to do some additional work to try to

10   find the witness?

11   A.        I would have asked --

12             MR. COGLIANESE:  Objection.

13   A.        -- what the -- I mean, if it got to me

14   and it came to my attention, I would have asked

15   what their thought process was on more follow-up.

16   Q.        Okay.  And if their thought process was

17   we just didn't do anything to try to identify

18   these witnesses, including even asking Officer

19   Morgan for more information, would you have

20   directed them to do something more?

21             MR. COGLIANESE:  Objection.

22   A.        I -- it's hypothetical.  I don't -- I

23   don't know what I would have done.

24   Q.        You don't know what you would have done

1    if the officers had been presented with potential

2    corroborating witnesses and had done nothing in

3    response to follow-up on that?

4              MR. COGLIANESE:  Objection.

5    A.         If there was reason to believe that

6    they actually had corroborating material then,

7    yes, I believe that I would have said try to find

8    them.

9    Q.         And in this case there was reason to

10   believe that they might have had corroborating

11   material because literally the officers were

12   asking Officer Morgan if there was anybody who

13   might have corroborating material and these were

14   the people that he listed?

15             MR. COGLIANESE:  Objection.

16   A.         He listed without names and dates and

17   times and place, yes.

18   Q.         But with some locations and even some

19   roles within the apartment complex?

20   A.         It could have been done, yes.

21   Q.         Okay.  And it should have been done?

22             MR. COGLIANESE:  Objection.

23   A.         I don't know that I can say that

24   because I don't know what the context of that

1    information was.  I don't know if they were told

2    not to by a lieutenant or a commander for some

3    specific reason.  So without knowing more about

4    that thought process, if it was even a thought

5    process, I can't say.  If they were told not to do

6    something, if they were said, you know, we did

7    look and try but we couldn't find anything, I --

8    you know.  It would have been nice to have some

9    reference to it, but I don't know that it wasn't

10   documented somewhere or discussed somewhere.

11   Q.        Well, part of the context was this was

12   an officer who everybody knew his job was

13   potentially on the line or at the very least

14   serious discipline was on the line, right?

15   A.        Correct.

16   Q.        And you certainly believed that this

17   was an important question since you asked it at

18   the chief's hearing?

19   A.        Yes.

20   Q.        Okay.  And now at least you know that

21   the sergeants asked it in their investigation and

22   got an answer from Officer Morgan, and then

23   apparently did nothing at all to follow-up on it,

24   including asking Officer Morgan for more

```
 1    information, asking Officer Roberts who apparently

 2    also knew these people for more information or

 3    going to the apartment complex and just trying to

 4    find them.  Does that -- I mean, doesn't that tell

 5    you that this is work, investigative work that

 6    should have been done as part of this

 7    investigation?

 8               MR. COGLIANESE:  Objection.

 9    A.         It would have been beneficial.

10    Q.         And it should have been done?

11               MR. COGLIANESE:  Objection.

12    A.         As I said before, I don't know what the

13    circumstances were whether it was discussed,

14    reviewed and decided upon.

15    Q.         Okay.  Assuming that Commander Knight

16    didn't tell these sergeants not to do it and there

17    were no other circumstances that would have

18    prevented them from doing it, it should have been

19    done?

20               MR. COGLIANESE:  Objection.

21    A.         An attempt could have been made, yes.

22    Q.         And it should have been made?

23               MR. COGLIANESE:  Objection.  Asked and

24    answered.
```

1          MR. VARDARO:  No.  She hasn't answered

2     it.  I keep saying should they have done it and

3     she keeps saying they could have done it.  I'm

4     just asking for a simple yes or no.

5          MR. COGLIANESE:  On a hypothetical

6     question.

7          MR. VARDARO:  Should they have done

8     this investigative work?

9          MR. COGLIANESE:  Jeff, move on.

10    Q.        Should they have done this

11    investigative work given the circumstances that

12    you're aware of?

13         MR. COGLIANESE:  Move on.  Objection,

14    asked and answered.

15    Q.        You can go ahead and answer the

16    question.

17         MR. COGLIANESE:  If you want to answer

18    it for the twelfth time, you're free to.  If you

19    don't feel like answering it for a twelfth time,

20    you don't have to.

21    A.        I want to get to the facts of the case

22    that's relevant to statements.  There were other

23    factors involved in this particular case that

24    certainly I considered to be very relevant with

1    regard to the rule violations.  Having that

2    information and it not being a question, yes, now

3    I can say we could have had that and then we would

4    have known instead of not knowing.

5    Q.          But you can't say, yes, it should have

6    been done?

7                MR. COGLIANESE:  Objection.  That's the

8    thirteenth time that's been asked.

9    A.          I don't know the circumstances under

10   which that decision was made.

11   Q.          Based on the circumstances that you do

12   know, should they have followed up and tried to

13   find these potential corroborating witnesses?

14               MR. COGLIANESE:  That's it.  That is

15   the last time that question is going to be asked.

16               MR. VARDARO:  Do you want to call the

17   judge?  Let's call the judge.

18               MR. COGLIANESE:  You've asked him how

19   many times.

20               MR. VARDARO:  She hasn't answered it,

21   yet, Rich.

22               MR. COGLIANESE:  She has, you just

23   don't like the answer.

24               MR. VARDARO:  Please stop making

163

1    speaking objections.  If you don't want her to

2    answer the questions, let's try to get on the

3    phone with the judge.

4              MR. COGLIANESE:  She has answered the

5    question.  Chief, if you want to answer it again,

6    go ahead.  Jeff, move on.

7    A.        Not knowing anything else but knowing

8    that this is an issue right now, then, yes, I can

9    say it should have been done so that we don't have

10   this issue.

11   Q.        Okay.  Do you want to take a break for

12   -- do you need lunch or --

13             MR. COGLIANESE:  Let's go off the

14   record.

15             (A short recess is taken.)

16   BY MR. VARDARO:

17   Q.        Okay.  You mentioned an officer named

18   Mayhew who had been terminated or recommended for

19   termination at some point?

20   A.        I did.

21   Q.        I think you said that you had testified

22   about his case sometime in the last few weeks?

23   A.        Arbitration hearing last week.

24   Q.        Oh, okay.  So his case is still in

1    arbitration?

2    A.        Yeah.

3    Q.        Okay.  I didn't know.  When was he

4    terminated?  Do you know what, I'll withdraw it.

5    A.        I think it was 2016, but I'm not sure.

6    Q.        Okay.  During the Morgan investigation,

7    Officer Morgan's union attorney Ron Snyder was

8    sitting in on his interviews.  Do you remember

9    that at all?

10   A.        I saw reference to it.

11   Q.        Okay.  At some point Mr. Snyder had

12   recommended checking the walkie log to see whether

13   Officer Morgan had any walkie-talkie activity

14   during the times when he was supposed to be at

15   Stratford Lakes or during other times that could

16   confirm that he was on duty.  Do you remember

17   that?

18   A.        Not specifically, no.

19   Q.        Okay.  I'll represent to you that both

20   Mr. Snyder and Sergeant Decker during the

21   interview acknowledged that that could show some

22   evidence of Officer Morgan being on duty during

23   the time -- during this time period, but nothing

24   -- there's no indication that anybody actually

1    followed up and pulled that data from the

2    division.  Do you have any knowledge of why that

3    would be?

4              MR. COGLIANESE:  Objection.  Go ahead.

5    A.        Not that I recall, no.

6    Q.        Okay.  There is a statement in the

7    internal affairs summary that Officer Morgan

8    consistently marked in service for his other

9    special duty assignments but not for the Stratford

10   Lakes assignment.  Do you remember that from

11   reading it?

12   A.         I remember that there were notations

13   that -- I don't know about the word

14   "consistently."  But if you -- if that's what's

15   there, then it is.  But I remember that there were

16   instances where he did mark with the radio room

17   and that there were other instances in some of

18   them at least, not more of them, when there

19   weren't any radio transmissions or marking in I

20   should say were related to his work at Stratford

21   Lakes.

22   Q.        Okay.  Was that something you relied on

23   in terms of your determination that Officer Morgan

24   was being un -- or being not actually making up

1    his hours at Stratford Lakes?

2    A.        I consider it to be a violation of our

3    rules when you don't mark in service, so, yes.

4    Q.        Well, you -- I'll break it into two

5    separate things.  First, he was disciplined with a

6    DCC for not marking in service on a number of

7    occasions --

8    A.        I believe that's true.

9    Q.        -- related to this investigation.

10   That's not what he was terminated for though?

11   A.        Correct.

12   Q.        My question is did you rely on Sergeant

13   Meister's assertion that Officer Morgan was

14   marking in service for all of his other

15   assignments but not for the Stratford Lakes

16   assignment in determining whether or not Officer

17   Morgan was actually working the Stratford Lake

18   assignment?

19   A.        I considered it.  I wouldn't say that I

20   relied on it, but I considered it.

21   Q.        Okay.

22             (A short recess is taken.)

23   BY MR. VARDARO:

24   Q.        I'm going to move onto a different

1    subject.

2              At the chief's hearing -- well, my

3    understanding is during chief's hearings for

4    discipline during your time as chief, there would

5    be some form of presentation from professional

6    standards lieutenant, whoever was the lieutenant

7    attending that hearing about comparable cases?

8    A.        Not during the hearing.

9    Q.        Not during the hearing.  When would

10   that be?

11   A.        After we had the hearing, went off the

12   record, excused the focus officer and the

13   representatives, then we would talk about what was

14   presented.  And if it was something that I wasn't

15   already aware of, then we would talk about

16   comparables.

17   Q.        Okay.  When you say it was something

18   you weren't already aware of, do you mean if it

19   was comparables you weren't already aware of?

20   A.        Sometimes going into a hearing, I would

21   have already asked for the comparables.

22   Q.        Okay.

23   A.        And the lieutenants might have already

24   provided that to me.

168

1    Q.      Okay.  Do you remember which it was in

2    Officer Morgan's case, whether you got the

3    comparables before or after the hearing?

4    A.      I don't recall.

5    Q.      Okay.  When you would get a list of

6    comparables before or after the hearing, was it

7    provided to you in writing or was it just a verbal

8    summary from the lieutenant?

9    A.      It varied.  Sometimes it was in writing

10    and sometimes it was verbal.

11    Q.      Okay.  Do you remember what form,

12    whether you got a verbal or a written summary of

13    comparables from the PSB lieutenant in Officer

14    Morgan's case?

15    A.      No.

16    Q.      Okay.  Do you remember which PSB

17    lieutenant gave you the list?

18    A.      No.

19    Q.      Okay.  Can you describe to me what the

20    discussion was after the -- after you went off the

21    record in Officer Morgan's chief's hearing?

22    A.      I don't have any specific recollections

23    of the discussion.

24    Q.      How about generally?

```
1   A.          I would have to -- to guess, because I

2   don't have a specific memory of it.  But, you

3   know, typically we would say what do you think of

4   the presentation of the information?  Are there --

5   is there enough evidence here.  I would generally

6   ask the deputy chief present to say what they

7   think before I do so that, you know, I don't give

8   them an idea of where I might be going.  I would

9   sometimes ask the people that aren't the deputy

10  chief what they thought.  If I had any questions

11  of the IA investigator, I would ask.  I just don't

12  remember any specific conversation in this

13  particular case.

14  Q.          Okay.  Is there anything you could look

15  at that could remind you of the conversation?

16  A.          Not that I am aware of.

17  Q.          Okay.  No notes, no minutes, nothing

18  like that?

19  A.          No.

20  Q.          Okay.  Do you remember which deputy

21  chief was in attendance?

22  A.          Well, based on this, I would assume

23  that it was Chief Kuebler.

24  Q.          Okay.  What gives you that --
```

1    A.        Well, he was the deputy chief that
2    signed off on this.
3    Q.        Okay.  Do you remember in particular
4    whether Chief Kuebler presented a point of view in
5    terms of this case and the strength of the
6    evidence or anything like that?
7    A.        I don't recall that it was different
8    than mine --
9    Q.        Okay.
10   A.        -- of it being sustained and --
11   Q.        Okay.  Do you remember --
12   A.        -- that the evidence was there.
13   Q.        Okay.  Do you remember any difference
14   of opinion among anybody involved?
15   A.        Not that I recall.
16   Q.        Okay.  Do you remember what any of the
17   comparable cases were?
18   A.        I don't know that we had too many that
19   were comparable about, you know, being accused of
20   taking pay for that.  There's one old case that
21   ended up getting criminally charged, went into
22   diversion program and got expunged from the
23   record, so it's sealed records and there's no
24   information that's available.

```
 1    Q.        Okay.  Was that officer terminated?

 2    A.        No.  No.

 3    Q.        Do you remember who the officer was?

 4    A.        Yeah.  I know who it was.

 5    Q.        Are you not able to tell me because of

 6    the --

 7    A.        I don't believe I'm allowed to.

 8    Q.        So you're not going to tell me?

 9    A.        It's a sealed record.

10    Q.        It's a sealed record?

11    A.        It's not even -- the -- without naming

12    the officer, you know, it was about a case where

13    an officer was working special duty for a bank and

14    hadn't worked there for -- or was accused of not

15    having worked there for quite sometime, and the

16    records indicated that that was true, he

17    acknowledged it at some point in time.  He was

18    charged criminally with a felony and the bank kind

19    of backed out on the prosecution's side of, you

20    know, going after it very hard so they agreed to

21    the diversion program.  Somebody in CPD agreed to

22    diversion program unbeknownst to the chief of

23    police and so he was allowed to go through that

24    program.  After a year, he was allowed to have the
```

1    record sealed.

2    Q.        Okay.  That was before you were chief?

3    A.        It was when I was in internal affairs

4    and/or part of internal affairs and maybe another

5    assignment after that.

6    Q.        Okay.

7    A.        So --

8    Q.        Was the officer disciplined?

9    A.        I don't recall.

10   Q.        Was there some aspect of the criminal

11   diversion program that was binding on the division

12   of police?

13   A.        Well, the conviction went away, so I --

14   I believe there was also contractual issue, I

15   think that they said that there was -- a violation

16   of 814, I believe, which was something to do with

17   it extending beyond 180 days and no discipline or

18   something like that.  Citizen complaint kind of a

19   thing whether it was or wasn't.

20   Q.        Uh-huh.

21   A.        So I think contract -- and there might

22   have been a disciplinary process.  It's just that

23   I was a commander at the time and I don't recall

24   all the details of what happened after it was

1    outside of my bailiwick.

2    Q.        Okay.

3    A.        I just remembered that that was an

4    accusation of being paid for special duty and not

5    being there.

6    Q.        Okay.  Were there any comparables

7    presented where the officer was terminated?

8    A.        I can't remember anything that was that

9    close.

10    Q.        Okay.  Were there any other comparables

11    presented that -- where the officer wasn't

12    terminated?

13    A.        Not that I recall.  I mean like I said,

14    I don't recall the specific conversation.  And I

15    don't recall another instance where the allegation

16    was that you're getting paid and you weren't

17    there.

18    Q.        Okay.  Is it your recollection in

19    general that there was only one comparable

20    presented, or do you think there were more

21    comparables and you just can't remember what they

22    were?

23    A.        I don't even know if that other one was

24    presented as much as I remember it.

174

1    Q.          Okay.  So is it possible there were no

2    comparables presented?

3    A.          Well, we always try to, you know, see

4    if anything else will be called a comparable.  And

5    so we might have discussed other instances where

6    people have been paid for work not performed.

7    Q.          Uh-huh.

8    A.          I know that we've had a lieutenant that

9    -- a lieutenant that was suspected of abusing

10   overtime.  And he I believe resigned before he got

11   to the -- I think I made a recommendation of

12   termination, but I think he might have resigned

13   before he was fired.

14   Q.          Was that Troy --

15   A.          Troy Casner.

16   Q.          -- Casner, yeah.

17   A.          Yeah.

18   Q.          Okay.  In that case, the lieutenant was

19   also alleged to have tampered with the

20   investigation, right?

21   A.          Oh, by talking to people.  I think that

22   was -- yes.

23   Q.          He was talking to his subordinate about

24   the investigation --

```
 1    A.          I believe that that's --

 2    Q.          -- and trying to compare stories with

 3    them?

 4    A.          I think that's it, yes.

 5    Q.          I'm sorry.  We're talking over each

 6    other.

 7    A.          Or tell them what he wanted them to

 8    remember.

 9    Q.          Right.

10    A.          Correct.

11    Q.          And that was a -- that was sustained

12    against him --

13    A.          Yes.

14    Q.          -- in addition to the time issue?

15    A.          I don't recall what the allegations

16    were.  But I remember that it was about time and

17    that, yes, he was accused of talking to people.

18    Q.          Okay.  Do you remember whether or not

19    that was brought up as a comparable in the Kevin

20    Morgan discussion or are you just sort of trying

21    to remember other similar cases?

22    A.          Yeah.  The latter.

23    Q.          The second.  Okay.

24                Is there anything that you could look
```

1    at to remind you of what the comparable cases

2    would have been that you discussed?

3    A.          Like I said, I just don't remember that

4    there was anything that I would describe as a

5    close comparable.

6    Q.          Okay.  Well, can you remember what the

7    reasoning was discussed whether it was your

8    reasoning or the reasoning presented by others as

9    to why Officer Morgan was terminated in this case?

10                MR. COGLIANESE:  Objection.  Go ahead.

11   A.          I could only tell you that I was

12   convinced that there was some critical misconduct

13   that had occurred that was of a criminal nature,

14   theft.  I considered it to be that he was asked to

15   work four hours a week and could not prove that he

16   had worked four hours a week.  I believe that the

17   evidence showed that there was at least some type

18   of deception or deceit going on with regard to

19   implying that he was working Wednesday nights from

20   9:00 to 1:00 because that's what the invoices were

21   for, that he was in two places or, you know,

22   thought to be in two places at the same time, that

23   he was expected to work four-hour shifts and

24   sometimes worked less than four-hour shifts but

1    still accepted the payment for the entire four

2    hours.  His -- his answers, his reasoning, his

3    defense was not credible enough to make me believe

4    that those facts weren't true.

5    Q.        Anything else?

6    A.        Not that I recall.

7    Q.        Okay.  You knew that the invoices for

8    the jobs were going out the same way every week

9    regardless of which actual days the officers on

10   this assignment were working?

11   A.        I understood that he was being paid to

12   work Wednesday nights from 9:00 to 1:00 and that's

13   what the invoices were being paid for.

14   Q.        Okay.  But that was true even during

15   the time when Officer Morgan was switching days

16   with the knowledge and authorization of Officer

17   Roberts?

18            MR. COGLIANESE:  Objection.

19   A.        I don't know about prior to that break

20   off point where he got a set schedule.

21   Q.        Okay.  Assuming for the moment that the

22   invoices were basically going out as Wednesdays

23   even when his special duty coordinator knew that

24   he was working a different schedule, would that

1    suggest to you that -- it still suggests to you

2    that it was deceptive for him to invoice for

3    Wednesdays when he was working on Fridays or

4    Sundays or something like that?

5              MR. COGLIANESE:  Objection.  Go ahead.

6    Q.        Or was the deceptive part that he

7    wasn't working the actual number of hours claimed?

8    A.        I would say both.  I don't believe that

9    he was working the hours claimed.  And the fact

10   that prior to he was giving actual hours and then

11   stopped giving actual hours in my opinion is very

12   damaging with regards to accountability.  You

13   know, why would you stop?  If you were told this

14   is the schedule, work that schedule, you don't do

15   that and you don't provide any of the former --

16   formerly provided dates and times, then to me

17   that's a big absence and omission that could lead

18   to the likelihood that you're deceiving.

19   Q.        Well, you understood there was a

20   difference of recollection between Officer Morgan

21   and Officer Roberts in terms of Officer Roberts

22   said, yeah, I told him just work Wednesdays from

23   now on and Officer Morgan said I'm generally going

24   to work Wednesdays but there may be days when I

179

```
 1    have to switch?
 2              MR. COGLIANESE:  Objection.  Go ahead.
 3    A.         I mean I don't specifically recall
 4    that.  But I knew that they had given somewhat
 5    different statements, yes.
 6    Q.         Okay.  You just chose to believe
 7    Officer Roberts rather than Officer Morgan in this
 8    particular instance?
 9    A.         Well, I believe that the indications
10    are that Officer Roberts had no reason to make
11    something up and that Officer Morgan certainly had
12    a reason to remember things differently if it was
13    in his favor because he was the one being accused
14    of not doing things the right way.
15    Q.         Okay.  So when two officers --
16    A.         Officers --
17              MR. COGLIANESE:  Well --
18    Q.         I'm sorry.  I didn't realized you
19    weren't done.
20    A.         Officer Roberts gave a statement that
21    indicated that this is what he had been told by
22    management and that he was passing that
23    information along, and so I didn't have any reason
24    to disbelieve what he had indicated.  You know, I
```

1    -- I know that everybody's memory as we've noted a

2    number of times is not perfect.  And so it's not

3    the question always of accusing somebody of lying

4    or not, it's just that's how they remember things.

5    And so I didn't have a reason to believe that

6    Officer Roberts was remembering it, you know,

7    wrong and I -- I do know that Officer Morgan had a

8    reason to say, no, it's okay, you know, I'm

9    allowed to flex my hours, you know, I had a deal,

10   they were aware of it.

11   Q.        Because --

12   A.        It could be true, but it could be made

13   up.

14   Q.        Because he was under investigation, he

15   had a reason to make it up?

16   A.        Absolutely.

17   Q.        So one officer is under investigation

18   and the other officer isn't, that's a basis for

19   concluding that the one officer is being truthful

20   and the other one isn't?

21             MR. COGLIANESE:  Objection.

22   A.        That's not the only factor that's taken

23   into consideration.  But certainly if you're the

24   one under investigation, there's kind of an

1    automatic motive to lie.

2    Q.        Okay.

3    A.           I've taught that for years, and said

4    that, you know, why do we trust an officer when

5    you say you ran a red light?  And we believe him

6    up and down, right?  But then when somebody makes

7    a complaint and says, well, they were rude to me,

8    now -- now the officer is accused.  They didn't

9    change, there's just a inbuilt motivation to deny,

10   that every, every person that talks about

11   credibility will teach you that.

12   Q.        Okay.  But typically in a CPD

13   investigation if one officer is saying this

14   officer committed misconduct and the officer who

15   is being accused says no, I didn't, here's what

16   actually happened, the investigator, the chain of

17   command, they don't generally take that as

18   anything -- as a, you know, well, this officer is

19   less credible because he's under investigation,

20   that's not -- I can't say I've ever seen that

21   cited as a factor in an investigation, that's why

22   I'm asking you about it.

23   A.           I'm not sure what the -- what the

24   question is.

1          MR. COGLIANESE:  Objection.

2    Q.          Your testimony is when one CPD officer

3    makes an allegation against another CPD officer,

4    the complaining officer is automatically more

5    credible than the focus officer?

6    A.          I didn't say that.

7    Q.          In a sort of he-said-she-said?

8    A.          I didn't say that.

9    Q.          Okay.  In the Roberts/Morgan situation,

10   Roberts -- if Roberts said, yeah, I told him to

11   show up every Wednesday 9:00 to 1:00 and Morgan

12   said 9:00 to -- Wednesday 9:00 to 1:00 was the

13   baseline, but I told him that I might not be able

14   to make it every Wednesday and I would work

15   different days, did -- that's a he-said-she-said.

16   By itself, that would be a he-said-she-said type

17   situation.

18   A.          Well, what he said --

19          MR. COGLIANESE:  Objection.

20   A.          -- was plausible.  He went to look for

21   him on a Wednesday night.  Why would you look for

22   him on a Wednesday night if you thought that he

23   was allowed to work differing shifts and, you

24   know, follow-up on what had been told by

1    management who didn't see him on a Wednesday

2    night.  Why would he look for him on a Wednesday

3    night?  So it's based on what he said, not just

4    he's the complaining --

5    Q.        It's based on what they each said and

6    then some of the surrounding circumstances is what

7    you're saying?

8    A.        Yeah.

9    Q.        Okay.  Officer Morgan was not charged

10   with or nor did he have a sustained allegation of

11   untruthful conduct in this situation, correct?

12   A.        Correct.

13   Q.        Once you recommended termination --

14   well, first of all, let me ask a basic question.

15   Your recommendation for discipline in this

16   situation was a 240-hour suspension I believe and

17   termination?

18   A.        I believe so.

19   Q.        What's the purpose of that?  Sort of --

20   I mean, obviously a six week suspension doesn't

21   really mean a whole lot if the officer is also

22   being terminated, right?

23   A.        Yep.  That was something that I saw

24   being done by previous chiefs and there wasn't a

1    lot of explanation for that in the past.  But I

2    had never been given any guidance not to do that

3    by the safety director.

4    Q.        Just sort of tradition?

5    A.        It was a little bit of tradition.  Also

6    just that, you know, in case an arbitrator or

7    somebody decided or even the safety director

8    decided that termination wasn't, you know --

9    wasn't appropriate.  Okay, but if you don't do

10   that, then do this.

11   Q.        Uh-huh.

12   A.        Because if it's either, you know --

13   Q.        It's just --

14   A.        If it's either no termination or

15   scot-free, then I think that there should be some

16   type of corrective action.  So it's my way and I

17   think previous chiefs way of saying I believe it's

18   very strong corrective action that's necessary.

19   And if you don't go for the termination, then, you

20   know, at least give them a suspension.

21   Q.        Okay.  Did you attend a director's

22   hearing in Kevin Morgan's case?

23   A.        No.

24   Q.        Do you ever attend director's hearings?

1    A.        No.

2    Q.        Okay.  Did you have any discussion with

3    -- at the time it was Director Speaks who did

4    Kevin Morgan's director's hearing.  Did you have

5    any discussion with Director Speaks about this

6    case?

7    A.        Not that I recall.

8    Q.        Would you typically?

9    A.        No.

10    Q.        Okay.  Did you have any discussions

11    with the union about trying to resolve Kevin

12    Morgan's case based on his suspension or something

13    less than a termination?

14    A.        Not that I recall.

15    Q.        Okay.  Would you typically have a

16    discussion with the union about that?

17    A.        Not that I recall, no.

18    Q.        Okay.  Did you have any role in Kevin

19    Morgan's arbitration?

20    A.        I might have very well testified.  I

21    just don't specifically remember.

22    Q.        Okay.  Do you remember that in Kevin

23    Morgan's case he -- the City attempted to deprive

24    Officer Morgan of his arbitration right because he

186

```
 1    had filed a charge with the EEOC or the civil
 2    rights commission?
 3                MR. COGLIANESE:  Objection.
 4    A.          I think I'm aware of that.
 5    Q.          Did you have any opinion or input into
 6    that decision?
 7    A.          That's not my call.
 8    Q.          Okay.  Do you know of an officer named
 9    Ricky Anderson?
10    A.          Yeah.
11    Q.          Was he terminated or disciplined at
12    some point for a time -- like, misreporting time
13    incident?
14    A.          Could be.
15    Q.          Okay.  Was he ever mentioned as a
16    comparable in Kevin Morgan's case?
17    A.          I don't know.
18    Q.          Okay.  Was that a special duty
19    situation?
20    A.          I don't know.  I don't recall what
21    you're talking about, so I can't --
22    Q.          Okay.  You recalled making a
23    disciplinary recommendation in the case involving
24    Bronson Constable and Doug Jones and some other
```

1    officers regarding misreporting leave?

2    A.          Yes.  I remember a case involving him

3    and Sergeant Jones and I'm not sure who else.

4    Q.          Would you differ with me if I said that

5    your recommendation in the Constable and Jones

6    case came within a few months of Officer Morgan's

7    case?

8    A.          Would I what?

9    Q.          Would you disagree with that general

10   timeline?

11   A.          I don't recall specifically.  But I

12   wouldn't have the facts to disagree with you.

13   Q.          Okay.  Do you remember which case

14   happened first?

15   A.          Not really.

16   Q.          Okay.  The findings in the Constable

17   and Jones case were very similar to Officer

18   Morgan's case, right?

19              MR. COGLIANESE:  Objection.  Go ahead.

20   A.          What do you mean by "findings"?

21   Q.          The findings -- the disciplinary

22   findings against the officers, a similar rule of

23   conduct, it was a similar circumstance?

24              MR. COGLIANESE:  Objection.  Go ahead.

1    A.        It could be.  I just don't remember the

2    specific charges.

3    Q.        Okay.  The officers in those -- first

4    of all, those are two sergeants, right?  Bronson

5    Constable and Doug Jones?

6    A.        Correct.

7    Q.        There was also a Sergeant Fox, I

8    believe it was, under investigation?

9    A.        Yeah, that sounds familiar.

10   Q.        And Sergeant Knight, who was Jennifer

11   Knight's husband?

12   A.        Correct.

13   Q.        As well as their lieutenant, whose name

14   escapes me at the moment was --

15   A.        Spears.

16   Q.        Spears was investigated for failure to

17   supervise?

18   A.        Uh-huh.

19   Q.        Sorry.  You have to say yes or no.  You

20   said uh-huh.

21   A.        Yes.

22   Q.        Okay.  And those are all white

23   officers?

24   A.        Yes.

1    Q.        Okay.  The allegation -- I want to

2    focus particularly on Constable and Jones because

3    I think the other officers were exonerated or

4    found to have committed less serious conduct.  But

5    the findings as to -- the investigative findings

6    as to Constable and Jones was that they had failed

7    to report to work on a number of occasions as

8    patrol sergeants for their regular duty and had

9    not submitted leave slips for those hours.  Does

10   that sound right?

11   A.        Correct.

12   Q.        Okay.  This is another investigation I

13   assume you were kept updated by Commander Knight

14   or whoever was in charge of IAB at the time?

15   A.        Yes.

16   Q.        The allegations against those sergeants

17   was sustained and recommended for departmental

18   charges?

19   A.        I know some were.  I don't know if

20   everything was.  But, yes, I do know that some

21   were, yes.

22   Q.        Well, one difference actually in this

23   case was those two officers, those two sergeants

24   were alleged to have been untruthful during their

190

1    investigations.  Does that ring a bell?

2    A.          I don't specifically recall it, but

3    I --

4    Q.          Okay.

5    A.          It could very well be.

6    Q.          If I said --

7    A.          Were they charged with untruthfulness?

8    Q.          I will represent to you they were --

9    there was an allegation of untruthfulness brought

10   up during the investigation by internal affairs,

11   and the internal affairs recommendation was not

12   sustained but the investigator indicated that it

13   was a close call.  Does that -- is any of this

14   refreshing your recollection or you just don't

15   remember this investigation?

16   A.          No, I remember --

17   Q.          Okay.

18   A.          -- the investigation as a whole.  But I

19   don't remember a lot of specific details.

20   Q.          Okay.  Do you remember that in the

21   Constable and Jones case that Bronson Constable

22   had sustained allegations against him that he had

23   failed to take leave for 19 full days that he had

24   not reported to work?

1    A.        It could be that.

2    Q.        Sounds like that ball park?

3    A.        Number, uh-huh.

4    Q.        It was a total of 152 hours of working

5    time.

6    A.        Okay.

7    Q.        And Sergeant Jones it was 23 days and

8    184 hours.  Does that sound about right?

9    A.        Could be, yeah.

10   Q.        Okay.  And it was -- I've seen some

11   news reports, I haven't done the calculations

12   myself.  But I've seen some news reports

13   indicating that the time that was not taken --

14   that leave wasn't taken for was worth seven or

15   eight thousand dollars for each officer?

16   A.        Okay.

17   Q.        Does that sound about right?

18   A.        I have no idea what their pay rate was

19   or what the amount of money that could have been,

20   but --

21   Q.        Do you recall from reading Officer

22   Morgan's investigation that he was being alleged

23   to have failed to report for 11 four-hour shifts?

24             MR. COGLIANESE:  Objection.

1   A.          Say that again.

2   Q.          The allegations against Officer Morgan

3   consisted of -- the ones where he was alleged not

4   to have shown up at all for shifts at Stratford

5   Lakes was for 11 four-hour shifts?

6   A.          Well, you said alleged.  I mean, I -- I

7   don't know that that number represents all the

8   allegations.

9   Q.          Those are the sustained allegations.

10  A.          Okay.

11  Q.          The sustained allegations were 11

12  four-hour shift and then a few partial?

13  A.          You didn't say sustained before.

14  Q.          I'm sorry.  I refer to them as alleged

15  because Officer Morgan does not --

16  A.          But I think there were other dates that

17  were alleged as well, so.

18  Q.          Sure.  So for these purposes, I'm

19  talking about the sustained allegations confirmed

20  by the division of police, consisted of 11

21  four-hour shifts and then a few partial shifts?

22  A.          That sounds right.

23  Q.          Okay.  And so roughly -- so if you take

24  that as, you know -- anyway, bottom line is it was

1   a much fewer number of hours than Constable and

2   Jones overall?

3   A.          However you want to describe much,

4   it's --

5   Q.          Okay.

6   A.          -- a difference.

7   Q.          I mean about a quarter?

8   A.          And smaller.

9   Q.          It's about a quarter, right?  I mean --

10  A.          Eleven and nineteen are not a quarter.

11  Q.          I guess I would say a third.  Well, but

12  it's 11 four-hour shifts versus 19 eight-hour

13  shifts?

14  A.          Okay.

15  Q.          So you're talking about a far less -- a

16  far lower amount of time?

17              MR. COGLIANESE:  Objection.

18  Q.          Do you disagree with that

19  characterization?

20  A.          Amount of time, it's definitely a

21  difference, yes.

22  Q.          Yeah.  The amount of time and money at

23  stake in the Constable and Jones case was much

24  more than the amount of time and money at stake in

1    the Morgan case?

2              MR. COGLIANESE:  Objection.

3    A.        You can characterize it that way if

4    you'd like.

5    Q.        Okay.  Well, would you characterize it

6    that way?

7    A.        There was a difference.  Yes.

8    Q.        And it was a fairly -- I mean, in terms

9    of proportions, it was a fairly large difference?

10             MR. COGLIANESE:  Objection.

11   A.        I don't know what the numbers are.  But

12   yeah, it was smaller.

13   Q.        Okay.  Does it matter in an

14   investigation -- like in terms of the discipline

15   whether an officer failed to report for one shift

16   or 20 shifts?

17   A.        Yes.

18   Q.        Okay.  So quantity of time and money

19   being, you know, misreported or stolen matters?

20   A.        Yeah.  I don't look at it as the money

21   because pay rates are different and all that kind

22   of stuff.  I mean, certainly I need to be

23   conscious of the fact that, you know, the

24   taxpayers are paying our salaries.  Special duty

195

```
 1    employers are paying special duty employee

 2    salaries.  But it's the act of misrepresenting or

 3    not being present or not being on time that is

 4    most relevant.

 5    Q.          Okay.  But the quantity matters, too,

 6    in terms -- for instance, an officer comes into

 7    work 20 minutes late 10 days in a row versus the

 8    officer just skips 10 shifts in a row, that's a

 9    different volume of misconduct, right?

10              MR. COGLIANESE:  Objection.

11    A.          There's a different amount, but it

12    doesn't mean that the behavior is less serious.

13    Q.          Okay.  So you can see disciplining two

14    officers the same for one of them shows up late 10

15    days in a row and one of them just doesn't show up

16    10 days in a row?

17              MR. COGLIANESE:  Objection.

18    A.          It depends on the circumstances.  I

19    mean, were they ordered to be here the next day,

20    you know, were they, you know -- I mean, the facts

21    of each case matter.  And I can't theoretically

22    say one is different than the other without

23    knowing what each situation is and calls for and

24    what the responses would be and who was aware and
```

1    all of that.

2    Q.        Okay.  So you can't tell me whether

3    skipping 20 minutes of a shift is the same as

4    skipping the shift?

5                MR. COGLIANESE:  Objection.

6    A.        There's a difference.  But as far as

7    the outcome of a disciplinary decision, it still

8    depends on what the facts are.

9    Q.        Okay.  Assuming every other fact about

10   the case is the same, there's no special order or

11   no, you know -- anything like that, wouldn't you

12   expect that the disciplinary recommendation all

13   the way up the chain and including yourself would

14   be more for the officer who skips an entire shift

15   than the officer who skips 20 minutes of a shift?

16               MR. COGLIANESE:  Objection.

17   A.        If every single thing is the same, the

18   defense is the same, there might be a difference.

19   Q.        Okay.  Do you remember -- first of all,

20   it was Daniel Weaver that did the investigation of

21   Constable and Jones.  Does that ring any bells?

22   A.        Sounds likely.

23   Q.        Okay.  Do you remember -- first of all,

24   the officers, Sergeant Jones, Sergeant Constable

1    never admitted any of their alleged misconduct?

2    A.        Well, Sergeant Jones came forward after

3    Constable was accused and said I might have

4    misreported some of my time, so he in one sense

5    came forward with potential errors, but ultimately

6    he denied that he had stolen time.

7    Q.        And Constable said that he never did

8    anything wrong and he submitted leave slips for

9    every hour of time that he missed?

10   A.        Well, I think that's the gist of that,

11   yeah.

12   Q.        And in Sergeant Jones's case the fact

13   that he came forward with additional leave slips

14   that he had not previously submitted was actually

15   pretty strong evidence of his other misconduct

16   that he didn't admit?

17   A.        It didn't help him at all.

18   Q.        In fact, it made it appear that he was

19   being purposefully dishonest?

20   A.        Well, misleading at least, yeah.

21   Q.        Because he had come forward with leave

22   slips for time that he had not reported missing,

23   and it happened that every single new leave slip

24   he came up with he had in fact not previously

1    submitted leave for and he had no way to know that

2    without knowing that he hadn't done it.

3              MR. COGLIANESE:  Objection.

4    A.        I don't remember all that specific.

5    Q.        Well, does that sound familiar?

6    Basically he had no way to know which time he had

7    missed that he had reported leave for and which

8    time he hadn't reported leave for within a

9    particular pay period?

10   A.        That could be.

11   Q.        And yet he somehow guessed which days

12   he had and hadn't reported?

13   A.        That could be.

14   Q.        Do you remember that Sergeant Weaver

15   had done some sort of back-of-the-envelope

16   calculations and come up with, you know, that it

17   was sort of extremely unlikely that somebody would

18   randomly guess correctly on those?

