IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Karl Shaw,  Case No: 2:18-cv-483

    Plaintiff,  Judge Graham

v.  Magistrate Judge Vascura

City of Columbus, *et al.*,

    Defendants.

<u>Opinion and Order</u>

Officer Karl Shaw brings this action under Title VII of the Civil Rights Act of 1964 against the City of Columbus, Division of Police ("CPD") and former Chief of Police Kimberley Jacobs. Shaw, an African-American, alleges that he was subjected to unlawful retaliation after cooperating with an Internal Affairs Bureau ("IAB") investigation in which he expressed his belief that Sergeant Eric Moore, who is white, had engaged in racist behavior. Later when Shaw was considering whether to accept a position offered to him in the CPD's Narcotics Bureau, where Sgt. Moore would have been his supervisor, Shaw learned that Sgt. Moore had sent two text messages about him to a white officer. The text messages stated that Shaw had "better not take [the] job" because Shaw had told the IAB investigator that Sgt. Moore "was a racist."

Shaw alleges that Sgt. Moore's retaliatory threat caused him to fear for his safety if he were to accept the job in Narcotics. Shaw further alleges that he felt compelled to decline the job when, upon reporting the threat to Lieutenant Ty Brust, who was in charge of filling the position, Lt. Brust failed to promise to ensure Shaw's safety if he accepted the job.

This matter is before the court on the parties' cross-motions for summary judgment, which are denied as to the retaliation claim.

I.     Background

    A.     **Officer Shaw and His Need for a New Position**

Officer Shaw joined the CPD in 1992. Prior to 2013, he worked in a variety of units, including vice and narcotics. He had a particular skill for investigative work. Shaw Decl. ¶ 3. In 2013 and 2014, Shaw served in the enforcement unit of the CPD's Strategic Response Bureau ("SRB"). His work in the SRB included investigating hotels on the north side of Columbus which had been linked to drug activity and prostitution. <u>Id</u>.

1

In December 2014, Chief Jacobs ordered that the enforcement unit of the SRB be disbanded. Officer Shaw and other SRB officers were given until March 1, 2015 to bid on available positions, after which time they would be assigned to open patrol positions. Id. ¶ 4.; Doc. 17-8 at p. 17.

Shaw learned that two positions had been posted in Narcotics. Both positions were in an investigation unit and reported to Sgt. Moore. Doc. 15-36 at p. 2. Jobs in the Narcotics Bureau were generally considered to be desirable because of favorable working hours and the expectation of overtime. Jacobs Dep. 224; Brust Dep. 53-54. The positions were also attractive to Shaw because of the opportunity to do investigative work and because a patrol assignment would have been difficult for him due to physical injuries to his knees and his need for flexible working hours to accommodate him having joint custody of his children. Shaw Decl. ¶ 4; Shaw Dep. 116.

The open positions were to be filled based on seniority. Brust Dep. 116-17; Cameron Dep. 80-81. The process for filling a position typically would have been for the supervisor, in this case Sgt. Moore, to contact the candidate with the most seniority to confirm their interest and award them the job. The supervisor had some discretion to conduct brief interviews to make sure that the candidate's expectations were reasonable in terms of what their duties and hours would be. Brust Dep. 56-57; Cameron Dep. 55; Doc. 15-32 at p. 16.

Shaw bid on the positions in Narcotics, He did so despite his reservations about working for Sgt. Moore, who had worked in the SRB before transferring to Narcotics. Shaw Decl. ¶ 5. Though Shaw had not had much personal interaction with Sgt. Moore, he was familiar with allegations that Sgt. Moore had made "violent racists threats" against two African-American officers in the SRB. Id. ¶¶ 6, 9. One officer, Sgt. Doug Williams, was Shaw's then-supervisor, and the other, Officer Eric Cornett, was a former partner of Shaw's. Id. ¶ 6. Shaw was also aware of the sense within his unit that Sgt. Moore had a negative attitude about "black officers and African-Americans in general" and that Sgt. Moore "had a practice of denying requested surveillance equipment to black officers that he provided to white officers." Id. ¶ 7. Shaw believed too that Sgt. Moore had made negative comments to one of Shaw's supervisors about Shaw's work with the hotel investigations. Id.

**B.    Internal Affairs Opens an Investigation of Sergeant Moore**

In August 2014, SRB Officer Wes Sorrell reported several complaints to his chain of command about Sgt. Moore. Doc. 15-33 at pp. 2-3. Sgt. Moore had been Sorrell's supervisor in the SRB. Sorrell's initial reports of misconduct by Sgt. Moore concerned overtime abuse and mishandling and misuse of CPD property. Id. at pp. at 2-4.