19   A.        I don't remember that.

20   Q.        It was discussed at the chief's

21   hearing, so I didn't -- it was like a 1 and 256

22   chance or something.  I'm --

23   A.        I'm --

24   Q.        I'm just asking your memory.

1    A.        I'm saying I don't recall it.

2    Q.        Okay.  But it was something along those

3    lines, that it was the fact that he had come up

4    with those leave slips made it seem more likely

5    that he was intentionally failing to submit leave?

6    A.        Yeah.

7    Q.        Which he did not admit to?

8    A.        Yes.  To the best of my recollection,

9    neither one of them accepted responsibility for

10   any errors.

11   Q.        Okay.  And certainly not for any

12   intentional misconduct?

13   A.        Correct.

14   Q.        The allegations against those officers

15   were widely reported in the media, it was an

16   embarrassment for the department.

17   A.        Yes.

18   Q.        Do you remember seeing and knowing

19   about the news articles at the time?

20   A.        I can't imagine that I wasn't.

21   Q.        Okay.  In both of their cases the

22   allegations against the officers were submitted

23   for criminal investigation, just like in Morgan's

24   case.

1    A.        Is that a question?

2    Q.        Yeah.

3    A.        Yes.

4    Q.        Okay.  And the officer who did the

5    criminal investigation, do you remember who that

6    was?

7    A.        No.

8    Q.        Okay.  But you remember it wasn't

9    prosecuted criminally?

10   A.        Correct.

11   Q.        Do you recall that it was prosecutor

12   Jeff Blake that made that decision?

13   A.        I thought Ron O'Brien had weighed in on

14   that.

15   Q.        Do you remember that the reason for the

16   lack of prosecution was extremely similar to the

17   reasoning that we talked about earlier for not

18   prosecuting Officer Morgan?

19             MR. COGLIANESE:  Objection.  Go ahead.

20   A.        No.  What I recalled was that the

21   reasons were is that our recordkeeping system was

22   such a mess that because we had records of people

23   actually doing the opposite, you know, they were

24   actually at work when we didn't have a record of

```
 1   them being at work and vice versa, that our
 2   recordkeeping system was such a mess that we
 3   couldn't successfully prove that leave slips had
 4   not been turned in.  And so I thought that the
 5   opinion was such that damaged even our
 6   administrative case because of the opinion of -- I
 7   thought it came from Ron O'Brien but maybe it
 8   didn't.  I don't know.
 9   Q.        What you're describing to me sounds a
10   lot like what Jeff Blake said in Officer Morgan's
11   case, which was there weren't very good records of
12   the special duty assignment that Officer Morgan
13   was participating in.  And the -- the property
14   manager for the department complex herself had
15   said that she wanted the officers to vary their
16   hours and be a little unpredictable and keep
17   people on their toes.  That -- you think that you
18   see those as very different explanations for not
19   prosecuting?
20             MR. COGLIANESE:  Objection.
21   A.        I -- that's kind of a convoluted
22   statement there.  The systems both might have had
23   errors, not the same kind of error.  We had a
24   leave slip request system in place that is nothing
```

1   like what Officer Morgan is accused of.  You know,

2   you requested leave by putting a slip in the

3   supervisor's tray.  The supervisor is supposed to

4   sign it, take it into payroll and it gets

5   processed.  That has nothing to do with Officer

6   Morgan's case.  He wasn't requesting leave.  He

7   wasn't saying, hey, I'm going to be off this day

8   or anything like that.  So I don't see a

9   similarity in the timekeeping process.

10  Q.         In both cases --

11  A.         Both.

12  Q.         I'm sorry.  Go ahead.

13  A.         Both of them, you know, relied on

14  peoples' integrity to a large degree.  And both

15  systems ended up being abused in my opinion by

16  people that were less than integrity [sic].

17  Q.         Okay.  So it sounds to me like you're

18  agreeing with me that in both cases what the

19  prosecutor's office reported was it would be

20  difficult to prove or disprove the officer's

21  claims who are under investigation and there

22  weren't going to be records that could sort of

23  demonstratively discredit or be used to prove the

24  criminal investigation.

203

```
 1              MR. COGLIANESE:  Objection.
 2    A.         I think that was part of the decision
 3    making.  Not all of it for each one, they each had
 4    different factors, but, yeah.
 5    Q.         You mentioned the taxpayers and the
 6    private companies that pay for special duty --
 7    taxpayers pay your salaries for the police
 8    officers, and in special duty cases you're talking
 9    about private companies paying for the services?
10    A.         Of a special duty officer.
11    Q.         Yeah.
12    A.         Correct.
13    Q.         Does that make one or the other more or
14    less important in terms of discipline?
15    A.         It goes back to the act itself.  You
16    know, is it stealing, is it deception, is it
17    double dipping, all of that.
18    Q.         I guess I'm asking if you make a
19    distinction between those things or whether
20    they're all just wrong.
21    A.         I don't consider it to be a big
22    difference, no.
23    Q.         Would you agree with me that the
24    investigation of Constable and Jones was more
```

204

1  thorough than the investigation in Morgan's case?

2  A.          I don't have any basis to say that.

3  Q.          Well, do you remember that an officer

4  in the Constable and Jones case, they didn't just

5  check the duty roster and compare it to their

6  leave slips, they actually went through and they

7  examined the officer's radio logs and walkie

8  records and ID swipes, they went so far as to look

9  through all the officer's e-mails to see whether

10  they might have been sending e-mails on the days

11  when they weren't on the duty roster to see if

12  they could fill in any of the time for the

13  officers?  Do you remember any of that stuff?

14  A.          I would say I remember that it seemed

15  like it was taking forever.  And when I kept

16  saying, you know, where is it, where is it, where

17  is it, they said, well, we're out of the records

18  warehouse going through records or something along

19  those lines.  And so I do remember that I was

20  constantly being told that there were more records

21  that they were searching and more records that

22  they were searching, and so whether that amounts

23  to more thorough, you know, it certainly sounds

24  like there were a lot of records that were

205

1    checked.

2    Q.         Okay.  And a lot of the records that I

3    just mentioned were actually ways that could have

4    been used to corroborate Sergeant Constable or

5    Sergeant Jones' claims that they might have been

6    in the workplace rather than absent without leave?

7    A.         Well, I mean it's just to get to the

8    facts.  Whether -- purpose -- you're alluding that

9    there's a purpose in it.  In my opinion it's to

10   try to check the records that are available to see

11   what it tells us.

12   Q.         Right.

13   A.         It's getting to the facts.

14   Q.         But the purpose is to rule out the

15   possibility or rule in the possibility that the

16   officers were actually working as opposed to

17   missing time without leave.

18   A.         Well, it's to determine whether or not

19   there's any evidence that says that they were at

20   work or not.

21   Q.         Okay.

22   A.         I mean, it's --

23   Q.         In every single one of the cases, in

24   every single date that was at issue, the starting

206

1    point for the investigation was Sergeant Constable

2    and Sergeant Jones were not on the duty roster

3    that was kept for the patrol sergeants, but they

4    had also not submitted a leave slip, and it was

5    not the case in this investigation that sergeant

6    Weaver just said, okay, well, the evidence is

7    you're not on the duty roster, so you're not at

8    work, let's see if there's a leave slip, end of

9    story.  He went further and said, okay, maybe they

10   weren't on the duty roster but maybe they sent an

11   e-mail, maybe they swiped their badge, maybe they

12   did this.  All of those methods were ways to

13   determine whether or not the officers were on duty

14   beyond just the initial evidence that they

15   weren't, right?

16             MR. COGLIANESE:  Objection.

17   A.        Yeah.  I mean, it's to find out what --

18   what happened, if they were working, if they

19   weren't working, if there was any evidence that

20   supported it one way or the other.

21   Q.        In addition to all of those methods,

22   Sergeant Weaver also pulled all of the leave slips

23   and duty rosters for the other sergeants in the

24   same unit.  Do you remember that?

```
 1    A.          Yeah.  I know that other sergeants were

 2    looked at and that's how I believe Fox and Knight

 3    got looked at.  I don't know who he considered to

 4    be the unit, but, yeah.

 5    Q.          So I mean Knight for instance was the

 6    complaining officer; do you remember that?

 7    A.          Correct.

 8    Q.          And he ended up getting disciplinary

 9    allegations against him, they were ultimately

10    exonerated.  But he became a focus --

11    A.          Yes.

12    Q.          -- because Sergeant Weaver decided to

13    pull all of the records for the other officers?

14    A.          Yes.

15    Q.          Which was not -- that was not done in

16    Officer Morgan's case for the Stratford Lakes job,

17    for instance?  You're not aware of any other

18    officers --

19    A.          No.

20    Q.          -- whose time for marking in service

21    was pulled for that job?

22    A.          Correct.

23    Q.          You knew -- I think we alluded to this

24    before, but you knew Bronson Constable had a prior
```

1    untruthfulness on his record?

2    A.          I was aware of that.

3    Q.          Because he was on the 1010 or Brady

4    list of officers who are -- probably shouldn't

5    testify in criminal proceedings?

6    A.          Well, it --

7    Q.          It would have to be disclosed?

8    A.          Yes.  Yes.

9    Q.          Okay.

10   A.          Yeah.  Whether they should testify or

11   not is as opinion.  But they need to disclose that

12   they've been found to be untruthful in the past.

13   Q.          Okay.  Which is a serious problem for

14   an officer's career?

15   A.          Yes, it is.

16   Q.          Okay.  In that investigation, do you

17   remember input whether you got input from

18   professional standards before the -- before the

19   chief's hearing or after the hearing about

20   comparables?

21   A.          Specifically what investigation are you

22   referring to?

23   Q.          The Constable and Jones and Fox and

24   Knight?

1   A.        Oh, I thought you might have been

2   referring to the 1010 one.

3   Q.        No.  I'm sorry.  The 1010 investigation

4   you had no involvement with, I assume?

5   A.        No.

6   Q.        Okay.  In fact, in -- but you're aware

7   -- I've seen the 1010 list, we can pull it out if

8   you want.  But it says on the 1010 list he had

9   three sustained allegations of untruthful against

10  him.

11  A.        That might be, I --

12  Q.        1010 list --

13  A.        -- I don't remember the number.

14  Q.        The 1010 list is one of the records in

15  the department that stays as long as the officer

16  is in the department -- in the division, as

17  opposed to other things that are required to be

18  expunged over time.

19  A.        Now, yeah.  We didn't have that policy

20  in the contract prior to 20 -- what -- '13 or '12,

21  something like that.

22  Q.        Okay.  But at the time we're talking

23  about, the 1010 list was permanent?

24  A.        Now it is, yes.

210

1   Q.        Right.  Now and in the 2013

2   renegotiation or whatever year it was you're

3   talking about.

4   A.        Yeah, as far as I know.

5   Q.        Okay.  Certainly during ties frame that

6   I am that we're talking about, the 2014-2015.

7   A.        As far as I know, yes.  There was a lot

8   of negotiation back and forth about the creation

9   of that list and who should be on it.

10   Q.        And Bronson Constable was on it?

11   A.        I believe so.

12   Q.        Okay.  But I'm -- so in terms of the

13   theft of time, misreporting leave investigation of

14   Constable and Jones and the other officers, I

15   assume there was a chief's hearing?

16   A.        Yes.

17   Q.        And do you remember whether you got

18   comparables before the hearing or after the

19   hearing?

20   A.      No.

21   Q.        Okay.

22   A.        Not specifically.

23   Q.        Do you remember whether it was in

24   writing or verbally?

1    A.        No.

2    Q.        Do you remember whether there were any

3    comparables presented?

4    A.        I assume that we talked about similar

5    cases that had, you know -- and I just don't

6    remember the timing.  I don't know if Officer

7    LaRoche or Kirby were prior to or after.  I

8    just --

9    Q.        I think they were both prior to.

10   A.        Okay.  So they probably would have come

11   up.

12   Q.        You think they were probably discussed?

13   A.        Yeah.

14   Q.        Do you think Officer Morgan's case came

15   up?

16   A.        Like I said before, I don't know

17   which --

18   Q.        It was like three-month --

19   A.        -- occurred first.

20   Q.        -- difference in the hearing.

21   A.        Who was first?

22   Q.        Morgan.

23   A.        Okay.  So in Jones and Constable, I

24   would have already made a decision on Kevin's.

212

1    Q.          Morgan's.  Yes.

2    A.          Yeah.  It very well -- I mean, there's

3    a good chance that it could have been discussed,

4    yes.

5    Q.          Okay.  Why did you impose -- you

6    remember you imposed 240 hours suspensions for

7    Bronson Constable and Doug Jones?

8    A.          I'm sorry.

9    Q.          I'm sorry.  You recommended 240 hours

10   suspensions for Bronson Constable and Doug Jones.

11   A.          Yes.

12   Q.          Not termination.

13   A.          Correct.

14   Q.          Not demotion to officer.

15   A.          Correct.

16   Q.          Why that disciplinary recommendation

17   and not termination or demotion?

18   A.          I thought that termination was

19   certainly on the table.  I was appalled.  I did

20   not like the fact that they didn't take any

21   responsibility for it.  I didn't trust Sergeant

22   Constable, as I stated before.  But I felt that

23   the evidence was not as strong I guess if we're

24   comparing these two cases.  The criminal

1    investigation and the comments about our leave

2    keeping system were pretty damaging to the

3    evidence.  And I thought that a 240-hour

4    suspension was probably the best that was going to

5    be able to happen out of this.  And if I thought

6    that I could have gotten a termination, I probably

7    would have recommended a termination.  This was

8    one of those I think where the FOP was as we

9    discussed earlier fighting very strenuously to

10   defend their honor, if you will, that they had

11   some.  So that was at least some line of the

12   reasoning that I had.  You know, I was sure that

13   it had happened, but I thought the evidence was

14   not the best.

15   Q.        Well, first of all, was there any

16   difference of opinion in the -- after the chief's

17   -- discussion after the chief's hearing about

18   whether they should go to termination?

19   A.        Difference of opinion.

20   Q.        Yeah.  Did Deputy Chief Kuebler make a

21   different recommendation, did anyone else?

22   A.        I don't recall.

23   Q.        What was the nature of the FOP's

24   advocacy in this situation that led you to believe

1    they were defending their honor more?

2    A.        They just wanted to believe that it was

3    all the fault of the leave keeping system --

4    Q.        Okay.

5    A.        -- the correspondence system.  And it

6    was a very large loophole if you will that had

7    been pointed out by the prosecutor's office.  And

8    that not -- not their fault for, you know, putting

9    a piece of paper in a tray and it never getting

10   processed, so they were -- what I recall -- and I

11   don't even remember who they were.  But I just

12   remember that it was pretty adamant that we didn't

13   have the evidence, period, let alone, you know,

14   51 percent.

15   Q.        After getting that notification from

16   the prosecutor's office, didn't Sergeant Weaver

17   address that potential loophole by comparing

18   Constable and Jones' time with the other officers

19   and sort of getting a baseline for the potential

20   errors in the system?

21   A.        I don't remember any timing on that

22   particular thing.  But I --

23   Q.        Well, the criminal investigation was

24   over before the administrative investigation

1    started as almost always happens, right?

2    A.        Well, oftentimes there's some

3    administrative investigation occurring during the

4    pendency of the criminal investigation but for

5    interviews of the focus officer.  So I don't know

6    when that was, but I don't consider it to be -- it

7    might very well have been that with that

8    information he did further investigation.

9    Q.        Okay.  You remember by the end of the

10   investigation Sergeant Weaver felt it was -- the

11   charges against the officers could be sustained

12   based on the fact that it was extremely unlikely,

13   if not impossible that these two sergeants and

14   only these two sergeants would have a much, much

15   larger number of missing leave slips than anybody

16   else in the unit?

17   A.        He convinced me that they were guilty

18   of the charges.

19   Q.        And none of that information to your

20   knowledge was used by or presented to Ron

21   O'Brien's office prior to their determination?

22   A.        I don't know.

23   Q.        Okay.

24   A.        I don't -- I don't know what was

1    presented to the prosecutor's office.

2    Q.        Okay.  Have you seen arbitration

3    proceedings where a letter from the prosecutor

4    declining criminal prosecution -- or criminal

5    charges was used in the arbitration?

6    A.        I don't remember any specific

7    arbitration hearing that went like that.

8    Q.        Okay.  I had asked previously about the

9    FOP's advocacy, and I guess I just want to

10   clarify.  I understand what the substance of their

11   advocacy was.  I'm just asking you what was the

12   nature of their advocacy.  Like did somebody from

13   the FOP come talk to you about these cases?

14   A.        Not that I recall.

15   Q.        Okay.

16   A.        It's their defense in the hearing.

17   Q.        At the chief's hearing?

18   A.        I mean, sometimes their -- either their

19   attorney or the FOP members are pounding their

20   first and, arg, you can't find this person guilty,

21   you know, da-da, da-da, da-da.

22   Q.        Just louder?

23   A.        Maybe, yeah.

24   Q.        Okay.  The suspensions that you

1    recommended against Constable and Jones were

2    concurrent, two concurrent 240-hour suspensions

3    for each of them.  Do you remember that?

4    A.          That sounds familiar.

5    Q.          Okay.  What's the purpose of a

6    concurrent six-week suspension?

7    A.          Well, six weeks is the max.

8    Q.          Okay.

9    A.          So you can't do more than that.

10   Q.          Okay.

11   A.          So you could say 12 weeks, but it's not

12   going to be 12 weeks.  It's going to be six weeks,

13   that's the max.

14   Q.          Okay.

15   A.          But in general I try to give a level of

16   disciplinary recommendation for each charge.  So

17   that -- I believe in this case that we're talking

18   about today, you know, there might be departmental

19   charges, but not everything would warrant

20   termination.  But by stating what it would be, at

21   least you're on record as to what this would have

22   been but for a suspension of longer term or, you

23   know, termination or something like that.  But

24   because my disciplinary recommendations are often

218

1   compared to each other by other people, I want to

2   be on record with different charges.  You know, if

3   it was a stand-alone charge, this is what it would

4   be, you know, that kind of thing.  Does that make

5   sense?

6   Q.        I guess I'm not going to render an

7   opinion on that.

8             What's the practical consequence for

9   the officer?  Is there any?

10  A.        If the director would decide on a

11  240-hour suspension, it would still be a six-week

12  suspension --

13  Q.        But --

14  A.        -- whether it's concurrent or not.

15  Q.        Okay.  But two concurrent 240-hours

16  suspensions has the same practical impact on the

17  officer as one?

18  A.        They would lose six weeks of pay.

19  Q.        Either way?

20  A.        Correct.

21  Q.        Okay.  Do you recall that this case was

22  settled prior to the safety director's

23  determination?

24  A.        I remembered that it was settled.  I

1     just don't know the timing.

2     Q.         Okay.

3     A.         I don't know if they had had a hearing,

4     if they hadn't had a hearing, but I know that it

5     was settled.

6     Q.         Okay. Do you remember that the outcome

7     of the settlement was that they reduced the

8     suspension for each officer from two concurrent

9     240-hour suspensions to one 240-hour suspension?

10     A.         I just remembered a 240-hour

11     suspension.

12     Q.         Okay. But that was -- I mean, your

13     recommended discipline was 240 hours twice at the

14     same time, concurrent, right?

15     A.         Yeah.

16     Q.         And the settlement of the suspension

17     was one 240-hour suspension?

18     A.         Correct.

19     Q.         Do you have any explanation for what

20     possible benefit the officers would get from

21     agreeing to a settlement like that?

22            MR. COGLIANESE: Objection. Go ahead.

23     A.         Benefit to the officers?

24     Q.         Yeah. There was no practical impact;

220

1    we just talked about that; they lose the same

2    amount of pay either way.

3    A.          Correct.

4    Q.          Is there -- there's no -- so what's the

5    point?  What was the point of the settlement like

6    that?

7    A.          You'd have to ask them.

8                MR. COGLIANESE:  Objection.

9    Q.          Okay.  Did you have any discussions

10   with the safety director about the settlement of

11   that charge?

12   A.          Not that I recall.

13   Q.          Okay.  Could the safety director have

14   terminated these officers despite your

15   recommendation of suspension?

16   A.          Absolutely.

17   Q.          Okay.  Do you remember whether these

18   officers were charged with a Rule 1.4 -- 1.04

19   charge?

20   A.          I don't recall specifically.

21   Q.          Okay.

22   A.          I don't think so.

23   Q.          Do you remember writing in a 1.04 for

24   these officers?

221

```
1    A.         I don't remember that.

2    Q.         Okay.  Kevin Morgan's case at least

3    until the filing of his lawsuit did not appear in

4    any media coverage.  Are you aware of any that I'm

5    not?

6    A.         I don't recall.

7    Q.         Okay.  You don't have the same

8    recollection that it was a widely reported sort of

9    public issue?

10   A.         I don't remember it being widely

11   reported.

12   Q.         Okay.  Did the safety director have to

13   agree to a settlement with Constable and Jones, do

14   you know?

15              MR. COGLIANESE:  Objection.

16   Q.         Is that typically what the nature of

17   the settlement is?

18   A.         They're the only ones that can approve

19   one.

20   Q.         Okay.  You can't settle cases?

21   A.         I cannot.

22   Q.         Okay.  And you were not involved in the

23   settlement discussions at all?

24   A.         No.
```

1  Q.        Okay.  Do you remember Zane Kirby's

2  case?  I think we mentioned it a little earlier.

3  A.        Somewhat.

4  Q.        Okay.  Do you remember his -- first of

5  all, Kirby was charged like Officer Morgan and

6  like Sergeant Constable and Sergeant Jones with

7  receiving pay for hours that he didn't work or

8  receiving --

9  A.        His was about --

10  Q.        -- credit for --

11  A.        His was about not being at work when he

12  was supposed to be, yes.

13  Q.        Right.  But he was paid for those

14  hours?

15  A.        Yes.

16  Q.        His case was not investigated by

17  internal affairs, it was investigated by his own

18  chain of command.  Do you remember that?

19  A.        Yes.

20  Q.        Do you have an explanation for why that

21  would be?

22  A.        It seemed like it was a fairly

23  straightforward case.  He admitted to behavior at

24  some point in time it seems like it was fairly,

223

```
1    fairly quick.  It wasn't in my opinion an

2    extensive number of dates.  And Sergeant Reffitt

3    was a former internal affairs supervisor or

4    investigator, so we knew that she had the ability

5    to get it done.  And I'm always about trying to

6    get it done as quickly as possible when possible.

7    If there's, you know, good reasons to get them

8    over with as quickly as possible.

9    Q.          Okay.  No criminal investigation of

10   Kirby's case?

11   A.          I don't think there was, no.

12   Q.          Why not?

13               MR. COGLIANESE:  Objection.  Go ahead.

14   A.          Because I generally prefer that there

15   not be criminal investigations.  And because of

16   the number of days being fairly short, I thought

17   it was prudent to get this done.

18   Q.          Okay.

19   A.          With the number of criminal

20   investigations that we've had that have not

21   resulted in charges, you know, I continue to be

22   confident that that's going to be a rare

23   occurrence when we get a charge filed against an

24   officer with such charges, allegations.
```

224

1    Q.        Okay.  Officer Kirby originally claimed

2    in response to Sergeant Reffitt's investigative

3    interview questions that he -- there was a

4    particular day out of the days when he was being

5    investigated for where he was not receiving pay

6    for time he hadn't worked but he had actually

7    worked from them.  Do you remember that?

8    A.        That sounds familiar.

9    Q.        And he claimed that he was installing a

10   particular kind of surveillance software that he

11   was using in his investigative work?

12   A.        I think that sounds familiar.

13   Q.        Okay.  And then in a second interview

14   after Sergeant Reffitt had started asking

15   questions of some of his fellow officers about

16   that software, he came in and admitted that in

17   fact he did not work from home on that date and he

18   just was overwhelmed with -- he was exhausted from

19   working a long week and he just took the day off

20   without permission?

21   A.        Uh-huh.

22   Q.        I'm sorry.  You have to say yes or no.

23   A.        Yes.

24   Q.        And then in a third interview with

1    Sergeant Reffitt when Sergeant Reffitt was

2    instructed to ask him about why he had lied about

3    that day, he admitted that he had purposefully

4    lied but that he -- he admitted to the lie because

5    he realized he had been caught and he was

6    concerned about the consequences.  Does that all

7    sound familiar?

8    A.         Yes.

9               MR. COGLIANESE:  Objection.

10   A.         It's starting to trigger my memories.

11   Q.         And then do you remember at the chief's

12   hearing in Officer Kirby's case you asked him

13   about working from home on that date and he

14   actually told you in the chief's hearing that he

15   had worked from home installing the same software

16   that he had falsely claimed to Sergeant Reffitt?

17   A.         I don't recall the specific comments,

18   no.

19   Q.         Okay.  Can I get 8.

20              While they're looking for that, I want

21   to ask you, I mean, you understood prior to the

22   chief's hearing that Officer Kirby had been

23   purposefully dishonest during the investigation of

24   his time theft investigation, right?

226

1   A.          I would have to assume if that was

2   included in the investigation that I was aware of

3   it, yes.

4   Q.          I mean, not only was it included in the

5   investigation but the deputy chief, I think it was

6   Deputy Chief Gray -- oh, no, Deputy Chief Bash had

7   actually repeatedly had to ask Sergeant Reffitt to

8   go back and do follow-up to figure out why he had

9   been untruthful and delve further into that pretty

10  serious charge.  You don't remember any of that?

11  A.          No.

12  Q.          Okay.

13  A.          I have no specific memory of that.

14  Q.          Okay.  But certainly if it was in with

15  the packet that you were presented prior to the

16  chief's hearing, you would have known at the time

17  the events that I just described where he

18  originally claimed he worked from home.

19  A.          If it was spelled out, I would have

20  been aware of it.

21  Q.          If it was spelled out.

22              One of the charges prior to the chief's

23  hearing was untruthfulness, so certainly that

24  would have been one of the things you were

227

```
 1    focusing on.

 2    A.          Okay.

 3    Q.          I'm asking you.

 4    A.          I don't know what the charges were.

 5    Q.          Okay.  Give me 4.  Well, actually, give

 6    me 9.  Might as well get 4, too.  I'm handing you

 7    what's previously been marked as Plaintiff's

 8    Exhibit 4.  And when I say "previously," I mean we

 9    premarked it; it hasn't been used previously.  And

10    I am just going to call your attention to the

11    first couple pages.  These are the charges that

12    were issued to Sergeant Kirby prior to the chief's

13    hearing, right, the first page and the second and

14    the third?

15    A.          Yes.

16    Q.          Charge II, specification I is that on

17    December 10th, 2013, he was untruthful to Sergeant

18    Denise Reffitt during an administrative interview

19    when he stated that he performed his December 6th,

20    2016 tour of duty by working from home, and he

21    knew at the time he made these statements that

22    they were untruthful.  Right?

23    A.          Yes.

24    Q.          And if you take a look at -- if you
```

1    flip through Exhibit 4, the first -- fairly early

2    on in this packet, the first interview is marked

3    for December 10th, 2013.  If you flip a few pages.

4    A.        What page is it?

5    Q.        The exhibit isn't paginated, but if you

6    go about 10 or 15 pages in, you'll start to see at

7    the top.

8    A.        What am I looking for?

9    Q.        December 10th, 2013 interview.

10            MR. COGLIANESE:  And why don't you

11   count the pages and tell her where you're at so

12   that way you guys are on the same page.

13   Q.        If you hand it to me, I'll find it for

14   you.

15            So here's the start of the December

16   10th interview.  Do you see that at the top?

17   A.        Uh-huh.

18   Q.        And there's pages numbers for each

19   page --

20   A.        Yes.

21   Q.        -- of the interview.  Can you flip to

22   page 14 of that interview?

23   A.        Okay.

24   Q.        And on this page 14 she's asking him

1    about December 6th.  Do you see that at the top?

2    Or toward the top?

3    A.        On page 14?

4    Q.        Yeah.

5    A.        I see November 22nd being referenced

6    there.

7    Q.        And then she says, "So, I'm looking at

8    December 6th, why nobody saw you, there are no

9    card swipes for that day."

10   A.        Yes, I see that.

11   Q.        Okay.  And then a few responses down he

12   says, "I don't know if this counts, but I'm going

13   to throw it out there.  Chris Kline...I worked

14   from home that day, Sarge."  I'm not sure what the

15   Chris Kline is.  Do you see that?

16   A.        I do.

17   Q.        Okay.  So he's saying he worked from

18   home on December 6th, and his answer a couple

19   answers down is that he was installing software on

20   a laptop used for scanning Wi-Fi networks?

21   A.        Correct.

22   Q.        Then I'll flip a few more pages in here

23   for you.  This is page 5 of his second interview

24   with Sergeant Reffitt which was on February 5th of

1  2014.  And at the very bottom of the page Sergeant

2  Reffitt says, "Okay, alright, on December 6th you

3  did not report to work.  That's a Friday.  What's

4  your explanation?"

5  A.        I see it.

6  Q.        And his answer is, "On that Friday I

7  had, that week was a busy week as well.  Um, and I

8  had worked over my 8 hour tour several days that

9  week.  When Friday came, I was exhausted.  I

10  stayed at home and needed a break."

11         And Sergeant Reffitt says, "So you

12  didn't work from home...you just took the day?"

13  And he says "Correct."

14         And she goes further on in that page,

15  you can see she's specifically saying, "previously

16  you have told me...you worked from home.  So, I

17  take it that was not correct."  And he says the

18  reality was he was exhausted and he didn't work.

19  Do you see all that?

20  A.        I do.

21  Q.        Okay.  And then I'll flip for you one

22  more time if you hand it back to me.  The third

23  interview from April of 2014, the very bottom of

24  the fifth page of that interview, Sergeant Reffitt

1    asks him why he was untruthful in the first

2    interview and why he admitted it in the second

3    interview.  And his answer was that he panicked.

4    And then if you look at the second answer down on

5    page 6, he says in terms of why he was truthful in

6    the second time, he said I knew that I had been

7    caught.  Do you see that?

8    A.        Uh-huh.

9    Q.        Okay.

10   A.        Yes.

11   Q.        This was all information that you would

12   have had at the time that the chief's hearing was

13   scheduled and the charges were issued?

14   A.        Correct.

15   Q.        So now I'm going to hand you what's

16   been marked as Plaintiff's Exhibit 8, which is a

17   transcript of the chief's hearing.  And if you

18   could turn to the third page of that, oops, I

19   should be following along.  Do you see at the top

20   of the page 3, in the middle of his answer he says

21   December 6th, which was a Friday, do you see that

22   part?

23   A.        Uh-huh.  Yes.

24   Q.        He says December 6th -- and that's the

1    same date that we were just talking about in those

2    three prior interviews, right?

3    A.         Correct.

4    Q.         So "December 6th, which was a Friday, I

5    stayed home.  I worked on a program known as

6    Flying Squirrel."  And he then describes the same

7    software that's supposedly used for intercepting

8    Wi-Fi signals or something like that.  Do you see

9    that?

10   A.         Yeah.

11   Q.         So in the chief's hearing he's going

12   back to the original untruthful explanation that

13   he gave to Sergeant Reffitt in his first

14   interview.  He's not saying he's exhausted, he's

15   not saying he just missed work.  He's saying, oh,

16   no, I worked from home, I installed this software,

17   the same answer he gave in the first interview.

18   A.         He gave a similar explanation as he did

19   in the first interview.

20   Q.         The one that he later admitted to

21   Sergeant Reffitt was false.

22   A.         Correct.

23   Q.         And I don't know if you remember this

24   from the investigation, but it turned out that

1    what he was describing doing while he was working

2    from home was not actually possible on his

3    computer.

4    A.          I don't recall that.

5    Q.          Okay.  I mean it's in the investigative

6    packet, we can -- I don't want to spend the time

7    going through it.

8    A.          Okay.

9    Q.          But the reason why his lieutenant

10   concluded, lieutenant -- I think it was Lieutenant

11   Springer maybe had -- the reason his lieutenant

12   had concluded that he was purposefully untruthful

13   and not just sort of confused or something was

14   that he only came forward and admitted lying about

15   working from home once he realized that Sergeant

16   Reffitt was going around and asking other people

17   about this software, and that it would have been

18   obvious that he could not have done what he

19   described doing.  Is any of that ringing a bell?

20            MR. COGLIANESE:  Objection.

21   Q.          No.

22   A.          No.

23   Q.          I guess my question is do you remember

24   at the end of this investigation what charges you

1   sustained against Officer Kirby?

2   A.          Not specifically, no.

3   Q.          Okay.  Would you disagree with me if I

4   told you you did not sustain his untruthfulness

5   charge?

6   A.          Well, it's in writing, so.

7   Q.          Okay.  Here, I'll just hand you what's

8   been marked as Exhibit 9, and you can look at the

9   first page for yourself.  But the finding of

10  untruthful is not sustained.  Do you see that?

11                      - - - - -

12          Thereupon, Plaintiff's Exhibit 9 is marked

13  for purposes of identification.

14                      - - - - -

15  A.          I do.

16  Q.          Okay.  Do you have any explanation for

17  how you could not sustain an untruthfulness charge

18  against an officer who admitted that he was

19  untruthful and then repeated his untruthfulness in

20  a hearing in front of you?

21              MR. COGLIANESE:  Objection.

22  A.          Do I have an explanation for it?  Is

23  that what you asked?

24  Q.          Yeah.  Well, I'll withdraw that

235

1   question for a second.

2          First of all, Officer Kirby is a white

3   officer.

4   A.      Yes.

5   Q.      Okay.  Do you have an explanation for

6   why Officer Kirby was not -- why you issued a not

7   sustained finding for Officer Kirby on

8   untruthfulness?

9   A.      I can't remember what I was thinking at

10  the exact moment when I decided to do that.  But I

11  felt that this officer very clearly exhibited some

12  signs of being under great stress.  He cried I

13  believe during the hearing.  If you've listened to

14  the tape, then you might have heard that.  I

15  believe that he was very upset, rambling, offering

16  things.  He didn't have a representative to the

17  best of my recollection, so he presented on his

18  own behalf.

19  Q.      That's something he chose to do, right?

20  A.      Yeah.

21  Q.      He could have had a representative if

22  he wanted to?

23          MR. COGLIANESE:  Let her finish the

24  answer.

1    Q.        I'm sorry.  Were you not done?

2    A.        No.  I was still describing --

3    Q.        Okay.  I'm sorry.  Go ahead.

4    A.        -- what I recall of the hearing.

5    Q.        Uh-huh.

6    A.        I don't recall everything.

7    Q.        Uh-huh.

8    A.        But I remember that he was very upset.

9    He had been working in a very, very, very

10   difficult assignment that plays on your motions

11   and creates an awful lot of -- of I think turmoil

12   perhaps when you see children and others being

13   abused and you can't really do everything that you

14   want to to deal with it.  He was emotional,

15   apologetic.  And as I said before, I haven't read

16   my entire transcript here.  But I think that I

17   might have recommended that he seek some

18   counseling.

19   Q.        Were you aware at the time -- I'm

20   sorry.  I'll let you keep going.

21   A.        Feeling that he was suffering from a

22   significant amount of stress and burnout.

23   Q.        Okay.  Do you remember whether he had

24   been diagnosed with any kind of condition?

237

1    A.          Not to my knowledge.

2    Q.          Okay.  His job -- what was his job?

3    A.          He worked in the Internet crimes

4    against children unit.

5    Q.          Okay.

6    A.          I believe.

7    Q.          Is that a job where it's important for

8    officers to be truthful?

9    A.          Every job that we have is.

10   Q.          Okay.  Not sustaining the allegation of

11   untruthfulness against Officer Kirby meant that he

12   did not go on the 1010 list, right?

13   A.          Correct.

14   Q.          So criminal defendants who were being

15   investigated by Officer Kirby would have no

16   automatic basis to know that he had lied about

17   reporting for duty and admitted lying because he

18   had been caught in the lie.

19              MR. COGLIANESE:  Objection.

20   A.          Well, the requirement is that you

21   report that to the prosecutor.  The prosecutor

22   then decides who needs to know what.

23   Q.          Okay.  You didn't report anything, you

24   had no -- nothing to report to the prosecutor on

```
1    Officer Kirby because you issued not sustained for

2    the untruthfulness.

3    A.          Correct.

4    Q.          Even though he admitted that he was

5    untruthful?

6                MR. COGLIANESE:  Objection.

7    A.          I don't recall the words admitted that

8    I was untruthful.  He gave different statements.

9    I don't -- did he say I admit that I lied?

10   Q.          I think he did.

11   A.          Okay.  I'm just saying I can't -- I

12   can't tell you what the word was.

13   Q.          I mean it was clear that he was

14   untruthful, right?  There was really no dispute

15   about it at the point at least prior to the

16   chief's hearing?

17               MR. COGLIANESE:  Objection.

18   A.          He gave two different stories, so one

19   of them is not true, yes.

20   Q.          And then he explained why he was

21   untruthful by saying the reason he was untruthful

22   was because he was caught and he was concerned

23   about the consequences.

24   A.          Correct.
```

239

```
 1   Q.          We just read through that.
 2               And then he lied again in the chief's
 3   hearing to you about working from home.
 4               MR. COGLIANESE:  Objection.
 5   A.          He very well could have.  I don't know
 6   what he did while he was at home, whether he, you
 7   know, picked that up for five minutes or not.  But
 8   I -- he certainly gave two different statements
 9   about the same day.
10   Q.          And one of which he admitted was a lie,
11   but that -- I guess so you're saying that you
12   issued a not sustained on Officer Kirby because
13   you felt he was stressed out from his job and he
14   was emotional about his conduct.
15               MR. COGLIANESE:  Objection.
16   A.          I said I don't remember all of the
17   things that I took into consideration, but that
18   was part of it.
19   Q.          Okay.  Why not just sustain the finding
20   but issue him a less serious discipline for that
21   finding?
22               MR. COGLIANESE:  Objection.
23   A.          It's what I chose to do.
24   Q.          Okay.  His suspension overall for three
```

1    instances of absence without leave was three

2    16-hour suspensions, so a total of 48 hours.  Do

3    you remember what -- why that level of discipline

4    and not a greater or lesser level?

5    A.        I thought that was what was appropriate

6    for those circumstances.