2

While the initial allegations were being investigated, Officer Sorrell reported additional accusations in September 2014 against Sgt. Moore involving racist behavior he had witnessed earlier in 2014 while Sgt. Moore was still in the SRB. Id. at p. 147; Doc. 18-1 at p. 2 (showing that Sgt. Moore transferred from the SRB to Narcotics in July 2014). Sorrell alleged that Sgt. Moore had referred to Sgt. Williams and Officer Cornett using racially-derogatory language and had threatened to kill both officers. Doc. 15-33 at pp. 147. Sgt. Moore allegedly used the N-word and the terms "ape" and "monkey" in reference to them and said that if something was not done "about those two monkeys, he was going to take them out back and kill them." Id. at pp. 149-50.

An IAB investigation was conducted by Sgt. Ken Decker. Follow-up interviews with Sorrell, Williams, Cornett and others elicited statements that Sgt. Moore had used racial slurs, racial jokes and called black officers "lazy." Id. at pp. 150-57. It was also reported that Sgt. Moore was "an angry guy" who had a "temper" and had threatened to place a GPS tracking device on Cornett's car. Id. at pp. 153-55.

Sgt. Decker interviewed Shaw on December 11, 2014 because Shaw had been in the SRB during the relevant timeframe. Doc. 16-3 at p. 1. Shaw reported that he had not personally observed Sgt. Moore make racially-derogatory comments. Id. But he did report being aware second-hand that Sgt. Moore had used the N-word, made racial jokes, called Williams and Cornett "monkeys," threatened to take them "out back and kill them," and threatened to put a GPS device on Cornett's car. Id. at pp. 1-2. When Decker informed Shaw that another African-American officer, Officer Whitney Lancaster, had alleged that Sgt. Moore denied surveillance equipment to black officers, Shaw generally agreed with that assessment. Id. at pp. 2-3. Shaw also stated his belief that Sgt. Moore had tried getting Shaw's hotel investigation efforts curtailed or "shut down" because of Shaw's race. Id. at pp. 3-4.

        **C.**      **The First Narcotics Position is Filled, but then Vacated**

The two positions in Narcotics were posted on December 12, 2014. Doc. 16-6 at p. 2. Shaw applied, as did others, including Officer Lancaster, who had more seniority than Shaw. Id. Sgt. Moore was originally in charge of filling the positions. After Shaw confirmed by email to Sgt. Moore that he was interested in the openings, he was instructed to report to Commander Gary Cameron and Lieutenant Ty Brust for an interview on January 8, 2015. Shaw Decl. ¶ 10. Cmdr. Cameron had decided that it would be inappropriate for Sgt. Moore to interview Officers Shaw and Lancaster because they had participated in the IAB investigation. Cameron Dep. 90-91.

Shaw alleges that his interview with Cmdr. Cameron and Lt. Brust was unduly hostile. Interviews for positions determined by seniority would typically be cursory and meant to confirm job expectations. Shaw states that Cmdr. Cameron unnecessarily went out of his way to "lecture" Shaw "on the need to avoid corruption in the Narcotics bureau." Shaw Decl. ¶ 12. Shaw also states that Cmdr. Cameron wrongly criticized his work ethic and productivity. Id. ¶¶ 12-13. After the interview, Officer Lancaster told Shaw that he had a similarly hostile experience during his interview with Cmdr. Cameron. Id. ¶ 15.

Shaw learned later in January 2015 that Sgt. Moore had awarded the first position to Officer Jeremy Ehrenborg. Id. at ¶ 16. Ehrenborg was white and had less seniority than Shaw and many others who had applied, regardless of their race. Id.; Doc. 16-6.

After a complaint was received by Deputy Chief Kenneth Kluber about Sgt. Moore's decision, Chief Jacobs looked into the situation. Sgt. Moore admitted that he had bypassed the rule of seniority because he felt Ehrenborg was deserving of the position. Doc. 15-23. Sgt. Moore claimed to Chief Jacobs that all of the applicants who had more seniority than Ehrenborg had agreed to pass on the position. Id. Shaw argues that Sgt. Moore's statement was false because he never agreed to pass.

Chief Jacobs vacated the position that Sgt. Moore had filled and ordered that it be re-bid. Brust Dep. 68. She put Lt. Brust in charge of filling the position. Id.

### D. Officer Shaw is Offered the Position in Narcotics

On February 4, 2015, Lt. Brust emailed the most senior applicants and asked that they indicate whether they were still interested in the position. Shaw Decl. ¶ 17; Doc. 15-25 at p. 1. Shaw indicated that he was. Id.

On February 9, 2015, Lt. Brust told Shaw that the job was available to him and asked if he wished to accept it. Shaw Decl. ¶ 17; Doc. 15-25 at p. 2. Shaw said that he wanted the job but would first like to talk about whether he could finish a hotel investigation he had been working on in the SRB. Shaw Decl. ¶ 17; Doc. 15-25 at p. 2. Shaw intended to take the job even if he could not wrap up the hotel investigation. Shaw Decl. ¶ 17.

In the morning of February 10, Lt. Brust and Shaw agreed to talk on February 13. Id.