7    Q.        Okay.  Officer Kirby's discipline was

8    issued prior to Officer Morgan's.  Do you remember

9    whether Kirby's case came up as a potential

10   comparable for Morgan?

11   A.        It may have been discussed as an

12   example with similar rule violation.

13   Q.        Okay.  Officer Morgan and pretty much

14   every other officer that I think we're going to

15   discuss today also worked in high stress jobs.  A

16   police officer is a pretty high stress job, right?

17   A.        Yes.

18   Q.        Certainly Officer Morgan's job working

19   patrol is a more dangerous job than Officer

20   Kirby's job doing computer investigations of child

21   pornographers.

22            MR. COGLIANESE:  Objection.

23   A.        Well, that's an opinion.  I mean

24   dangerous to physical health, dangerous to mental

1    health.

2    Q.          I meant physically.

3    A.          Yes.  They're all dangerous.

4    Q.          I meant physically dangerous.

5    A.          Okay.  You didn't -- you did not say

6    that.

7    Q.          Would you agree it's more physically

8    dangerous than what Officer Kirby was doing?

9    A.          The potential certainly there, yes.

10   Q.          Okay.  Did you ask Officer Morgan or

11   any of his chain of command whether Officer Morgan

12   may have been under any kind of stress during this

13   time period?

14   A.          I don't recall asking that question.

15   Q.          Okay.  Officer Morgan was fairly

16   apologetic in his chief's hearing.  He didn't --

17   obviously, he didn't admit to doing the conduct

18   that he was being accused of, but he did apologize

19   to you for the inconvenience caused by his shoddy

20   recordkeeping.

21   A.          I do believe so.

22   Q.          Did he seem concerned about the charges

23   during his chief's hearing?

24   A.          Officer Morgan?

242

1  Q.        Yeah.

2  A.        Yeah.

3  Q.        He was at least pretty stressed out

4  during the hearing?

5  A.        Yes.

6  Q.        He was like Officer Kirby was sort of

7  throwing things out there like potential witnesses

8  who could corroborate his story, for instance,

9  documents that he felt like he could have been

10 able to provide, things like that?

11           MR. COGLIANESE:  Objection.

12 A.        I'm not sure what the question is.

13 Q.        It's okay.

14           He did admit to some misconduct in the

15 chief's hearing, including the failure to mark in

16 service.

17 A.        Yes.

18 Q.        He was apologetic about it?

19 A.        I believe so.

20 Q.        He sort of asked you for another chance

21 so that he could, you know, improve his

22 organization and that kind of thing?

23 A.        If it's in the transcript, then, yes.

24 Q.        Why didn't you ask Officer Morgan about

1    his stress level and his emotional state?

2    A.        I don't even remember that I didn't, so

3    I -- I wouldn't have a reason for not doing it or

4    a reason for doing it.

5    Q.        Officer Kirby unlike Officer Morgan had

6    a prior issue of some issues about his attendance,

7    right?

8    A.        Say that again.

9    Q.        Officer Kirby had issues previously

10   about his attendance, he had been repeatedly

11   warned about being more careful about his

12   attendance and leave time?

13   A.        Maybe.

14           MR. COGLIANESE:  Objection.

15   Q.        Okay.

16   A.        I don't recall.

17   Q.        And his chain of command noted -- it

18   was actually Lieutenant Gardener -- I said the

19   wrong name.  But Lieutenant Gardener had noted

20   during the investigation that Officer Kirby had

21   expressed concerns about being overworked and they

22   had sort of bent over backwards to make sure that

23   it wouldn't keep happening prior to this incident.

24           MR. COGLIANESE:  Objection.

244

```
 1    Q.         Do you remember that?

 2    A.         No.  Not specifically.

 3    Q.         Okay.

 4    A.         But that could be.

 5    Q.         Okay.  I think we talked a little

 6    earlier about a black officer named Randall Lyons.

 7    Do you remember Randall Lyons?

 8    A.         Yes.

 9    Q.         He's a current CPD officer, right?

10    A.         Yes.  I believe so.

11    Q.         I think the most recent thing I saw in

12    the news about him was that he had, like, helped

13    pull a child out of a pond or something like that

14    and saved the child's life or helped to do that.

15    A.         He was there, yes.  I don't think they

16    ultimately were able to pull him out.  He -- he

17    got cold and got pulled out himself before he

18    actually saved the child, but --

19    Q.         Okay.

20    A.         -- he attempted to.

21    Q.         Okay.  Do you remember there being an

22    issue between you and -- that your executive staff

23    about whether you were willing to congratulate

24    Officer Lyons about that, about his attempted act
```

1    of heroism at least?

2    A.          What do you mean by "congratulate"?

3    Q.          That you had to be pressured by people

4    in your chain of command to actually give Officer

5    Lyons a call to thank him for his service in that

6    instance.

7                MR. COGLIANESE:  Objection.

8    A.          I remember that I was told that he was

9    very upset that I hadn't called him.  And I don't

10   know that I ever did call him.  I -- I don't know

11   who might have tried to -- maybe my PIO or

12   somebody tried to tell me that I should call him,

13   reach out to him or something like that because he

14   was upset.

15   Q.          Okay.  You didn't -- I mean why not

16   just -- I mean, it was a pretty high profile

17   incident, he had done something fairly heroic,

18   jumping into a pond to try to save a kid at risk

19   to himself.

20   A.          I --

21   Q.          Wouldn't it be routine to call an

22   officer in that situation?

23   A.          It's not routine.

24   Q.          No?

246

1    A.          No.

2    Q.          Okay.  Randall Lyons had his own time

3    reporting issue.  I think you alluded to it

4    earlier.

5    A.          I did.

6    Q.          In that situation he had actually been

7    in 580 on administrative duty, had been relieved

8    of duty at the time.

9    A.          I don't think that he was working in

10   the patrol office.  I think he was assigned to

11   work in the telephone reporting unit.

12   Q.          Okay.

13   A.          But he --

14   Q.          He was relieved of duty and put on

15   administrative assignment of some kind.

16   A.          Correct.

17   Q.          He reported to supervisors in that role

18   that he was extremely uncomfortable in the

19   assignment that he was given because it was, like,

20   very confined and had limited lighting or

21   something like that.  Is any of this ringing a

22   bell?

23   A.          I don't recall that specific

24   information.  I --

247

1    Q.         Would you deny it?

2               MR. COGLIANESE:  Hold on.  Let her

3    finish.

4    Q.         I'm sorry.  Go ahead.

5               MR. VARDARO:  Rich, I'm just trying to

6    move things along.  I'm not trying to interrupt

7    her, but she's got these long pauses.

8    A.         I'm trying to recall things that

9    happened years ago.

10   Q.         I'm not purposefully trying to

11   interrupt you.  I thought you were just sort of

12   done with that part of your answer.  So go ahead.

13   A.         I don't recall what concerns that he

14   might have had.  I just know that he wasn't

15   working in the patrol office and that he was

16   working in the telephone reporting unit which is a

17   more out of the public eye place.  I don't recall

18   if that was by choice or by -- you know, by design

19   by the supervisor.

20   Q.         Okay.

21   A.         I just don't recall that.

22   Q.         And you don't remember that Officer

23   Lyons had reported to supervisors that because of

24   a severe psychological condition he had, he was

 1    really struggling in the assignment that he was on

 2    and that he was actually experiencing suicidal

 3    thoughts?

 4              MR. COGLIANESE:  Objection.

 5    A.        I think when he came to see me, he

 6    expressed how troubled he was.  I don't remember

 7    it being suicidal, but --

 8    Q.        You were aware -- I'm sorry.  Go ahead.

 9    A.        Go ahead.

10    Q.        You were aware that Officer Lyons was a

11    military veteran and had some psychological

12    conditions related to that service?

13    A.        I might have been at the time.

14    Q.        Okay.  Actual, unlike Officer Kirby's

15    situation, actual diagnosed psychological

16    conditions?

17              MR. COGLIANESE:  Objection.

18    A.        If that was brought to my attention,

19    then I was aware of it at the time.

20    Q.        Okay.  And his explanation for why he

21    had stopped coming to work in his administrative

22    assignment was that he was unable to cope with the

23    assignment psychologically and was experiencing

24    suicidal thoughts.  Wasn't that his defense?

249

```
1    A.          It could be.  I --

2    Q.          Okay.

3    A.          -- just don't recall.

4    Q.          Officer Lyons received an 80-hour

5    suspension for the time issue related to his

6    issue, right?

7    A.          Sounds familiar.

8    Q.          Okay.  Do you remember why he received

9    a greater suspension than Officer Kirby?

10   A.          I don't recall enough of the specific

11   facts and numbers and all that kind of thing to do

12   that.  He had been involved in another incident

13   involving judgment and decision making and all

14   that that made -- may have played into that.  But

15   I don't -- I don't recall any specific reason.

16   Q.          Okay.  Do you remember whether Kirby's

17   case was brought up as a competitor for Lyon's?

18   A.          If it had happened prior to then, it

19   might very well have.

20   Q.          I talked a little bit previously about

21   David LaRoche.

22   A.          Uh-huh.

23   Q.          He's a white officer?

24   A.          Uh-huh.
```

250

1    Q.        I'm sorry.  You've got to give yeses or

2    nos.

3    A.        Yes.

4    Q.        Doug Williams was his supervisor during

5    the time when his disciplinary issue came up.

6    Does that sound familiar?

7    A.        Maybe.  Yeah.  I think that was the

8    case.

9    Q.        It was in SRB?

10   A.        Yes.

11   Q.        There was an incident somewhat similar

12   to Officer Morgan's situation in the sense that

13   there was an incident where somebody was looking

14   for LaRoche during the time when he was supposed

15   to be on duty and couldn't find him.

16   A.        Okay.

17   Q.        I'm asking you whether you remember

18   this stuff.  I --

19   A.        I --

20   Q.        I'm sorry that I don't put question

21   marks at the end of all of them.

22   A.        Rarely.

23             I don't recall the specific, you know,

24   facts.

```
 1    Q.          I'll just give you a description of it
 2    and you can tell me whether this jogs your memory.
 3    LaRoche was supposed to be working a surveillance,
 4    the other officers working surveillance couldn't
 5    find him.  And then because of that, Sergeant
 6    Williams started surveilling him and trying to
 7    keep track of when he was coming in and leaving
 8    versus when he was reporting coming in and leaving
 9    over several weeks.
10    A.          Sounds familiar.
11    Q.          And it turned out that in fact some
12    days he wasn't coming in, that some days he was
13    coming in very late or leaving early and reporting
14    different hours than he was actually working, much
15    -- many more hours than he was actually working
16    during that several week period.
17    A.          Yes.  I remember there were several
18    instances that he couldn't find him.
19    Q.          Okay.
20    A.          For at least some periods of the time.
21    Q.          And there was an administrative
22    investigation and it was clear during the
23    investigation that -- first of all, he did not
24    admit to any misconduct.  Do you remember him
```

252

1    admitting to any misconduct?

2    A.          I don't recall the specifics.

3    Q.          Okay.  The deputy chief reported to you

4    -- this was Deputy Chief Quinlan, Deputy Chief

5    reported to you that his behavior was done with

6    deliberate intent and it was not the result of

7    carelessness or negligence and involved reporting

8    overtime that wasn't worked and that it occurred

9    over a lengthy time period.  Any of that --

10             MR. COGLIANESE:  Objection.

11   Q.          -- sound familiar?

12   A.          I don't remember the overtime part of

13   it.  But I'm not disputing any of that.

14   Q.          Officer LaRoche received an 88-hour

15   suspension as a result of that investigation.  Do

16   you remember why that suspension and not something

17   more severe?

18   A.          Just based on the information that I

19   had available and other comparables as we've

20   discussed, you know, all of the other factors that

21   I take into consideration, I felt that was an

22   appropriate level of corrective action.

23   Q.          Unlike with Officer Morgan, in Officer

24   LaRoche's case there was no effort to go back

253

```
 1    through prior time records and figure out whether

 2    he had committed actually more misconduct than was

 3    immediately witnessed by Sergeant Williams.  Do

 4    you have any knowledge of why that was?

 5                    MR. COGLIANESE:  Objection.

 6    A.         No.

 7    Q.         Do you remember sort of understanding

 8    as part of the LaRoche discipline that the actual

 9    number of times that he reported late or left

10    early was most likely sort of the tip of the

11    iceberg, because all of the surveillance happened

12    after a particular time when he was essentially

13    caught and not being on duty, and there was no

14    effort to go back in time and trying to figure out

15    whether there were other instances like that?

16                    MR. COGLIANESE:  Objection.

17    A.         I accept the fact that, you know, if

18    what we see is happening that it could have

19    happened before.

20    Q.         Okay.  Do you remember whether you

21    added cause for dismissal as one of the charges

22    against Officer LaRoche?

23    A.         I don't believe I did.

24    Q.         I think I may have asked this already.
```

254

1    LaRoche is white, right?

2    A.          I believe so.  Yeah.

3    Q.          Do you remember discussing LaRoche's

4    case with the safety director?

5    A.          I don't recall any conversations like

6    that.

7    Q.          Okay.  How about with the union other

8    than just directly in the chief's hearing?

9    A.          Not that I recall.

10   Q.          And I'm sorry.  Fred pointed this out

11   for me.  The LaRoche case was resolved by

12   suspension in July of 2014, about nine months

13   before your determination in Officer Morgan -- or

14   your recommendation in Officer Morgan's case.  Do

15   you remember whether the LaRoche case came up as a

16   potential comparable for Morgan?

17   A.          If the rule number is the same, then,

18   yes, it probably did.

19   Q.          Does it matter the specific rule

20   number?  Is that the whole -- is it only

21   comparable if it's the specific -- same specific

22   rule number?

23   A.          Well, that's the starting point.

24   Q.          Okay.

255

1    A.          You know, it's easier -- not everybody

2    always agrees on the right rule of conduct number.

3    But generally that's where we're going to look for

4    any other instances that were charged under the

5    same rule.

6    Q.          Okay.  Do you remember there being any

7    discussion about why the Morgan investigation was

8    so much more extensive in terms of its scope than

9    the LaRoche investigation?

10             MR. COGLIANESE:  Objection.

11   A.          I don't remember any discussions along

12   those lines.

13   Q.          Do you remember why LaRoche wasn't

14   investigated criminally?

15   A.          I don't recall a specific date,

16   reasoning or anything like that.  I told you

17   before that my preference is to not do criminal

18   investigations when we think that that's still,

19   you know, going to take care of the situation as

20   best.

21   Q.          Okay.

22             MR. COGLIANESE:  Jeff, let's take a

23   break when you --

24   Q.          I was going to say five minutes would

1     probably be good for everybody at this point.

2              (A short recess is taken.)

3     BY MR. VARDARO:

4     Q.         In terms of the LaRoche investigation

5     we were just talking about, there was no, like,

6     loophole or problem with the evidence like you

7     were mentioning with the Constable and Jones

8     situation, right?

9     A.         Not that I recall.

10    Q.         I mean, in that case, Sergeant Williams

11    had essentially directly observed LaRoche stealing

12    time, so there wasn't really much doubt to the

13    whole thing?

14    A.         I think LaRoche claimed that he had

15    submitted some slips, but I'm not sure about that.

16    Q.         Okay.  He was claiming that he was

17    submitting leave slips during a period of time

18    when Sergeant Williams was actively surveilling

19    him for failing to show up for work which made it

20    a really unlikely claim, right?

21    A.         I was convinced that he had done it,

22    that's why I sustained the charge.

23    Q.         Okay.  Do you remember an officer named

24    White -- Freudian slip.  His name was not White

1    Slaughter.  Brett Slaughter.

2    A.        I remember a case involving Brett

3    Slaughter.

4    Q.        White officer?

5    A.        I believe he is.

6    Q.        Okay.  He was alleged to have claimed

7    overtime or regular duty time of some kind that he

8    had not worked while he was on an ATF task force.

9    A.        I don't recall a whole lot about the

10   overtime part of it.  But I think I remember the

11   most was that they didn't think that he was

12   working the hours that they expected him to in the

13   ATF office.

14   Q.        "They" meaning the ATF?

15   A.        Well, the division expects you to work

16   an 8-hour tour.  ATF was his supervisor at the

17   time.  So it came to light that he might have been

18   shorting his days and was investigated for that.

19   Q.        Okay.  That similar to the LaRoche

20   situation it came to light because someone at the

21   ATF was essentially looking for him while he was

22   supposed to be there and he wasn't there, right?

23   A.        That sounds familiar.

24   Q.        Okay.  And his shorting of hours or

```
 1    theft of time or whatever you want to call it was
 2    discovered directly through basically surveillance
 3    after the initial report.
 4    A.          I believe so.
 5    Q.          Okay.  Do you remember how much time he
 6    was alleged to have stolen?
 7    A.          No.
 8    Q.          Do you remember that during the
 9    investigation there was additional misconduct
10    discovered, there was some kind of pornographic
11    material or something like that discovered in his
12    office that he wasn't supposed to have?
13    A.          I remember that they found pornographic
14    material.  I don't remember if it resulted in an
15    actual allegation of misconduct.
16    Q.          Okay.
17    A.          Because I don't remember if we could
18    prove that it was his or -- I just remember that
19    they found that material.
20    Q.          Was officer --
21    A.          I don't remember the outcome.
22    Q.          Oh, I'm sorry.  Was Officer Slaughter
23    terminated?
24    A.          No.
```

259

1    Q.        What was his discipline?

2    A.        He was removed from that assignment.

3    And I don't recall what the outcome of the

4    disciplinary case was.

5    Q.        Was there a suspension?

6    A.        I don't -- I just said I don't recall.

7    Q.        You don't remember.  Oh, I'm sorry.  I

8    just meant like, you know, you could not remember

9    whether it was a DCC or a written reprimand or

10   something?

11   A.        I don't recall.

12   Q.        You just don't remember at all what the

13   level of discipline was?

14   A.        I'm sure you have the record.

15   Q.        I actually don't.

16   A.        Oh.

17   Q.        Do you remember any discussions with

18   professional standards or the safety director

19   about the level of discipline in this case?

20             MR. COGLIANESE:  Objection.

21   A.        I don't have any recall of it.

22   Q.        Okay.

23   A.        When was the hearing?

24   Q.        I believe 2018 maybe.

1    A.          Well, I was gone for a significant

2    portion of 2018.

3    Q.          Okay.

4    A.          So --

5    Q.          Do you think you were involved in

6    Slaughter's discipline?

7    A.          It's not ringing any bells.

8    Q.          Okay.

9    A.          I might have been.  I remember being

10   told about the case, but I don't remember holding

11   the disciplinary hearing.

12   Q.          Do you remember what deputy chief he

13   would have been reporting up to through ATF?

14   A.          I'm pretty sure it was Deputy Chief

15   Becker.

16   Q.          Okay.  Is there anything else you can

17   tell me about that case?  Everything we just

18   discussed is basically everything you remember?

19   A.          I remember that the ATF was highly

20   embarrassed by their lack of oversight over him

21   and we threatened to not give them another task

22   force officer because we didn't want that kind of

23   behavior to be allowed.  They admitted that they

24   had done a very poor job of monitoring time in the

1    office and/or whatever.  I believe that in that

2    particular case there was some surveillance, yes.

3    But it was surveillance that said you're not in

4    the office, but I can't prove that you are not

5    doing some other type of work, you know, that

6    originated outside the office and you were just

7    late getting there.  That was a -- I believe an

8    evidence problem in that particular case, and

9    really poor oversight by the ATF.

10   Q.        But at the end of the day, the CPD's

11   conclusion was that Slaughter was guilty of some

12   misconduct conduct related to this.

13   A.        I don't recall.

14   Q.        Okay.

15   A.        I'm not sure if I even had the hearing

16   because I didn't work the last two months of the

17   year, and I was gone for almost all of August, and

18   I don't recall when that was resolved.

19   Q.        Okay.  Other than the officers that we

20   have discussed today, are you aware of any white

21   Columbus Division of Police officers who were

22   terminated for misreporting their hours worked or

23   receiving pay or leave credit for hours that they

24   didn't work?

```
 1              MR. COGLIANESE:  Objection.  Go ahead.
 2   A.         I can't remember exactly what the
 3   charges were, but Lieutenant Brian Lance was
 4   charged with a lot of different leave issues, not
 5   being at work when he said he was at work.  I
 6   believe I made a recommendation of 240-hour
 7   suspension, termination and demotion on him.
 8   Q.         Okay.  That was his -- I'm sorry.  Go
 9   ahead.
10   A.         And I believe that he might have
11   resigned prior to being fired.
12              I already talked about Troy Casner.
13   Sergeant Moore, as you know, I believe I made a
14   recommendation of termination and suspension for
15   him with regard to abuse of overtime and basically
16   stealing money that he didn't earn, didn't work.
17   Q.         And a lot of other things as well.
18   A.         And a lot of other things.  As far as
19   related to leave and time and overtime and theft.
20   Officer Knode is white, I recommended termination
21   for him for theft.
22   Q.         But not for theft of time?
23   A.         No.  Money.  Those are the ones that I
24   recall.  There may be -- well, no.  I take that
```

1    back.  I had a number of male white officers that

2    got in trouble with being at work.  Joe Hern,

3    Steve Franchini, Richard Ptak.  They basically

4    abandoned their jobs to a large degree.  But they

5    had medical conditions so they were being covered

6    by sick leave and/or, you know, maybe they were

7    time -- leave without pay time, but they were

8    marked off sick I believe.  I think both Ptak and

9    Franchini might have died after they left

10   employment.  I think they were both fired.  Hern

11   might have resigned because he was under

12   investigation a number of times.  Josh Wagner was

13   I don't think related to time, but he had several

14   different issues going on.

15           Sergeant -- but, yeah, Franchini and

16   Ptak and Hern all I believe were somewhat similar

17   in the sense that they were probably abusing sick

18   leave and not coming to work and therefore being

19   -- and I don't even know if -- what paid status

20   they were in, but it was potentially under the

21   same rule of conduct or something similar.

22   Q.       What time frame are we talking about?

23   A.       During my time as chief.

24   Q.       Okay.  And these were all guys who had

264

```
 1    legitimate medical conditions -- you don't know?
 2    A.         Well, I think two of them were
 3    alcoholics.
 4    Q.         Okay.
 5    A.         And just weren't able to get their life
 6    turned around well enough.  Hern I don't know that
 7    he had a medical problem or not.  I -- I just
 8    don't remember the circumstances well enough.  I'd
 9    have to go back through the -- well, if they still
10    exist.  But --
11    Q.         I guess I'm -- I've got to figure out
12    what you're saying about Franchini and Ptak.  Were
13    they terminated because they had basically run out
14    of unpaid sick leave that they could take or were
15    they terminated because they were found to have
16    abused sick leave?
17    A.         Well, we have rules that say that you
18    have to, you know, stay in touch.  If you are on
19    medical leave, you have to at lease call HR every
20    two weeks to say, hey, I'm still on medical leave
21    and this is my condition and give us an update.
22    And they were failing to follow orders.  So at
23    some point in time HR gets involved and starts
24    talking to them to see if they're dealing with
```

265

```
 1    their issues and yet they still can't violate the
 2    orders to, you know, stay in touch or to stay in
 3    paid status if they can and various other things.
 4    And so they weren't fired because they have a
 5    medical condition.  They were I believe fired
 6    because they were failing to follow the orders
 7    related to staying -- of following orders.
 8    Q.        They basically just stopped coming to
 9    work and then nobody could get in touch with them
10    to figure out --
11    A.        Correct.
12    Q.        -- what was going on.
13    A.        Yeah.
14    Q.        And they abandoned their jobs?
15    A.        We went out to do home visits, and, you
16    know, either they weren't home or they were home
17    and they weren't answering the door, you know.
18    Q.        So it wasn't about officers trying to
19    get paid for work they weren't doing or something
20    like that.  It was basically officers who just
21    weren't coming to work anymore and weren't --
22    A.        Well, I don't recall.  At some point in
23    time they might have been trying to get paid for
24    not working.  But I just don't remember the
```

266

```
1    timeline.  You know, oftentimes you -- if it goes

2    that long, you were on paid time for a while and

3    then you get off of it.

4    Q.        Okay.  Was it the same with Hern as

5    with Franchini and Ptak, or is that something

6    different?

7    A.        No.  It's different.

8    Q.        What was Hern doing?

9    A.        I don't recall.  There was some

10   misconduct on his part.

11   Q.        About abuse of sick leave or --

12   A.        I can't remember.

13   Q.        Okay.  And Hern resigned under

14   investigation but hadn't actually been recommended

15   for termination at that point.

16   A.        I believe so.

17   Q.        And Franchini and Ptak were terminated,

18   but it was basically like --

19   A.        As far as I recall.

20   Q.        Did they contest the termination or did

21   they just basically disappear?

22   A.        I don't believe that they contested it

23   much.

24   Q.        Was there a chief's hearing?
```

1    A.          To be terminated you would have to have

2    a chief's hearing.

3    Q.          Did they show up for the chief's

4    hearing?

5    A.          I just don't know that.

6    Q.          Okay.  You said somebody named Wagner.

7    Did you say that that wasn't related at the time?

8    A.          Yeah.  I don't think that that's

9    related to leave time.

10   Q.          Okay.  I'm going to jump back to the

11   ones that I think are a little bit more closely

12   related maybe -- maybe you think those are closely

13   related.  But Casner we talked about a little bit.

14   There was an additional allegation about tampering

15   with the investigation or talking to other

16   officers about the investigation.  But in addition

17   to that, do you recall he had had also a DUI

18   within the time frame of the lookback?

19   A.          It was prior to that behavior being

20   discovered.

21   Q.          Right.  But it was within the four-year

22   window of being able to be included in

23   disciplinary decisions?

24   A.          Yeah.  I don't think that he received

1  any discipline out of the DUI.  Did he?

2  Q.        Oh, really?  I --

3  A.        I don't think that he did.

4  Q.        Okay.

5  A.        They were -- they were -- he was found

6  not guilty I believe in court, and so that made it

7  really difficult to proceed administratively.

8  Q.        Okay.  The one you mentioned, Brian

9  Lance that you recall he was terminated on this

10  third incident of AWOL.

11  A.        I think he was terminated.  I don't

12  think he resigned.

13  Q.        Well, I mean he resigned in lieu of

14  termination, I guess.

15  A.        Okay.

16  Q.        But your recommendation for his

17  termination was after his third indent of AWOL,

18  right?

19  A.        All within a short period of time, yes.

20  Q.        But they were separately investigated

21  like they had actually disciplined him for AWOL

22  previously twice before he was recommended for

23  termination.

24  A.        Yeah.  I believe so.

269

```
1    Q.          Are you -- other than the officers we
2    already mentioned, are you aware of any black
3    officers who had a sustained allegation of time
4    reporting issues that were not terminated?
5    A.          Do you mean --
6                MR. COGLIANESE:  Objection.
7    A.          -- besides Randall Lyons?
8    Q.          Yes.
9    A.          Not that I recall specifically.
10   Q.          Okay.
11   A.          I mean, understand that, you know,
12   discipline could happen for being late by the
13   immediate supervisor and I wouldn't know about it.
14   Q.          In terms of discipline that was in
15   front of you, though, you can't think of any other
16   ones?
17   A.          That's correct.
18   Q.          Okay.  How about white officers who had
19   discipline in front of you who were not terminated
20   for time reporting infractions besides the ones
21   we've talked about?
22   A.          Not that I recall.
23   Q.          Okay.  Do you remember I think we
24   talked about Joseph Houseberg at the very
```

270

1    beginning in terms of your relationship?  Do you

2    remember an investigation of Houseberg related to

3    special duty?

4    A.        Yes.

5    Q.        Houseberg was found to have made a

6    false report regarding his special duty assignment

7    about contact he had with a civilian; is that

8    right?

9    A.        Yes.

10   Q.        All right.  And it was the kind of

11   report that it somehow caused the apartment

12   complex involved to mistakenly believe that

13   somebody had violated a protection order or

14   something and they had actually started to

15   initiate civil litigation about it; does that

16   sound familiar?

17   A.        Not a protection order.  I think it was

18   just a stay away order.

19   Q.        Stay away order?

20   A.        Uh-huh.

21   Q.        Okay.  And first of all, he was

22   immediately fired from that special duty

23   assignment by the apartment complex, right?

24   A.        I believe so.

271

1    Q.          Okay.  And the same report that he

2    filed actually amounted to improper use of OHLEG

3    data from the law enforcement Gateway.

4    A.          It contained information from that,

5    yes.

6    Q.          And he had given that information to a

7    civilian, to the apartment complex.

8    A.          Yes.

9    Q.          Which was improper.

10   A.          Correct.

11   Q.          And a felony.

12   A.          Well --

13               MR. COGLIANESE:  Objection.

14   A.          -- if it's prosecuted, then it's a

15   felony.

16   Q.          Well, it's a felony whether it's

17   prosecuted or not.  But if he was found guilty of

18   it, he would be guilty of a felony, right?

19               MR. COGLIANESE:  Objection.

20   Q.          I'll withdraw that question.

21               Improper use of -- impair sharing of

22   OHLEG data with a civilian by a police officer is

23   a fifth degree felony in the State of Ohio?

24               MR. COGLIANESE:  Objection.

1    A.        There is a law like that.

2    Q.        Okay.  In particularly I mean there's

3    -- I don't know if you've seen the reporting

4    recently, there was a chief of police out of

5    Buckeye Lake that was just indicted for a couple

6    of those.  Do you remember seeing that?

7    A.        I don't.

8    Q.        Okay.  The luxury of not having to read

9    the papers I guess when you're not the chief

10   anymore.

11           In the packet, the internal affairs

12   packet and the chain of command materials for the

13   Houseberg investigation there's a notation that

14   said that after consulting with Jeff Furbee, there

15   was an indication that this was not the kind of

16   OHLEG violation that would likely to be

17   prosecuted.  Do you remember that?

18   A.        Not specifically.  But I don't doubt

19   that you've read that.

20   Q.        Do you remember that there was no

21   actual criminal investigation of Joe Houseberg?

22   A.        I don't recall a criminal investigation

23   being conducted by anybody about that particular

24   violation.

273

1    Q.          Okay.  And he admitted to the

2    violation, I mean it was clear that there was no

3    question that he had shared OHLEG data with a

4    civilian.

5    A.          Correct.

6    Q.          Okay.  He received a sustained

7    allegation of untruthful after your chief's

8    hearing; is that right?

9    A.          After my chief's hearing?

10   Q.          You sustained -- there was a charge of

11   untruthful against him.

12   A.          You said after my hearing.

13   Q.          And then after your hearing you

14   sustained -- you recommended sustaining the

15   charge.

16   A.          I thought I changed the rule of

17   conduct.

18   Q.          Okay.  Can I get 24.

19              Let me ask before we get into that.  Do

20   you remember why you would have changed the rule

21   of conduct?

22   A.          Because I thought that was the most

23   appropriate way of handling that particular

24   situation.

1    Q.       Okay.  What did you change it --
2    A.       He was classified as making a
3    misrepresentation of the information on the report
4    rather than untruthfulness.
5    Q.       Okay.  Is that a less serious charge?
6    A.       It was handled as a less serious rule
7    of conduct.  With a 136, there's -- that's the
8    unbecoming conduct.  He was untruthful to the
9    people that he worked for at the apartment
10   complex.  It wasn't a matter of being untruthful
11   to the Division of Police.
12   Q.       Okay.  But before we go further down
13   this line, let me just give you the packet.  This
14   has been marked as Plaintiff's Exhibit 24.  If you
15   flip, one, two -- about three pages in is your
16   recommendation to Director Speaks on Houseberg's
17   case.  Do you see it?
18                      - - - - -
19        Thereupon, Plaintiff's Exhibit 24 is
20   marked for purposes of identification.
21                      - - - - -
22   A.       Yes.
23   Q.       On the second page it appears to me
24   that you -- the charge says, "You are hereby

1    charged with violating Rule 1:15(A)(5) General

2    Requirements, which states, 'Division personnel

3    shall be truthful at all times.'"  And it says,

4    "Specification I+II:  Sustained."  Is that not a

5    sustained untruthful?

6    A.        Well, you have to keep reading.

7    Q.        Okay.  What does that mean, the next

8    notation?

9    A.        It says my recommendation is that it's

10   an 80-hour suspension for violating rule of

11   conduct 1.36.

12   Q.        Okay.  So basically you're saying he

13   did the thing that he was accused of, but the rule

14   of conduct is as you described.

15   A.        Yeah.

16   Q.        It's different in your mind -- well,

17   first of all, do you know, does a finding like

18   this get an officer put on a 1010 list?

19   A.        No.

20   Q.        Okay.  In your view, it's different for

21   the officer to falsely report something to his

22   special duty employer than it is to falsely report

23   it to the division.

24   A.        Well, there's a distinction.

276

```
 1              MR. COGLIANESE:  Objection.
 2    Q.         Okay.  Less serious to report it to a
 3    private person than to the public.
 4    A.         It's serious any time it's -- you know,
 5    the rule is to be truthful at all times, it
 6    doesn't specify just to division personnel.  We
 7    hope that you're honest and have integrity in all
 8    cases.  But in this particular case, he ended up
 9    giving bad information to his special duty
10    employer.
11    Q.         False information.
12    A.         Yeah.
13    Q.         Information that wasn't just bad, he
14    knew it was not true.
15    A.         Well, I don't know if he knew that it
16    -- yeah.
17    Q.         Do you remember what the report was
18    about?
19    A.         He said that he talked to somebody, so,
20    yes, that was wrong.
21    Q.         Yeah.  He said that he -- rather than
22    just seeing somebody drive by, he had actually
23    stopped the car and done some work that he didn't
24    actually do which is to stop the car and --
```

277

1    A.         Yeah.

2    Q.         -- talk to the person.

3    A.         Yeah.

4    Q.         And confirm their identity.

5    A.         I remember that now.

6    Q.         Okay.  So obviously something that he

7    intentionally lied about within the report.

8    A.         Correct.

9               MR. COGLIANESE:  Objection.

10   Q.         And again as with the Kirby case, this

11   is a situation where you've got an officer who's

12   found in an investigation to have lied, but in

13   terms of the prosecutor's obligation to inform

14   criminal defendants of untruthfulness, a criminal

15   defendant being investigated by Officer Houseberg

16   would not be provided with the information.

17              MR. COGLIANESE:  Objection.

18   A.         What was the question?

19   Q.         This is another situation where you

20   have an officer who you know lied but you're not

21   informing the prosecutor of that?

22              MR. COGLIANESE:  Objection.

23   Q.         Right?

24   A.         I wouldn't describe it that way.  I

1    decided not to sustain a charge of untruthfulness.

2    It's not a matter of me not telling the

3    prosecutor.

4    Q.         Okay.  Did you tell the prosecutor

5    about this one?

6    A.         I don't believe that I did.

7    Q.         Okay.  And you didn't put him on the

8    1010 list?

9    A.         Correct.

10    Q.         Okay.  Why wasn't Officer Houseberg

11    terminated?

12    A.         Because I didn't think that that was

13    the level of discipline that was appropriate for

14    this instance.

15    Q.         Why not?

16    A.         Because I didn't think it was

17    appropriate.

18    Q.         Okay.  No reasoning, no, you know,

19    nothing -- what makes this case less serious than

20    Officer Morgan's case in your mind?

21             MR. COGLIANESE:  Objection.

22    A.         Well, to start off with, this was a

23    one-time incident.  It was giving the wrong

24    information -- untruthful information if you will

279

1    in one particular instance.

2    Q.        Okay.  Do you know whether in this

3    investigation anybody pulled the rest of Officer

4    Houseberg's reports to this special duty employer

5    to determine whether they may have been other

6    similar instances?

7    A.        I do not know.

8    Q.        Okay.  Unlike in Officer Morgan's case

9    where all of his time was pulled?

10            MR. COGLIANESE:  Objection.

11   A.        I don't know.

12   Q.        Okay.  Do you know -- first of all, is

13   Officer Houseberg a white officer?

14   A.        Yes.

15   Q.        Okay.  Do you remember an officer named

16   Andrew Hawkins?

17   A.        I know of -- I know of him.

18   Q.        Okay.  White officer?

19   A.        Yes.

20   Q.        Okay.  Do you recall that there was an

21   investigation of Officer Hawkins related to an

22   off-duty stop of civilians?

23   A.        Well, I don't know about calling it a

24   stop.  But there was an incident involving him off

280

1    duty and civilian.

2    Q.         Okay.  Well, what do you remember about

3    that incident?

4    A.         His wife called him very upset about

5    something that had happened while she was I

6    believe shopping.  And he misconstrued it it

7    sounds like or she gave him bad information, I'm

8    not sure which.  But he believed that she was in

9    some sort of danger or, you know, facing harm or

10   some type of a volatile situation, and he

11   responded to her location and found I think two

12   men that he thought were involved with her

13   situation.  And I believe that he, you know,

14   threatened them.  I'm not sure if he -- he might

15   have pulled his gun and tried to keep them there

16   until -- I think maybe he might have called the

17   Sheriff's Office or something like that, but I

18   don't remember all the particulars.

19   Q.         Okay.  Do you remember that the actual

20   incident that his wife was calling him about was

21   she was in the parking lot and the guys had opened

22   their car door and dinged her car door with their

23   door and then drove away without exchanging

24   information?

1    A.          I remember that it was something that

2    was totally blown up.  And I don't remember what

3    she told him.  But I remember that he perceived it

4    as something far worse than it actually was.

5    Q.          Okay.  And do you remember that he told

6    Sergeant Decker, who conducted his internal

7    affairs investigation, that he believed his wife

8    might have been kidnapped and that this somehow

9    justified him stopping these civilians on the

10   road?

11   A.          I can't remember what words he used

12   exactly.  But I know that he felt that she was in

13   some sort of danger.

14   Q.          Okay.  And Sergeant Decker's conclusion

15   was that was not a reasonable reaction to this

16   situation, considering that there was, like, 30 or

17   40 seconds between him getting the call from his

18   wife and coming into contact with these guys?

19   There wasn't, like, possibly enough time for

20   somebody to grab her and put her in a car or

21   something like that?

22   A.          I don't remember Sergeant Decker's

23   words to that effect.  But I think that most of us

24   felt that.