### E. Officer Shaw Learns of Sgt. Moore's Text Messages

Later in the day on February 10, a white SRB officer named John Evans showed Shaw two text messages he had received from Sgt. Moore on February 7. Shaw Decl. ¶ 18; Doc. 15-26; Doc. 15-33 at p. 190. The texts referred to Officers Lancaster and Shaw and Officer Richard Moore (no relation to Sgt. Moore), and their cooperation with the ongoing IAB investigation of Sgt. Moore being

4

conducted by Sgt. Decker.  It was believed by some officers that Officer Moore had complained to Deputy Chief Kluber about Sgt. Moore coercing applicants to pass on the Narcotics position so that Ehrenborg could get the job.  Doc. 15-33 at p. 190.

>The texts stated:
>
>I have his [Officer Lancaster's] audio tape.  He told Decker I was a racist.  But had no instance of anything I ever did to him or any other black person.  Karl [Shaw] did the same thing and added that I GPS'd officers cars.  But had no instance or proof.  If we did that and accused a black officer of being racist with no proof we'd do days off.  Nothing will happen to them.  Richard went to DC Kluber and told him that i coerced him from taking my job.  If he hadn't done that him and Jeremy wiuld be working for me now.  But he decided to play both sides thinking I wouldn't find out.  I'll never trust him.  Especially after I was keeping him in the loop the entire time.  He shit on me and my team.  That's worse than what the brothers did.  I expect that out if them.
>
>He didn't speak.  But it was clear he better not take my job.  The same goes for Karl and Richard Moore.

Doc. 15-26 (grammatical errors in the original).

When Shaw saw the text messages, he felt "anger" because he believed that Sgt. Moore did not like him because was black.  Shaw Dep. 90-91.  Shaw thought that the term "the brothers" was a racial reference to him and Lancaster.  Shaw Decl. ¶ 19.[1]  Shaw thought too that Sgt. Moore was accusing Officer Moore of being a "race traitor by taking sides against him as another white officer." Id.  Shaw talked to Officer Moore, who denied that he had complained about how Sgt. Moore filled the job position with Ehrenborg.  Shaw Dep. 93.

Shaw felt "fear" as well.  Id. 90.  He was "alarmed" to learn that Sgt. Moore had obtained and listened to the audio recordings of his and Lancaster's IAB interviews with Sgt. Decker.  Shaw Decl. ¶ 20.  He was also alarmed by the "He didn't speak" comment in the second text message, surmising that Sgt. Moore must have talked directly to Lancaster about the matter.  Id. ¶ 21.  Shaw had been told by Cmdr. Cameron during his January 8 job interview that Sgt. Moore was not allowed to have any personal contact with him or Lancaster during the job-filling process.  Id.  That Sgt. Moore talked

---

[1] Sgt. Moore told Sgt. Decker during an IAB interview that "the brothers" meant Wes Sorrell and a couple of other officers who were "overtly religious" and called themselves "brothers in Christ."  Decker Dep. 248.  Sgt. Decker did not find this explanation to be credible and thought, like Officer Evans did, that it was a racial reference.  Id. 247-49.

to Lancaster meant that Sgt. Moore had broken the chain of command and apparently had not been reprimanded for doing so.² Id.

Shaw's feeling of fear also stemmed from Sgt. Moore's "reputation for racial bias" and having a "violent temperament." Id. ¶ 9. Shaw knew of Sgt. Moore's racial threats against Sgt. Williams and Officer Cornett. Id. ¶ 20. Shaw talked to Cornett, who had gone through "a hard time with the threats" that Sgt. Moore had made against him. Shaw Dep 94. Cornett "confirmed" that the threat against Shaw was "real" and informed Shaw that Sgt. Moore had threatened to take Cornett's job away from him. Id. 94-94.

Shaw was concerned that the individual making the threat, Sgt. Moore, would be his supervisor in Narcotics. Police work in Narcotics often involves undercover work which is "particularly dangerous." Shaw Decl. ¶ 23. Shaw believed that a "hostile or unsupportive supervisor" could put his life in jeopardy. Id. ¶ 24 He knew that Officers Lancaster and Moore, who had more seniority than he did, must have declined the position in order for it to be offered to him, and he thought that they may have had the same fears or concerns about Sgt. Moore as he did. Id. ¶ 25 (stating that he had talked to Officer Moore about Sgt. Moore's text messages).

### F.   Officer Shaw Turns Down the Position After Talking to Lt. Brust

Shaw knew that the IAB investigation of Sgt. Moore was still ongoing and he "remained hopeful" that Sgt. Moore would be relieved of his position in Narcotics. Shaw Decl. ¶ 26. Shaw decided he would use his scheduled meeting with Lt. Brust on February 13 to discuss his concerns about working for Sgt. Moore. Id. ¶ 27.