282

1   Q.          Yeah.  And in particular, also there

2   was reason to believe that even Officer Hawkins

3   didn't actually believe that his wife had

4   potentially been kidnapped or harmed because he

5   was yelling at these guys about doing a hit skip

6   or a hit and run, not about kidnapping somebody or

7   hurting somebody.

8   A.          Is that a question?

9   Q.          I'm asking you whether you remember

10  that?

11  A.          Not particularly.

12  Q.          Okay.  But you wouldn't dispute it?

13  A.          No.

14  Q.          Okay.  Do you remember that this was a

15  very widely reported incident in the media?

16  A.          I don't remember how widely.

17  Q.          There was news coverage, though.

18  A.          Okay.

19  Q.          Right?

20  A.          I can't remember anything specific on

21  that.

22  Q.          Okay.  Do you remember that Officer

23  Hawkins pled guilty to criminal charges based on

24  this incident?

283

1    A.          That sounds familiar, maybe a

2    disorderly conduct or something.

3    Q.          I think it was actually an attempted

4    unlawful restraint.  Does this sound right or --

5    A.          Could be.  You've got the paperwork.

6    Q.          Do you remember that once Officer

7    Hawkins -- well, I'll just represent to you once

8    Officer Hawkins pled guilty to the charges against

9    him, he was immediately restored to active duty

10   after having been relieved of his assignment prior

11   to that.

12   A.          Do I recall that?

13   Q.          I'm representing to you that that

14   happened.  I'm just asking do you recall being

15   involved in that or aware of that?

16   A.          No.

17   Q.          Okay.  Can you explain why he would be

18   restored to active duty before the investigation

19   was concluded?

20   A.          What is --

21              MR. COGLIANESE:  Objection.

22   A.          -- the -- what is the level of

23   conviction?

24   Q.          It was a misdemeanor.  Does that

1    matter?

2    A.        Yes.

3    Q.        So if it's a misdemeanor and not a

4    felony, that's automatically back to duty.

5    A.        Well, if it's a felony, he can't be a

6    police officer.

7    Q.        Okay.

8    A.        So it's an automatic.

9    Q.        Okay.

10   A.        If it's a misdemeanor, then it's taken

11   into consideration.  But we've had any number of

12   officers charged with M1s that have not been

13   fired.  OVI, for instance.

14   Q.        Okay.

15   A.        So there's no reason to believe

16   necessarily that a conviction of a misdemeanor

17   would be resulting in a termination.

18   Q.        Okay.  Officer Hawkins received a

19   40-hour suspension for this incident.  Do you have

20   recollection of why that level of discipline was

21   chosen compared to something more serious or

22   termination?

23   A.        It's a misdemeanor conviction, so I

24   look at what other misdemeanor convictions we have

285

1    and the circumstance of the case.  And I know

2    previously mentioned Officer Lyons had been

3    involved in an off-duty incident, pulling a gun

4    and pointing it at a citizen and scaring her half

5    to death and waiving it in front of her children.

6    And I don't remember what the outcome of his case

7    was, but I know that that was something that was

8    taken into consideration.

9    Q.        Just to remind you, Officer Lyons got

10   80 hours --

11   A.        Okay.

12   Q.        -- double the suspension that Officer

13   Hawkins got.  Does that tell you any more about

14   why you gave Hawkins what you gave him or

15   recommended what you recommended?

16   A.        Well, I based it based on the fact that

17   I thought that the 40 hours was appropriate for

18   the circumstances, just like I did for Officer

19   Lyons.

20   Q.        The Lyons situations that you just

21   mentioned, Officer Lyons had actually been

22   directly involved in the accident that resulted in

23   the stop that he made, right?

24   A.        What are you asking?

286

```
 1    Q.          Officer Hawkins, he was told about an
 2    incident and then basically chased these guys down
 3    without proper authority to do that.  Whereas,
 4    Officer Lyons personally witnessed a potential
 5    crime and therefore had authority to make the
 6    stop, right?
 7    A.          That was his interpretation --
 8                MR. COGLIANESE:  Objection.
 9    A.          -- of it, yes.
10    Q.          Okay.  That was also Jeff Furbee's
11    interpretation of it, right?
12                MR. COGLIANESE:  Objection.  Don't --
13    don't answer what Furbee told you.
14                MR. VARDARO:  It's been -- I mean, it's
15    in the public records that we were provided about
16    Officer Lyons.
17                MR. COGLIANESE:  You're asking her to
18    tell you what Furbee told her.
19                MR. VARDARO:  The department's already
20    disclosed it in public records.
21    A.          I don't recall the conversation.
22    Q.          Officer Lyons wasn't subjected to a
23    criminal investigation unlike Hawkins who was
24    criminally convicted, right?
```

1    A.        You have better records than I do.

2    Q.        Okay.  You just don't remember.

3    A.        I don't remember.

4    Q.        Okay.  Do you remember that the Officer

5    Lyons situation was he was driving with a woman

6    and a child in his car and the person that he was

7    accused of this conduct toward had actually run

8    into his car and he believed that it might have

9    been on purpose?

10              MR. COGLIANESE:  Objection.

11   Q.        Clipped his mirror or something like

12   that.

13   A.        I think that was the claim.

14   Q.        Okay.  And it was confirmed that there

15   was contact between the cars at least.

16   A.        Could be.

17   Q.        Okay.  Officer Lyons I'll represent to

18   you was never charged with anything, never

19   convicted of anything in terms of the criminal

20   process.  He was relieved of duty for the entire

21   course of his investigation, unlike Officer

22   Hawkins.  Can you explain that?

23              MR. COGLIANESE:  Objection.

24   A.        I don't know what the reasoning was.

```
 1    Q.          Okay.  Was it your reasoning --

 2    A.          But I don't know that I made that

 3    decision.

 4    Q.          Okay.  Who would have made the

 5    decision?

 6    A.          Immediate supervisors have the ability

 7    to relieve somebody of duty and deputy chiefs can

 8    put somebody back to work after being relieved of

 9    duty, sometimes commanders can.  So I don't know

10    where that decision was made.

11    Q.          Okay.  Officer Lyons had made quite an

12    issue of the fact that he was being kept in

13    administrative duty for as long as he was, right?

14    I mean, it had been grieved through the union, it

15    resulted in a federal lawsuit.  Is any of this

16    ringing a bell?

17    A.          Now that you say something about that,

18    I think that he and Jones and Constable are all

19    part of one.  But I haven't heard much about that

20    particular lawsuit.

21    Q.          Okay.  But at the time, you don't

22    remember being aware of a controversy over Lyons

23    being kept in an administrative duty as long as he

24    was?
```

289

1    A.        I'm saying I don't recall that now.

2    Q.        Okay.  Do you also remember an

3    investigation of Officer Hawkins while he was

4    under investigation for the improper -- for that

5    -- the situation we just described where he

6    improperly handled an OVI arrest?

7    A.        You're going to have to refresh my

8    memory on that one.

9    Q.        He was a field training officer, and he

10   and his trainee had been called in to help with an

11   OVI situation involving a Hispanic male and ended

12   up -- he ended up being removed from the field

13   training officer program as a result of it.

14   A.        I don't remember the details about

15   that.

16   Q.        I'll tell you a little bit more about

17   it, see if I can jog your memory.

18             He actually failed to investigate the

19   guy for OVI, even though it was obvious that he

20   was the person driving the car and he was

21   extremely intoxicated and had been involved in a

22   hit and run.  They put the guy in the back of the

23   cruiser without putting his seat belt on and he

24   was flailing all around the cruiser and falling

1    down and stuff while they were driving.  He ended

2    up vomiting and defecating in the cruiser, and

3    Hawkins was accused of taking pictures of it and

4    distributing it to other officers.  Does any of

5    that familiar?

6    A.          Was he departmentally charged?

7    Q.          I -- that, I don't know.

8    A.          Was he given a written reprimand?

9    Q.          I'm asking you whether you remember it.

10   A.          I don't remember dealing with the

11   disciplinary case involving that --

12   Q.          Okay.

13   A.          -- set of circumstances.  I'm not

14   saying I didn't, I just don't recall it.

15   Q.          If it happened during the course of the

16   stop investigation, the investigation resulting in

17   his criminal charge or resulting from his criminal

18   charge, would you have been informed of it at the

19   time of your chief's hearing in terms of his

20   active discipline?

21              MR. COGLIANESE:  Objection.  Go ahead.

22   A.          I don't know.  I can't recall.

23   Q.          Okay.

24   A.          It's just not sounding familiar to me.

1   Q.        You do remember the Eric Moore

2   investigation, the one where he was terminated and

3   then brought back after arbitration?

4   A.        I do.

5   Q.        Okay.  And you remember also

6   recommending the termination of Melissa McFadden

7   related to EEO violations?

8   A.        I do.

9   Q.        Okay.  Officer Moore, Sergeant Moore a

10  white officer.  McFadden was black, correct?

11  A.        Yes.

12  Q.        Both officers were investigated for

13  allegedly making racially inappropriate remarks,

14  right?

15  A.        Not -- Sergeant Moore's allegation of

16  making racially charged remarks was different than

17  Lieutenant McFadden's.  And Lieutenant McFadden

18  was alleged to have engaged in a pattern of that.

19  Q.        Okay.  But they were both accused of

20  making racially inappropriate remarks.

21  A.        No.

22            MR. COGLIANESE:  Objection.

23  A.        I believe that Lieutenant McFadden was

24  charged with making discriminatory -- not just

292

1    racially inappropriate, but discriminatory

2    remarks.

3    Q.         But the remarks were also racially

4    inappropriate.  I mean, depending on -- the label

5    is fair to put on that in addition to whatever

6    other label you want to add to it.

7               MR. COGLIANESE:  Objection.

8    Q.         Let me put it this way before you

9    answer:  I understand there are differences

10   between the two cases and I want to ask those

11   differences.

12   A.         Okay.

13   Q.         I'm just asking about a similarity.

14   Both of these supervisors were alleged to have

15   made racial remarks of some kind, right?

16              MR. COGLIANESE:  Objection.

17   A.         That's one way of phrasing it if you

18   want to.  But there's a great distinction between

19   the behavior that they each were accused of.

20   Q.         Okay.  Well, Sergeant Moore's remarks

21   that he was alleged to have made involved making

22   violent threats toward black officers, right?

23   A.         That was an allegation that was not

24   sustained.

293

1    Q.       Okay. But it was clear in reviewing

2  the investigation that there were corroborated

3  allegations of him if not making death threats

4  towards these officers, at least threatening to

5  beat them up.

6            MR. COGLIANESE: Objection.

7    A.       The allegation was not sustained.

8    Q.       Okay. But you read the investigation,

9  right? You read it pretty recently. We had a

10  deposition about this last month.

11    A.       The allegation was not sustained.

12    Q.       You're allowed to overrule and not

13  sustain allegations, right?

14    A.       Yes.

15    Q.       Okay. You decided not to sustain the

16  allegation based on the recommendation of your

17  chain of command and IA, right?

18    A.       Based on all the evidence.

19    Q.       Okay. The evidence included multiple

20  officers confirming that Sergeant Moore used

21  racial slurs and used them in a context of

22  threatening to beat up or further harm black

23  officers.

24    A.       I'm not going to agree to that --

294

```
 1              MR. COGLIANESE:  Objection.

 2    A.         -- depiction of that.

 3    Q.         Okay.  The allegations against

 4    lieutenant --

 5              (A discussion is held off record.)

 6    BY MR. VARDARO:

 7    Q.         The allegations against Lieutenant

 8    McFadden did not involve any allegation that she

 9    had made any threat of violence toward any

10    officers based on race, not even alleged.

11              MR. COGLIANESE:  Objection.

12    A.         Not that I recall.

13    Q.         Okay.  You do remember that there were

14    officers who told internal affairs that they

15    directly heard Eric Moore make violent threats

16    toward black officers.

17    A.         I know that the allegation was made.

18    Q.         Okay.  And you know that multiple

19    officers who Sergeant Decker interviewed confirmed

20    that allegation.

21    A.         I don't know what you mean by

22    "multiple," so --

23    Q.         Well, officer --

24    A.         More than one?
```

295

1    Q.          Yes, more than one.  That's what

2    multiple means.

3    A.          I believe that that might be the case

4    that there was more than one.

5    Q.          Okay.  Is there a difference between

6    multiple officers saying the same type of thing

7    and corroboration?

8    A.          It is not necessarily the same, but it

9    can be.

10   Q.          Okay.  Well, in this case Officer

11   Serrell accused Eric Moore of making violent

12   threats toward black officers and using racial

13   slurs in that conversation.  And another officer

14   said he wasn't sure if it was a death threat, but

15   he definitely used a racial slur and said that he

16   was going to beat up a black officer named Cornett

17   who was black.

18   A.          What's the question?

19   Q.          I'm asking you whether you agree with

20   that.

21   A.          Whether I agree --

22               MR. COGLIANESE:  Objection.

23   A.          -- with what?

24   Q.          The fact that another officer confirmed

1    Officer Serrell's allegation that Sergeant Moore

2    made a violent threat toward Eric Cornett, a black

3    officer.

4    A.        I'm not denying anything that was in

5    the investigation --

6    Q.        Okay.

7    A.        -- that was said.

8    Q.        Well, the reason I'm asking it is I

9    asked you whether there was a corroborated

10   allegation of a violent racial threat by Eric

11   Moore, and you said you weren't going to admit to

12   that because you didn't sustain the allegation.

13   A.        I don't think that's how you phrased

14   it.

15   Q.        Okay.  So if I phrase it that way, then

16   that is accurate in terms of the Moore

17   investigation?

18             MR. COGLIANESE:  Objection.

19   A.        Corroboration in my opinion means that

20   the stories match and are contributory towards

21   believing that a certain thing did occur.  Stories

22   that are similar that may or may not match up on

23   certain times may or may not be corroborative.  So

24   it's just that word that I'm, you know --

297

1   Q.       Okay.

2   A.       I don't know -- like I said, statements

3   are the statements, the investigation is there.

4   Q.       Okay.  So you agree with me that

5   multiple officers reported in the Eric Moore

6   investigation that Eric Moore made violent racial

7   threats toward another CPD officer?

8           MR. COGLIANESE:  Objection.

9   A.       The investigation has statements from

10   those people that alleged what they said.

11   Q.       Is that a yes?  Can you answer my

12   question yes or no?

13   A.       Well, the investigation contains all of

14   that information, so --

15   Q.       Including information that multiple

16   officers --

17   A.       I --

18   Q.       -- reported that --

19   A.       I don't --

20   Q.       -- Eric Moore made violent racial

21   threats toward another CPD officer.

22   A.       I don't recall what they specifically

23   said.  So if I have to take your word for what it

24   says specifically, then you can read it to me or

298

1    point it to me and then I'll say yes.  But I don't

2    recall exactly what was said in that investigation

3    and by how many people.

4    Q.        Okay.  I mean I assume, I hope, you

5    haven't had too many investigations where your

6    officers are accusing another officer of making

7    violent racial threats toward another officer.

8              MR. COGLIANESE:  Objection.  Jeff, come

9    on.

10             MR. VARDARO:  Please stop with the

11   speaking off objections, Rich.  I'm trying to

12   move --

13             MR. COGLIANESE:  Please stop haranguing

14   the witness.

15   A.        What's the question?

16   Q.        Is there some reason that you can't

17   remember this investigation?  We talked about it a

18   month ago --

19   A.        It happened a long time ago.

20   Q.        -- in great detail.

21             Sergeant Moore's conduct also involved

22   directly taking employment action against black

23   officers because they participated in internal

24   affairs investigation against him, correct?

```
 1              MR. COGLIANESE:  Objection.
 2   A.         I don't recall what you're talking
 3   about.
 4   Q.         Do you remember that he confronted
 5   Whitney Lancaster, a black officer, about not
 6   taking a narcotics job, and he had made some
 7   threatening statements and text messages about
 8   Carl Shaw about the same narcotics job, and he
 9   admitted in the internal affairs investigation
10   that he did that because they had called him a
11   racist in an internal affairs investigation?
12              MR. COGLIANESE:  Objection.
13   A.         That sounds familiar, yeah.
14   Q.         Okay.  There was no allegation that
15   Lieutenant McFadden had directly taken action
16   against a white officer because of some racial --
17   some conduct that they engaged in during the
18   internal affairs investigation?
19   A.         Not --
20   Q.         Or a black officer?  She didn't
21   retaliate against anybody for participating in her
22   investigation that you know of?
23   A.         Correct.
24   Q.         And as I said, Sergeant Moore admitted
```

1     that retaliation, Lieutenant McFadden didn't admit

2     to any misconduct.

3     A.        Correct.

4     Q.        There was evidence that Sergeant Moore

5     may have violated some federal weapons laws during

6     his investigation.  Do you remember that?

7     A.        I remember that coming up.

8     Q.        Okay.  And that nothing like that

9     involved in Lieutenant McFadden's investigation.

10     A.        Correct.

11     Q.        Sergeant Moore was directly untruthful

12     to you about his involvement in a hiring process

13     for that same narcotics job about who had passed

14     on the job and who hadn't.

15     A.        Say that again.

16     Q.        Sergeant Moore was directly untruthful

17     to you about the narcotics position that he was

18     hiring for.

19     A.        In what way?

20     Q.        He told you that all of the officers

21     involved in the hiring process had passed on the

22     job.

23     A.        Did he tell me that?

24     Q.        Yes.  In a report to you.

301

1    A.         Yeah.  I think that's how he

2    represented it.  I -- I can't remember very well.

3    Q.         Well, it turned out not to be true.  He

4    was actually told in particular Carl Shaw could

5    not have passed to him because he was supposed to

6    not even be talking to Carl Shaw about it.

7    A.         Okay.

8    Q.         Lieutenant McFadden was not charged

9    with untruthfulness or accused in any

10   untruthfulness in her investigation, right?

11              MR. COGLIANESE:  Objection.

12   A.         During the investigation of the EEO

13   stuff, there was no allegation brought forward

14   about an untruthfulness.

15   Q.         Sergeant Moore was found to have

16   violated a direct report related to the

17   investigation, the no contact order with respect

18   to Whitney Lancaster.  Do you remember that?

19   A.         I believe that's true.

20   Q.         Lieutenant McFadden had no

21   insubordination or charge against her in her

22   investigation.

23   A.         I believe that's true.

24   Q.         Right.  Sergeant Moore was never

 1   relieved of his assignment or relieved of duty

 2   until his sustained IA investigation concluded,

 3   correct?

 4              MR. COGLIANESE:  Objection.

 5   A.         I believe that's been addressed.

 6   Q.         And that's correct, right?  I mean --

 7   A.         I take your word for it.

 8   Q.         Okay.  I mean, you know that he was not

 9   relieved of duty until after the IA investigation

10   was over.

11   A.         I don't recall that specifically.  I've

12   been told that a number of times by you and

13   others.

14   Q.         Okay.  You have no reason to doubt it.

15   A.         No.

16   Q.         Okay.  Lieutenant McFadden you removed

17   from supervision before her first interview in the

18   internal affairs investigation.

19   A.         She was not relieved of duty.

20   Q.         I didn't say relieved of duty.

21   A.         I know, but she wasn't relieved of

22   supervision.  She was relieved of assignment.

23   Q.         Immediately before her first internal

24   affairs interview, correct?

1    A.        Shortly after the allegations came

2    forth, she was relieved of her assignment.

3    Q.        Right.

4    A.        Not relieved of supervision.

5    Q.        Well, she wasn't supervising anybody

6    any more because she was working in the

7    property room.

8              MR. COGLIANESE:  Objection.

9    Q.        Right?

10   A.        She wasn't relieved of her

11   responsibility as a supervisor.

12   Q.        But she was relieved of the practical

13   responsibility of supervising any human being?

14             MR. COGLIANESE:  Objection.

15   A.        I wouldn't say that.

16   Q.        Who was she supervising in the property

17   room?

18   A.        Any officer that came in there would be

19   subject to whatever supervisory decision that she

20   made.

21   Q.        Okay.  She didn't have any direct

22   reports anymore?

23   A.        To my knowledge, that's correct.

24   Q.        Okay.  Sergeant Moore never faced any

```
1    departmental charges for any of his racial

2    remarks, all the departmental charges were about

3    his property allegations, correct?

4              MR. COGLIANESE:  Objection.

5    A.        I believe that's correct.  I don't

6    recall if it was a departmental charge that got

7    dropped down to a written reprimand for the one

8    that was sustained.

9    Q.        Okay.  Lieutenant McFadden you

10   recommended for termination.

11   A.        Correct.

12   Q.        All right.  The safety director

13   overtured it.

14   A.        Correct.

15   Q.        Okay.  You remember an officer named

16   Jesse Perkins?

17   A.        I do.

18   Q.        White officer?

19   A.        Uh-huh.  Yes.

20   Q.        He was found through an internal

21   affairs -- actually, through a -- yeah, through an

22   internal affairs investigation to have used

23   excessive force against a civilian, hit him over

24   the head with a baton, right?
```

1    A.        Yes.

2    Q.        And he lied about it directly to his

3    sergeant after the incident.

4    A.        Right after the incident.

5    Q.        Okay.  And he later admitted to the

6    untruthfulness.

7    A.        Within a couple hours.

8    Q.        Okay.  His allegation -- his misconduct

9    involved likely a violation of constitutional

10   rights of the civilian.

11              MR. COGLIANESE:  Objection.

12   Q.        Right?

13   A.        Say that again.

14   Q.        Hitting somebody over the head with a

15   baton without cause, without proper cause would

16   violate that person's constitutional rights to be

17   free of excessive force.

18              MR. COGLIANESE:  Objection.

19   A.        If it was found to be unconstitutional

20   use of force, yes.

21   Q.        Okay.  I mean your department concluded

22   and you agreed that this was an excessive use of

23   force against a civilian, right?

24   A.        Correct.

306

1   Q.        And that violated -- that likely

2   violated that person's constitutional rights.

3             MR. COGLIANESE:  Objection.  Legal

4   conclusions.  Come on.

5   Q.        You --

6   A.        We don't find people guilty of

7   violating the constitutional right.  We find them

8   guilty of violating our rules of conduct.

9   Sometimes those coincide.

10  Q.        Okay.  You've been trained extensively

11  in constitutional rights of civilians in your long

12  police career, correct?

13  A.        Yeah.  However you want to describe

14  extensively.

15  Q.        I mean, all of your officers in the

16  division of police are trained in what does and

17  doesn't violate the constitutional rights of

18  civilians with respect to searches, with respect

19  to seizures --

20  A.        Sure.

21  Q.        -- with respect to excessive force, all

22  of that stuff, that training is given as a basic

23  element of police procedure, right?

24  A.        Yes.

1    Q.        So you know that using excessive force

2    against a civilian violates their constitutional

3    rights.

4              MR. COGLIANESE:  Objection.  She's not

5    a lawyer.

6    Q.        Don't you --

7    A.        I know that it could be a

8    constitutional violation.  It's not always

9    perceived that way based on the circumstances.

10   And just because we rule it to be outside doesn't

11   always mean that it would be found to be

12   unconstitutional in a court of law.

13   Q.        Okay.  Is there any doubt in this

14   situation involving Jesse Perkins that his use of

15   excessive physical force against this civilian

16   would have violated this person's constitutional

17   rights?

18             MR. COGLIANESE:  Objection.  This calls

19   for a legal conclusion.

20   A.        Ask the question again.

21   Q.        Did you have any doubt that this use of

22   force by Officer Perkins violated that civilian's

23   constitutional rights?

24             MR. COGLIANESE:  Objection.

308

1    Q.        To hit them over the head with a baton

2    in a situation that didn't call for it.

3              MR. COGLIANESE:  Objection.

4    A.        It certainly could be perceived that

5    way.

6    Q.        You're aware there was a lawsuit about

7    that use of force.

8    A.        I'm not recalling that part.

9    Q.        Okay.  In Officer Perkins' case when

10   the departmental charges came to you for your --

11   prior to the chief's hearing, did you add cause

12   for dismissal to the charges against Officer

13   Perkins?

14   A.        Not that I'm aware of.

15   Q.        Okay.  Any reason why?

16   A.        No.

17   Q.        Okay.  Officer Perkins was recommended

18   for termination -- Officer Perkins was recommended

19   for termination by you and then was brought back

20   to work with a 240-hour suspension by the safety

21   director; does that sound right?

22   A.        Uh-huh.  Yes.

23   Q.        Do you have any understanding of why

24   that case was settled?

309

```
 1   A.          I believe that it was determined that
 2   it would be possible to allow him to continue his
 3   career.
 4   Q.          Okay.  How was that determined?
 5   A.          Well, by the director of public safety.
 6   Q.          Okay.  Well, where did you get the
 7   understanding I guess is what I'm sort of asking
 8   you?
 9   A.          If he didn't fire him, he must have
10   thought that he had some value.
11   Q.          Well, does Director Speaks consult with
12   you about that, returning that officer to your
13   employment?
14   A.          I don't remember if I had direct
15   communication with him or not.  I might very well
16   have.
17   Q.          Okay.  I mean, it would be your
18   typical --
19   A.          I don't know if I reached out to him or
20   I reached out --
21               MR. COGLIANESE:  Hold on.  She's added
22   to her answer, Rich.
23               MR. VARDARO:  I'm not intentionally
24   doing it.
```

310

```
 1              MR. COGLIANESE:  You seem to be doing a
 2    lot of it.  Whether it's intentional or not, just
 3    let her finish her answers.
 4    BY MR. VARDARO:
 5    Q.        Do you remember any situations while
 6    you were chief of police where you recommended
 7    somebody for termination and the safety director
 8    settled the case or overruled you where you were
 9    not at least informed in advance if not consulted
10    before that decision was made?
11              MR. COGLIANESE:  Objection.
12    A.        You have to ask that one again.
13    Q.        Do you remember any situations while
14    you were chief of police where you recommended
15    somebody for termination and the safety director
16    settled the case or overruled you where you were
17    not at least informed in advance if not consulted
18    before that decision was made by the safety
19    director?
20              MR. COGLIANESE:  Objection.
21    A.        Just for termination?
22    Q.        Yeah.
23    A.        I don't recall whether or not he told
24    me before he made the decision on Lieutenant
```

1    McFadden.

2    Q.        Do you remember that your

3    recommendation on McFadden was forwarded to the

4    safety director and then there was a long delay

5    between the safety director's hearing and the

6    determination in McFadden's case because he was

7    waiting for you to come back for vacation or leave

8    of some kind?

9              MR. COGLIANESE:  Objection.

10   A.        I don't recall what the reasoning was

11   for the delay.  It may have well have been, but I

12   don't recall.

13   Q.        Okay.  And you don't remember whether

14   or not he told you before he made that decision?

15   A.        I believe the decision had already been

16   made by the time I found out about it --

17   Q.        Okay.

18   A.        -- from the director.

19   Q.        In Perkins' case, you just can't

20   remember whether there was consultation or not

21   about the settlement.

22   A.        I don't remember who any contact was

23   made -- made between.

24   Q.        Did you disagree with the decision to

1    bring him back?

2    A.          No.

3    Q.          Okay.  Why not?

4    A.          I thought that Officer Perkins made a

5    very bad decision to not be truthful about the

6    circumstances of that particular incident.  It was

7    done kind of in the heat of the moment in my

8    opinion, after a volatile situation.  I think that

9    he realized very quickly that he had made a very

10   bad mistake and went to his supervisor and

11   confessed that he had not told him the truth and

12   that he was remorseful about that and honest about

13   that mistake.  And I thought that he might have

14   the potential for more value within the division

15   of police.

16   Q.          Okay.  I assume you remember a white

17   officer named Zach Rosen.

18   A.          I remember him.

19   Q.          Okay.  I want to ask you about two

20   different investigations involving Officer Rosen.

21   First of all, he was investigated for a -- for

22   allegedly kicking a civilian in the head while he

23   was handcuffed.  Do you remember that?

24   A.          I do.

1  Q.        Okay.  And he was also investigated and

2  disciplined for a retaliatory stop of a civilian

3  who had yelled at him.  Do you remember that one?

4  A.        I believe that it was a civilian

5  complaint that had come in from a traffic violator

6  that had gotten a ticket from him.  I don't

7  remember what the allegation was because it did

8  not come to me for a resolution.

9  Q.        Okay.  No departmental charges in that

10 situation?

11 A.        It wasn't brought to me for those --

12 Q.        Okay.

13 A.        -- charges.

14          They had decided to do a DCC without

15 consulting with me.

16 Q.        Okay.  Do you remember becoming aware

17 that the deputy chief had actually issued some

18 discipline or counseling to the chain of command

19 beneath him for not properly disciplining Officer

20 Rosen in that situation?

21 A.        I don't have any specific recall of it.

22 But I remember being very frustrated that they had

23 not viewed it as critical misconduct.

24 Q.        If you wanted to, you could have

```
1    instructed them to departmentally charge him,

2    right?  You had the power to do that.

3    A.        Not that I'm aware of.

4    Q.        Okay.

5    A.        They had already disciplined the

6    officer, and so I -- I'm not aware that I can come

7    back and do a departmental charge for the same

8    behavior.  He was disciplined and -- I mean, I

9    don't know that I ever tried it.  I don't know if

10   anybody ever tried it.  But, you know, all the

11   training and advice and all that that I've been

12   given is that, you know, once somebody has been

13   disciplined, you can't change that discipline.

14   Q.        In the other investigation, the one

15   where he was accused of using improper force

16   against the civilian, the allegation was that the

17   civilian was handcuffed and lying on the ground

18   and that he had come from a fair distance away and

19   run over and kicked the guy in the head, right?

20   A.        Yes.

21   Q.        And there was video evidence in that

22   situation showing him doing that.

23   A.        There is video of that particular

24   incident.
```

315

1    Q.          Okay.  The video confirmed that he was

2    not being truthful in his use of force report,

3    didn't it?

4    A.          By -- in what way?

5    Q.          Well, his use of force report indicated

6    that he had placed his foot on the person's

7    shoulder and held him down, and the video showed

8    that he had struck him with his foot, to the point

9    where the guy's head, like, bounced off the

10   pavement, right?

11   A.          Well, you're alleging that he was

12   untruthful in saying that.  It doesn't match up

13   with what it appears on the video, but you're

14   saying it's untruthful and it might have been his

15   perception.

16   Q.          Okay.  His use of force report was

17   inaccurate in a way that downplayed the severity

18   of the incident, putting aside his motive.

19   A.          Well, it certainly didn't look as he

20   described.

21   Q.          Because he didn't do what he described?

22   A.          That's certainly the way that it

23   appears, yes.

24   Q.          Why did you recommend not terminating

316

1    Zach Rosen for that incident?  Your recommendation

2    was a three-day working suspension, right?

3    A.          For outside policy use of force.

4    Q.          Right.

5    A.          And I don't know that I've ever

6    recommended termination for an outside of policy

7    use of force.  I don't remember any comps along

8    those lines.

9    Q.          Okay.

10   A.          So it ranges from a written reprimand

11   to I think the most I gave was like 160-hour

12   suspension --

13   Q.          Okay.

14   A.          -- for outside policy use of force or

15   something along those lines.

16   Q.          Rosen's was 24 hours, right?

17   A.          Yes.

18   Q.          And I assume you did not charge him

19   with cause for dismissal as you did with Officer

20   Morgan.

21   A.          Correct.

22   Q.          Okay.  Did you discuss Rosen's case

23   with the safety director?

24   A.          I know that the conversations were had

317

1    and a number of different ways, so, yes, that

2    particular incident was discussed a number of

3    times.

4    Q.         Okay.  Did you disagree with the safety

5    director's determination to terminate?

6    A.         Yes.  Or I would have recommended it.

7    Q.         Okay.  This by the way was an incident

8    that was very widely reported in the media and

9    didn't reflect particularly well on the

10   department.

11   A.         Correct.

12   Q.         Was there criminal investigation of

13   Officer Rosen?

14   A.         No.

15   Q.         Okay.  And Officer Rosen at the time

16   was still actively under investigation for

17   shooting a civilian, correct?  The shooting

18   investigation hadn't cleared him at that point?

19   A.         I think that's -- I think that's

20   correct.

21   Q.         Did you take that into account?

22   A.         Did I take what into account?

23   Q.         The fact that he was already under

24   investigation for use of force against a civilian

318

1    when he improperly used force another civilian.

2    A.        Well, I was aware of it.  But what do

3    you mean by take into account?

4    Q.        Did you use it as an aggravating or a

5    mitigating factor in his discipline, the fact that

6    he was -- he knew that he was already sort of

7    under investigation and maybe should have been a

8    little bit more careful about kicking people in

9    the head?

10   A.        No.  I didn't --

11             MR. COGLIANESE:  Objection.

12   A.        -- consider -- I didn't consider that

13   they played into each other.

14   Q.        Okay.  Did you consider the fact that

15   he had recently been found -- even though you

16   weren't involved, that he had been recently found

17   to have made a retaliatory stop of a civilian?

18   A.        I can't consider discipline that's

19   beyond its administrative use time.

20   Q.        Was that DCC for the retaliatory stop

21   beyond its administrative use time?

22   A.        I believe it was.

23   Q.        What would be the use time?

24   A.        Nine months.

319

1    Q.          The --

2    A.          And it was not the same behavior.  So

3    it's progressive if it's the same behavior.  It's

4    not progressive if it's different behavior.

5    Q.          Okay.  Can you shed any light for me on

6    why Rosen got a shorter suspension than Lyons for

7    the vehicle stop?

8                MR. COGLIANESE:  Objection.

9    A.          Different circumstances.  Lyons was off

10   duty, he had no duty to take action.  He could

11   have written down a license plate and drove on.

12   He could have called the police agency and

13   reported a hit skip accident if he wanted to.

14               Officer Rosen was in a circumstance

15   where he had a duty to respond to this particular

16   incident and he did and he responded in a way that

17   was inappropriate and so different circumstances,

18   different rules in play.  On duty, off duty.  All

19   of that played into the decision making.

20   Q.          Okay.  And in your mind what Lyons did

21   was more severe than what Rosen did?

22               MR. COGLIANESE:  Objection.

23   A.          I thought it deserved a more severe

24   corrective action.  You know, it's hard to say

320

1    what's more severe in the sense of public trust in

2    the sense of a whole bunch of other things.  But

3    based on the behavior and the comparables and the

4    circumstances and all of that, I thought that that

5    was appropriate level of corrective action for

6    that particular use of force.

7    Q.         If we could take a quick break, I think

8    I'm just about done.  But I've got to check with

9    my co-counsel.

10   A.         Great.

11              (A short recess is taken.)

12   BY MR. VARDARO:

13   Q.         With one exception, those are the

14   questions that I have for you today.

15              The only other question I have is

16   whether there's anything that we've discussed that

17   you feel like you need to add to or correct?

18   A.         Not that I can think of.

19   Q.         Then those are all the questions I

20   have.

21              MR. COGLIANESE:  She'll read.

22                  (Signature not waived.)

23           (Thereupon, the foregoing proceedings

24            concluded at 5:21 p.m.)

321

```
1    State of Ohio     :        C E R T I F I C A T E
     County of Franklin: SS
2
         I, Stacy M. Upp, a Notary Public in and for
3    the State of Ohio, certify that Kimberley K.
     Jacobs was by me duly sworn to testify to the
4    whole truth in the cause aforesaid; testimony then
     given was reduced to stenotype in the presence of
5    said witness, afterwards transcribed by me; the
     foregoing is a true record of the testimony so
6    given; and this deposition was taken at the time
     and place specified on the title page.
7
         Pursuant to Rule 30(e) of the Federal Rules of
8    Civil Procedure, the witness and/or the parties
     have not waived review of the deposition
9    transcript.

10       I certify I am not a relative, employee,
     attorney or counsel of any of the parties hereto,
11   and further I am not a relative or employee of any
     attorney or counsel employed by the parties
12   hereto, or financially interested in the action.

13       IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Columbus,
14   Ohio, on August 2, 2019.

15

16

17

18

19

20   _____
     Stacy M. Upp, Notary Public - State of Ohio
21   My commission expires August 6, 2021.

22

23

24
```

322

```
            Witness Errata and Signature Sheet
              Correction or Change Reason Code
        1-Misspelling  2-Word Omitted  3-Wrong Word
          4-Clarification  5-Other (Please explain)

Page/Line        Correction or Change        Reason Code

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____
```

I, Kimberley K. Jacobs, have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.

Date_____Signature_____

The witness has failed to sign the deposition
within the time allowed.