During the meeting, Shaw told Lt. Brust that he "did not feel that [he] could work with Sgt. Moore." Id. Shaw told Lt. Brust he had learned that Sgt. Moore had "made a threat that I better not take the job." Shaw Dep. 98; Shaw Decl. ¶ 27. According to Lt. Brust, Shaw said that "he was interested in the job, but he expressed concern that he didn't want any retaliation from Eric Moore." Brust Dep. 120.

In Shaw's view, Lt. Brust "reacted very casually" about what Shaw reported to him and did not ask "about the details" of the text messages or express "surprise or alarm." Shaw Decl. ¶ 27. According to Shaw, Lt. Brust "said he would try to protect me, but he wouldn't be around all the

---

² Sgt. Moore had in fact met with Lancaster on January 15, 2015, after Lancaster's interview with Cmdr. Cameron and Lt. Brust. Doc. 15-32 at 20. Sgt. Moore later admitted that he persuaded Lancaster to pass on the job after telling him, "I don't think that you have a good work ethic," "you start trouble wherever you go," "I really don't want you to take my job," and "I don't want you on the team." Id.

6

time to protect me." Shaw Dep. 98, 106.  According to Lt. Brust, he "told Karl that that [retaliation] won't happen.  And he goes, you can't be there all the time.  And I said, well, that's true, but I won't let that happen."  Brust Dep. 120.

Shaw interpreted Lt. Brust's words and reaction as "meaning that he could not effectively protect me if Sgt. Moore tried to harm me."  Shaw Decl. ¶ 27.  Shaw told Lt. Brust that he believed Sgt. Moore would "do something" to him if he took the job and that he would "have to pass" on the job position in Narcotics.  Shaw Dep. 98; Shaw Decl. ¶ 27.  Lt. Brust acknowledges that Shaw cited concerns about Sgt. Moore retaliating against him when he declined the position.  Brust Dep. 159.  Lt. Brust remembers that Shaw said he would not take "the job because of things that Moore would say that he would do to him or that he would get him."  Id.

Lt. Brust did not report Shaw's report of a threat from Sgt. Moore to his chain-of-command, Commander Cameron, nor did he confront Sgt. Moore about the matter.  Brust Dep. 134-35, 143.

Shaw asserts that if Lt. Brust "had responded more strongly" in favor of investigating Sgt. Moore's threat or taking action against Sgt. Moore, Shaw would have considered taking the job position.  Shaw Dep. 107; Shaw Decl. ¶ 29.

### G.     The First Position is Filled and Shaw Applies for the Second Position

The first position was accepted by a less senior, white officer.  Doc. 16-6.  On February 25, 2015, Lt. Brust sent a notice that he would be filling the second open position in Narcotics.  Doc. 15-25 at p. 5.  Shaw emailed Lt. Brust on the same day saying, "If the job gets down to me this time I'm taking it."  Id.

Shaw explained that he was willing to take the second position despite his concerns about Sgt. Moore because he was running out of time before former members of the SRB would begin to be reassigned to open patrol positions in early March.  Shaw Dep. 115-16, 118; Doc. 17-8 at p. 17.

A more senior, white officer received the second position.  Cameron Dep. 78-80.  This officer, who was already in Narcotics, had not applied for the first open position but was seeking to transfer units within Narcotics by the time the second position was posted.  Id.; Doc. 16-6.

### H.     Officer Shaw Files a Report with Sgt. Decker

In late February or early March 2015, Shaw learned of two issues involving Sgt. Moore that he believed "needed to be reported."  Shaw Decl. ¶ 32.  Another officer, Dick Elias, who is Latino, told Shaw that Sgt. Moore had "gestured towards or started to draw his weapon" on Elias.  Id.  Shaw also learned that the Bureau of Alcohol, Tobacco, Firearms and Explosives was investigating Sgt. Moore for obtaining a weapons enhancement called a "Lightning Link," which could turn a semi-automatic

7

rifle into a fully automatic one. Id. Shaw found this information to be "alarming" because, combined with Sgt. Moore's past threatening and aggressive conduct, it showed that Sgt. Moore had a "mechanism to carry out his threats." Shaw Dep. 127-35.

On March 16, 2015, Shaw reported these two issues to Sgt. Decker. Shaw Decl. ¶ 32; Doc. 15-38 at p. 2. He also told Decker about Sgt. Moore's text messages to Officer Evans and how he turned down the Narcotics position. Shaw Decl. ¶ 32; Decker Dep. 171. Shaw told Decker that "Sgt. Moore was going around saying that if I took the job, that he was 'gonna get me.'" Doc. 15-33 at 186. Shaw further stated that Lt. Brust had said, "Well, I can try to protect you, but I'm not gonna be around all the time." Id. Shaw said he turned the job down because Lt. Brust could not promise to fully protect him. Id. Shaw also told Decker that during the February 13 meeting Shaw said nothing to Lt. Brust of "the brothers" aspect of the text messages. Id.