Date_____Signature_____

                    Ref:  SU31482KJ   S-SU P-BW

**Exhibits**

**31482 Exhibit 001** 4:5
95:19
108:16
125:8
130:13
**31482 Exhibit 004** 4:7
227:8 228:1
**31482 Exhibit 008** 4:8
231:16
**31482 Exhibit 009** 4:9
234:8,12
**31482 Exhibit 014**
**31482 Exhibit 015** 4:10
147:14
**31482 Exhibit 017**
**31482 Exhibit 019** 4:11
144:7,11
**31482 Exhibit 024** 4:12
274:14,19
**31482 Exhibit 035**
**31482 Exhibit 038**

———

**1**

**1** 95:19
108:16
125:8
130:13
198:21
**1.04** 97:5,10
98:11,15,20
156:10
220:18,23
**1.36** 275:11
**1.4** 220:18
**10** 82:3
195:7,8,14,
16 228:6
**100** 66:14
68:4,17 70:1
121:19,21
**1010** 208:3
209:2,3,7,8,
12,14,23
237:12
275:18
278:8
**104** 97:11
**10th** 227:17
228:3,9,16
**11** 191:23
192:5,11,20
193:12

**12** 209:20
217:11,12
**13** 209:20
**136** 274:7
**13th** 122:11
125:10
126:16
129:12
141:6
**14** 72:14
228:22,24
229:3
**15** 72:14
121:1
130:12,13,
15,20
147:14
228:6
**152** 191:4
**153** 122:5
**154** 123:2
**155** 122:15
**16-hour**
240:2
**160** 147:19
**160-hour**
316:11
**180** 172:17
**184** 191:8
**19** 144:4,7,11
190:23
193:12
**1:00** 109:22
110:8,21
111:2
113:19
146:2
176:20
177:12
182:11,12
**1:15(A)(5)**
275:1
**1st** 82:12

———

**2**

**20** 194:16
195:7 196:3,
15 209:20
**20-something**
42:15,17
**2000** 94:4
**2007** 13:3
**2010** 17:16
**2012** 9:4 11:3
94:10
**2013** 75:13,
17 82:11
118:12
210:1
227:17
228:3,9
**2014** 230:1,
23 254:12

**2014-2015**
210:6
**2015** 75:13,
18 82:12
94:5
**2016** 94:22
164:5
227:20
**2018** 259:24
260:2
**22nd** 229:5
**23** 191:7
**24** 273:18
274:14,19
316:16
**240** 212:6,9
219:13
**240-hour**
183:16
213:3 217:2
218:11
219:9,10,17
262:6
308:20
**240-hours**
218:15
**256** 198:21
**2:00** 146:2

———

**3**

**3** 231:20
**30** 281:16

———

**4**

**4** 227:5,6,8
228:1
**40** 35:16
281:17
285:17
**40-hour**
284:19
**48** 240:2

———

**5**

**5** 64:19 122:5
229:23
**51** 40:14
50:19 68:4
69:5 70:1
214:14
**55** 144:18
**580** 79:22,23
80:2,11
81:21 82:11,
17 83:11
84:16,21
246:7
**5:21** 320:24
**5th** 229:24

———

**6**

**6** 231:5

**62** 108:18
**6th** 227:19
229:1,8,18
230:2
231:21,24
232:4

———

**7**

**7** 122:15

———

**8**

**8** 225:19
230:8
231:16
**8-hour**
54:18,22,24
55:1 257:16
**80** 35:11,21
285:10
**80-hour**
249:4
275:10
**814** 172:16
**88-hour**
252:14

———

**9**

**9** 227:6
234:8,12
**99** 50:20
**9:00** 109:22
110:8,21
111:1
113:19
176:20
177:12
182:11,12
**9:30** 140:7

———

**A**

**a.m.** 109:22
110:8,21
111:2
**abandoned**
263:4
265:14
**ability** 223:4
288:6
**absence**
137:19
178:17
240:1
**absent** 205:6
**absolute**
50:15
**absolutely**
53:1 61:10
68:5 180:16
220:16
**abuse**
262:15
266:11

**abused**
202:15
236:13
264:16
**abusing** 39:2
174:9
263:17
**academic**
33:2
**accept**
253:17
**accepted**
40:7 66:1
96:19 98:4
177:1 199:9
**access** 13:18
**accident**
63:17
285:22
319:13
**accidental**
35:23 36:10
37:1,17
54:14 55:21,
24 56:8 61:6
**accidentally**
36:5 37:11
**accompany**
35:13
**accomplish**
40:21
139:22
**account** 34:8
47:4,8 48:3,
6 49:7,8
52:21 56:11
59:16 60:18
65:17 66:9
67:22 69:20
70:20 74:15
75:8 136:2
138:11
140:6,9
142:3 143:9
149:21
153:17
317:21,22
318:3
**accountability** 178:12
**accurate**
70:6 112:5,
18 129:24
130:2 131:8
296:16
**accurately**
75:5 132:4
**accusation**
173:4
**accused**
126:17
170:19
171:14
175:17
179:13
181:8,15
197:3 202:1
241:18
275:13
287:7 290:3
291:19

292:19
295:11
301:9
314:15

**accusing**
180:3 298:6

**accustom**
142:16

**achieve**
70:10

**acknowledged** 26:17
112:8,16,17
164:21
171:17

**acquaintance**
135:2

**act** 62:1
195:2
203:15
244:24

**action** 30:24
39:3 40:21
42:24 47:17
48:7 52:6,7
53:6 58:17
70:11 74:19,
23 97:3
107:12
184:16,18
252:22
298:22
299:15
319:10,24
320:5

**actions** 12:9
66:2

**active** 283:9,
18 290:20

**actively**
256:18
317:16

**activities**
80:2

**activity**
164:13

**acts** 67:13

**actual** 19:11
131:11
177:9 178:7,
10,11
248:14,15
253:8
258:15
272:21
280:19

**adamant**
214:12

**add** 6:17
16:1 71:17
97:16 292:6
308:11
320:17

**added** 99:7,
18 129:15,
18 253:21
309:21

**addition** 57:1
175:14
206:21

267:16
292:5

**additional**
43:24 157:9
197:13
258:9
267:14

**address**
102:21
214:17

**addressed**
156:22
302:5

**administrative** 44:20
46:15,18
51:7 71:18
80:3,7 81:17
100:3 201:6
214:24
215:3
227:18
246:7,15
248:21
251:21
288:13,23
318:19,21

**administratively** 46:9
268:7

**admit** 197:16
199:7 238:9
241:17
242:14
251:24
296:11
300:1

**admitted**
26:16 66:7
197:1
222:23
224:16
225:3,4
231:2
232:20
233:14
234:18
237:17
238:4,7
239:10
260:23
273:1 299:9,
24 305:5

**admitting**
110:14
252:1

**advance**
310:9,17

**advantage**
47:15

**advice** 46:12
314:11

**advise** 31:4

**advised**
76:5,14 79:6
94:23 152:6

**advisor**
88:16

**advisors**
44:24

**advocacy**
213:24
216:9,11,12

**AELE** 33:5

**affairs** 8:5
9:15 14:24
15:6 18:23
27:1,4 32:13
39:14 44:17,
20 77:6,12
78:17 86:5,9
88:9 89:8,
11,22 90:13,
24 91:9,16
92:20 95:20
96:23 99:11
100:16
101:20
107:15
119:22
120:5 121:4
143:20
151:5
154:10,22
155:5,8,17
165:7 172:3,
4 190:10,11
222:17
223:3
272:11
281:7
294:14
298:24
299:9,11,18
302:18,24
304:21,22

**affected**
103:3

**African**
150:12,14

**agencies**
32:11 33:8
46:21

**agency**
319:12

**aggravated**
72:24

**aggravating**
72:19,21
73:6,10,18
74:8 318:4

**agree** 84:19
120:15
131:7
203:23
221:13
241:7
293:24
295:19,21
297:4

**agreed** 45:16
171:20,21
305:22

**agreeing**
202:18
219:21

**agreement**
34:4

**agrees** 255:2

**ahead** 49:18
50:11 52:4,

22 53:23
54:3 55:13
57:7 58:7
60:13 62:19
63:7 64:15
65:10 66:17
84:23 105:8,
22 106:4
107:6,19
110:15,16,
18 113:9
114:7 115:3,
16 116:5
118:19
119:1 120:2
123:1 124:6
135:6 138:8
148:11
154:20
161:15
163:6 165:4
176:10
178:5 179:2
187:19,24
200:19
202:12
219:22
223:13
236:3 247:4,
12 248:8,9
262:1,9
290:21

**aide** 86:18,
19,20

**alcohol** 39:2

**alcoholics**
39:1 264:3

**allegation**
96:18 98:2
99:10,12
114:22
115:12
116:2
173:15
182:3
183:10
189:1 190:9
237:10
258:15
267:14
269:3 273:7
291:15
292:23
293:7,11,16
294:8,17,20
296:1,10,12
299:14
301:13
305:8 313:7
314:16

**allegations**
76:14 115:2
175:15
189:16
190:22
192:2,8,9,
11,19
199:14,22
207:9 209:9
223:24
293:3,13
294:3,7
303:1 304:3

**alleged**
19:12 27:19

75:17
174:19
189:24
191:22
192:3,6,14,
17 197:1
257:6 258:6
291:18
292:14,21
294:10
297:10

**allegedly**
108:24
109:10
291:13
312:22

**alleging**
315:11

**allowed**
42:18 171:7,
23,24 180:9
182:23
260:23
293:12

**alluded**
207:23
246:3

**alluding**
205:8

**alright** 230:2

**alternative**
101:12

**amount**
81:15
115:10
139:20
191:19
193:16,20,
22,24
195:11
220:2
236:22

**amounted**
271:2

**amounts**
204:22

**and/or** 53:4
76:5 134:4
172:4 261:1
263:6

**Anderson**
186:9

**Andrew**
279:16

**announcement** 35:14

**announcements** 35:8

**answering**
161:19
265:17

**answers**
177:2
229:19
310:3

**Anthony**
21:4

**anybody's**
60:4

anymore
59:9 265:21
272:10
303:22

apartment
100:22
101:5,6
114:15
140:11,13
142:16
143:8
158:19
160:3
270:11,23
271:7 274:9

apologetic
236:15
241:16
242:18

apologize
241:18

appalled
212:19

apparently
159:23
160:1

appearance
45:4,11 46:1

appeared
36:23

appears
144:14
274:23
315:13,23

applied
67:23

applies
57:17 63:21

apply 57:14

apprised
79:3

approvals
47:14

approve
221:18

April 230:23

arbitrated
40:23

arbitration
70:18
163:23
164:1
185:19,24
216:2,5,7
291:3

arbitrator
41:20 46:24
51:2,6,15
52:1,9,11
184:6

arbitrators
51:10,14
67:23

arg 216:20

Arizona
33:24

arrest 289:6

arresting
73:15

arriving 98:6

articles 32:6,
14,18,23
33:2 199:19

asks 231:1

asleep 49:24
73:12

aspect
172:10

aspects
114:8 142:2

assertion
114:5
166:13

assess 75:5

assessment
56:13

assigned
79:21,23
80:11 83:16
84:16,21
101:13
107:18
108:4
116:23
118:18
124:19
127:22
133:22
135:18
141:18
142:4
153:14
246:10

assigning
78:15

assignment
111:12,13
112:24
135:4,24
137:2
138:12
141:8,13,19
150:10
165:10
166:16,18
172:5
177:10
201:12
236:10
246:15,19
248:1,22,23
259:2 270:6,
23 283:10
302:1,22
303:2

assignments
165:9
166:15

assist 78:15

assistant
93:21

assisting
78:20

Association
33:1

assume 6:8,
24 20:13

76:3 79:2
86:8 126:14,
15,20
130:23
169:22
189:13
209:4
210:15
211:4 226:1
298:4
312:16
316:18

assuming
57:23 84:12
125:21
127:19
129:2
131:22
132:14,15
149:13
160:15
177:21
196:9

assumption
126:4,6,8,22
127:3,5,11,
14

ATF 257:8,
13,14,16,21
260:13,19
261:9

attempt
160:21

attempted
185:23
244:20,24
283:3

attend
184:21,24

attendance
169:21
243:6,10,12

attending
167:7

attention
39:4 60:4
62:7 81:8,13
125:1,3
154:14
157:14
227:10
248:18

attorney
164:7
216:19

attorney's
88:15

attorneys
31:7 152:10

audio
123:21,23

August
261:17

authority
155:19
286:3,5

authorization
105:20
107:4
177:16

automatic
181:1
237:16
284:8

automatically
182:4 284:4

autonomous
47:11

autonomy
47:15 48:5
57:2

aware 16:16
25:15 26:4
58:21
161:12
167:15,18,
19 169:16
180:10
186:4
195:24
207:17
208:2 209:6
221:4 226:2,
20 236:19
248:8,10,19
261:20
269:2
283:15
288:22
308:6,14
313:16
314:3,6
318:2

awful 236:11

AWOL
268:10,17,
21

_____
B
_____

Babcock
17:1 18:10

Baca 34:12

back 9:4
11:2,4 12:5
13:3 17:15
19:14,15,23
20:15 29:4
33:19 39:8,
10 40:9
41:18 42:18
46:24 52:9
56:24 63:11
64:18 79:12,
16 81:1
86:14 97:24
99:24
112:14
125:8 135:8
137:14
139:16
140:11
141:5 154:4,
11,12 156:6
203:15
210:8 226:8
230:22
232:12
252:24
253:14
263:1 264:9
267:10
284:4 288:8

289:22
291:3
308:19
311:7 312:1
314:7

back-of-the-
envelope
198:15

backed
171:19

background
15:14 53:10

backing
34:23

backwards
243:22

bad 276:9,13
280:7 312:5,
10

badge 79:24
206:11

bailiwick
173:1

Baldwin 18:9
20:11

ball 191:2

bank 171:13,
18

barrel 36:4,6

based 12:3
32:9 34:2,11
35:2,12
40:18 48:17
84:24
105:12
107:7
114:23
115:13
144:18
147:2
162:11
169:22
183:3,5
185:12
215:12
252:18
282:23
285:16
293:16,18
294:10
307:9 320:3

baseline
182:13
214:19

Bash 226:6

basic 70:4
104:22
108:2
109:19
135:15
183:14
306:22

basically
26:14 36:3
41:16 42:16
66:7 76:21
80:7 87:19
108:8
109:21
112:13

114:5 119:7
122:1 136:9
177:22
198:6 258:2
260:18
262:15
263:3
264:13
265:8,20
266:18,21
275:12
286:2

**basis** 10:20
58:19,20
135:18
137:1,20
138:12
180:18
204:2
237:16

**bathroom**
133:20

**baton** 304:24
305:15
308:1

**beat** 293:5,
22 295:16

**Becker**
260:15

**beginning**
125:6 270:1

**behalf** 153:2
235:18

**behavior**
11:16 12:13
34:20 35:12
57:15 62:10
74:21 97:20,
22 123:11
195:12
222:23
252:5
260:23
267:19
292:19
314:8 319:2,
3,4 320:3

**believed**
105:5
122:22
150:23
159:16
280:8 281:7
287:8

**believing**
296:21

**bell** 84:4
190:1
233:19
246:22
288:16

**bells** 196:21
260:7

**belonged**
42:7

**belt** 289:23

**beneath**
313:19

**beneficial**
132:21
160:9

**benefit**
219:20,23

**bent** 243:22

**bias** 45:13
155:3,5

**big** 178:17
203:21

**bigger** 53:22
54:8

**binding**
172:11

**bit** 121:13
147:17
184:5
249:20
267:11,13
289:16
318:8

**black** 145:24
244:6 269:2
291:10
292:22
293:22
294:16
295:12,16,
17 296:2
298:22
299:5,20

**Blake** 21:17
22:5 100:11
102:4,13
200:12
201:10

**blanket** 63:1
120:20

**blow** 37:24

**blowing** 36:7

**blown** 281:2

**blurb** 9:19

**Bond** 22:7
151:23
153:1,10

**boss** 22:16

**bothered**
149:20

**bottom**
107:14
121:9 122:6,
9,14 123:2
144:17
145:5,10
147:19
192:24
230:1,23

**bounced**
315:9

**bound** 73:20

**Brady** 208:3

**brand** 148:24

**brand-new**
147:1

**break** 64:4,
22 163:11
166:4
177:19
230:10
255:23
320:7

**Brett** 257:1,2

**Brian** 262:3
268:8

**Briar** 134:8

**bring** 60:15
312:1

**Bronson**
25:7 26:3
82:17
186:24
188:4
190:21
207:24
210:10
212:7,10

**Brooks**
20:18 21:3

**brought** 8:1
29:2 54:13
124:24
125:3 153:5
154:14
156:20
175:19
190:9
248:18
249:17
291:3
301:13
308:19
313:11

**Buckeye**
272:5

**bullet** 35:24
36:2 37:4,6,
8,12

**bumping**
93:13

**bunch** 47:13
320:2

**burden** 51:7
67:16

**burdens**
50:17

**bureau** 10:9,
22 85:21

**burnout**
236:22

**busy** 230:7

---

**C**

**calculations**
191:11
198:16

**calendar**
112:5,10

**calendars**
111:15,18,
23 112:17

**call** 23:13
32:9 37:13,
16 39:5
81:23 154:3,
8 162:16,17
186:7
190:13
227:10
245:5,10,12,

21 258:1
264:19
281:17
308:2

**called** 79:21
95:9 119:8
134:22
174:4 245:9
280:4,16
289:10
299:10
319:12

**calling**
153:17
279:23
280:20

**calls** 41:10
150:12
195:23
307:18

**car** 63:17
73:12
276:23,24
280:22
281:20
287:6,8
289:20

**card** 229:9

**care** 255:19

**career**
208:14
306:12
309:3

**careful**
243:11
318:8

**carelessness**
252:7

**Carl** 5:20
299:8 301:4,
6

**cars** 287:15

**case** 5:11,15,
20 8:18 9:21
10:12,17
11:12 17:9
19:4 34:8,9
40:5 41:14
48:20 49:21
50:14 51:6,
16 55:9,19
65:19 71:19
76:18 78:3
79:1 80:24
81:3 86:2,6
87:18 89:21
90:6 91:22
92:13,15
93:5,16
94:14,18
99:2,3,17
100:1,4,17
101:14
102:16,23
103:21
104:20
105:7
107:10
115:21
120:17
127:19
130:1 154:8

158:9
161:21,23
163:22,24
168:2,14
169:13
170:5,20
171:12
174:18
176:9 184:6,
22 185:6,12,
23 186:16,
23 187:2,6,
7,13,17,18
189:23
190:21
193:23
194:1
195:21
196:10
197:12
199:24
201:6,11
202:6 204:1,
4 206:5
207:16
211:14
217:17
218:21
221:2 222:2,
16,23
223:10
225:12
240:9
249:17
250:8
252:24
254:4,11,14,
15 256:10
257:2 259:4,
19 260:10,
17 261:2,8
274:17
276:8
277:10
278:19,20
279:8 285:1,
6 290:11
295:3,10
308:9,24
310:8,16
311:6,19
316:22

**cases** 12:11
13:11 14:20
44:8 48:13
52:17 53:4
54:9 55:24
56:3,6 65:23
68:3 83:5
98:19,24
167:7
170:17
175:21
176:1
199:21
202:10,18
203:8
205:23
211:5
212:24
216:13
221:20
276:8
292:10

**cash** 42:11

**Casner**

174:15,16
262:12
267:13

**caught** 225:5
231:7
237:18
238:22
253:13

**caused**
241:19
270:11

**celebratory**
23:1

**Chad** 41:24
42:1

**chain** 39:15
115:24
151:5 155:6,
18 181:16
196:13
222:18
241:11
243:17
245:4
272:12
293:17
313:18

**chairman**
93:21

**challenges**
46:16

**chance** 52:8
198:22
212:3
242:20

**change**
35:19 74:20,
23 112:10
147:9,13
155:11
181:9 274:1
314:13

**changed**
20:4 111:4
273:16,20

**characterizat
ion** 193:19

**characterize**
194:3,5

**charge** 28:4
35:16 39:20,
22 69:18
77:5 97:3,16
99:7 101:24
115:14
116:3
156:10
186:1
189:14
217:16
218:3
220:11,19
223:23
226:10
227:16
234:5,17
256:22
273:10,15
274:5,24
278:1
290:17,18
301:21

304:6 314:1,
7 316:18

**charged**
27:24 35:20
66:14 98:11,
14 99:4
170:21
171:18
183:9 190:7
220:18
222:5 255:4
262:4 275:1
284:12
287:18
290:6
291:16,24
301:8

**charges** 7:24
8:8 9:5,21
15:6 39:17
46:2 48:18
66:15 68:2,
15 71:17
87:21 88:6
92:24 96:22
100:7,23
135:16
188:2
189:18
215:11,18
216:5
217:19
218:2
223:21,24
226:22
227:4,11
231:13
233:24
241:22
253:21
262:3
282:23
283:8 304:1,
2 308:10,12
313:9,13

**charging**
98:20

**chased**
286:2

**check** 204:5
205:10
320:8

**checked**
117:3
145:18
205:1

**checking**
164:12

**chief** 9:2
17:17 18:24
20:7,8,9,10
30:16,22
31:10 33:16
35:14 39:12,
24 56:7
58:14 59:8
64:22 65:18
86:22 88:3
91:21,22
92:2,19
94:10 97:5
98:24
115:23
126:12

154:6 155:7,
15,19 163:5
167:4 169:6,
10,21,23
170:1,4
171:22
172:2
213:20
226:5,6
252:3,4
260:12,14
263:23
272:4,9
310:6,14
313:17

**chief's** 10:14
97:1 136:21
143:3 144:9
146:6,21
147:21
148:1,6,15,
17,21
156:21
159:18
167:2,3
168:21
198:20
208:19
210:15
213:16,17
216:17
225:11,14,
22 226:16,
22 227:12
231:12,17
232:11
238:16
239:2
241:16,23
242:15
254:8
266:24
267:2,3
273:7,9
290:19
308:11

**chiefs** 30:22
31:23 32:24
33:2 85:19,
21 88:1
183:24
184:17
288:7

**child** 240:20
244:13,18
287:6

**child's**
244:14

**children**
236:12
237:4 285:5

**choice**
247:18

**choices**
120:19

**chose** 179:6
235:19
239:23

**chosen**
284:21

**Chris** 151:23
229:13,15

**Christopher**
22:7

**chronology**
154:7

**church**
131:15
135:2

**circulated**
32:24

**circumstanc
e** 73:6,10
187:23
285:1
319:14

**circumstanc
es** 56:9,16
57:18 64:2
72:19,22
73:1,18 76:5
160:13,17
161:11
162:9,11
183:6
195:18
240:6 264:8
285:18
290:13
307:9 312:6
319:9,17
320:4

**cited** 181:21

**citizen** 45:5
155:22
172:18
285:4

**city** 42:8,11
43:12 63:10,
15,17 88:15
185:23

**city's** 68:1

**civil** 63:22
186:1
270:15

**civilian**
19:21,22,24
56:4,5 61:6
62:16,23
270:7 271:7,
22 273:4
280:1
304:23
305:10,23
307:2,15
312:22
313:2,4
314:16,17
317:17,24
318:1,17

**civilian's**
307:22

**civilians**
61:2 279:22
281:9
306:11,18

**claim** 66:8
116:13
118:16
138:4
256:20
287:13

**claimed**
178:7,9
224:1,9
225:16
226:18
256:14
257:6

**claiming**
256:16

**claims**
108:23
109:9
202:21
205:5

**clarified**
134:7

**clarify**
216:10

**classified**
274:2

**clear** 11:19
12:7 40:15
51:11,13
67:18 113:6
124:1 141:7
145:7
150:14
238:13
251:22
273:2 293:1

**cleared**
24:13
317:18

**Clipped**
287:11

**close** 54:17
155:2 173:9
176:5
190:13

**closely**
267:11,12

**co-counsel**
320:9

**codified**
57:12

**coffee**
133:21

**COGLIANES
E** 14:7,11
47:24 48:11
49:12,18
50:11 52:4,
22 53:23
55:13 57:7
58:7 60:13
62:19 63:7
64:1,13,15
65:10 66:17,
22 67:19
68:9 69:12
70:7,21
71:23 74:5,
10 83:4
84:23 85:8,
11,15 87:11
88:19
101:15
104:2,7
105:8,22
106:4 107:6,
19 108:7,10

109:7
110:15,17
113:9 114:7
115:3,16
116:5
118:19
119:1 120:2
123:1 124:6,
20 126:9
128:2,8
129:5,13
130:5 131:9
132:1,8,24
134:1 135:6
136:4,11
137:6,23
140:16,24
141:22
142:7,19
143:2,22
148:11
149:9,24
150:22
152:22
154:2,17
156:12,16
157:12,21
158:4,15,22
160:8,11,20,
23 161:5,9,
13,17 162:7,
14,18,22
163:4,13
165:4
176:10
177:18
178:5 179:2,
17 180:21
182:1,19
186:3
187:19,24
191:24
193:17
194:2,10
195:10,17
196:5,16
198:3
200:19
201:20
203:1
206:16
219:22
220:8
221:15
223:13
225:9
228:10
233:20
234:21
235:23
237:19
238:6,17
239:4,15,22
240:22
242:11
243:14,24
245:7 247:2
248:4,17
252:10
253:5,16
255:10,22
259:20
262:1 269:6
271:13,19,
24 276:1
277:9,17,22
278:21

279:10
283:21
286:8,12,17
287:10,23
290:21
291:22
292:7,16
293:6 294:1,
11 295:22
296:18
297:8 298:8,
13 299:1,12
301:11
302:4 303:8,
14 304:4
305:11,18
306:3 307:4,
18,24 308:3
309:21
310:1,11,20
311:9
318:11
319:8,22
320:21

**coincide**
306:9

**coinciding**
54:1

**cold** 244:17

**Coleman**
95:3

**colleague**
23:8

**Columbus**
33:15 42:8,
12 261:21

**combination**
33:4

**comfortable**
74:17

**comits** 65:7

**command**
39:15
115:24
151:5 155:6,
14,18
181:17
222:18
241:11
243:17
245:4
272:12
293:17
313:18

**commander**
24:3,6,8
27:7 77:3,5,
14,15 85:22
86:4,9
87:10,12
102:21
154:9 155:8
157:5 159:2
160:15
172:23
189:13

**commanders**
77:12 288:9

**comment**
146:1

**comments**

213:1
225:17

**commission**
186:2

**commit**
47:20

**committed**
51:23 71:20
75:17
181:14
189:4 253:2

**communicati
on** 309:15

**communicati
ons** 112:9

**companies**
203:6,9

**company**
100:21
122:23
123:3,4,5,10
124:5

**comparable**
8:2 65:22
167:7
170:17,19
173:19
174:4
175:19
176:1,5
186:16
240:10
254:16,21

**comparables**
40:4 68:19
167:16,19,
21 168:3,6,
13 173:6,10,
21 174:2
208:20
210:18
211:3
252:19
320:3

**compare**
175:2 204:5

**compared**
30:22 218:1
284:21

**comparing**
212:24
214:17

**comparison**
112:22

**competitor**
249:17

**compilation**
33:10

**complacent**
36:22

**complained**
81:9

**complaining**
182:4 183:4
207:6

**complaint**
155:23
172:18
181:7 313:5

**complete**
88:9 92:21,
22

**completed**
89:12

**completely**
78:16

**complex**
100:22
101:5,6
114:15
119:11
142:16
143:8
158:19
160:3
201:14
270:12,23
271:7
274:10

**comps** 316:2

**computer**
12:20,22
233:3
240:20

**concept**
142:11

**concern**
45:11
102:12,15,
17 129:18
148:10
149:22
150:20

**concerned**
35:17 38:16
56:10 225:6
238:22
241:22

**concerns**
19:17 24:24
27:14,16
45:22 103:2
156:18
243:21
247:13

**conclude**
115:1 116:3

**concluded**
18:13 89:9
233:10,12
283:19
302:2
305:21
320:24

**concludes**
44:19

**concluding**
180:19

**conclusion**
107:14
108:2 147:4
261:11
281:14
307:19

**conclusions**
155:17
306:4

**concurrent**
45:19 217:2,
6 218:14,15

219:8,14

**condition**
236:24
247:24
264:21
265:5

**conditions**
7:1 248:12,
16 263:5
264:1

**conduct**
10:14 40:6
44:1,7 57:6
60:14 65:8
70:15 71:13
72:8 97:11,
12 98:11,15
99:9 183:11
187:23
189:4
239:14
241:17
255:2
261:12
263:21
273:17,21
274:7,8
275:11,14
283:2 287:7
298:21
299:17
306:8

**conducted**
44:18 46:21
68:6 123:20
143:19
154:24
272:23
281:6

**confessed**
312:11

**confident**
223:22

**confined**
246:20

**confirm**
107:16,22
116:14
125:9 150:9
164:16
277:4

**confirmed**
108:24
109:10,21
119:16,19
120:8 148:7
192:19
287:14
294:19
295:24
315:1

**confirming**
111:6
118:23
127:20
129:10
293:20

**confirms**
122:20
147:24

**conflict**
16:12 112:8

confronted 125:22 126:2,18 157:5 299:4

confused 233:13

congratulate 244:23 245:2

conscious 194:23

consequence 218:8

consequences 11:18 12:6, 9,13 225:6 238:23

consideration 31:21 37:23 40:3 44:13 50:22 54:11 56:21 62:2 66:24 69:3,9 70:24 72:10 75:2 118:3 153:23 180:23 239:17 252:21 284:11 285:8

considerations 69:1 151:3,14

considered 53:12 70:22, 23 128:13 161:24 166:19,20 176:14 207:3

consisted 192:3,20

consistent 109:3,12

consistently 165:8,14

Constable 15:1 25:7 26:3 82:17, 22 83:10 186:24 187:5,16 188:5 189:2, 6 190:21 193:1,23 196:21,24 197:3,7 203:24 204:4 205:4 206:1 207:24 208:23 210:10,14 211:23 212:7,10,22 214:18 217:1 221:13 222:6 256:7 288:18

constantly 204:20

constitutional 46:5 63:22 305:9,16 306:2,7,11, 17 307:2,8, 16,23

consult 309:11

consultation 311:20

consulted 310:9,17

consulting 32:15 272:14 313:15

contact 138:17 270:7 281:18 287:15 301:17 311:22

contacts 138:21

contained 271:4

content 88:23

contest 266:20

contested 266:22

context 151:11 158:24 159:11 293:21

continue 74:21,24 223:21 309:2

continued 73:9

continuing 66:8

contract 172:21 209:20

contractual 172:14

contributory 296:20

control 51:21 56:19 63:16

controversy 288:22

conversation 77:22 93:16 117:24 125:15 127:7 130:4, 24 131:4,20 149:3,14 169:12,15

173:14 286:21 295:13

conversations 86:5,8 88:23,24 92:17 93:12 94:13 117:20 149:10 254:5 316:24

convicted 286:24 287:19

conviction 44:6,7 71:14,16 172:13 283:23 284:16,23

convictions 7:4 284:24

convinced 37:3 51:22 53:1 69:6,7 106:24 107:9 176:12 215:17 256:21

convincing 40:15 51:11, 14 67:18

convoluted 201:21

coordinator 111:11,12 177:23

cop 73:17

cope 248:22

copy 7:23 14:8,12

Cornett 295:16 296:2

corporal 123:18 128:14 130:24 131:1,11,12, 18 132:14, 15 133:10, 16 134:6,22 138:1 141:15 153:7,17

correct 6:18 7:3 8:10 20:6,12 21:15 23:16, 24 26:9 34:20 35:5 49:14 56:2 67:15 75:20 84:12 87:15 89:16,23 90:19 96:21 98:3,12 100:9 104:15

105:15,18 109:18 111:7,14 112:14 123:16 136:16,18, 22 141:21 148:3 152:5, 8,20,21,24 155:12 159:15 166:11 175:10 183:11,12 188:6,12 189:11 199:13 200:10 203:12 207:7,22 212:13,15 218:20 219:18 220:3 229:21 230:13,17 231:14 232:3,22 237:13 238:3,24 246:16 265:11 269:17 271:10 273:5 277:8 278:9 291:10 298:24 299:23 300:3,10 302:3,6,24 303:23 304:3,5,11, 14 305:24 306:12 316:21 317:11,17, 20 320:17

corrective 39:3 40:21 52:6,7 70:10 74:19,22 97:3 107:12 184:16,18 252:22 319:24 320:5

correctly 198:18

correspondence 214:5

corroborate 118:15 138:4,11 140:6 142:2 143:9 149:21 153:16 205:4 242:8

corroborated 128:13 139:17 142:14 293:2 296:9

corroborates 128:3,9

corroborating 128:4,11 157:7 158:2, 6,10,13 162:13

corroboration 135:13 136:1 295:7 296:19

corroborative 296:23

cost 63:17

counsel 7:8

counseling 236:18 313:18

count 228:11

counties 38:1

counts 229:12

county 21:16 34:14

couple 103:6 122:14 124:21 145:1 150:8 227:11 229:18 272:5 305:7

courses 32:13

court 101:1 268:6 307:12

cover 95:21 96:3,13

coverage 221:4 282:17

covered 124:4 263:5

CPD 171:21 181:12 182:2,3 244:9 297:7, 21

CPD's 261:10

create 34:5

creates 236:11

creation 210:8

credibility 181:11

credible 177:3 181:19 182:5

credit 222:10 261:23

cried 235:12

crime 71:21

286:5
**crimes** 237:3
**criminal** 7:4
44:1,5,10,
17,19,22
45:12,17,20
46:2,10,22
71:13,19
79:4,6 89:2,
5 100:2,6,7,
23 101:3
103:21
152:3,7,11,
17 172:10
176:13
199:23
200:5
202:24
208:5
212:24
214:23
215:4 216:4
223:9,15,19
237:14
255:17
272:21,22
277:14
282:23
286:23
287:19
290:17
317:12
**criminally**
44:9 45:6,10
46:14
101:23
170:21
171:18
200:9
255:14
286:24
**critical** 88:4
176:12
313:23
**CROSS-
EXAMINATIO
N** 5:4
**cruiser** 36:18
289:23,24
290:2
**culpability**
62:12 72:10,
12 97:23
**current**
244:9
**cut** 110:18

**D**

**da-da** 216:21
**damaged**
201:5
**damaging**
38:21,23
178:12
213:2
**danger** 62:1
280:9
281:13
**dangerous**
60:21 61:2

240:19,24
241:3,4,8
**Daniel** 16:17
196:20
**data** 165:1
271:3,22
273:3
**database**
10:1,2
**date** 11:1
17:16
118:13,14
121:6
124:15,17
130:11
133:2,11
135:10
137:19
140:4,5
141:16
142:13
205:24
224:17
225:13
232:1
255:15
**dates** 77:8
82:19
108:23
109:9
112:14
121:5 125:9
128:16
129:7
133:16
137:14
139:16
147:7
158:16
178:16
192:16
223:2
**David** 28:19
249:21
**day** 112:7
118:20
119:20
120:14
121:15
127:21
153:24
195:19
202:7 224:4,
19 225:3
229:9,14
230:12
239:9
261:10
**day-to-day**
154:7
**days** 105:2,
17,20
106:20
107:3,17,23
108:3
116:13,22
118:17
127:24
137:18
138:5
140:18
142:3,24
172:17
177:9,15

178:24
182:15
190:23
191:7 195:7,
15,16
198:11
204:10
223:16
224:4 230:8
251:12
257:18
**DCC** 59:4
63:18 166:6
259:9
313:14
318:20
**deal** 14:15
28:16 180:9
236:14
**dealing**
21:10
264:24
290:10
**dealings**
25:4
**dealt** 21:9,13
23:12 63:23
64:11 92:12
**death** 285:5
293:3
295:14
**deceit**
176:18
**deceitful**
62:8
**deceiving**
178:18
**December**
227:17,19
228:3,9,15
229:1,8,18
230:2
231:21,24
232:4
**deception**
176:18
203:16
**deceptive**
178:2,6
**decide** 51:10
69:4 115:20
135:7
218:10
**decided**
28:15 69:17
160:14
184:7,8
207:12
235:10
278:1
293:15
313:14
**decides**
237:22
**decision**
19:13 29:15
40:18 52:10
61:22 92:24
98:9 102:16
105:11
162:10

186:6 196:7
200:12
203:2
211:24
249:13
288:3,5,10
303:19
310:10,18,
24 311:14,
15,24 312:5
319:19
**decision-
makers**
31:22
**decisions**
8:1,23 9:1
11:6 29:13
31:1,8 59:5
81:7 267:23
**Decker** 16:23
78:10,15,20
153:11
164:20
281:6
294:19
**Decker's**
281:14,22
**declining**
216:4
**deeper** 26:19
**deeply**
126:12
**defecating**
290:2
**defend**
213:10
**defendant**
277:15
**defendants**
237:14
277:14
**defending**
214:1
**defense**
135:16
177:3
196:18
216:16
248:24
**deficiencies**
102:21
**definition**
115:4
**Degoey**
122:22
123:18,21
124:5,12
128:15
129:2,8
131:1,12,18
132:14,16
133:16
134:6,22
138:1 141:6
153:7,18
**Degoey's**
130:19
141:15
**degree** 47:5
57:2 60:17

202:14
263:4
271:23
**delay** 46:17
120:17
311:4,11
**delayed**
114:14
**deliberate**
252:6
**delve** 226:9
**demonstratin
g** 58:4
**demonstrativ
ely** 202:23
**demotion**
212:14,17
262:7
**denied** 197:6
**denies**
114:24
115:14
**Denise** 26:20
227:18
**deny** 67:2
107:22
181:9 247:1
**denying**
116:3 296:4
**department**
9:24 32:21
33:21 41:9
67:7 74:14
125:11
151:21
199:16
201:14
209:15,16
305:21
317:10
**department's**
33:21
286:19
**departmental**
9:5 35:15
39:17,19
69:18 87:21
88:6 92:24
97:3 189:17
217:18
304:1,2,6
308:10
313:9 314:7
**departmental
ly** 290:6
314:1
**departments**
33:14,20
**depend**
142:10
150:1
**depended**
155:22
156:2
**depending**
63:24 68:19
94:2 292:4
**depends**

47:23 48:12
61:15 62:20
64:16 65:5
66:18 68:15
106:5
139:20
153:19,20
195:18
196:8

**depiction**
294:2

**deposed**
5:16

**deposition**
5:19 6:17
7:2,9,20
14:4,16,21
15:12
293:10

**depositions**
5:19

**deprive**
185:23

**deputy** 18:24
85:18,21
88:1,2
91:21,22
92:2,19 97:1
155:15
169:6,9,20
170:1
213:20
226:5,6
252:3,4
260:12,14
288:7
313:17

**describe**
19:8,9 85:24
93:9 168:19
176:4 193:3
277:24
306:13

**describes**
131:16
232:6

**describing**
12:24 201:9
233:1 236:2

**description**
251:1

**deserved**
319:23

**design**
247:18

**detail** 131:6,
19 132:11
298:20

**details** 34:9
172:24
190:19
289:14

**determinatio
n** 39:16 97:2
100:6
165:23
215:21
218:23
254:13
311:6 317:5

**determine**
87:20 99:12
205:18
206:13
279:5

**determined**
31:19 32:1
39:22 309:1,
4

**determining**
166:16

**diagnosed**
236:24
248:15

**died** 263:9

**differ** 187:4

**difference**
142:22
170:13
178:20
189:22
193:6,21
194:7,9
196:6,18
203:22
211:20
213:16,19
295:5

**differences**
292:9,11

**differently**
45:5,14
57:18 106:7
133:6
179:12

**differing**
182:23

**difficult**
101:13
202:20
236:10
268:7

**digging**
153:12

**dinged**
280:22

**dinner** 22:22

**dipping**
76:21
203:17

**direct** 15:21
16:6,20 17:2
20:19 21:5
24:21 25:23
121:8 155:1
301:16
303:21
309:14

**directed**
157:20

**direction**
70:3 147:2
151:4

**directly** 22:8
23:18 24:18
25:24 28:20
30:5 254:8
256:11
258:2
285:22

294:15
298:22
299:15
300:11,16
305:2

**director**
46:13 95:5
184:3,7
185:3,5
218:10
220:10,13
221:12
254:4
259:18
274:16
304:12
308:21
309:5,11
310:7,15,19
311:4,18
316:23