Sgt. Decker obtained the text messages from Officer Evans and shared the information with Deputy Chief Ronald Gray. Decker Dep. 173-77. Decker was instructed by either Deputy Chief Gray or Commander Jennifer Knight to expand his IAB investigation into Sgt. Moore to include the text messages and the ATF issue, but not the matter concerning Officer Elias because Elias had not filed a complaint. Id. 177, 253-54; Doc. 15-38 at p. 2. Decker's investigation into the ATF issue confirmed that ATF had initiated an investigation into Sgt. Moore. ATF closed the investigation as "unfounded." Doc. 15-33 at p. 169. Commander Knight instructed Decker to not investigate the matter any further since ATF had handled the issue to resolution. Id.; Decker Dep. 260.

**I.      Sgt. Decker Investigates the Text Messages**

Sgt. Decker interviewed Officer Evans about the text messages. Doc. 15-33 at p. 189. Evans told Decker that Sgt. Moore had sent him the text messages after the two of them talked about how Officers Lancaster, Shaw and Moore were interested in the open Narcotics positions. Id. at 190. Evans confirmed that Sgt. Moore was referring to Lancaster in the texts (as well as Shaw) even though the texts did not mention Lancaster by name. Id. at 190-91. Evans also related that Sgt. Moore believed Officer Moore was the one who had complained about him picking Ehrenborg. Id. at 190.

Decker interviewed Sgt. Moore on April 14, 2015. Doc. 15-32; Doc. 15-33 at p. 200. They first discussed the text messages as they related to Lancaster and his IAB interview.[3] Then Decker

---

[3] It is clear from Sgt. Decker's records of the interview that when Sgt. Moore said that "he [Lancaster] better not take my job," Sgt. Moore was using the term "my job" to refer to the open position in Narcotics that would come under his supervision. He was not referring to Lancaster or Shaw taking Sgt. Moore's job as a supervisor away from him. Doc. 15-32 at pp. 18-19; Doc. 15-33 at p. 190.

8

asked him, "You wrote that it was clear that he [Lancaster] better not take my job, and then you wrote, 'The same goes for Karl and Richard Moore.' Why'd you say the same goes for Karl?" Doc. 15-32 at 21.

Sgt. Moore responded, "Well, because they – he's accusing me of being a racist, and accusing me of all this nonsense. Why – I don't understand why he'd want to work for me. . . . [A]t the time, I probably had a few beers in me and I was a little angry and upset, and probably said some things I shouldn't have – I mean, clearly." Id.

### J. The Internal Affairs Investigation is Concluded

Sgt. Decker issued a 208-page report on September 28, 2015 regarding the claims of misconduct against Sgt. Moore and Officer Sorrell. Doc. 15-33. The report was divided into 21 separate claims, many of which related to misuse of CPD property and overtime abuse.

Decker briefly stated his findings regarding the text messages in a section of the report addressing the claim that Sgt. Moore "did not fairly and equitably fill a Narcotics Bureau assignment vacancy" when he selected Ehrenborg (a claim which Decker sustained). Id. at p. 205-06. Concerning the statement in the text messages that Lancaster and Shaw "better not take my job," Decker concluded that Sgt. Moore "may or may not have been motivated by the fact that they are black." Id. at p. 206. "It is clear, however, that Sergeant Moore's intention was to keep each of them from taking his job(s)." Id.

With respect to his failure to fairly and equitably fill the Narcotics position, Sgt. Moore was given "documented constructive counseling." Doc. 15-34 at p. 18. The CPD terminated Sgt. Moore on the basis of other forms of misconduct described in the report, but Sgt. Moore was reinstated following an arbitration proceeding. Quinlan Dep. 141; Decker Dep. 27-28.

### K. Procedural Background and the Claims Asserted in the Complaint

Plaintiff timely filed a charge of retaliation and racial discrimination against the CPD with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission. On January 30, 2018, plaintiff received a right to sue letter and filed this action in state court on April 17, 2018. Defendants removed the action to this court on May 16, 2018.

The complaint asserts that plaintiff was subjected to retaliation by the CPD in violation of Title VII and Ohio law. Plaintiff describes his retaliation claim, based on Sgt. Moore's "better not take my job" text message, as the "undisputed core claim" of the lawsuit. Doc. 27 at p. 2.

The complaint also asserts that plaintiff was subjected to racial discrimination by the CPD in violation of Title VII and Ohio law. The discrimination claim, which receives no attention in the

9

summary judgment briefs, is pleaded in the complaint as follows. After the positions in Narcotics were filled, Shaw applied for a freeway patrol position because he "was running out of time to find a position." Compl. ¶ 34. He was denied the position, purportedly because he was about to go on medical leave due to an injury. The complaint alleges that white officers in similar situations "had previously had positions held for them pending such leave" but Shaw "received no such accommodation. Id. The complaint further alleges that Shaw filed a union grievance about the freeway position and ultimately the "union accepted a compromise through which he was re-assigned temporarily." Id. ¶ 35.