**director's**
10:16 94:17
184:21,24
185:4
218:22
311:5 317:5

**disagree**
114:4 187:9,
12 193:18
234:3
311:24
317:4

**disappear**
266:21

**disbelieve**
179:24

**disbelieved**
133:2

**disbelieving**
133:10

**discharge**
36:5,13
54:15 55:21
56:4 61:6

**discharges**
35:23 36:10
37:1,17
55:24 56:8

**disciplinary**
8:1,23 10:4
11:12 12:16
15:7 21:10
25:15 29:9
30:14,21
31:12,19
32:10,17
34:22 35:10
39:13 40:10
42:24 47:17
48:7 53:6,9,
21 54:6
58:17 64:23
67:13,14
68:24 92:7,
18 102:16
152:16
172:22
186:23
187:21
196:7,12
207:8
212:16

217:16,24
250:5 259:4
260:11
267:23
290:11

**discipline**
10:1,2,10,24
20:11 21:13
31:5,13,24
32:5,6
33:13,15
34:11 35:2,7
36:24 39:11,
22 42:17
44:4 47:6,21
48:8,9 49:8,
16,23 50:9,
21 51:24
52:2,11,19
54:2 55:10,
20 59:4,17
60:12,19
63:5 65:5,18
67:11,17
68:7,14,18
69:11,20
70:6,10
71:21 72:17
91:20 143:4
159:14
167:4
172:17
183:15
194:14
203:14
219:13
239:20
240:3,7
253:8 259:1,
13,19 260:6
268:1
269:12,14,
19 278:13
284:20
290:20
313:18
314:13
318:5,18

**disciplined**
50:7 53:2
84:9 166:5
172:8
186:11
268:21
313:2 314:5,
8,13

**disciplining**
195:13
313:19

**disclose**
208:11

**disclosed**
208:7
286:20

**discovered**
258:2,10,11
267:20

**discovery**
12:19

**discredit**
202:23

**discretion**
81:15

**discriminator
y** 291:20
292:1

**discuss** 71:1
91:16 92:20
240:15
316:22

**discussed**
12:3 40:2,24
86:11
159:10
160:13
174:5 176:2,
7 198:20
211:12
212:3 213:9
240:11
252:20
260:18
261:20
317:2
320:16

**discussing**
254:3

**discussion**
168:20,23
175:20
185:2,5,16
213:17
255:7 294:5

**discussions**
77:19 78:23
86:3 87:1
92:2,14 93:4
185:10
220:9
221:23
255:11
259:17

**dishonest**
65:7,9
197:19
225:23

**dismissal**
97:13,15
99:14
156:10
253:21
308:12
316:19

**disorderly**
283:2

**disprove**
107:16
108:6 116:2
202:20

**disproven**
114:23
115:5,13
116:7

**disproving**
116:12

**dispute**
114:2,19
130:7 150:6
238:14
282:12

**disputed**
110:24

**disputes**
136:20

disputing 133:13 135:9 252:13

disrepute 60:15

distance 314:18

Distelzweig 20:8

distinction 203:19 275:24 292:18

distinguished 71:15

distribute 80:6

distributing 290:4

diversion 170:22 171:21,22 172:11

division 13:19 14:1 33:15 43:13 59:20 60:12 62:18,22 63:3 72:6 88:16 115:7, 9,18,19 165:2 172:11 192:20 209:16 257:15 261:21 274:11 275:2,23 276:6 306:16 312:14

division's 9:20 10:7 59:12,15 114:24

document 9:24 12:16, 18,23 129:21,23

documentation 111:6 123:6,10,15 124:4 129:9 135:21 140:3

documented 31:23 159:10

documenting 136:15

documents 7:19 15:9 109:20,24 114:23 115:13 116:1,12 153:12 242:9

dollars 63:18 191:15

door 54:21 265:17 280:22,23

double 76:20 203:17 285:12

doubt 256:12 272:18 302:14 307:13,21

Doug 25:22 27:11,17 54:13 55:9, 19 186:24 188:5 212:7, 10 250:4

downplayed 315:17

dozens 9:8, 10,15

draft 91:8,11, 12 154:12

drive 276:22

driver 145:24 148:2

driver's 37:22 38:1,2

driving 35:11,15,20 37:17,20 38:8,17 39:6 48:14 49:22 59:12 63:19 287:5 289:20 290:1

dropped 304:7

drove 280:23 319:11

drugs 7:1

drunk 35:11, 15,20 37:17, 20 38:8 48:14 59:11

due 98:6

DUI 38:8 267:17 268:1

duly 5:2

duties 38:4 76:15 80:1 81:23

duty 22:10, 21 23:19 26:23 76:4, 9,19 79:3, 17,23 80:10, 14,17,19 81:11,14 83:18,21 84:3,8,10,14 96:19 98:5 99:7 104:17 111:12 134:4 135:4, 24 137:2

164:16,22 165:9 171:13 173:4 177:23 186:18 189:8 194:24 195:1 201:12 203:6,8,10 204:5,11 206:2,7,10, 13,23 227:20 237:17 246:7,8,14 250:15 253:13 257:7 270:3, 6,22 275:22 276:9 279:4 280:1 283:9, 18 284:4 287:20 288:7,9,13, 23 302:1,9, 19,20 319:10,15, 18

dwelled 102:20

_____ E _____

e-mail 206:11

e-mails 204:9,10

Eagle 110:2 134:9

earlier 46:20 56:12 73:2 127:6 200:17 213:9 222:2 244:6 246:4

early 94:5 125:15 228:1 251:13 253:10

earn 107:3 262:16

easier 255:1

easily 117:23

education 32:9 34:2,11 35:2

EEO 291:7 301:12

EEOC 186:1

effect 10:4 20:5 281:23

effects 38:21

effort 112:22 119:23 139:12 252:24 253:14

eight-hour 193:12

element 306:23

Eleven 193:10

else's 6:15 113:2

embarrassed 260:20

embarrassing 60:11

embarrassment 59:21 72:2 199:16

emotional 236:14 239:14 243:1

employed 145:21

employee 41:17 195:1

employer 275:22 276:10 279:4

employers 195:1

employment 76:20 263:10 298:22 309:13

emptying 37:9

encountered 43:7

end 144:23, 24 145:4 155:16 156:9 206:8 215:9 233:24 250:21 261:10

ended 170:21 202:15 207:8 276:8 289:11,12 290:1

enemyship 20:24

enforcement 271:3

engaged 291:18 299:17

ensure 37:11

entire 111:19 155:9 177:1 196:14 236:16 287:20

equal 50:5,9, 12 60:10 64:14

equipment 42:7

Eric 29:21 291:1 294:15 295:11 296:2,10 297:5,6,20

error 201:23

errors 197:5 199:10 201:23 214:20

ESB 87:10

escapes 188:14

essentially 47:20 110:7 253:12 256:11 257:21

events 226:17

everybody's 180:1

evidence 17:4 19:6,19 40:3,14 50:23 51:1, 3,8 65:19,20 68:3,17,22 69:6 103:3 106:8,9,11, 12,21 107:22,24 115:9 141:12 146:15,24 147:1,10 164:22 169:5 170:6, 12 176:17 197:15 205:19 206:6,14,19 212:23 213:3,13 214:13 256:6 261:8 293:18,19 300:4 314:21

exact 13:9 48:21 135:15 235:10

examined 204:7

examples 28:7 74:6

exception 320:13

excessive 304:23 305:17,22 306:21 307:1,15

exchange 36:16

exchanging 280:23

exclusively
74:2

exculpatory
147:23

excused
167:12

executive
78:24 85:18,
20,24 86:3,
10 87:13
244:22

exhausted
224:18
230:9,18
232:14

exhibit 95:19
96:16
108:16
125:8
130:13
144:7,11
147:14,19
227:8 228:1,
5 231:16
234:8,12
274:14,19

exhibited
235:11

exhibits
95:13,14

exist 264:10

exonerated
189:3
207:10

expect 50:8
59:1 103:18
196:12

expectation
109:23

expected
105:2 120:4
129:3,11
132:20
133:23
135:4
139:11
176:23
257:12

expects
257:15

experienced
117:21

experiencing
248:2,23

experts
32:15

explain
52:15 61:16
283:17
287:22

explained
9:20 238:20

explanation
101:11
104:23
105:4
107:21
111:3 184:1
219:19

222:20
230:4
232:12,18
234:16,22
235:5
248:20

explanations
201:18

explored
134:2

expose
63:10,15

Exposing
63:3

expressed
243:21
248:6

expunged
170:22
209:18

extending
172:17

extensive
223:2 255:8

extensively
306:10,14

extra 145:21
153:24

extremely
57:8 58:12
60:5 62:12
198:17
200:16
215:12
246:18
289:21

eye 67:3
247:17

eyewitness
135:23
136:23

eyewitnesss
116:15

————

F

————

faced 303:24

facing 81:2
280:9

fact 19:18
48:21 53:10
55:23 102:9
111:22
114:1,18
117:16
142:12
147:8 178:9
194:23
196:9
197:12,18,
24 199:3
209:6
212:20
215:12
224:17
251:11
253:17
285:16
288:12
295:24

317:23
318:5,14

factor 44:1
60:2 67:10
68:13,23
70:1,19
71:8,11,24
72:3,6,9
73:20 75:1
180:22
181:21
318:5

factored
71:21

factors 60:9
65:4,16 67:6
69:19 72:15
74:4,9 75:6
106:6
141:14
161:23
203:4
252:20

facts 12:3
17:11 28:16
48:12,17
50:16 62:20
69:14 105:9
147:13
161:21
177:4
187:12
195:20
196:8 205:8,
13 249:11
250:24

faded 20:4

fail 63:16

failed 98:5
189:6
190:23
191:23
194:15
289:18

failing 199:5
256:19
264:22
265:6

failure
141:11
188:16
242:15

fair 31:2 57:3
75:12 81:15
292:5
314:18

fairly 5:16
194:8,9
222:22,24
223:1,16
228:1
241:15
245:17

faith 29:14

fall 73:12

falling
289:24

false 109:1,
11 232:21
270:6
276:11

falsely
225:16
275:21,22

familiar
119:12
188:9 198:5
217:4 224:8,
12 225:7
249:7 250:6
251:10
252:11
257:23
270:16
283:1 290:5,
24 299:13

fault 214:3,8

favor 179:13

February
229:24

federal 46:21
288:15
300:5

feedback
104:6,9,11

feel 30:20
51:22 52:2,
24 74:17
146:23
154:24
161:19
320:17

Feeling
236:21

feelings 53:3

feels 80:8

fellow
224:15

felony
171:18
271:11,15,
16,18,23
284:4,5

felt 28:7 31:4
32:2,15
38:14 53:21
54:7 55:11
69:4 120:8
135:10
151:7 155:2
156:2
212:22
215:10
235:11
239:13
242:9
252:21
281:12,24

fessed 28:23

fewer 193:1

field 289:9,
12

fight 73:15

fighting
53:7,15
213:9

figure 70:2
139:12
226:8 253:1,
14 264:11

265:10

file 14:14
123:21

filed 46:2
100:8 186:1
223:23
271:2

filing 221:3

fill 204:12

final 40:18
91:10

financial
60:22 61:14

financially
38:23 63:11

find 12:2
19:18 51:6
80:3,5 82:3
108:19
120:5
121:24
122:3 139:4
143:21
146:10
148:9
149:20
150:4,19
151:18
153:12
154:1
157:10
158:7 159:7
160:4
162:13
206:17
216:20
228:13
250:15
251:5,18
306:6,7

finding 234:9
235:7
239:19,21
275:17

findings
187:16,20,
21,22 189:5

finish 110:18
235:23
247:3 310:3

fire 309:9

fired 174:13
262:11
263:10
265:4,5
270:22
284:13

fit 115:14

flailing
289:24

flee 73:14

flex 47:12
180:9

flip 122:4,8
145:15
147:16
228:1,3,21
229:22
230:21
274:15

**flipping**
147:18

**flouting** 58:1

**fluctuates**
80:12

**Flying** 232:6

**focus** 37:7
45:23 71:3
151:7
167:12
182:5 189:2
207:10
215:5

**focusing**
227:1

**follow** 58:5
103:19
121:13
264:22
265:6

**follow-up**
91:5 138:18
150:16,24
153:2,15
154:10,14,
15 155:21
157:15
158:3
159:23
182:24
226:8

**foolproof**
127:12

**foot** 54:21
315:6,8

**FOP** 35:9
71:3 93:4,19
152:10
213:8
216:13,19

**FOP's**
213:23
216:9

**force** 61:18,
21 62:13,16,
23 73:3
257:8
260:22
304:23
305:17,20,
23 306:21
307:1,15,22
308:7
314:15
315:2,5,16
316:3,7,14
317:24
318:1 320:6

**foregoing**
320:23

**forever**
204:15

**form** 11:24
167:5
168:11

**forms** 75:19

**forward** 9:4
46:9 197:2,
5,13,21
233:14

**forwarded**
311:3

**found** 189:4
208:12
258:13,19
264:15
268:5 270:5
271:17
277:12
280:11
301:15
304:20
305:19
307:11
311:16
318:15,16

**four-hour**
176:23,24
191:23
192:5,12,21
193:12

**four-year**
267:21

**Fox** 188:7
207:2
208:23

**frame** 75:13
82:22 84:3,
7,13,17
85:10
128:18
210:5
263:22
267:18

**frames** 83:8

**Franchini**
263:3,9,15
264:12
266:5,17

**Fred** 254:10

**free** 161:18
305:17

**Freudian**
256:24

**Friday**
134:10
140:8
141:24
230:3,6,9
231:21
232:4

**Fridays**
133:17
140:11
142:17
178:3

**friend** 21:24
23:7,9,14,15
39:5 117:12

**friendship**
20:21

**front** 43:18
83:1 147:13
234:20
269:15,19
285:5

**frustrated**
313:22

**full** 98:4,5
190:23

**Furbee**
88:14,17,21
272:14
286:13,18

**Furbee's**
286:10

**future** 70:15

_____

**G**

**gap** 155:1,2

**Gardener**
243:18,19

**Gateway**
271:3

**gave** 9:21
46:24 48:2
55:10 57:21
65:3 68:21
104:5 117:2
138:2,15
146:19
168:17
179:20
232:13,17,
18 238:8,18
239:8 280:7
285:14
316:11

**general**
30:13 39:10
46:11 47:11
52:14 57:6
65:11,13
66:10 75:8,
12 76:4,13
79:8,13,16
82:21 85:20
114:6,21
128:7
137:20
173:19
187:9
217:15
275:1

**generalizatio
n** 114:9

**generally**
10:13 44:6
45:3 59:4
61:12 72:15
77:15 79:2
81:5 87:6
93:20 94:20
99:13
168:24
169:5
178:23
181:17
223:14
255:3

**George**
22:15

**get along**
15:24

**Giant** 110:2
134:9

**Gilbert** 94:9

**Ginther**
94:22

**gist** 101:18,
19 108:8
197:10

**GITTES** 64:4,
6

**give** 11:9,22
39:21 45:3,
24 50:15
54:12 61:4,
17 68:18
69:13 70:5
73:16 94:17
95:15 103:2
104:11
115:19
120:20
146:17,20
152:7,11
169:7
184:20
217:15
227:5 245:4
250:1 251:1
260:21
264:21
274:13

**giving** 104:8
138:22
178:10,11
276:9
278:23

**good** 40:10
67:5 120:10
201:11
212:3 223:7
256:1

**government**
33:8

**grab** 281:20

**Gray** 226:6

**great** 34:19
114:16
151:24
235:12
292:18
298:20
320:10

**greater**
40:15 57:2
240:4 249:9

**grew** 35:17

**grid** 10:4

**grievance**
10:24 91:20
92:7,19
93:14,21,22

**grieved**
288:14

**ground** 5:18
314:17

**guaranteed**
152:12

**guard** 117:14
118:11

**guard's**
118:10
123:6

**guess** 11:20
12:5 16:1,3
37:15 39:8
41:4 44:12,
14 48:1,7
49:4 50:18
57:16 65:3,6
69:15 70:2,
23 85:5
106:14
123:7
153:18
169:1
193:11
198:18
203:18
212:23
216:9 218:6
233:23
239:11
264:11
268:14
272:9 309:7

**guessed**
198:11

**guidance**
115:10,11,
15,19,22
154:22
184:2

**guilty** 215:17
216:20
261:11
268:6
271:17,18
282:23
283:8 306:6,
8

**gun** 28:10
54:16 79:24
280:15
285:3

**guru** 34:17

**guy** 34:19
139:2 148:2,
9 150:12,14
289:19,22
314:19

**guy's** 315:9

**guys** 228:12
263:24
280:21
281:18
282:5 286:2

_____

**H**

**half** 285:4

**hallway**
93:13

**hand** 54:16
228:13
230:22
231:15
234:7

**handcuffed**
312:23
314:17

**handed**
69:11 72:17

**handing**

59:17 95:18
120:24
144:6 227:6
**handled**
31:13 39:11
56:19 274:6
289:6
**handling**
273:23
**handwriting**
97:9
**handwritten**
97:5
**handwrote**
98:20
**haphazard**
113:8 114:6,
11
**happen**
18:14 36:10,
14 70:8
76:23 95:10
104:4 213:5
269:12
**happened**
6:14 11:11
75:17 93:17
94:21
130:10
149:11
172:24
181:16
187:14
197:23
206:18
213:13
247:9
249:18
253:11,19
280:5
283:14
290:15
298:19
**happening**
132:19
243:23
253:18
**haranguing**
298:13
**hard** 58:24
73:16
121:13
171:20
319:24
**harm** 60:17,
19,20,22
61:12 62:6
72:5 280:9
293:22
**harmed**
282:4
**harsher**
34:22 39:3
55:7
**harshness**
34:24
**hat** 57:21,24
58:2,11,22,
24 59:2
**hats** 48:24

**Hawkins**
279:16,21
282:2,23
283:7,8
284:18
285:13,14
286:1,23
287:22
289:3 290:3
**he-said-she-
said** 182:7,
15,16
**head** 17:15,
20 304:24
305:14
308:1
312:22
314:19
315:9 318:9
**heads** 94:17
**health**
240:24
241:1
**hear** 138:6
**heard** 42:4
65:16 75:22,
23 76:18
235:14
288:19
294:15
**hearing** 8:12
71:1 77:23
87:21 92:24
93:2,3,14
136:21
143:4 144:9,
23 145:1,4
146:7,21
147:21
148:1,6,16,
17,21
156:21
159:18
163:23
167:2,7,8,9,
11,20 168:3,
6,21 184:22
185:4
198:21
208:19
210:15,18,
19 211:20
213:17
216:7,16,17
219:3,4
225:12,14,
22 226:16,
23 227:13
231:12,17
232:11
234:20
235:13
236:4
238:16
239:3
241:16,23
242:4,15
254:8
259:23
260:11
261:15
266:24
267:2,4
273:8,9,12,

13 290:19
308:11
311:5
**hearings**
167:3
184:24
**heat** 61:22
312:7
**held** 57:5,13
294:5 315:7
**helped** 78:13
244:12,14
**helpful** 14:9
**Hern** 263:2,
10,16 264:6
266:4,8,13
**heroic**
245:17
**heroism**
245:1
**hey** 93:14
117:2 134:7
135:3 148:6,
21 202:7
264:20
**high** 240:15,
16 245:16
**higher** 47:22
48:9 49:9,
15,16 54:24
57:5,11,13,
16 67:23
68:7 70:5
**highlighted**
123:14
**highly** 28:11
260:19
**Hill** 134:8
**hiring**
300:12,18,
21
**Hispanic**
289:11
**history**
40:10,11
67:7,14
**hit** 282:5,6
289:22
304:23
308:1
319:13
**Hitting**
305:14
**hold** 44:16
52:3 149:9
152:15
154:17
247:2
309:21
**holding**
260:10
**hole** 36:7
49:1
**holes** 36:23
**home** 142:17
146:1
224:17

225:13,15
226:18
227:20
229:14,18
230:10,16
232:5,16
233:2,15
239:3,6
265:15,16
**home...you**
230:12
**honest** 16:3
276:7
312:12
**honesty**
29:18 64:10,
24 66:6
**honor**
213:10
214:1
**hope** 276:7
298:4
**hour** 197:9
230:8
**hours** 7:18
35:11,16,21
47:12 101:5,
12 104:24
105:13
106:18
107:2 108:5
124:19
126:19
127:24
133:17
135:17
166:1
176:15,16
177:2 178:7,
9,10,11
180:9 189:9
191:4,8
193:1
201:16
212:6,9
219:13
222:7,14
240:2
251:14,15
257:12,24
261:22,23
285:10,17
305:7
316:16
**Houseberg**
29:5 269:24
270:2,5
272:13,21
277:15
278:10
279:13
**Houseberg's**
274:16
279:4
**HR** 31:7
264:19,23
**huh-uh**
32:22
**human**
303:13
**humiliation**
59:21

**Hundley**
86:13
**hurting** 36:8
282:7
**husband**
188:11
**Hyland** 24:8
**hypothetical**
50:2 69:13
106:16
157:22
161:5

———

**I**

———

**I-ii** 275:4
**IA** 15:3 78:12
148:16
169:11
293:17
302:2,9
**IAB** 157:5
189:14
**iceberg**
253:11
**ID** 204:8
**idea** 126:18
169:8
191:18
**identification**
144:12
234:13
274:20
**identified**
153:14
**identify**
150:19
157:17
**identifying**
116:20
**identity**
277:4
**II** 96:18
227:16
**III** 98:2
**illegal** 63:9
152:19
**image** 13:9
59:13,15
**imagine**
199:20
**immediately**
253:3
270:22
283:9
302:23
**impact**
218:16
219:24
**impair**
271:21
**implicates**
64:24
**implying**
176:19

**important**
12:10 57:4,8
58:12 62:12
136:1,8
137:4,7,15
156:3
159:17
203:14
237:7

**impose**
212:5

**imposed**
212:6

**impossible**
215:13

**impression**
22:5 124:11
133:1

**improper**
271:2,9,21
289:4
314:15

**improperly**
289:6 318:1

**improve**
242:21

**inaccurate**
131:24
132:3,7,13
315:17

**inappropriate**
291:13,20
292:1,4
319:17

**inappropriate
ly** 62:1

**inbuilt** 181:9

**incident**
19:11
118:23
119:7
122:24
129:10
130:8 131:4,
14 132:18
153:7
186:13
243:23
245:17
249:12
250:11,13
268:10
278:23
279:24
280:3,20
282:15,24
284:19
285:3 286:2
305:3,4
312:6
314:24
315:18
316:1 317:2,
7 319:16

**incidental**
93:12

**incidents**
11:7 25:18
26:4 27:18
28:7 37:18

**include**
137:4,7

**included**
37:21
100:20
116:9 226:2,
4 267:22
293:19

**including**
56:3 95:21
150:10
157:18
159:24
196:13
242:15
297:15

**inconvenienc
e** 241:19

**indent**
268:17

**independent**
76:16

**indeterminan
t** 58:20

**indicating**
191:13

**indication**
29:19
143:20
164:24
272:15

**indications**
179:9

**indicted**
272:5

**individual**
143:14

**influence**
53:8,9

**influenced**
117:24

**inform**
277:13

**information**
10:11 11:11,
22 13:10
19:10,13,14
31:3 32:7,8
33:7 82:24
83:6 102:13
103:10
116:21
120:13
133:24
136:5,9,13
137:8,9,21
138:3,23
139:14,18,
21 141:2
146:18,20
147:12,23
148:24
150:24
151:2,6,18
152:6 153:7,
16 157:19
159:1 160:1,
2 162:2
169:4
170:24
179:23

**215:**8,19
231:11
246:24
252:18
271:4,6
274:3 276:9,
11,13
277:16
278:24
280:7,24
297:14,15

**informed**
11:6 31:2
76:1 77:15
290:18
310:9,17

**informing**
112:6
277:21

**infractions**
64:23
269:20

**initial** 206:14
258:3

**initials** 97:6

**initiate** 39:14
270:15

**initiated** 76:3

**initiation**
76:1

**innocent**
53:2

**input** 186:5
208:17

**inside** 36:10

**insisted**
58:16

**installed**
232:16

**installing**
224:9
225:15
229:19

**instance**
14:23 35:10
61:9 62:24
149:4 153:6
173:15
179:8 195:6
207:5,17
242:8 245:6
278:14
279:1
284:13

**instances**
135:22
156:5
165:16,17
174:5 240:1
251:18
253:15
255:4 279:6

**instruct**
88:20

**instructed**
157:8 225:2
314:1

**insubordinati
on** 301:21

**integrity**
64:10 65:1
66:6 202:14,
16 276:7

**intent** 252:6

**intentional**
72:8 73:22
199:12
310:2

**intentionally**
62:16,17
65:7 199:5
277:7
309:23

**intercepting**
232:7

**interested**
11:5

**interesting**
30:19

**intermittent**
58:20

**internal** 8:5
9:15 14:24
15:6 18:23
27:1,3 32:12
39:14 44:17,
20 61:14
77:6,11
78:16 86:4,9
88:9 89:8,
11,22 90:13,
24 91:9,15
92:20 95:20
96:23 99:11
100:16
101:20
107:15
119:22
120:4 121:3
143:20
151:5 154:9,
22 155:5,8,
16 156:1
165:7 172:3,
4 190:10,11
222:17
223:3
272:11
281:6
294:14
298:23
299:9,11,18
302:18,23
304:20,22

**International**
33:1

**Internet**
237:3

**interpretatio
n** 286:7,11

**interrupt**
247:6,11

**interview**
8:12 89:24
90:13 102:2
118:22
121:5,15,17
123:21,22
124:12
130:19
131:11

**150:**5 152:7,
11 157:6
164:21
224:3,13,24
227:18
228:2,9,16,
21,22
229:23
230:23,24
231:2,3
232:14,17,
19 302:17,
24

**interviewed**
19:24 121:4,
15 143:24
294:19

**interviews**
78:13 89:24
90:6,21
121:3
143:19
164:8 215:5
232:2

**intoxicated**
38:17
289:21

**intranet** 9:20
10:7 13:19

**introduced**
5:10

**investigate**
45:10 99:11
289:18

**investigated**
44:9 84:13
188:16
222:16,17
224:5
237:15
255:14
257:18
268:20
277:15
291:12
312:21
313:1

**investigating**
45:6 77:20
122:21

**investigation**
7:23 8:6
15:1 19:2
25:1,5 26:6,
8 29:4
39:14,15
40:13 44:18,
19,20,22
45:12,18,20
46:10,20,23
75:11,18
77:1,16
78:11,21
79:5,7,14,18
82:22 83:11,
21 84:15
87:2,8 88:18
89:1,3,6,9
91:5 92:21
100:2,3,7,14
101:3 103:1
104:22
109:20
111:19

113:7
115:20
116:18
121:14
128:19
137:22
149:23
150:21
151:16,24
152:3,11,16,
17 153:21
154:4,23
155:20,24
156:1,9,24
157:3
159:21
160:7 164:6
166:9
174:20,24
180:14,17,
24 181:13,
19,21 188:8
189:12
190:10,15,
18 191:22
194:14
196:20
199:23
200:5
202:21,24
203:24
204:1 206:1,
5 208:16,21
209:3
210:13
213:1
214:23,24
215:3,4,8,10
223:9
225:23,24
226:2,5
232:24
233:24
243:20
251:22,23
252:15
255:7,9
256:4 258:9
263:12
266:14
267:15,16
270:2
272:13,21,
22 277:12
279:3,21
281:7
283:18
286:23
287:21
289:3,4
290:16
291:2 293:2,
8 296:5,17
297:3,6,9,13
298:2,17,24
299:9,11,18,
22 300:6,9
301:10,12,
17,22 302:2,
9,18 304:22
314:14
317:12,16,
18,24 318:7
**investigation
s** 9:11,12
44:15 45:17,
19 46:3 51:8

76:2 87:24
190:1
223:15,20
240:20
255:18
298:5
312:20
**investigative**
8:4 78:5
91:16 102:6,
8,18 104:6
108:16
121:3
123:19
124:2,3,10
125:7
128:22,24
130:13,14,
19 131:7,16,
23 137:4
143:18
157:6 160:5
161:8,11
189:5 224:2,
11 233:5
**investigator**
131:17
169:11
181:16
190:12
223:4
**investigators**
91:6 138:2,
18 139:11
157:9
**invoice**
113:18
178:2
**invoices**
113:20
176:20
177:7,13,22
**involve**
294:8
**involved**
25:16 26:3,8
27:19,20
38:23 53:13
59:5,7 65:1
68:20 78:11
81:6 87:18
100:21
135:22
161:23
170:14
221:22
249:12
252:7 260:5
264:23
270:12
280:12
283:15
285:3,22
289:21
292:21
298:21
300:9,21
305:9
318:16
**involvement**
76:24 77:4
78:14 88:8
209:4
300:12

**involves**
64:9
**involving**
55:24
186:23
187:2
249:13
257:2
279:24
289:11
290:11
307:14
312:20
**Irwin** 23:17,
21 86:24
92:15
**issue** 38:9
52:2 53:22
54:8 55:12
61:14
114:13
163:8,10
172:14
175:14
205:24
221:9
239:20
243:6
244:22
246:3 249:5,
6 250:5
288:12
**issued** 47:6
227:12
231:13
235:6 238:1
239:12
240:8
313:17
**issues** 25:16
37:14 39:11
243:6,9
262:4
263:14
265:1 269:4

_____

**J**

**Jackson**
58:14
**Jacobs** 5:1,8
64:22
126:12
**Jason** 94:6,8
**Jeff** 5:10
21:16 22:5
24:14 88:14
92:15
100:11
102:4,13
110:18
126:10
161:9 163:6
200:12
201:10
255:22
272:14
286:10
298:8
**Jennifer** 77:5
188:10
**Jesse** 304:16

307:14
**Jim** 94:9
**job** 46:24
81:4 105:1
113:8 114:6,
14,16
116:22
136:14
138:4
159:12
207:16,21
237:2,7,9
239:13
240:16,18,
19,20
260:24
299:6,8
300:13,14,
22
**jobs** 98:5
177:8
240:15
263:4
265:14
**Joe** 263:2
272:21
**jog** 289:17
**jogs** 251:2
**Jones** 15:2
25:22 82:22
83:10
186:24
187:3,5,17
188:5 189:2,
6 190:21
191:7 193:2,
23 196:21,
24 197:2
203:24
204:4 206:2
208:23
210:14
211:23
212:7,10
217:1
221:13
222:6 256:7
288:18
**Jones'** 205:5
214:18
**Jones's**
197:12
**Joseph** 29:5
269:24
**Josh** 263:12
**judge** 41:16
162:17
163:3
**judgment**
29:16 51:20
74:16
249:13
**July** 254:12
**jumbled**
19:15
**jump** 79:15
267:10
**jumping**
245:18

**justified**
102:18
281:9
**justify**
103:10

_____

**K**

**keeping** 11:1
77:15 213:2
214:3
**Ken** 16:23
78:10
**Kevin** 5:11
8:5,8 14:20
24:19,20
25:5 75:11
76:18 77:20
90:6 95:20
98:10 100:4
121:2
131:13
157:7
175:19
184:22
185:4,11,18,
22 186:16
221:2
**Kevin's**
211:24
**kick** 17:15
18:3
**kicked** 17:19
314:19
**kicking**
312:22
318:8
**kid** 245:18
**kidnapped**
281:8 282:4
**kidnapping**
282:6
**kill** 38:20
**Kim** 5:8
**KIMBERLEY**
5:1
**kind** 18:11
23:2,8,15
28:23 35:15
36:21 49:23
63:13 69:23
83:6 126:6
147:12
171:18
172:18
180:24
194:21
201:21,23
218:4
224:10
236:24
241:12
242:22
246:15
249:11
257:7
258:10
260:22
270:10
272:15
292:15

311:8 312:7

**kinds** 15:13
76:5 81:22
117:19

**Kirby** 26:12
83:20 211:7
222:5 224:1
225:22
227:12
234:1 235:2,
6,7 237:11,
15 238:1
239:12
241:8 242:6
243:5,9,20
249:9
277:10

**Kirby's**
222:1
223:10
225:12
240:7,9,20
248:14
249:16

**Kline** 229:15

**Kline...i**
229:13

**knew** 43:9
55:4 73:8
80:15
100:15
123:17
128:11,23
150:14
159:12
160:2 177:7,
23 179:4
207:23,24
223:4
227:21
231:6
276:14,15
318:6

**Knight** 77:5,
14,15
160:15
188:10
189:13
207:2,5
208:24

**Knight's**
188:11

**Knode** 41:24
42:1 47:1
262:20

**knowing**
51:14 69:14
151:2,11
159:3 162:4
163:7
195:23
198:2
199:18

**knowledge**
28:2,5 30:11
33:18 78:18
125:2 153:9
165:2
177:16
215:20
237:1 253:4
303:23

**Kroger** 117:8
119:8,9
133:17,20
134:17,20,
24 153:8

**Kuebler**
91:23 92:2
169:23
170:4
213:20

**Kyle** 122:22

———

**L**

**LA** 34:2,13,
14

**label** 292:4,6

**labor** 31:7

**lack** 200:16
260:20

**lacking**
156:7,9,15

**Lake** 147:5,6
166:17
272:5

**Lakes**
111:13
119:10
133:23
134:18,21
140:13,22
141:8 142:5
153:24
164:15
165:10,21
166:1,15
192:5
207:16

**Lancaster**
299:5
301:18

**Lance** 262:3
268:9

**laptop**
229:20

**large** 84:20
194:9
202:14
214:6 263:4

**larger** 215:15

**Laroche**
28:19 211:7
249:21
250:14
251:3
252:14
253:8,22
254:1,11,15
255:9,13
256:4,11,14
257:19

**Laroche's**
252:24
254:3

**late** 140:10
195:7,14
251:13
253:9 261:7
269:12

**late...or** 98:6

**law** 43:15
271:3 272:1
307:12

**laws** 300:5

**lawsuit** 8:18
221:3
288:15,20
308:6

**lawyer** 307:5

**layer** 155:13

**lead** 12:12
25:16 57:9
178:17

**leading** 59:2

**leads** 117:20

**lease** 264:19

**leave** 11:23
26:7 187:1
189:9
190:23
191:14
197:8,13,21,
23 198:1,7,8
199:4,5
201:3,24
202:2,6
204:6 205:6,
17 206:4,8,
22 210:13
213:1 214:3
215:15
240:1
243:12
256:17
261:23
262:4,19
263:6,7,18
264:14,16,
19,20
266:11
267:9 311:7

**leaving**
251:7,8,13

**leaving...
early.** 98:6

**led** 213:24

**Lee** 34:12

**left** 86:22
94:11 103:5,
15 253:9
263:9

**legal** 44:24
46:12 63:4,
10 88:15
306:3
307:19

**legitimate**
264:1

**legwork**
151:18

**length** 46:22

**lengths**
144:1

**lengthy**
252:9

**lessen**
118:4,6

**lesser** 53:20
54:6 55:10
240:4

**let alone**
214:13

**letter** 216:3

**level** 26:2
39:22 40:11
43:2 53:3
54:2 65:4,
18,19 68:1,
7,18,22,23
69:10,20
70:5,9,15
71:10 72:2
76:9 105:21
217:15
240:3,4
243:1
252:22
259:13,19
278:13
283:22
284:20
320:5

**levels** 58:17

**liability** 63:4,
10

**license** 38:1,
2 319:11

**lie** 181:1
225:4
237:18
239:10

**lied** 29:20
225:2,4
237:16
238:9 239:2
277:7,12,20
305:2

**lieu** 268:13

**lieutenant**
24:1,2 27:10
47:19 86:24
87:1,14
102:21
154:9 159:2
167:6 168:8,
13,17 174:8,
9,18 188:13
233:9,10,11
243:18,19
262:3
291:17,23
294:4,7
299:15
300:1,9
301:8,20
302:16
304:9
310:24

**lieutenants**
10:24 87:10,
23 91:20
92:8,19
167:23

**life** 244:14
264:5

**light** 181:5
257:17,20
319:5

**lighting**
246:20

**likelihood**
178:18

**limited**
246:20

**limits** 155:24

**lines** 18:16
76:19 93:19
117:13
142:18
199:3
204:19
255:12
316:8,15

**link** 10:10

**list** 41:5
68:21 72:24
83:5 96:22
168:5,17
208:4 209:7,
8,12,14,23
210:9
237:12
275:18
278:8

**listed** 15:5
67:6 99:10
100:12
101:8 102:3,
9,10 158:14,
16

**listen** 8:14
90:24

**listened**
90:21
123:23
235:13

**listening**
46:11

**lists** 145:20

**literally** 41:8
158:11

**litigation**
270:15

**lived** 139:2
145:24

**located**
81:20

**location**
134:4
135:24
137:1 139:3
280:11

**locations**
158:18

**log** 164:12

**logs** 112:23
204:7

**Lokai** 24:15
87:1 92:15

**long** 7:17
37:22 69:22
81:11 83:17
120:17
121:16
145:16
146:21

149:11
153:19,20
209:15
224:19
247:7 266:2
288:13,23
298:19
306:11
311:4

**longer** 19:16
46:19 82:18
217:22

**lookback**
267:18

**looked** 32:9,
10 33:13
40:6 207:2,3

**loophole**
214:6,17
256:6

**lose** 218:18
220:1

**lost** 37:21

**lot** 12:2 22:2
26:4 29:12,
14,22 32:12,
16 33:10
38:11 44:8,
15 45:11,22
48:23 73:19
141:1
153:11
183:21
184:1
190:19
201:10
204:24
205:2 210:7
236:11
257:9 262:4,
17,18
280:21
310:2

**louder**
216:22

**lower** 57:5
58:4 193:16

**lunch** 22:22
163:12

**luxury** 272:8

**lying** 67:3
180:3
233:14
237:17
314:17

**Lyon's**
249:17

**Lyons** 84:2
244:6,7,24
245:5 246:2
247:23
248:10
249:4 269:7
285:2,9,19,
20,21 286:4,
16,22 287:5,
17 288:11,
22 319:6,9,
20