The complaint further asserts that former Chief Jacobs is liable under Ohio law for aiding or abetting unlawful discrimination. See O.R.C. § 4112.02(J). The complaint alleges that she failed to hold Sgt. Moore accountable for his racially-hostile conduct. The CPD's attempt to terminate Sgt. Moore was based on his non-race-based conduct, and the CPD allegedly issued only a minor reprimand with respect to his racially-hostile conduct. The complaint alleges that Chief Jacob's failure to charge or punish Sgt. Moore for the entirety of his misconduct stands "in stark contrast to her treatment of black officers," whom she disciplined "more harshly" and investigated "without cause." Id. ¶ 40. The complaint cites as an example a black officer (not Officer Shaw) who was terminated for misreporting the hours he worked. Id. ¶ 42. According to the complaint, Chief Jacob's administration had a pattern of avoiding "findings of discrimination by white officers" while "refusing to protect minority officers from discrimination." Id. ¶ 43.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might

10

affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

### III. Discussion

#### A. The Scope of the Cross-Motions for Summary Judgment

Plaintiff moves for summary judgment as to liability on his retaliation claim against the CPD. The motion does not make any reference to the claims asserted in the compliant for racial discrimination or individual liability on the part of Chief Jacobs.

Defendants' motion for summary judgment addresses the retaliation claim and the claim against Chief Jacobs. It does not mention the racial discrimination claim.

The discrimination claim, which relates to the CPD's alleged refusal to hold open a freeway patrol assignment for Shaw pending medical leave, has therefore not been put at issue in the cross-motions for summary judgment.

Defendants' motion for summary judgment further addresses a perceived claim for hostile work environment. In response, plaintiff states that he is not pursuing a hostile work environment claim and that the allegations in the complaint about Sgt. Moore's racially-hostile conduct were meant to provide context for why Shaw was interviewed during the IAB investigation and why Shaw took Sgt. Moore's text messages seriously.

11

### B. Retaliation

#### 1. Elements

Under Title VII, an employer may not retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). The elements of a retaliation claim are: (1) plaintiff engaged in a protected activity by opposing a practice of unlawful employment discrimination; (2) thereafter, defendant took an action "materially adverse" to the plaintiff; and (3) there was a but-for causal connection between plaintiff's protected activity and defendant's materially adverse action. Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013); Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014).

Defendants do not dispute that Officer Shaw engaged in protected activity by cooperating in the Internal Affairs investigation of Sgt. Moore. When interviewed by Sgt. Decker, Shaw reported his knowledge and observations regarding the charges that Sgt. Moore had made racially-hostile statements, jokes and threats in the workplace and had deprived black officers of surveillance equipment. See Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271, 276-79 (2009) (holding that an employee engaged in protected activity when she responded to questions during her employer's internal investigation of claims of sexual harassment by a coworker).

#### 2. Direct Evidence of Retaliatory Motive

The court will next examine the final element, which is the requirement of a causal connection to establish a retaliatory motive. A claim for retaliation can be established "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." Imwalle v. Reliance Medical Products, Inc., 515 F.3d 531, 538 (6th Cir. 2008). Direct evidence is that evidence which, if believed, requires no inferences to conclude that the desire to retaliate was the but-for cause of the challenged adverse action. Id at 543-44; Nassar, 570 U.S. at 352. Absent direct evidence of retaliatory motive, plaintiff may establish a circumstantial case, which involves the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

As direct evidence of a retaliatory motive, plaintiff cites the April 14, 2015 IAB interview that Sgt. Decker conducted of Sgt. Moore. This interview occurred after Decker learned about the text messages sent by Sgt. Moore on February 7. Sgt. Moore confirmed what the text messages had indicated on their face – that they concerned Lancaster and Shaw and their participation in the IAB investigation. Doc. 15-32 at pp. 19, 21. Decker asked Sgt. Moore why he said "the same goes for Karl," that he "better not take my job." Id. at 21. Sgt. Moore explained that he said Shaw had "better

12

not take my job" because "he's accusing me of being a racist, and accusing me of all this nonsense." Id.

The court agrees that this is direct evidence of a retaliatory motive. Sgt. Moore acknowledged that he made the statement about Shaw because Shaw had opposed behavior that he perceived as racist. The only documented occasion in which Shaw accused Sgt. Moore of being a racist was in Shaw's IAB interview with Sgt. Decker on December 11, 2014. Sgt. Moore claimed in the text messages that he had obtained the audio recordings of the IAB interviews and heard Shaw accuse him of being a racist. Thus, Sgt. Moore's admission to Decker, if believed, compels the conclusion that Shaw's report of racist conduct was Sgt. Moore's motivation in making the "he better not take my job" statement about Shaw. See Christopher v. Stouder Mem'l Hosp., 936 F.2d 870, 879 (6th Cir. 1991) (holding that plaintiff, a nurse, had presented direct evidence of retaliatory motive where she offered evidence that her supervisors had told a hospital committee that the supervisors took adverse employment actions against her in response to her filing a discrimination suit).