---

**M**

**M1s** 284:12

**made** 9:2
19:11 29:2,
12 30:20
37:4 55:8
91:21 92:23
120:19
125:11
128:10
132:22
137:1
160:21,22
162:10
174:11
180:12
197:18
199:4
200:12
211:24
227:21
249:14
256:19
262:6,13
268:6 270:5
285:23
288:2,4,10,
11 292:15,
21 294:9,17
296:2 297:6,
20 299:6
303:20
310:10,18,
24 311:14,
16,23 312:4,
9 318:17

**main** 37:7
141:12

**majority**
135:22

**make** 14:8
19:13 31:2,
7,11,19 32:1
36:18 40:18
48:8 49:8
53:3,22 54:8
55:12 63:4
69:15 81:10,
23 82:7 88:3
126:3,7
127:2,5,10,
13,22,24
128:6 132:7
139:12
140:9,14
145:7 155:4
177:3
179:10
180:15
182:14
203:13,18
213:20
218:4
243:22
286:5
294:15

**makes** 17:6
131:23
132:2
150:13
181:6 182:3
278:19

**making** 11:5
29:15 31:1,8
39:2 52:10
61:23 74:17
162:24
165:24
186:22
203:3
249:13
274:2
291:13,16,
20,24
292:21
293:3
295:11
298:6
319:19

**male** 145:24
263:1
289:11

**manage**
32:16

**management**
179:22
183:1

**manager**
100:21
101:2 102:1
111:22
113:14
125:14
150:11
201:14

**manner**
37:10 157:1

**mark** 115:1
141:11,20
165:16
166:3
242:15

**marked**
95:19 121:1
141:2,3,8
142:6 143:1
144:6,12
165:8 227:7
228:2
231:16
234:8,12
263:8
274:14,20

**marking**
112:23
140:22
165:19
166:6,14
207:20

**marks**
250:21

**match** 147:7
296:20,22
315:12

**material**
121:5 158:6,
11,13
258:11,14,
19

**materials**
14:20 15:3
272:12

**matrices**
33:13

**matrix** 33:16,
20 34:5,7
40:1

**matrixes**
32:10 33:22

**matter** 56:23
105:19
114:21
194:13
195:21
254:19
274:10
278:2 284:1

**matters**
21:10
194:19
195:5

**max** 217:7,
13

**Mayhew**
99:2,3,16,23
163:18

**Mayor** 94:22
95:3,5

**Mcfadden**
30:4 291:6,
10,17,23
294:8
299:15
300:1 301:8,
20 302:16
304:9 311:1,
3

**Mcfadden's**
291:17
300:9 311:6

**me...you**
230:16

**meaning**
38:3 257:14

**means** 36:19
46:18 295:2
296:19

**meant** 97:21
237:11
241:2,4
259:8

**media**
199:15
221:4
282:15
317:8

**medical** 7:1
263:5 264:1,
7,19,20
265:5

**medications**
7:1

**meet** 7:8

**meetings**
78:24 86:10
94:24 95:2,
4,6,9

**Meister** 16:4
77:19 78:16,
20 101:21
102:3 103:5,
23 119:14
123:18
129:3,9

131:2,5,16
132:16
133:17
148:14,15,
20 149:1,6,
17 151:17
153:11

**Meister's**
107:15
108:2 109:4
130:24
166:13

**Melissa** 30:4
291:6

**members**
60:21
216:19

**memories**
20:4 225:10

**memory** 6:15
21:12
117:22
169:2 180:1
198:24
226:13
251:2 289:8,
17

**men** 280:12

**mental** 63:12
240:24

**mention**
148:6,23

**mentioned**
15:8 33:13
35:6 50:17
59:10,12
69:24 70:9,
17 71:6
72:15 74:4
83:20 127:6
131:12,20
148:1,8
149:2,18
150:7
153:19
163:17
186:15
203:5 205:3
222:2 268:8
269:2 285:2,
21

**mentioning**
256:7

**mentor**
117:12

**mess** 200:22
201:2

**message**
35:18

**messages**
132:18
299:7

**met** 21:20
22:2,3

**metal** 36:6

**meted** 31:13

**method**
89:19 157:1

**methods**

89:20
206:12,21

**middle** 6:16,
20 130:20
231:20

**military** 42:5,
8 248:11

**mind** 51:1
129:19
137:13
147:16
275:16
278:20
319:20

**mind's** 67:3

**mine** 13:9
51:4 102:15,
17 170:8

**minimize**
80:16

**minimum**
35:11,12

**minute** 39:9,
19 64:5

**minutes**
64:19
169:17
195:7 196:3,
15 239:7
255:24

**mirror**
287:11

**misconduct**
11:19 12:7
38:5 51:23
64:24 65:6
68:6,13
73:21 75:16
114:24
151:19
176:12
181:14
195:9 197:1,
15 199:12
242:14
251:24
252:1 253:2
258:9,15
261:12
266:10
300:2 305:8
313:23

**misconstrue
d** 280:6

**misdeeds**
26:17 28:24

**misdemeano
r** 283:24
284:3,10,16,
23,24

**mishandled**
43:8

**misleading**
197:20

**misreported**
194:19
197:4

**misreporting**
186:12
187:1

210:13
261:22

**misrepresent
ation** 274:3

**misrepresent
ing** 195:2

**missed**
197:9 198:7
232:15

**missing**
197:22
205:17
215:15

**mistake**
312:10,13

**mistakenly**
270:12

**misundersta
nding** 24:11

**mitigating**
72:21,24
73:2,6 74:3
318:5

**mixed** 46:3

**mixing** 46:15

**mom** 146:4

**moment**
61:22
125:10,21
126:15,20
130:23
177:21
188:14
235:10
312:7

**money** 42:11
99:6 107:3
191:19
193:22,24
194:18,20
262:16,23

**monitor**
81:8,11

**monitoring**
260:24

**month** 95:10
120:18
129:23
293:10
298:18

**monthly**
94:23 95:4,9

**months**
120:19,22
187:6
254:12
261:16
318:24

**Moore** 29:21
262:13
291:1,9
293:20
294:15
295:11
296:1,11,16
297:5,6,20
299:24
300:4,11,16
301:15,24

303:24

**Moore's**
291:15
292:20
298:21

**Morgan** 5:11
8:5,9 15:5,6
24:19,20
25:5 75:11
77:20 79:17
82:10 87:2
95:20 96:19
98:10 100:4
101:23
103:22
104:17
105:12
106:17
107:16
108:3
110:13,24
112:6,19
113:13
116:18
118:14
119:16,24
122:10,20
123:5
124:14
125:11,17,
22 126:17
127:21
128:6,16
131:3,13,20
133:19,22
134:3,23
135:1
136:10,20
138:2,9
140:2 141:7,
17 143:6
144:2,9
146:6,11
150:7,17
152:4 153:3,
13 157:7,19
158:12
159:22,24
164:6,13,22
165:7,23
166:13,17
175:20
176:9
177:15
178:20,23
179:7,11
180:7
182:11
183:9
185:24
192:2,15
194:1
200:18
201:12
202:1
211:22
222:5
240:10,13
241:10,11,
15,24
242:24
243:5
252:23
254:13,16
255:7
316:20

**Morgan's**
14:21 76:18
86:2,6 90:6
101:11
104:22
108:23
109:9
116:12
118:16,22
121:3 125:3
135:15
136:2 142:2
143:4
151:18
153:17
164:7 168:2,
14,21
184:22
185:4,12,19,
23 186:16
187:6,18
191:22
199:23
201:10
202:6 204:1
207:16
211:14
212:1 221:2
240:8,18
250:12
254:14
278:20
279:8

**morning**
146:2

**motions**
236:10

**motivation**
181:9

**motive** 181:1
315:18

**move** 161:9,
13 163:6
166:24
247:6
298:12

**moved** 46:9

**multiple** 13:5
25:18 49:5
133:19
135:23
293:19
294:18,22
295:2,6
297:5,15

———————

**N**

**named** 21:16
88:14
163:17
186:8 244:6
256:23
267:6
279:15
295:16
304:15
312:17

**names**
138:14,15
143:11,13,
24 158:16

**naming**
171:11

**narcotics**
299:6,8
300:13,17

**nature** 48:23
79:8 88:5
129:19
176:13
213:23
216:12
221:16

**necessarily**
27:22 29:14
35:3 59:3
62:6 68:10
76:10 88:23
95:5 128:9
134:13
284:16
295:8

**needed** 68:1
70:10
103:22,23
230:10

**negate** 52:12

**negative**
15:23 16:15

**neglecting**
81:12

**negligence**
252:7

**negligent**
62:10 72:9
73:23

**negotiating**
34:5

**negotiation**
210:8

**networks**
229:20

**news** 191:11,
12 199:19
244:12
282:17

**nice** 159:8

**night** 182:21,
22 183:2,3

**nights**
110:22
134:24
153:13
176:19
177:12

**nineteen**
193:10

**Norm** 18:9

**nos** 250:2

**notation**
95:11 96:15
97:4 113:17
272:13
275:8

**notations**
165:12

**noted** 180:1
243:17,19

**notes** 169:17

**notice** 11:7,9
31:3 35:7,19
37:5 40:12

**notification**
214:15

**notified**
127:1

**November**
82:11 229:5

**number**
27:18 36:22
39:7 45:17
46:16 80:16
84:21
104:24
105:13
107:2
110:22
130:15
147:19
156:23
166:6 178:7
180:2 189:7
191:3 192:7
193:1
209:13
215:15
223:2,16,19
253:9
254:17,20,
22 255:2
263:1,12
284:11
302:12
317:1,2

**numbers**
85:2 121:9,
10 194:11
228:18
249:11

O

**O'BRIEN**
200:13
201:7

**O'Brien's**
215:21

**object** 54:23
55:5

**objecting**
52:19 53:24

**Objection**
47:24 48:11
49:12,18
50:11 52:4,
22 53:23
55:13 57:7
58:7 60:13
62:19 63:7
64:1,13,15
65:10 66:17,
22 67:19
68:9 69:12
70:7,21
71:23 74:5,
10 83:4
84:23 85:8,
11,15 87:11
101:15
104:2,7

105:8,22
106:4 107:6,
19 108:7,10
109:7 113:9
114:7 115:3,
16 116:5
118:19
119:1 120:2
123:1 124:6,
20 126:9
128:2,8
129:5,13
130:5 131:9
132:1,8,24
134:1 135:6
136:4,11
137:6,23
140:16,24
141:22
142:7,19
143:2,22
148:11
149:24
150:22
152:22
154:2
156:12,16
157:12,21
158:4,15,22
160:8,11,20,
23 161:13
162:7 165:4
176:10
177:18
178:5 179:2
180:21
182:1,19
186:3
187:19,24
191:24
193:17
194:2,10
195:10,17
196:5,16
198:3
200:19
201:20
203:1
206:16
219:22
220:8
221:15
223:13
225:9
233:20
234:21
237:19
238:6,17
239:4,15,22
240:22
242:11
243:14,24
245:7 248:4,
17 252:10
253:5,16
255:10
259:20
262:1 269:6
271:13,19,
24 276:1
277:9,17,22
278:21
279:10
283:21
286:8,12
287:10,23
290:21

291:22
292:7,16
293:6 294:1,
11 295:22
296:18
297:8 298:8
299:1,12
301:11
302:4 303:8,
14 304:4
305:11,18
306:3 307:4,
18,24 308:3
310:11,20
311:9
318:11
319:8,22

**objections**
163:1
298:11

**objective**
103:16

**objectivity**
103:1

**obligation**
277:13

**observed**
256:11

**obvious**
233:18
289:19

**occasion**
134:23
141:19

**occasional**
95:2

**occasionally**
94:21

**occasions**
110:22
133:20
135:23
166:7 189:7

**occupational**
38:3

**occur** 296:21

**occurred**
19:12 45:8
89:4 99:13
112:15
118:2
122:24
124:17,21
129:10
147:11
149:5
176:13
211:19
252:8

**occurrence**
223:23

**occurring**
70:16 215:3

**October**
118:12
125:10
126:16
140:8 141:6

**off-duty**
279:22

285:3

**offense** 47:6,
20 49:9 50:5
62:24 63:5
64:9

**offer** 136:10

**offered**
129:8
138:10,16

**offering**
235:15

**offhand** 75:9

**office** 31:10
80:3,5 81:21
86:21 88:15
94:17,22
101:24
145:22
202:19
214:7,16
215:21
216:1
246:10
247:15
257:13
258:12
261:1,4,6
280:17

**officer** 18:2,
5,8,20 20:11
21:4 22:7
38:4 39:18,
20 40:22
41:22 42:2
43:3 45:9,
13,24 46:19
47:19,22
48:10 49:10,
15,22 50:7,
10,19 51:23
52:5,20
53:1,16
55:20 56:18
58:3 61:23
63:9 64:10
65:1,7 66:1,
6,11,12,19,
23 67:5 68:6
69:18 71:3,
7,10,20
73:3,15
74:13,22
79:17,22
80:22 82:10
83:19,20,23,
24 84:2
86:2,6 90:12
96:18
101:11,23
103:21
104:17,22
105:12
106:17
107:16
108:23
109:8
110:13,24
111:10
112:4,6,8,
16,19,23
113:13,21
114:22,23
115:14
116:2,12,18

117:7
118:14,16,
21,23 119:8,
15,16,24
122:10,20,
22 123:5
124:14
125:3,11,14,
16,22
126:17
127:7,20
128:6,15
131:3,20
133:19,22
134:3,23
135:1,15
136:2,9,20
138:1,9
140:2 141:7,
17 142:2
143:4,6
144:2,9
146:5,11
150:7,8,17
151:18
152:4,16
153:1,3,10,
12,16
157:18
158:12
159:12,22,
24 160:1
163:17
164:7,13,22
165:7,23
166:13,16
167:12
168:2,1,3,21
171:1,3,12,
13 172:8
173:7,11
176:9
177:15,16
178:20,21,
23 179:7,10,
11,20 180:6,
7,17,18,19
181:4,8,13,
14,18 182:2,
3,4,5 183:9,
21 185:24
186:8 187:6,
17 191:15,
21 192:2,15
194:15
195:6,8
196:14,15
200:4,18
201:10,12
202:1,5
203:10
204:3 207:6,
16 209:15
211:6,14
212:14
215:5 218:9,
17 219:8
222:5
223:24
224:1
225:12,22
234:1,18
235:2,3,6,7,
11 237:11,
15 238:1
239:12
240:7,8,13,

14,16,18,19
241:8,10,11,
15,24 242:6,
24 243:5,9,
20 244:6,9,
24 245:4,22
247:22
248:10,14
249:4,9,23
250:12
252:14,23
253:22
254:13,14
256:23
257:4
258:20,22
260:22
262:20
271:22
275:18,21
277:11,15,
20 278:10,
20 279:3,8,
13,15,18,21
282:2,22
283:6,8
284:6,18
285:2,9,12,
18,21 286:1,
4,16,22
287:4,17,21
288:11
289:3,9,13
291:9,10
294:23
295:10,13,
16,24 296:1,
3 297:7,21
298:6,7
299:5,16,20
303:18
304:15,18
307:22
308:9,12,17,
18 309:12
312:4,17,20
313:19
314:6
316:19
317:13,15
319:14

**officer's**
10:13 41:6,
11 62:9 67:6
71:24
202:20
204:7,9
208:14

**officers**
11:10,20
12:8 15:16
37:7 38:14,
17 45:5
47:11 53:17
56:1 57:5,13
58:5,18
59:1,19 61:2
63:16 80:9
81:14 84:13,
14,16,21
98:13 101:4
111:16
122:21
143:19
150:15
152:9 158:1,
11 177:9

179:15,16
187:1,22
188:3,23
189:3,23
195:14
196:24
199:14,22
201:15
203:8
204:13
205:16
206:13
207:13,18
208:4
210:14
214:18
215:11
219:20,23
220:14,18,
24 224:15
237:8 251:4
261:19,21
263:1
265:18,20
267:16
269:1,3,18
284:12
290:4
291:12
292:22
293:4,20,23
294:10,14,
16,19 295:6,
12 297:5,16
298:6,23
300:20
306:15

**officers'** 12:7

**officials** 31:7

**oftentimes**
10:15 62:10
155:23
215:2 266:1

**Ohio** 271:23

**OHLEG**
271:2,22
272:16
273:3

**omission**
102:14
103:13
178:17

**one-time**
278:23

**oops** 231:18

**opened**
280:21

**opinion**
115:18
116:1,6
147:9
170:14
178:11
186:5 201:5,
6 202:15
205:9
208:11
213:16,19
218:7 223:1
240:23
296:19
312:8

**opinions**
115:8

**opportunity**
7:7 47:11
146:17,20
153:2

**opposed**
58:18
205:16
209:17

**opposite**
200:23

**order** 98:9
196:10
270:13,17,
18,19
301:17

**ordered** 46:1
195:19

**ordering**
45:23

**orders**
264:22
265:2,6,7

**organization**
242:22

**organizations** 33:1

**organize**
80:6

**organized**
140:3

**original**
232:12

**originally**
19:17 224:1
226:18

**originated**
261:6

**outcome**
31:6 47:16,
17 48:6 71:1
102:16
156:4 196:7
219:6
258:21
259:3 285:6

**outcomes**
12:11

**outstanding**
41:17

**overrule**
20:10
293:12

**overruled**
310:8,16

**oversight**
260:20
261:9

**overstated**
103:21

**overtime**
174:10
252:8,12
257:7,10
262:15,19

**overtured**
304:13

**overturned**
52:1

**overview**
39:21

**overwhelmed**
224:18

**overworked**
243:21

**OVI** 49:21
73:11
284:13
289:6,11,19

_____
P
_____

**p.m.** 109:22
110:21
111:1 140:8
320:24

**P55** 144:20

**P65** 144:22
145:10

**packet**
226:15
228:2 233:6
272:11,12
274:13

**pages** 13:4,5
121:19,20
122:14
144:16
145:2
227:11
228:3,6,11,
18 229:22
274:15

**paginated**
108:17
121:20
228:5

**pagination**
121:12
144:18

**paid** 76:21
107:8
114:10,13
173:4,16
174:6
177:11,13
222:13
263:19
265:3,19,23
266:2

**panicked**
231:3

**paper** 214:9

**papers** 272:9

**paperwork**
111:24
283:5

**Pappus** 94:8

**paragraph**
9:21 10:17
108:21,22
145:16

**park** 191:2

**parked** 146:1

**parking**

280:21

**part** 11:13,14
44:13 47:16
105:3
114:11
121:2,22
122:1,4,11
147:18
155:5
159:11
160:6 172:4
178:6 203:2
231:22
239:18
247:12
252:12
253:8
257:10
266:10
288:19
308:8

**part-time**
150:11

**partial**
192:12,21

**participant**
45:23

**participate**
152:17

**participated**
42:2 298:23

**participating**
153:4
201:13
299:21

**particulars**
118:1
280:18

**parts** 121:14

**passed**
300:13,21
301:5

**passing**
179:22

**past** 36:24
67:13 98:14
122:18
135:2 184:1
208:12

**path** 103:15

**patrol** 18:2,
20 50:10
58:3 80:2,7
81:17 189:8
206:3
240:19
246:10
247:15

**pattern**
48:21
291:18

**pause** 12:14

**pauses**
247:7

**pavement**
315:10

**pay** 81:12
113:18
170:20

191:18
194:21
198:9 203:6,
7 218:18
220:2 222:7
224:5
261:23
263:7

**paying**
114:16,17
194:24
195:1 203:9

**payment**
96:19 98:4
177:1

**payroll** 46:19
202:4

**pellets** 36:7

**pendency**
78:2 81:2
83:11
120:16
215:4

**people** 15:20
31:4 36:22
48:23 71:2
80:5,17
81:11 82:3
85:19 88:11
92:23 101:6
115:8,19
117:3,20,23
118:1 138:3,
10,17,21
139:2,13
140:7 143:7,
14,21,24
144:2 145:6
146:10
147:7 150:8
157:2
158:14
160:2 169:9
174:6,21
175:17
200:22
201:17
202:16
218:1
233:16
245:3 274:9
297:10
298:3 306:6
318:8

**peoples'**
63:22
202:14

**perceived**
281:3 307:9
308:4

**percent**
40:14 50:19,
20 66:14
68:4,17 69:5
70:1 214:14

**perception**
315:15

**perfect** 6:16
157:3 180:2

**perform** 38:4
80:1

**performance**
41:11

**performed**
174:6
227:19

**period** 30:15
37:22 77:6
82:9,15,16,
18 111:19
112:3
121:16
133:18
164:23
198:9
214:13
241:13
251:16
252:9
256:17
268:19

**periods**
142:6
251:20

**Perkins**
304:16
307:14,22
308:13,17,
18 312:4

**Perkins'**
308:9
311:19

**permanent**
209:23

**permission**
224:20

**person** 15:24
54:16,17
74:21 86:17
88:14
113:21
114:10
117:5
145:20,24
149:19,20
150:12
154:1
181:10
216:20
276:3 277:2
287:6
289:20

**person's**
115:18
305:16
306:2
307:16
315:6

**personal**
15:17,22
16:6,19 17:3
21:24 22:9
23:19 24:16,
23 25:9
26:1,22
27:13 28:21
30:6

**personally**
21:6 26:21
286:4

**personnel**
11:5 80:4
275:2 276:6

**persons**
138:14
156:19

**perspective**
99:15

**persuade**
147:1

**philosophica
lly** 34:12

**philosophies**
31:24 32:5

**philosophy**
34:7,20 35:3

**Phoenix**
33:23,24

**phone**
132:19
163:3

**phones** 80:4

**phrase**
296:15

**phrased**
133:6
296:13

**phrasing**
292:17

**physical**
61:12
240:24
307:15

**physically**
61:1 241:2,
4,7

**picked** 239:7

**pictures**
290:3

**piece** 62:18
214:9

**PIO** 245:11

**place** 53:6
134:14
152:4
158:17
201:24
247:17

**places** 33:6
76:22 81:21
176:21,22

**Plaintiff's**
95:19 121:1
144:7,11
227:7
231:16
234:12
274:14,19

**plate** 319:11

**plausible**
182:20

**play** 50:20
69:10 86:17
151:14
319:18

**played** 106:7
249:14
318:13
319:19

**plays** 236:10

**pled** 282:23
283:8

**plotted** 73:7

**point** 14:15
21:21 27:1
31:2 36:4
39:15 56:23
87:19 88:10
89:10 94:3
96:9 111:24
149:2 155:4
163:19
164:11
170:4
171:17
177:20
186:12
206:1 220:5
222:24
238:15
254:23
256:1
264:23
265:22
266:15
298:1 315:8
317:18

**pointed**
214:7
254:10

**pointing**
285:4

**police** 9:2
19:21 30:16
32:24 33:2,
8,15 38:4
53:13 57:12
74:22 80:1
88:16 154:6
171:23
172:12
192:20
203:7
240:16
261:21
271:22
272:4
274:11
284:6
306:12,16,
23 310:6,14
312:15
319:12

**policy** 58:21
61:20,21
209:19
316:3,6,14

**pond** 244:13
245:18

**poor** 260:24
261:9

**pornographe
rs** 240:21

**pornographi
c** 258:10,13

**portion**
110:3 260:2

**portions**
150:4

**position**

36:20 57:24
140:1,5
300:17

**positive**
15:22

**possibility**
18:21 89:21
105:23,24
107:10
205:15

**possibly**
281:19

**post** 32:7,8

**postdated**
112:13

**posted** 9:19

**posting** 35:6
37:19

**potential**
60:16,19
63:4,14
104:20
116:19
118:6 119:9
138:10
148:22
151:19
157:7 158:1
162:13
197:5
214:17,19
240:9 241:9
242:7
254:16
286:4
312:14

**potentially**
21:11 24:8
38:19 49:11
63:6 83:22
86:4 129:6
135:14
139:5
147:23
149:21
159:13
263:20
282:4

**pounding**
216:19

**power** 314:2

**practical**
218:8,16
219:24
303:12

**practice**
115:1,23,24
127:23

**predict** 74:18

**predictable**
11:19 12:8

**prefer**
223:14

**preference**
45:18
255:17

**premarked**
227:9

premedicated 73:22

premise 105:12 127:16

preparation 14:4

prepare 7:8, 20 9:11 14:21 154:12

preponderance 40:14 51:8 67:17,23 68:2,17 69:5

present 59:8 71:2 86:11 169:6 195:3

presentation 167:5 169:4

presented 116:18 158:1 167:14 170:4 173:7, 11,20,24 174:2 176:8 211:3 215:20 216:1 226:15 235:17

presenting 140:10

president 94:1,3,10

pressured 245:3

pretty 26:2 48:24 68:8 70:4 113:8 114:6 132:23 136:1,24 137:1 141:6 197:15 213:2 214:12 226:9 240:13,16 242:3 245:16 260:14 293:9

prevent 11:8 70:15

prevented 35:24 160:18

previous 25:15 30:1 31:1,23 40:4 95:14 183:24 184:17

previously 15:15 27:1 40:2 95:18 112:15 121:1 197:14,24

216:8 227:7, 8,9 230:15 243:9 249:20 268:22 285:2

printed 12:16 13:20, 22

prior 7:24 25:4,5 35:13,14 42:17 55:24 65:22 67:6 93:3 100:2 124:17 125:10 126:17 128:5 130:3 131:2,14,21 134:24 146:17,19 155:13 177:19 178:10 207:24 209:20 211:7,9 215:21 218:22 225:21 226:15,22 227:12 232:2 238:15 240:8 243:6, 23 249:18 253:1 262:11 267:19 283:10 308:11

priority 38:9

prison 34:15 42:3

private 203:6,9 276:3

privileges 37:22 38:3

probable 90:16

problem 74:24 109:19 208:13 256:6 261:8 264:7

problems 84:9 102:24

procedure 306:23

proceed 46:14 268:7

proceeding 87:3

proceedings 208:5 216:3 320:23

process 29:9 30:14,21

31:19 32:2, 17 34:22 35:10 39:13, 16 41:1 44:22 75:23 87:22 88:18 90:23 155:6, 17 157:15, 16 159:4,5 172:22 202:9 287:20 300:12,21

processed 202:5 214:10

processes 31:13

productive 74:22

professional 10:9,21 13:21 15:18 23:23 24:4, 12 88:8 92:9 167:5 208:18 259:18

profile 245:16

program 170:22 171:21,22, 24 172:11 232:5 289:13

progress 78:24

progressive 319:3,4

prompting 118:1

proof 50:17 51:7 67:16 68:1,23 106:8 107:9 109:5 110:9, 20 126:22

proper 105:20 286:3 305:15

properly 56:20 313:19

property 62:4,5,18,24 100:21 101:2 102:1 111:22 113:14 125:13 150:11 201:13 303:7,16 304:3

proportions 194:9

prosecute 102:1

prosecuted 101:23 102:11 200:9 271:14,17 272:17

prosecuting 200:18 201:19

prosecution 100:17 104:18 200:16 216:4

prosecution's 171:19

prosecutor 21:16 100:10,15 102:10 200:11 216:3 237:21,24 277:21 278:3,4

prosecutor's 202:19 214:7,16 216:1 277:13

prosecutors 22:2

prostitutes 99:6

protecting 18:20

protection 270:13,17

protections 152:13

prove 18:7 27:22 40:13 66:13 101:14 108:5 110:7 116:1,21 176:15 201:3 202:20,23 258:18 261:4

proved 134:13

proven 66:19,21 109:1,10 114:22 115:5,13 116:7

provide 154:22 178:15 242:10

provided 12:19 14:1, 6,12 152:4 167:24 168:7 178:16 277:16 286:15

proving 116:12

prudent 223:17

PSB 87:12, 23 168:13, 16

psychological 247:24 248:11,15

psychologically 248:23

Ptak 263:3,8, 16 264:12 266:5,17

public 46:13 59:13,15,20 60:18,19,22 62:6,8 72:2, 5 85:21 221:9 247:17 276:3 286:15,20 309:5 320:1

pull 73:14 207:13 209:7 244:13,16

pulled 148:20 165:1 206:22 207:21 244:17 279:3,9 280:15

pulling 285:3

purpose 63:13 126:5, 16 154:20 183:19 205:8,9,14 217:5 287:9

purposeful 62:9,11,15 73:22

purposefully 62:3 73:8 80:18 197:19 225:3,23 233:12 247:10

purposes 144:12 192:18 234:13 274:20

pursue 100:22

pursued 100:17

put 29:14 31:3 35:19 44:16 79:12 120:10 124:9 135:11 246:14 250:20

275:18
278:7
281:20
288:8
289:22
292:5,8
**putting**
202:2 214:8
289:23
315:18
**puzzled**
131:17

---

**Q**

**quantity**
194:18
195:5
**quarter**
193:7,9,10
**question**
5:24 6:2,7,9,
20 12:6 16:9
24:14 26:5
29:7 30:8
43:24 44:14,
21 52:14
54:3 67:9
69:19 70:4
84:18 98:16
124:7 126:5,
16,24
127:17
131:10
132:4,13
133:14
137:12
138:6 141:4
148:13
159:17
161:6,16
162:2,15
163:5
166:12
180:3
181:24
183:14
200:1
233:23
235:1
241:14
242:12
250:20
271:20
273:3
277:18
282:8
295:18
297:12
298:15
307:20
320:15
**questionable**
29:13
**questioning**
79:13
**questions**
5:12,23 6:13
29:1,16,18,
22 30:13
39:23 41:4
65:12 88:20
91:3 122:16
143:10

145:12
150:16
157:1 163:2
169:10
224:3,15
320:14,19
**quick** 15:19
223:1 320:7
**quickly**
223:6,8
312:9
**Quinlan**
252:4
**quoted** 102:4

---

**R**

**race** 294:10
**racial** 292:15
293:21
295:12,15
296:10
297:6,20
298:7
299:16
304:1
**racially**
291:13,16,
20 292:1,3
**racist** 299:11
**radio** 140:23
165:16,19
204:7
**raise** 129:18
149:22
150:20
**raised**
124:18
128:5 148:9
156:18
**raises** 30:19
**raising** 157:7
**rambling**
235:15
**ramifications**
11:16
**ran** 121:16
181:5
**Randall** 84:2
244:6,7
246:2 269:7
**randomly**
198:18
**Randy** 99:1,
3,16,23
**range** 80:13
**ranged** 68:3
**ranges**
316:10
**rank** 24:1
47:3,8 48:2
49:7,17
71:24
**ranking**
47:22 48:9
49:9,15 57:5
58:4

**rare** 223:22
**rarely** 48:20
250:22
**rate** 191:18
**rates** 194:21
**Ray** 16:4
77:19
**reach** 88:11
98:9 245:13
**reached**
309:19,20
**reaction**
281:15
**read** 32:6,19
89:11,22
90:2,5 91:4
107:20
108:15
109:15
115:19
122:13,17
130:18
133:9
154:10
236:15
239:1 272:8,
19 293:8,9
297:24
320:21
**readily**
129:21
**reading**
32:13 90:10,
13 112:2
119:13
128:23
165:11
191:21
275:6
**ready** 36:18
122:16
**real** 11:22
12:3
**reality**
230:18
**realize** 6:16
**realized**
103:20
179:18
225:5
233:15
312:9
**reason** 16:2,
7,10,14,21
17:24 21:7
22:13 23:5
25:2,12
26:14,23
28:23 38:10
79:12
106:11
120:9
129:24
130:2,3
132:16
134:22
140:14
158:5,9
159:3
179:10,12,
23 180:5,8,

15 200:15
233:9,11
238:21
243:3,4
249:15
282:2
284:15
296:8
298:16
302:14
308:15
**reasonable**
281:15
**reasoning**
176:7,8
177:2
200:17
213:12
255:16
278:18
287:24
288:1
311:10
**reasons**
46:23
100:16,20
101:9,22
200:21
223:7
**recall** 7:16
8:21 18:18
21:11 25:6
52:10 75:24
77:2 83:13
87:4 89:7
90:4,7,10,22
91:7,11,18
93:6,15 96:1
97:14 98:19
99:20 100:1
104:1,3,8,21
105:3
107:20
108:11
111:20
112:2 113:3,
5,23 114:1,
18 116:24
118:8,11
123:22,24
125:13,17
129:1 139:6,
9 143:11,23
156:4,17
165:5 168:4
170:7,15
172:9,23
173:13,14,
15 175:15
177:6 179:3
185:7,14,17
186:20
187:11
190:2
191:21
199:1
200:11
213:22
214:10
216:14
218:21
220:12,20
221:6
225:17
233:4 236:4,
6 238:7

241:14
243:16
246:23
247:8,13,17,
21 249:3,10,
15 250:23
252:2 254:5,
9 255:15
256:9 257:9
259:3,6,11,
21 261:13,
18 262:24
265:22
266:9,19
267:17
268:9 269:9,
22 272:22
279:20
283:12,14
286:21
289:1
290:14,22
294:12
297:22
298:2 299:2
302:11
304:6
310:23
311:10,12
313:21
**recalled**
186:22
200:20
**recalling**
308:8
**receive**
49:16 50:8
**received**
40:12 71:11
249:4,8
252:14
267:24
273:6
284:18
**receiving**
222:7,8
224:5
261:23
**recent** 131:3
244:11
**recently** 5:17
131:14
272:4 293:9
318:15,16
**recess** 64:20
95:16
163:15
166:22
256:2
320:11
**reckless**
62:11 72:9
73:23
**recklessly**
49:22
**recognized**
135:1
**recollecting**
127:9
**recollection**
20:14 22:4
76:17 89:13

104:16
117:22
118:5,16
173:18
178:20
190:14
199:8 221:8
235:17
284:20

**recollections**
168:22

**recommend**
51:24 52:6
315:24

**recommenda tion** 10:15,16
19:5 40:17,
18 88:3
174:11
183:15
186:23
187:5
190:11
196:12
212:16
213:21
217:16
220:15
254:14
262:6,14
268:16
274:16
275:9
293:16
311:3 316:1

**recommenda tions** 53:9,
15,21 54:7
217:24

**recommende d** 41:14
90:12
163:18
164:12
183:13
189:17
212:9 213:7
217:1
219:13
236:17
262:20
266:14
268:22
273:14
285:15
304:10
308:17,18
310:6,14
316:6 317:6

**recommendi ng** 291:6

**record** 5:7
12:21 14:5
147:17
163:14
167:12
168:21
170:23
171:9,10
172:1
200:24
208:1
217:21
218:2

259:14
294:5

**recorded**
149:10

**recordings**
8:15 90:21,
24

**recordkeepin g** 200:21
201:2
241:20

**records**
42:21 112:6
118:23
119:24
120:5,21,23
122:23
123:3,4,7
170:23
171:16
200:22
201:11
202:22
204:8,17,18,
20,21,24
205:2,10
207:13
209:14
253:1
286:15,20
287:1

**red** 181:5

**reduced**
219:7

**refer** 192:14

**reference**
117:2 159:9
164:10

**referenced**
46:20 229:5

**referred** 10:3
76:20

**referring** 8:9
113:16
208:22
209:2

**Reffitt** 26:20
223:2
224:14
225:1,16
226:7
227:18
229:24
230:2,11,24
232:13,21
233:16

**Reffitt's**
224:2

**reflect** 317:9

**refresh** 5:17
289:7

**refreshing**
190:14

**refused**
37:24
104:18

**regard** 40:3
46:16 99:5
102:15,17
151:5

154:23
162:1
176:18
262:15

**regular**
58:19
136:24
137:20
138:12
189:8 257:7

**regularly**
95:3 135:17
142:15

**related** 14:20
29:4 37:20
48:13 66:5
73:24
165:20
166:9
248:12
249:5
261:12
262:19
263:13
265:7 267:7,
9,12,13
270:2
279:21
291:7
301:16

**relationship**
15:22 16:7,
15,19 17:3
22:10 23:20
24:17,23
25:9 26:1,22
27:13 28:22
30:1,4,7
117:6,10,16
130:4 131:2,
15,21 270:1

**relationships**
15:18 20:16

**relevant** 35:1
135:11,12
137:8,9,13
161:22,24
195:4

**relied** 31:20
51:19
165:22
166:20
202:13

**relief** 76:14
79:3 80:17,
19 81:11

**relieve** 288:7

**relieved**
76:4,9
79:17,23,24
80:10,14
81:14 83:17,
21 84:3,8,
10,14
104:17
246:7,14
283:10
287:20
288:8 302:1,
9,19,20,21,
22 303:2,4,
10,12

**reloaded**
36:19

**rely** 15:14
166:12

**remained**
104:17

**remarks**
291:13,16,
20 292:2,3,
15,20 304:2

**remember**
8:23 9:6
17:16 21:14
24:7 30:3
31:12 37:18
38:7 42:13
77:14,18,21
78:2,10
83:14 86:22
90:5,17,20
92:1,10,11,
14,16 94:11,
12 96:7
99:23
100:13
101:21
104:5,14
109:16
112:12,21
114:12
116:17
117:4,10,18
118:1,9,21
119:6,13
120:1
132:17
134:17
138:7,9,13,
16,22 139:7
143:3,6
146:5 149:3,
11 157:3
164:8,16
165:10,12,
15 168:1,11,
16 169:12,
20 170:3,11,
13,16 171:3
173:8,21,24
175:8,16,18,
21 176:3,6
179:12
180:4
185:21,22
187:2,13
188:1
190:15,16,
19,20
196:19,23
198:4,14,19
199:18
200:5,8,15
204:3,13,14,
19 206:24
207:6
208:17
209:13
210:17,23
211:2,6
212:6
214:11,12,
21 215:9
216:6 217:3
219:6
220:17,23
221:1,10

222:1,4,18
224:7
225:11
226:10
232:23
233:23
235:9 236:8,
23 239:16
240:3,8
243:2 244:1,
7,21 245:8
247:22
248:6 249:8,
16 250:17
251:17,24
252:12,16
253:7,20
254:3,15
255:6,11,13
256:23
257:2,10
258:5,8,13,
14,17,18,21
259:7,8,12,
17 260:9,10,
12,18,19
262:2 264:8
265:24
266:12
269:23
270:2 272:6,
17,20
273:20
276:17
277:5
279:15
280:2,18,19
281:1,2,3,5,
11,22 282:9,
14,16,20,22
283:6 285:6
287:2,3,4
288:22
289:2,14
290:9,10
291:1,5
294:13
298:17
299:4 300:6,
7 301:2,18
304:15
309:14
310:5,13
311:2,13,20,
22 312:16,
18,23 313:3,
7,16,22
316:7