### 3. Materially Adverse Action

The burden of establishing a materially adverse action is "less onerous in the retaliation context than in the anti-discrimination context." Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595-96 (6th Cir. 2007). To establish this element, "'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Laster, 746 F.3d at 731 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

The court finds that a genuine dispute of material fact exists concerning whether defendants took a materially adverse action against Shaw. That is, both sides have produced evidence from which a jury could reasonably find in their favor.

Plaintiff has submitted evidence from which a jury could find that Shaw lost a desirable job opening because he reported racist conduct by Sgt. Moore. The loss of a favorable job reassignment constitutes a materially adverse action that would dissuade a reasonable officer from making a report of discrimination. See Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 345 (6th Cir. 2008) (adverse action includes a materially adverse change in the terms and conditions of plaintiff's employment).

Plaintiff has produced evidence from which a jury could find that a reasonable officer in Shaw's position would have taken the text messages and the "better not take my job" statement seriously. Shaw was aware of Sgt. Moore's reputation for engaging in racist conduct and having a violent temperament, in particular the alleged racists threats about killing Sgt. Williams and Officer

13

Cornett. And there is evidence to establish that Shaw had reason to believe that Sgt. Moore had the capacity to act in covert, and perhaps improper, fashion to accomplish his objectives. Namely, Sgt. Moore had allegedly put, or threatened to put, a GPS tracking device on Cornett's vehicle, and the text messages indicated that Sgt. Moore had somehow obtained the audio recordings of the IAB interviews conducted of Shaw and Lancaster.

A jury could find too that Shaw had a reasonable basis to believe that Sgt. Moore was willing to jeopardize the safety of black officers and would be in a position to put Shaw at risk if he were to accept the job in Narcotics. Shaw was aware of the claim that Sgt. Moore had a practice of denying surveillance equipment to black officers. He knew that the prospective job in Narcotics would include undercover work and that his safety could be seriously compromised by an unsupportive or hostile supervisor.

Plaintiff also has submitted evidence to support his claim that he reasonably perceived that the CPD was unwilling to take action which would safeguard him against Sgt. Moore's threat. Despite the IAB investigation, Sgt. Moore retained his supervisory position throughout the relevant time frame. Sgt. Moore had not been reprimanded despite breaking the chain of command when he made direct contact with Lancaster during the interview period. And, most importantly, Shaw has submitted evidence from which a jury could determine that when he reported Sgt. Moore's threat to Lt. Brust, he was met with a nonchalant response in which Lt. Brust said he could not be around all the time to guarantee Shaw's safety. Lt. Brust did not assure Shaw that he would confront Sgt. Moore, report the matter to his supervisors or take any other action to address Shaw's complaint.

The court thus finds that plaintiff has submitted sufficient evidence from which a jury could find that Sgt. Moore's "better not take my job" statement would dissuade a reasonable officer from making or supporting a charge of discrimination.

The court, however, also finds that a jury could reasonably reach the opposite conclusion. A jury could decide not to credit Shaw's testimony on these matters or find that his beliefs and impressions were unreasonable. Shaw's impressions of Sgt. Moore were largely based on hearsay. Shaw admitted to Decker in the December 11, 2014 IAB interview that he had never directly observed Sgt. Moore engage in racist or threatening behavior. Even the text messages were not sent directly to Shaw. They were sent to another officer, with no indication that Sgt. Moore meant for Shaw to see them or be dissuaded by them.

Though Shaw claims that the CPD allowed Sgt. Moore to be a loose cannon, there is some evidence that they did not. They conducted an extensive IAB investigation of him, told him not to

14

have contact with Shaw and Lancaster during the interview period (because of their participation in the IAB investigation), vacated his decision to fill the first job position with Officer Ehrenborg, and thereafter precluded him from filling the two Narcotics positions. Shaw admitted to being hopeful that the CPD would terminate or demote Sgt. Moore, such that there was some chance Sgt. Moore would not have been Shaw's supervisor had Shaw accepted the job in Narcotics.

Further, a jury could credit Lt. Brust's testimony that he sufficiently assured Shaw that his safety would not be at risk if he accepted the Narcotics position. According to Lt. Brust, it was Shaw who said that Lt. Brust would not be around all of the time to protect Shaw, to which Lt. Brust responded that he would not allow any retaliation to happen. A jury could further determine that Shaw failed to ask Lt. Brust to confront Sgt. Moore, report the matter to his superiors or take any other action.

A jury could also find that Shaw's readiness to apply for the second Narcotics position less than two weeks after turning down the first undermines his claim that the alleged threat was materially adverse. He appeared eager to take the job, telling Lt. Brust in advance that he would accept the job this time if it were offered to him. Of course, plaintiff explains that Shaw was desperate by that point to avoid a looming assignment to an open patrol position, but the court finds that these matters are best left for the jury to resolve.