**remembered**
131:6,18
132:5,10
133:19
137:16
143:15
173:3
218:24
219:10

**remembering**
142:11
180:6

**remind**
169:15
176:1 285:9

**remorseful**
312:12

removed
259:2
289:12
302:16

render 218:6

renegotiation
210:2

repeat 17:8
54:3 103:10,
18

repeated
135:18
234:19

repeatedly
226:7
243:10

rephrase
6:1,8

report 96:6
108:2,9,18
109:4
124:22
125:10
137:4 155:8
189:7
191:23
194:15
230:3
237:21,23,
24 258:3
270:6,11
271:1 274:3
275:21,22
276:2,17
277:7
300:24
301:16
315:2,5,16

reported
28:9 190:24
197:22
198:7,8,12
199:15
202:19
221:8,11
246:17
247:23
252:3,5
253:9
282:15
297:5,18
317:8
319:13

REPORTER
95:15

reporting
26:7,8
119:19
237:17
246:3,11
247:16
251:8,13
252:7
260:13
269:4,20
272:3

reports 79:9
191:11,12
279:4
303:22

represent
121:2

134:20
150:3
164:19
190:8 283:7
287:17

representativ
e 235:16,21

representativ
es 93:22
167:13

represented
301:2

representing
5:11 283:13

represents
192:7

reprimand
37:1 54:20
56:1 69:23
88:6 259:9
290:8 304:7
316:10

reputation
28:13 38:22
56:13

request
201:24

requested
202:2

requesting
202:6

required
57:24
209:17

requirement
237:20

Requirement
s 275:2

research
32:16
117:22

resigned
174:10,12
262:11
263:11
266:13
268:12,13

resolution
313:8

resolve
185:11

resolved
29:8 254:11
261:18

respect 21:2
155:21
301:17
306:18,21

respond
319:15

responded
280:11
319:16

response
69:24 131:5
133:14
143:9
145:17

158:3 224:2

responses
106:5
195:24
229:11

responsibilit
y 11:21 40:7
43:12 47:10
48:5 66:2
113:15
199:9
212:21
303:11,13

responsible
11:1

rest 279:3

restored
283:9,18

restraint
283:4

result 25:1
59:3 60:12
252:6,15
289:13

resulted
75:11 107:5,
12 223:21
258:14
285:22
288:15

resulting 9:5
284:17
290:16,17

retaliate
299:21

retaliation
300:1

retaliatory
313:2
318:17,20

retirement
23:2

return 42:11

returning
309:12

review 7:19,
22 8:11,17
14:19 15:3
17:21 18:11
34:21 87:23
91:8 112:22
113:7 155:6

reviewed
7:23 8:24
9:1,10,15
13:15 14:24
15:9 19:23
44:15 78:4,6
83:3 95:22
119:23
124:9
143:17
160:14

reviewing
18:24 91:11
103:20
293:1

reviews 91:1

Rich 126:11
154:20
162:21
247:5
298:11
309:22

Richard
20:18 263:3

Ricky 186:9

ride 39:5

rights 63:22
186:2
305:10,16
306:2,11,17
307:3,17,23

ring 84:4
190:1
196:21

ringing
233:19
246:21
260:7
288:16

risen 105:21

risk 70:17
245:18

road 281:10

Roberts
21:4,10
111:11
112:4,8,17
113:13
125:14,16
127:8 150:9,
14,19 160:1
177:17
178:21
179:7,10,20
180:6
182:10

Roberts'
112:23

Roberts/
morgan
182:9

ROC 97:5,10

role 52:16
59:12 86:17
88:17 89:9
185:18
246:17

roles 158:19

rolling 10:20

Ron 164:7
200:13
201:7
215:20

room 165:16
303:7,17

Rosen 29:10
312:17,20
313:20
316:1
317:13,15
319:6,14,21

Rosen's
316:16,22

roster 204:5,

11 206:2,7,
10

rosters
206:23

roughly
82:11 94:5
192:23

routine
245:21,23

routing 76:8,
12

row 195:7,8,
15,16

rude 181:7

rule 10:13
28:24 37:12,
13,15,16
40:5,20 44:6
52:13 60:3,
14 62:22
63:1 97:11,
12 98:11,15
99:9,13
147:10
162:1
187:22
205:14,15
220:18
240:12
254:17,19,
22 255:2,5
263:21
273:16,20
274:6 275:1,
10,13 276:5
307:10

rules 5:18
11:17 58:1,
5,6 62:5,6
99:4 166:3
264:17
306:8
319:18

ruling 91:21

rumors 11:8

run 264:13
282:6 287:7
289:22
314:19

running
73:12

_____

S

safe 37:10

safety 46:13
94:16 95:5
184:3,7
218:22
220:10,13
221:12
254:4
259:18
304:12
308:20
309:5 310:7,
15,18 311:4,
5 316:23
317:4

safety's
36:21

**sake** 112:22
**salaries**
194:24
195:2 203:7
**Sarge** 229:14
**sat** 86:10
87:12
**satisfied**
19:12
155:20
**save** 147:16
245:18
**saved**
244:14,18
**scanning**
229:20
**scaring**
285:4
**scenario**
106:16
107:4
**scene** 18:16
**schedule**
177:20,24
178:14
**scheduled**
118:14
124:16
231:13
**scope** 255:8
**scot-free**
184:15
**scrap** 42:10
**scrapped**
42:10
**screen** 12:22
**scrutiny** 32:3
**scuffle** 56:4
**sealed**
170:23
171:9,10
172:1
**search** 63:9
**searches**
306:18
**searching**
204:21,22
**seat** 289:23
**seconds**
281:17
**secretary**
86:13
**security**
101:4 117:7,
14 118:10,
11,22
119:15,16
122:22
123:3,6,10
124:5
**seek** 236:17
**seizures**
306:19
**self-defense**
46:6

**send** 35:8
52:9 154:12
**sending**
35:18
132:18
204:10
**sense** 43:6
61:24 197:4
218:5
250:12
263:17
320:1,2
**sentence**
109:8
**separate**
166:5
**separately**
268:20
**September**
82:11
125:16
127:8
**sergeant**
15:1 16:4,
17,23 17:1
18:10 20:15,
18 21:3 27:8
47:19 49:24
56:13,20
77:19 78:15,
20 80:8
81:15,17
82:1,7,20
86:14,15,16,
19 101:21
102:20
103:5,23
107:14
108:2 109:4
119:14
120:8
123:17
129:3,9
130:24
131:2,5,16
132:16
133:2,16
148:14,15,
16,20 149:1,
6,17 151:17,
20,23
153:11
164:20
166:12
187:3 188:7,
10 191:7
196:24
197:2,12
198:14
205:4,5
206:1,2,5,22
207:12
212:21
214:16
215:10
222:6 223:2
224:2,14
225:1,16
226:7
227:12,17
229:24
230:1,11,24
232:13,21
233:15

251:5 253:3
256:10,18
262:13
263:15
281:6,14,22
291:9,15
292:20
293:20
294:19
296:1
298:21
299:24
300:4,11,16
301:15,24
303:24
305:3
**sergeants**
15:2 78:13
143:20
146:10
148:4,5
150:15
151:16
159:21
160:16
188:4 189:8,
16,23 206:3,
23 207:1
215:13,14
**seriousness**
47:4,5
**Serrell**
295:11
**Serrell's**
296:1
**served**
117:12
**service** 39:5
41:12 67:8
112:23
140:23
141:2,9,11,
20 142:6
143:1 165:8
166:3,6,14
207:20
242:16
245:5
248:12
**services**
203:9
**set** 31:10
57:4 121:20
154:22
177:20
290:13
**settle** 221:20
**settled**
218:22,24
219:5
308:24
310:8,16
**settlement**
219:7,16,21
220:5,10
221:13,17,
23 311:21
**severe**
247:24
252:17
319:21,23
320:1

**severity**
315:17
**sex** 99:6
**shared** 273:3
**sharing** 31:3
39:5 271:21
**Shaw** 5:20
299:8 301:4,
6
**She'll** 320:21
**shed** 319:5
**sheet** 76:8,
13 95:21
96:3,13
98:1,20 99:8
**Sheriff** 34:14
**Sheriff's**
280:17
**shift** 36:16,
17 80:8 98:6
110:4
111:17
192:12
194:15
196:3,4,14,
15
**shifted** 107:3
**shifts** 96:19
111:4
176:23,24
182:23
191:23
192:4,5,21
193:12,13
194:16
195:8
**shoddy**
241:19
**shooting**
49:1 53:13
54:17
317:17
**shopping**
280:6
**short** 64:20
95:16
163:15
166:22
223:16
256:2
268:19
320:11
**shorten**
80:19
**shorter**
319:6
**shorting**
257:18,24
**shortly** 76:3
79:18 303:1
**shotgun**
36:4,14,16,
18
**shoulder**
315:7
**show** 95:12
141:16
164:21

182:11
195:15
256:19
267:3
**showed**
122:23
141:18
153:12
176:17
315:7
**showing**
12:21,23
111:15
140:3 141:2
314:22
**shown** 192:4
**shows**
195:14
**sic** 202:16
**sick** 263:6,8,
17 264:14,
16 266:11
**side** 171:19
**sighing**
126:12
**sign** 50:1
63:16 73:13
202:4
**signals**
232:8
**signature**
320:22
**signed** 170:2
**significance**
117:15
**significant**
236:22
260:1
**significantly**
114:15
**signs** 235:12
**similar** 12:13
48:24 54:9
70:15
175:21
187:17,22,
23 200:16
211:4
232:18
240:12
250:11
257:19
263:16,21
279:6
296:22
**similarity**
202:9
292:13
**similarly**
138:3
**simple** 161:4
**single**
196:17
197:23
205:23,24
**sitting**
126:13
164:8

**situation**
35:1,11 43:5
49:14 56:19
61:24 62:21
73:4,17
182:9,17
183:11,16
186:19
195:23
213:24
245:22
246:6
248:15
250:12
255:19
256:8
257:20
273:24
277:11,19
280:10,13
281:16
287:5 289:5,
11 307:14
308:2 312:8
313:10,20
314:22

**situations**
53:13,20
54:5 57:14
109:5
285:20
310:5,13

**six-week**
217:6
218:11

**skip** 282:5
319:13

**skipping**
196:3,4

**skips** 195:8
196:14,15

**Slaughter**
257:1,3
258:22
261:11

**Slaughter's**
260:6

**slip** 197:23
201:24
202:2 206:4,
8 256:24

**slips** 189:9
197:8,13,22
199:4 201:3
204:6
206:22
215:15
256:15,17

**slur** 295:15

**slurs** 293:21
295:13

**small** 13:1

**smaller**
193:8
194:12

**Snyder**
164:7,11,20

**socialize**
23:14

**socially**
22:21

**software**
224:10,16
225:15
229:19
232:7,16
233:17

**solicited**
99:5

**solid** 31:8

**someplace**
47:13
103:17

**sort** 10:20
31:10 39:10
44:8 50:18
52:18 56:12
57:1,3 58:1,
4 66:5 74:12
101:7
116:20
150:11
175:20
182:7
183:19
184:4
198:15,17
202:22
214:19
221:8
233:13
242:6,20
243:22
247:11
253:7,10
280:9
281:13
309:7 318:6

**sound** 75:14
77:7 91:23
133:12
147:11
189:10
191:8,17
198:5 225:7
250:6
252:11
270:16
283:4
308:21

**sounding**
290:24

**sounds**
82:13,14
119:12
120:10
137:10
188:9 191:2
192:22
196:22
201:9
202:17
204:23
217:4 224:8,
12 249:7
251:10
257:23
280:7 283:1
299:13

**sources**
141:12

**speak** 45:23,
24

**speaking**

163:1
298:11

**Speaks**
22:15 185:3,
5 274:16
309:11

**Spears**
188:15,16

**special**
76:19 96:19
98:5 111:12
134:4 135:4,
24 137:2
165:9
171:13
173:4
177:23
186:18
194:24
195:1
196:10
201:12
203:6,8,10
270:3,6,22
275:22
276:9 279:4

**specific**
65:14 74:11
77:2,21
92:4,16
93:16 94:15
101:16
117:5
133:16
137:14,19
138:14
139:16
143:7 159:3
168:22
169:2,12
173:14
188:2
190:19
198:4 216:6
225:17
226:13
246:23
249:10,15
250:23
254:19,21
255:15
282:20
313:21

**specifically**
36:9 75:24
90:10 91:18
98:22 119:2
125:17
138:13
149:12
156:17
164:18
179:3
185:21
187:11
190:2
208:21
210:22
220:20
230:15
234:2 244:2
269:9
272:18
297:22,24
302:11

**specification**
227:16
275:4

**specifics**
28:12 252:2

**speculate**
104:12

**spelled**
103:11
226:19,21

**spend** 233:6

**split** 61:22

**spread** 11:23

**Springer**
233:11

**Squirrel**
232:6

**SRB** 250:9

**staff** 78:24
85:18,20,24
86:3,10
87:13
244:22

**stake**
193:23,24

**stance**
103:10

**stand** 32:2
41:1 79:10

**stand-alone**
218:3

**standard**
35:15 40:16
51:18 54:20
57:6,11,13,
16 67:22

**standards**
10:9,21
13:21 23:23
24:4,12 34:3
67:24 85:21
88:8 92:9
167:6
208:18
259:18

**start** 44:23
121:17,24
228:6,15
278:22

**started** 79:19
96:5 215:1
224:14
251:6
270:14

**starting**
205:24
225:10
254:23

**starts** 44:21
130:20
144:18
145:13
264:23

**state** 5:6
63:12 243:1
271:23

**stated**
103:17

122:21
212:22
227:19

**statement**
55:8 165:6
179:20
201:22

**statements**
151:1
161:22
179:5
227:21
238:8 239:8
297:2,3,9
299:7

**states** 275:2

**stating**
217:20

**stationed**
140:12

**status** 56:21,
24 79:4,6,9
80:10,17,19
81:8,12,13
86:2 263:19
265:3

**stay** 81:5
264:18
265:2
270:18,19

**stayed**
230:10
232:5

**staying**
265:7

**stays** 209:15

**stealing**
41:16 42:5
62:18
203:16
256:11
262:16

**steals** 62:4,5

**steps** 146:4

**Steve** 263:3

**sticker** 96:16

**stolen** 28:10
194:19
197:6 258:6

**stood** 79:14

**stop** 44:21
49:24 63:16
73:13
111:23
162:24
178:13
276:24
279:22,24
285:23
286:6
290:16
298:10,13
313:2
318:17,20
319:7

**stopped**
73:13
178:11
248:21

265:8
276:23

**stopping**
281:9

**stories** 19:15
20:3 175:2
238:18
296:20,21

**story** 206:9
242:8

**straightforwa
rd** 222:23

**Stratford**
111:13
119:10
133:22
134:8,18,21
138:22
140:12,22
141:8 142:5
145:21
147:5,6
153:24
164:15
165:9,20
166:1,15,17
192:4
207:16

**street**
134:18,21
135:3

**strength**
51:3 170:5

**strenuous**
53:14

**strenuously**
52:19 53:7
213:9

**stress**
235:12
236:22
240:15,16
241:12
243:1

**stressed**
239:13
242:3

**strictly** 61:13

**strike** 103:4

**strong**
50:23,24
97:22 110:9
184:18
197:15
212:23

**strongly**
70:20

**struck** 315:8

**structure**
154:21

**struggling**
248:1

**stuck** 32:19

**studied**
31:24

**study** 32:4,
12

**stuff** 29:20
36:21 63:13
106:10
194:22
204:13
250:18
290:1
301:13
306:22

**subject**
167:1
303:19

**subjected**
286:22

**submit** 111:9
112:4 199:5

**submitted**
91:9 113:21,
22 189:9
197:8,14
198:1
199:22
206:4
256:15

**submitting**
111:23
256:17

**subordinate**
174:23

**subpoenas**
80:6

**substance**
216:10

**substation**
36:11 49:2
61:8

**substations**
36:1,23 37:8

**successful**
46:11

**successfully**
201:3

**suffering**
236:21

**sufficient**
146:16

**suggest**
102:24
178:1

**suggests**
178:1

**suicidal**
248:2,7,24

**summaries**
9:16

**summarize**
102:22

**summary**
7:24 8:4,5
9:14 10:16
12:16 13:16
14:18,24
15:6,7 78:5
88:9 89:11,
22 91:4,9,16
95:20
100:14
101:20,22
102:7,8,18

104:6
107:15
108:17
119:14,23
123:19
124:2,3,10
125:7
128:22,24
129:4,11,19
130:13,14,
19 131:8,16,
23 132:20,
22 133:24
135:5,8
143:18
157:6 165:7
168:8,12

**Sunday**
134:11,12
142:1

**Sundays**
107:2
133:18
178:4

**supermarket**
110:3

**supervise**
28:20
188:17

**supervised**
22:9,17
23:19 24:18,
22 25:8,24
26:21 27:12
30:6

**supervising**
303:5,13,16

**supervision**
48:13,15
50:6,13
302:17,22
303:4

**supervisor**
15:21 16:6,
21 17:2
20:20 21:6
24:21 47:14
50:6,8
56:17,22
57:1,23
58:3,6,23
202:3 223:3
247:19
250:4
257:16
269:13
303:11
312:10

**supervisor's**
58:1 202:3

**supervisors**
47:9 48:4
57:1,4,9,15
58:18
246:17
247:23
288:6
292:14

**supervisory**
303:19

**supported**
206:20

**suppose**
23:13 74:16
82:3

**supposed**
36:17 105:1,
14,17
106:18
107:1
111:16
125:12,23
126:19
164:14
202:3
222:12
250:14
251:3
257:22
258:12
301:5

**supposedly**
232:7

**surplus** 42:5

**surrounding**
183:6

**surveillance**
224:10
251:3,4
253:11
258:2 261:2,
3

**surveilling**
251:6
256:18

**suspected**
18:19 125:4
126:18
174:9

**suspended**
69:22

**suspension**
35:16 54:18,
22,24 55:1
69:22,23
183:16,20
184:20
185:12
213:4 217:6,
22 218:11,
12 219:8,9,
11,16,17
220:15
239:24
249:5,9
252:15,16
254:12
259:5 262:7,
14 275:10
284:19
285:12
308:20
316:2,12
319:6

**suspensions**
9:5 212:6,10
216:24
217:2
218:16
219:9 240:2

**suspicion**
19:3 124:18
128:5

**suspicions**

124:24

**sustain**
19:19 68:2
69:17 234:4,
17 239:19
278:1
293:13,15
296:12

**sustained**
18:6 19:4
20:10,11
28:3 30:9
39:20 97:2
115:2,4,10,
15 116:4
170:10
175:11
183:10
189:17
190:12,22
192:9,11,13,
19 209:9
215:11
234:1,10
235:7 238:1
239:12
256:22
269:3 273:6,
10,14 275:4,
5 292:24
293:7,11
302:2 304:8

**sustaining**
237:10
273:14

**swiped**
206:11

**swipes** 204:8
229:9

**switch** 179:1

**switched**
107:23
111:17

**switching**
105:20
112:7
116:13
177:15

**sworn** 5:2

**system**
200:21
201:2,24
213:2 214:3,
5,20

**systems**
32:10
201:22
202:15

———
**T**
———

**table** 212:19

**taking** 36:14
38:15 47:14
57:20
120:17
125:9
170:20
204:15
290:3
298:22
299:6

**talk** 11:10
14:8 39:18
41:3 46:1
65:14 72:20
75:10 79:15,
16 88:2
91:20 93:2,
15,18
116:15
145:5,18
146:3,5
149:19
150:9,19
167:13,15
216:13
277:2

**talked** 29:24
35:9 70:18
72:18 73:20
75:7 78:1
117:3,17
120:16
131:13
200:17
211:4 220:1
244:5
249:20
262:12
267:13
269:21,24
276:19
298:17

**talking** 8:4
12:17 14:19
15:7 23:22
30:15 33:3,
24 49:19
50:4 59:7,11
60:10 66:5
68:12 75:13
82:10 84:11,
15 86:1 92:8
118:24
148:22
150:17
174:21,23
175:5,17
186:21
192:19
193:15
203:8
209:22
210:3,6
217:17
232:1 256:5
263:22
264:24
267:15
299:2 301:6

**talks** 181:10

**tampered**
174:19

**tampering**
267:14

**tape** 121:16
235:14

**task** 257:8
260:21

**taught** 60:16
181:3

**taxpayers**
194:24
203:5,7

**teach** 181:11

**telephone**
246:11
247:16

**telling** 48:3
106:15
116:14
127:23
128:7
140:15,17
143:6 146:6,
11 278:2

**tells** 205:11

**tens** 63:17

**tenure** 40:8
41:6 42:13
56:22 71:6
77:8,13
80:16

**term** 155:7
217:22

**terminate**
98:10 317:5

**terminated**
69:21 75:18
82:12 98:13
106:1,17
163:18
164:4
166:10
171:1 173:7,
12 176:9
183:22
186:11
220:14
258:23
261:22
264:13,15
266:17
267:1 268:9,
11 269:4,19
278:11
291:2

**terminating**
315:24

**termination**
35:22 41:15
75:12 80:24
81:2 88:18
89:21 90:12
97:23
104:20
105:7,11,21
107:5,13
163:19
174:12
183:13,17
184:8,14,19
185:13
212:12,17,
18 213:6,7,
18 217:20,
23 262:7,14,
20 266:15,
20 268:14,
17,23
284:17,22
291:6
304:10
308:18,19
310:7,15,21
316:6

**terms** 8:17,
22 15:17
31:12 32:18
44:2,16 47:4
50:18,24
51:1 52:17
56:12 59:17
63:5 65:17
66:4,6
68:22,23
69:20 72:16
74:13 81:16
102:11
108:1
114:13
119:7
132:23
165:23
170:5
178:21
194:8,14
195:6
203:14
210:12
231:5 255:8
256:4
269:14
270:1
277:13
287:19
290:19
296:16

**testified**
133:15
163:21
185:20

**testifies** 5:2

**testify** 101:1
133:12
208:5,10

**testifying**
99:22

**testimony**
134:16
141:15
182:2

**text** 132:18
299:7

**theft** 45:8
62:24
101:24
119:9
176:14
210:13
225:24
258:1
262:19,21,
22

**theoretical**
49:20
106:13

**theoretically**
195:21

**thing** 6:12
11:8 23:2
29:6,11 33:9
34:3 35:22
46:18 49:23
51:20 57:1,3
59:2 63:20
66:7 73:11
75:21 76:17
98:1 102:19

147:20
149:12
156:8
172:19
196:17
214:22
218:4
242:22
244:11
249:11
256:13
275:13
295:6
296:21

**things** 6:13
12:2 15:13
17:22 22:21
25:10,13
27:20,22,23
31:6,21
32:1,14
33:11 34:9
39:8 40:13
41:5 42:5
45:6 50:4,12
59:19 60:3,
10,21,23
61:1,3,11,13
63:23 64:14
65:14 69:24
70:2 72:14,
23 80:5,6
103:6
120:15
131:6 146:6
155:18
166:5
179:12,14
180:4
203:19
209:17
226:24
235:16
239:17
242:7,10
247:6,8
262:17,18
265:3 320:2

**thinking** 73:4
235:9

**thirteenth**
162:8

**thought** 14:7
18:21 39:2
54:1,14,20,
22 55:5,7
97:18,20
127:6,7
157:15,16
159:4
169:10
176:22
182:22
200:13
201:4,7
209:1
212:18
213:3,5,13
223:16
240:5
247:11
273:16,22
280:12
285:17
309:10
312:4,13

319:23
320:4

**thoughts**
248:3,24

**thousand**
191:15

**thousands**
63:17

**threat** 294:9
295:14
296:2,10

**threatened**
260:21
280:14

**threatening**
293:4,22
299:7

**threats**
292:22
293:3
294:15
295:12
297:7,21
298:7

**three-day**
316:2

**three-month**
211:18

**throw** 229:13

**throwing**
242:7

**thumb** 37:16

**Thursday**
7:14

**Thursdays**
106:2

**ticket** 313:6

**ties** 210:5

**time** 7:13
15:11 19:15
20:7 21:21
23:22 24:7
26:7 30:24
37:22 42:14
46:10 55:22
56:23 65:17
73:16 75:12
76:22 77:6
80:10,19
82:9,15,17,
18,21 83:8
84:3,7,9,13,
17,22 85:10,
17 87:20
89:12 92:4
93:24 95:7
109:13
111:6 112:3,
23 120:17
121:16
124:11
128:11,18
133:18
135:10
136:17
142:5,13
146:16
147:17,22
148:1,7
150:5

151:14
155:9,24
156:5 157:4
161:18,19
162:8,15
164:23
167:4
171:17
172:23
175:14,16
176:22
177:15
185:3
186:12
189:14
191:5,13
193:16,20,
22,24
194:18
195:3 197:4,
6,9,22
198:6,8
199:19
204:12
205:17
207:20
209:18,22
210:13
214:18
219:14
222:24
224:6
225:24
226:16
227:21
230:22
231:6,12
233:6
236:19
241:13
243:12
246:2,8
248:13,19
249:5 250:5,
14 251:20
252:9 253:1,
12,14
256:12,17
257:7,17
258:1,5
260:24
262:19,22
263:7,13,22,
23 264:23
265:23
266:2 267:7,
9,18 268:19
269:3,20
276:4 279:9
281:19
288:21
290:19
298:19
311:16
317:15
318:19,21,
23

**timekeeping**
113:7,10,16
114:5 202:9

**timeline**
187:10
266:1

**timely**
114:17

**times** 12:2
28:10 51:5
52:24 70:24
75:19 85:7
93:12
108:23
109:9 110:2
112:18
128:17
137:15
139:16
140:22
147:6
156:23
158:17
162:19
164:14,15
178:16
180:2 253:9
263:12
276:5
296:23
302:12
317:3

**times.'** 275:3

**timing** 211:6
214:21
219:1

**Tina** 86:13

**tip** 253:10

**today** 5:13
13:17
217:18
240:15
261:20
320:14

**toes** 101:7
201:17

**told** 15:14
76:13 80:1
81:10 84:24
100:15
112:19
129:2,20
130:3
131:22
132:15,16
133:16
135:2 148:4
150:8
153:22
159:1,5
178:13,22
179:21
182:10,13,
24 204:20
225:14
230:16
234:4 245:8
255:16
260:10
281:3,5
286:1,13,18
294:14
300:20
301:4
302:12
310:23
311:14
312:11

**tolerated**
97:21

**ton** 151:17

**tone** 132:23
133:1

**tonight**
134:8,9

**Tony** 21:4,10
111:11
150:9,14,19

**tools** 37:10

**top** 66:15
95:21
108:17
121:10,12,
23 122:1,5,
15 130:15
147:24
228:7,16
229:1,2
231:19

**total** 191:4
240:2

**totally** 21:2
23:20 71:18
146:24
281:2

**touch** 264:18
265:2,9

**touched** 39:7

**tour** 227:20
230:8
257:16

**touted** 34:18

**track** 85:2
144:1 251:7

**tradition**
184:4,5

**traffic** 313:5

**trained** 43:5,
11 306:10,
16

**trainee**
289:10

**training**
32:13 34:21
40:11 43:2,
13,21 47:10
48:4 57:2
71:10 289:9,
13 306:22
314:11

**transcript**
144:14
231:17
236:16
242:23

**transcripts**
8:12 90:1

**transmission
s** 165:19

**transparent**
31:20

**trap** 35:24
36:2 37:6,8,
12

**traps** 37:4

**tray** 202:3
214:9

**treated** 43:8

44:4 45:4
57:18

**treating**
45:13

**trigger**
225:10

**trouble**
263:2

**troubled**
248:6

**Troy** 174:14,
15 262:12

**truck** 145:24
146:3 148:2

**true** 19:18
51:17 130:8
131:23
152:18
166:8
171:16
177:4,14
180:12
238:19
276:14
301:3,19,23

**trust** 16:22
17:4 18:11
22:10,14
23:5,20
24:18,24
25:10,13
26:14,23
27:15 28:17
29:3,8 30:8
81:4 103:4
181:4
212:21
320:1

**trusted**
80:23

**trusting**
29:12

**trustworthine
ss** 56:14,15,
23

**trustworthy**
16:3,8 21:8

**truth** 116:14
127:23
128:7
140:15,17
146:12
312:11

**truthful**
25:17 27:21
28:8 180:19
231:5 237:8
275:3 276:5
312:5 315:2

**truthfulness**
26:5 29:23

**tube** 36:3

**Tuesday**
142:1

**Tuesdays**
106:2,3

**turmoil**
236:11

**turn** 121:21
231:18

**turned** 66:13
201:4
232:24
251:11
264:6 301:3

**twelfth**
147:18
161:18,19

**two-year**
82:14 85:10

**type** 11:8
67:17 139:3
150:1
176:17
182:16
184:16
261:5
280:10
295:6

**typed** 96:23

**types** 11:7
27:23

**typical** 36:23
87:5 89:14
90:23 91:2,
12 93:8
152:9
309:18

**typically**
32:23 71:1
76:7 80:9
91:19 92:20,
22 93:7,18
99:11
148:16
169:3
181:12
185:8,15
221:16

———

**U**

**uh-huh**
22:24 23:11
25:19 31:17
37:2 42:9
44:11 45:7,
15,21 46:4
49:6 51:9,12
53:19 57:22
59:10,14
60:6 78:7
79:20 96:14
103:7,12
134:5,15
137:17
145:19
146:22
149:16
172:20
174:7
184:11
188:18,20
191:3
224:21
228:17
231:8,23
236:5,7
249:22,24
270:20
304:19

308:22

**ultimately**
40:16 78:1
197:5 207:9
244:16

**un** 165:24

**unable**
248:22

**unbecoming**
274:8

**unbeknownst** 171:22

**uncomfortable** 246:18

**unconstitutional** 305:19
307:12

**understand**
5:24 6:1,5,
14,19 11:15
12:11,12
37:13 39:13
40:17 53:5
69:16
103:23
106:14
131:10
149:13
216:10
269:11
292:9

**understanding** 12:15
26:24 45:1
55:18 78:19
83:2 109:13
167:3 253:7
308:23
309:7

**understood**
6:9 177:11
178:19
225:21

**underway**
154:4

**union** 34:4
37:14 52:14,
16,18 53:22,
24 54:7
55:4,11 81:9
94:1,9,13
164:7
185:11,16
254:7
288:14

**unit** 206:24
207:4
215:16
237:4
246:11
247:16

**unlawful**
283:4

**unlike** 243:5
248:14
252:23
279:8
286:23
287:21

**unloaded**
36:19

**unnamed**
144:2

**unnecessary**
73:3

**unpaid**
264:14

**unpredictable** 201:16

**untruthful**
30:10 65:8,9
66:20,23
183:11
189:24
208:12
209:9 226:9
227:17,22
231:1
232:12
233:12
234:10,19
238:5,8,14,
21 273:7,11
274:8,10
275:5
278:24
300:11,16
315:12,14

**untruthfulness** 28:1,4
66:15 81:3
190:7,9
208:1
226:23
234:4,17,19
235:8
237:11
238:2 274:4
277:14
278:1 301:9,
10,14 305:6

**unusual**
28:11 85:1

**unusually**
84:20

**update**
264:21

**updated**
10:19 77:16
189:13

**upset** 235:15
236:8 245:9,
14 280:4

—————
**V**
—————

**vacation**
311:7

**valuable**
137:21

**Van** 14:8
23:17,21

**Vardaro** 5:5,
10 14:9,13,
17 64:5,7,21
95:13,17
126:11
144:4,5
161:1,7
162:16,20,
24 163:16
166:23

247:5 256:3
286:14,19
294:6
298:10
309:23
310:4
320:12

**varied** 168:9

**vary** 101:5
201:15

**vast** 135:21

**vehicle**
319:7

**verbal** 168:7,
10,12

**verbally**
11:23 76:13
210:24

**versa** 201:1

**version**
13:20 91:10
131:22

**versus** 50:19
62:17 66:8
73:22
193:12
195:7 251:8

**veteran**
248:11

**vice** 201:1

**video** 20:13
314:21,23
315:1,7,13

**videotape**
56:17

**view** 88:10
170:4
275:20

**viewed**
104:19
105:7
313:23

**violate** 265:1
305:16
306:17

**violated**
10:14 46:5
270:13
300:5
301:16
306:1,2
307:16,22

**violates**
62:3,5 307:2

**violating**
99:4 275:1,
10 306:7,8

**violation**
11:16 40:20
43:15 44:7
166:2
172:15
240:12
272:16,24
273:2 305:9
307:8

**violations**
29:1 58:11

63:21 99:13
147:10
162:1 291:7

**violator**
313:5

**violence**
294:9

**violent**
292:22
294:15
295:11
296:2,10
297:6,20
298:7

**virtually**
153:15

**visits** 265:15

**vivid** 131:6,
19 132:11

**vividly**
132:17

**volatile**
61:24 73:4
280:10
312:8

**volume**
195:9

**voluntary**
152:7

**volunteer**
150:11

**volunteered**
131:1

**vomiting**
290:2

—————
**W**
—————

**Wagner**
263:12
267:6

**wait** 64:5
81:1 129:22
145:9

**waiting**
311:7

**waived**
320:22

**waiving**
285:5

**walkie**
164:12
204:7

**walkie-talkie**
164:13

**wall** 36:7
49:1 61:8

**wanted**
32:20 35:18
55:11 94:23
97:16 101:3
175:7
201:15
214:2
235:22
313:24
319:13

**warehouse**
204:18

**warned**
243:11

**warrant**
97:23
217:19

**ways** 49:5
205:3
206:12
317:1

**weapon** 37:9
56:20

**weapons**
300:5

**wear** 57:24
59:1

**wearing**
48:24 57:21
58:2,22,24

**Weaver**
16:18
196:20
198:14
206:6,22
207:12
214:16
215:10

**websites**
33:5

**Wednesday**
110:12,22
111:1
113:18
153:13
176:19
177:12
182:11,12,
14,21,22
183:1,2

**Wednesdays**
106:2 107:1
109:22
110:7 128:1,
18 133:23
137:3
140:18
177:22
178:3,22,24

**week** 7:12
13:24 78:6
95:22 99:22
109:16
120:18
124:10
163:23
176:15,16
177:8
183:20
224:19
230:7,9
251:16

**weeks** 5:20
124:21
163:22
217:7,11,12
218:18
251:9
264:20

**weighed**
200:13

weight
118:5,7

Wellday
86:15

wheel 73:12

white 188:22
235:2
249:23
254:1
256:24
257:4
261:20
262:20
263:1
269:18
279:13,18
291:10
299:16
304:18
312:16

Whitney
299:5
301:18

Wi-fi 229:20
232:8

widely
199:15
221:8,10
282:15,16
317:8

wife 280:4,20
281:7,18
282:3

Williams
27:11,17
54:13 55:9,
19 56:20
250:4 251:6
253:3
256:10,18

Williams'
56:13

window
267:22

withdraw
164:4
234:24
271:20

witness's
118:5

witnessed
253:3 286:4

witnesses
19:16,20,21,
24 116:19
140:10
141:23
153:2 157:8,
18 158:2
162:13
242:7

woman
287:5

wondered
17:10

word 11:23
24:24 89:18
125:9
165:13
238:12

296:24
297:23
302:7

words
101:16
238:7
281:11,23

work 15:23
20:22 21:1,7
23:15 40:10
41:11 79:12
80:3,7,23
81:1,23,24
82:2 91:5
96:20 98:5
105:1,14,17
106:19
107:1
113:24
118:14
126:20
142:17
145:21,23
157:9 160:5
161:8,11
165:20
174:6
176:15,23
177:12
178:14,22,
24 182:14,
23 189:7
190:24
195:7
200:24
201:1
205:20
206:8 222:7,
11 224:11,
17 230:3,12,
18 232:15
246:11
248:21
256:19
257:15
261:5,16,24
262:5,16
263:2,18
265:9,19,21
276:23
288:8
308:20

worked
30:14,21
31:6 82:1
104:23
106:18,19
107:1 108:4,
24 109:10
117:9
122:10
124:14
140:10,18
141:17,19
142:3,4
171:14,15
176:16,24
224:6,7
225:15
226:18
229:13,17
230:8,16
232:5,16
237:3
240:15
252:8 257:8

261:22
274:9

working 5:16
76:19 101:4,
12 105:13,
16 106:1
107:8,17
108:3 110:2,
21 116:22
118:12,17
124:18
126:19
127:21,24
128:1 134:3,
8,13 135:3,
17 137:2
138:11,21
140:21
141:7,13
142:5,23,24
150:10
153:13
166:17
171:13
176:19
177:10,24
178:3,7,9
191:4
205:16
206:18,19
224:19
225:13
227:20
233:1,15
236:9 239:3
240:18
246:9
247:15,16
251:3,4,14,
15 257:12
265:24
303:6 316:2

workplace
205:6

works 24:12

worry 38:24

worse 281:4

worth 151:2
191:14

wrapping
87:18

wrestling
54:15

write 97:8
116:8

writing
168:7,9
210:24
220:23
234:6

written 11:24
36:24 54:19
56:1 88:5
168:12
259:9 290:8
304:7
316:10
319:11

wrong 6:19
43:10 49:15
66:8 125:18
180:7 197:8

203:20
243:19
276:20
278:23

wrote 97:14
98:1,7 99:8
101:21
132:4

_____

Y

yards 42:10

year 38:2,4
86:23
142:12
147:8
171:24
210:2
261:17

years 6:14
23:13 40:9
41:9,11,17
42:15,17,19,
22 43:1
46:22 77:12
82:1,13
103:9 147:9
153:22
181:3 247:9

yelled 313:3

yelling 282:5

yeses 250:1

Yesterday
13:17

_____

Z

Zach 29:10
312:17
316:1

Zane 26:12
222:1