### 4. Vicarious Liability

Defendants argue that they are not liable for Sgt. Moore's alleged retaliatory conduct because he was not a supervisor for purposes of imposing liability under Title VII. Defendants' argument on this point is not well-developed, pointing out only that Sgt. Moore's role in filling the open Narcotics job was designed to be purely ministerial and involved only determining which candidate had the most seniority. This argument is not well-taken.

Title VII liability is imposed on the "employer." 42 U.S.C. § 2000e-3(a). An employer is liable for the actions of supervisors. See Vance v. Ball State Univ., 570 U.S. 421, 424 (2013). A person is a "supervisor" under Title VII if he or she is "empowered by the employer to take tangible employment actions" with respect to the plaintiff. Id. Here, Sgt. Moore would have been Shaw's immediate supervisor in Narcotics had Shaw accepted the job offer. Though a supervisor's discretion in filling a position was limited and despite Sgt. Moore being later removed from filling the Narcotics positions, there is no dispute that Sgt. Moore would have had full supervisory authority over Shaw had he accepted the position. See Cameron Dep. 58-59 (sergeant has authority to relieve officer of their duty); Gray Dep. 31 (same).

15

Moreover, even if Sgt. Moore could be considered a co-worker in this situation, plaintiff has sufficiently established a claim of vicarious liability. Where the challenged action was committed by a co-worker, an employer is liable if "supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior" and "supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances." Hawkins, 517 F.3d at 347.

Plaintiff has submitted evidence that he reported Sgt. Moore's retaliatory threat to Lt. Brust. See Brust Dep. at 120 ("[H]e expressed concern that he didn't want any retaliation from Eric Moore."). And a jury could find that Lt. Brust's alleged inaction was so inadequate as to manifest indifference or unreasonableness under the circumstances.

In summary, the court finds that the cross-motions for summary judgment should be denied as to plaintiff's retaliation claim.

### C. Individual Liability of Chief Jacobs

The complaint asserts that former Chief Jacobs is liable under Ohio Revised Code § 4112.02(J) for aiding or abetting unlawful discrimination and retaliation. The complaint alleges that Chief Jacobs had black officers investigated more rigorously and disciplined black officers more harshly than she did with Sgt. Moore. The complaint faults Chief Jacobs for making Sgt. Moore's non-racial misconduct the entire basis of the recommended termination of his employment and for not fully pursuing discipline for his racial misconduct. According to the complaint, Chief Jacobs's failure to do more than reprimand Sgt. Moore for his racial misconduct was the reason his termination was overturned by an arbitrator.

Under § 4112.02(J), it is unlawful for any person to "aid, abet, incite, compel, or coerce the doing of any act" which is an unlawful discriminatory employment practice. Defendant argues that discovery proved that Chief Jacobs did not engage in any conduct that would constitute aiding and abetting Sgt. Moore's retaliatory conduct. Further, the complaint's allegations of racially-discriminatory discipline have no causal relationship to the harm asserted by plaintiff.

Plaintiff's response struggles to link the alleged retaliation against Shaw to Chief Jacobs. Plaintiff argues that Chief Jacobs's racial "double standard" with respect to internal affairs investigations enabled Sgt. Moore to stay in his supervisory role pending the investigation against him. Doc. 27 at p. 30. Had she reassigned, suspended or removed Sgt. Moore from his employment, he would not have been in a position to issue the retaliatory threat against Shaw, plaintiff claims.

16

Plaintiff fails to cite any law in support of this theory.  The statutory provision does not define aiding and abetting, but the common meaning of civil aiding and abetting carries both a knowledge component and a substantial assistance or encouragement component.  See, e.g., Whelan v. Vanderwist of Cincinnati, 2011-Ohio-6844, ¶¶ 18, 21-23 (Ohio Ct. App. 2011); O'Brien v. Olmsted Falls, 2008-Ohio-2658, ¶ 41 (Ohio Ct. App. 2008); Pavlovich v. Nat'l City Bank, 435 F.3d 560, 570 (6th Cir. 2006); Restatement (Second) of Torts, § 876.  There is no evidence that Chief Jacobs either knew of or encouraged Sgt. Moore's retaliatory threat at the time he made it or at the time Shaw declined the job in Narcotics because of the threat.  It is unclear when Chief Jacobs became aware of the matter, but it was no earlier than a month later, in mid-March 2015, when Shaw informed Sgt. Decker of the text messages.  By that point, the alleged retaliatory conduct had been committed, and it cannot be said that Chief Jacobs aided or abetted it.

**IV.     Conclusion**

For the reasons stated above, plaintiff's motion for summary judgment (doc. 16) is denied.  Defendants' motion for summary judgment (doc. 18) is granted in part and denied in part.  It is granted as to the claim of individual liability against Chief Jacobs and denied at to the retaliation claim.

s/ James L. Graham<br>
JAMES L. GRAHAM<br>
United States District Judge

DATE: June 12, 2020